# EXHIBIT B

[1] IN THE UNITED STATES DISTRICT COURT  
[2] FOR THE DISTRICT OF DELAWARE  
[3]  
[4] HEIDI VASCEK, individually  
    and as administratrix of THE  
[5] ESTATE OF JOHN VASCEK, JR.,  
    : Civil Action  
[6]    Plaintiffs,          : No. 04-1538 SLR  
[7]    vs.                  :  
[8] UNITED PARCEL SERVICES, INC.  
    a Delaware corporation, and  
[9] MARK BARD,  
[10]   Defendants.  
[11]  
[12]  
[13]    Deposition of CORPORAL JEFFREY W.  
[14] WEAVER, taken pursuant to notice before Gail Inghram  
[15] Verbano, RPR-RMR, CSR No. 8635, in the law offices of  
[16] Richard R. Wier, Jr., P.A., 1220 Market Street, Suite  
[17] 600, Wilmington, Delaware 19801, on Thursday,  
[18] June 23, 2005, beginning at approximately 8:55 a.m.,  
[19] there being present:  
[20]  
[21]  
[22]    CORBETT & ASSOCIATES  
       Registered Professional Reporters  
[23]   1400 French Street  Wilmington, DE 19801  
          (302) 571-0510  
[24]       www.corbettreporting.com  

Page 2

[1] APPEARANCES:  
[2]    MICHAEL T. VAN DER VEEN, ESQ.  
       KATS, JAMISON, VAN DER VEEN & ASSOCIATES  
[3]    23 Bustleton Pike  
       Feasterville, Pennsylvania 190653  
[4]    Attorney for Plaintiffs  
[5]    JAYNE ANDERSON RISK, ESQ.  
       PIPER, RUDNICK, GRAY, CARY, DLA  
[6]    One Liberty Place  
       1650 Market Place, Suite 4900  
[7]    Philadelphia, Pennsylvania 19103  
       Attorney for Defendants  
[8]  
[9]  
[10]  
[11]  
[12]  
[13]  
[14]  
[15]  
[16]  
[17]  
[18]  
[19]  
[20]  
[21]  
[22]  
[23]  
[24]  

6—08:56:57   24—08:57:36

[1] CORPORAL JEFFREY W. WEAVER, having  
[2] first been duly sworn according to law, was examined  
[3] and testified as follows:  
[4]  
[5]            EXAMINATION  
[6]         BY MR. VAN DER VEEN:  
[7]    Q: Corporal, my name is Michael  
[8] van der Veen, and I'm at a Kats, Jamison,  
[9] van der Veen & Associates, and I represent Heidi  
[10] Vascek and the estate of John Vascek.  
[11]    How are you this morning?  
[12]    A: Fine, thank you.  
[13]    Q: Before I start with the deposition, my  
[14] understanding is that you've brought your entire file  
[15] with you regarding your investigation of the accident  
[16] of October 26 between; John Vascek's motorcycle an  
[17] UPS vehicle; is that correct?  
[18]    A: Yes, sir.  
[19]    Q: What I'd like to do now is — if you  
[20] could hand me that file.  
[21]    A: Sure.  
[22]    Q: And you have it in a brown litigation  
[23] folder. And I see a number of documents in here,  
[24] which I won't go through and identify at this time.  

1—08:57:38   24—08:58:37

[1]    I have agreement of counsel, Jayne  
[2] Risk, who's here and present in the room, that we  
[3] will get all these materials copied now, when we  
[4] begin your deposition. Is that okay?  
[5]    A: Absolutely.  
[6]    Q: You also have a 8-1/2-by-11 binder in  
[7] front of you. What is that?  
[8]    A: This is my — what I refer to as my trial  
[9] records. This is my resum , my training,  
[10] certificates of the training — actually, I didn't  
[11] bring the certificates, but I brought all the  
[12] advanced schools, collision reconstruction, and what  
[13] I was to where I am today as far as records. And  
[14] it's just a reference, my resum as to classes,  
[15] schools.  
[16]    Q: Okay. Will you make that available to be  
[17] copied as well?  
[18]    A: Sure.  
[19]    Q: But I'll let you keep that now, because  
[20] probably where I start with the deposition is what  
[21] your qualifications are, your educational background  
[22] and that kind of stuff. So we'll leave that in front  
[23] of you for point of reference if you need it, and  
[24] then we'll copy it at a later date.

**Page 5**

1—08:58:38  24—09:00:34

[1] A: Okay.
[2]     MR. VAN DER VEEN: All right with
[3] you.?
[4]     MS. RISK: That's fine.
[5]     (Discussion off the record.)
[6]     MR. VAN DER VEEN: I'm going to
[7] mark this as 1.
[8]     (Document marked Plaintiffs'
[9] Exhibit 1 for identification.)
[10]                BY MR. VAN DER VEEN:
[11]    Q: Corporal, I'm going to assume that you
[12] have sat through depositions before?
[13]    A: Yes, sir.
[14]    Q: Approximately how many do you think
[15] you've sat through?
[16]    THE WITNESS: How do you write
[17] "laughing"?
[18]    A: Well, I don't even know. Maybe 50, 60.
[19] I'm guessing.
[20]    Q: I'm going to give you a series of
[21] instructions, then, which you've probably heard
[22] before, but for the sake of this record, I'm going to
[23] repeat them anyway.
[24]       This is a deposition pursuant to a

**Page 6**

1—09:00:38  24—09:01:31

[1] subpoena, which I've marked as Plaintiff's Exhibit
[2] No. 1.
[3]    Do you recognize that subpoena?
[4]    A: Yes, sir.
[5]    Q: Is this a subpoena that you received and
[6] the subpoena that you are here pursuant to?
[7]    A: Yes, sir.
[8]    Q: The court reporter, who's sitting in the
[9] room, can only take down what one of us says at a
[10] time. So if I'm asking you a question, let me
[11] complete the question before you begin an answer.
[12] I'm going to extend the same courtesy: I'll let you
[13] finish an answer before I ask another question. Is
[14] that fair?
[15]    A: I understand.
[16]    Q: The court reporter can also only take
[17] down verbal responses, such as "yes" or "no" or some
[18] other verbal response. Laughs are tough to
[19] transcribe. Also "uh-huh," "huh-uh," nods of the
[20] head and whatnot are difficult for her to transcribe
[21] accurately. So I ask that your responses be verbal.
[22]    A: Yes, sir.
[23]    Q: If you don't know the answer to one of my
[24] questions, tell me, "I don't know." I'm only here to

**Page 7**

1—09:01:34  24—09:02:23

[1] find you what you do know.
[2]    If you don't remember the answer to
[3] the question, tell me, "I don't remember." I'm only
[4] here to find out what you do remember. If your
[5] answer is "I don't remember," I'm probably going to
[6] ask you a bunch of questions trying to provide or
[7] provoke your memory.
[8]    If at any time you need to take a
[9] break, if you need to go to the rest room, need some
[10] more coffee, you have to answer a call in an
[11] emergency situation, just let me know; we'll take a
[12] break. Okay?
[13]    A: Yes, sir.
[14]    Q: We are in federal court. So that at the
[15] time during any breaks, you cannot consult with
[16] either myself or with Ms. Risk regarding the subject
[17] of your deposition. Is that understood?
[18]    A: Yes, sir.
[19]    Q: It's as though you're on the witness
[20] stand.
[21]    A: Yes, sir.
[22]    Q: For the purposes of this deposition, one
[23] of the most important instructions that I'm going to
[24] give you is that I'm going to ask you at times to

**Page 8**

1—09:02:27  24—09:03:28

[1] give me dates, distances, possibly speeds. I
[2] understand that when you do that, you'll be
[3] estimating or approximating. But I need you to be
[4] clear with me when you're being exact as to a
[5] distance or a speed, and/or a date, and when you're
[6] estimating or approximating.
[7]    Is that fair?
[8]    A: Yes, sir.
[9]    Q: Clearly, I don't want to have, and I
[10] would not ask you to, at any time, give a wild guess.
[11]    The difference between a guess and
[12] an approximation, I'm sure you understand. But so
[13] that the record is clear, if I were to ask you what
[14] is my Social Security number, I'm sure that any
[15] nine-digit number, if you gave me one, would be a
[16] guess.
[17]    A: Yes, sir.
[18]    Q: However, if I stood up in front of you
[19] and said, Can you tell me what my height is, you'd be
[20] able to approximate 5'11" — used to be 5'11-1/2";
[21] now I'm 5'11". Okay?
[22]    A: Yes, sir.
[23]    Q: So it's important that I know when you're
[24] approximating or estimating. Is that clear?

**Page 9**

 [1]  A: Yes, sir.
 [2]  Q: If you don't understand one of my
 [3]  questions, tell me you don't understand it. I'll
 [4]  repeat it, I'll rephrase it in a manner so that you
 [5]  do understand it.
 [6]     But somebody reading this
 [7]  transcript is going to assume that you understood my
 [8]  question, that the question was apparently clear to
 [9]  you. So that if there's any confusion in your mind,
[10]  any hesitancy in your mind, any question as to what
[11]  I'm asking, you'll promise to let me know.
[12]  A: Yes, sir.
[13]  Q: Okay. I'm going to start with this
[14]  deposition, just some basic background information.
[15]     How old are you?
[16]  A: 48.
[17]  Q: And what's your date of birth?
[18]  A: October 20th, 1956.
[19]  Q: Where do you currently live? And I'm not
[20]  asking for your home address; I'm asking for the —
[21]  A: Wilmington.
[22]  Q: Wilmington, Delaware. And how long have
[23]  you lived in Wilmington, Delaware?
[24]  A: About nine years.

**Page 10**

 [1]  Q: Where did you go to high school?
 [2]  A: Manheim Township High School. That's in
 [3]  Lancaster County, Pennsylvania.
 [4]  Q: Up near the auction?
 [5]  A: Yes, sir.
 [6]  Q: And what high school class were you in?
 [7]  A: I'm sorry?
 [8]  Q: What high school class were you in?
 [9]  A: 1975.
[10]  Q: When you got out of high school, what did
[11]  you do?
[12]  A: Immediate — well, in the spring of that
[13]  year, I enlisted in the United States Army, delayed
[14]  entry program. I was an active member of the Reserve
[15]  but on inactive service at that time.
[16]     In October of that year, I went on
[17]  active duty for three years. Did eight weeks basic
[18]  training, Ft. Dix, New Jersey. And then went to
[19]  Ft. McClennan, Alabama, in which I had eight weeks of
[20]  training as a military policeman.
[21]     I then — the beginning of 1976, I
[22]  was stationed or sent to then the Federal Republic of
[23]  Germany, in which I served in a tour of duty in two
[24]  duty locations. The first year, year and a half I

 [1]  was at a — don't ask me how to spell this —
 [2]  Siegelsbach, Germany, which was a security — high
 [3]  security job.
 [4]     Because of our background in
 [5]  military police, they had already done certain agency
 [6]  checks for our clearances. And the military, trying
 [7]  to accommodate and save money, military police wei
 [8]  already trained and investigated to that level. So
 [9]  to get to the next level of security clearance, they
[10]  had a lot less to do with us than starting from
[11]  scratch.
[12]     At the completion of that, then I
[13]  went to Augsburg, Germany, which is in southern
[14]  Bavaria, southern Germany. Siegelsbach was kind of a
[15]  central location.
[16]     That was a duty assignment in
[17]  question I actually performed military police
[18]  functions, patrol functions, investigation of
[19]  collisions and reports of thefts, assaults. Anything
[20]  police-related.
[21]  Q: Let me back up for just a moment.
[22]     In '75, did the country have a
[23]  draft at that time?
[24]  A: No, sir.

 [1]  Q: So you were a voluntary enlist?
 [2]  A: Yes, yes.
 [3]  Q: Vietnam was just tailing down, wasn't it?
 [4]  A: Yes, sir.
 [5]  Q: And you did not serve in Vietnam?
 [6]  A: No.
 [7]  Q: I think we would officially say we pulled
 [8]  out in '76?
 [9]  A: Officially, yes, sir.
[10]  Q: Your Ft. Dix program, how long was that?
[11]  A: Eight weeks. And that's — that's
[12]  referred to as BCT, basic combat training. That is
[13]  the initial training that every member of the
[14]  military receives upon entry to prepare you to be a
[15]  soldier.
[16]  Q: I understand.
[17]  A: Then the following school is you get an
[18]  additional — what they call an MOS, or a military
[19]  occupational skill.
[20]  Q: Depends upon what your specialty is?
[21]  A: Yes.
[22]  Q: Or job classification.
[23]  A: I entered into a military policeman.
[24]  Q: Now, it's clear with your eight weeks at

1—09:07:55  24—09:09:07                                Page 13

[1] Dix, you did not have any training in accident
[2] reconstruction; correct?
[3]   A: No, sir.
[4]   Q: Safe to assume that when you had your
[5] eight weeks after Dix, and you did not in any way
[6] have any accident reconstruction training?
[7]   A: Not accident reconstruction. I had
[8] collision or accident investigations, because that's
[9] standard typical dispatch to a crash scene. So I had
[10] my initial — actually, that's where I got my initial
[11] beginning of collision investigations. At the basic
[12] level, but no advanced, yes, sir.
[13]   Q: And that is an investigation, not a
[14] reconstruction?
[15]   A: Correct.
[16]   Q: How many years did you stay in Germany?
[17]   A: I was in the country for three years, 36
[18] months, of which basically four to five months were
[19] training before I got there. I believe it was 19 —
[20] February of '76 I think is when I went in country.
[21]   So about — I was there about 31
[22] months, 32 months.
[23]   Q: So you got out approximately the tail end
[24] of '78?

1—09:09:09  24—09:10:24                                Page 14

[1]   A: I came off active duty October of '78,
[2] yes, sir.
[3]   Q: And?
[4]   A: And immediately — I stayed in the Army
[5] Reserve program.
[6]   Q: And until today?
[7]   A: Actually, I retired October 1st of 2004,
[8] last year, after 29-1/2 years.
[9]   Q: And you weren't subject to the backdoor
[10] draft — yet?
[11]   A: Not yet. I've been through the Persian
[12] Gulf wars and all the multiple conflicts we've had,
[13] and I'm still — even though retired, I'm still
[14] subjected to being called back if necessary.
[15]   Q: Did you go off to the Gulf?
[16]   A: No, I was on standby. I was currently
[17] serving in a combat support hospital at the time.
[18] They were taking the technical skills, trained
[19] individuals, like the LPNs, OR expertise, and I was a
[20] basic — what happened was when I came off active
[21] duty in '78, I crossed-trained and got a second skill
[22] level in the medical side of the house to be a basic
[23] medic, combat medic.
[24]   At that level, they hadn't

1—09:10:26  24—09:11:31                                Page

[1] gotten — I mean, first Gulf War they obviously
[2] prepared in all directions, not knowing exactly how
[3] long or what we were going to get into.
[4]   So I was on a standby list, but I
[5] had not been called up to active duty as of yet.
[6]   I was in the process of — and they
[7] would not have technical — I guess the hospital that
[8] I was assigned to was not full strength, so they
[9] would not have activated us, and they did not — were
[10] not going to activate us as a hospital. They were
[11] taking individuals, and about 50 percent of my unit
[12] had been activated individually, what they call
[13] individual mobilization, and assigned to other units
[14] to beef up.
[15]   But to answer the question, I was
[16] not called; I was just on standby.
[17]   Q: What's the highest government security
[18] level you ever achieved?
[19]   A: Secret. We have confidential, secret and
[20] top secret.
[21]   Q: That's also GS12? 14?
[22]   A: Oh, as far as — I'm not what the — the
[23] highest level. As far as my background, my highest
[24] level I achieved was a secret clearance.

1—09:11:34  24—09:12:41                                Page 16

[1]   Q: Okay. Did you learn any other skill
[2] levels or train for any other skill levels in the
[3] military other than military police and a medic —
[4] combat medic?
[5]   A: Not specific training areas. But
[6] obviously going up the ranks, multiple, many. I
[7] retired as a sergeant major, so multiple leadership
[8] levels and managerial. But not solely as far as any
[9] other specifics, no.
[10]   Q: Regarding your military career, have we
[11] basically covered the span of your military career?
[12]   A: Yeah.
[13]   Q: And have we basically covered the duties
[14] of your military career?
[15]   A: Without getting into, I mean, the finites
[16] of management; and I've been in combat support
[17] hospitals; I've been in general hospitals; I've been
[18] in a lot of administrative positions being a first
[19] sergeant. But excluding going into the details of
[20] that, yes.
[21]   Q: Is there anything in your Army career or
[22] your military career that would bear on your role as
[23] an accident reconstructionist that we have not talked
[24] about?

### Page 17

1—09:12:42  24—09:13:38

[1] A: Not other than my basic entry and my
[2] experience of the years that I was a military
[3] policeman on the street. No advanced schools.
[4] Q: Now, the time that you were a military
[5] policeman on the street sounds to be about 31 months?
[6] A: Actually, not. That's my time in
[7] country, in Germany.
[8] Q: Okay.
[9] A: The first year, not quite a year and a
[10] half, I was working basically physical security.
[11] Q: Okay.
[12] A: Then the remaining time that I was in
[13] Germany, a little over a year was military police,
[14] patrol.
[15] Q: So 12 to 18 months as military police
[16] patrol?
[17] A: Yes.
[18] Q: During that 12- to 18-month period, how
[19] many accidents would you say you investigated —
[20] motor vehicle accidents would you say you
[21] investigated?
[22] A: We're going to go back to the guess that
[23] you talked about before, because I have no idea.
[24] Q: Fair enough.

### Page 18

1—09:13:39  24—09:14:45

[1] Would it be fewer than 100? That
[2] would be one every three days, if we're talking about
[3] a one-year period.
[4] A: I'd say probably a little more than that.
[5] Our responsibilities were not just
[6] military members involved in collisions. But it also
[7] extended into their dependents driving throughout —
[8] wherever, and working relationship with the Germany
[9] police that occurred — our jurisdictional authority
[10] only was really on the military installations. But
[11] we were often called outside to assist with the
[12] German police in cooperation and agreement with them
[13] and the United States government.
[14] Q: Can you recall or can you approximate how
[15] many motorcycle versus truck accidents you
[16] investigated while serving as a military police
[17] patrolman?
[18] A: No memory. It would not have been many.
[19] I don't remember exactly how many I had been involved
[20] in.
[21] Q: Is it fair to say, as you sit here today,
[22] you don't remember any at all?
[23] A: Correct.
[24] Q: Okay. And is it correct that you didn't

1—09:14:47  24—09:15:49

[1] reconstruct any accidents while you were in the
[2] military?
[3] A: Yes, sir.
[4] Q: Educational background. After high
[5] school, did you go to any secondary-level education?
[6] A: Yes, sir.
[7] Q: Can you tell me what that is and when it
[8] was.
[9] A: While I was on active duty in Germany, I
[10] began to take college courses.
[11] Q: Through military school?
[12] A: Actually, civilians that were hired and
[13] that provided college courses while we were on activ
[14] duty.
[15] Q: My question probably wasn't clear.
[16] The military provides educational
[17] opportunities to their personnel that are overseas in
[18] military-based facilities?
[19] A: Uh-huh.
[20] Q: There's also, in Germany, a number of
[21] universities, some of which are very famous and are
[22] not in any way associated with the United States
[23] government or the United States military.
[24] Where did you — when you're

1—09:15:50  24—09:17:16

[1] talking about your college courses during the
[2] military, was it at a German facility, or was it at a
[3] United States governmental/military facility that
[4] they provided?
[5] A: It was at a government facility with a
[6] separate entity. Like for instance, one of which was
[7] University of Maryland, was one course I had taken.
[8] Central Texas College was a second. There was a
[9] third one that I can't recall right now. And I
[10] believe — I had taken seven classes while I was on
[11] active duty, the equivalent to 21 credit hours.
[12] Upon completion of my military
[13] active duty career, I had enrolled and was accepted
[14] at York College of Pennsylvania.
[15] Q: You were born and raised in PA?
[16] A: Yes, sir. Lancaster is my hometown.
[17] Q: Okay.
[18] A: I attended York College for — as a
[19] transfer and acceptance of any credits, they gave me
[20] credit for military — I went for three semesters,
[21] and I received an associate's in police science from
[22] York College in the spring of 1980.
[23] I then transferred to Temple
[24] University and went there two additional years, and

### Page 21

1—09:17:23  24—09:18:40

[1] achieved a bachelor's degree in criminal justice —
[2] Bachelor of Arts degree in criminal justice in 1982,
[3] I think. I'm pretty sure.
[4] Yes, June of 1982.
[5] Q: Your coursework while at York College,
[6] did that include any accident reconstruction classes?
[7] A: No. Bachelor's in criminal justice at
[8] Temple.
[9] Q: A very good program. Did you have any
[10] training in accident reconstruction during that
[11] degree?
[12] A: No, sir.
[13] Q: After — while you were at York College,
[14] did you also work?
[15] A: No. I was a full-time student at that
[16] point.
[17] Q: While you were at Temple University, did
[18] you also work?
[19] A: If I could regress, excluding being in
[20] the active Army Reserve, I had one weekend a month,
[21] two weeks out of the summer. But that was only my
[22] employment during that time frame, as well as Temple.
[23] Q: I understand. And the same for York?
[24] A: Yes, I kind of forgot. Thought it was

### Page 22

1—09:18:45  24—09:19:42

[1] like a part-time job, which it was.
[2] Q: It used to be.
[3] A: Yes.
[4] Q: After earning the bachelor's degree in
[5] criminal justice at Temple, did you earn any other
[6] degrees?
[7] A: No, sir.
[8] Q: I want to talk about your employment
[9] history after the military —
[10] A: Yes, sir.
[11] Q: — aside from your Army Reserve job.
[12] Fair enough?
[13] A: Yes.
[14] Q: Can you give it to me chronologically.
[15] In other words, "I got out of the military in October
[16] of '78. The next job I had was" —
[17] A: Yes, sir.
[18] I got out of the military in
[19] October of '78, active duty, and immediately enrolled
[20] in the Army Reserve program, which we've already
[21] discussed; and had remained a member of that until
[22] October 1st of last year, 2004.
[23] The next job that I had was — that
[24] would have been June of 1982, in searching, seeking

### Page 23

1—09:19:48  24—09:20:56

[1] for employment. Secret Service, FBI, everything and
[2] anything criminal justice-related.
[3] I initially was hired as security.
[4] There was — my ex-wife, now but at the time wife, we
[5] were stationed — she was stationed in Philadelphia
[6] in the United States Army, and we lived at what was
[7] then the Philadelphia Naval Base.
[8] Q: Sure, in those houses down to the left?
[9] Apartments down to the left?
[10] A: Yes, and that's where we resided.
[11] Obviously, military installation has its own
[12] community.
[13] Q: Of course.
[14] A: And I was hired as security. Applied for
[15] what they referred to as the Enlisted Club. It was
[16] combination enlisted/officers club on the base. Was
[17] hired initially as security, worked two or three
[18] nights and then was promoted to manager.
[19] And worked night shift throughout
[20] the summer. And then in the fall — beginning fall
[21] was promoted to assistant manager and worked day
[22] work. And I worked that for about a year.
[23] At that time —
[24] Q: So that was the summer of '83?

### Page 24

1—09:20:59  24—09:22:11

[1] A: Yes — actually, the spring of '83, my
[2] ex-wife received orders for Germany. And in April
[3] of '83, I temporarily withdrew from the Reserve —
[4] active Reserve program, believing that as we, my wife
[5] and our five-month-old daughter, went to Germany, I
[6] was going to — I was basically transferred. I was
[7] going to look for a unit in Europe to continue
[8] serving my commitment.
[9] Things didn't work out. After four
[10] months over there, my wife — ex-wife now —
[11] requested a hardship discharge. She didn't want to
[12] be away from our daughter, and she was assigned to a
[13] combat unit that was going to be out in the field far
[14] more than she was going to be back at the garrison.
[15] And we came back to the United
[16] States in August of that same year, '83, which I
[17] immediately went back to the unit I had four
[18] months — had previously withdrew from the program,
[19] the active service.
[20] Q: The active Reserve program?
[21] A: I went back into the Reserve program.
[22] And I was still a member of the Reserve, but I went
[23] from inactive back into the active program in August.
[24] And started attending drills again regularly and

Page 25

[1] receiving benefits and pay, of which during that
[2] four-month period you're still a member, but there's
[3] no benefits or pay.
[4]   Q: I understand.
[5]   A: Then basically we lived with my parents
[6] for a period of time, in which we were obviously
[7] trying to get our life back together. And I was
[8] applying anywhere and everywhere.
[9]   Q: In the Lancaster area?
[10]   A: Yes, and outside area, as well as trying
[11] to find occupation to take care of my wife and my
[12] daughter.
[13]   Q: Of course.
[14]   A: I was hired by Jamesway, no longer in
[15] existence, the department store.
[16]   Q: Sure.
[17]   A: And I was hired as a — their security
[18] department. I worked that full time until the
[19] process — actually, I was — that would have been
[20] January of —
[21]   Q: '84?
[22]   A: — '84. I was hired by East Hempfield
[23] Township Police Department, which is a municipal
[24] police department in Lancaster County. Small-member

Page 26

[1] department, at the time 15 members. And that was my
[2] first police — actual civilian police job.
[3]   Q: Now, was that in January of '84 that you
[4] started with the East Hempfield Police Department?
[5]   A: Yes, sir.
[6]   Q: You were at Jamesway, then, from about
[7] August of '83 to January of '84?
[8]   A: Yes.
[9]   Q: Four months?
[10]   A: Couple months.
[11]   Q: How long were you with the East Hempfield
[12] police department?
[13]   A: Almost three years, until September of
[14] 1986.
[15]   Q: And then where did you go?
[16]   A: Then I was hired by the Delaware State
[17] Police. I had begun the application process, but I
[18] was officially hired in September of 1986 and began
[19] the academy in Delaware.
[20]   Q: Before I talk to you about the Delaware
[21] State Police, what was your position with the East
[22] Hempfield Police Department?
[23]   A: I was patrolman.
[24]   Q: And as patrolman, your job duties were?

[1]   A: Dispatched to anything and everything:
[2] Criminal, traffic, civil. Just basic police duties,
[3] service, preserve peace.
[4]   Q: While you were at East Hempfield Police
[5] Department, did you receiving any training?
[6]   A: Yes, sir.
[7]   Q: What training did you receive?
[8]   A: Well, initially, in — at that time —
[9] I'm not sure what it is now, but they had what was
[10] referred to as Act 120, and that was a minimum of 12(
[11] days of training.
[12]   And I began —
[13]   Q: That was on-the-job training?
[14]   A: No, this was actually in the academy
[15] training.
[16]   Q: Where was the academy?
[17]   A: The academy was held in Harrisburg,
[18] Pennsylvania, and it was held at Harrisburg Area
[19] Community College.
[20]   Q: During that 120 days of training, did you
[21] receive any training in accident reconstruction —
[22]   A: Yes.
[23]   Q: — as opposed to accident investigation?
[24]   A: I'm sorry. No, sir, this is accident

[1] investigations, not reconstruction, no.
[2]   Q: In your training in Harrisburg, in this
[3] Act 120 training, the training that you got in
[4] collision investigation, did it differ from or was
[5] there new information that you learned, as opposed tc
[6] to the training that you received from the military
[7] in accident investigation? Or was it basically
[8] refreshing the same stuff?
[9]   A: It was refreshing, but more detailed.
[10]   The military schooling was somewhat
[11] just that: Basic. Whereas the civilian school,
[12] which is coordinated through Pennsylvania State
[13] Police, have more detail to it. It was a lot longer.
[14] I certainly received much more — many more hours c
[15] training with collision investigations with the
[16] police department, civilian sector as opposed to what
[17] I received in the military.
[18]   Q: How many hours do you think that — while
[19] you were in Harrisburg for the Act 120 training, do
[20] you think that you received in collision
[21] investigation?
[22]   A: Roughly, perhaps a week, about 40 hours.
[23] Not all at one time, but over —
[24]   Q: I understand. I'm familiar with the

**Page 29**

1—09:26:56  24—09:28:37

[1] course.
[2]     During that 40 hours, how much of
[3] that time do you estimate was attributed to
[4] motorcycle versus truck or van collision
[5] investigation, if at all?
[6]     A: Very small portion. Just taking into
[7] consideration the types of vehicles that collide and
[8] the likelihood of that. But not a high percentage.
[9]     Q: Can you recall any accidents that you
[10] investigated while with the East Hempfield Police
[11] Department that were a motorcycle versus van/package
[12] van accident that you investigated?
[13]    A: Not really. I mean not specifically like
[14] a UPS van or a FedEx truck or whatever. I know I've
[15] investigated several motorcycle crashes during that
[16] time frame, but as far as — I don't recall any being
[17] with a van.
[18]    Q: Can you estimate how many motorcycle
[19] crashes you investigated during this three-year
[20] period that were with another vehicle versus single
[21] motorcycle accident?
[22]    A: Again, this is an approximation; I don't
[23] have any records specifically. But maybe 6 to 12,
[24] maybe a dozen or a little less. Because it's not a

**Page 30**

1—09:28:40  24—09:29:42

[1] common crash.
[2]    Q: And none of which you recall specifically
[3] as you sit here today?
[4]    A: No, sir.
[5]    Q: You were hired by the Delaware State
[6] Police, I believe you said, September of '86?
[7]    A: Yes, sir.
[8]    Q: What was your — and you've — let me ask
[9] you — and you've been there to date?
[10]   A: Yes, sir.
[11]   Q: You've held no other employment during
[12] September of 1986 to date, other than the Army
[13] Reserve military?
[14]   A: Yes, sir.
[15]   Q: Other than as a Delaware State trooper?
[16]   A: Yes, sir.
[17]   Q: Correct?
[18]   A: Yes, sir.
[19]   Q: That's correct?
[20]   A: Yes, sir; correct.
[21]   Q: Can you go through with me what your
[22] positions have been with the Delaware State Police.
[23] For example, you've risen to the level of Corporal 3.
[24] I know that would be probably the highest level you

**Page 31**

1—09:29:44  24—09:30:54

[1] can achieve as a corporal?
[2]    A: Yes, sir.
[3]    Q: You didn't go in as a corporal?
[4]    A: No, sir.
[5]    Q: So can you tell me where you started and
[6] how it is you came to Corporal 3.
[7]    A: Yes, sir. Obviously upon being hired,
[8] the status that we are is recruit trooper. So we are
[9] in training. And that probationary period for the
[10] training process of it is — at that time was six
[11] months.
[12]       At the time, the in-house academy
[13] program was about 15 weeks. Then there was a —
[14] still is —
[15]   Q: Did you say 15 or 16 weeks?
[16]   A: 15. Then there's a 12-week program,
[17] which they call the FTO, or field training program —
[18] or actually field training officer program, FTO. And
[19] that basically is after you complete the academic
[20] portion of the academy, you are assigned to three
[21] separate senior troopers.
[22]       MR. VAN DER VEEN: Excuse me for
[23] one moment.
[24]       (Discussion off the record.)

**Page 32**

1—09:31:10  24—09:32:16

[1]       BY MR. VAN DER VEEN:
[2]    Q: We were talking about the 12-week FTO
[3] program.
[4]    A: The field training program, officer
[5] program, is you are evaluated by three separate
[6] troopers. Basically you're evaluated daily. And
[7] primarily the design or the focus of that program is
[8] to assist — as recruit trooper, you are riding with
[9] a seasoned trooper during the entire process. And
[10] it's basically designed to assist you in taking the
[11] academics that you learned in the academy and
[12] applying it to the street and on the road and —
[13]   Q: In the field?
[14]   A: In the field, exactly.
[15]       You're evaluated daily — most
[16] acceptable, least acceptable — as a continuation of
[17] your training process and your training program.
[18]       And the sole purpose for the
[19] additional, three separate troopers is because, if
[20] there's a conflict, you're not getting graded solely
[21] by one particular trooper.
[22]   Q: Continuity, consistency?
[23]   A: Exactly.
[24]       At the end of the program, the last

1—09:32:17  24—09:33:23                                   Page 33

[1] week or two weeks — I don't remember; it's
[2] definitely at least a week; it might have been two
[3] weeks — the trooper that you were with rides in
[4] civilian clothes, and basically you're supposed to
[5] act as if they're not there; they're an observer.
[6]     By that point in the training
[7] process — in preparation for being cut loose, for
[8] being on the street in the field yourself. By that
[9] point, you need to be able to do and know what you're
[10] supposed to. Of course, you still have questions,
[11] but be able to perform as a Delaware State trooper.
[12]     They're primarily there during that
[13] process as to observe; to additionally, even though,
[14] yeah, you should be hitting the street — you're
[15] still green; you're new — to minimize or eliminate
[16] the potential for danger, being injured or hurt,
[17] whatever.
[18]     And then at that point, when that's
[19] concluded, provided you successfully do everything
[20] that you need to do and it's not extended if you've
[21] had some problems, whatever, you graduate the
[22] academy, the complete program, and you're assigned to
[23] a uniformed troop — you're assigned somewhere,
[24] wherever they want you to go.

1—09:33:24  24—09:34:51                                   Page 34

[1]    Q: During that 12-week FTO training, are you
[2] authorized to make arrests at that point in time?
[3]    A: Yes, sir.
[4]    Q: And so that the development of probable
[5] cause is something that you would do during that
[6] two-week period, independent of whatever the trooper
[7] in civilian clothes would develop as probable cause?
[8]    A: Yes, sir.
[9]    Q: Back up just a moment.
[10]    The recruit training and the six
[11] months' probationary period that you initially talked
[12] about, is it during that period, that six-month
[13] period that you have the 15 weeks of the in-house
[14] training and then the 12 weeks of the FTO training?
[15]    A: Yes, sir.
[16]    Q: The 15 weeks in-house training, were you
[17] trained —
[18]    A: Everything to be a cop, be a trooper.
[19]    Q: For the purposes of this deposition, were
[20] you specifically trained in any accident
[21] reconstruction?
[22]    A: Yes, sir. Actually, wasn't necessarily
[23] taught reconstruction.
[24]    The class is provided with a mixed

1—09:34:54  24—09:36:15                                   F

[1] group of people. We oftentimes will have municipal
[2] officers training with the state police. They're
[3] training at that time. And as part of that 12 weeks
[4] is we come back and given some advanced collision
[5] investigations — not specifically reconstruction,
[6] but beyond the basic course.
[7]    And looking back at it now, that
[8] would be things like — some additional things of
[9] recognizing skid marks, and interpretation of some of
[10] the debris and things that you look for. But —
[11]    Q: Directional change of vehicles, for
[12] example?
[13]    A: Things like — whereas the basic course
[14] is just that: It was the basic course.
[15]    Because, understandably, we handle
[16] all state roads, high volume of collisions.
[17]    Q: Let me ask you, the — would you say that
[18] the first portion that you described, where some
[19] municipal officers may be present during this
[20] training for a collision investigation, was it the
[21] same as what you had basically at East Hempfield?
[22]    A: Yes, sir.
[23]    Q: And what you received after the
[24] municipal, when you came back and there was just th

1—09:36:18  24—09:37:15                                   P

[1] state troopers candidates, that was more than what
[2] you would have received at East Hempfield as well?
[3]    A: Yes, sir.
[4]    Q: Okay. Now, in the 12-week field training
[5] officer program, that's really more on-the-road
[6] training?
[7]    A: Yes, sir.
[8]    Q: It's not — is there a classroom
[9] component to that 12-week FTO training?
[10]    A: Not in classroom, but —
[11]    Q: Excuse me. FTO program.
[12]    A: Not in classroom, but in the car and/or
[13] in the troops also.
[14]    Q: Of course.
[15]    A: It's an extension of a continuation —
[16] there's a curriculum that you follow in which you go
[17] over, again, the Title 21, which is the Delaware
[18] motor vehicle code, and Title 11, which is the
[19] criminal code.
[20]    And it's reinforcement of training.
[21] Actually, every day there's — like on Monday of that
[22] week, you cover left turns, whatever. There are
[23] certain criteria that they followed, because it's
[24] just a reinforcement of what you learned in the

**1—09:37:18   24—09:38:20**   Page 37

[1] academy, to make sure — familiarization and
[2] utilization of the two codes.
[3]    Q: Situational application?
[4]    A: That, plus the actual Delaware code. I
[5] mean, making sure that you had an understanding of a
[6] stop sign violation, a red violation, a yield
[7] violation. So it's a continual — it's an academic
[8] part.
[9]    Q: Reading the code in the car, for example,
[10] and then looking for it?
[11]    A: Well, reading it and then giving it back
[12] to the FTO and saying, Well, this is what it means to
[13] me; that is what the title says: No person shall —
[14] and whatever. And it goes on.
[15]    You read it verbatim, and they say,
[16] What does this mean to you? And you have to give
[17] examples and show that you understand, so when you're
[18] cut free on the road, if you see a violation, in your
[19] mind, at least, to have the probable cause to stop
[20] the vehicle. And that's — that was — that's part
[21] of the program.
[22]    Q: Or the reasonable suspicion?
[23]    A: Yes.
[24]    Q: When would you say that you graduated the

**1—09:38:23   24—09:39:48**   Page 38

[1] academy?
[2]    I'll note for the record that
[3] you're reviewing what looks to be probably a very
[4] detailed resum or a curriculum vitae.
[5]    A: Yes, sir.
[6]    February 26, 1987, was when we
[7] graduated, at which time I was assigned to a
[8] uniformed troop.
[9]    At that point, graduation, you're
[10] basically cut free to go out and be utilized as a
[11] trooper.
[12]    Q: And as a trooper, you were first a
[13] patrolman?
[14]    A: Yes, sir.
[15]    Q: And how long were you a patrolman?
[16]    A: From February of 1987 until July of 1990.
[17]    Q: And what unit were you with?
[18]    A: At that time, during that time frame, I
[19] was assign uniform trooper, Troop 6, which is located
[20] on Kirkwood Highway.
[21]    Q: Kirkwood Highway in what town?
[22]    A: Wilmington. It's just west of Elsmere.
[23]    Q: During that three-year-and-five-month
[24] period of being a patrolman with Troop 6, were you

**1—09:39:55   24—09:41:14**   Page

[1] given any training for accident reconstruction?
[2]    A: Yes, sir.
[3]    Q: What training did you receive for
[4] accident reconstruction during that time?
[5]    A: In July of 1988, I took a course that was
[6] entitled Technical Accident Investigation Course,
[7] which was a 16-hour course. And that was conducted
[8] at the Delaware State Police training academy.
[9]    Q: The title says Accident Investigation.
[10] It also had accident reconstruction components to it?
[11]    A: It did. It didn't have the word
[12] "reconstruction," but it gave a basic introduction to
[13] some of the formulas.
[14]    Q: Do you recall which formulas you were
[15] given in the instruction?
[16]    A: Just the basic.
[17]    Q: It was a two-day course?
[18]    A: Yeah. It was just to give you some
[19] introduction to a little bit beyond what your
[20] training was.
[21]    And that course, now actually — I
[22] mean, we teach — it's now developed into a full
[23] one-week course. Over the years, it went from two
[24] days to three days to four days, and now it's a full

**1—09:41:16   24—09:44:33**   Page 40

[1] five-day course.
[2]    Q: And now you're one of the teachers?
[3]    A: Yes, sir.
[4]    Q: When is it that you wanted to get into
[5] accident reconstruction?
[6]    (Brief recess.)
[7]    (Record read.)
[8]    THE WITNESS: I've always been
[9] interested in investigations regarding collisions,
[10] investigation of accidents.
[11]    I guess when I came on board the
[12] Delaware State Police and realized that they had a
[13] special unit that specifically does that, certainly
[14] more advanced. So I guess primarily after I came on
[15] the division.
[16]    I'm sure not through the academy.
[17] It was a high point at that point. But it has always
[18] been an interest in my enjoyment of investigating
[19] collisions. So basically when I came on the Delaware
[20] State Police was probably when I first got interested
[21] in reconstruction.
[22]    BY MR. VAN DER VEEN:
[23]    Q: Fair enough.
[24]    During the three-year period with

**Page 41**

1—09:44:35  24—09:45:29

[1] Troop 6, three-year-five-month period with Troop 6,
[2] you described the July '88 two-day course that you
[3] took.
[4]     Can you tell me how many other
[5] courses you took during that period that had to do
[6] with accident reconstruction.
[7]     A: November of 1988 —
[8]     Q: Maybe it will be easier if you just list
[9] for me the numbers as they appear on your resum, and
[10] then we'll take a look at them.
[11]     A: From this point on?
[12]     Q: Sure.
[13]     A: No. 14 was the Technical Accident
[14] Investigation Course that I just previously spoke
[15] about.
[16]     Q: July of '88?
[17]     A: July '88.
[18]     No. 15, in November of '88, I took
[19] a two-week course, 80 hours. This also was conducted
[20] at the Delaware State Police training academy, but it
[21] was put on by the Traffic Institute of Northwestern
[22] University.
[23]     Q: But it wasn't out on the lake; it was
[24] here?

**Page 42**

1—12:03:18  24—09:46:34

[1]     A: Yes, it was here at the academy. And
[2] that course —
[3]     Q: It wasn't in Evanston?
[4]     A: No. That course was entitled Technical
[5] Motor Vehicle Traffic Accident Investigation Course.
[6]     Q: Anything else in that
[7] three-year-five-month period?
[8]     A: No, that was it.
[9]     Q: Have you ever had the chance to go to the
[10] IPTM?
[11]     A: Yes, sir.
[12]     Q: When did you do that?
[13]     A: No. 17.
[14]     Q: That was next. Okay.
[15]     A: In July of 1990. That was when I was
[16] assigned to the fatal team. September — that would
[17] be No. 18, September of 1990. Media, Pennsylvania,
[18] police department hosted the basic course at their
[19] police department, police station.
[20]     Q: Delaware County.
[21]     A: And University of North Florida Institute
[22] of Police Technology and Management, the basic
[23] reconstruction — traffic accident reconstruction
[24] course was offered, and this was a two-week course

1—09:46:36  24—09:47:35

[1] that I took there.
[2]     Q: Have you taken it again since 1990?
[3]     A: Not the basic course, no.
[4]     Q: You've taken other IPTM courses since
[5] '90?
[6]     A: Yes, sir.
[7]     Q: I think you said it was '90 when you
[8] became with the FAIR team?
[9]     A: Yes, sir. July.
[10]     Q: July '90. And is it fair to say that
[11] you've been with the FAIR team ever since?
[12]     A: Yes, sir.
[13]     Q: You've been assigned to no other units or
[14] troops since the July '90?
[15]     A: Troops. We've been — we initially were
[16] housed — the fatal team was initially at Troop 6, in
[17] the basement of Troop 6, and then we moved — and I
[18] don't remember exactly. I think it was '98 or '99 we
[19] moved to our current location, which is the
[20] Brandywine Town Center.
[21]     Q: Where I had the pleasure of meeting you
[22] once.
[23]     A: Yes, sir. And at that time, the way the
[24] division policies and procedures are, we fall under

1—09:47:38  24—09:48:43

[1] the administration of the troop to which we are
[2] assigned.
[3]     FAIR team at that time was at
[4] Troop 6, so we fell under the Troop 6 commanders and
[5] lieutenants and everybody at Troop 6.
[6]     The building where we are now is
[7] the Delaware State Police Troop 1, and we fall under
[8] the administration of Troop 1, which is Penny Hill
[9] Avenue of Philadelphia Pike, with their commanders
[10] and lieutenants and —
[11]     So I've been in the FAIR team for
[12] all but 15 years — 15 years next month and starting
[13] my 16th year in August of this year. But physical
[14] location under different administration of different
[15] troops. Troops 6 and Troop 1 is the only two troops
[16] that I've been assigned to.
[17]     Q: Can you describe for me where you started
[18] with the FAIR team and your rise through the ranks.
[19]     A: Basically our fatal team — we have a
[20] fatal team in each county. Up north there are four
[21] members. Down state, Sussex has four, and Kent
[22] County has three.
[23]     Primarily, the way our schedule is,
[24] we work in pairs at all times, unless circumstances

### Page 45
1—09:48:49  24—09:50:08

[1] dictate other — sometimes one of us are doing what
[2] we need to do or sometimes the entire team is called.
[3]     In July of 1990, when I went into
[4] the unit, primarily I'm put on schedule, on call.
[5] We're on call 24 hours a day. Normally we're on call
[6] a minimum of two weeks a month, sometimes more
[7] depending on vacations schedules and work conflicts
[8] and whatever — family schedules.
[9]     At that point, you're under the
[10] wing of someone that's been doing it. And at that
[11] point, I fell under the senior members of the units,
[12] which all three of them were senior to me, because
[13] they had been in the unit.
[14]     Q: Who were they?
[15]     A: At that time, Sergeant Donald Pine —
[16] excuse me. He was — yes, Sergeant Donald Pine was
[17] the sergeant at the time. Master Corporal John Volk,
[18] and Master Corporal Kirk Phillips. Those three
[19] members were in the unit at that time. And all three
[20] are retired.
[21]     Q: How much time did you spend with Volk?
[22] How many years?
[23]     A: I'm guessing maybe a year, year and a
[24] half. He was promoted and transferred to another

### Page 46
1—09:50:12  24—09:51:28

[1] unit.
[2]     Q: Your rank when you entered the FAIR team
[3] was?
[4]     A: I believe I was a trooper first class,
[5] which is the highest of trooper ranks. It's recruit
[6] trooper, trooper, and then trooper first class.
[7]     Q: What level did you achieve after trooper
[8] first class?
[9]     A: Crew corporal — then Corporal Grade 1,
[10] Corporal Grade 2, which is referred to as senior
[11] Corporal, and Corporal Grade 3, which I currently am,
[12] which is the highest of the corporal — the four
[13] ranks of corporal, and that's referred to as master
[14] corporal.
[15]     Q: When did you become a master corporal?
[16] Can you go through the ranks, what they were in each
[17] year.
[18]     A: Not — I don't —
[19]     Q: Can you approximate when you went from
[20] trooper first class to a corporal?
[21]     A: Wow. I can't really, because the
[22] guidelines have changed over the years as to how long
[23] you had to be a trooper first class before you would
[24] be eligible to be a Trooper Grade 1, Grade 2,

### Page 47
1—09:51:31  24—09:53:01

[1] Grade 3.
[2]     I've been a master corporal, I
[3] guess I can answer this — I think.
[4]     Man, I don't even know. I've been
[5] a master corporal for a long time. I don't know. At
[6] least six years. Maybe seven years. I don't know.
[7]     Q: Okay. During your time with the FAIR
[8] team, your job responsibilities have been?
[9]     A: Basically we're on call 24 hours a day.
[10] The guidelines for the fatal team to be called out,
[11] we get called out for — of course if it's a
[12] confirmed death.
[13]     We are called out if it looks like
[14] it possibly could result in a death, very serious
[15] crash. We are called out for departmental
[16] collisions, in which —
[17]     I guess to summarize it, we'll come
[18] for any departmental that they request us to come.
[19] But primarily if it's a property damage crash, no one
[20] is injured and it looks like the trooper had not
[21] contributed to the crash, the road supervisor can
[22] handle that. But because of the conflicts of
[23] interest or the issues that could be raised —
[24]     Q: Liability issues?

### Page 48
1—09:53:02  24—09:54:04

[1]     A: — as a result of that, if the trooper
[2] possibly contributed to the crash and/or the trooper
[3] is hurt, regardless of whether they contributed to it
[4] or not, we come out.
[5]     Q: Who calls you?
[6]     A: Basically, of course, road units get sent
[7] to a collision. They get there.
[8]     The initial call for the road units
[9] is to — if they establish and see what they have,
[10] their next — they're supposed to either call the
[11] assistant road supervisor or primarily the road
[12] supervisor.
[13]     Then they make the call. He or she
[14] determines whether or not they feel that they want to
[15] call us out.
[16]     Sometimes they call us — they'll
[17] look and see who's on call. We'll call the scene and
[18] they'll talk to us and given us some basics of what's
[19] going on. And they determine at that point whether
[20] they want us to come out or not. We'll come out for
[21] everything and anything.
[22]     Q: As a member of the FAIR team, has it been
[23] exclusively your job duty to investigate and
[24] reconstruct motor vehicle accidents?

1—09:54:06   24—09:54:57                                Page 49

[1] A: Yes.
[2] Q: Of course, consult with the AG's office
[3] as to whether to charge it, and then, of course,
[4] testify in court if necessary; correct?
[5] A: Yes, sir.
[6] Q: Regarding your training for accident
[7] reconstruction and accident investigation, is that
[8] summarized in any documents in front of you?
[9] A: Yes, sir.
[10] Q: And is it summarized in chronological
[11] order?
[12] A: Yes, sir.
[13] Q: Is what is in front of you a complete and
[14] an exhaustive list?
[15] A: Yes, sir. To the best of my knowledge,
[16] yes.
[17] Q: And you've had time — it looks to be
[18] typewritten and put in a very fancy binder. Looks
[19] like you've had time to make sure that everything
[20] that you've done is in there?
[21] A: Yes.
[22] Q: Could I have those materials that are in
[23] front of you that deal with your training in accident
[24] investigation and accident reconstruction —

1—09:54:59   24—09:56:12                                Page 50

[1] A: Yes, sir.
[2] Q: — training and education.
[3] A: Yes, sir.
[4] MR. VAN DER VEEN: And I'll have
[5] those copied now and marked as Weaver 2.
[6] THE WITNESS: There are two
[7] resum s. One is civilian, which goes up to '69,
[8] which is the last course I attended.
[9] So far, in May of this year,
[10] there's an overall — and this is only up to May, the
[11] end of May — I've had a list of times that I've
[12] testified in the collision reconstruction field, as
[13] well as number of fatals I've investigated, assisted.
[14] There's also a military resum and
[15] a description of the actual — this was the
[16] definition of what the skill requirements, knowledge
[17] and what we did or do in the fatal team back when I
[18] went on board.
[19] Q: Great.
[20] A: As well as — there's some basic
[21] information regarding Northwestern University, the
[22] Traffic Institute, as well as IPTM. And there's
[23] outlines of the courses that I've taken that
[24] correspond with everything that's in the beginning

1—09:56:15   24—09:57:27                                F

[1] resum part of it. And it gives you like a breakdown
[2] of what was covered in the class — not in minute
[3] detail, but what topics were covered.
[4] MR. VAN DER VEEN: I'm going to
[5] have this removed from the room, if it's all right
[6] with you, so that Janine can copy it.
[7] THE WITNESS: No, problem.
[8]         BY MR. VAN DER VEEN:
[9] Q: Regarding the list of cases that you've
[10] testified in, is that a list of cases for a specific
[11] time period?
[12] A: That is number of fatals. I investigated
[13] one fatal when I was in East Hempfield Township
[14] department with no advanced collision reconstruction
[15] training in that prior to that.
[16] The other is a list from basically
[17] July of 1990 — not my training. But the list that I
[18] was referring to is from the time that I went on the
[19] fatal team, a list of active cases I've either
[20] assisted in or called out for, been primary, chief
[21] investigator or assisting investigator; and there's a
[22] breakdown of a couple departmentals, assists.
[23] One of the things that I started to
[24] talk about, we get called out, and if — sometimes

1—09:57:30   24—09:58:49                                Pe

[1] it's just for an assist at that point.
[2] Oftentimes what we'll do is we'll
[3] do things that we would normally do — photograph tl
[4] scene, give some assistance and measurements; or
[5] sometimes we'll do the diagram, because we use the
[6] auto CAD and provide computer-generated
[7] investigations, drawings, diagrams.
[8] What we oftentimes do — and
[9] obviously from the time that we're initially called
[10] out until the time we get to hospital, a lot of
[11] things oftentimes change. If the status is upgraded
[12] and it doesn't look like it's going to be a fatal,
[13] oftentimes we'll refer it to turn it back to the road
[14] unit. They do the preliminary and then we file — do
[15] a supplemental report if we do the drawing.
[16] Oftentimes we'll do a drawing for them and do a
[17] supplemental report to also include in a file in our
[18] office. The photographs or whatever we did, it's in
[19] file.
[20] So all those numbers, there's
[21] assists on there. There are the number of —
[22] actually, there's also the number of deaths total.
[23] Obviously, you might investigate 10 crashes but you
[24] could have 20 people die. And again, it's just to

Corporal Jeffrey Weaver
June 23, 2005

Vasco v.
UPS

---

**Page 53**  1—09:58:53   24—10:01:13

[1] try to be as accurate as possible of what my career
[2] has exposed me to.
[3]   Q: For my purposes, that's appreciated.
[4]   THE WITNESS: Off the record.
[5]   (Discussion off the record.)
[6]         BY MR. VAN DER VEEN:
[7]   Q: Going back on the record, I think you'd
[8] indicated that you actually have saved a copy of the
[9] report for every investigation that you've ever been
[10] lead investigator on?
[11]   A: Yes, sir.
[12]   Q: Okay. Out of the list, which is going to
[13] be — which you've identified in the booklet that's
[14] being copied now, which I'm going to mark as Weaver
[15] Exhibit 2, Group Exhibit 2, how many of those could
[16] you proximate were motorcycle accidents?
[17]   A: In fatal collisions?
[18]   Q: Yeah.
[19]   A: Without looking back and researching each
[20] year, maybe 15 or 20.
[21]   Q: Okay.
[22]   A: And that's an approximation. I'm not
[23] exactly sure. It's not as common as —
[24]   Q: I understand. If I wanted to get a more

**Page 54**  1—10:01:15   24—10:02:41

[1] exact number, how would I do that?
[2]   A: I could go back and look at each page
[3] of — I have binders from 1990, when I went in the
[4] fatal team, until present, and I make a copy of every
[5] investigation.
[6]   At the beginning of that, there's a
[7] face page that says what I did that year, for the
[8] year 1990, 1991, '92, '93. And there is a
[9] chronological page at the beginning of each year that
[10] says, January 1st I was dispatched to and I
[11] investigated this fatal; or February — whatever.
[12]   One of the things that I put in
[13] there is the date, the complaint number, the name of
[14] the victim, the location of the crash, whether it's
[15] prosecution or nonprosecution, and the dynamics of
[16] the collision. And by that I mean, vehicle versus
[17] pedestrian, vehicle versus motorcycle, motorcycle
[18] versus tree, whatever.
[19]   So what I could do, in answer to
[20] your question, would be to go back and look through
[21] my last 15 years of binders and collectively count,
[22] 1, 2, 3, 4, 5, whatever.
[23]   Q: Okay. Corporal Weaver, if I were to,
[24] after this deposition, send you a letter — of

**Page 55**  1—10:02:44   24—10:03:47

[1] course, I'd copy all counsel on it — asking you to
[2] send back — to write back to me the number of motor
[3] vehicle — excuse me — motorcycle fatal accidents
[4] that you've investigated, and then the number of
[5] motorcycle versus truck or package van accidents that
[6] you investigated, would you be able to do that?
[7] Would you be able to answer that for me?
[8]   A: Yes, sir.
[9]   Q: Okay. That saves me the time and you the
[10] hassle of coming back for another deposition to ask,
[11] possibly, that question.
[12]   I could also send you a formal
[13] written interrogatory, which you would answer to
[14] under oath. But I think counsel and I probably
[15] agree, having sat with you here for a couple hours
[16] now, that you're an honest guy and would be accurate
[17] in your response.
[18]   A: Yes, sir. Documentation is not
[19] necessarily. I'll look at them, and tally it up.
[20] And I can either verbally telephone, email, whatever
[21] you want.
[22]   Q: Probably would want some kind of record.
[23]   A: Formal letter.
[24]   Q: Yeah.

**Page 56**  1—10:03:47   24—10:04:47

[1]   A: That's fine.
[2]   MS. RISK: I would agree.
[3]   MR. VAN DER VEEN: Ms. Risk, you
[4] would agree that that's an appropriate way to do it,
[5] rather than a formal interrogatory?
[6]   MS. RISK: That's fine. I would
[7] also agree that he's an honest guy.
[8]   MR. VAN DER VEEN: Okay.
[9]   THE WITNESS: Should I send that
[10] letter to you, sir?
[11]         BY MR. VAN DER VEEN:
[12]   Q: Sure. Actually, you should probably
[13] address it to both of us.
[14]   THE WITNESS: Cc?
[15]   MS. RISK: Would you do that,
[16] please?
[17]   THE WITNESS: Sure, absolutely.
[18] And you want the dynamics of them as well?
[19]         BY MR. VAN DER VEEN:
[20]   Q: Yeah, I would appreciate that.
[21]   And in all fairness to you, if
[22] there's something in there that close to mirrors this
[23] accident, I may ask for your deposition again. Ask
[24] you a series of questions about it.

---

1—10:04:49   24—10:06:19                                    Page 57

[1]  A: No problem.  
[2]  Q: Probably unlikely.  
[3]  A: No problem.  
[4]  Q: I don't know that I would do that.  
[5]  A: It's okay.  
[6]  Q: In the interest of saving time, I'm not  
[7] going to go through and ask you particularly — now  
[8] that you've given us your book with a chronology and  
[9] index of all the accident reconstruction courses  
[10] you've taken, I'm not going to ask you to go through  
[11] those one at a time. Fair enough?  
[12]  A: Yes, sir.  
[13]  Q: What I'm going to ask you, though, is,  
[14] are there authoritative books, publications, articles  
[15] or treatise that you consider to be authoritative in  
[16] the field of accident reconstruction?  
[17]  A: Yes.  
[18]  Q: Can you give me a list of those?  
[19]  A: Not off the top of my head.  
[20]      And primarily what I'm referring to  
[21] would be any and all of the classes in which I have  
[22] taken, there are manuals by the providing institutes  
[23] that support what you're being taught. And some of  
[24] those classes also incorporate published books. But

1—10:06:29   24—10:07:50                                    Page 58

[1] off the top of my head, there's been so many, I can't  
[2] name anything specifically.  
[3]      But, I mean, for instance, there's  
[4] various books that have — I have copies of what I've  
[5] taken. And again, it's documented, not only in —  
[6] I've also kept all the notebooks, and I have in my  
[7] library at my office in chronological order, from  
[8] when I took them to present, what courses I've taken,  
[9] with a copy of the certificate of completion or  
[10] diploma or whatever you want to call it.  
[11]  Q: Sure. With the text?  
[12]  A: Everything and anything related to what  
[13] that class was, whatever publications were given.  
[14] Whatever was given to me, I have at my office,  
[15] whether it be from IPTM and the array of classes I've  
[16] taken through them — I've taken multiple classes  
[17] through them. And primarily through them.  
[18]      The course that I talked about  
[19] earlier from Northwestern University, the text  
[20] material that they gave me and whatever books  
[21] associated with that, I have all of those. But off  
[22] the top of my head, I can't tell you —  
[23]  Q: Well, Northwestern University uses the  
[24] J. Stannard Baker book; correct?

1—10:07:52   24—10:08:51                                    Pa

[1]  A: Yes, sir.  
[2]  Q: Would you consider that to be a  
[3] authoritative in the field of accident  
[4] reconstruction?  
[5]  A: Yes, sir.  
[6]  Q: Are there any books of that volume of  
[7] that nature, which you also consider to be  
[8] authoritative, to equal to the Baker book?  
[9]  A: Not specifically without looking at what  
[10] I have back in my office, no.  
[11]  Q: Corporal, if I looked through your list  
[12] of all of the courses that you've taken and I want to  
[13] look at some of the materials associated with that  
[14] course that you got that you reviewed, would I be  
[15] able to do that?  
[16]  A: Yes, sir.  
[17]  Q: Would I be able to, without the necessity  
[18] of a subpoena, have Nina send you orally or have  
[19] Nina — Nina is Nina Bushman, my right hand at my  
[20] office.  
[21]  A: We've communicated quite frequently in  
[22] preparation for today and other material matters.  
[23]  Q: And you're communications with have her  
[24] have been regarding scheduling?

1—10:08:52   24—10:09:52                                    Pa

[1]  A: Yes, sir.  
[2]  Q: She hasn't asked you any questions about  
[3] accident reconstruction or anything?  
[4]  A: Just getting here, what was needed  
[5] through the course of the investigation; obviously  
[6] why wasn't it complete? Do we anticipate a date when  
[7] it will be done?  
[8]  Q: She was calling you almost weekly saying,  
[9] When is the report going to be done?  
[10]  A: Not daily, but pretty close.  
[11]  Q: That was at my instruction.  
[12]  A: Doesn't matter. When it's done, it's  
[13] done. And then when it was done, I had to get  
[14] through the review process that the division does.  
[15] But not a problem. Yes.  
[16]  Q: Of course I would send copies to counsel  
[17] of those things that I want to review.  
[18]      When you are doing an accident  
[19] reconstruction, do you rely on or do you fall back  
[20] onto or do you reference those materials, those  
[21] authoritative materials, books, treatise, volumes or  
[22] anything of that nature?  
[23]  A: Yes, sir; as well as the expertise of the  
[24] other members of the unit.

|  | Page 61 |
|---|---|
| 1—10:09:54  24—10:10:58 | |

[1] Q: Okay. I will get to that.
[2] A: Okay.
[3] Q: Have you ever been qualified as an expert
[4] witness in a court?
[5] A: Yes, sir.
[6] Q: How many times would you approximate
[7] you've been qualified as an expert witness in a
[8] court?
[9] A: Approximately maybe 8 to 10. Maybe 12.
[10] In my resum there's a list of when and where I was
[11] called while I was in the collision reconstruction
[12] unit.
[13]     Not necessarily always testifying
[14] in a reconstruction. From the field unit that I am
[15] in, I testified; but not necessarily always
[16] testifying in the realm of expert testimonial
[17] witness, to say you're not expert in this field. But
[18] I've been called to civil court, superior court,
[19] federal court, magistrate court. You name it.
[20] Q: Civil and criminal both?
[21] A: Yes, sir.
[22] Q: My question is a little more specific
[23] than that. My question is, how many times has a
[24] court, a judge, either state or federal — and I'll

|  | Page 62 |
|---|---|
| 1—10:11:03  24—10:12:06 | |

[1] try to break it down from there — qualified you as
[2] an expert to testify in the field of accident
[3] reconstruction?
[4] A: I'm guessing approximately maybe six to
[5] eight, to and including — by way of which, I mean,
[6] in the foundation of the trial, when we're doing
[7] exactly what we're doing here, I didn't have to go
[8] into — sometimes into minute detail. By dealing
[9] with other attorneys on a regular basis, they
[10] sometimes just have immediately accepted me,
[11] recognized me as — but as far as — about eight
[12] times, maybe.
[13] Q: Let me make sure I'm being clear.
[14]     There are two ways that you can be
[15] qualified as an expert by the court, traditionally.
[16] One is by the stipulation of the parties that you are
[17] qualified as an expert in the field of accident
[18] reconstruction. Of course, that stipulation has to
[19] be accepted by the court, but I've never, in my 15
[20] years of trying cases, ever seen a stipulation not be
[21] accepted by the court.
[22]     Okay? So the parties could
[23] stipulate to it, and then you go and testify as an
[24] expert.

|  | Page 63 |
|---|---|
| 1—10:12:07  24—10:12:57 | |

[1]     Or your qualifications can be
[2] presented through direct testimony to the court.
[3] Then the judge, upon request, declares you an expert
[4] in your field, accepts you as an expert in your field
[5] of accident reconstruction.
[6]     Do you understand those methods?
[7] A: Yes, sir.
[8] Q: And either way, a judge has to find you
[9] and qualify you on the record as an expert —
[10] A: Yes, sir.
[11] Q: — in the field of accident
[12] reconstruction.
[13] A: Yes, sir.
[14] Q: And you think that's been done six to
[15] eight times?
[16] A: Approximately, yes, sir.
[17] Q: Of those six to eight times, can you tell
[18] me how many times were in a federal court and how
[19] many times were in a Delaware State court?
[20] A: I think once in federal, and the rest
[21] have been like Superior Court.
[22] Q: Can you —
[23] A: Or Court of Common Pleas.
[24] Q: All in the state of Delaware?

|  | Page 64 |
|---|---|
| 1—10:12:59  24—10:14:13 | |

[1] A: State of Delaware, yes, sir.
[2] Q: Can you recall what the federal case was?
[3] A: Not without looking at my resum book.
[4] Q: I will probably, when that comes back in
[5] the room, ask you to do that.
[6]     So your resum book will have
[7] that — last series of questions regarding the
[8] numbers of times qualified as an expert, it will have
[9] that in there?
[10] A: It will have the dates of the cases that
[11] actually went to trial in which I was called to
[12] testify; we went through the procedures as opposed to
[13] a plea, where we actually started the beginning
[14] and — but it doesn't necessarily — like I said,
[15] some of those cases — it's as I've testified in this
[16] field. But not necessarily every one of them as an
[17] expert they called upon me.
[18] Q: Because sometimes, particularly in a
[19] criminal case, an officer will come in and testify as
[20] a fact witness as to his observations, as to his
[21] investigation, as to witness statements, defendant's
[22] confessions, that kind of thing, without being
[23] qualified by a court, by a judge as an expert in
[24] accident reconstruction.

1—10:14:15  24—10:15:20                                     Page 65

[1] Are you able to distinguish, when
[2] you look at your book, at those cases which you
[3] testified as a fact witness and those cases which you
[4] testified as an expert witness?
[5]     A: Approximately, not pinpoint. If I say
[6] six and you hold me to six, I can't do that.
[7]     Q: That's not my intention to do that. I'm
[8] clearly asking you to estimate or approximate.
[9]     A: I understand.
[10]    Q: Of the six to eight times, though, to be
[11] clear, we're talking about six to eight times where
[12] you're qualified as an expert, not where you
[13] testified as a fact witness?
[14]    A: Yes, sir.
[15]    Q: Okay. Out of the six to eight times
[16] where you testified as an accident reconstructionist
[17] in court, do you know how many times the finder of
[18] fact agreed with your opinion or your conclusions?
[19]    A: Not really.
[20]    Q: Okay.
[21]    A: Obviously they didn't agree with
[22] something or we wouldn't have been going to trial.
[23]    MS. RISK: For the record, I think
[24] maybe we ought to define finder of fact for —

1—10:15:24  24—10:16:25                                     Page 66

[1]     MR. VAN DER VEEN: Let me reclarify
[2] that.
[3]              BY MR. VAN DER VEEN:
[4]     Q: Traditionally in our court systems, there
[5] are two types of trials. One is a trial by judge,
[6] what we commonly call a bench trial, and one is a
[7] trial by jury.
[8]     A: Okay.
[9]     Q: In a trial by judge, the finder of fact
[10] is the judge.
[11]    A: Okay.
[12]    Q: In a trial by jury, the finder of fact is
[13] a jury.
[14]    A: Okay.
[15]    Q: Okay? Now, can you find — do you know
[16] or do you have records of how many times the finder
[17] of fact, whether in a trial in front of the judge, in
[18] a criminal trial, or whether you were in a trial by
[19] jury, where the conclusion of the finder of fact
[20] agreed with you?
[21]    For example, so that I'm clear,
[22] your testimony was that Car A was at fault for the
[23] accident, because it took an illegal right-hand turn.
[24] Okay?

1—10:16:25  24—10:17:21                                          P

[1]     A: Okay.
[2]     Q: And where the jury, or judge, whoever is
[3] the finder of fact, agreed with you?
[4]     In other words, if it were a civil
[5] matter, they would say, Yes, the person who took the
[6] right-hand turn was liable for the accident. Or in a
[7] criminal matter, Yes, the person who took this
[8] illegal right-hand turn was guilty of manslaughter or
[9] vehicular homicide, under the Delaware code. Okay?
[10]    A: Okay.
[11]    Q: Do you know how many times the finder of
[12] fact agreed with your conclusions? In other words,
[13] how many times you won the trial, I guess would be
[14] another way to look at it.
[15]    Do you understand what I'm asking?
[16]    A: Yes, I understand. If I could look at my
[17] resum, I could tell you.
[18]    Q: Okay.
[19]    A: I could tell you — by looking, once I
[20] see the name of the defendant and the dates of the
[21] trial, unfortunately, because of what I do, they
[22] stick in your head.
[23]    Q: Of course.
[24]    A: I can tell you whether it was a trial by

1—10:17:23  24—10:18:47                                          Pa

[1] jury, trial by judge, as well as whether the state
[2] won or lost or agreed or disagreed with my opinion or
[3] conclusions.
[4]     Q: So when I come back — when that does
[5] come back in the room, right when it comes back in
[6] the room, we'll come back and revisit that area.
[7] Okay?
[8]     A: Okay.
[9]     Q: Are there any texts that you — let me
[10] ask the question again.
[11]    Were there any texts, journals,
[12] books, treatise, articles, that you consider to be
[13] authoritative in the analysis of skid marks in a
[14] motor vehicle accident, reconstruction?
[15]    A: Specifically vehicle or any?
[16]    Q: Any — vehicle, truck, tire skid marks.
[17] A skid — an authoritative treatise, book, journal,
[18] article on interpretation of skid marks, whether it
[19] be yawl mark, whatever it be?
[20]    A: It would be all the books that I
[21] previously spoke about in correlation with the
[22] training I received.
[23]    Q: Well, not all of the books that you've
[24] reviewed deal with skid marks, necessarily.

### Page 69

1—10:18:52  24—10:19:57

[1] A: Yeah, I understand what you're saying.
[2] Q: And there are some books written,
[3] publications published, that deal primarily with
[4] interpretation and analysis of skid marks in a crash?
[5] A: Yes, sir.
[6] Q: Are there any that, as you sit here
[7] today, you can think of as authoritative for you?
[8] Something that you would consult?
[9] A: The Baker book, you talked about, touches
[10] that.
[11] Q: Of course, yeah.
[12] A: Has a chapter on it.
[13] Q: As a regular publication.
[14] A: There are books, and I can't — off the
[15] top of my head, I can't tell you without looking who
[16] the authors of the publications or the materials that
[17] are copied and provided as far as IPT, Institute of
[18] Police Technology, classes. Certainly there's books
[19] that we got from the Institution of Police
[20] Technology. That book, I can't recall — I can
[21] provide later, but I can't — other than what's
[22] related to the classes.
[23] But there are — whether it's
[24] solely addressing that, because like some of the

### Page 70

1—10:20:01  24—10:21:09

[1] handouts or booklets that are provided by IPTM, you
[2] might cover 15 topics, and each topic has its own —
[3] one is skid marks, one is lamp examination, one is
[4] whatever.
[5] Q: I'm familiar with that.
[6] A: Okay.
[7] Q: If I ask, in my letter to you, to list
[8] for me or identify — of course, with copies to
[9] counsel — those publications, articles, packets that
[10] are authoritative on the analysis, interpretation and
[11] analysis of skid marks, would you be able to provide
[12] me with those?
[13] A: Yes, sir.
[14] Q: And those would be materials that you
[15] consult and you review when interpreting skid marks?
[16] A: Yes, sir.
[17] Q: Okay.
[18] MS. RISK: Can I, just for the
[19] record — I understand that what you meant by a copy
[20] going to counsel, a copy of your letter as well as a
[21] copy of the materials provided by Corporal Weaver.
[22] MR. VAN DER VEEN: Of course. To
[23] Ms. Risk, any communication between my office and the
[24] corporal and the corporal and my office would be

### Page 71

1—10:21:13  24—10:22:30

[1] copied to Ms. Risk.
[2] MS. RISK: Thank you.
[3] MR. VAN DER VEEN: We have a duty
[4] to do that anyway, but just to be clear.
[5] BY MR. VAN DER VEEN:
[6] Q: I want to speak with you generally about
[7] your methodology in undertaking an accident — first,
[8] an accident investigation.
[9] A: Okay.
[10] Q: Where you're going to reconstruct it.
[11] Before I ask that, other than your
[12] investigating departmental crashes, all of your
[13] investigations are fatal; correct?
[14] A: No. Serious — we handle — a small
[15] percentage, we'll handle a serious crash. But for
[16] the most part, the majority of everything I do,
[17] excluding departmentals, are fatals, yes.
[18] Q: My questions to you to date that have
[19] dealt with numbers of investigations that you had for
[20] motorcycles or anything, you were giving me your
[21] whole span, not just fatals?
[22] A: The — what's in my resum is
[23] specifically since I've been assigned to the fatal —
[24] it's broke down.

### Page 72

1—10:22:31  24—10:24:03

[1] Q: Fatal, nonfatal?
[2] A: Fatal, nonfatal, injury, property damage.
[3] Q: That's easily discernible to the novice,
[4] Mike van deer Veen, who may be reading it?
[5] A: Anyone can understand it. No offense
[6] intended, it's just how many serious PI — personal
[7] injury, property damage, suicide by motor vehicle,
[8] whatever.
[9] Q: When you conduct an investigation at a
[10] scene, what is your general methodology?
[11] A: We're called to a scene; obviously I
[12] respond.
[13] Preliminarily, one of the first
[14] things that we normally do is we get up with whoever
[15] is at the scene and they gave us a base foundation of
[16] what they know, at least at that point: Direction
[17] the vehicles were traveling, what all is involved,
[18] how many vehicles, things like that, just general
[19] basic collision investigation information.
[20] When the two members arrive, we all
[21] know exactly what we're supposed to do. I —
[22] Q: I don't. That's why I'm asking you.
[23] A: Oh, okay. Well, basically we know, in
[24] the unit, what we do in an investigation, which I'll

**Page 73**

1—10:24:06  24—10:24:57

[1] touch on. What I'm saying is that primarily, at that
[2] point, there's a gentleman's agreement; we
[3] coordinate, communicate with one other as to who is
[4] going to do what. For instance —
[5]    Q: What you're saying is, Mike, we're so
[6] well-trained and we've worked together so closely for
[7] such a significant period of time that we know one
[8] another and we know what each one is responsible for;
[9] we have an understanding of who's doing what, when
[10] and where.
[11]    Is that what you're saying to me?
[12]    A: Yes, with communications.
[13]    Q: Of course.
[14]    A: For instance, if I get to the scene
[15] first, normally one of the first things I'll do after
[16] I've obtained some basic information is I'll start
[17] photographing, to preserve what's there.
[18]    Q: Let's back up. That's really what I'm
[19] trying to get to.
[20]    A: Okay.
[21]    Q: What your procedure is, what your
[22] methodology is, and what order do you do it —
[23]    A: Okay.
[24]    Q: — generally.

**Page 74**

1—10:24:59  24—10:25:55

[1]    So I think you've told me that the
[2] first thing that you do is you try to get up with
[3] people on the scene?
[4]    A: Troopers.
[5]    Q: Troopers. Okay.
[6]    You don't — when you first arrive,
[7] you don't go to civilians first. Your methodology is
[8] to go to police personnel on the scene first?
[9]    A: Yes, sir.
[10]    Q: If there are no police personnel on the
[11] scene first, then who would you go to?
[12]    A: Won't happen.
[13]    Q: Okay.
[14]    A: We're only called — there's always a
[15] unit there. They preserve and call us, and they
[16] don't go — there always has to be a trooper there.
[17]    Q: Okay. When you arrive, the first thing
[18] that you do, then, always, is you go to the police
[19] personnel on the scene?
[20]    A: Yes, sir.
[21]    Q: What do you do next?
[22]    A: There's not a, etched in stone, No. 1,
[23] talk to the trooper; No. 2 is photograph. But over
[24] my years of experience, of being trained, and what I

1—10:25:57  24—10:27:14

[1] do, one of the first things I normally do, we'll
[2] start photographing.
[3]    And until the other trooper gets
[4] there, my partner — if they haven't already arrived.
[5] If we get there about the same time, we obviously
[6] both approach the — whoever is at the scene and get
[7] a base foundation of a preliminary information of
[8] what is going on.
[9]    At that point, he and I — it's
[10] always he and I, because they're all male members up
[11] north. All right.
[12]    Well, Jeff, you take photographs;
[13] I'm going to start making a field sketch. We come to
[14] an agreement with one another as to what we're going
[15] to do, and then we do that.
[16]    One of the other things that we do
[17] is — when getting that information from the
[18] troopers, they tell us whether or not the witnesses
[19] have been cut loose or if they're still at the scene;
[20] or if the operators are still present or if they've
[21] been released, taken to the hospital.
[22]    Primarily, that's the only reason
[23] an operator would be released from the scene, is if
[24] they're injured.

1—10:27:15  24—10:28:19

[1]    Q: Of course. But witnesses too, generally;
[2] is that true?
[3]    A: No, most times, in recent investigations
[4] over the years, everybody has got fast schedules and
[5] some people — a lot of people are reluctant to get
[6] involved to begin with.
[7]    But a lot of times, they'll give
[8] their names, the troopers — road troopers will take
[9] the names, telephone numbers, a brief statement, and
[10] they'll cut them free — "I got to pick up my son at
[11] daycare" or whatever.
[12]    And then that requires, of course,
[13] follow-up on our behalf to do follow-up interviews.
[14] When the supplements are provided, if they write
[15] supplements, overall, making sure you're crossing
[16] every — dotting every I and crossing every T, that
[17] you don't miss anything. Sometimes they're at the
[18] scene; sometimes they're not.
[19]    Q: If an on-the-scene trooper, not FAIR team
[20] trooper, takes down a witness' name, number and
[21] information and initial statement, is that
[22] information then given to you?
[23]    A: Yes, sir.
[24]    Q: In what form?