Corporal Jeffrey Weaver
June 23, 2005
UPS

---

**1—10:28:20  24—10:29:24**  Page 77

[1]   A: Can be one of two ways. It can be
[2] handwritten notes. Sometimes just the name,
[3] telephone number; sometimes there's a little more
[4] than that — brief little bullets, we referred to
[5] them in the military. Just words to jog your memory,
[6] W/B, westbound before motorcycle, or westbound behind
[7] motorcycle, whatever.
[8]   Q: Yeah.
[9]   A: Sometimes it's a little more than that.
[10] Sometimes it's just a name and number and where we
[11] have to follow up and call them to do an extensive
[12] interview.
[13]   If they are present, what we try to
[14] do, between the two of us, is ascertain who's going
[15] to handle the investigation. Sometimes we do that at
[16] the scene; sometimes we don't.
[17]   Q: When you say "handle the investigation,"
[18] who is going to be the —
[19]   A: The senior investigator.
[20]   Q: — lead investigator?
[21]   A: Yes, sir.
[22]   Q: That is not done by a spindle or
[23] rotation, but it is done by the agreement of you and
[24] your partner when you're both on the scene together?

**1—10:29:27  24—10:30:23**  Page 78

[1]   A: Yes, sir. Sometimes it's done at the
[2] scene and sometimes it's done later.
[3]   Primarily we're looking at working
[4] with what another one — our current caseload is.
[5] How many we have pending, if we're backed up, say —
[6] perhaps I've been called out a couple times during
[7] the week; I'm the next guy in line. Or we work with
[8] one another to try to fairly distribute.
[9]   Q: You hope your partner is not a slacker
[10] then, huh?
[11]   A: No, no, they're all good. Good guys.
[12] Including the sergeant.
[13]   The sergeant — at times we try to
[14] take some of the workload off of him, and he won't
[15] have it. He dives in with the rest of us, knee deep,
[16] and does whatever has to be done.
[17]   Q: Let me back up a little bit.
[18]   The first thing you do, your
[19] methodology, what you try to do when you get on scene
[20] is — the first thing that you do is you try to talk
[21] to — locate the on-scene responding troopers —
[22]   A: Yes, sir.
[23]   Q: — right? Talk to them, get a basis
[24] of — a base knowledge or foundation of what's in

**1—10:30:26  24—10:31:29**  Pag

[1] front of you?
[2]   A: Yes.
[3]   Q: Then you will — is it at that point
[4] you'll decide, if your partner is there, who's going
[5] to take the lead?
[6]   A: Sometimes. Sometimes we do.
[7]   And where I was going with that is,
[8] then, at the scene, we determine that — that would
[9] determine who's going to do the major interviews.
[10] For instance, in this case, I'm the senior
[11] investigator. I can't recall off the top of my
[12] head — I'm sure probably interviewing the operator
[13] of the UPS truck — I agreed at the scene that I was
[14] going to take this investigation.
[15]   Q: Okay.
[16]   A: So I interviewed him at the scene,
[17] because why have Sergeant Cox interview, or someone
[18] interview, that I'm going to have to reinterview?
[19]   Q: Follow up on his interview?
[20]   A: He'll do a supplement. But to get an
[21] overall, full integrity of the investigation, I might
[22] have questions I would ask that he might not or
[23] whatever.
[24]   Q: Okay.

**1—10:31:29  24—10:32:21**  Page 80

[1]   A: He interviewed one of the witnesses at
[2] this collision.
[3]   Q: I'm not there yet.
[4]   A: Okay.
[5]   Q: I do understand. He interviewed Amy
[6] Stratton.
[7]   A: Yes.
[8]   Q: Okay. After getting your base foundation
[9] down, you start taking photographs of the scene?
[10]   A: Yes, sir.
[11]   Q: You try to locate the operators and the
[12] witnesses?
[13]   A: Yes, sir.
[14]   Q: Next?
[15]   A: The two primary, major got-to-get-dones
[16] are preserving the evidence with the photography and
[17] then putting together a field sketch.
[18]   So usually when I'm doing the
[19] photographs, my partner will begin the field sketch.
[20]   Q: Okay.
[21]   A: Or vice versa.
[22]   Q: Okay.
[23]   A: It's just that's one of the two things
[24] that's imperative.

---

1—10:32:22   24—10:33:22   Page 81

[1] **Q:** And then after the photographs and the
[2] field sketch are completed, then you approach
[3] witnesses or operators for interviews?
[4] **A:** Yes, sir.
[5] **Q:** What do you do next?
[6] **A:** Well, to be more detailed —
[7] **Q:** Sure.
[8] **A:** — relationship to the field sketch. Of
[9] course, that's interpreting evidence: What you see,
[10] what you don't see, what you're looking for, final
[11] resting positions of vehicles or whatever else. It's
[12] what you see when you get there.
[13]   And understandably, such as in this
[14] case, you find out that where they were when I got
[15] there were not where they were when the crash
[16] occurred and/or shortly thereafter, as a result of
[17] basic dynamics of where they ended up —
[18] **Q:** Yeah.
[19] **A:** — being moved.
[20]   Once we've done the field sketch —
[21] and sometimes while your partner is still doing the
[22] sketch, we interview someone. We're maximizing —
[23] and understandably, there's a lot of elements that we
[24] have to consider.

1—10:33:23   24—10:34:23   Page 82

[1]   And every scene is identical but
[2] different, if that makes any sense. We've got the
[3] time elements if we're working towards it's starting
[4] to get dark. And that's the reason why we take the
[5] photographs: We want to preserve as much as, and the
[6] integrity, as when it happened, because time is our
[7] worst enemy. Whether it has anything involved with
[8] it or not, different perspectives.
[9]   Just like here, looking for
[10] different things in an investigation, one thing we
[11] have to deal with is they want us to take the time to
[12] do what we need to do, to not violate the integrity
[13] of the investigation.
[14] **Q:** When you say "they" want us to —
[15] **A:** The division.
[16] **Q:** Okay.
[17] **A:** And Department of Motor Vehicle,
[18] transportation, whatever, their goal: They want the
[19] road opened. Simple.
[20]   I'm talking about time elements,
[21] because we have the road, obviously — the road is
[22] completely shut down. And we take whatever time we
[23] take.
[24] **Q:** Both roads were shut down?

1—10:34:25   24—10:35:43   Pa[ge]

[1] **A:** And that's another element to consider.
[2] The darkness was one, because the time of this crash,
[3] when this occurred, the sun was starting to set.
[4] **Q:** Well, it was still an hour plus away from
[5] sunset, and ambient light was about 1 hour 40 minutes
[6] away still.
[7] **A:** Approximately, yes.
[8] **Q:** Okay.
[9] **A:** Collect the interviews of whoever is
[10] there, operator, witnesses.
[11]   Oftentimes one of the things that
[12] we do after — not every scene, but pretty much, we
[13] mark whatever evidence we can find with paint.
[14] Because, again, depending on the elements, we might
[15] not have the opportunity to pick everything up or not
[16] see everything or whatever the situation is. So that
[17] we can go back and at least identify —
[18]   We have two ways of collecting
[19] evidence. We do the grid-coordinate method, which is
[20] basically a 90-degree angle. You lay a base
[21] foundation; and two points for each east/west north
[22] and south, and you pick up each piece of evidence to
[23] do a diagram, which is what we did in this case.
[24] **Q:** That was done in this case.

1—10:35:43   24—10:36:42   Pa[ge]

[1] **A:** Also, if it's a complex situation, we use
[2] a transit, which is modified for police work. Same
[3] thing a surveyor uses but it's modified for us. We
[4] do the roadway, final resting positions of the
[5] vehicles. And we can basically pick up four times
[6] the amount of data a lot quicker and open a roadway
[7] when we do.
[8] **Q:** Not done in this investigation?
[9] **A:** No, we didn't use that in this case.
[10]   But had we done that, when we put
[11] the paint down, that assists us with locking in what
[12] we've already picked up and collected through the
[13] grid-coordinate system to collectively put the two
[14] together. But we did not use that in this case.
[15]   But we did put paint down, is where
[16] I'm going with this —
[17] **Q:** Yeah.
[18] **A:** — to establish and mark resting
[19] positions of the vehicles and things like that.
[20] **Q:** We will go back to that, but I want to
[21] stay where we are for a minute.
[22]   (Interruption in proceedings.)
[23]   **MR. VAN DER VEEN:** Let the record
[24] reflect the copies just came in the room of his

### Page 85

1—10:36:44   24—10:38:03

[1] resum .
[2]   **BY MR. VAN DER VEEN:**
[3]   **Q:** Base foundation, photographs, witness —
[4] photograph and field sketch at the same time?
[5]   **A:** Yes, sir.
[6]   **Q:** Witness statements?
[7]   **A:** Yes.
[8]   **Q:** Marking of evidence?
[9]   **A:** Yes.
[10]  **Q:** Then?
[11]  **A:** At that time — and during that, we are
[12] also maintaining contact with the troopers that are
[13] at the scene.
[14]     For instance, if it's a serious
[15] crash, the status of the individual, if they're
[16] initial, beginning feeling — not in this case, but
[17] in cases in which it's believed that alcohol or
[18] illegal substance is involved, that the individuals
[19] go to the hospital and start their continuity of
[20] their evidence and what they need to do, of course.
[21] That was not done in this case, but this is going on
[22] while we're doing the other thing, just to make sure
[23] that all bases are touched.
[24]     And then at that point, when we are

### Page 86

1—10:38:07   24—10:39:13

[1] done at the scene and when we feel that we have
[2] exhausted what we need to do, collected the — what
[3] we previously talked about, the field sketch and the
[4] witness interviews are done, request tow vehicles at
[5] that time, of which they respond.
[6]     Sometimes, like in that vicinity,
[7] I'm sure — off memory, but a lot times we probably
[8] requested them early so that — because of it taking
[9] them awhile to get there. So that when we're
[10] completely done with what we needed, we knew that
[11] they could get things quickly and open the road up.
[12] Until we give them the green light, they don't touch
[13] anything.
[14]     And then at that point, we open up
[15] the roadway again, after everything has been secured,
[16] cleaned — I mean, the tow company, whatever debris
[17] might be there, whatever, making it a clear and safe
[18] roadway.
[19]  **Q:** Okay. When you get on the scene and you
[20] have contact with the troopers on the scene, the
[21] non-FAIR team members, do you then become instructors
[22] to them?
[23]  **A:** Yes.
[24]  **Q:** Do you tell them what to do?

### Page 87

1—10:39:15   24—10:40:04

[1]  **A:** Yes. Basically, it then — at that
[2] point, it becomes our scene.
[3]  **Q:** You control the scene?
[4]  **A:** Yes, sir.
[5]  **Q:** You tell Patrol Trooper Smith, "Go stand
[6] by that roadway and make sure nobody comes down."
[7] You tell Patrol Trooper Jones, "Go do this, go stand
[8] over there, go hold this witness over there."
[9] Whatever it is that you want them to do, they're at
[10] your disposal for you to tell them what to do;
[11] correct?
[12]  **A:** Basically, yes.
[13]  **Q:** You do not rely on those troopers that
[14] are present to take the photographs?
[15]  **A:** No.
[16]  **Q:** You do not rely on those troopers present
[17] to do the field sketches?
[18]  **A:** No.
[19]  **Q:** You do not rely on those troopers present
[20] to take witness statements?
[21]  **A:** No.
[22]  **Q:** You do not rely on those troopers present
[23] to take measurements?
[24]  **A:** Let me regress. Occasionally if we — we

### Page 88

1—10:40:09   24—10:41:04

[1] can instruct them to take witness — and I have, over
[2] the years, for instance, if there are multiple
[3] witnesses, to take a brief statement, and they
[4] provide us a supplement — we can instruct them to do
[5] that.
[6]  **Q:** If it's an important witness, though
[7] you're going to take the statement yourself, even?
[8]  **A:** Well, they're all important. But as far
[9] as if there's five, six, seven, we instruct them and
[10] have instructed sometimes to do that for us; and then
[11] we, of course, do follow-up interviews at a later
[12] time.
[13]     But the primary people — like in
[14] this case, there's basically one specific witness
[15] that stated we took care of that and we would do
[16] that.
[17]  **Q:** Well, when you say all witnesses are
[18] important, everything in life is a matter of degrees.
[19]  **A:** Yes, sir.
[20]  **Q:** And so that a witness who is an
[21] eyewitness to an impact versus a witness who comes on
[22] the scene 15 minutes later, post impact, there's a
[23] difference of importance there.
[24]  **A:** Yes, sir.

**Page 89**

Q: And you, as an experienced accident reconstructionist, if you have a multiple witness situations, will try to, I assume, interview the eyewitness yourself; and if you need to have a nontrained trooper take a statement of a witness, it would be the witness who got there 15 minutes later? You wouldn't do that vice versa?

A: Again, it goes back to the element of time.

Q: Yeah.

A: If I'm going to interview, if it's my case and there's 15 witnesses — to be respectful to those that are there, their statements are important, but to get the preliminary and get them on their way and then do follow-ups — I mean, it depends on each case.

Q: Fair enough. You do not rely on non-FAIR team member troopers to take measurements?

A: They sometimes assist us, but no, not just them.

Q: And you don't rely on them to mark, with paint, evidence?

A: No, sir. That's generally —

**Page 90**

Q: Yes, sir.

A: — extra set of hands.

Q: Okay. With regard to the taking of photographs, generally, what type of a camera do you use?

A: 35-millimeter. I believe it's a Cannon.

Q: Generally how many rolls of film do you have with you?

A: I normally carry — the guys laugh at me, but they always come to me when they need film. I try to keep a minimum of four of 36, 24 and 12, which is what the division provides.

Q: Yep.

A: It's a division camera.

Q: When you — division film, division camera?

A: Yes.

Q: Division property?

A: Yes, sir.

Q: When you take photographs, do you — how many rolls do you generally take at an accident investigation scene?

A: Depends on the scene, how large and the dynamics, what all is involved.

Q: When you generally create a field sketch at the scene, where is that generally created?

A: At the scene.

Q: On the car? On a hood? On a curb?

A: All. Started initially usually in the car on a clipboard. All depends on the weather. We do use waterproof paper, but it's nice to have at least the majority of it done before you get out and get wet.

But initially it will usually start in the car. And then goes out — I personally use the hood or the trunk of my car as a desk to get what's there. And then we walk and work together collectively to —

Q: And as you walk, you may continue to sketch?

A: Yes.

Q: That was my next question. What types of materials do you use in making your field sketch?

A: Clipboard. We have a precopied grid coordinate form that we use, in which the top basically has the date, the location and the complaint number. There's an area of space to the right of the form; and then to the left of the form, there's a grid box for — and it has north, west, east, south — north, south, east, west.

There's a column — most of that which you use for your reference point, and we basically use alphabetic A, B, C, D, E as we label out evidence.

And then there's a small box to the right of those four directions, of which we can put a note — a very short note. For instance, gouge mark start, gouge mark end, tire mark, tire scuff, whatever. FRP, final resting.

Q: POI, point of impact?

A: Exactly.

Q: My question, I think, more is, what material is the field sketch made out of? I believe you mentioned waterproof —

A: We have some waterproof paper that we use. It's just that form, a piece of paper.

Q: Its size?

A: Legal size, standard.

Q: Legal size actually is —

A: Well —

Q: That's 8-1/2-by-11 in front of you. The size of your subpoena that has been marked as

1—10:46:00  24—10:47:04                                         Page 93

[1] Exhibit 1 is 8-1/2-by-11.
[2]    A: It's 8-1/2-by-11.
[3]    Q: It's actually not legal-sized. But
[4] that's the size of your paper for which the field
[5] sketch is?
[6]    A: Yes, sir.
[7]    Q: Okay. What type of material do you use
[8] to write the field sketch?
[9]    A: Pencil, so we can erase.
[10]   Q: When you interview witnesses, what is
[11] your general procedure for doing so? And I'm asking
[12] if you're the man interviewing the witnesses. I'm
[13] not asking what the procedure is for anybody else on
[14] the scene.
[15]       What is, then, generally your
[16] methodology for interviewing a witness?
[17]   A: I normally have the individual sit in the
[18] police car, depending where we are. Primarily that's
[19] what I like.
[20]       I get out a regular notepad, and I
[21] go through the basic information of writing down
[22] their license number and all the things that are
[23] elements that you need for the crash — phone
[24] numbers, things like that.

1—10:47:06  24—10:48:05                                         Page 94

[1]       I then record the time that I begin
[2] the actual interview, to start talking to the person
[3] and asking them questions. Basically I ask them,
[4] Tell me what happened, where you were coming from,
[5] where you were going, what you can tell me.
[6]       And while they're talking, I
[7] basically scribble. From that, I then go back to
[8] clarify, or if they're going too fast, have them
[9] stop, slow down, and ask them specific questions.
[10]      And there's a form that I try to go
[11] through, with every investigation, to include what
[12] the traffic conditions were like at the time, what
[13] the lighting conditions were like. Standard
[14] questions you have to ask.
[15]   Q: When you speak of a form, is this a
[16] written form or a form that is in your head?
[17]   A: It's in my head, just from experience
[18] over the years of knowing what's going on the
[19] collision reports, the boxes that you have to fill
[20] in.
[21]   Q: I gotcha. Yeah.
[22]   A: And at that point, when the interview is
[23] concluded, I normally at the bottom will put a end
[24] time. I put the time of start so that I know the

1—10:48:09  24—10:49:02                                         Page 95

[1] approximate time I interview the person, and the
[2] approximate time that I ended, which is incorporated
[3] in the report.
[4]    Q: Now, generally, in your methodology for
[5] interviewing witnesses, if there are multiple
[6] witnesses, do you separate them?
[7]    A: Yes.
[8]    Q: The purpose of that is?
[9]    A: Make sure there's — like a sequestering.
[10]   Q: To make sure Witness A doesn't listen to
[11] what Witness B says and that becomes Witness B's
[12] version?
[13]   A: Correct. All I want is what that
[14] individual can tell me.
[15]   Q: Okay. When you interview a witness, do
[16] you generally do that alone?
[17]   A: Sometimes. Sometimes we have other
[18] members — for instance, if it's a young child — I
[19] mean — young, 19, 20, whatever, sometimes they're
[20] parents respond to the scene. I've permitted them to
[21] be with us.
[22]       Sometimes I've permitted members of
[23] a company — their representatives are there;
[24] certainly they have an interest, and there's — they

1—10:49:05  24—10:50:19                                         Page 96

[1] can't participate in the questions. They can't —
[2] and I tell them before they get in the car, You're an
[3] observe. You can listen to what's being said. It's
[4] my interview. I ask the questions. I don't want any
[5] prompting, don't answer this or — I mean, and that's
[6] my discretion as an investigator.
[7]       And I try at all times to be as
[8] professional as possible to offer that opportunity to
[9] others, whether it be family members just being
[10] supportive of them in the interview or this tragedy
[11] or whatever that they've just experienced; or if it's
[12] a member of the company — like in this case when I
[13] interviewed the operator, there was a representative
[14] of UPS there. And that's a courtesy that I would
[15] extend to anyone.
[16]   Q: That's normal operating procedure for
[17] you?
[18]   A: Yes, sir.
[19]   Q: Is there any book that you recall having
[20] reviewed regarding the interviewing of witnesses that
[21] talks about the separation and then isolation of
[22] witnesses during an interview?
[23]       For example, have you ever read in
[24] a book that if you're talking to a 19-year-old at a

1—10:50:22   24—10:51:28                                    Page 97

[1] fatal accident about how the accident happened and
[2] his mother is there with him, he may not be likely to
[3] tell you about the drinking that he had done the
[4] night before, or the marijuana he had smoked the half
[5] an hour before, because he doesn't want his mom to
[6] know what he does?
[7]   A: Yes, sir.
[8]   Q: Have you ever — do you know what book
[9] that you read that?
[10]  A: I mean, not — I took a course in
[11] interviewing and interrogating, which is a general
[12] course that can be applied to whether it's collision
[13] or criminal, civil whatever.
[14]  Q: Are you mocking me now?
[15]  A: I talk with my hands.
[16]  Q: Yeah, so do I.
[17]  A: Some of it is just experience. And I've
[18] had those cases where I have talked to — if it's a
[19] situation in which I have to have a parent present,
[20] if they're under the age of 18, that's —
[21]  Q: That's another matter.
[22]  A: I got to play the game. But if it is
[23] someone that is over that and I feel that there's
[24] reasons or whatever — I've had parents or I've had

1—10:51:33   24—10:52:46                                    Page 98

[1] individuals step out of the vehicle to continue that
[2] because — for that primary reason. Again, it's
[3] experience.
[4]   Q: Your instinct and intuition?
[5]   A: Yes.
[6]   Q: Have you ever read, in any articles,
[7] publications, books, treatises, journals, regarding
[8] the interviewing of witnesses that would mandate that
[9] when interviewing a driver of a commercial vehicle at
[10] the scene of the accident, that a representative of
[11] his employer not be there for the interview, because
[12] the driver may not want to make statements or
[13] observations or report observations or statements to
[14] you because his employer, the person who writes his
[15] check, is there at the time and he may not want to
[16] say things that the employer would — he would not
[17] want the employer to hear?
[18]  A: I have never read that specifically, that
[19] I can recall, in your question.
[20]  Q: Yeah.
[21]  A: But again, back to experience and
[22] discretion, you can sometimes tell how the interview
[23] is going, and that's by body language and by
[24] responses and how — obviously they're very

1—10:52:52   24—10:53:50                                    P

[1] uncomfortable.
[2]    There's two ways of viewing that.
[3] It could be because they've just witnessed and been
[4] part of what just took place; and/or a combination of
[5] that, plus they don't want to answer the questions
[6] because the boss is in the backseat of the police
[7] car.
[8]   Q: Right.
[9]   A: And again, that has to do with my feeling
[10] the situation and, over my course of the years, my
[11] direction of how I carry —
[12]  Q: You trust your instincts?
[13]  A: Yes. And if I feel that I'm not getting
[14] what I think I need because of that, for whatever
[15] reason, I ask them to step out of the car.
[16]    And there's — oftentimes, there's
[17] one on one. I definitely talk to individuals as
[18] they're walking, getting ready to get in the car.
[19] Oftentimes I'll ask, Are you comfortable with this
[20] person being in the car with us, or Do you have a
[21] problem with it?
[22]    And I don't recall in this case if
[23] I did. But I try to be as cognizant of if they're
[24] comfortable. If I don't want the boss there, I give

1—10:53:54   24—10:54:50                                    Pag

[1] them that opportunity and try to — or if I don't,
[2] during the conversation, like I say, you'll start to
[3] pick up things. They're pretty callous, cold
[4] answers; I'm starting to get blockades or whatever,
[5] and I'll ask someone to step out.
[6]    Equally, when I later do interviews
[7] as follow-up — again, a preliminary. I get back to
[8] the office, I've had the interview to — you know,
[9] you interview X number of people or I see something
[10] that doesn't fit in with everything else, and —
[11]    A clear example in here. One of
[12] the questions that was asked later, I had to call the
[13] operator back, Mr. Bard, and say, Was the motorcycle
[14] moved? Maybe it wasn't something that was specific,
[15] and try to get more precise exactly where was it —
[16] things like that.
[17]    I'm not calling and talking to the
[18] company —
[19]  Q: I'm not there yet.
[20]  A: Okay.
[21]  Q: The majority of questions are there. I'm
[22] not there yet.
[23]  A: Okay.
[24]  Q: The methodology that you've described to

1—10:54:52  24—10:55:56                                Page 101

[1] me now — well, before I ask that.
[2]     Regarding the marking of evidence,
[3] can you describe for me the methodology that you use
[4] in marking the evidence. And I want to say,
[5] generally, for example, the markings of tires — tire
[6] marks, skid marks on a roadway, how do you do it?
[7]     A: Well, both of us that are at the scene
[8] obviously interpret what we see individually based
[9] upon our own experience and training, and we work as
[10] a team.
[11]     Obviously, Sergeant Cox, in this
[12] case, might have and/or did see something that I
[13] didn't, or vice versa. Or asked for.
[14]     Q: I'm sorry. In this case, did Sergeant
[15] Cox see something that you didn't see?
[16]     A: No, I'm not suggesting you're talking
[17] about our methodology.
[18]     Q: Yeah, yes.
[19]     A: We are constantly communicating with one
[20] another.
[21]     Q: And my question is much more specific.
[22]     The methodology and marking and
[23] preserving skid marks —
[24]     A: Okay.

1—10:55:57  24—10:57:04                                Page 102

[1]     Q: — length, distance, direction, that kind
[2] of stuff —
[3]     A: Okay.
[4]     Q: — is there a method that you have for
[5] doing that?
[6]     A: We just look at what's there.
[7]     Q: For example, some people — you look at
[8] what's there. And then you preserve it with paint
[9] marks, for example; right?
[10]     A: After we photographed it without —
[11]     Q: Right.
[12]     A: — paint.
[13]     Q: And some people use a nail system, where
[14] they nail something into the ground to preserve start
[15] points and end points. Are you familiar with that?
[16]     A: Yes, sir.
[17]     Q: Okay. What methodology do you use in
[18] preserving skid marks after photographing them?
[19]     A: We use paint.
[20]     Q: Okay. When you — I'm going to draw for
[21] you — and I'm going to mark this as Weaver
[22] Exhibit No. 4 —
[23]     THE COURT REPORTER: Excuse me.
[24] What were Exhibits 2 and 3?

1—10:57:04  24—11:03:15                                Page

[1]     MR. VAN DER VEEN: I believe the
[2] subpoena was 1; his files which we copied were 2.
[3] I've already identified them, although not marked as
[4] an exhibit. I referred to this as I identified and
[5] we'll mark as 2. These are 3, so this would be 4.
[6]     MS. RISK: "These" meaning his —
[7] When you referred to "these," you're holding the
[8] documents that are his curriculum vitae?
[9]     MR. VAN DER VEEN: Let the record
[10] reflect I'm holding the binder or his CV and trial
[11] records.
[12]     (Discussion off the record.)
[13] (Documents marked Plaintiffs'
[14] Exhibits 2 through 4 for
[15] identification.)
[16]          BY MR. VAN DER VEEN:
[17]     Q: We're back on the record. Trooper, I'm
[18] going to show you what I've now marked as Plaintiff's
[19] Exhibit Weaver 4. This is exemplary. It's not to
[20] scale. It's not of anything related to this
[21] accident. It's not meant to be associated with this
[22] accident in any way. There's no trickery to what I'm
[23] asking you.
[24]     What I've done is — and I want to

1—11:03:17  24—11:04:33                                Page 104

[1] know whether you can recognize it as such. I've
[2] drawn you what I believe is a — what I've drawn was
[3] a skid mark on a roadway. Okay?
[4]     A: Okay.
[5]     Q: If you were generally at an accident
[6] scene and you had viewed this skid mark on the
[7] roadway and you were going to try to preserve it, the
[8] first thing you would do is you would photograph it;
[9] correct?
[10]     A: Yeah.
[11]     Q: And then as you look it and as you
[12] photograph it, it's my understanding that you would,
[13] at that point, make a determination as to what you
[14] think the direction of travel of the mark would have
[15] been; correct?
[16]     A: Yes, sir.
[17]     Q: Okay. And then you would preserve it
[18] with paint. You would bracket it with paint;
[19] correct?
[20]     A: Yes, sir.
[21]     Q: Assuming that on this skid mark you
[22] determined the direction of travel to be generally
[23] from south to north, can you show me how you would
[24] paint the brackets.

```
                1—11:04:36  24—11:05:50              Page 105
```
[1]    A: We'd paint them the same way. You don't
[2] indicate arrows or north or south.
[3]    Q: I understand that. I understand that.
[4]    A: We basically, for skid marks, tire marks,
[5] we bracket it with a U on either end of it to
[6] distinguish that's a tire mark, scuff. It's a scuff,
[7] skid; it's a tire mark. And we bracket it with Us.
[8]    Q: The U being a beginning and an ending
[9] point; the U bracketing a beginning and an ending
[10] point?
[11]    A: Yes, sir.
[12]    Q: Okay. If you thought — I'm going to
[13] draw it again.
[14]    MS. RISK: But that's an exhibit.
[15] Can we state for the record that Corporal Weaver
[16] actually drew the brackets around the tire — around
[17] what you termed as the exemplar tire mark.
[18]    MR. VAN DER VEEN: Thank you very
[19] much, yeah. The only thing — I drew everything on
[20] Plaintiff's Exhibit Weaver No. 4 except for the tire
[21] marks — I'm sorry — except for the U brackets.
[22] Okay?
[23]    MS. RISK: Uh-huh.
[24]    MR. VAN DER VEEN: Everybody clear?

```
                1—11:05:52  24—11:07:25              Page 106
```
[1]    THE WITNESS: Yes, sir.
[2]    MR. VAN DER VEEN: Okay.
[3]                BY MR. VAN DER VEEN:
[4]    Q: While I'm drawing this, is the way that
[5] you drew the U brackets on Weaver 4 a general method
[6] for drawing them?
[7]    A: Yes.
[8]    Q: That's the way you always do it?
[9]    A: Yes.
[10]    Q: And that is the way that it would be done
[11] by — it's the way the other members of the FAIR team
[12] would have been trained to draw them as well?
[13]    A: Yes, sir.
[14]        (Document marked Plaintiffs'
[15] Exhibit 5 for identification.)
[16]    MR. VAN DER VEEN: I'll going to
[17] show you what I've now marked as Plaintiff's Exhibit
[18] Weaver No. 5.
[19]                BY MR. VAN DER VEEN:
[20]    Q: Now, if you thought that this mark left
[21] on the roadway from the tire was in the direction
[22] from east to west, it was made from east to west, how
[23] would you draw the brackets? The U brackets on that.
[24]    A: Same way I drew them for that. As I

```
                1—11:07:28  24—11:09:03              Pa
```
[1] stated earlier, we don't put a direction; we just
[2] mark the tire mark with brackets to distinguish
[3] between the difference with a tire mark or, say, a
[4] scratch or gouge.
[5]    Q: So how do you mark that?
[6]    A: With a V at the ends, start and end.
[7]    Q: How is that marked differently?
[8]    And are there any other symbols
[9] that you use on the roadway when marking?
[10]    A: Not other than occasionally marking —
[11] for instance, we'll mark the final resting position
[12] of vehicles when we put Ts at the tires to show the
[13] positioning of the tires. Sometimes we'll write on
[14] the roadway — for instance, if we use an RP,
[15] sometimes we'll put paint RP on the roadway. But not
[16] any other distinctive, like a legend that you would
[17] follow or whatever. It's just mostly U brackets and
[18] Vs, is what we distinguish between tire marks and
[19] scratch/gouge marks.
[20]    Q: Okay. Regarding your methodology that
[21] we've talked about and kind of your general
[22] methodology that we've talked about in depth for the
[23] investigating of an accident for the purposes of
[24] accident reconstruction, is this methodology, in your

```
                1—11:09:09  24—11:10:32              Pa
```
[1] opinion, generally an accepted method by accident
[2] reconstructionists in your field?
[3]    A: I'd say yes, from my experience.
[4]    Q: Have you ever tested your methodology for
[5] reliability or accuracy?
[6]    A: I'm not sure I understand.
[7]    Q: Have you ever conducted any tests to
[8] determine whether the way you investigate an accide
[9] reconstruction is more or less accurate or reliable
[10] than another method?
[11]    MS. RISK: Objection to the form.
[12]    THE WITNESS: I'm not aware of any
[13] other forms of investigating or method of what
[14] you're — I've been taught by IPTM and through the
[15] other — we've already stated. And my experience as
[16] a trooper, being taught by other troopers and being
[17] exposed to other police officers in that forum or
[18] arena. I'm not aware of any other ways of doing what
[19] I do, if that answers your question.
[20]                BY MR. VAN DER VEEN:
[21]    Q: Well, for example, we talked about there
[22] are two ways to coordinate an accident
[23] reconstruction.
[24]    A: Yes, sir.

**Page 109**

1—11:10:32  24—11:11:45

[1] Q: We talked about there are two ways to
[2] mark tire marks on a roadway; right?
[3] A: I'm not sure I'm understanding what
[4] you're asking me.
[5] Q: Okay. Well, you've gone through and
[6] discussed with me the methodology that you generally
[7] use; right?
[8] A: Of bracketing, yes.
[9] Q: The methodology that you generally use
[10] for accident reconstruction, are you aware of whether
[11] anybody has ever tested that methodology for
[12] reliability or accuracy?
[13] A: Of what we do as Delaware State Police?
[14] Q: Yes. Of what you do, the method that you
[15] use.
[16] A: I'm not aware of any.
[17] Q: Do you know whether there is a known
[18] error rate for your methodology of accident
[19] investigation and reconstruction?
[20] A: I'm not aware of any.
[21] Q: Does your methodology always reach
[22] conclusion?
[23] A: No.
[24] Q: You have used your methodology — your

**Page 110**

1—11:11:48  24—11:13:13

[1] methodology of accident investigation and accident
[2] reconstruction and not been able to come to a
[3] conclusion; is that true?
[4] A: That's correct.
[5] Q: How many times has that happened?
[6] A: I don't know.
[7] Q: Can you approximate?
[8] A: What we do is a totality of everything:
[9] Witness statements, operator statements, physical
[10] evidence, photographs. Occasionally there are times
[11] in which it's inconclusive; we can't say one way or
[12] other.
[13] For instance, an example would be
[14] lamp examination. There's characteristics that bulbs
[15] will do, and sometimes you can look at it and
[16] sometimes you say, I can't say one way or the other;
[17] I can't confirm or dispute.
[18] I don't know. I can't say — my
[19] investigations and my opinion portion of my report is
[20] based on everything that I'm provided with. Not
[21] assuming everything, not — or reading into anything.
[22] Just on what my experience and what my training has
[23] compiled together.
[24] I mean, to give you — I'd have to

**Page 111**

1—11:13:14  24—11:14:24

[1] go through every one of my reports to find out
[2] what —
[3] There are a few. It's not — there
[4] are occasionally — it doesn't happen often, but
[5] occasionally evidence is not seen or picked up.
[6] Witness statements conflict. Oftentimes — we can
[7] have 15 people at a scene and they'll all say
[8] something different.
[9] We have to go — as an
[10] investigator, my responsibility is to go with the
[11] average, if you will. If you've got 15 and 10 saying
[12] one thing and five are saying the other, and the
[13] physical evidence supports what the 10 are saying,
[14] you go in the direction of what the totality of
[15] everything tells you.
[16] To tell you exactly how many times
[17] I have not been able to come to a conclusion based on
[18] just sole evidence? I don't even want to guess.
[19] There's a time when you can look at
[20] a mark on the roadway and, by and of itself, if you
[21] don't know anything else about it, you could flip a
[22] coin and say, It could be this and it could be that.
[23] I don't want to lock myself into an
[24] exact. I'm not saying you're trying to trick me —

**Page 112**

1—11:14:27  24—11:15:36

[1] Q: And you know I'm not.
[2] A: And I'm saying I don't know. And I don't
[3] feel comfortable guessing, because I don't know.
[4] Q: Do you think that you can approximate?
[5] More than five? less than five? more than ten? less
[6] than ten?
[7] A: Well, in every case, there's some things
[8] that — there's always some — it's open for opinion.
[9] I don't know as far as —
[10] I'm comfortable in saying that
[11] there are times in which you can't determine things
[12] by what is there. If you have only — if you have
[13] two cars in the middle of the night that collide and
[14] both operators are dead, the evidence can only tell
[15] you so much if there's no witnesses to add external
[16] input.
[17] Q: Okay. Let's talk about that. Let's talk
[18] about if you have witness statements that are
[19] inconsistent, generally.
[20] A: Okay.
[21] Q: Okay? How is it that you reconcile the
[22] inconsistencies?
[23] A: Again, it depends on the nature of the
[24] case. If it's a criminal case and they have counsel,

1—11:15:39  24—11:16:49                                          Page 113

[1] that oftentimes controls what we can or can't do.
[2]    Q: Let's limit — for the purpose of this
[3] question, and generally, in a case that you would
[4] anticipate to be a civil case.
[5]    How do you reconcile — of course,
[6] you don't always know what case is going to be
[7] criminal until somewhere down the line; correct?
[8]    A: Correct.
[9]    Q: Until blood results come back, until your
[10] accident construction is completely done, until you
[11] talk to the AG; correct?
[12]    A: Potential is always there.
[13]    Q: Right. I don't want that caveat to be
[14] there. To say for cases that you think are civil
[15] cases, cases that are going to end up in a civil
[16] dispute. Okay?
[17]    How do you reconcile witness
[18] statements that are inconsistent?
[19]    MS. RISK: Objection to form.
[20]    THE WITNESS: Over the period of
[21] time and experience, sometimes I'll conduct follow-up
[22] interviews, just as I stated earlier, as far as
[23] clarification of where vehicles were moved. I know a
[24] question had been asked during the course of this

1—11:16:52  24—11:18:06                                          Page 114

[1] investigation as —
[2]                BY MR. VAN DER VEEN:
[3]    Q: I'm not talking about this investigation.
[4]    A: Okay. Occasionally follow-up interviews.
[5] If the consistent — or the body of what was said the
[6] day of — obviously for me, that has more bearing
[7] than something maybe a week, two weeks, three weeks,
[8] whatever later.
[9]    It can work both ways. Sometimes
[10] things will trigger. But oftentimes, it works in the
[11] negative; I really didn't mean to say — whatever.
[12] I often — I try to take a higher — you were talking
[13] earlier about the —
[14]    Q: Degrees?
[15]    A: Degrees. Thank you.
[16]    I pay more degree of what I'm told
[17] right then and there, because — again, back to the
[18] instinct and experience. And if they're going to lie
[19] to you, they're going to do it right then, usually.
[20] But I'm more of the belief that if they haven't had
[21] the time to think about what they're going to tell me
[22] when I'm asking questions, they're going to give me a
[23] gut feeling. They're going to give —
[24]    Q: I think of it the other way.

1—11:18:08  24—11:18:58                                           Pa

[1]    MS. RISK: Could you not talk — I
[2] would ask counsel not to talk over the witness. Wait
[3] until he's finished.
[4]    MR. VAN DER VEEN: I don't think
[5] I've been doing that, but okay.
[6]                BY MR. VAN DER VEEN:
[7]    Q: I look at it just the opposite way,
[8] actually. I look at it, you're on the scene and
[9] talking to someone, bang, like they're more apt to
[10] tell you the truth; and more down the line, they have
[11] the opportunity to think and ruminate and talk to
[12] their lawyers or brothers or sisters and mothers and
[13] they come up with another version.
[14]    A: I understand.
[15]    Q: Do you agree with that or disagree with
[16] that?
[17]    A: Depends on who they are. And that —
[18] what I'd like to expound on that is if — that if you
[19] have a participant, i.e., operator, you have
[20] something to gain or lose in the scenario of the
[21] investigation.
[22]    If you are an independent witness
[23] and you provide a statement, you don't have anything
[24] to win or lose there until later, if whatever is

1—11:19:02  24—11:20:03                                           Pa

[1] involved, if cash or the interests are baited or
[2] whatever, after that scene.
[3]    Q: Somebody pays you.
[4]    A: I'm regarding whoever contacts whom first
[5] and whatever their interests are. There's a lot of
[6] outside factors.
[7]    But I — for witnesses, obviously
[8] what they provide me with, I'm not going to say what
[9] you did or didn't see, or the evidence is telling me
[10] something else. I let them tell me what they saw.
[11]    So their statements — and I agree
[12] with you where — or I was trying — or maybe I
[13] wasn't quite clear. For the operator, they're going
[14] to note — like, I'll roll up on a crash scene
[15] anywhere, and the first question out of my mouth is
[16] always, Are you injured? The second question is,
[17] What happened? And I'll let them blurt it out.
[18]    I don't write it down. It goes in
[19] my head. But right then he might say, I turned left
[20] and didn't see him. Later when they're at the
[21] hospital and they're interviewed, later they say,
[22] Well, I didn't see anything coming and made a left
[23] turn.
[24]    So I go with that, and that's —

Corporal Jeffrey Weaver  
June 23, 2005

Vasek v.  
UPS

---

1—11:20:06  24—11:20:56  Page 117

[1] I'm with you on that.
[2] Q: Okay. When you have inconsistent
[3] statements from witnesses, what factors do you take
[4] into consideration when trying to make a
[5] determination as to which one is more believable and
[6] more trustworthy?
[7]   MS. RISK: May I ask you a
[8] clarification? When you say "inconsistent
[9] statements," do you mean inconsistent statements as
[10] between witnesses, those statements are inconsistent;
[11] or a single witness' statement at one point in time
[12] as compared to another point in time? I think that
[13] needs to be clarified.
[14]   BY MR. VAN DER VEEN:
[15] Q: Do you understand my question? I'm
[16] asking if you had two witnesses and their statements
[17] are inconsistent.
[18] A: Yes, sir.
[19] Q: You understand that's what I'm asking?
[20] A: Two separate —
[21] Q: Yes? Do you understand that I'm asking
[22] you that for the last five questions?
[23] A: Yes.
[24] Q: Back to what factors do you take into

1—11:21:02  24—11:22:12  Page 118

[1] consideration when you have two witnesses with
[2] inconsistent statements?
[3] A: Going back to what I've said before. I
[4] think you've touched on bias, what interests they
[5] have.
[6] Q: Motive.
[7] A: For instance, if four cars are traveling
[8] together and I'm interviewing three cars that were
[9] not involved but are with the party, or — and here's
[10] a better example.
[11]   If two cars are going down the
[12] roadway and each have occupants as well as the
[13] drivers, I normally don't interview occupants. I
[14] normally ask the drivers, separately independent.
[15] Because if Dad is driving the car
[16] and Mom and the children are in the car, whether they
[17] believe they are or intentionally or not, they have a
[18] vested interest, because their comments of what they
[19] saw — I want to sometimes find out what they saw to
[20] get a collective. But the people in that car have a
[21] specific interest of whoever is driving it. Or if
[22] the kids are goofing around and trying to protect
[23] their friend — I'm not suggest they do it
[24] intentionally. Some do, some don't, whatever.

1—11:22:16  24—11:23:26  Page

[1]   As far as separate witnesses, when
[2] they tell me — if there are inconsistencies in what
[3] one tells me in regards to what the other one tells
[4] me, for the most part, the content stays as with what
[5] they've said. That's on them. Personally, you want
[6] to word it, change their mind, if they want to
[7] clarify something, and — "I might have said this and
[8] I really meant that," whatever. That's a different
[9] form.
[10] Q: I'm not talking about changes in
[11] testimony. And believe me, we're going to get to
[12] there.
[13] A: Right.
[14] Q: Right now what I'm talking about is one
[15] witness gives you a statement as to time, distance
[16] and speed; and another witness gives you a statement
[17] as to time, distance and speed, and the two are
[18] inconsistent.
[19]   What factors do you take into
[20] consideration when trying to figure out which witness
[21] statement is more reliable for you, more trustworthy?
[22] A: And there's only two?
[23] Q: Yeah.
[24] A: Because of what I previously stated, is I

1—11:23:28  24—11:24:43  Page 120

[1] look at everything.
[2] Q: I understand. But in a case where you
[3] only have two eyewitnesses to the accident, one a
[4] driver and one an independent witness —
[5] A: Primarily I don't pay any more weight on
[6] one or the other.
[7] Q: Do you look at the ability to perceive?
[8] A: Correct.
[9] Q: Do you look at ability to recall?
[10] A: Correct.
[11] Q: Do you look at ability to articulate?
[12] A: Correct.
[13] Q: Do you look at whether one was involved
[14] and is somewhat in a state of shock or one is not?
[15] A: Correct.
[16] Q: Do you look at the bias or motive to tell
[17] one story versus the other?
[18] A: Correct.
[19] Q: Do you look at anything else?
[20] A: Not anything other than what we've said.
[21] Q: Okay.
[22] A: Other than the honesty of the individual.
[23] I don't know them from anyone. And people lie to us,
[24] that's true, obviously. But I'm a honest, integrity

**1—11:24:47   24—11:25:52                                 Page 121**

[1] kind of person, and I know that not everybody tells
[2] me everything.
[3]    Q: I can tell your honesty and integrity.
[4] It's clear. You wear it on your shoulder. You
[5] should be commended for it.
[6]    What other experts do you rely on,
[7] generally, when investigating or reconstructing an
[8] accident?
[9]    A: The other members of the unit.
[10]   Q: Okay.
[11]   A: Not only to whoever is my partner at the
[12] scene, but the others in the unit. We bounce things
[13] off each other all the time.
[14]   Q: Of course.
[15]   A: And our reports are reviewed by at least
[16] one — well, they're reviewed by two
[17] reconstructionists in our unit before they even go
[18] out of the office.
[19]    What — oftentimes what I try to do
[20] is give my report — and again, it has to do with
[21] caseload and how backed up people are. Because — in
[22] this scenario, Sergeant Cox is my supervisor, so he'd
[23] do the final review anyway. But in this case, he's
[24] part of this case, because he helped investigate part

**1—11:25:53   24—11:26:46                                 Page 122**

[1] of it.
[2]    I always try to get one of the
[3] other members in the unit that know nothing about it.
[4] They're going to be more — as I am when I'm
[5] reviewing something that I have not been at. I'm
[6] looking for everything to get the total perspective
[7] of what that report says. Not add anything, not
[8] delete anything, just as it is. Because I don't know
[9] anything about it. I can only go on what they're
[10] telling me and what we're looking at. And the reason
[11] why we do that is to try to provide a finished,
[12] polished, professional product.
[13]    I mean, when it leaves our
[14] office —
[15]   Q: Of course.
[16]   A: — we want it to be as accurate as
[17] possible.
[18]    In this case, I know you're going
[19] to come at me, because there's a few things that I
[20] know that were some mistakes that were made. Type
[21] errors or whatever. It happens. But it's reviewed
[22] by two other people.
[23]    So within the unit, we are —
[24] because, for instance, one of the individuals, might

**1—11:26:48   24—11:28:05                                 Pag**

[1] be they love tractor-trailer, commercial, motor
[2] vehicle crashes. That's not my forte. If I have a
[3] tractor-trailer crash and I happened to be the senior
[4] investigator on it, I will go to the member of the
[5] unit that loves and eats and sleeps and drinks
[6] tractor-trailer crashes, because they have a vested
[7] interest above and beyond my expertise and training.
[8]    Q: Not a vested interest, but also perhaps a
[9] different base of knowledge?
[10]   A: Different knowledge, different
[11] perspective of interpretation, the works.
[12]    So we go off each other.
[13]   Q: Do you have a forte?
[14]   A: A couple areas that I like.
[15]   Q: Can you tell me what those are.
[16]   A: One in particular, as far as areas of
[17] what we do, I enjoy interviewing witness. I like to
[18] talk to people. I'm a people person.
[19]   Q: I can tell.
[20]   A: Something that doesn't have necessarily
[21] anything to do with collision reconstruction, but
[22] part of what I've already said is it's a very
[23] sincere, devoted, compassionate part of me that I —
[24] and I enjoy where the others will kind of like go in,

**1—11:28:08   24—11:29:18                                 Pag**

[1] talk to the family and move on. I do follow-ups
[2] continually. I take a personal interest in the
[3] humanitarian — you've been through — everything —
[4] everybody involved in these cases are victims,
[5] whether you witnessed it, whether you're involved in
[6] it.
[7]    Obviously in this case, there's one
[8] senior, No. 1 victim, because he's no longer with us.
[9]   Q: Feeling no pain now. But —
[10]   A: But all the other members that are
[11] involved, I take a personal in interest. It's within
[12] what my job allows me to do.
[13]    But to answer your question is
[14] contact with the families and the witnesses and the
[15] operators, and primarily those — their worlds have
[16] been rattled by this and will never be the same as a
[17] result of this incident, whether they were there by
[18] chance, just happened to be witness. They didn't
[19] want to be there are, or are a participant. That's
[20] an area that I very much enjoy, the interviewing
[21] witnesses.
[22]   Q: Do you have a forte with respect to a
[23] specific type of vehicle which you have even a more
[24] specialized knowledge of? Like a straight job or a

**Page 125**

1—11:29:24  24—11:30:20

[1] motorcycle or a station wagon or a minivan or dirt
[2] scooter? Is there anything that — you know, you
[3] mentioned that there's some guys are tractor-trailers
[4] are their forte, jackknife situations, rollovers, all
[5] that kind of — chemical spills, they're the guys,
[6] they're there. Do you have a vehicle of that nature
[7] which is a forte you would describe, or are you
[8] general?
[9]  A: I'm general.
[10]  Q: Okay.
[11]  A: The scenes that I love, when you say my
[12] forte, would be the scenes that I have evidence that
[13] we can do reconstruction. There are scenes that we
[14] cannot do reconstruction because of the lack thereof.
[15]  Q: To a certain extent, like this case?
[16]  A: Exactly.
[17]  Q: Okay.
[18]  A: Which are frustrating, because you're
[19] trained in all these areas. And I love to be able to
[20] do this, that and the other thing and explain to the
[21] family — back to that part of it. It's difficult to
[22] say, Well, I can't say. But yes, I'm, for the most
[23] part, general.
[24]  Q: Yeah.

**Page 126**

1—11:30:20  24—11:31:40

[1]  A: Down and get dirty type of areas. I
[2] enjoy the documentation of the diagrams and doing the
[3] scales and things that we do when we have all that
[4] evidence in the perfect-world case where you've
[5] got —
[6]  Q: A lot of stuff which you didn't have in
[7] this case, the Vascek case?
[8]  A: Correct.
[9]  Q: You got me a little bit off the track.
[10]  A: Sorry.
[11]  Q: It's okay.
[12]    Generally, are there other experts
[13] that you rely on when investigating or reconstructing
[14] an accident? And you've mentioned already other
[15] members of your team, supervisors, that kind of
[16] thing. Anybody else?
[17]  A: Not normally outside the division. We
[18] have members or — one specific member that's retired
[19] who's not in the division and has his own business.
[20] He is hired oftentimes by various — and he wasn't in
[21] this case. That's why I'm comfortable saying this.
[22] But when he has been retained by insurance companies
[23] or law firms or whatever in a case, he has assisted
[24] us with —

**Page 127**

1—11:31:41  24—11:32:40

[1]  Q: He wasn't in this case?
[2]  A: No, no, not to my knowledge.
[3]  Q: Well, can you give me his name?
[4]  A: Bill Shirky.
[5]  Q: Okay. He may have been on the scene the
[6] next day.
[7]  A: I'm not aware of any of his involvement.
[8]  Q: Okay. He may have been on the scene the
[9] next day. Ex Delaware State trooper?
[10]  A: Yes, sir.
[11]  Q: Okay.
[12]  A: Occasionally we call the academy.
[13]  Q: Okay.
[14]  A: I don't mean as in our academy. I mean,
[15] for instance, I have in the past called instructors
[16] or IPTM, say, I'm having a problem with this, or kind
[17] of give me an idea.
[18]    For instance, I've taken a
[19] pedestrian course, which is — by the way, that and
[20] bicycles are two of the most difficult, because of
[21] the lack of evidence. When you've got the dynamics
[22] of two vehicles colliding, there's often distinctive
[23] marks. With a bicycle, a pedestrian — obviously
[24] they still can be investigated, and there are

**Page 128**

1—11:32:43  24—11:33:51

[1] parameters in what we can work with. But even then
[2] it's limited just because of the dynamics of like a
[3] large vehicle versus a pedestrian.
[4]    Occasionally I have contacted IPTM
[5] instructors in the past to run things past them, to
[6] say, I have a problem with this, or That doesn't seem
[7] to add up. Lamp examinations, sometimes there's
[8] things.
[9]    But for the most part, we stay in
[10] house. And again, going back to the integrity of
[11] what we're doing, again, if Bill is involved in a
[12] case or whomever the outside reconstructionists —
[13]  Q: Bill Shirky?
[14]  A: Yeah, Bill Shirky or — the person I'll
[15] probably call, Albert taught the motorcycle course.
[16] I was a student. I talked to him. He's been
[17] involved in this incident.
[18]  Q: On my behalf.
[19]  A: Regardless. What I'm saying is, we try
[20] to keep the parameters within what we do.
[21]  Q: Yeah.
[22]  A: Not saying that outside it can't or won't
[23] be challenged. But from my experience, my personal
[24] experience is I stay within the box.

1—11:33:53   24—11:35:13                                    Page 129

[1]  Q: Yeah. Or the —
[2]  A: The parameters of the professional box in
[3] which I can go without — whether it's — all cases
[4] initially are started with a perspective, in my mind,
[5] that it's criminal until there's any way else —
[6]      And the reason why I go that route
[7] is because if it becomes a point where it's clear and
[8] evident that there is no criminal or traffic, if you
[9] keep that perspective, you're less likely, my
[10] opinion, to not overlook something.
[11]  Q: Let me ask you this, though. And this
[12] may — when I actually use terms of art — you said,
[13] When I approach an investigation and reconstruction,
[14] I keep in my mind that this may be criminal; right?
[15]  A: Correct.
[16]  Q: And that unless it's clear and
[17] convincing, that it's not criminal or not traffic,
[18] then you consider it to be civil; is what you said?
[19]  A: No.
[20]  Q: Okay. Because your standard as to
[21] whether you would recommend criminal charges isn't a
[22] clear and convincing standard, is it?
[23]  A: If I can clarify.
[24]  Q: Sure.

1—11:35:14   24—11:36:22                                    Page 130

[1]  A: What I'm trying to say is I treat every
[2] scene the same when I get there.
[3]  Q: Okay.
[4]  A: My responsibility is — not only a sworn
[5] officer, as a collision reconstructionist, as a
[6] division, as a trooper is to find the facts and only
[7] the facts. Not to interpret, other than the realm of
[8] my box that I'm allowed to go as collision
[9] reconstruction. But when I go to that scene, I get
[10] down there five minutes and say, This car already did
[11] it.
[12]      I have an issue in which I have to
[13] look at everything. I have nothing to lose and/or
[14] gain from my conclusions. My direction is to — as
[15] accurately as possible, with my training and
[16] everything else, is to reflect what happened or what
[17] my conclusions are that happened.
[18]  Q: Okay.
[19]  A: Facts only. And again, I'm allowed to go
[20] in that box of my training. But when I take that
[21] perspective — and maybe that was a poor example.
[22]      But when I go in there to every
[23] investigation, that's the mentality I do.
[24]  Q: I understand.

1—11:36:22   24—11:37:40                                    P

[1]  A: Because what my direction is, if I lessen
[2] that, I'm going to miss something, or intensify the
[3] chances of missing something that could later be the
[4] small puzzle piece that puts it all together.
[5]  Q: Okay.
[6]  A: That's what I'm trying to explain.
[7]      And I mean this respectfully,
[8] because I know why I'm here; I don't answer to
[9] civil. I do later, when I'm, like now, being
[10] deposed. But my sole responsibility, through the
[11] division, to do what the parameters of what I'm
[12] allowed to do as a state trooper, for public service
[13] and — the whole deal, of doing the integrity issue,
[14] of trying to identify what happened, and that's it.
[15]      When I leave here — I don't mean
[16] specifically here. When I leave an investigation,
[17] there's no bonus or — I get the self-gratification
[18] within my heart of waking up each day knowing I di
[19] the best that I could. And if I made a mistake, I
[20] made a mistake. But I try to keep that integrity.
[21]      And that's why it's important at
[22] times, although we don't do it every time. It's
[23] important to — I try to identify who's going to be
[24] lead investigator, because I do things different than

1—11:37:42   24—11:38:41                                    Pa

[1] the other three members. There are certain quirks
[2] that I have when I'm interviewing a witness that I'm
[3] trying to do. Or there's a certain way I photograph
[4] a scene. I have my own preference.
[5]      And not to mean-mouth or talk
[6] disrespectfully to my partners. If they do the
[7] photographs and I end up being the lead, and I get
[8] the photographs back — not to be arrogant or
[9] whatever. But if I do my photographs, provided they
[10] come out, I'm going to have what I want or need,
[11] where they might miss things: Nuts, they didn't take
[12] a picture of that.
[13]      I go clockwise —
[14]  Q: That was going to be my question. What
[15] is your procedure for taking photographs? I thought
[16] I had I gotten it, and I probably — obviously
[17] didn't.
[18]  A: No.
[19]  Q: What's your procedure and methodology for
[20] taking the photographs at a scene?
[21]  A: Provided I'm not interrupted, which
[22] happens all the time. We can be in the middle of an
[23] interview and somebody taps me — Hey, the tow truc
[24] is here.

Corporal Jeffrey Weaver                                                   Vascek  v.
June 23, 2005                                                                 UPS

1—11:38:41   24—11:39:46                                    Page 133

[1]     My direction is, I do a 360. I
[2] will go from every angle possible, in my perspective.
[3] The physical — without physical limitations of what
[4] I can or can't do.
[5]     I will do a circular of the scene.
[6] Final resting positions, I will do circulars of each
[7] vehicle to get all different angles that I'm trying,
[8] hopefully, not missing. Because what I see at the
[9] scene later could very well — something will appear
[10] that I didn't see.
[11]     Q: In the photo?
[12]     A: Because — brain cramp.
[13]     The filters within the camera will
[14] oftentimes pick things up that I don't see, like in
[15] hours of darkness; or sometimes it doesn't reflect —
[16] it won't pick up, depending on the flash or whatever.
[17]     But I do circular; I do the whole
[18] scene; I do all the vehicles, normally try to get all
[19] sides of it.
[20]     I focus on the damaged areas of the
[21] car, which we will do follow-ups later, oftentimes at
[22] tow yards in which we had the opportunity. In this
[23] case, I did with the motorcycle, not with the UPS
[24] truck.

1—11:39:49   24—11:40:48                                    Page 134

[1]     I definitely take photographs prior
[2] to paint. I love — again, it's not the idealistic
[3] Disney world. I love a hot scene, where everyone is
[4] still there.
[5]     The problem then, of course, is the
[6] contamination. Obviously, first and foremost, is the
[7] preservation of life and doing everything they could
[8] possibly do.
[9]     But in the perspective of looking
[10] as a medic and a paramedic and the nurse, that's
[11] their focus, and that should be what their focus is.
[12] I'm not suggesting that it's not. But as a collision
[13] reconstructionist or as an investigator, when you
[14] move the motorcycle, you're never going to tell me
[15] exactly where it was, especially if there's an
[16] absence of marks.
[17]     Q: Yeah.
[18]     A: Or where the body was. I can approximate
[19] how the body landed, or from descriptions. But if
[20] you've moved it — and I'm not saying leave it there
[21] until we get there. But if the person is —
[22]     Q: It's not a hot scene for you?
[23]     A: Well, for instance, if the person — the
[24] parameters of the medical examiner's office is if the

1—11:40:51   24—11:41:54                                    Page

[1] individual is deceased and at the scene, they remain
[2] at the scene, because it's not even my scene. It's
[3] not the — the fire fighters, the fire chief is
[4] initially in control. They're over us. But the
[5] medical examiner is over all of us, and they prefer
[6] that the bodies stay where they are.
[7]     But in this case, the preservation
[8] of life, to do what they can do, he was moved.
[9]     But what I'm trying to get as to
[10] the point, if not right being on the scene — and
[11] like I said earlier, time is our worst element.
[12]     Q: Okay.
[13]     A: But then after I photographed the
[14] vehicles, after I have photographed the scene; and
[15] then, as we stated, in great detail putting down
[16] paint marks or — one of the vehicles have been
[17] removed, I try to make a habit of photographing it
[18] again, with just the paint marks, just as an
[19] additional reference point of later looking and
[20] seeing, Well, I didn't see that, or maybe from this
[21] angle, whatever. That's my direction.
[22]     Q: Okay.
[23]     A: And for the most part, I do, excluding
[24] occasional —

1—11:41:55   24—11:42:51                                    Page 136

[1]     Q: 360?
[2]     A: And the others take photographs.
[3]     But the last couple years, and I
[4] guess maybe it's because I'm normally one of the
[5] first guys that always get there. They accuse me of
[6] sleeping in my uniform. That's one of the things
[7] I'll normally do, because it's a very delicate item,
[8] my opinion. And that's one of the areas that I try
[9] to get on immediately.
[10]     Even if they're still extricating
[11] the person out of the vehicle or whatever, because
[12] you could pick up things that you didn't see later;
[13] or relying on a paramedic report of whether they had
[14] the seat belt because he can tell from the friction
[15] marks, or it was cut or whatever. But it's hot to
[16] that scene, is what I am trying to do.
[17]     Q: What I'm going to try to do now is shift
[18] focus and talk about the accident itself, this
[19] accident and this investigation itself. Okay?
[20]     A: Okay.
[21]     MR. VAN DER VEEN: Just for
[22] everybody's edification, this conference room, I
[23] think, is going to need to be used from 1:00 to 2:00.
[24] So from 1:00 to 2:00, we'll take a lunch break.

1—11:42:54   24—11:47:46                                                          Page 137

[1]     (Discussion off the record.)
[2]     MR. VAN DER VEEN: What I'm going
[3] to do now, before we talk about this case, I want to
[4] go back and make sure that I've marked the exhibits
[5] properly, and describe what I believe to be 2 and 3.
[6] Okay? Is that okay with you?
[7]     THE WITNESS: Sure.
[8]     MR. VAN DER VEEN: The first thing
[9] that we have is — this is 1, 2 and 3.
[10]    (Discussion off the record with the
[11] court reporter.)
[12]              BY MR. VAN DER VEEN:
[13]    Q: Looking at Plaintiff's Exhibit Weaver
[14] No. 2, this group exhibit is about an inch thick of
[15] paper, and it is your file on this matter; correct?
[16]    A: Yes, sir.
[17]    Q: It has things ranging from letters from
[18] Ms. Coldwell at Piper, Rudnick, Gray and Cary, to
[19] subpoenas, to the report itself?
[20]    A: Yes, sir.
[21]    Q: To the autopsy report, to your graphs and
[22] diagrams, to photographs, to phone call receipts —
[23]    A: Yes, sir.
[24]    Q: — or messages.

1—11:47:48   24—11:49:07                                                          Page 138

[1]     I'm assuming that your field notes
[2] are in here?
[3]     A: Yes, sir.
[4]     Q: I'm not going to take the time to go
[5] through these now — maybe I'll be able to do it at
[6] lunch, because I may need to look through these and
[7] then ask you for another deposition. And you would
[8] not have a problem with that?
[9]     A: Not at all.
[10]    Q: I appreciate that.
[11]    And then I'm looking at what is
[12] Plaintiff's Exhibit Weaver No. 3, and this was in
[13] your binder. This is also about an inch thick, with
[14] your resume or curriculum vitae, which includes all
[15] of the accident reconstruction investigation training
[16] and courses and whatnot that you've taken; correct?
[17]    A: Yes, sir.
[18]    Q: It also is going to have your testimony
[19] pages in there; is that correct?
[20]    A: Yes, sir.
[21]    Q: Can you look in your book, which is
[22] Weaver 3, and go to the area of testimony.
[23]    A: Yes, sir.
[24]    Q: I'll try to get there with you.

1—11:49:09   24—11:52:15                                                              P

[1]     My questions to you regarding that
[2] were, can you tell how many times — from this list,
[3] how many times you were qualified as an expert in
[4] court?
[5]     A: Do you want which cases had judge or
[6] jury? Is that what you're saying?
[7]     Q: My first question is which cases
[8] qualified you — in which cases did a judge qualify
[9] you as an expert to testify in the field of accident
[10] reconstruction?
[11]    A: I'm not sure. I thought I was.
[12]    I'm not really sure.
[13]    Q: Okay. You have on this listed "Expert
[14] Court Testimony."
[15]    A: That actually is — and I believe I
[16] counted, 18.
[17]    Q: Some of these you may have been a fact
[18] witness rather than qualified by a judge as an expert
[19] witness?
[20]    A: Yes.
[21]    Q: Looking at this list, with the benefit of
[22] having this list in front of you, is your
[23] approximation of six to eight times — do you feel
[24] that's still accurate?

1—11:52:16   24—11:53:57                                                             Pa

[1]     A: Yes, sir. I just don't recall which
[2] cases. I thought I would by looking at the names and
[3] the —
[4]     Q: Yeah.
[5]     A: — of the defendants and the cases in
[6] which they were. But I'd say about six to eight. I
[7] really —
[8]     Q: Fair enough. Fair enough.
[9]     Let me ask you my next question,
[10] though. The federal court case, were you qualified
[11] as an expert by the federal court judge in that case?
[12]    A: That was a civil. I initially thought I
[13] would know, when I'm looking at it, that it was a
[14] civil case. I'm not sure if it was or not. I know I
[15] testified, obviously, in the capacity of a
[16] reconstructionist, but I don't —
[17]    I'm not 100 percent sure. I know I
[18] was there and testified to the dynamics of the
[19] collision, and I thought usually that the federal
[20] cases I have been. But not — I'm really not
[21] comfortable saying yes and then later biting me in
[22] the but and saying —
[23]    Q: You imagine I'm going to pull the case,
[24] take a look anyway. Okay.

1—11:54:02  24—11:55:21                              Page 141

[1]    Of the civil cases that are here, I
[2] see 1, 2, 3 listed. That would be Jimenez versus
[3] Stevenson in '93.
[4]    A: Uh-huh.
[5]    Q: The Vance/Senn versus Leon in 1986,
[6] and —
[7]    A: Daniels versus Fontan in March of '01.
[8]    Q: Do you recall whether you were qualified
[9] by the court in either one of those three as an
[10] expert?
[11]   A: I don't remember if I was or was not.
[12] Probably not, but I don't remember.
[13]   Q: Okay. Regarding the dates on this — is
[14] that the date of the accident or is that the date of
[15] your testimony?
[16]   A: That was the date of either my testimony
[17] and/or the beginning of the trial.
[18]   Q: Okay.
[19]   A: Obviously in a trial, I could have
[20] testified several times. But that's the case — if
[21] it was a one-day, in-and-out, that's the date —
[22] should be the date of my testimony. Or if it's the
[23] initial date, it was the date that the trial began.
[24]   Q: Fair enough.

1—11:55:26  24—11:56:26                              Page 142

[1]    Looking at this list now, can you
[2] recall, either exactly or approximately, how many
[3] times, out of these 18 where you did testify, how
[4] many times the finder of fact agreed with the
[5] position that you reported?
[6]    First of all, it would only be in
[7] the range of six to eight; right? I mean, only six
[8] to eight is where you would have given an opinion
[9] about the cause of the accident —
[10]   A: Uh-huh.
[11]   Q: — right?
[12]   A: Yes.
[13]   Q: Okay. Out of those six to eight, can you
[14] approximate how many times the finder of fact agreed
[15] with your position?
[16]   A: How many times we won?
[17]   Q: Right, that's the way I would put it.
[18]   A: About six.
[19]   Q: Okay.
[20]   A: Approximately.
[21]   Q: Okay.
[22]   A: Because I know two of which — back on
[23] the dynamics and whatever —
[24]   Q: You do know two of which they did not

1—11:56:31  24—11:57:52                              Page 143

[1] agree with you?
[2]    A: Yes.
[3]    Q: Which two?
[4]    A: State versus Harmon. And again, I don't
[5] know —
[6]    Q: State versus Harmon, H-A-R-M-O-N?
[7]    A: Yes.
[8]    Q: And that was the 10/13/92 date?
[9]    A: Yeah. Jury acquitted him.
[10]   Q: Okay.
[11]   A: And the State versus Delio, D-E-L-I-O.
[12]   Q: The 12th, 1/25/99 date?
[13]   A: That was a hung jury that was later then
[14] pled. Those are off the top of my head. The other
[15] ones I think are — were convictions.
[16]   Q: Okay. The cases on this list that you
[17] have for magistrate court, traffic — do you see
[18] that?
[19]   A: Yes.
[20]   Q: Every magistrate court it says "traffic."
[21] And so there were two magistrate courts.
[22]      The magistrate court does not
[23] qualify as an expert; is that true?
[24]   A: To my — I don't think so.

1—11:58:01  24—11:59:11                              Page 144

[1]    Again, it's — it was primarily —
[2] perhaps the "expert testimony of witness" is
[3] misleading, and it's not meant to be. It's just as I
[4] testified in my capacity as a collision
[5] reconstructionist. Not necessarily accepted — for
[6] instance, we talked earlier, sometimes there's no
[7] evidence there. But I'm there as a
[8] reconstructionist, not necessarily testifying as to
[9] formulas or areas, other than just being recognized
[10] as this is my area of what I do.
[11]   Q: Okay. Understood.
[12]   A: As opposed to uniformed trooper or a
[13] criminal homicide investigator or whatever their
[14] areas are.
[15]   Q: Okay. Without really having to look
[16] through with any detail at Plaintiff's Exhibit
[17] Weaver 3, that's it for my questions on that right
[18] now.
[19]   A: Okay.
[20]      (Document marked Plaintiffs'
[21] Exhibit 6 for identification.)
[22]      BY MR. VAN DER VEEN:
[23]   Q: I'm going to show you what I'm going to
[24] mark — and I believe this to be a clean, blank

*1—11:59:14  24—12:00:58*  Page 145

[1] copy — as Plaintiff's Exhibit Weaver No. 6. It is
[2] your report in this case, the motorcycle/van accident
[3] between Vascek and the UPS driver, Bard.
[4]   A: Okay.
[5]   Q: When was the last time you looked at this
[6] report? For example, did you look at it in
[7] preparation for your testimony today?
[8]   A: A little bit, but not in its entirety. I
[9] haven't read it from cover to cover when I went out
[10] of the office.
[11]   Q: Probably since you wrote it?
[12]   A: Correct.
[13]   Q: Could you look through Weaver 6 and make
[14] sure that that is a complete copy of the report as
[15] you had it, including what I believe to be the one
[16] and only supplemental report.
[17]   MS. RISK: Mike, do you have a copy
[18] of the document that you've just given Corporal
[19] Weaver, or is that the only copy?
[20]   MR. VAN DER VEEN: No, I believe I
[21] do.
[22]   MS. RISK: I have my copy, but I
[23] just want to make sure that it's the same.
[24]   MR. VAN DER VEEN: Maybe what I'll

*1—12:00:59  24—12:02:44*  Page 146

[1] do is have this copied. Because I couldn't make sure
[2] that the one more copy that I have actually — I
[3] don't actually know it's the same, because I see a
[4] cover page on it, for example.
[5]   MS. RISK: Okay.
[6]   MR. VAN DER VEEN: Why don't we
[7] pull that out. It's just a fax cover sheet. Pull
[8] that out. Okay.
[9]   THE WITNESS: Would you want
[10] that —
[11]   MS. RISK: Since you've marked it
[12] as an exhibit, could you please disclose what
[13] you're —
[14]   MR. VAN DER VEEN: Sure. It's a
[15] fax cover sheet with Nina's handwriting on it saying
[16] that this is what was faxed to us from the
[17] supplement.
[18]   MS. RISK: Okay.
[19]   MR. VAN DER VEEN: I just didn't
[20] want to clog up the report as it is.
[21]   MS. RISK: I understand.
[22]   THE WITNESS: I'll have to
[23] (indicating) —
[24]        BY MR. VAN DER VEEN:

*1—12:02:44  24—12:04:30*  Pa

[1]   Q: Please do. All I'm trying to do here is
[2] make sure that we're working off of one complete
[3] report. That's my goal.
[4]   A: It appears to be conclusive, but let me
[5] check.
[6]   Q: And please double check against that
[7] which you know is a complete report.
[8]   A: As far as the report portions of it,
[9] there are other exhibits that this refers to.
[10]   Q: Such as the photographs?
[11]   A: Photographs.
[12]   Q: Field notes?
[13]   A: Medical examiner's reports. They're not
[14] included in this, but they're in this file.
[15]     But as far as the bare, base
[16] reports, primarily being what we refer to as the
[17] collision report, and then the crime incident report,
[18] and the one supplement report, yes, that appears to
[19] be everything.
[20]   Q: Okay. You had indicated in our
[21] conversation so far that you had noticed that there
[22] were a couple of errors in the report, whether it be
[23] typographical or otherwise. Could you identify for
[24] me those which you know to be errors? And I don't

*1—12:04:37  24—12:06:01*  Pa

[1] like that word, but — the word that you used, I'll
[2] use it.
[3]   A: I don't like it either, but —
[4]     On the —
[5]   Q: I don't like the word, because I don't
[6] want you to think that I'm being accusatory in the
[7] way — which is what the word connotates.
[8]   A: The face page of the criminal incident
[9] report, which is one of 19, it says "Initial Crime
[10] Report," there are two discrepancies.
[11]   MS. RISK: What page?
[12]   THE WITNESS: It's Page 1. It's
[13] the face page of the crime report.
[14]   MR. VAN DER VEEN: See, what we
[15] have is not in that order. I assume that yours and
[16] mine are not, because we got it from the same place.
[17]   Tell you what. Do you want me to
[18] take a copy of this so that we're on the same page?
[19]   MS. RISK: Please, literally.
[20]   MR. VAN DER VEEN: Yeah.
[21]   THE WITNESS: That's what I — all
[22] your things are stapled; it's the complete
[23] everything. But what I'm looking at is —
[24]        BY MR. VAN DER VEEN:

1—12:06:01  24—12:07:06  Page 149

[1] Q: Different order.
[2] A: That's only including the collision
[3] report and the crime report. There's other pages, a
[4] whole array of the entire file. The toxicology
[5] report, that's not in that. That right there is just
[6] the collision report.
[7] Q: But you didn't prepare the toxicology
[8] report; right?
[9] A: Right. You asked me to identify what
[10] that was.
[11] Q: Right. What is in front of me is the
[12] complete report that you prepared to?
[13] A: I believe in addition to Corporal —
[14] Q: And the one supplemental?
[15] A: Yes, yes.
[16] Q: And the other items which you say are in
[17] your report are the autopsy report, the toxicology
[18] report, the victim's notification report?
[19] A: Everything, yes. The other things that
[20] we refer to, in addition to the supporting documents,
[21] field notes, whatever was in the file.
[22] Q: Okay. And let's call that a complete
[23] report, with the autopsy and tox screens and your
[24] field notes and all of that.

1—12:07:07  24—12:08:25  Page 150

[1] That has never been produced to
[2] anybody in total, correct, as one report?
[3] A: Correct, to my knowledge.
[4] Q: But Weaver Exhibit 6 is what was
[5] distributed to my office and represented to me as
[6] your report.
[7] A: Yes.
[8] MR. VAN DER VEEN: Okay. I'm going
[9] to make a copy of Weaver 6, if you like.
[10] MS. RISK: That's fine. But just
[11] for the record, the sketch that I have in front of me
[12] that was sent from Delaware State Police, that was
[13] provided to me, when the supplement came, was also
[14] the page including fingerprints, the tox report,
[15] certificate of death.
[16] MR. VAN DER VEEN: Those were never
[17] given to me, nor did you send them to me in your
[18] document production request.
[19] MS. RISK: No, your office was
[20] provided with a copy from the Delaware State Police,
[21] as well as mine.
[22] MR. VAN DER VEEN: Actually — but
[23] no, I was not provided, apparently, the same thing
[24] you were. I've never seen the fingerprints.

1—12:08:29  24—12:09:24  Page 151

[1] What you sent to me in your
[2] document production request, which is your
[3] Bates-stamped Nos. 1 through — as far as the police
[4] report. You can stop after your Bates Stamp No. 9.
[5] MS. RISK: Which is the diagrams of
[6] the vehicle.
[7] MR. VAN DER VEEN: Yeah. Isn't the
[8] fingerprints you have there? Isn't the tox screen
[9] that you have there? Isn't the —
[10] MS. RISK: No. But this was
[11] provided — these were provided — this was provided
[12] in a production from the Delaware State Police
[13] subsequent to that initial police report.
[14] MR. VAN DER VEEN: You mean they've
[15] sent you stuff more than once?
[16] MS. RISK: This was the report in
[17] its entirety. I assume they must have sent it the
[18] second time.
[19] MR. VAN DER VEEN: Okay.
[20] MS. RISK: But at the time that
[21] those Interrogatories were responded to, that was the
[22] totality of the report that I had.
[23] MR. VAN DER VEEN: You'll update
[24] your document production request then?

1—12:09:25  24—12:10:15  Page 152

[1] MS. RISK: Are you telling me that
[2] you don't have what was provided?
[3] MR. VAN DER VEEN: I don't have my
[4] client's fingerprints. I don't have the tox screen.
[5] MS. RISK: Or the pathology report
[6] on either your client or any driver?
[7] MR. VAN DER VEEN: No, I don't have
[8] the pathology report on your driver.
[9] MS. RISK: Not the tox report, the
[10] pathology report —
[11] MR. VAN DER VEEN: I have the
[12] coroner's report. I have the —
[13] MS. RISK: I'm sorry. This is all
[14] right in the middle of the end of the supplemental
[15] part of the report. But I'm happy to share anything
[16] that I have here.
[17] MR. VAN DER VEEN: Let me ask you
[18] this: Do you think that's a complete report that you
[19] have there?
[20] MS. RISK: I assumed that it was a
[21] complete report, because that's what was sent to us
[22] from the Delaware State Police.
[23] MR. VAN DER VEEN: Do you want to
[24] mark this as Weaver 7, and we'll use that for the

Vascek v. UPS                                                         Corporal Jeffrey W
                                                                      June 23,

| 1—12:10:19  24—02:06:18 | Page 153 |
|---|---|

[1] purposes of the questioning of the report?
[2]     It doesn't make sense for the
[3] continuity and clarity of a transcript, to work off
[4] of a half a report and then a full report.
[5]     MS. RISK: I'd be happy to do that.
[6] I believe this is a clean copy.
[7]     MR. VAN DER VEEN: Okay.
[8]     MS. RISK: Although I just wrote on
[9] it. And it has a stamp at the top of it.
[10]    MR. VAN DER VEEN: "Working copy,"
[11] for you guys.
[12]    MS. RISK: For me.
[13]    MR. VAN DER VEEN: I see. I will
[14] I'll work with Weaver 6.
[15]    MS. RISK: Can we go off the record
[16] for just a minute?
[17]    MR. VAN DER VEEN: We can go off
[18] the record.
[19]    For the purposes of clarity, what
[20] time did we start the deposition?
[21]    THE COURT REPORTER: 8:56.
[22] (Brief recess.)
[23]              BY MR. VAN DER VEEN:
[24] Q: Okay. Now, looking at Plaintiff's

| 1—12:24:24  24—12:25:36 | Page 154 |
|---|---|

[1] Exhibit 6, I had asked you — you had indicated that
[2] you thought there were some errors to a certain
[3] extent on this. And I was going to ask you if you
[4] could show me where they exist.
[5]     A: These are all in the same order?
[6]     Q: We're all in the same order.
[7]     A: The page immediately following the sketch
[8] of the truck, or the van.
[9]     Q: Gotcha.
[10]    A: That is the face page of the initial
[11] crime report, of which it says, in the narrative, See
[12] Pages 2 through 19 of the report for investigative
[13] narrative.
[14]    If you'll note, about halfway down,
[15] there's a block that says "Reporting person," and
[16] "no" is marked. And right to the right of that it
[17] says "Victim injured?" And it says "no," "no."
[18]    That's clearly — obviously should
[19] be a yes. And "Victim deceased?" should also be a
[20] yes, not a no.
[21]    Those are the two that I referred
[22] to. And they were picked out by the family when they
[23] reviewed report. We didn't catch it, and
[24] unfortunately the computer-generated reports that we

| 1—12:25:41  24—12:27:09 | Pa |
|---|---|

[1] use occasionally have quirks. And you save and you
[2] file and when you reopen it, things — this was never
[3] caught. So those are the two that I was referring
[4] to.
[5]     The other two questions that were
[6] asked by the family that we asked — the victim
[7] services representative, were not errors. They were
[8] questions specifically as to whether you could say
[9] whether or not — if the operator, Mr. Bard,
[10] performed CPR, was one of the questions. It has
[11] nothing to do with an error, and they did challenge
[12] the question on the commission report. Which is not
[13] an error, but I'm just clarifying these four areas.
[14]    On the collision report, which
[15] would be Page 3 of 6, about two/thirds of the way
[16] down, there's a block that says "Contributing
[17] circumstances, driver."
[18]    Again, this is a category of fields
[19] that we pick and a drop-box pops down. But the
[20] family was challenging — and by that I mean, this is
[21] referring to — this is Mr. Bard's portion of the
[22] report dealing with license information and
[23] everything relating to him.
[24]    Contributing circumstances to

| 1—12:27:13  24—12:28:13 | Pa |
|---|---|

[1] driver. It says, "No improper driving." That is not
[2] an error. But again, that's the fourth area that was
[3] pointed out by the victim's representative. In their
[4] opinion, they feel and felt that that was an error
[5] and/or — obviously why we're here today.
[6]     But those are the four issues that
[7] I was talking about. Two of them actually are
[8] computer error. Obviously he's injured, and
[9] obviously he's deceased, because they both — but
[10] those are the two that I was referring to.
[11]    Q: Is it your belief that Mr. Bard himself
[12] performed CPR on Mr. Vascek?
[13]    A: It's my understanding that he did not,
[14] because that — I made follow-up phone calls to see
[15] if that happened. And I think — I'm not going to
[16] answer that, because that's assumption and what the
[17] family — all I was answering was the question that
[18] was asked.
[19]    Q: And he's since sworn to a statement that
[20] he did, in fact, perform CPR, Mr. Vascek. Are you
[21] aware of that?
[22]    A: No.
[23]    Q: Okay. Were you ever told that he was
[24] certified to give CPR at any time in his life?