---

**Page 157**
1—12:28:16   24—12:29:54

[1] A: I have no knowledge of that.
[2] Q: Okay.
[3] A: Nor would need to know.
[4] Q: Okay. Certainly not something he told
[5] you?
[6] A: I'm going to go to my —
[7] Q: We'll get there.
[8] A: By memory, I don't recall. If it's in
[9] the statement, he did. But I don't recall him doing
[10] it or saying it.
[11] Q: How were you called to the scene of this
[12] accident?
[13]     Now, for the record, I'm going to
[14] now be referring to "this" accident. I'm referring
[15] to no other accident than the accident that happened
[16] a little bit after 4 o'clock on October 26th, 2004,
[17] at the intersection of Route 100 and Twaddell Mill
[18] Road between John Vascek and Mark Bard driving a UPS
[19] package van. Okay?
[20] A: Yes, sir.
[21] Q: Is that clear?
[22] A: Yes, sir.
[23] Q: Okay. How were you assigned to or called
[24] to this accident scene?

---

**Page 158**
1—12:30:13   24—12:31:31

[1]     And you're now looking at your
[2] section of the report where you described what each
[3] police officer did at the scene; correct?
[4] A: Yes, Page 10.
[5] Q: Yeah.
[6] A: According to the Regional Communication
[7] Center report, which is also incorporated in the
[8] file, or what we refer to as Recom — that's the
[9] dispatch report that incorporates the police dispatch
[10] side of the house; and there is a copy report for the
[11] fire board side of the house.
[12]     They have me, according to their
[13] records, en route to the collision scene at
[14] approximate 1704 hours, which is 4 minutes past
[15] 5:00 p.m. And they have me arriving at the scene at
[16] approximately 1718 hours, military time for 18
[17] minutes past 5:00 p.m., on Tuesday afternoon,
[18] October 26th, 2004.
[19]     But judging the time, I was
[20] probably — I was at home. We get — when we're on
[21] call or out of our house, we have to have a pager on
[22] so they can get us. Or if we're home, normally I'll
[23] turn it off. I don't know if the pager went off or
[24] if it was a phone call. But that's the time I was

---

**Page 159**
1—12:31:34   24—12:33:28

[1] notified.
[2] Q: Whose car would you have driven to the
[3] scene?
[4] A: My assigned police car.
[5] Q: Which you have 24 hours around the clock?
[6] A: Yes.
[7] Q: What time did the accident happen,
[8] according to your investigation?
[9] A: Approximately 1600, which is 4 o'clock.
[10] Q: On your report, you also, at times,
[11] indicate that the accident happened at 1620.
[12]     I'll direct your attention to
[13] Page 4 of CMV investigation. On Page 2, the second
[14] to the bottom, "On Tuesday afternoon, October 26,
[15] 2004, at approximately 1620 hours, vehicle was
[16] traveling southbound on Route 100 traveling" —
[17]     (unintelligible as witness reads from report.)
[18]     Okay.
[19] Q: Do you see that?
[20] A: Yes. That's also in the crime report.
[21] Q: It's — it's interchangeable on your
[22] graph. It's 1600 — on some of the forms, it's 1600.
[23] It's 1620 at other times. And as you sit here today,
[24] what time do you think the accident was?

---

**Page 160**
1—12:34:03   24—12:35:39

[1]     What are you looking at?
[2] A: I'm looking at the Regional Communication
[3] printouts.
[4] Q: Gotcha.
[5] A: The time of the collision should be
[6] approximately 1620 hours, because the first call —
[7] wait a minute.
[8]     The fire board got the call at 1600
[9] hours, and it was not apparently given to police
[10] dispatch until 1625 hours — 25 minutes into it.
[11]     So I would have to say that the
[12] collision occurred, by the earliest time that it was
[13] reported, 1600, or 4 o'clock p.m.
[14] Q: If Mr. Bard says it was after that and
[15] the eyewitness says it was after that —
[16] A: After what? 1620 or —
[17] Q: After 1600.
[18] A: Okay.
[19] Q: — what would you say that the time would
[20] be?
[21]     MS. RISK: Are you asking for an
[22] opinion?
[23]     MR. VAN DER VEEN: Yeah, I'm asking
[24] for —

1—12:35:39  24—12:37:03                                    Page 161

[1] THE WITNESS: My opinion, to answer
[2] both questions, based on the documentation that I
[3] have in front of me, would be that it would have to
[4] have occurred at 4 o'clock, because that's the
[5] earliest time of the two emergency reporting systems,
[6] 911 system, of it going in.
[7]     Normally when the call-taker takes
[8] a call — to my understanding, not by experience of
[9] being a call taker — they try to differentiate at
[10] that point, or distinguish whether it's injury or
[11] property damage crash. If it's a police incident,
[12] they immediately refer it to the police side of the
[13] dispatch. If it's injury, obviously injuries come
[14] first; they dispatch it to the fire board side of the
[15] house and get medical personnel rolling.
[16]     So the report that I have is a copy
[17] of the fire board printout for that day. They
[18] clearly have that the report — the first call of
[19] this incident was 1600 hours, or actually on the
[20] report it's actually 1600.54.
[21]     So if their records are accurate,
[22] then the collision had to have occurred around
[23] 4 o'clock, as opposed to 4:20.
[24]     Now, the time on the police

1—12:37:05  24—12:38:19                                    Page 162

[1] dispatch — see the numbers that the troopers receive
[2] are only Recom. They get the time that the Regional
[3] Communication Center receives it, and the time that
[4] they're dispatched and the time that they arrive —
[5] the road units.
[6]     And as you see, although I didn't
[7] realize it until just now, normally there's a few
[8] minutes in difference in which the fire board gets
[9] it; a couple minutes later, police gets it. Because
[10] obviously it's important that medical issues are
[11] addressed before we're — get us all rolling at the
[12] same time, but in order of priority or degree —
[13]     Q: The thing is that I don't believe — did
[14] you ever talk to anybody who was on the scene that
[15] said it took 20 minutes for somebody to arrive on the
[16] scene?
[17]     A: No. What the 20 minutes is — from the
[18] 1625, according to those records — I mean, the one
[19] record says the fire board received this at 1600,
[20] 4 o'clock. The Regional Communication Center or the
[21] dispatch center that works through us, they received
[22] the call at 1625,
[23]     And I can't explain why there's a
[24] 25-minute difference between the fire board receiving

1—12:38:29  24—12:39:52                                    Pa

[1] it and the police dispatch receiving it. There's a
[2] 25-minute difference, and I can't explain it.
[3]     And you're asking me opinion. If
[4] these records are accurate, which I have no reason to
[5] doubt that they are not, then the times that I refer
[6] to, those two areas that you discussed, the — and
[7] basically that's a cut and paste. The report is
[8] documented in Word and then copied and put in the
[9] code reports. It's identical.
[10]     So the 1620 that's in that is based
[11] on the times that are in the police report
[12] dispatches.
[13]     But as you clearly shown and seen
[14] and indicated, 1600 is when the fire board got it.
[15] And why there's a 25-minute — I can't explain that.
[16]     Q: Okay. The summary report, Page 5 of your
[17] report, also lists it as 1620. That would be an
[18] error also?
[19]     A: That's the one I was referring to.
[20] That's the cut and paste.
[21]     Q: Okay.
[22]     A: And that based on — normally what we do,
[23] for investigation purposes, I normally take a minute
[24] or two or couple minutes off and round it off. It's

1—12:39:55  24—02:06:18                                    Pa

[1] approximate.
[2]     Obviously like in this case, this
[3] is obviously incorrect, because I've got the report
[4] occurring at approximately 25 minutes after it
[5] already had occurred. And you go by the oldest
[6] that's there.
[7]     But for purposes of clarification,
[8] this collision occurred — it could not have occurred
[9] after 1600 hours, because it's already been reported
[10] and documented by the fire board, the first calls
[11] that came in on it. And again, I can't explain the
[12] discrepancies for the 25 minutes of why it took 25
[13] minutes to go to the dispatch side of the house.
[14]     Q: Can you imagine why it would have taken
[15] you an hour and — what time did you arrive
[16]     A: I was notified a little bit after 5:00,
[17] 5:04.
[18]     Q: So you weren't notified for over an hour?
[19]     A: Correct.
[20]     Q: Your evidence or your investigation leads
[21] you to believe that medics were on the scene very
[22] quickly, realizing that this was a very serious
[23] accident.
[24]     A: Yes. They have the first — the

---

**1—12:41:12   24—12:42:30**                               Page 165

[1] paramedic — New Castle County paramedic and the
[2] Talleyville ambulance are on scene at 13 minutes
[3] after 4:00.
[4]    Q: It's still another 50 minutes before
[5] you're notified. Is that typical?
[6]    A: If the 1600 hours on the fire board was
[7] accurate, the answer to your question would be no,
[8] that's not typical.
[9]       Because based just what's on the
[10] police dispatch, for them to have received this at
[11] 4:25, first unit that was dispatched to the scene
[12] received a dispatch, they obviously — apparently
[13] were backed up. The first person dispatched to the
[14] scene that's recorded is 1640, which is Blaine
[15] Quickel.
[16]    Q: 1640 is the time that he's supposedly
[17] pronounced dead.
[18]    A: Well —
[19]    Q: When I say "he," John Vascek —
[20]    A: I understand.
[21]    Q: — is supposedly pronounced dead?
[22]    A: But according to the printouts here, 1640
[23] is when the first state police is acknowledged to be
[24] dispatched or en route to the collision scene.

---

**1—12:42:33   24—12:43:51**                               Page 166

[1]    Q: Who were the first people on the scene?
[2]    A: Police or fire board?
[3]    Q: Fire board first and then police.
[4]    A: Fire board first arriving, according to
[5] the fire board dispatch, is 13 minutes after 4:00.
[6] It was Talleyville and the New Castle County
[7] paramedic.
[8]    Q: Who was the first police on the scene?
[9]    A: First police to arrive at the scene is
[10] Trooper First Class John Forrester.
[11]    Q: At what time?
[12]    A: They have him arriving at the scene at
[13] 1625, which is the same time they're saying police —
[14] see, with him there was no dispatch time. They have
[15] him arriving at 1625.
[16]    Q: They had the police helicopter there at
[17] 1618 and waved it off. Do you know why?
[18]    A: No. Might be because of geographical
[19] location as to where they could land. But there's
[20] fields south and probably north of that where — I
[21] don't know why it was called off.
[22]    Q: Can I ask you that — when I look on
[23] Page 6 of your report, I'm not — it says, that the
[24] 'copter was called off because of Mr. Vascek's

---

**1—12:43:54   24—12:50:02**                               Page

[1] injuries. Who wrote that?
[2]    A: That's my report.
[3]    Q: You wrote those words?
[4]    A: Yes, sir.
[5]    Q: Okay. Who told you that it was waved off
[6] because of his injuries?
[7]    A: This is what the chief had on that.
[8] "Called off by the fire chief of Talleyville." He
[9] called it off.
[10]    Q: Did you speak with the fire chief of
[11] Talleyville in your investigation and reconstruction
[12] of this case?
[13]    A: I must have or I wouldn't have put that
[14] there.
[15]    Q: Do you have anything in your field notes
[16] indicating a conversation with him?
[17]       Were you able to find any notes of
[18] a conversation with a fire chief from Talley?
[19]    A: I don't have any particular notes. But I
[20] think it's on the fire board. It says, halfway down
[21] the page, "1620 AOR," which means available on
[22] request. "Troop 4," which means it arrived in the
[23] immediate area, according to the reports, at 18
[24] minutes after 4:00 and it was called off — and it

---

**1—12:50:04   24—12:51:00**                               Page 168

[1] says here "by 258."
[2]       I don't have any notes to go on,
[3] only my memory. I don't recall whether I had or had
[4] not talked to him. But during a break, if I'm
[5] permitted to make a phone call to the fire board,
[6] they can tell me what the notes 258 on the fire board
[7] is. Probably the chief.
[8]       I know from experience of what the
[9] medic units are, what ambulance units are, I have a
[10] breakdown sheet of like — for instance, what the
[11] numbers are. Like for instance, like 25 is
[12] Talleyville, or if they're numbers, the specific fire
[13] companies.
[14]       By looking at this, I mean, I'd
[15] have to say the 258 is the chief. That's where I got
[16] it from, the fire board. But I don't recall speaking
[17] with him.
[18]    MR. VAN DER VEEN: Fair enough.
[19] We're going to take a lunch break
[20] now.
[21]    A: Okay.
[22]    MR. VAN DER VEEN: Actually, we ask
[23] that you don't call anybody during the break. So
[24] it's as though you're still on the stand, and I don't

---

1—12:51:02  24—02:30:21                                    Page 169

[1] want to in any way circumvent that.
[2]      THE WITNESS: No problem.
[3]      MR. VAN DER VEEN: Thank you.
[4]      (Luncheon recess from 12:50 p.m. to
[5] 2:30 p.m.)
[6]           BY MR. VAN DER VEEN:
[7]      Q: We will turn to Weaver 6, which is the
[8] police report. I believe we went through how you
[9] were assigned, by the time you got there.
[10]     When you arrived on the scene, what
[11] did you do first?
[12]     A: Talked to the troopers at the scene.
[13]     Q: And they were who?
[14]     A: Well, the troopers who were at the scene
[15] were Trooper First Class John Forrester, Master
[16] Corporal Blaine Quickel, looks like Corporal Steve
[17] Rizzo, and Trooper First Class Andrew Hudak, is
[18] what's on the communication printout.
[19]     I couldn't tell you who exactly I
[20] spoke to. I spoke to some of them, one of them,
[21] couple of them. Just got the idea of what was going
[22] on.
[23]     Looking at this printout —
[24]     Q: Which printout?

1—02:30:23  24—02:31:09                                    Page 170

[1]     A: This is just a copy that I made — I got
[2] the numbers.
[3]     Q: The Recom and the fired board?
[4]     A: That's the format that I used. I just
[5] did this on my own.
[6]     MS. RISK: Do you mean — I wanted
[7] to see what you were — okay. Now I understand.
[8]           BY MR. VAN DER VEEN:
[9]     Q: You did this on your own?
[10]    A: I made this up. Because what I do is I
[11] look at each item entry on the log and then put in
[12] the continuity.
[13]    If you'll refer to the page in the
[14] report that it does, it's easier to —
[15]    Q: I understand. So the page that I'm
[16] looking at, which is in your report, which is under
[17] your file — actually, wasn't in your report, but
[18] it's out of your file.
[19]    A: It's like a working —
[20]    Q: It's a worksheet for you. And it has
[21] Recom printout on it, fire board printout. I gotcha.
[22]    A: By looking at it, looks like Sergeant Cox
[23] got there before I did. So realistically, and
[24] understandably, he already had talked to them. So he

1—02:31:11  24—02:32:09                                    Pa

[1] was on — in that group of who I spoke to too, I'm
[2] sure, to find out what he wanted us to — how we we
[3] going to work as a team. And the next thing I did
[4] was took photographs.
[5]     Q: Before I ask you about the photographs,
[6] do you recall anything that either one of the
[7] troopers, either Forrester, Quickel, Rizzo or Hudak,
[8] might have told you at the scene when you got there
[9]     A: No.
[10]    Q: Do you recall anything that Sergeant Cox
[11] told you when you got to the scene?
[12]    A: Not specifically.
[13]    Q: Generally?
[14]    A: Not any — I couldn't say. He told me
[15] this — the group of who was there, I got the basic
[16] drift of the preliminary, what happened.
[17]    Q: So then you took the photographs?
[18]    A: Yes, sir.
[19]    Q: And did you do it in the manner in which
[20] you've described, 360 degrees?
[21]    A: Yes, sir.
[22]    Q: What did you do next?
[23]    A: Sergeant Cox was doing the field sketch
[24] while I was doing that.

1—02:32:16  24—02:34:01                                    Pa

[1]     Q: Do you have that field sketch handy to
[2] you?
[3]     A: Yes.
[4]     Q: While you're looking for that, when you
[5] got on the scene, what do you recall seeing?
[6]     A: This intersection is somewhat of a
[7] T-shaped intersection, and it's on the curve. I
[8] arrived from the south going north to get to that
[9] intersection.
[10]    What I remember, as far as the
[11] scene, there was a UPS truck parked or stopped,
[12] positioned on Twaddell Mill Road. And it was not at
[13] the stop sign but ahead of the stop sign toward the
[14] intersection, but not in the intersection.
[15]    There was a motorcycle off to — it
[16] looked like it would have been in the northbound
[17] lane. That was pretty much about it. There wasn't
[18] much there.
[19]    And I also then had learned that
[20] the UPS truck had been moved. And I'm trying to
[21] remember initially — I don't remember if there were
[22] two UPS trucks there at that time or not. I believe
[23] there were. Because there was one backed up to the
[24] first one, because they were unloading the packages.

Corporal Jeffrey Weaver  
June 23, 2005

Vasick v.  
UPS

---

1—02:34:09   24—02:35:48                                      Page 173

[1] I'm pretty sure that they were both there when I got
[2] there. But they would be reflected in the
[3] photographs. If it wasn't there, it was there
[4] shortly after it happened, because I remember that.
[5]    Q: You don't recall if there were two UPS
[6] trucks or one UPS truck there when you got there; is
[7] that correct?
[8]    A: There were two. I'm pretty sure they
[9] were both there. If someone had — had already given
[10] authorization — and I don't know who that was — for
[11] the packages to be removed from the truck that was
[12] involved in the collision to a separate truck for
[13] delivery to be able to be made.
[14]    (Document marked Plaintiffs'
[15] Exhibit 7 for identification.)
[16]         BY MR. VAN DER VEEN:
[17]    Q: Let me show you what has been marked as
[18] Weaver 7 —
[19]    MS. RISK: Can I just see it just
[20] to make sure.
[21]    MR. VAN DER VEEN: Sure.
[22]         BY MR. VAN DER VEEN:
[23]    Q: Weaver 7 is the field sketch made by Cox;
[24] is that true?

1—02:35:49   24—02:38:05                                      Page 174

[1]    A: Yes, sir.
[2]    Q: Okay. This field sketch, as it is drawn,
[3] was this part of the basis of your report?
[4]    A: Yes, sir.
[5]    Q: While the field sketch was being drawn,
[6] you were taking the photographs; correct?
[7]    A: Yes.
[8]    Q: Let me talk about the field sketch first.
[9]    Field sketch, Weaver 7, shows the
[10] UPS truck in two positions, one at the intersection
[11] of Twaddell Mill Road and Route 100; and then one in
[12] dotted lines across the southbound lanes; correct?
[13]    A: Yes, sir.
[14]    Q: Now, this diagram is not to scale;
[15] correct?
[16]    A: Correct.
[17]    Q: And its positions on the roadway are
[18] approximations; is that true?
[19]    MS. RISK: I'm going to object to
[20] the form. And I'll ask counsel, I know that we've
[21] gone all the way through Corporal Weaver's background
[22] by leading questions.
[23]    But with respect to the accident
[24] report, I'm going to have a standing line of

1—02:38:08   24—02:38:55                                      Page

[1] objections to form of questioning if you continue
[2] with the leading questions. I'd rather — obviously
[3] I'd rather have you ask the corporal exactly what it
[4] depicts rather than lead. So —
[5]    MR. VAN DER VEEN: No problem.
[6]         BY MR. VAN DER VEEN:
[7]    Q: It's not to scale; right?
[8]    A: Correct.
[9]    Q: And it only approximates positions of
[10] vehicles, skid marks and whatnot on the road?
[11]    A: Yes.
[12]    MS. RISK: Objection to form.
[13]         BY MR. VAN DER VEEN:
[14]    Q: Is it exact?
[15]    A: Exact in regards to —
[16]    Q: The positions of vehicles in the roadway.
[17]    A: No.
[18]    Q: I only ask it that way so that her form
[19] objection is satisfied.
[20]    A: Okay.
[21]    Q: I understand.
[22]    Is it exact with respect to any
[23] markings on the roadway?
[24]    A: No. It's a field sketch.

1—02:38:59   24—02:06:18                                      Page 176

[1]    Q: It's obvious to me.
[2]    Do you know whether or not the UPS
[3] package van had been moved before Cox got there?
[4]    A: I don't know. I believe it was, but I
[5] don't know.
[6]    Q: Do you know whether the motorcycle had
[7] been moved before Cox got there?
[8]    A: Again, I believe it was, but I can't
[9] confirm that. Only Sergeant Cox could, because he
[10] got there 15 minutes before me.
[11]    Q: At some point you found out that you —
[12] when you got there, they weren't at their final
[13] resting spots?
[14]    A: Correct.
[15]    Q: Did Sergeant Cox tell you that they had
[16] been moved at any time after he got there?
[17]    A: I don't recall him ever saying that, no.
[18] Or anyone, for that matter.
[19]    Q: All right. Let's go through your
[20] pictures first.
[21]    I have a series of 24
[22] photographs — actually, it's 25 photographs, the
[23] first being your case file.
[24]    A: Yes, sir.

**Page 177**

1—02:40:24   24—02:44:57

MR. VAN DER VEEN: And I will have these marked as group Exhibit No. 8.

(Document marked Plaintiffs' Exhibit 8 for identification.)

BY MR. VAN DER VEEN:

Q: What I'd like to do is go through each photograph and have you describe what you see in it and what is — what it is that you're trying to get and what you were trying to capture in each photograph.

Do you understand that and is that fair?

A: Yes, sir.

Q: Okay, great.

So we will go first with what is Photo No. 2.

A: Okay. My numbers correspond with yours. I should be in the right order.

Q: Looking at what we have marked as 8.2, what do you see in this picture? Is this the first picture that you took?

A: It would have to be if it's out of the sequence. Is this the same one?

Q: Yeah, we're on the same one.

**Page 178**

1—02:45:00   24—02:45:57

A: This is a location — you're looking in a northerly direction at the intersection. Do you see my police car to the right? Unmarked Crown Vic.

There's a gentleman to the left on a cellphone.

Q: Do you know who that is?

A: Not by the back. I know he's a representative from UPS, but I don't know who.

Q: Is he the gentleman who was sitting in the car with you when you took the statement?

A: Probably.

Q: Do you remember how that gentleman was dressed? Tie? not tie? It looks to me from this picture there might be a couple UPS guys.

A: It was probably him, but — and actually, if I saw him in the face, I wouldn't remember his name. I got business cards as to who I spoke with.

Q: Sure.

A: The intersection of Twaddell Mill Road is to the left of this photograph, or the west and an easterly direction. You can see the front of the UPS truck.

You can see straight ahead — in the 50, 70 feet or so ahead of my police car in the

1—02:46:02   24—02:46:53

northbound lane is the resting position of the motorcycle, or the motorcycle involved in this collision.

You can see two troopers standing in the middle of the southbound lane. There's a car behind them, or north of them. And Sergeant Cox is standing to the right of that open door.

Q: Whose car is that?

A: I'm not sure. If I had to guess, if you want me to guess —

Q: Okay.

A: — I would think it's Amy Stratton, a witness, but I'm not sure.

Q: And then there's emergency vehicles north of that. You can see the headlights of the vehicle. And pretty much depicts — there's a gentleman standing to the right front corner of the bus — or the van or the truck, whatever you call it.

And from a distance, I believe that's Mr. Bard.

Q: With the UPS cap on?

A: Yes.

And then there's two other gentlemen standing to the left of the UPS truck,

1—02:46:57   24—02:48:17

which would be north of where the truck is positione in this photograph. I don't know who they are. I can't see or tell from here.

Q: Do not look like police personnel to you?

A: No.

Q: Were any people allowed on the scene that were not police personnel or UPS employees?

A: Not normally, no. Excluding media. We normally permit them to a point, after like — obviously we don't let media take photographs of bodies and things like that.

But excluding — the answer to the question, no.

Q: You don't recall any media being on the scene of this accident; right?

A: No.

Q: 8.3?

A: That's this one?

Q: No, 8.3 has — there's No. 3 on the back. That's correct.

A: No. 3. I'm sorry. I apologize. The first shot — you're right. Right choir, wrong pew.

Q: What's this show? You were hoping to get the road signs in there, I bet, but they shine.

**1—02:48:21  24—02:49:31**  Page 181

[1] A: Yeah. This is the first picture —
[2] basically I'm standing somewhat in the center of the
[3] north and southbound lanes and shooting a photograph,
[4] which would be in a northwesterly direction toward
[5] Twaddell Mill. Which shows — of course, the glare
[6] and you can't — from the flash, you can't see the
[7] wording on the signs. But there's a stop sign, and
[8] then it has the two trucks back to back.
[9] Q: What are they doing?
[10] A: Well, what — what they had done — was
[11] requesting — once we gave them authorization — and
[12] I'm not sure if my sergeant did or somebody did.
[13] They were requesting permission to offload the
[14] damaged vehicle to — the packages, to put it on
[15] another vehicle and to make deliveries, for their
[16] continuity and accountability for the packages on the
[17] truck.
[18] Q: Okay. So they wanted to get the packages
[19] off to where they needed to go?
[20] A: Yes.
[21] Q: Okay. Anything else in that picture
[22] that —
[23] A: Just showing that — where the truck was
[24] located at that time, upon my arrival.

**1—02:49:34  24—02:50:23**  Page 182

[1] Q: Which isn't really relevant to your
[2] investigation of this case, because it's not a final
[3] resting point or a point of rebound or anything of
[4] that nature; correct?
[5] MS. RISK: Objection to form.
[6] BY MR. VAN DER VEEN:
[7] Q: You can answer.
[8] A: This represents where the trucks were
[9] when I got there, not as to where I later learned
[10] they were.
[11] Q: And when you talk about your opinions in
[12] this case, where the truck was when you got there
[13] really has no relevance to it; is that true?
[14] MS. RISK: Objection to form.
[15] THE WITNESS: No, it does have
[16] relevance.
[17] BY MR. VAN DER VEEN:
[18] Q: What's the relevance?
[19] A: Well, like I stated earlier, once upon a
[20] time ago, our preference in the Disney world is that
[21] the vehicles aren't removed at all; that they're at
[22] their final resting point post impact of where they
[23] go.
[24] But — so it is important and

**1—02:50:24  24—02:51:20**  Page 183

[1] relevant to what we do, because it's obviously much
[2] harder to reconstruct placement of where these things
[3] end up.
[4] Q: Do you know who put the package van there
[5] where it is?
[6] A: No.
[7] Q: Do you know who instructed it to go
[8] there?
[9] A: Not specifically. I'm — my
[10] understanding, it was a member of the representatives
[11] from UPS. But also Sergeant Cox was directing some
[12] things. I know they were coordinating — I never
[13] gave any permission, but I know they would have
[14] coordinated, because they wouldn't have — we
[15] wouldn't have allowed them to do it without our
[16] authorization.
[17] Q: My question is, is it possible that it
[18] was done before you even — you or Sergeant Cox or
[19] any trooper ever got there?
[20] A: As far as packages being removed?
[21] Q: No, the van being moved to that location,
[22] the package van.
[23] A: The collision vehicle or the
[24] noncollision —

**1—02:51:20  24—02:52:07**  Page 184

[1] Q: The collision vehicle. Let me ask you
[2] that.
[3] A: Identify what van we're talking about.
[4] Q: I'm talking about the vehicle that was
[5] involved in the collision.
[6] A: Correct.
[7] Q: Who put it there? Do you know?
[8] A: My understanding from the investigation
[9] was Mr. Bard.
[10] Q: Do you know who told him to put it there
[11] or who authorized him to put it there?
[12] A: Through hearsay, I know, but not —
[13] Q: Sure.
[14] A: It was my understanding from the
[15] investigation that one of the nurses or both the
[16] nurses asked him to back it up to give them space,
[17] because they were working on Mr — "Vascek"? Is that
[18] how you pronounce it?
[19] Q: "Vascek."
[20] A: "Vascek."
[21] Q: Do you believe that that was the only
[22] time the van was moved, post impact?
[23] A: I don't know.
[24] Q: Did anybody ever tell you that — I can

1—02:52:11  24—02:53:57                                       Page 185

[1] tell you —
[2]     Picture No. 5, 8.5, on our
[3] exhibits — 8.4. I'm sorry. Let's go to 8.4 first.
[4]     The difference between 8.4 and 8.3
[5] aside from your vantage point off a little bit to the
[6] west, is the white car is gone, the people are gone,
[7] and all but one emergency vehicle appear to be gone.
[8]     MS. RISK: Just for clarification,
[9] do you mean the difference between 8.4 and 8.2?
[10]    MR. VAN DER VEEN: Yeah, 8.4 and
[11] 8.2. Thank you.
[12]                BY MR. VAN DER VEEN:
[13]    Q: Is that correct?
[14]    A: Yes, sir.
[15]    Q: Who directed those people and that white
[16] car out of the way? Do you know?
[17]    A: No idea.
[18]    Q: Is there anything of significance in that
[19] photograph to you?
[20]    MS. RISK: Is that 8.4?
[21]    MR. VAN DER VEEN: 8.4.
[22]    THE WITNESS: It's another
[23] perspective of the northern view of the roadway. And
[24] you can see part of the curve, a little bit of the

1—02:54:01  24—02:54:48                                       Page 186

[1] curve in the road on the north side of the
[2] intersection. Because you can see where — the
[3] positioning where the vehicle with the headlights are
[4] on. But the other cars and the people that are all
[5] out of the way give a clear view as to just the
[6] overview of the scene.
[7]                BY MR. VAN DER VEEN:
[8]    Q: Looking at 8.4, you were standing in the
[9] southbound lanes of Route 100 when you took it; is
[10] that true?
[11]   A: Just to the west of the center line, yes.
[12]   Q: And you can see all the way down past
[13] that stone bridge, can you not?
[14]   MS. RISK: Objection to the form.
[15]   THE WITNESS: I can see a bit
[16] beyond the stone bridge, yes.
[17]                BY MR. VAN DER VEEN:
[18]   Q: Now —
[19]   A: And I also see the front of a car. It
[20] looks like it's in the driveway —
[21]   Q: Correct.
[22]   A: — at that location.
[23]   Q: Yes, the driveway past —
[24]   A: Past.

1—02:54:49  24—02:56:01                                       P

[1]    Q: North of the stone bridge?
[2]    A: Yes.
[3]    Q: Yeah. Now, do you see in that photograph
[4] tire marks on the roadway?
[5]    A: To my location, yes.
[6]    Q: What I have counted is more than a series
[7] of 20 tire marks coming out of westbound Twaddell
[8] Mill Road and going both north and south on to
[9] Route 100.
[10]   MS. RISK: Objection to form.
[11]   THE WITNESS: What's the question?
[12]                BY MR. VAN DER VEEN:
[13]   Q: Do you see, in your photograph, tire
[14] marks —
[15]   A: Yes.
[16]   Q: — 20 or more tire marks on the roadway
[17] surface?
[18]   A: Yes, sir.
[19]   Q: When you were at the scene, did you
[20] inspect the whole intersection area for tire marks?
[21]   A: Yes, sir.
[22]   Q: Did you inspect the whole what you
[23] believed to be the path of the bike for skid marks
[24] from the bike?

1—02:56:02  24—02:57:08                                       Pa

[1]    A: Yes, sir.
[2]    Q: You found a tire mark associated with the
[3] UPS van; is that correct?
[4]    A: Yes, sir.
[5]    Q: And upon your inspection, you did not
[6] find any skid marks or tire marks from the
[7] motorcycle; is that true?
[8]    MS. RISK: Objection to form.
[9]                BY MR. VAN DER VEEN:
[10]   Q: Let me ask you it this way: Did you find
[11] any tire marks left by the motorcycle?
[12]   A: No.
[13]   Q: Did you look thoroughly?
[14]   A: Thoroughly as we could. I thought we
[15] did.
[16]   Q: You looked as though this were possibly a
[17] criminal investigation and looked with as much vigor
[18] as you could; correct?
[19]   A: Yes, sir.
[20]   Q: Thank you.
[21]      No other officer, trooper from Cox
[22] on down ever told you that they found tire marks
[23] associated with the motorcycle; is that true?
[24]   MS. RISK: Objection to the form.

## Page 189

1—02:57:10  24—02:58:06

BY MR. VAN DER VEEN:
[2] Q: You can answer that one.
[3] A: No other trooper — Sergeant Cox, as I
[4] stated earlier, did the field sketch. He observed
[5] and looked at the collision scene prior to me when he
[6] was doing his field sketch and looking and
[7] identifying what he found or what he was looking —
[8] what was there or what he thought — what we thought
[9] was there.
[10] Q: Yeah.
[11] A: And to answer, no, no one, he nor I — I
[12] looked after he did. I looked generally, but I
[13] wasn't looking specifically, because I interviewed
[14] the operator and was doing those things.
[15] But when I assisted him at the
[16] conclusion of his field sketch, before we left the
[17] scene, I equally looked as well. So no one told me
[18] that they had seen something that we didn't; he
[19] didn't see something I didn't or vice versa. We both
[20] concluded that we picked up everything that was
[21] there.
[22] Q: Has anybody ever told you — first of
[23] all, the day of this accident scene, did anybody ever
[24] tell you that they saw a tire mark associated with

## Page 190

1—02:58:08  24—02:58:54

[1] the motorcycle?
[2] A: Has anyone?
[3] Q: On that day, did anybody —
[4] A: No.
[5] Q: Has anybody, since the day of this
[6] accident, told you that they found a tire mark
[7] associated with the motorcycle?
[8] A: Yes.
[9] Q: Who told you that?
[10] A: Counsel.
[11] Q: Ms. Risk?
[12] A: Yes, ma'am.
[13] Q: When did she tell you that?
[14] THE WITNESS: Was that last week or
[15] the week when we met?
[16] MS. RISK: It was really last
[17] month.
[18] THE WITNESS: I have the date.
[19] It's on the card.
[20] BY MR. VAN DER VEEN:
[21] Q: Can you give me that date.
[22] A: Thursday, June 9th at about 9:30. I met
[23] with her at my office at the troop.
[24] Q: And on Thursday, June 9th is the first

## Page 191

1—02:58:57  24—03:00:25

[1] time that anybody had told you that they believed
[2] they found a mark associated with the tire of the
[3] motorcycle at this accident scene?
[4] A: That's the first I learned of it, yes,
[5] sir.
[6] Q: Were you told when this mark was
[7] discovered?
[8] A: That wasn't part of the conversation. I
[9] only recall her saying that there was some marks that
[10] were identified. Faint but found. I don't recall
[11] what day she said. I don't believe she did.
[12] Q: Did you see any faint marks?
[13] A: No.
[14] Q: You looked for marks, faint or otherwise?
[15] A: I looked for — as I'm trained to do, and
[16] didn't see anything.
[17] Q: 8.5?
[18] A: Okay.
[19] Q: Anything of significance in this
[20] photograph?
[21] A: Just walking closer to the location of
[22] the UPS vehicle represented in the other photographs
[23] as well.
[24] Q: I know that you told me that generally,

## Page 192

1—03:00:27  24—03:01:21

[1] when you take photographs of the scene, you like to
[2] go 360 around the scene; correct?
[3] A: Correct.
[4] Q: And you like to go 360 around each
[5] vehicle; correct?
[6] A: Yes.
[7] Q: You were not able to do that in this
[8] case, were you?
[9] A: Yes.
[10] Q: Because UPS had a double van blocking the
[11] back; is that true?
[12] A: Yes, sir.
[13] Q: Looking at No. 6, 8.6, this is you
[14] standing again looking northbound?
[15] A: Yes, sir.
[16] Q: You are south of the intersection with
[17] Twaddell Mill Road; correct?
[18] A: Yes, sir.
[19] Q: And you are still west of the center line
[20] when standing.
[21] A: I'm looking — I'm more toward the center
[22] of the road here, but maybe a little left.
[23] Q: A bit west?
[24] A: Just a little bit west.

**Page 193**

1—03:01:22  24—03:02:24

[1] Q: Yeah. And you can see straight past
[2] the — how far down can you see?
[3] A: From this location, you can see the road
[4] bends to the left quite a distance.
[5] Q: You can see a long ways; correct?
[6] MS. RISK: Objection to form. Why
[7] don't you ask him how far he can see.
[8]         BY MR. VAN DER VEEN:
[9] Q: You can see a long ways; right?
[10] MS. RISK: Objection to form.
[11]         BY MR. VAN DER VEEN:
[12] Q: You can answer it.
[13] A: I can see beyond that driveway.
[14] Q: You can see beyond the stone bridge;
[15] right?
[16] A: And behind the driveway.
[17] Q: And behind a driveway?
[18] A: A little bit. But then it goes to the
[19] left. Of course the vegetation and trees and —
[20] Q: Okay. I'm looking at No. 8.7 — before I
[21] go there, back to 8.6. You can start to see here —
[22] again, you see — do you see a lot of tire marks in
[23] the roadway —
[24] A: Yes.

**Page 194**

1—03:02:25  24—03:03:05

[1] Q: — coming out of Twaddell Mill Road?
[2] A: Yes.
[3] Q: And that's made from — would you agree
[4] that that's made from numerous vehicles?
[5] MS. RISK: Objection to form.
[6] THE WITNESS: It's made by numerous
[7] vehicles or the same vehicle going over the same site
[8] many, many times.
[9]         BY MR. VAN DER VEEN:
[10] Q: A lot. Yeah, okay. Fair enough.
[11] And you also see faintly in this
[12] photo dirt patches, do you not, in the southbound
[13] lane?
[14] A: Yes.
[15] Q: At the middle of the intersection?
[16] A: Yes.
[17] Q: Those are the dirt — well, you see
[18] actually two different patches, do you not?
[19] A: Yeah.
[20] MS. RISK: Objection to form.
[21]         BY MR. VAN DER VEEN:
[22] Q: How many dirt patches do you see?
[23] A: Two.
[24] Q: Is it your belief that one or two of

1—03:03:07  24—03:04:05

[1] those dirt patches are related to this accident?
[2] MS. RISK: Objection to form.
[3]         BY MR. VAN DER VEEN:
[4] Q: Do you believe those dirt patches are at
[5] all related to this accident?
[6] A: The dirt patch that's to the northern
[7] part of the photograph within the southbound lane, I
[8] recall, through Sergeant Cox's conversation, and I
[9] believe possibly the driver indicated that's the
[10] approximate location of where Mr. Vascek's body cam
[11] to rest after the impact, or estimated that's
[12] approximately where the impact occurred.
[13] Q: Is it your belief that the dirt came from
[14] Mr. Vascek?
[15] A: No.
[16] Q: Is it your belief that the dirt came from
[17] Mr. Vascek's bike?
[18] A: No.
[19] Q: Is it your belief that the dirt came from
[20] the undercarriage or the wheel well of the UPS
[21] vehicle?
[22] A: That would be my — I can't prove it, but
[23] that's what I thought.
[24] Q: That would be your best guess?

1—03:04:06  24—03:05:08

[1] A: That's where it came from, because
[2] there's no other dirt elsewhere on the road.
[3] Q: That would be your best guess?
[4] A: Correct, but it's a guess.
[5] Q: Yep.
[6] No. 7. There are guys in the UPS
[7] van — there's one man in the UPS van?
[8] A: Yes, sir.
[9] Q: Do you know who that is?
[10] A: No, sir.
[11] Q: Do you know what he's doing in the van?
[12] A: At this point, I would — I can only come
[13] to the conclusion that they had been given
[14] authorization to remove the packages, and that's what
[15] he was in the process of doing.
[16] Q: Do you know whose car that is in the
[17] background, pulled over to the side?
[18] A: No.
[19] Q: Do you know who the gentleman is looking
[20] like he's running on the left?
[21] A: Fire fighter.
[22] MS. RISK: Can I just see?
[23]         BY MR. VAN DER VEEN:
[24] Q: Looking at 8.8, what do you see in this

1—03:05:30  24—03:06:30                                Page 197

[1] photo?
[2]    A: This is showing the front and left side
[3] of the UPS truck. It shows some of the damage to the
[4] left front area, left front fender, hood area of the
[5] truck.
[6]    Q: This shows all the area of the damage
[7] from this accident, doesn't it?
[8]    MR. VAN DER VEEN: Pretty much.
[9]    MS. RISK: Objection to the form.
[10]              BY MR. VAN DER VEEN:
[11]   Q: Is there any damage to this van that's
[12] not in this photograph?
[13]   A: Not that I'm aware of.
[14]   Q: Okay. Now, you have in your report, I
[15] believe, described this damage as severe.
[16]   MS. RISK: Objection to form.
[17]   THE WITNESS: Again, I didn't read
[18] my cover. If you want to give me a second —
[19]              BY MR. VAN DER VEEN:
[20]   Q: Sure, take a look at your report. In
[21] your narrative — well —
[22]   A: It said "moderate to severe" — wait a
[23] minute.
[24]   Q: No, that's the bike.

1—03:06:31  24—03:07:25                                Page 198

[1]    A: Hold on.
[2] "Severe contact damage," yes.
[3] That's the way I worded it.
[4]    Q: Let me see how I worded it. I wrote
[5] those to Nina.
[6]    You also say that — you also
[7] classified this as functional?
[8]    A: Yes.
[9]    Q: In other words, it's drivable away; is
[10] that what functional means?
[11]   A: From observation and — yes.
[12]   Q: And they drove it away?
[13]   A: To my understanding, yes. They drove it
[14] back to Ruthar Drive.
[15]   Q: Did you inspect under the hood?
[16]   A: No.
[17]   Q: Did you inspect on the other side of the
[18] sheet metal here?
[19]   A: Where?
[20]   Q: The dented sheet metal.
[21]   A: As in up underneath it?
[22]   Q: Yes.
[23]   A: No, sir.
[24]   Q: Do you know how thick the sheet metal is

1—03:07:30  24—03:08:22                                Page

[1] on this front left fender that's dented in,
[2] Photograph 8.8?
[3]    A: No, sir.
[4]    Q: Do you know how much force it would take
[5] to dent that to that extent?
[6]    A: No, sir.
[7]    Q: Did you ever do any calculations to
[8] determine how much force it would take to dent it to
[9] this extent?
[10]   A: No, sir.
[11]   Q: Are you aware that the hinges to this —
[12] to the hood on top were not dented or bent in any
[13] way?
[14]   A: Am I aware of that?
[15]   Q: Yeah.
[16]   A: I would not know. If you say they
[17] weren't, I'd have to say yes to your statement.
[18]   Q: They weren't.
[19]   Why didn't you inspect the van to
[20] the extent where you lifted up the hood to see if
[21] there was damage to the engine or frame damage or
[22] anything of that nature?
[23]   A: Don't normally do that.
[24]   Q: You don't?

1—03:08:23  24—03:09:44                                Page 200

[1]    A: No.
[2]    Q: Is your — what do you normally do when
[3] inspecting damage to the vehicle?
[4]    A: We primarily look for the exterior
[5] damage, note where on the vehicle it is located.
[6] Sometimes more severe damage — like say we'll do a
[7] profile to show how far into the vehicle the two
[8] vehicles went — if there's penetration or whatever
[9] the situation is.
[10]   But the severity of this did not
[11] normally warrant us to do any more than we did.
[12]   Q: As you're looking at this photograph now,
[13] 8.8 and the other photographs, does that look like
[14] severe damage to you?
[15]   A: Probably not, as — depending on what
[16] your range of severity was. But again, based on what
[17] I did that day and what — putting things together,
[18] these photographs —
[19]   I mean, I'm going from sketches and
[20] things that we do at the scene. These photographs,
[21] we get them oftentimes long after I had the
[22] opportunity to review these, as I completed the work,
[23] because the report took so long to be done with the
[24] other caseload.

**Page 201**

[1] I'd say it was severe to moderate.
[2] Q: The designation "Severity," this is a tab
[3] on the computer, is it not?
[4] A: I'm sorry?
[5] Q: The designation "Severity" on your
[6] report, that's a pop-up tab on the computer? You
[7] have —
[8] A: For the criminal report — excuse me —
[9] the collision report?
[10] Q: Correct.
[11] A: Probably.
[12] Q: Did you know that UPS, in their last
[13] pleading to the court in this case, described the
[14] damage to the package van as minor?
[15] MS. RISK: Objection to form.
[16] THE WITNESS: Did I know that?
[17] BY MR. VAN DER VEEN:
[18] Q: Yeah.
[19] A: No, sir.
[20] Q: Okay. 8.9, Photograph 8.9. More
[21] photographs of the damage?
[22] A: Yes, sir. Actually, a better view of the
[23] damage perspective of looking at it from the north in
[24] a southern direction, directly into or onto the

**Page 202**

[1] vehicle, however you want the words.
[2] Q: Do you know notice that the UPS door is
[3] all the way opened?
[4] A: Yes, sir.
[5] Q: And that the — you can see right in?
[6] A: Yes, sir.
[7] Q: When you look right in, do you notice
[8] that the garbage can is in its place on the steps?
[9] MS. RISK: Objection to form.
[10] THE WITNESS: Do I notice it? Yes,
[11] sir.
[12] BY MR. VAN DER VEEN:
[13] Q: Do you notice that the fire extinguisher
[14] or toolbox box that's in that photograph is in its
[15] place?
[16] A: Yes, sir.
[17] Q: When you inspected this van, did you
[18] notice anything on the inside of the vehicle that was
[19] pushed in any way out of place by the impact?
[20] A: I didn't specifically look for anything
[21] in the vehicle —
[22] Q: Okay.
[23] A: — to be out of place.
[24] Q: Right. Did you inspect the inside of the

[1] vehicle?
[2] A: Briefly, yes.
[3] Q: Okay. And did you notice anything that
[4] was out of place, out of skew due to the impact?
[5] A: Well, I wouldn't know if it was out of
[6] place from the impact. I didn't — I took — there
[7] was no note of anything —
[8] What I look for, which we'll get to
[9] later, is initially, before I knew that the van — I
[10] took the photographs first. Before I knew that the
[11] van had been moved, I took photographs from the
[12] position of the driver's seat, because I was trying
[13] to get a perspective of what the driver may have seen
[14] in relationship to this particular investigation.
[15] Q: And we're going to get to those in these
[16] 24.
[17] A: That's later, yes, sir. But that's my —
[18] I wasn't looking for anything that might have been
[19] bounced out of place or whatever.
[20] Q: Uh-huh. You notice the door is wide
[21] open?
[22] A: Yes, sir.
[23] Q: 8.10. This is a photograph basically
[24] taken west of the last photograph, starting a

[1] circular direction.
[2] Now, looking somewhat in a
[3] southeasterly direction, you can see a police car in
[4] the background of the location where the previous
[5] photographs were taken from, working in a northerly
[6] direction and now coming to the west. Do you see
[7] inside the van that there's a monitor up on the top
[8] right inside the van?
[9] MS. RISK: Objection to form.
[10] THE WITNESS: I see something. You
[11] see, looks like a — perhaps a roll of paper towels
[12] or toilet tissue and something. And then directly
[13] above that looks like some type of —
[14] BY MS. RISK:
[15] Q: Oh, look at that. I see. I'm with you.
[16] Go ahead.
[17] A: In alignment with the mirrors, with this
[18] shot of the mirror, there's a mirror above — I can't
[19] say if that's a mirror or if there's two mirrors —
[20] if there's two mirrors on the side of the van.
[21] Q: This roll of paper towels on the left
[22] there, in that side-view mirror that you identified
[23] as what looks like a roll of paper towels —
[24] A: If I can —

```
1—03:14:17   24—03:15:04                Page 205
```
[1]  Q: — or toilet paper.
[2]  A: Go back. Those are side mirrors. What
[3] it is, it appears to be like a monitor, but — are
[4] you looking at the —
[5]  Q: I was looking at this monitor up here.
[6]  A: I'm looking at the mirror. I'm not up
[7] high enough.
[8]  Q: Let's go one at a time.
[9]     Down here on the left in the
[10] side-view window —
[11]  A: Gotcha.
[12]  Q: — there is what appears to be a roll of
[13] toilet paper or paper towels —
[14]  A: Yes, sir.
[15]  Q: — not attached to anything; correct?
[16]  A: From this perspective, I can't see what's
[17] behind it.
[18]  Q: And it looks like it's resting very
[19] closely to the left side of the vehicle, does it not?
[20]  A: In this picture, it does.
[21]  Q: It doesn't look like, to you, that it was
[22] knocked over to the side, does it?
[23]  MS. RISK: Objection to the form.
[24]  THE WITNESS: With this photograph,

```
1—03:15:07   24—03:15:58                Page 206
```
[1] first, I don't know where or if that roll was there
[2] before the crash or after the crash and what
[3] relationship that has to —
[4]          BY MR. VAN DER VEEN:
[5]  Q: No, I understand. I'm just asking you
[6] how it appears in this photograph.
[7]  MS. RISK: Objection. I would ask
[8] that you let the witness finish his response rather
[9] than interrupting him and interjecting another
[10] question.
[11]  THE WITNESS: From this
[12] perspective, it's really hard to say. There's no
[13] three-dimensional ability in this photograph, without
[14] taking a photograph, say, from the inside to a more
[15] inside direction of placement. I can't say where
[16] that is.
[17]    I mean, you could — from this
[18] shot, you could say that it's toward the left of the
[19] vehicle. You could say it's toward the right of the
[20] vehicle, just because of the pillar and how the
[21] photograph is taken.
[22]    I understand you're asking your
[23] questions, but the purpose of the photograph is to
[24] view the damage. That's the point of why I took the

```
1—03:16:00   24—03:16:35                Page
```
[1] picture.
[2]  Q: I understand. But sometimes you can see
[3] other things in a photograph.
[4]  A: I agree. I'm not —
[5]  Q: In this photograph, do you see anything
[6] on the interior of this truck that looks like it was
[7] knocked out of place?
[8]  MS. RISK: Objection to form.
[9]          BY MR. VAN DER VEEN:
[10]  Q: Upon impact.
[11]  MR. VAN DER VEEN: What's form?
[12]  MS. RISK: There's a lack of
[13] foundation. He's already testified that this is —
[14] this is the way the vehicle was when he took the
[15] photographs.
[16]  MR. VAN DER VEEN: Foundation is
[17] enough.
[18]  MS. RISK: Okay.
[19]          BY MR. VAN DER VEEN:
[20]  Q: Okay, go ahead.
[21]  A: I can't tell what was moved or what
[22] wasn't moved.
[23]  Q: Did you ever notice anything — did you
[24] ever notice anything on the inside of this van that

```
1—03:16:38   24—03:18:12                Page 208
```
[1] was moved out of place by the impact?
[2]  A: I don't recall seeing anything.
[3]  Q: Looking at 8.11, what do you see there?
[4]  A: This would be a photograph taken from
[5] somewhat of the same place where I was standing
[6] taking the previous picture, although now I'm
[7] focusing in a easterly direction to the final resting
[8] position of the motorcycle. There are the helmet,
[9] the clothing, the sign, which is at that T
[10] intersection showing you you either have to go left
[11] or right or into the sign.
[12]  Q: You see a dirt patch to the right in the
[13] photograph?
[14]  A: Yes.
[15]  Q: And that is a dirt patch that you believe
[16] is associated with the true final resting point of
[17] the bike?
[18]  A: Actually, there are two dirt spots that
[19] we looked at earlier —
[20]  Q: And there's a bigger one and a smaller
[21] one.
[22]  A: I'm trying to identify which one that is,
[23] because I only see one in this photograph.
[24]    That appears — hang on. Yes, that

**Page 209**

[1] appears to be that spot, from what I can see in these
[2] two — I'm looking at —
[3]   Q: Is there anything else of significance?
[4]   A: 8.6?
[5]   Q: Is there anything else that you see of
[6] significance in this photograph, to you? When I say
[7] "this photograph," I mean 8.11.
[8]   A: I see — there's some scratch marks on
[9] the roadway surface.
[10]   Q: What do you attribute the cause of those
[11] scratch marks to be?
[12]   A: The bike being moved from the final
[13] resting position.
[14]   Q: So its position in the photograph?
[15]   A: Yes, sir. All of which I learned later.
[16]   Q: Yes, I understand.
[17]   Looking at 8.12, you took that
[18] photograph from the driver's seat?
[19]   A: Yes, sir.
[20]   Q: Do you know what the height of Mr. Bard
[21] was?
[22]   A: How tall he is?
[23]   Q: Yeah.
[24]   A: I don't know off the top of my head, but

**Page 210**

[1] I can look in the report.
[2]   Q: Okay. His height would be in your
[3] report?
[4]   A: It would be probably on his driver's
[5] license — should be.
[6]   According to motor vehicle records,
[7] on his license he's listed as 6-foot-4.
[8]   Q: Do you know how tall he is from the torso
[9] up?
[10]   A: No, sir.
[11]   Q: And how tall are you?
[12]   A: 6-foot, sir.
[13]   Q: So his vantage point from this
[14] photograph, his eyesight vantage from this photograph
[15] would have been approximately four inches taller than
[16] that vantage point?
[17]   A: He's four inches taller than I am, yes.
[18]   Q: Do you believe that his vantage point
[19] would be any different than yours with respect to
[20] height in this seat?
[21]   A: It's going to be approximately three to
[22] four inches higher than I am.
[23]   Q: Okay. Now, you took this photograph
[24] originally because why?

[1]   A: I wanted to get a perspective of his
[2] viewpoint.
[3]   Q: And —
[4]   A: On the understanding that that's where
[5] the vehicle was before — or when the crash happene
[6]   Q: So this photograph now has an evidentiary
[7] value to you of what extent?
[8]   MS. RISK: Objection to form.
[9]   MR. VAN DER VEEN: What's the form?
[10]   MS. RISK: Just ask him what the
[11] evidentiary value is of the photograph. You're
[12] leading him with the question. Just say, What's the
[13] evidentiary value of the photograph?
[14]   MR. VAN DER VEEN: That wasn't
[15] leading. That's another way of asking what you just
[16] asked. Leading would be, Isn't it true, sir, that
[17] the evidentiary value of this photograph is zero?
[18] That would be leading.
[19]         BY MR. VAN DER VEEN:
[20]   Q: My question to you is, what is the
[21] evidentiary value of this photograph for you?
[22]   A: It shows me, of the position of where the
[23] UPS vehicle was at that time, what the view was
[24] north, northwest of that intersection in relationship

[1] to the intersection.
[2]   Q: It shows you what the view was of that —
[3] from that vehicle to where Mr. Bard moved his truck
[4] after the impact; correct?
[5]   A: Yes. And in relationship to where the
[6] stop sign is, looking at the previous photographs,
[7] it's east of the stop sign.
[8]   The — the evidentiary — the value
[9] of the photograph, for me looking at it, is that
[10] it's — it also shows and supports the fact that the
[11] visibility is blocked by trees, vegetation. Because
[12] when I went back to the scene on later dates and
[13] looked, I'm looking at it through my police vehicle,
[14] which is sitting lower.
[15]   Q: Lower?
[16]   A: So the tree line of where the trees are,
[17] I can see further back where I am, because I'm
[18] looking under the trees as opposed to being up
[19] higher, more trees to block my view.
[20]   Q: Do you know that Mr. Bard has verified
[21] under oath that there was no obstructions to his view
[22] on the day of this accident?
[23]   A: In perspective to what?
[24]   Q: The motorcycle.

1—03:23:32  24—03:24:43                                    Page 213

[1] A: My understanding through my interview
[2] with him, he stopped at the stop sign, moved slowly
[3] forward into the intersection; initially couldn't
[4] see, and slowly moved until he could see, and didn't
[5] see anything coming. And then when he saw the
[6] motorcycle, stopped.
[7] Q: From your interview, when he first
[8] stopped at the stop sign, did he then stop again
[9] before the impact? I'm sorry.
[10]     Did he then stop again before
[11] entering into the roadway?
[12] A: My memory of the interview is that he
[13] stopped, was unable to see anything coming, started
[14] to move forward slowly into the intersection. And he
[15] was partially into the intersection — or like about
[16] two feet or so from the center of the roadway, saw
[17] the motorcycle and stopped.
[18]     So I guess the question that you're
[19] asking me, to me — leading — he initially couldn't
[20] see what was coming. My understanding of the
[21] interview that I had with him was he initially
[22] stopped at the stop sign, could not see anything and
[23] could not see.
[24]     So to me, there was some

1—03:24:45  24—03:25:38                                    Page 214

[1] obstruction, my understanding. He started to move
[2] forward slowly into the intersection so that he could
[3] gain both north and south direction, upon which time
[4] he didn't see anything initially. He sees a
[5] motorcycle and he stops.
[6] Q: Okay. So did he ever tell you that he
[7] stopped three times prior to impact, once at the stop
[8] sign, once at the break of the two roadways and then
[9] once right before impact?
[10] A: I don't recall him telling me he stopped
[11] three times. I could look at his interview.
[12] Q: We'll get to that.
[13] A: But what's in the interview —
[14] Q: We'll get to that. I wanted to go on
[15] what your recollection was first. Then we'll get to
[16] the interview.
[17] A: Okay.
[18] Q: But that's your recollection; he didn't
[19] tell you?
[20] A: No.
[21] Q: Either the first time you interviewed him
[22] on the day of the accident, or when you did three
[23] months later in February, on February 9th?
[24] A: I don't recall him telling me he stopped

1—03:25:41  24—03:27:17                                    Page

[1] three times.
[2] Q: No. 13, taking a look at No. 13. This is
[3] one of those "aha" photos. This has a lot of stuff
[4] in it; right? This is 8.13.
[5] A: At the lower left corner of this
[6] photograph shows a tire mark that's referred to in
[7] the field sketch and the diagram and the report. And
[8] it's approximately two feet a couple inches in
[9] length.
[10] Q: When you say 2.4 — 2 feet 4 inches in
[11] length, which way?
[12] A: From the lower left corner of the
[13] photograph in a — if you're looking to a
[14] northeasterly direction, on an angle.
[15] Q: Can you show me?
[16] A: From there to there.
[17] Q: From here to here is 2.4 inches?
[18] A: Yes, sir.
[19] Q: In your opinion, which way was the tire
[20] traveling to make that mark?
[21] A: What that appears — it appears to be a
[22] scuff.
[23] Q: Which way is the movement of the tire to
[24] make this mark?

1—03:27:18  24—03:29:09                                    Page 216

[1] A: Well, it could be one of two ways. It
[2] would be in a southeasterly direction, toward
[3] Twaddell Mill, or it could be — or toward the
[4] southern part of the intersection; or it could be in
[5] a northeasterly direction, going up.
[6] Q: You mean it could be this way —
[7] A: It could be this way or that way.
[8] Q: Could it be that way?
[9] A: The mark won't — I can't substantiate.
[10] It could either be from this direction back or this
[11] direction up, the conclusion I came to.
[12] Q: Okay. So I'm going to draw on this, on
[13] 8.13. Okay?
[14]     (Discussion off the record.)
[15]         BY MR. VAN DER VEEN:
[16] Q: On 8.13. Okay?
[17] A: Uh-huh.
[18] Q: You're saying that the movement could be
[19] in either one of those directions?
[20] A: That — in taking into consideration that
[21] the wheel — the driver is making a left turn, which
[22] means that the wheels of the vehicle are going to be
[23] turned to the left to go north.
[24]     What this is, in my opinion of what

1—03:29:11  24—03:30:16                                    Page 217

[1] I observed at the scene and what was told at the —
[2] everything else out there, the wheels are turned to
[3] the left, the motorcycle strikes the van coming from
[4] the north to the south. And that's what causes that
[5] scuff mark, and I believe that's the right front tire
[6] of the UPS vehicle.
[7]    Q: Okay. Did you measure, when the tire is
[8] sitting on the ground, stationary, on this roadway,
[9] how much of the rubber — what the length of the
[10] rubber is that is actually contacting the roadway?
[11]    A: No.
[12]    Q: Based on your theory of this — so what
[13] you're saying is you believe that this tire mark was
[14] created by a force in this direction?
[15]    A: Yes, sir.
[16]    Q: I'm going to draw that direction now.
[17] Okay?
[18]    You believe it was made by a force
[19] in that direction?
[20]    A: Yes, he — well, more —
[21]    MS. RISK: For purposes of the
[22] record what we're describing, could we describe
[23] with —
[24]    MR. VAN DER VEEN: I'm going to

1—03:30:17  24—03:31:14                                    Page 218

[1] mark them.
[2]    MS. RISK: Okay. North, south,
[3] east, west, is what I was going to say.
[4]    THE WITNESS: From a northerly
[5] direction, toward the south.
[6]    Yes, sir.
[7]              BY MR. VAN DER VEEN:
[8]    Q: And in this direction, I'm going to put
[9] "force" there. Okay?
[10]    A: I would be more — a little bit like
[11] this. This implies that it's coming from herein
[12] relationship to the road. I'm looking —
[13]    (indicating) — like that.
[14]    Q: Okay. Will you initial your line that
[15] you drew, please. I drew a line and wrote "force"
[16] above it, and you initialled the line you drew;
[17] correct?
[18]    A: Correct.
[19]    Q: You believe the force is like that;
[20] correct?
[21]    A: Yes, sir.
[22]    Q: Okay. I don't want to be tricky to you.
[23] Okay? It looks like — to me like what you drew is
[24] the bike coming back into the lane almost.

1—03:31:20  24—03:32:40                                    Pag

[1]    A: Coming back into the lane?
[2]    Q: Yeah, heading from the center of the lane
[3] into the middle of the lane. From the center of the
[4] roadway to the middle of the southbound lane.
[5]    A: I'm not sure I understand the question.
[6]    Q: Are you comfortable with the arrow that
[7] you drew?
[8]    A: Yes, sir.
[9]    Q: Okay. Now, the amount of tire, then, if
[10] that is the direction of the force that created this
[11] tire mark, that is the amount of rubber that would
[12] have to have contact with the roadway to create the
[13] scuff mark; correct?
[14]    A: Mostly, yes.
[15]    Q: What do you mean, "mostly"?
[16]    A: You're having a line of force strike a
[17] vehicle, and the wheel is turned; it would slide
[18] completely across without doing what — tires have a
[19] tendency to angle. Do you understand, like,
[20] scuffing? If a part of the tire scuffed, it would be
[21] a little more portion than what you measured it in
[22] the resting position as opposed to where it slid for
[23] that distance, that short distance.
[24]    Q: How much would you account for that

1—03:32:44  24—03:34:20                                    Pag

[1] percentage of the 2.4 feet?
[2]    A: I don't know.
[3]    Q: Did you, when you looked at this scuff
[4] mark, or the photo of the scuff mark while looking at
[5] your report, look at any authoritative treatise,
[6] journal, about the marking itself and how to identify
[7] it for its direction of travel?
[8]    A: No.
[9]    Q: You did not measure the — if we call the
[10] 2.4 feet the length of the mark, you did not at any
[11] time measure the width of the mark; is that true?
[12]    A: I don't believe so. I don't believe so.
[13] No, sir.
[14]    Q: Okay. You indicate that the truck was
[15] moved 2.4 feet; correct? 2 feet point 4 inches is in
[16] your report; right?
[17]    A: Yes.
[18]    MS. RISK: Objection to the form.
[19]    MR. VAN DER VEEN: That's fine.
[20]    THE WITNESS: Based on the
[21] measurements.
[22]              BY MR. VAN DER VEEN:
[23]    Q: Right. I understand.
[24]    A: And the statement by Mr. Bard.

|  | 1—03:34:22  24—03:35:44 | Page 221 |
|---|---|---|

[1]  Q: Well, well get to Mr. Bard's statement,
[2] believe me. Because the fact is, the first time you
[3] talked to him, he didn't tell you a thing about the
[4] truck being moved; right?
[5]  MS. RISK: Objection to form.
[6]         BY MR. VAN DER VEEN:
[7]  Q: First time you talked to him, did he tell
[8] you anything about the truck being moved?
[9]  A: I have to look.
[10]  Q: Please feel free to take a look and we'll
[11] get the answer to that.
[12]  A: He says someone instructed him to move
[13] the truck back to provide space around the fallen
[14] motorcycle operator.
[15]  Q: Do you know what I'm talking about? I
[16] believe we were talking about the truck being moved
[17] at impact by the force of the bike. That's what you
[18] understand us to be talking about; right?
[19]  A: Yeah, that was about moving the truck.
[20]  Q: You were going back. I understand.
[21]  A: He told me that the truck was moved —
[22] backed up and moved from its original resting
[23] position.
[24]  Q: Yeah.

|  | 1—03:35:46  24—03:37:45 | Page 222 |
|---|---|---|

[1]  A: He doesn't say a distance, at least at
[2] that point.
[3]   When I first interviewed him, he
[4] made no statements about it; correct.
[5]  Q: The first time you interviewed Mr. Bard,
[6] when you've testified earlier things were freshest in
[7] his memory, did he ever tell you that his van was
[8] moved by the force of this impact?
[9]  A: Not during that first interview, no.
[10]  Q: You indicated that this is 2 feet
[11] 4 inches in length; correct?
[12]  A: Yes, sir.
[13]  Q: You did not measure the width of this
[14] mark; correct?
[15]  A: No, sir.
[16]  Q: And you believe that the truck was moved
[17] 2.4 inches at impact?
[18]  A: Based on that measurement. And the later
[19] statement made by — again, not in and of itself.
[20]  Q: I understand. But if the force were this
[21] way, measuring the distance it travels — that the
[22] van would travel, would be measuring a distance
[23] parallel with this force; correct?
[24]  A: No, I'm measuring it the way that the

|  | 1—03:37:47  24—03:38:47 | Page |
|---|---|---|

[1] wheels turned and which it's hit the mark, from
[2] beginning to end, that it gives.
[3]  Q: But when the — when an object hits
[4] another object, Physics 101 —
[5]  A: Yes.
[6]  Q: — it moves the object in the direction
[7] of the force; correct?
[8]  A: Yes, sir.
[9]  Q: Not in the direction of a round wheel in
[10] an opposite direction; correct?
[11]  A: Correct.
[12]  Q: Okay. The direction of this force, from
[13] the motorcycle on the line as you have drawn it,
[14] would be parallel to the line of force; correct?
[15]  MS. RISK: Objection to the form.
[16]  THE WITNESS: I'm not sure I
[17] understand your question.
[18]         BY MR. VAN DER VEEN:
[19]  Q: Well, your force is — and I'm just
[20] drawing my pen with your line. I don't even care if
[21] this is clear on the record. I want you and I to be
[22] on the same page here. Okay?
[23]  A: I understand.
[24]  Q: The force is in this direction.

|  | 1—03:38:50  24—03:39:42 | Page 224 |
|---|---|---|

[1]  A: Yes.
[2]  Q: If this is the van, okay, the movement of
[3] the van is going to be in that direction; correct?
[4]  A: Yes, sir.
[5]  Q: It is not going to be in this direction;
[6] correct?
[7]  A: Yes, sir.
[8]  Q: Okay. So that as we talk about this
[9] 2 feet 4 inches, that's not relevant to the distance
[10] that the van — that's not related to the distance
[11] that the van would move by the direction of force, as
[12] you've indicated on this photograph; isn't that
[13] right?
[14]  MS. RISK: Objection; form.
[15]         BY MR. VAN DER VEEN:
[16]  Q: The width of this mark would be the
[17] relevant factor —
[18]  A: I understand.
[19]  Q: — not it's length.
[20]  MS. RISK: Object to form.
[21]  THE WITNESS: I understand.
[22]         BY MR. VAN DER VEEN:
[23]  Q: Do you agree with me?
[24]  A: Yes, sir.

**Page 225**

1—03:39:43   24—03:41:08

[1] Q: Okay. Thanks. Thanks. Appreciate that.
[2]    So that when we talk about it in
[3] those terms and we look at this photograph, are you
[4] sure that this 2-foot-4-inch mark was made at impact
[5] when the — by the bike hitting the van?
[6] A: The 2-foot-4-inch distance?
[7] Q: Yeah.
[8] MS. RISK: Objection to form.
[9] MR. VAN DER VEEN: That's fine.
[10] THE WITNESS: It's 2 foot 4 inches
[11] from corner to corner, not north to south. So I'd
[12] have to say it's an incorrect mark of distance.
[13]           BY MR. VAN DER VEEN:
[14] Q: Okay. Thank you.
[15]    Now, Baker is the authority on skid
[16] marks; right? One of them.
[17] MS. RISK: Objection.
[18] THE WITNESS: One of them.
[19]           BY MR. VAN DER VEEN:
[20] Q: An authoritative voice on skid marks;
[21] correct? Reading them?
[22] A: One of many, yes.
[23] Q: Okay. A scuff mark, a sideways force
[24] mark made by a tire, as you have initially described

**Page 226**

1—03:41:13   24—03:42:07

[1] this, would not have tread in it; isn't that true?
[2] MS. RISK: Objection to form.
[3]           BY MR. VAN DER VEEN:
[4] Q: It wouldn't have the tread mark in it?
[5] MS. RISK: Objection to form.
[6] THE WITNESS: If it's a scuff mark,
[7] it would not, no.
[8]           BY MR. VAN DER VEEN:
[9] Q: And you've identified this as a scuff
[10] mark?
[11] A: Yes, sir.
[12] Q: Okay. I'm going to show you what is
[13] marked as 13 — look at 13, but look at it clearly in
[14] your photographs. Do you see the tread?
[15] A: I see marks that reflect the possibility
[16] of a tread.
[17] Q: Okay. Thanks.
[18]    Of course, when you see marks that
[19] would reflect the possibility of a tread, that means
[20] that it is made by a forward or a backward force
[21] rather than a sideways force; correct?
[22] A: That's correct.
[23] MS. RISK: Objection to form.
[24] THE WITNESS: That's correct.

**Page [227]**

1—03:42:08   24—03:43:03

[1]           BY MR. VAN DER VEEN:
[2] Q: Let me ask it to you another way.
[3]    If you see the possibility of tread
[4] marks within the tire mark, what does that tell you
[5] about the direction of travel of the tire at the time
[6] it made the mark?
[7] A: It's either going in the direction and/or
[8] opposite. You can't say by looking at it by itself.
[9] Q: It's a skid mark not a scuff mark.
[10] MS. RISK: Objection to form.
[11] THE WITNESS: If it is a skid mark,
[12] correct. Scuff, it has striations.
[13]           BY MR. VAN DER VEEN:
[14] Q: Correct. Striations that you see in a
[15] yawl, for example —
[16] A: Correct.
[17] Q: — are different than striations you see
[18] in a skid?
[19] A: Yes, sir.
[20] MS. RISK: Objection to form.
[21]           BY MR. VAN DER VEEN:
[22] Q: Can you explain that to me again so that
[23] it's clear for the record and so that it is not I
[24] who's leading you to the answer.

**Page [228]**

1—03:43:04   24—03:44:07

[1]    What is the difference between the
[2] markings in a scuff and a skid?
[3] A: A skid mark is there is no rotation in
[4] the tire. It is stopped, locked, going across the
[5] surface of the roadway.
[6] Q: And can you or can you not see tread?
[7] A: You can. In a skid — normally. Not
[8] always, but — depending on a lot of factors.
[9] Q: Yeah.
[10] A: A striation, or a scuff, which is what I
[11] identified this as, has — there's rotation in the
[12] tire, or the tire is moving, or it is the absence of
[13] lock; it's not locked up. And it's normally
[14] significant of a slide.
[15] Q: And as you look at this photograph now,
[16] you aren't sure whether that — do you know
[17] whether — for sure whether this is a scuff or a
[18] skid?
[19] A: I believed when I looked at it, it was a
[20] scuff.
[21] Q: But now?
[22] MS. RISK: Objection.
[23] THE WITNESS: I still believe it's
[24] a scuff.

Corporal Jeffrey Weaver  
June 23, 2005

Vascek v.  
UPS

---

**Page 229**  
1—03:44:07  24—03:44:50

BY MR. VAN DER VEEN:
Q: But you do see the presence —
A: But I do see the presence of what you're asking, yes.
Q: Okay. Which means that it could possibly be a skid mark?
MS. RISK: Objection to form.
THE WITNESS: It could be.
BY MR. VAN DER VEEN:
Q: Which means that it could possibly be what?
A: Skid mark.
Q: Thank you.
I want to also look at 13 for some other things, okay, regarding the dirt patch.
A: Okay.
Q: On 13 here, you see the big patch of dirt — and I'm going to circle it right here.
This is the patch of dirt that we think came — that you believe came from the front left wheel well of the van?
A: Possibility, yes.
Q: Okay.
A: And that's just a possibility.

**Page 230**  
1—03:44:52  24—03:45:57

Q: I understand.
A: I can't confirm it.
Q: I understand. Did you measure the distance between this dirt patch and the tire mark in the roadway?
A: No.
Q: Okay.
A: Wait a minute.
Q: Okay, go ahead.
A: It wasn't measured. I'm looking at Sergeant Cox's field sketch. It's not noted on there.
Q: Okay. Would it surprise you that it's not related — that the distance is not in relation to the width of the truck?
A: Would it surprise me?
Q: Yeah.
A: No.
Q: Okay. And if it's not in relation to the width of the truck, that would indicate what?
A: That that's not dirt from up under the upper left fender of the UPS truck, as we talked about earlier.
Q: Right. Or if that is dirt from the upper

**Page 231**  
1—03:45:59  24—03:47:03

left fender of the UPS truck, what does it tell you about the tire mark?
A: That's not related to the crash.
Q: Okay. Now, looking at this dirt mark here, do you see in this photograph a significant amount of other dirt of the same color, of different size, as though it had been dumped off of a landscape truck or a dump truck on this roadway surface?
A: I see the other dirt. And it's also obviously noted in the other photographs that we talked about. It's south of the upper one that you just circled.
Q: Correct.
Do you — as you review this photograph, do you see the dirt to be the same kind of color?
A: Similar in color, yes.
Q: Is it fair to say you didn't do any testing of the dirt on the roadway?
A: Correct.
Q: And you didn't do any testing of the dirt on the undercarriage of the truck?
A: No, sir.
Q: Did you look at the undercarriage of the

**Page 232**  
1—03:47:05  24—03:47:59

truck to see whether there was more dirt on the left front tire wheel well than the right front tire wheel well?
A: No, sir.
Q: Did you believe, as you look at this paragraph, 8.13, that the dirt that I drew a circle around hit the roadway at about the same time or from the same source as the rest of the dirt on the roadway?
A: I can't say that.
Q: Do you know whether it was or was not?
A: Hit the roadway at the same time?
Q: Yeah, comes from the same source?
A: I don't know that. It appears by color, but I can't say one way or the other.
Q: You can't say one way or the other; is that true?
A: That's absolutely correct.
Q: So fair to say that we don't know what the source of the dirt marks are anywhere on this roadway?
A: Correct.
MS. RISK: Objection.
BY MR. VAN DER VEEN:

---

1—03:47:59  24—03:48:47   Page 233

[1]    Q: Is part of the reason why we don't is
[2] because the truck was moved from its final resting
[3] point?
[4]    A: That could be, because of the fact that
[5] if it was in relationship to — if it had not been
[6] moved, there might have been a better way of
[7] correlation — of associating the dirt with the
[8] truck. But no.
[9]    Q: Have you ever heard that UPS trains its
[10] drivers, if you're in an impact that's your fault,
[11] move the truck quickly?
[12]    MS. RISK: Objection to form.
[13]             BY MR. VAN DER VEEN:
[14]    Q: Are you aware of that?
[15]    A: No, sir.
[16]    Q: Okay.
[17]    MS. RISK: Actually, I'm going to
[18] move to strike that from the deposition transcript.
[19]    MR. VAN DER VEEN: Well, his answer
[20] is no.
[21]    MS. RISK: Okay. I'm going to move
[22] to strike the question.
[23]    MR. VAN DER VEEN: If the question
[24] is made with a good-faith basis, you can't strike it.

1—03:48:50  24—03:50:34   Page 234

[1]    MS. RISK: Exactly. It will be
[2] stricken.
[3]             BY MR. VAN DER VEEN:
[4]    Q: With respect to the dirt in the roadway,
[5] do we see any bicycle parts around the dirt?
[6]    A: I see leaves.
[7]    Q: Do you see any bicycle parts?
[8]    A: Nothing that's jumping out to me in this
[9] photograph and/or that day at the collision scene.
[10]    Q: Yeah. Let's go to 14. What do you see
[11] there?
[12]    A: I see final resting position of the — I
[13] see the resting position of the motorcycle when I
[14] arrived at the scene. I see a — the lower center
[15] area of this photograph, the chalked word H-E-A-D,
[16] for head.
[17]    Q: Who wrote that?
[18]    A: No idea. One of the troopers at the
[19] scene, I would imagine, because the paramedics and
[20] medics don't do that. It would have been one of the
[21] troopers at the scene.
[22]    I see some scratch marks going
[23] from — one somewhat in the center or little bit left
[24] of the photograph. And several other scratch marks

1—03:50:38  24—03:51:59   Pa

[1] going in the direction of the motorcycle towards the
[2] motorcycle.
[3]    Q: Those are the scratch marks that we
[4] talked about earlier, as caused by somebody moving
[5] the bike?
[6]    A: That's my belief, yes.
[7]    Q: Not being related to the impact or
[8] anything after it?
[9]    A: No, sir.
[10]    Q: Thanks.
[11]    A: Only by statements of what had been
[12] provided of where the motorcycle and the operator v
[13] when the nurses arrived and what Mr. Bard stated.
[14]    Q: I understand.
[15]    15. This is your 360 maneuver on
[16] the bike, right, this series of photographs?
[17]    A: Right.
[18]    MS. RISK: Can you hold on for a
[19] minute. Let me make sure I got the right one.
[20]    (Discussion off the record.)
[21]             BY MR. VAN DER VEEN:
[22]    Q: 15; right?
[23]    A: Yes, sir.
[24]    Q: What do you see?

1—03:52:01  24—03:52:51   Pag

[1]    A: From the east side of the roadway,
[2] looking at the photograph taken in somewhat of a
[3] northwesterly direction, you can see the front of the
[4] motorcycle. You can see the helmet resting on the
[5] motorcycle.
[6]    To the left of that side of the
[7] photograph, you can see the word spelled upside dow
[8] "head," which was previously noted in the previous
[9] photograph.
[10]    Q: Now, where the word "head" is written,
[11] you don't believe that to be the final resting spot
[12] of the body, do you?
[13]    MS. RISK: Objection; form.
[14]             BY MR. VAN DER VEEN:
[15]    Q: Do you believe that to be the final
[16] resting spot of the body?
[17]    A: I believe that to be the approximate
[18] location of where the head was, only based on where
[19] the trooper or whomever — it would have to have bee
[20] a trooper. No one would have had a reason to write
[21] "head."
[22]    Q: So when the trooper got there, after he
[23] had been — as has been described to you, he was
[24] rolled over and whatnot and worked on; right?