1—03:52:53  24—03:54:17                    Page 237

[1]   A: Yes.

[2]   Q: So you don't believe that to be his final
[3] resting point after POI, point of impact; right?

[4]   MS. RISK: Objection to form.

[5]   THE WITNESS: I believe that to be
[6] the location of where he was after he was moved,
[7] initially by the nurses.

[8]           BY MR. VAN DER VEEN:

[9]   Q: 16. 16, 17, 18 and 19 merely complete
[10] your 360-degree photographs of the bike; correct?

[11]   A: Yes, sir. 16, 17, 18 and 19.

[12]   MS. RISK: Let me just see the
[13] order.

[14]   THE WITNESS: Are we going as far
[15] as 19?

[16]           BY MR. VAN DER VEEN:

[17]   Q: Yeah.

[18]   A: Okay. Yes.

[19]   Q: Correct?

[20]   A: Yes.

[21]   Q: The damage to the bike in these
[22] photographs as you observed them on that day?

[23]   A: In the position that it's in, yes.

[24]   Q: Regarding the cleanliness of the bike,

1—03:54:20  24—03:56:04                    Page 238

[1] how would you describe it?

[2]   A: Relatively clean. Pretty clean.

[3]   Q: Would it surprise you if you were told
[4] that it was washed right before the ride started?

[5]   A: Wouldn't surprise me, no.

[6]   Q: The tires, do they appear to be in good
[7] condition to you?

[8]   A: From what I remember, yes.

[9]   Q: Pirelli tires; right?

[10]   A: I'm not sure I know that, but, yes.

[11]   Q: And did you notice any marks or
[12] striations on the tires from the roadway?

[13]   A: No.

[14]   Q: Looking at 20, this is made in the —
[15] taken by you in the southbound lane; correct?

[16]   A: Yes.

[17]   Q: And you were probably standing in about
[18] the middle of the intersection?

[19]   MS. RISK: Objection to form.

[20]           BY MR. VAN DER VEEN:

[21]   Q: Where are you standing in relationship to
[22] Twaddell Mill Road?

[23]   A: I am standing somewhere in the proximity
[24] of Twaddell Mill Road.

1—03:56:05  24—03:56:57                    Page .

[1]   Q: Okay.

[2]   A: In somewhat — a little bit to the left
[3] or — excuse me — west of the center of the roadway
[4] where the double line is. You can see where — at
[5] the intersection, the double yellow lines continue
[6] down and stops. There's a break, and then they start
[7] again on the south part of the intersection. This is
[8] where you can see the start of the lines as they
[9] progress toward the north.

[10]   Q: That bridge is — the beginning of that
[11] bridge is 180 feet away; is that true?

[12]   MS. RISK: Objection to form.

[13]   THE WITNESS: From what point?

[14]           BY MR. VAN DER VEEN:

[15]   Q: From where you are.

[16]   MS. RISK: Objection to form.

[17]           BY MR. VAN DER VEEN:

[18]   Q: From where you're standing.

[19]   A: I don't know if it's exactly that far
[20] from where I'm standing. I have to have a reference
[21] point to —

[22]   Q: You're standing about on a reference
[23] point — you're standing about parallel with a
[24] reference point, aren't you, when you're taking this

1—03:56:59  24—03:57:59                    Page 240

[1] photo?

[2]   A: Actually, the reference point that we
[3] used — that Sergeant Cox used is —

[4]   Q: Right there?

[5]   A: Correct.

[6]   Q: So you're standing not on it, but you are
[7] standing about parallel to it?

[8]   MS. RISK: Objection to form.

[9]   THE WITNESS: No. Looking at this
[10] photograph, I'm north of the motorcycle's resting
[11] position.

[12]           BY MR. VAN DER VEEN:

[13]   Q: Okay. How many feet would you
[14] approximate the bridge is?

[15]   MS. RISK: Objection to form.

[16]           BY MR. VAN DER VEEN:

[17]   Q: The beginning of the bridge, the south
[18] side of the bridge.

[19]   MS. RISK: From where?

[20]   MR. VAN DER VEEN: From where he's
[21] taking the photo.

[22]   MS. RISK: The question was great.

[23]   THE WITNESS: From the center —
[24] looking at the diagram that I made and somewhat in

Vascek v.                                         Corporal Jeffrey W
UPS                                                June 23,

---

**1—03:58:02   24—03:59:14**      Page 241

[1] relationship to this photograph, but it's a little
[2] bit south. If you extend the center of Twaddell Mill
[3] Road, from that location, I rolled off the distance
[4] to the base — that bridge that you're talking about,
[5] the southern side of the bridge, it's about 156 feet,
[6] 6 inches.

[7]            **BY MR. VAN DER VEEN:**

[8]     Q: Okay. And in Photo No. 20, would you
[9] agree with me that you are standing at about where
[10] the UPS driver would have come to stop at impact?

[11]     **MS. RISK:** Objection to form.

[12]     **THE WITNESS:** I can't say whether I
[13] was or wasn't. I'm taking the photograph from
[14] somewhat the center portion of the roadway, of the
[15] intersection. Not in relation to where — the dirt
[16] we referred to in the previous photographs and the
[17] diagram field sketch or whatever. They're not in
[18] this photograph; I'm north of it. So I can't say
[19] exactly from this perspective.

[20]            **BY MR. VAN DER VEEN:**

[21]     Q: Okay. How far — from this perspective,
[22] how far down can you see, approximately?

[23]     A: Actually, I'm further north than the
[24] previous. So I'm north of the intersection — you're

---

**1—03:59:19   24—04:00:40**      Page 242

[1] just at the south of the northern section of Twaddell
[2] Mill. You can see the concrete bridge. You can see
[3] the driveway that I referred to earlier and the car
[4] that's positioned in that, which I believe is a
[5] police car. I'm not sure from this location.

[6]     The vehicle — and I'm not
[7] 100 percent sure, but I believe the vehicle that you
[8] see in this photograph now, with the headlights out,
[9] is possibly the vehicle that was in the previous
[10] photographs with the headlights on, and it looks like
[11] two cars behind that. One looks like maybe parking
[12] lights on, and the car behind that looks like they
[13] have headlights on.

[14]     Because we're further north, so
[15] we're seeing further into the curve, which bends to
[16] the left in a northwesterly direction. Or if you're
[17] traveling in the southbound lanes, you're coming back
[18] in the southeasterly direction.

[19]     Q: Now, that bend, that turn, as depicted in
[20] this photo in front of you, No. 20, how would you
[21] describe that bend, as you see it there in that
[22] photo?

[23]     A: From the perspective I'm at right now in
[24] the middle of the road, a gradual curve.

---

**1—04:00:48   24—04:03:36**      Pa

[1]     Q: Okay. Did you take any photos of what
[2] you would describe as a sharp curve — what you hav
[3] described as a sharp curve?

[4]     A: I'm not sure I understand. Of these
[5] here?

[6]     Q: Yeah, out of all of — well, yeah. Out
[7] of the 24 photos — 25 photos in this bunch, do any
[8] show a — depict a sharp curve to this roadway — to
[9] Route 100 at this relevant portion of this roadway?

[10]     A: Picture 4, as you're looking north.

[11]     Q: And you characterize that to be a sharp
[12] curve?

[13]     A: In referring to the intersection, yes.

[14]     Q: Okay.

[15]     A: Further into it, as the ones that we were
[16] just talking about, you're further north; it's more
[17] of a gradual curve, because you're in the curve. I'm
[18] looking at the perspective from going into a curve to
[19] a straight-away, or more straight-away.

[20]     Q: But the perspective in 4 is not a
[21] perspective that anybody had in this accident;
[22] correct? Either driver.

[23]     A: No.

[24]     Q: No. 22?

---

**1—04:03:47   24—04:04:46**      Pa

[1]     A: 21 or 22.

[2]     Q: Did we look at 21 yet?

[3]     A: No.

[4]     Q: No. 21?

[5]     A: 21 is the opposite direction coming in
[6] the area of the bridge.

[7]     Q: Uh-huh. That would be the view of the
[8] motorcycle as it's coming up?

[9]     A: Somewhat.

[10]     **MS. RISK:** Objection to form.

[11]     **THE WITNESS:** This is from the
[12] center of the roadway. His perspective would be more
[13] to the east or to the right of this photograph.

[14]            **BY MR. VAN DER VEEN:**

[15]     Q: Uh-huh.

[16]     A: Correction: To the west — well, we're
[17] looking at this from — the photograph is taken from
[18] the north in a southern direction, which means
[19] Twaddell Mill Road is now on the right when you're
[20] looking at the photograph. But directionwise, it
[21] would be to the west as you're traveling south.

[22]     **MR. VAN DER VEEN:** What time is it?

[23]     **THE COURT REPORTER:** 4:40.

[24]     **MR. VAN DER VEEN:** Does anybody

---

Corporal Jeffrey Weaver
June 23, 2005

Vasick v.
UPS

---

1—04:04:47  24—04:14:06                                    Page 245

[1] have a particular time they need to be out?

[2]    (Brief recess.)

[3]        BY MR. VAN DER VEEN:

[4]    Q: No. 21 is the bridge.

[5]    A: Yes, sir.

[6]    Q: And looking north would be the direction

[7] of travel — looking in the direction of travel of

[8] the bike.

[9]    A: Yes, sir.

[10]    Q: 22?

[11]    A: This is for a perspective of the

[12] motorcycle. It's taken from within the lane and

[13] somewhat center of the lane, provided that's — I

[14] mean, that's where most people travel. Where the

[15] bike would be or the driver's perspective would be a

[16] little bit to the left of this. But it was taken

[17] from the center of the lane.

[18]    Q: That's also where the independent

[19] witness, Mr. Seaford, told you he saw the bike

[20] traveling, in the center of the lane when he saw it;

[21] correct?

[22]    A: Yes, but I hadn't interviewed him at that

[23] point.

[24]    Q: I understand.

---

1—04:14:07  24—04:15:13                                    Page 246

[1]    A: I'm just going 360.

[2]    Q: This is still part of your 360?

[3]    A: Trying to get a perspective of the scene.

[4]    Q: Got you. We take pictures the same way,

[5] actually.

[6]    24?

[7]    A: 23.

[8]    Q: I'm sorry. 23. Getting closer.

[9]    A: That's closer to the intersection. And

[10] it shows the DelDOT marking sign that reflects the

[11] intersection.

[12]    Q: I noticed there are more cars behind

[13] yours now.

[14]    A: Correct.

[15]    Q: When did those arrive and who are they?

[16] Do you know?

[17]    A: You have a magnifying glass?

[18]    Q: Tow truck?

[19]    A: I can't — that's what it —

[20]    Q: Looks like from the top.

[21]    A: It looks like it might be a tow truck.

[22] Or possibly could be — well, not there. Normally it

[23] would be fire police, but the intersection is pretty

[24] much south of that so it wouldn't have been the fire

---

1—04:15:16  24—04:17:49                                    Page

[1] police.

[2]    Q: 24?

[3]    A: 24 is taken from the center of Twaddell

[4] Mill. Somewhat in the center you can see the left

[5] side of the UPS truck. And this photograph is taken

[6] from the west in an easterly direction, which shows

[7] the motorcycle, the sign. And again, the DelDOT sign

[8] that reflects you have to go either right or left at

[9] this intersection, the T intersection.

[10]    Q: 25?

[11]    A: This is further to the west. This is

[12] showing the stop sign somewhat. You can see the glow

[13] or glare from the flash. You can't make out the name

[14] of the roadway for the same reason.

[15]    But you can see the UPS truck

[16] that's backed up to the UPS truck that was involved

[17] in the collision. And you can also see that there's

[18] a little bit of the curve in the roadway there at

[19] Twaddell Mill.

[20]    Q: I'm going to show you now several

[21] photographs that have been produced to me from UPS.

[22]    Now, these photographs were taken,

[23] I believe, on November 15th, which would be about

[24] three weeks after the accident. Okay — strike that.

---

1—04:20:11  24—04:21:29                                    Page 248

[1]    Looking at Weaver 7, the field

[2] diagram, the field diagram shows on it the dirt

[3] patch; correct? Blocked off. It doesn't show — it

[4] shows the blocks of the dirt patch?

[5]    A: Yes.

[6]    Q: And it shows the skid mark and the U

[7] brackets; correct?

[8]    A: Yes.

[9]    Q: And it shows where the UPS truck's body

[10] would be in dotted lines?

[11]    A: Yes, sir.

[12]    Q: And it shows the direction of travel of

[13] what the motorcycle would have been?

[14]    A: Yes, sir.

[15]    MS. RISK: Objection to form.

[16]        BY MR. VAN DER VEEN:

[17]    Q: Does it show the direction of travel of

[18] where the motorcycle would be?

[19]    A: It doesn't show a motorcycle in the lane,

[20] but it we know that it came from the north to the

[21] south.

[22]    Q: What's W1?

[23]    A: Witness 1.

[24]    Q: Okay. Witness 1.

---

Vascek   v.                                                    Corporal Jeffrey W
UPS                                                            June 23,

---

**1—04:21:35   24—04:23:40**                     Page 249

[1]   A: And that's in relationship — again, not
[2] to scale — but in relationship of what direction the
[3] witness was coming, just for purposes of the sketch.
[4]   Q: Okay. The measurements that were taken
[5] at the scene, who took them?
[6]   A: Sergeant Cox and myself.
[7]   Q: What measurements did Sergeant Cox take?
[8]   A: He did — he prepared the field sketch.
[9] These are his writing.
[10]   Actually, that's all in his
[11] writing. So he did everything.
[12]   Q: Did you take any measurements in the
[13] investigation of this accident at the scene?
[14]   A: I don't believe so, no These were all
[15] done by him.
[16]   Normally what happens, like I
[17] stated earlier — and I have to look at the time. If
[18] I'm interviewing Mr. Bard, that's what I'm doing. If
[19] I finish with his interview, then I assist him.
[20]   This isn't his handwriting, I don't
[21] believe —
[22]   Q: And actually, Trooper, if one person
[23] starts taking the measurements, for consistency sake,
[24] doesn't it make sense to have him take all the

---

**1—04:23:44   24—04:24:43**                     Page 250

[1] measurements anyway?
[2]   A: Usually, but like I say, we try to help
[3] each other when we can.
[4]   Q: I understand. But the measurements all
[5] being taken by Sergeant Cox isn't any kind of breach
[6] of your protocol?
[7]   A: No, sir.
[8]   Q: You're off doing the witness statements?
[9]   A: Correct.
[10]   Q: Let's move to the witness statements
[11] then. Okay?
[12]   A: Or in this case, the operator statements,
[13] yeah.
[14]   This one measurement is in my
[15] handwriting, the 2.4, and that would have been what
[16] we discussed. As he marks it in grid coordinates,
[17] it's not necessarily a reflexion of the true length.
[18]   Oftentimes, what I will do is take
[19] a measurement, because even, though, if you lock it
[20] in, whether you're on a curve or whatever, to go from
[21] Point A to Point B, you can subtract that difference,
[22] and it's not necessarily going to be 2 feet 4 inches,
[23] because you're not going the truth length from
[24] beginning to end.

---

**1—04:24:56   24—04:25:53**                     Pag

[1]   Q: There's an arrow off of Box A and Box B
[2] on the right-hand side of the note column, with the
[3] number 2, and then a fraction 4 above it and the word
[4] "long." That's yours; correct?
[5]   A: Yes.
[6]   Q: Everything else on this diagram, Weaver
[7] 7, is Sergeant Cox's?
[8]   A: Handwriting, yes.
[9]   Q: And his measurements, the result of his
[10] taking measurements?
[11]   A: Yes.
[12]   Q: Okay. Now, this 2 feet 4 inches, you
[13] initially, I believe, and in your report indicated
[14] that that was the amount — No. 1, that was the
[15] length of the skid mark; correct?
[16]   A: Correct.
[17]   Q: And you originally thought that that was
[18] the distance moved — that the van moved at impact b
[19] the force of the bike; correct?
[20]   MS. RISK: Objection to form.
[21]   THE WITNESS: Yes, sir. The
[22] questions that we asked earlier established, yes.
[23]   BY MR. VAN DER VEEN:
[24]   Q: And now we aren't sure about the distance

---

**1—04:25:56   24—04:27:17**                     Pag

[1] that it moved, based on what we went through before;
[2] correct?
[3]   MS. RISK: Objection to form.
[4]   THE WITNESS: Yes.
[5]   BY MR. VAN DER VEEN:
[6]   Q: Okay, thanks.
[7]   Let's go to the witness statements.
[8] Okay?
[9]   A: Okay.
[10]   Q: Let's go to Weaver 6.
[11]   Do you have my police report, my
[12] working copy?
[13]   (Discussion off the record.)
[14]   BY MR. VAN DER VEEN:
[15]   Q: Let me be sure of one thing. Weaver 7 —
[16] the copy of Weaver 7 is not complete. I think —
[17] where is the original to Weaver 7? Because there's
[18] writing on the back of it; right? Do you have a copy
[19] of the writing on the back?
[20]   Do you have this?
[21]   MS. RISK: It's in our copies.
[22] It's in the copy of Corporal Weaver's file.
[23]   MR. VAN DER VEEN: The copies that
[24] we obtained today?

---

Corporal Jeffrey Weaver                                                    Vascek    v.
June 23, 2005                                                                        UPS

---

1—04:27:19   24—04:29:06                    Page 253

[1]  MS. RISK: Yes.

[2]  MR. VAN DER VEEN: It's in there?

[3]  MS. RISK: Yes, it's in there.

[4]  MR. VAN DER VEEN: Okay.

[5]  THE WITNESS: It's just not

[6]  attached.

[7]  MR. VAN DER VEEN: I also saw

[8]  writing on the back of something else. Is it this

[9]  one?

[10]  So we also have this in our copies?

[11]  MS. RISK: Yes.

[12]  MR. VAN DER VEEN: Gotcha. And

[13]  they're in order?

[14]  MS. RISK: Yes.

[15]  MR. VAN DER VEEN: Okay, great.

[16]  Weaver 9 is going to be a two-page

[17]  document.

[18]  (Document marked Plaintiffs'

[19]  Exhibit 9 for identification.)

[20]            BY MR. VAN DER VEEN:

[21]  Q: Let me show you what we've marked as

[22]  Weaver 9. What is that?

[23]  A: This is a follow-up sketch that I did.

[24]  Q: Who took those measurements?

---

1—04:29:08   24—04:30:46                    Page 254

[1]  A: Me.

[2]  Q: When did you take them?

[3]  A: Wednesday, December 29th.

[4]  Q: Did any of your measurements differ from

[5]  the measurements that Sergeant Cox had taken?

[6]  A: I didn't take photographs — I mean, I

[7]  didn't take measurements of the things that he had

[8]  collected. What I did was took more detail of the

[9]  distances of the intersection in relationship to

[10]  trees, the bridge, line of sight to enhance the

[11]  diagram, the preliminary of what he did. But he

[12]  needed more to do the diagram.

[13]  Q: For example, he took lane widths —

[14]  A: Okay.

[15]  Q: — and you did not?

[16]  A: No. We did the measurements.

[17]  Q: He took road widths of Twaddell Mill Road

[18]  that are different from yours. He has 11'5" and

[19]  11'2. You have 9'4" and 9' 11"?

[20]  A: I took mine further back. I was down the

[21]  road further.

[22]  Q: Okay.

[23]  A: Further to the west. He was closer to

[24]  the intersection for the measurements he took.

---

1—04:30:47   24—04:33:33                    Page 255

[1]  Q: Where it widens out a bit?

[2]  A: Yes, sir.

[3]  Q: Let's go to the police report, Weaver 6.

[4]  We'll come back to Weaver 9.

[5]  I'm going to start on Page 1 of DSP

[6]  Troop 1. What is — I'd like to start on that page

[7]  with you.

[8]  A: Okay. Where is that on Weaver 1? Is

[9]  that the collision report or the incident report? It

[10]  looks like it's the collision report.

[11]  Q: Yeah, which is the first page in

[12]  Weaver 6.

[13]  A: Okay.

[14]  MS. RISK: Hold on.

[15]            BY MR. VAN DER VEEN:

[16]  Q: Going really up to this first, "Within

[17]  corporate limits of," and you put "Not applicable" —

[18]  the "County," "New Castle," "Within corporate limits

[19]  of," and you have "NA" in quotes, which I believe is

[20]  abbreviations for not applicable?

[21]  A: Yes, sir.

[22]  Q: Where was the accident? In

[23]  unincorporated Delaware?

[24]  A: That's one of the populated drop-down

---

1—04:33:40   24—04:35:06                    Page 256

[1]  boxes. If you didn't fill it in, it immediately

[2]  kicks it in. It would be —

[3]  Q: Wouldn't every corporate limit be

[4]  available to you in your pop-up box?

[5]  A: No. Again, the Trax system is a new

[6]  system. It hasn't been on that long and they're

[7]  still working bugs out of it.

[8]  Q: I see. Can you tell me what city or

[9]  township or corporate entity this was within, this

[10]  accident?

[11]  A: I'm not familiar with that area. There

[12]  are grid books that we use, and the troops are

[13]  assigned to those sectors. I don't know where this

[14]  is in relationship to what the closest city is, if

[15]  that's what you're asking.

[16]  Q: No, I'm actually asking what city is it

[17]  in? What city did the accident happen in?

[18]  A: That I don't know.

[19]  Q: Okay. A little further down to the

[20]  right, "X coordinate"?

[21]  A: Yes, sir.

[22]  Q: What is that?

[23]  A: There is a box when you're doing the Trax

[24]  system, you have the opportunity — one of the things

---

Vascek    v.
UPS

Corporal Jeffrey W
June 23,

---

**1—04:35:10  24—04:36:12                    Page 257**

[1] that you're required to do is to, on a map, a map
[2] field will come up, and you put a dot to locate that.
[3] And the computer oriented those — in relationship to
[4] that map, it gives you those two coordinates.
[5]    What's that mean to me? If you're
[6] not within the system, it's a — it's a coordinated
[7] system through relationship to DelDOT, and all the
[8] statistics and — all the departments statewide are
[9] eventually going to go on this, so that when they
[10] want to pull their statistics, whatever they want,
[11] they'll use that.
[12]    As far as me personally what this
[13] number means, absolutely nothing, other than figuring
[14] with the boxes that are in it, and it assigns those
[15] numbers.
[16]    Q: I only ask you because I didn't know what
[17] it was. It's not relevant to your investigation or
[18] your reconstruction?
[19]    MS. RISK: Objection to form.
[20]    THE WITNESS: No.
[21]             BY MR. VAN DER VEEN:
[22]    Q: Is it relevant to your investigation or
[23] reconstruction?
[24]    A: No. And if I can regress to the previous

---

**1—04:36:17  24—04:37:29                    Page 258**

[1] question, on the previous forms that we did, one of
[2] the things we normally do was put 1.6 miles
[3] south of Wilmington, or north of Greenville, or
[4] whatever.
[5]    Q: Yeah.
[6]    A: It's not on this one, because it's not
[7] within the limits of a city.
[8]    Q: So you — in these next series of 1, 2,
[9] 3, 4, 5, 6, 7, 8, 9, 10, 11, 12 boxes where they all
[10] have "NA," that was your picking "NA" and putting it
[11] in?
[12]    A: Basically, yes. And for the record, I
[13] was relatively new with this program. We had just
[14] instituted it. I'm still working with it. It was
[15] relatively new.
[16]    Q: How long had you used this program at the
[17] time you made this report?
[18]    A: I'm not sure, but it hadn't been real
[19] long.
[20]    Q: A couple months?
[21]    A: Yes, sir.
[22]    Q: Having worked with this system now for an
[23] additional nine months, in these 12 boxes that I've
[24] just counted off, would you have put anything

---

**1—04:37:31  24—04:38:44                    Pa**

[1] different in?
[2]    A: No.
[3]    Q: Okay. Then we go through Accident
[4] Environment, correct? And Roadway Characteristics?
[5] You put "Roadway," "88, other." What does that mean
[6]    A: Contributing circumstances?
[7]    Q: Physical obstruction; and then you put,
[8] under the roadway, "88, other." Nothing was typed
[9] in.
[10]    A: I'm not sure. It doesn't give you a
[11] field to put anything.
[12]    Q: Okay. And you weren't sure what you
[13] meant when you put "other"?
[14]    A: With not having the computer, I'm not —
[15] the wordage what — I couldn't answer that.
[16]    Q: Okay. Type of roadway is a state road
[17] with a T intersection and a stop sign. Those are all
[18] things that you put in?
[19]    A: Yes, sir.
[20]    Q: Okay. And so all of the information on
[21] Page 1 of this report, you put in; correct?
[22]    A: Yes, sir.
[23]    Q: Okay. Going to Page 2 of this report —
[24] and you call this report which?

---

**1—04:38:46  24—04:39:45                    Pag**

[1]    A: Collision report.
[2]    Q: Okay.
[3]    A: Or Trax.
[4]    Q: All of this information you put in
[5] yourself; correct?
[6]    A: Yes, with the limits that it allows me
[7] to.
[8]    Q: When Elmore's Towing came to pick up the
[9] bike — who actually called Elmore's?
[10]    A: That would have come out of Troop 1.
[11]    Q: Okay. When Elmore's came and got the
[12] bike, were they given any specific instructions as to
[13] how to store or maintain or preserve the bike?
[14]    A: I didn't give them any. I don't know if
[15] Sergeant Cox did.
[16]    Q: Would you normally?
[17]    A: The only main restrictions that we give
[18] is that no one is allowed to have access to them
[19] until we release them.
[20]    Q: Okay. Did you ever, in the course of
[21] your investigation, determine whether that was
[22] adhered to?
[23]    A: I can't say if it was or wasn't.
[24]    Q: Did you ever ask Elmore's about who came

---

Corporal Jeffrey Weaver
June 23, 2005

Vascek v.
UPS

---

1—04:39:48  24—04:41:11                    Page 261

[1] to see the bike, who moved the bike? Did anybody
[2] ever turn the bike, run the bike —
[3]   A: I didn't ask them, no.
[4]   Q: — spin the wheels to the bike?
[5]   A: Didn't ask them.
[6]   Q: Page 3. All this information appears to
[7] be correct to you?
[8]   A: Yes, sir.
[9]   Q: The driver entry information, the
[10] citation info, owner info, vehicle info?
[11]   A: Appears to be, yes, sir.
[12]   Q: This is all the UPS information; correct?
[13]   A: Yes, sir.
[14]   Q: Going back to Page 1, if I may, just
[15] something out of order. The approval date of this
[16] was March 7th of '05.
[17]   A: Yes, sir.
[18]   Q: That is approximately — this is more
[19] than five months postaccident; correct?
[20]   A: Correct.
[21]   Q: Why did it take so long to have this
[22] report approved until that time?
[23]   A: Part of it, as I previously testified, I
[24] had a felony vehicular homicide case at the AG's

---

1—04:42:15  24—04:43:21                    Page

[1] they're looking for is the narrative content and
[2] hopefully looking for and catching any discrepancies,
[3] like we've already pointed out earlier about the
[4] discrepancy in the 1600 versus 1620.
[5]     When I've completed with report —
[6] I don't have the date with me, but I can gain access
[7] to it because we have a status sheet of the status of
[8] our investigations. I can't tell you exactly when I
[9] gave it to Sergeant Cox. But then again, in addition
[10] to his caseload and all that he's working on, it can
[11] sit a week or two weeks or whatever until he has the
[12] opportunity to review it.
[13]     He sends it back to me if there's
[14] any correction or something he might note. You
[15] spelled this — well, with computers we're pretty
[16] good to go now.
[17]     But if there's any things that he
[18] finds, a description, it's changed or brought to my
[19] attention. If — to check, to clarify if it is, in
[20] fact, a mistake or not. If anything is needed to be
[21] changed, then it's changed, and at that time is when
[22] he approves it.
[23]     So there's a time frame. That
[24] explains —

---

1—04:41:18  24—04:42:12                    Page 262

[1] office that directed me to take precedence over
[2] anything that happened that I still was working on
[3] prior to that date.
[4]     Plus, in addition to being called
[5] out and the other directions that the division uses
[6] us and personal vacation, whatnot.
[7]     Then the report is finished, and
[8] it's given to another reconstructionist, either
[9] Corporal Aube or Corporal Nottingham. Once they've
[10] reviewed it, if there's any corrections or notes —
[11] what you picked up as been previously found as far as
[12] the time as far as fire board printout and Recom
[13] printout weren't picked up.
[14]   Q: Or in relation to the distance that the
[15] truck was moving; correct?
[16]   A: Yes.
[17]   Q: Okay. Or in relation to what
[18] direction — whether the skid is a skid or a scuff?
[19]   A: Yes.
[20] MS. RISK: Objection.
[21] THE WITNESS: Well, to that —
[22]     BY MR. VAN DER VEEN:
[23]   Q: They wouldn't review?
[24]   A: They wouldn't be reviewing that. All

---

1—04:43:21  24—04:44:24                    Page 264

[1]   Q: All of that explains it?
[2]   A: All of that In addition to, like I say,
[3] I'm on call, a continuation and other caseloads.
[4]   Q: I understand.
[5]   A: One more. I'm sorry.
[6]   Q: Sure.
[7]   A: In addition to if there were any
[8] investigations that preceded this one.
[9]     For instance, we get called out, we
[10] go to a fatal. We take days, weeks, whatever it
[11] takes to collectively get all that we could possibly
[12] believe we could get on that case. Gets put a binder
[13] or folder, and it gets put in the order in which
[14] it comes in. And then when the AG office — like I
[15] said with the other one, when I got that done, I had
[16] to go to whatever — and I don't know off the top of
[17] my head if there was something preceding that. But
[18] that adds to the distance of —
[19]   Q: I understand.
[20]     With respect to this report, do you
[21] remember who reviewed and approved this report?
[22] Whether it was Nottingham or —
[23]   A: I can't tell you — I don't remember.
[24] But we have a logbook. And like for instance, when I

---

Vascek   v.
UPS

Corporal Jeffrey W
June 23

---

1—04:44:28   24—04:46:07                    Page 265

[1] get a report, I will say, Turned over to Bill for
[2] first review, or Turned over to Joe for first review.
[3]     Q: Can you let me know when that was?
[4]     A: Are you going to need that before I give
[5] you that letter or —
[6]     Q: Maybe we'll just incorporate it in that.
[7] I don't need it before then. There's no specific
[8] time or rush for it.
[9]     A: Okay. It would be either Bill
[10] Notthingham or Joe Aube.
[11]    Q: And do you know if they made any changes
[12] to it?
[13]    A: I don't have any idea.
[14]    Q: Would that be in the logbook also?
[15]    A: No. What happens, it's given to another
[16] trooper, another reconstructionist. They review it,
[17] they return it to me. Normally they'll mark it up.
[18] If there's something that needs to be changed — or
[19] take stickies and put arrows, You spelled this wrong,
[20] or This is — whatever.
[21]     And then once the corrections are
[22] made, it's trashed. I throw it in the trash. It's
[23] not kept in the file.
[24]    Q: You don't recall any corrections being

---

1—04:46:09   24—04:47:17                    Page 266

[1] made to yours, do you?
[2]     A: No. I see one now.
[3]     Q: Which one?
[4]     A: The time discrepancy.
[5]     Q: How long you're available to proofread?
[6]     A: They're normally pretty good. And I'm
[7] not faulting them. The senior, primary is on me.
[8]     Q: I want to go back to Page 2 of your
[9] vehicle info. Halfway down under Vehicle Info, there
[10] Is "Vehicle role, 05, both striking and struck";
[11] correct? That's what you put?
[12]    A: Yes, sir.
[13]    Q: This is for the Vascek motorcycle;
[14] correct?
[15]    A: Yes, sir.
[16]    Q: And indicated that it was both a striking
[17] vehicle and a vehicle that was struck?
[18]    A: Yes, sir.
[19]    Q: Is that correct?
[20]    A: Without seeing the blocks, I couldn't
[21] tell you.
[22]    Q: Well, if you look at the next page, on 3,
[23] under Info, you put striking vehicle as the UPS one.
[24]    A: It should be struck. The striking

---

1—04:47:21   24—04:48:21                    Pa

[1] vehicle is the motorcycle. The struck vehicle is the
[2] UPS truck. And again, with —
[3]     Q: And that is — and why is that?
[4]     A: Because the motorcycle was traveling
[5] south. And within relationship to what was said, the
[6] UPS truck, if it's stopped, can't strike anything.
[7] The force is coming from the north.
[8]     And these blocks, again, I'm not —
[9] I'm making an excuse, but I'm not.
[10]     The fields that come up, there's a
[11] whole new area generated questions in which they
[12] ask — arrows of direction of something. I'm not —
[13] without seeing the other blocks, I can't really give
[14] more definition.
[15]    Q: Well, we know you could have put
[16] striking, and you did not.
[17]    A: Correct.
[18]    MS. RISK: Can we have
[19] clarification on that.
[20]             BY MR. VAN DER VEEN:
[21]    Q: Sure. On Page 2, under Vehicle Info,
[22] Vehicle Role for the bike, you put both striking and
[23] struck; correct?
[24]    A: Yes.

---

1—04:48:21   24—04:49:11                    Pa

[1]     Q: And you could have put just striking?
[2]     MS. RISK: Objection to form.
[3]             BY MR. VAN DER VEEN:
[4]     Q: Could you have just put striking?
[5]     A: On Page 2?
[6]     Q: Yeah.
[7]     A: Yes. I believe it should say that. I'd
[8] have to look at the blocks again to see what the
[9] drop-down is. I would imagine that it is.
[10]    Q: On Page 2, you put, "Extent of damage,
[11] 04, severe, vehicle totaled"; correct?
[12]    A: For the motorcycle.
[13]    Q: For the motorcycle?
[14]    A: Yes, sir.
[15]    Q: You put approximate cost of repair;
[16] correct?
[17]    A: Yes, sir.
[18]    Q: And you got that information from where?
[19]    A: Honda East.
[20]    Q: Mr. Swift at Honda East?
[21]    A: Yes, sir.
[22]    Q: Do you know —
[23]    A: Not the dollar value — I don't believe I
[24] got the dollar value from him.

---

Corporal Jeffrey Weaver
**June 23, 2005**                                                                   **UPS**

---

1—04:49:13  24—04:49:51                          Page 269

[1]    Q: He gives you that in his interview, too.

[2]    A: But as far as the totaled, I didn't know

[3] the motorcycle was totaled until he told me that when

[4] I interviewed him.

[5]    Q: Do you know that that was wrong, the

[6] insurance company did not total this vehicle?

[7]    MS. RISK: Objection.

[8]    THE WITNESS: I do not know.

[9]               BY MR. VAN DER VEEN:

[10]    Q: Do you know that —

[11]    A: I do — I do now, if you're telling me

[12] that's what they said.

[13]    Q: It wasn't totaled.

[14]    A: MS. RISK: Objection to form. Is

[15] there a question in there?

[16]               BY MR. VAN DER VEEN:

[17]    Q: Yeah. Do you also know that the value of

[18] the damage was below $3,500, according to the

[19] insurance company and the check that was paid out,

[20] which you received in discovery?

[21]    MS. RISK: Objection to form.

[22]    THE WITNESS: I do not know that,

[23] no.

[24]               BY MR. VAN DER VEEN:

---

1—04:49:51  24—04:50:53                          Page 270

[1]    Q: Okay. Does that — if the information

[2] that Mr. Swift gave you regarding the totaling of the

[3] motorcycle and with respect to the value of the

[4] damage to the motorcycle, would that tell you

[5] anything about the value of the information you got

[6] from Mr. Swift?

[7]    A: In relation to other things he told me?

[8]    Q: Well, in relationship, first of all, to

[9] that malfunction.

[10]    A: That information, I have no — no — I

[11] have nothing to base other than what he told me. And

[12] again, I'm a trooper, not a repair person and/or —

[13]    Q: Absolutely.

[14]    A: — an insurance adjuster and/or — our

[15] best — we use our best guesstimation when we

[16] guesstimate. It's just a best estimate, and today's

[17] prices and everything else.

[18]    Q: I understand.

[19]    A: We're just trying to get an —

[20]    Q: I agree.

[21]    A: I'm not defensive. I'm just explaining.

[22]    Q: And I'm not on the offensive with you

[23] either.

[24]    A: I'm with you.

---

1—04:50:55  24—04:51:53                          Page

[1]    Q: Good. 3, Page 3.

[2]       With respect to vehicle information

[3] on the UPS package van, 3, you indicated it was the

[4] striking vehicle; correct?

[5]    MS. RISK: Objection. I think the

[6] witness just spoke to and corrected that.

[7]    MR. VAN DER VEEN: I'm walking

[8] through it.

[9]    THE WITNESS: In this block it says

[10] striking. It does say striking.

[11]               BY MR. VAN DER VEEN:

[12]    Q: You put striking vehicle, and that's not

[13] correct?

[14]    A: No. It should be struck.

[15]    Q: You put the extent of damage to be

[16] functional damage?

[17]    A: Where are we?

[18]    Q: Two lines down. "Extent of damage" —

[19]    A: I'm looking over here. Yes.

[20]    Q: Functional damage, that means that the

[21] truck was functional, that it was able to be driven

[22] afterwards?

[23]    A: Yes.

[24]    Q: Was it, in your opinion, roadworthy at

---

1—04:51:56  24—04:52:44                          Page 272

[1] that time?

[2]    MS. RISK: Objection to form.

[3]    THE WITNESS: Roadworthy as to

[4] continually use it on a regular basis?

[5]               BY MR. VAN DER VEEN:

[6]    Q: To drive it.

[7]    A: To drive it from the scene? That was my

[8] observation of what I saw. If there was mechanical

[9] malfunctions underneath as a result of that — I'm

[10] not a mechanic — then I wasn't aware of if a belt

[11] was knocked off or hose was whatever.

[12]       But looking at it in perspective to

[13] the damage, that's what that relates to, that I

[14] believed it was drivable.

[15]    Q: Did you watch it drive away, by the way?

[16]    A: No.

[17]    Q: Did you leave before it left?

[18]    A: Yes.

[19]    Q: When you left, the UPS personnel were

[20] still on the scene?

[21]    MS. RISK: Objection to form.

[22]    THE WITNESS: I believe

[23]               BY MR. VAN DER VEEN:

[24]    Q: That actually was, were the UPS people

---

Vascek    v.                                              Corporal Jeffrey W
UPS                                                       June 23

---

**1—04:52:46   24—04:53:44**                          Page 273

[1] still on the scene?

[2]    **A:** I believe we were basically leaving all
[3] pretty much at the same time. But I didn't actually
[4] visually pay attention to the vehicle driving off.
[5] Because they would have had to be moving and leaving,
[6] because we give the green light to open the roadway
[7] and not exactly where you want to be standing when
[8] the roadway is open.

[9]    **Q:** Do you know that the next day, UPS had
[10] the package — another package van back out at the
[11] time and the location as it's depicted in these
[12] photographs for a significant period of time?

[13]    **MS. RISK:** Objection to form.

[14]    **THE WITNESS:** I'm aware that they
[15] did their own investigation, and it's to my
[16] understanding that it began the day after, yes. As
[17] to the extent or how long the road — I'm not aware
[18] of any of that.

[19]             **BY MR. VAN DER VEEN:**

[20]    **Q:** Was the road closed off for them or not?

[21]    **A:** I don't know. We weren't involved. The
[22] fatal team was not involved. Whether they called for
[23] road cars or for safety or whatever, I am not aware
[24] of any of that.

---

**1—04:53:45   24—04:54:47**                          Page 274

[1]    **Q:** If they were to call for road cars or
[2] safety, who would they call?

[3]    **A:** Delaware State Police. It would be
[4] what's referred to as a "pay job."

[5]    **Q:** Which is what?

[6]    **A:** A pay job is when we are —

[7]    **Q:** Pay job? Did you say pay, P-A-Y?

[8]    **A:** P-A-Y, J-O-B.

[9]    **Q:** Okay.

[10]    **A:** The Delaware State Police are contracted
[11] and hired for functions outside of the realm of our
[12] duties — it is provided as a trooper like to direct
[13] traffic at a carnival or security at whatever.

[14]    But it is not something that if —
[15] and I'm using them specifically, because we're
[16] talking specifically of this investigation.

[17]    **Q:** Yep.

[18]    **A:** UPS, FedEx or whomever could not pick up
[19] a phone and dial the dispatch and say, I need a
[20] trooper, because you wanted to stop traffic to do
[21] such-and-such. They won't do that.

[22]    **Q:** Right.

[23]    **A:** Now, if we wanted to hire the Delaware
[24] State Police — and this has been done in the past,

---

**1—04:54:50   24—04:55:33**                          Pa

[1] specifically, as well as have been done with
[2] Mr. Shirky and others in which there's been collision
[3] reconstruction. They hire the state police primarily
[4] for traffic control.

[5]    **Q:** Yeah.

[6]    **A:** But that would be — a trooper that takes
[7] that position is off duty.

[8]    **Q:** Yeah.

[9]    **A:** Or on vacation, which is also off duty,
[10] and you're getting paid.

[11]    **Q:** So I can do that?

[12]    **A:** Yes.

[13]    **Q:** Mike van der Veen can do that?

[14]    **A:** Yes.

[15]    **Q:** Mike van der Veen can take a package van,
[16] park it out there and have them to close off the
[17] roads or stop traffic for a little while I do
[18] what I need to do with it?

[19]    **A:** Yeah, but you would pay the rates.

[20]    **Q:** No problem.

[21]    **A:** But what we get, it's in relationship —
[22] it's voluntary overtime. But it's when you're off
[23] duty and it's a pay job,

[24]    **Q:** Gotcha.

---

**1—04:55:36   24—04:56:35**                          Pa

[1]    **A:** And where we went with this: I have no
[2] knowledge of whether that was ever done. And I only
[3] knew that they had done an investigation, because I
[4] was under the understanding that they did it the very
[5] next day.

[6]    But as to the extent, the length of
[7] time that day and/or following, subsequent days, I'm
[8] not aware of.

[9]    **Q:** How did you know they did it the next
[10] day?

[11]    **A:** Through conversations with UPS on a later
[12] contact, or follow-up interviews to talk to Mr. Bard.
[13] As well as, stated earlier, the compassionate part of
[14] me: I called just to check to see how he was doing
[15] to see how — not just with the company or
[16] corporation; with him specifically.

[17]    **Q:** Yeah, what do you mean? Just —

[18]    **A:** Just to see how you're doing. Is there
[19] anything we can do for you? Are you having problems
[20] dealing with this? Victim services is — that's one
[21] of victim services that we provide. Like I stated
[22] earlier: All involved are victims.

[23]    **Q:** Have you ever called Heidi Vascek and
[24] asked her that stuff?

---

Corporal Jeffrey Weaver
June 23, 2005

Vascek v.
UPS

---

1—04:56:35　24—04:57:25　　　　Page 277

[1] **A:** Am I aware of that?

[2] **Q:** Yeah.

[3] **A:** There was some contact made.

[4] **Q:** Not until the report was done.

[5] It's irrelevant. Really

[6] irrelevant.

[7] Let me ask you this: Do you know

[8] that UPS went out there on November 15th and did a

[9] second investigation with a package van there at the

[10] scene?

[11] **A:** No.

[12] **Q:** Did they tell you that?

[13] **A:** They didn't tell me. I wouldn't have had

[14] a reason to ask.

[15] **Q:** Well, I mean, they told you that they

[16] were out there the next day?

[17] **A:** Correct.

[18] **Q:** Did they tell you that they were also out

[19] there three weeks later —

[20] **A:** I don't recall them.

[21] **Q:** — with a new group of engineers?

[22] **A:** No.

[23] **Q:** Did they tell you that they went and

[24] inspected the bike the next day?

---

1—04:57:28　24—04:58:14　　　　Page 278

[1] **A:** I don't recall them telling me that.

[2] **Q:** At Elmore's?

[3] **A:** I don't recall — I don't think there's

[4] any notes to reflect that.

[5] **Q:** Okay. You don't remember them telling

[6] you that?

[7] **A:** No.

[8] **Q:** Would that have been something that you

[9] would have wanted to have happen? You not having

[10] been able to inspect the bike as you did at Elmore's?

[11] **MS. RISK:** Objection to form.

[12] **BY MR. VAN DER VEEN:**

[13] **Q:** Would you have wanted anybody else to

[14] have access to the bike before you did?

[15] **A:** No one is supposed to —

[16] **MS. RISK:** Objection.

[17] **THE WITNESS:** No, I would not. And

[18] instructions are given, and I also would love to tell

[19] you that this is a Disney world and all the tow

[20] companies adhere to those policies. But they don't.

[21] **Q:** They didn't.

[22] **A:** And it's not relevant here, but we've had

[23] things removed from vehicles, et cetera.

[24] **Q:** It may be relevant here.

---

1—04:58:16　24—04:59:05　　　　Page

[1] **A:** I'm referring to my knowledge in this

[2] case.

[3] **Q:** I understand.

[4] **A:** But as far as viewing it, I'm not aware

[5] of it.

[6] **Q:** Did anyone tell you, from UPS, that they

[7] also inspected the bike a second time, approximately

[8] three weeks after, also at Elmore's?

[9] **A:** I have no knowledge of that.

[10] **Q:** Didn't share that information with you,

[11] as far as you recall?

[12] **MS. RISK:** Objection to form.

[13] **THE WITNESS:** They didn't ask. I

[14] didn't ask or have a reason to ask, no.

[15] **BY MR. VAN DER VEEN:**

[16] **Q:** Okay.

[17] **A:** They didn't just say, Oh, by the way —

[18] whatever they did. They didn't pick up the phone and

[19] say, Corporal Weaver, today I did this, and Corporal

[20] Weaver, yesterday I did that.

[21] **Q:** How did it come up in conversation then?

[22] And who was the conversation with that told you they

[23] did have the package van out there the next day?

[24] **A:** That was weeks later.

---

1—04:59:06　24—05:00:19　　　　Page 280

[1] **Q:** With whom?

[2] Hold on, because I'm going to go

[3] through all your conversations with them in order.

[4] Okay? You got me off the track a little bit.

[5] **A:** Sorry.

[6] **Q:** Now, going to Page 4, you put — there's

[7] a miscellaneous column, and here you say that the

[8] role of the vehicle, the package van, was struck

[9] while turning left with functional damage. Do you

[10] see that?

[11] **A:** Yes.

[12] **Q:** Okay.

[13] **A:** And I'm not 100 percent sure, but I'm

[14] about 99 percent sure that particular column is

[15] something that's pulled from the other information

[16] and it's put there by the computer.

[17] **Q:** It's different than the previous page?

[18] **A:** I told you there's quirks in the system.

[19] **Q:** Is that an error with the system?

[20] **A:** It might be.

[21] **Q:** Okay.

[22] **A:** But again, with not being — I was not

[23] real familiar with the program at this point or this

[24] time, and I don't know.

---

Vascek  v.
UPS

Corporal Jeffrey W
June 23,

---

**1—05:00:26  24—05:01:32**                                Page 281

[1]   Q: I'm reading your narrative that follows
[2] there on Page 4 and goes over to Page 5.
[3]   A: Okay.
[4]   Q: It looks like a lot of that information
[5] you got from Mr. Bard.
[6]   MS. RISK: Objection to form. Is
[7] there a question in there?
[8]              BY MR. VAN DER VEEN:
[9]   Q: Is that true?
[10]   MS. RISK: Objection to form.
[11]   THE WITNESS: The lower portion of
[12] the statement, where it starts is Operator 2. That
[13] is from his information incorporated with everything
[14] else that we knew.
[15]              BY MR. VAN DER VEEN:
[16]   Q: Okay. Did you ever get the position of
[17] the bike at final resting point?
[18]   A: No.
[19]   Q: You don't — today, you don't know what
[20] the final resting point of the bike was; correct?
[21]   MS. RISK: Objection to form.
[22]              BY MR. VAN DER VEEN:
[23]   Q: Until today, do you know where exactly
[24] the final resting point of the bike was?

---

**1—05:01:34  24—05:02:34**                                Page 282

[1]   A: The exact location, no.
[2]   Q: Do you know where the resting point of
[3] the UPS van was?
[4]   A: No.
[5]   Q: Did Mr. Bard ever tell you that after the
[6] point of impact, his vehicle jolted forward and ended
[7] up on the right elbow of Mr. Vascek?
[8]   A: I recall that, yes.
[9]   Q: He told you that?
[10]   A: I don't recall him saying that it bolted
[11] forward. But I recall him saying that it was
[12] positioned on — either it was at that point or when
[13] moved it.
[14]   Q: Did he tell you that or did Mr. Seaford
[15] tell you that? It's not in your statement from
[16] Mr. Bard, as you recall it — as you report it.
[17]   Let's go through Mr. Bard's
[18] statement. Okay. It's a number of things I'm
[19] asking —
[20]   MS. RISK: Why don't we let
[21] Corporal Weaver answer your last question that's
[22] posed.
[23]   MR. VAN DER VEEN: I'll withdraw
[24] the question.

---

**1—05:02:35  24—05:03:43**                                Pa

[1]              BY MR. VAN DER VEEN:
[2]   Q: Let's go to the statement of Mr. Bard.
[3] Okay?
[4]   A: Okay. The first one.
[5]   Q: Actually, you know what, I'm just going
[6] to keep in order on this. After Page 5 on your
[7] report, we have a diagram, Fatal Motor Vehicle
[8] Collision.
[9]   A: Yes, sir.
[10]   Q: And it has a stamp across it, "fatal."
[11]   A: Yes, sir.
[12]   Q: Is that in duplicate? In other words, is
[13] the next page the same thing?
[14]   A: It is identical, but in the originals
[15] that are sent to headquarters, one is all black ink,
[16] and the other is a color photograph.
[17]   Q: Do we have a color photograph of this?
[18]   A: Not with me, no. The original went to
[19] headquarters.
[20]   Q: So where could I get the original? How
[21] could I get the original?
[22]   A: It's with the original report.
[23]   Q: Which is where?
[24]   A: In headquarters, Dover. The diagram is

---

**1—05:03:51  24—05:04:48**                                Pag

[1] in our computer. The only difference is a picked —
[2] as you can see the difference, the color plotter has
[3] a tendency to blur a little bit. And the second page
[4] that you see, it's more crystal — crisp. It's
[5] clearer. And I can.
[6]   Q: Can I put that in the letter to you?
[7]   A: Yes.
[8]   Q: Thanks.
[9]   A: You want one of each?
[10]   Q: Any, yeah, please.
[11]   MS. RISK: Just for clarification's
[12] sake, Corporal Weaver, are you saying that the second
[13] copy here of that diagram is from is the black —
[14] originally the black and white?
[15]   THE WITNESS: It's —
[16]   MS. RISK: The clearer version is
[17] the black and white?
[18]   THE WITNESS: Yes. The blurred
[19] version is the color one in which the trees are green
[20] and —
[21]              BY MR. VAN DER VEEN:
[22]   Q: Which in order, as you're looking at it,
[23] I think, Ms. Risk, is the one that's all black is the
[24] color; and that's the first one in our package.

---

Corporal Jeffrey Weaver
June 23, 2005

Vascek  v.
UPS

1—05:04:51  24—05:05:57                 Page 285

[1]    A: Right exactly.

[2]    Q: Now, this diagram is not to scale;
[3] correct?

[4]    MS. RISK: Objection to form.

[5]            BY MR. VAN DER VEEN:

[6]    Q: Is this diagram to scale?

[7]    A: No, sir.

[8]    Q: Did you ever make a diagram in your
[9] accident reconstruction of this accident that was to
[10] scale?

[11]    A: No, sir.

[12]    Q: So all of the positions of the vehicles
[13] and trees and bridges on this diagram are
[14] approximations?

[15]    MS. RISK: Objection to form.

[16]            BY MR. VAN DER VEEN:

[17]    Q: Is everything on here an approximation?

[18]    A: It is using the auto CAD program. You
[19] put grid points in. You take the information on the
[20] grid sheet, and you make — everything is relative
[21] within itself on here. But as far as scale, one foot
[22] equals one inch to — whatever. It's not to scale in
[23] that perspective.

[24]    Q: You could have made a diagram to scale;

1—05:06:00  24—05:06:35                 Page 286

[1] correct?

[2]    A: Yes, sir.

[3]    Q: And you could have also made a diagram to
[4] scale that was from a computer program?

[5]    MS. RISK: Objection to form.

[6]    THE WITNESS: That's the only way I
[7] can do it. We no longer do the drafting boards,
[8] longhand.

[9]            BY MR. VAN DER VEEN:

[10]    Q: Well, but it can be done longhand to
[11] scale; correct?

[12]    A: It can be, but it's not our procedure to
[13] do that anymore.

[14]    Q: And it can be made to scale through a
[15] computer program?

[16]    A: Yes.

[17]    Q: And that computer program was available
[18] to you?

[19]    MS. RISK: Objection to form.

[20]            BY MR. VAN DER VEEN:

[21]    Q: Was it available to you?

[22]    A: Yes.

[23]    Q: Okay. And you chose — and did you
[24] choose not to use it?

1—05:06:36  24—05:07:54                 Page

[1]    A: Yes.

[2]    Q: Okay. Why?

[3]    A: Because of the lack of evidence.

[4]       If this was — if there was more —

[5] as I stated earlier, what we would have done, if
[6] there was more evidence to lock in and to do a scale
[7] diagram and to be more precise, we would have shot
[8] the scene with the transit, which is like 1/100th of
[9] a foot in accuracy from the transit to the points
[10] that pick it up. You download the data — it's raw,
[11] but it's basically a — it's a scale diagram from the
[12] scene, and then when you enhance it with the auto CAD
[13] to extend the lines and make it a pretty product,
[14] labeling and things like that.

[15]       But that's — we didn't do that,
[16] because it wasn't — time takes a great bit of time.
[17] And in the situation in with the lack of evidence, is
[18] one of the reasons why — multiple many reasons why
[19] we didn't do it. I didn't do it.

[20]    Q: The reason why you didn't do, it is
[21] because you had a significant lack of evidence?

[22]    A: Correct.

[23]    MS. RISK: Objection to form.

[24]            BY MR. VAN DER VEEN:

1—05:07:54  24—05:09:13                 Page 288

[1]    Q: Also because you had a time constraint?

[2]    A: Yes.

[3]    Q: Anything else?

[4]    A: That's basically it.

[5]    Q: Okay. The next page is your motor
[6] vehicle damage and severity location profiles.

[7]    A: Yes, sir.

[8]    Q: When did you do the inspection of the
[9] motorcycle?

[10]    A: If this was a clearer photograph, I could
[11] read it. So I'll have to refer to the narrative
[12] part.

[13]    Q: It looks — is that the date it was done,
[14] 11/27/04?

[15]    MS. RISK: Where are you pointing
[16] to?

[17]       What's the date over here? 11/26.

[18]    MR. VAN DER VEEN: This one has
[19] 11/26.

[20]    THE WITNESS: 10 — up where it
[21] says "Examined by," my name, hour, date, and after
[22] the accident has Wednesday, 10 —

[23]    MS. RISK: 27.

[24]    THE WITNESS: Let me see if my copy

Vascek   v.
UPS

Corporal Jeffrey W
June 23,

Page 289

[1] is clearer.

[2] MR. VAN DER VEEN: Sure.

[3] MS. RISK: Is my copy clear,

[4] because I can read 10/27.

[5] THE WITNESS: It's written in the

[6] narrative, the date of the examination of the

[7] vehicles, is when I did it.

[8] 10/27, Wednesday at 8:15 a.m., is

[9] when I inspected the vehicle.

[10] BY MR. VAN DER VEEN:

[11] Q: Stick with me there, will you, please?

[12] A: Yes.

[13] Q: Under "Examined by" and your name, and

[14] "Hour," "Days" and "After the accident," below that

[15] is "Place"; right?

[16] A: Yes.

[17] Q: Elmore's Auto Collision; correct?

[18] A: Yes.

[19] Q: And then it has another date under there.

[20] It says 11/27/04?

[21] A: Yes.

[22] Q: Do you know what that is?

[23] A: Right now, no.

[24] Q: Do you know what that address is

Page 290

[1] underneath there? Is that a plate number, the Del 7A

[2] box, 111?

[3] A: I'm not sure what that is.

[4] Q: Okay. Over on the next box on the right,

[5] it has "Accident number" and "Case file number";

[6] correct?

[7] A: Yes.

[8] Q: And it gives the Delaware Route 100,

[9] southbound?

[10] A: Yes.

[11] Q: And it gives Twaddell Mill Road?

[12] A: Yes. It answers the question you asked

[13] earlier north of Centreville.

[14] Q: North of Centreville. Thank you.

[15] A: But not a direction.

[16] Q: Okay. And it says, at 6:20 on

[17] November 26 of '04.

[18] A: That's wrong.

[19] Q: That's wrong?

[20] A: That goes back to the ones we talked

[21] about earlier.

[22] Q: Not just the hour of 1620 but the month

[23] of November?

[24] A: Correct.

Pag

[1] Q: It's October; correct?

[2] A: Correct.

[3] Q: When you did this — when you did the

[4] inspection, did you fill out this form at the same

[5] time or did you fill out the form in November?

[6] A: When I filled out — what I normally fill

[7] out is the time that I do it, and oftentimes leave

[8] the rest blank, for time. I mean, I'm at the tow

[9] yard, whatever, and then go back at a later time and

[10] pull the file. And it's obviously an error.

[11] Q: Okay. The next page is of the package

[12] van. Now, these measurements off of the package van

[13] were done — can you tell me when?

[14] A: The observations of the damage that was

[15] done was done the day of the crash, because that's

[16] the only time I viewed the vehicle. And the

[17] measurements that were that taken were provided by

[18] UPS at a later telephone call, because I didn't take

[19] measurements or gotten them from them at that point

[20] Q: So you don't know if the measurements on

[21] here are right or wrong?

[22] MS. RISK: Objection to form.

[23] BY MR. VAN DER VEEN:

[24] Q: Do you know whether they're right or

Pag

[1] wrong?

[2] A: I have nothing to base them on to say

[3] they are or they're not, other than provided by the

[4] company. No, I can't say that they are right or

[5] wrong.

[6] Q: Because the length of this, by my math,

[7] adds up to — the length of this truck, by my math,

[8] ads up to 24'6" according to this page, which is the

[9] Vehicle 2 damage severity and location profiles.

[10] A: Okay.

[11] MS. RISK: Is there a question?

[12] MR. VAN DER VEEN: Yeah, there

[13] really is.

[14] THE WITNESS: It's coming.

[15] BY MR. VAN DER VEEN:

[16] Q: Does your math add up to that?

[17] MS. RISK: Can I ask your numbers

[18] you're adding, just for clarification's sake?

[19] MR. VAN DER VEEN: I think I'm

[20] 5'1", 5'6", 13'1", and 5'11". Or is that a 3'6?

[21] MS. RISK: It's a 3'6". I have

[22] 3'6".

[23] THE WITNESS: That's 3'6".

[24] BY MR. VAN DER VEEN:

Corporal Jeffrey Weaver
June 23, 2005

---

1—05:14:14  24—05:16:21                 Page 293

[1]   Q: So now it adds up to 22'6"?

[2]   A: 23'6".

[3]   Q: Because the 12/11 and the 1 equal 12. I

[4] was in my second year of calculus by senior year in

[5] high school. I'm still having trouble adding, but I

[6] believe that adds up too. 22'6".

[7]   A: 22'6". I'm sorry.

[8]   Q: Would it surprise you that in your

[9] narrative report you have a different total than that

[10] for the length? My question is, would it surprise

[11] you, first?

[12]   A: Considering we found two times of the

[13] collision and the way this day is going, no.

[14]   Q: Okay. Would it surprise you that when

[15] one of my experts measured the van from bumper to

[16] bumper, it was a distance different than 22'6"?

[17]   MS. RISK: Objection to form. Are

[18] you asking him if he would be surprised if anyone's

[19] measurements were different?

[20]        BY MR. VAN DER VEEN:

[21]   Q: That's fine.

[22]   A: Would I be surprised if anyone measuring

[23] it — no, depending on where you put your tape

[24] measure and —

---

1—05:16:22  24—05:22:45                 Page 294

[1]   Q: Okay. When did UPS give you these

[2] measurements?

[3]   (Discussion off the record.)

[4]   THE WITNESS: I don't have the

[5] date.

[6]        BY MR. VAN DER VEEN:

[7]   Q: Do you recall who called you from UPS and

[8] gave you these measurements?

[9]   MS. RISK: Objection to form. It

[10] implied the phone call came from UPS. Why don't you

[11] ask him whether he called UPS or UPS called him.

[12]        BY MR. VAN DER VEEN:

[13]   Q: Do you remember?

[14]   A: I received a memo from one of the members

[15] of the unit that say, You received from — UPS

[16] called, no phone number, no last names, with the

[17] measurements that I had called earlier and had

[18] requested for the unit, and the measurements that in

[19] are the file.

[20]   Q: On Vehicle No. 2, Damage Severity and

[21] Location Profiles —

[22]   A: Yes, sir.

[23]   Q: — when did you make these diagrams?

[24]   A: It would have been — I don't have the

---

1—05:22:53  24—05:24:08                 Page

[1] exact date when I did it.

[2]   Q: When you sketched the area of damage, you

[3] were doing it by memory?

[4]   A: Photographs. And just confirming what I

[5] remembered seeing at the scene.

[6]   Q: So it was after the photographs were

[7] developed that you drew this?

[8]   A: Yes.

[9]   Q: Is there anything on the diagram itself

[10] which would tell us when it was created?

[11]   A: No.

[12]   Q: Your weight, then, you got — the weight

[13] of this vehicle you got from UPS?

[14]   A: Yes.

[15]   Q: Did you do anything independent to verify

[16] that weight?

[17]   A: No.

[18]   Q: Did you ever do a calculation to

[19] determine how much force would be necessary to move

[20] that amount of weight at this location?

[21]   A: No.

[22]   Q: Going to the Fatal Motor Vehicle

[23] Collision, Delaware State Police Troop 1 report, what

[24] do you call this report? It starts with Page 2.

---

1—05:24:11  24—05:25:23                 Page 296

[1]   A: That's the incident report.

[2]   Q: The incident report itself?

[3]   A: Yes, sir.

[4]   Q: Could you look at that with me.

[5]   A: Page 2?

[6]   Q: Yeah. In the first paragraph, you say

[7] that Mr. Vascek sustained multiple blunt-force

[8] injuries to the head and to the body.

[9]   A: Yes.

[10]   Q: Where did you get information that there

[11] was any kind of a head injury to Mr. Vascek?

[12]   A: That's just a standard thing we put to

[13] cover until additional information is provided, which

[14] is later thorough — should be described in the

[15] autopsy report.

[16]   Q: The autopsy report doesn't describe a

[17] head injury to Mr. Vascek, does it? No bruising, no

[18] swelling, no broken bone, no skull fracture, no

[19] scratch, no mark, no bruise, no scrape, nothing;

[20] correct?

[21]   A: I didn't read every word of the medical

[22] examiner's report. I don't read them verbatim.

[23] Medical terms and — it says blunt-force injury to

[24] the torso.

---

Vascek  v.
UPS

Corporal Jeffrey W
June 23,

---

**1—05:25:24  24—05:26:34**                                   Page 297

[1]     Q: Okay. Not to the — nothing that you
[2] read in their report indicates that there was a head
[3] injury of any kind?
[4]     A: Not that I'm aware of.
[5]     Q: Okay. But you didn't read the report in
[6] total?
[7]     A: No.
[8]     Q: On Page 3 of your report, the second full
[9] paragraph, in the middle of the body, you indicate
[10] that the motorcycle displayed moderate contact
[11] damage.
[12]    A: Okay.
[13]    Q: Those are your words; correct?
[14]    A: Yes.
[15]    Q: You wrote that?
[16]    A: Yes, sir.
[17]    Q: That's not the result of a pop-up or a
[18] screen or anything else?
[19]    A: Yes, sir.
[20]    Q: It was your opinion, as you viewed the
[21] motorcycle after its inspection, that the damage to
[22] the motorcycle was moderate?
[23]    A: Yes, sir.
[24]    Q: You still believe that as you sit here

---

**1—05:26:35  24—05:27:35**                                   Page 298

[1] today?
[2]     A: Yes, sir.
[3]     Q: Okay.
[4]     A: This was written prior to the statements
[5] provided by Mr. Swift, where he says it's totaled.
[6] This is just my observations, as a cop, how I found
[7] the scene, what my observations, not knowing it was a
[8] $4,000 seat replacement or a $6,000 turn signal or
[9] whatever.
[10]    I'm not being disrespectful to why
[11] we're here; I'm just referring to my observations as
[12] a cop.
[13]    Q: I understand. Your belief was — as you
[14] viewed the damage, you classified the damage to the
[15] motorcycle after this impact as moderate; correct?
[16]    A: Yes.
[17]    Q: Okay. Somebody else told you that they
[18] thought it was severe and totaled; correct?
[19]    A: Yes, sir.
[20]    Q: Okay. And what they told you did not
[21] square with what you thought?
[22]    MS. RISK: Objection to form.
[23]    THE WITNESS: It didn't conform to
[24] my observations, as a layman as opposed to an expert

---

**1—05:27:39  24—05:28:51**                                   Pa

[1] or someone who works in that field and replacement
[2] time, time, labor, et cetera. What they all
[3] incorporate in that are their numbers. We're
[4] supposed to look at an approximation of just the
[5] damage. Moderate is my estimation.
[6]     BY MR. VAN DER VEEN:
[7]     Q: In the next paragraph we talk about the
[8] placement of the — the position of Mr. Vascek's body
[9] on the roadway.
[10]    A: In that same paragraph?
[11]    Q: I'm sorry, the next paragraph down.
[12]    A: Okay.
[13]    Q: Where you talk about observing the chalk
[14] marks.
[15]    A: Yes.
[16]    Q: We don't know — okay. That's placed
[17] there by the initial responding troopers; right?
[18]    A: Yes.
[19]    Q: But that does not, I believe we
[20] concluded, indicate that that was the actual final
[21] resting point of the body post impact?
[22]    A: Correct.
[23]    Q: Okay. The scratches that you speak of in
[24] the next paragraph underneath the motorcycle are no

---

**1—05:28:54  24—05:30:19**                                   Pag

[1] related to the accident but were caused by people
[2] afterwards; correct?
[3]     MS. RISK: Objection to form.
[4]     BY MR. VAN DER VEEN:
[5]     Q: Caused by someone sliding the bike over?
[6]     A: That was my determination after. I'm
[7] just describing the scene as I found it.
[8]     Q: In Paragraph — the third paragraph down
[9] on Page 4, you say there's a relatively sharp curve
[10] in the roadway.
[11]    A: Yes.
[12]    Q: Do you still agree with that
[13] characterization of the roadway, having reviewed the
[14] photos today?
[15]    A: Yes.
[16]    Q: Okay. Was Mr. Bard aware of the
[17] curvature in the roadway when he was there that day?
[18]    A: I would say yes. Only by his statement,
[19] and I'm going from memory.
[20]    But I recall him — there was a
[21] part where I interviewed him and he said that his
[22] route — that he is familiar with the area so — not
[23] specifically saying those particular words.
[24]    He's familiar with that

---

Corporal Jeffrey Weaver
June 23, 2005

Vascek    v.
UPS

---

1—05:30:20  24—05:31:19          Page 301

[1] intersection; he had just dropped off delivery and
[2] was on his way to another delivery, and I believe —
[3] I am pulling the notes, if you want the exact. He
[4] stated how long he had been working for UPS, how long
[5] he has been a driver.
[6]    Q: I am going to want to know the exact in
[7] the notes and the exact — but I am not there yet.
[8]    A: And also how long he had been assigned to
[9] that route.
[10]    Q: So is it your opinion that Mr. Bard,
[11] while at this stop sign, has to proceed with the duty
[12] and the caution with somebody at a sharp curve rather
[13] than somebody at a straight-away?
[14]    A: Yes.
[15]    Q: And coming out of — in the next
[16] paragraph you described this as a somewhat hidden
[17] intersection from Montchanin Road?
[18]    A: Yes.
[19]    Q: He has a duty to act as a driver coming
[20] out of a somewhat hidden intersection, does he not?
[21]    A: Correct.
[22]    MS. RISK: Objection to form.
[23]    THE WITNESS: Yes.
[24]             BY MR. VAN DER VEEN:

1—05:31:55  24—05:32:44          Page 302

[1]    Q: Page 5, Section 4, How and Why the
[2] Collision Occurred, that's your narrative; correct?
[3]    A: Yes.
[4]    Q: I may come back to that, but for now I
[5] want to go past that.
[6]    A: Okay.
[7]    Q: And go to 5.
[8]    A: Yes, sir.
[9]    Q: Do you know why New Castle County
[10] Paramedic Unit M8B was dispatched but then called
[11] off?
[12]    A: No.
[13]    Q: Do you know who was in the Talleyville
[14] Fire Company ambulance?
[15]    A: As far as the crew?
[16]    Q: Yeah.
[17]    A: No.
[18]    Q: Do you know who was in New Castle County
[19] Paramedic Unit M8D?
[20]    A: I personally don't know.
[21]    Q: Do you know if any video was taken by the
[22] helicopter or any police or ambulance or medic
[23] personnel?
[24]    A: In regards to — I would say no, I'm not

---

1—05:32:48  24—05:34:01          Page .

[1] aware of it. If it was, it was not under my
[2] direction and I'm not aware of it.
[3]    And the information that you're
[4] asking, some of that information is on the fire board
[5] printout as to members who are on what reviews.
[6] Sometimes they don't, but they have access and
[7] records to all that, whereas I don't. And it has no
[8] relationship to what I'm doing in regards to this —
[9] this is a standard format of things, that we account
[10] for how many people respond and —
[11]    Q: I understand.
[12]    I'm now on Page 7. Do you have
[13] with you the two Polaroids that you took of
[14] Mr. Vascek at the autopsy?
[15]    A: Yes.
[16]    Q: Could I take a look at those.
[17]    MS. RISK: They're in the file that
[18] he gave us. We've had all of that copied this
[19] morning.
[20]    MR. VAN DER VEEN: Are they clear,
[21] though; do you know?
[22]    MS. RISK: We can take a look.
[23]    THE WITNESS: Did they make copies
[24] of the — there was a question from headquarters at

1—05:34:08  24—05:35:39          Page 304

[1] the beginning of the week, from when I was out of the
[2] office last week, regarding the Polaroid pictures
[3] that I took at the tow yard. They are here, and I'm
[4] to understand that our office made copies of them for
[5] you as well. They are here as well.
[6]    MR. VAN DER VEEN: Yeah, I'll take
[7] a look.
[8]             BY MR. VAN DER VEEN:
[9]    Q: Are Sergeant Cox and Detective Cochran
[10] still with the force?
[11]    A: Yes, sir.
[12]    Q: Did you ever weigh the bike?
[13]    A: No.
[14]    Q: Did you understand that the bike had
[15] after-market equipment on it, from lights to mufflers
[16] to brake linings to things that might have added or
[17] subtracted from its weight?
[18]    A: I'm not aware of that.
[19]    Q: So that when you give a weight for the
[20] bike, it's approximate?
[21]    A: Yes, sir.
[22]    Q: And again, to be clear, the 1500 plus
[23] pounds, you never made a calculation to determine how
[24] much 600 pounds — how much force it would take

---

Vascek    v.                                                    Corporal Jeffrey W
UPS                                                                    June 23,

---

**1—05:35:43  24—05:37:10**                          Page 305

[1] 600 pounds to move 15,900 pounds 2 feet 4 inches
[2] uphill?
[3]    MS. RISK: Objection to form.
[4]    THE WITNESS: No, sir, I didn't.
[5]              BY MR. VAN DER VEEN:
[6]    Q: You have included here the victim
[7] services supplemental report for additional details
[8] on Page 11 of the report. I'm told that Detective
[9] Cochran's victim services supplemental report for
[10] additional details and related information — do you
[11] have that? Was that in here?
[12]    A: That is the — they made copies of that
[13] today. That is the —
[14]    MS. RISK: Is that the contact
[15] sheet?
[16]    THE WITNESS: Yes.
[17]              BY MR. VAN DER VEEN:
[18]    Q: Let's go to Page 12, Mr. Bard's
[19] statement.
[20]    Is it true that your first
[21] interview with him was 12 minutes long?
[22]    A: Yes, sir.
[23]    Q: And during this interview, he had his
[24] supervisor from UPS present?

---

**1—05:37:12  24—05:38:01**                          Page 306

[1]    MS. RISK: Objection to form.
[2]              BY MR. VAN DER VEEN:
[3]    Q: Who was present?
[4]    A: Mr. Jim Jester.
[5]    Q: From?
[6]    A: Package operations supervisor for
[7] Atlantic District for United Parcel Services.
[8]    Q: Did Jester — what did Jester say to you?
[9]    MS. RISK: Objection to form.
[10]    MR. VAN DER VEEN: What's the —
[11]    MS. RISK: It implies that
[12] Mr. Jester spoke to Corporal Weaver first. I mean —
[13]    MR. VAN DER VEEN: I didn't ask who
[14] the —
[15]    MS. RISK: The question is how did
[16] you talk to this person.
[17]              BY MR. VAN DER VEEN:
[18]    Q: What did he say to you?
[19]    A: I really don't remember anything other
[20] than he — I don't remember exactly. But I believe
[21] he asked if he could be present during the interview.
[22]    Q: Had he spoke —
[23]    A: Because I wouldn't normally just say, Do
[24] you want to be there?

---

**1—05:38:03  24—05:39:49**                          Pa

[1]    Q: Is it your understanding that he spoke to
[2] Mr. Bard before you did?
[3]    A: I believe that, because they were both at
[4] the scene when I got there — before I got there.
[5]    Q: Is it true that Mr. Bard told you that
[6] his last stop was 5801 Kennett Pike?
[7]    A: That's what he said.
[8]    Q: He didn't tell you it was 511 Twaddell
[9] Mill Road, as he swore to in Answers to
[10] Interrogatories?
[11]    MS. RISK: Objection to form.
[12]    MR. VAN DER VEEN: He didn't swear
[13] to it?
[14]    MS. RISK: It's an argumentative
[15] question. And Counsel, ask the question, did he tell
[16] him or didn't he tell him?
[17]              BY MR. VAN DER VEEN:
[18]    Q: Did he tell you that — did he tell you
[19] that he was at 5801 Kennett Pike?
[20]    A: My note is he made a stop at 5801 Kennett
[21] Pike, had just made a stop. Was eastbound on
[22] Twaddell Mill Road and continuing into the — what is
[23] written in the report. These are my field notes.
[24]    Q: Did he ever tell you that he stopped at

---

**1—05:39:51  24—02:06:18**                          Pa

[1] 511 Twaddell Mill Road, was his last stop?
[2]    A: Neither interview he stated that to me.
[3]    Q: Okay. Did Mr. Jester tell you that if he
[4] couldn't be present for the interview with Mr. Bard,
[5] there would be no interview with Mr. Bard?
[6]    A: I don't recall that being said.
[7]    Q: Okay. It wasn't — his presence was not
[8] a condition of the interview?
[9]    A: No, it would not, as far as we're
[10] concerned.
[11]    Q: You would have remembered that if it was?
[12]    A: Yes.
[13]    Q: Okay. In your first paragraph of the
[14] interview with Mark Bard, the first interview, you
[15] say, "The following is a brief synopsis of the
[16] content of that interview."
[17]    Why is it a brief synopsis?
[18]    A: Because it's not transcript, verbatim,
[19] word for word. Like I stated earlier, I take notes.
[20] From those notes, I put in perspective of what he
[21] said.
[22]    Q: Do you believe that you left out anything
[23] of significance in your brief synopsis?
[24]    A: No.

---

Corporal Jeffrey Weaver
June 23, 2005

Vascek v.
UPS

---

**1—05:41:14  24—05:42:19**                    Page 309

[1] Q: Any salient facts?

[2] A: No. I take notes as an interviewer, and
[3] experience, write down what they say. If there's
[4] something that I need clarification, I'll expand on
[5] it. Or I'll go back and say — you know, for
[6] instance, when I interviewed — oftentimes when I go
[7] back the second time, Mr. Bard confirmed that he had
[8] originally stated in his interview. I go over
[9] things.

[10] Q: Did he tell you in the second
[11] interview — just, I don't want to get there yet, but
[12] you brought it up. In the second interview, did he
[13] tell you how many times he had gone over this story
[14] with UPS before he talked to you a second time?

[15] **MS. RISK:** Objection to form.

[16] **THE WITNESS:** No.

[17]         **BY MR. VAN DER VEEN:**

[18] Q: Did he tell you how many times he had
[19] gone over this scenario of how this accident happened
[20] with his lawyers before he talked to you the second
[21] time?

[22] A: No.

[23] Q: Okay. Going to his first statement,
[24] "Mr. Bard stated that he had just made a stop at 5801

---

**1—05:42:24  24—05:43:43**                    Page 310

[1] Kennett Pike and was traveling eastbound on Twaddell
[2] Mill Road"; correct?

[3] A: Yes, sir.

[4] Q: "He said that he stopped at the stop sign
[5] at the intersection with Montchanin Road. He stated
[6] that he could not see, moved forward, and still did
[7] not see anything coming. Mr. Bard stated that he was
[8] slowly coming out in the intersection when he
[9] suddenly saw the motorcycle approaching from his left
[10] side." Okay?

[11] A: Yes, sir.

[12] Q: At the point where he sees that
[13] motorcycle coming from his left side, how many times
[14] has he stopped, according to what he told you?

[15] A: Once.

[16] Q: Okay. Did he tell you that he had looked
[17] to his left and his right multiple times?

[18] A: Not multiple times.

[19] Cannot see, he moved forward; still
[20] could not see anything coming. Slowly coming out of
[21] intersection. First, saw the motorcycle
[22] approximately 50 to 75 feet away to his left.

[23] Q: Okay. Now, when Mr. Bard stated that he
[24] was slowly coming out into the intersection when he

---

**1—05:43:45  24—05:44:28**                    Page

[1] suddenly saw a motorcycle approaching from his left
[2] side, did he tell you where he was looking at the
[3] stop sign?

[4] A: No.

[5] Q: Did he tell you where he was looking
[6] three feet past the stop sign?

[7] A: No.

[8] Q: Did he tell you where he was looking five
[9] feet past the stop sign?

[10] A: No.

[11] Q: Did he tell you where he was looking
[12] 10 feet past the stop sign?

[13] A: No.

[14] Q: Did he tell you what direction he was
[15] looking 15 feet past the stop sign?

[16] A: No.

[17] Q: Did he tell you where he was looking when
[18] he was completely blocking the southbound lane of
[19] Route 100 south?

[20] **MS. RISK:** Objection to form.

[21] **THE WITNESS:** No to all those
[22] questions.

[23]         **BY MR. VAN DER VEEN:**

[24] Q: Okay. He tells you that the first time

---

**1—05:44:32  24—05:45:37**                    Page 312

[1] he sees the motorcycle is when he's into the
[2] southbound lane of Route 100; correct?

[3] A: Yes, sir.

[4] Q: He says it's the first time he saw the
[5] bike; right?

[6] A: Yes, sir.

[7] Q: And he says the bike was 50 to 75 feet
[8] away; is that true?

[9] A: Yes, sir.

[10] Q: When you are in the southbound lane —
[11] when you are one foot into the southbound lane of
[12] Route 100, how far down can you see, approximately?

[13] A: How far down?

[14] Q: How far up the southbound lane can you
[15] see in the southbound lane?

[16] A: Not that far.

[17] Q: You know you can see the bridge from
[18] there; right?

[19] A: Correct.

[20] Q: How many feet away is the bridge,
[21] approximately?

[22] A: 180 feet we talked earlier.

[23] Q: You can see even the driveway one foot
[24] into the southbound lane of Route 100; correct?

---

Vascek   v.
UPS

Corporal Jeffrey W
June 23,

---

**1—05:45:45   24—05:46:42**                    Page 313

[1]   **A:** Yes.

[2]   **MS. RISK:** Objection to form.

[3]            **BY MR. VAN DER VEEN:**

[4]   **Q:** How many feet away is that driveway?

[5]   **A:** Roughly approximately 180 feet-ish. Not

[6] quite 200 feet. The hedgerow is a little bit further

[7] than that.

[8]   **Q:** Let's back up now. Okay?

[9]       He tells you that he doesn't see

[10] the motorcycle until he's more than one foot into the

[11] southbound lane; right?

[12]   **A:** Yes, sir.

[13]   **Q:** So if he — when he entered the

[14] southbound lane, was looking to his left, would the

[15] motorcycle have been more than 50 feet away from him?

[16]   **A:** If he was looking to his left the entire

[17] time.

[18]   **Q:** Yeah.

[19]   **A:** Yes.

[20]   **Q:** Okay, yeah. When you're turning into

[21] a — when you're crossing a line of traffic, is it

[22] your duty to look into that lane?

[23]   **A:** Yes, sir.

[24]   **Q:** Is it apparent to you that he wasn't

---

**1—05:46:45   24—05:47:38**                    Page 314

[1] looking into that lane the whole time?

[2]   **A:** I can't say he was or wasn't. If he was

[3] looking specifically to the left the entire time —

[4]   **Q:** He would have seen the motorcycle; right?

[5]   **A:** Sooner than he said he did, yes.

[6]   **Q:** Yeah. The duty at a stop sign before you

[7] enter into a roadway, as taught to all drivers, is to

[8] look left, right and then left before you go and make

[9] a left turn; correct?

[10]   **A:** Yes.

[11]   **MS. RISK:** Objection to form.

[12]            **BY MR. VAN DER VEEN:**

[13]   **Q:** Right?

[14]   **A:** Yes, sir. Obligation, make sure it's

[15] clear.

[16]   **Q:** If he only saw the bike 50 feet, he

[17] didn't do that, right?

[18]   **MS. RISK:** Objection to form.

[19]   **THE WITNESS:** I don't know which

[20] way he was looking.

[21]            **BY MR. VAN DER VEEN:**

[22]   **Q:** He wasn't looking left, or else he would

[23] have seen the bike more than 50 feet away; correct?

[24]   **MS. RISK:** Objection to form.

---

**1—05:47:40   24—05:49:04**                    Pa

[1]   **THE WITNESS:** Should have, yes.

[2]            **BY MR. VAN DER VEEN:**

[3]   **Q:** When you talked to him the second time

[4] three months later, after he talked to whoever he

[5] talked to, he didn't change that distance, did he?

[6]   **A:** No.

[7]   **Q:** And when he gave you that distance of,

[8] The first time I saw the bike it was 50 to 75 feet

[9] away from me, he had the benefit of being right there

[10] on the scene; right?

[11]   **A:** Yes, sir.

[12]   **Q:** And he had the benefit of having it just

[13] happened within about an hour and a half before the

[14] event; correct?

[15]   **A:** I don't understand what you're asking.

[16]   **Q:** The event which he was recalling to you,

[17] about seeing a bike 50 to 75 feet away from the first

[18] time, had happened within an hour —

[19]   **A:** Yes, yes.

[20]   **Q:** — of his telling it to you?

[21]   **A:** Yes, yes.

[22]   **Q:** It wasn't momentarily so he was in shock;

[23] right?

[24]   **A:** Correct.

---

**1—05:49:04   24—05:49:56**                    Pag

[1]   **Q:** And it wasn't three months had gone by,

[2] or six months, when the Answers to Interrogatories

[3] had gone by, so that time would waive or fade a

[4] memory; correct?

[5]   **A:** Correct.

[6]   **Q:** It's at a time where you would expect his

[7] memory — at a time and a place where you would

[8] expect his memory and his ability to give you a

[9] detail of that significance to be at its best; right?

[10]   **A:** Yes.

[11]   **MS. RISK:** Object to the form.

[12]            **BY MR. VAN DER VEEN:**

[13]   **Q:** Now, when he answered that question to

[14] you or volunteered that information to you of 50 to

[15] 75 feet, did he — were you rushing him at all?

[16]   **A:** No.

[17]   **Q:** Did he appear to you to be rushed in his

[18] answer?

[19]   **A:** I don't recall any problems with that,

[20] no.

[21]   **Q:** Did he waiver on that distance in any

[22] way?

[23]   **A:** No. It's just a standard question that

[24] we ask.

---

---

1—05:49:57  24—05:50:57                    Page 317

[1]   **Q:** Mr. Seaford says that he saw the bike
[2] also 50 feet away; right?
[3]   **A:** Yes.
[4]   **Q:** Mr. Seaford says — an independent
[5] witness with no bias here, says that when he saw
[6] the bike 50 feet away, he was going 35 to 45 miles an
[7] hour; right?
[8]   **MS. RISK:** Objection to form. And
[9] I am going to object, because we actually don't have
[10] usual stipulations here. But I'm going object.
[11]   **MR. VAN DER VEEN:** We're in federal
[12] court.
[13]   **MS. RISK:** I'm sorry. It's lack of
[14] foundation, because that is not what Mr. Seaford
[15] said.
[16]   **MR. VAN DER VEEN:** That's fine.
[17]           **BY MR. VAN DER VEEN:**
[18]   **Q:** Further down in his statement —
[19]   **A:** He estimated the speed of the motorcycle
[20] to be approximately 35 to 45 miles per hour at
[21] impact. He said he wasn't sure how fast he was
[22] traveling, initial speed. Estimated that he had
[23] already decelerated for approximately one to two
[24] seconds when he observed it.

---

1—05:50:59  24—05:52:25                    Page 318

[1]   Let me go back.
[2]   **Q:** Go ahead.
[3]   **MS. RISK:** The ninth line
[4]   **THE WITNESS:** Mr. Seaford estimated
[5] that the motorcycle was approximately 45 feet away
[6] from the truck when he first observed it, first saw
[7] the motorcycle — meaning "he," Mr. Seaford. It was
[8] located behind the UPS truck.
[9]           **BY MR. VAN DER VEEN:**
[10]   **Q:** His speed is significantly different than
[11] the speed Mr. Bard gave you at approximately the same
[12] distance away from the truck, right?
[13]   **MS. RISK:** Objection to form.
[14]   **THE WITNESS:** Yes.
[15]           **BY MR. VAN DER VEEN:**
[16]   **Q:** Right?
[17]   Why didn't you go with Bard's speed
[18] instead of Seaford's?
[19]   **A:** What do you mean, why did I go with his
[20] speed?
[21]   **Q:** What do you believe the speed of the bike
[22] was at impact?
[23]   **A:** I don't know what the speed is, as I
[24] stated. I know — I believe, from the totality of

---

1—05:52:29  24—05:53:15                    Page

[1] the investigation of the injuries and the dynamics of
[2] how the vehicles met, doing a front wheelie, or a
[3] stoppie, and the injuries that he sustained.
[4]   **Q:** Let me ask you about that stoppie —
[5]   **MS. RISK:** Can we let Corporal
[6] Weaver finish his response, please, before you go on
[7] and — excuse me.
[8]   Could you let Corporal Weaver
[9] finish his sentence before you proceed.
[10]   **MR. VAN DER VEEN:** Sure, sure.
[11]   **MS. RISK:** Please, Corporal Weaver.
[12]   **THE WITNESS:** Based on the
[13] information that I stated in the report, I don't know
[14] the exact speed.
[15]           **BY MR. VAN DER VEEN:**
[16]   **Q:** Let me ask you this: Stoppies — I'm
[17] going ahead of myself, because I'm running out of
[18] time.
[19]   But stoppies, has anybody ever told
[20] you that you can do a stoppie on this bike with the
[21] bike off coasting down a driveway at five miles an
[22] hour?
[23]   **A:** A stoppie as in to bring it up in the
[24] position that it was in —

---

1—05:53:16  24—05:54:17                    Page 320

[1]   **Q:** Yeah.
[2]   **A:** — to hit — to bring in this span, where
[3] as it came completely off the ground at 5 mile an
[4] hour?
[5]   **Q:** No. At 5 miles an hour, down a driveway
[6] with the engine off, you can bring this wheel off the
[7] ground 8 to 10 inches in a stoppie.
[8]   **A:** I'm not going to argue that. I'm talking
[9] about the position that it was in and described by
[10] Mr. Seaford in relationship to how it struck the van.
[11] It wasn't —
[12]   Depending on the decline in the
[13] driveway, couple inches — and through my statements
[14] that I took from him, slower speeds, stoppies
[15] absolutely can be done, and it can bring the rear
[16] wheel off the ground.
[17]   But I have no other information as
[18] far as I don't ride motorcycles. I prefer not to
[19] because of what I do for a living and know how the
[20] stories end. Not necessarily operational error on
[21] the operator but because of people not seeing them.
[22]   But based on the dynamics of this
[23] collision and how that bike came all the way up off
[24] the ground is the based on the statements I made and

---

Vascek  v.
UPS

Corporal Jeffrey W
June 23

---

**1—05:54:19  24—05:55:00**                                Page 321

[1] my opinion.

[2]    **Q:** But that — where you got that was from

[3] Mr. Swift; right?

[4]    **A:** Correct.

[5]    **Q:** Okay. Do you know what Mr. Swift's

[6] experience is for riding a bike?

[7]    **A:** Other than what's stated in his

[8] statement?

[9]    **Q:** Yeah.

[10]    **A:** No.

[11]    **Q:** Do you know how long he's ridden a bike?

[12]    **A:** Other than what's in his statement, no.

[13]    **Q:** There's nothing in his statement about

[14] how long he's ridden a bike.

[15]    **A:** Okay.

[16]    **Q:** Do you know anything about what exactly

[17] his interaction with bikes are?

[18]    **A:** In relationship to — what do you mean?

[19]    **Q:** His relationship to the knowledge of

[20] bikes.

[21]    **A:** I didn't get into detail as to his

[22] expertise. I called Honda East to get some

[23] information from a source.

[24]    **Q:** Yeah. Well, the source that you got, do

---

**1—05:55:02  24—05:57:33**                                Page 322

[1] you know anything about his educational background?

[2]    **A:** No.

[3]    **Q:** His ability to judge physics?

[4]    **A:** No.

[5]    **Q:** Okay. Mr. Bard — keep going down —

[6] headlights were on.

[7]    Amy Stratton identified herself as

[8] a nurse to who?

[9]    **A:** What line? What page?

[10]    **Q:** I'm sorry. Mr. Bard's statement.

[11]    **A:** Page 12?

[12]    **Q:** Yeah.

[13]    **A:** "A female witness arrived at the scene

[14] and identified herself as a nurse."

[15]    **Q:** To whom?

[16]    **A:** To him.

[17]    **Q:** Okay. Are you sure that's not one of the

[18] other two nurses who were on the scene? Amy Stratton

[19] is a pastry chef. The other two are DiPaolo and

[20] Galloway, who are both nurses.

[21]    **A:** So what you're asking is if M. Stratton

[22] is not a nurse?

[23]    **Q:** Or who told you who she was a nurse?

[24]    I'm going to move on. We need to

---

**1—05:57:36  24—05:58:40**                                P

[1] come back, but I have a couple more questions for

[2] you.

[3]    It says, "Someone instructed

[4] Mr. Bard to move the truck back to provide space

[5] around the fallen motorcycle."

[6]    Is that what he told you?

[7]    **MS. RISK:** "Operator." "Fallen

[8] motorcycle operator."

[9]    **BY MR. VAN DER VEEN:**

[10]    **Q:** "The fallen motorcycle operator." Is

[11] that what he told you?

[12]    **A:** Yes.

[13]    **Q:** He didn't tell you that Mr. Seaford,

[14] after the impact, came around to his driver's side

[15] door — he came out his passenger door, met at the

[16] motorcycle, saw the UPS package van on Mr. Vascek's

[17] arm, and Mr. Seaford told him, You better move the

[18] truck? Mr. Bard didn't tell you that?

[19]    **A:** No.

[20]    **Q:** And that he got back in the truck and

[21] backed it off his body?

[22]    **A:** No.

[23]    **Q:** You did read in the autopsy report that

[24] there was a break in the right elbow?

---

**1—05:58:45  24—05:59:45**                                Pa

[1]    **A:** No.

[2]    **Q:** Mr. Bard told you he does not wear

[3] glasses?

[4]    **A:** That's what he said.

[5]    **Q:** He didn't tell you that he wears

[6] prescription bifocals?

[7]    **A:** No.

[8]    **Q:** Did he tell you whether he was

[9] nearsighted or farsighted?

[10]    **A:** He didn't tell me.

[11]    **Q:** Do you know that he swore in his Answers

[12] to Interrogatories that he wears bifocals?

[13]    **MS. RISK:** Objection.

[14]    **MR. VAN DER VEEN:** He didn't do

[15] that?

[16]    **MS. RISK:** How would Corporal

[17] Weaver know what he said?

[18]    **MR. VAN DER VEEN:** I don't know.

[19] You talked with him two weeks ago. I don't know wha

[20] you did or did not go over with him.

[21]    **THE WITNESS:** No, I did not know.

[22]    **BY MR. VAN DER VEEN:**

[23]    **Q:** Okay. Mr. Bard told you he never heard

[24] the motorcycle.

---

Corporal Jeffrey Weaver
June 23, 2005

Vascek v.
UPS

---

1—05:59:48   24—06:00:28                    Page 325

[1] **A:** Correct.

[2] **Q:** He told you —

[3] **A:** Approaching.

[4] **Q:** He told you his door was all the way

[5] open; right?

[6] **A:** Yes, sir.

[7] **Q:** Do you know that the Blue Flame muffler

[8] on this bike can be heard from a mile away?

[9] **A:** If you say so. I don't know that.

[10] **Q:** Do you know why he didn't hear this

[11] motorcycle?

[12] **A:** I do not know.

[13] **Q:** When you stood on this intersection, did

[14] motorcycles ever come back and forth?

[15] **A:** No. Roadway was shut down.

[16] **Q:** When you went back to take measurements

[17] or do anything like that, did you ever hear

[18] motorcycles come back and forth?

[19] **A:** No, just cars.

[20] **Q:** You should. You can hear them 10 seconds

[21] away.

[22] **A:** I'm just saying, when I was there, I

[23] didn't hear them. There weren't any going past that

[24] day and the days that I went back. I'm not saying

---

1—06:00:33   24—06:01:31                    Page 326

[1] you couldn't; I'm saying I didn't experience it.

[2] **Q:** Are you familiar with the term that

[3] before you leave an intersection you must stop, look

[4] and listen?

[5] **A:** Yes, sir.

[6] **Q:** That's a duty; right?

[7] **A:** It's a dual responsibility at a stop

[8] sign: First to stop, then to yield. Because you

[9] have — you don't have the right of way.

[10] **Q:** And you have to stop, look and listen?

[11] **A:** Yeah.

[12] **MR. VAN DER VEEN:** I've got more

[13] questions for you, and we're getting on 6 o'clock.

[14] And I promised everyone that we would stop at

[15] 6 o'clock, and I want to adhere to that promise.

[16] **BY MR. VAN DER VEEN:**

[17] **Q:** Let me ask you this, though: Is it true

[18] that you cannot tell us what the speed of this

[19] package van was just prior to impact, within a

[20] reasonable degree of accident reconstruction and

[21] scientific certainty?

[22] **A:** The speed of the van?

[23] **Q:** Yeah.

[24] **A:** Correct.

---

1—06:01:32   24—06:02:17                    Page

[1] **Q:** Is it true that you can't tell us what

[2] the speed of the motorcycle was just prior to and at

[3] the time of the impact within a reasonable degree of

[4] scientific and accident reconstruction certainty?

[5] **MS. RISK:** Object to the form.

[6] **THE WITNESS:** On the information

[7] that I have in this report, other than statements.

[8] But to answer your question, no.

[9] **BY MR. VAN DER VEEN:**

[10] **Q:** Okay. I'm asking you within a reasonable

[11] degree of accident reconstruction and scientific

[12] certainty, having been qualified as an expert.

[13] You're familiar with those terms;

[14] right?

[15] **A:** Yes.

[16] **Q:** Those terms do not appear anywhere in

[17] your report; right?

[18] **A:** No, sir.

[19] **Q:** Your opinions in this report are not

[20] given within a reasonable degree of scientific and

[21] accident reconstruction certainty; correct?

[22] **A:** Correct.

[23] **MS. RISK:** Objection to form.

[24] **THE WITNESS:** Correct.

---

1—06:02:17   24—06:02:58                    Page 328

[1] **BY MR. VAN DER VEEN:**

[2] **Q:** Okay. None of the opinions in here are

[3] given within a reasonable degree of scientific and

[4] accident reconstruction certainty; correct?

[5] **MS. RISK:** Objection.

[6] **THE WITNESS:** Correct.

[7] **BY MR. VAN DER VEEN:**

[8] **Q:** How do we reschedule some time with you?

[9] **A:** Whenever you're available, provided I'm

[10] free.

[11] **Q:** Sure.

[12] **MS. RISK:** We're going to remain on

[13] the record for this.

[14] **MR. VAN DER VEEN:** Sure.

[15] **MS. RISK:** It's now 6 o'clock.

[16] We've gone eight hours. I mean —

[17] **MR. VAN DER VEEN:** Do you know what

[18] my realtime is?

[19] (Discussion off the record with the

[20] court reporter.)

[21] **MR. VAN DER VEEN:** Okay, stay on

[22] the record.

[23] I probably have about another half

[24] an hour to 45 minutes with you. I need to go over

---

Vascek   v.
UPS

Corporal Jeffrey W
June 23,

---

**1—06:03:03   24—06:04:08**                               Page 329

[1] all of your conversations that you had with UPS
[2] personnel. I want to go over the conversations that
[3] you had with me the day that I met you. I want to go
[4] over Mr. Bard's, obviously, second statement to you.
[5] And that's really about it.
[6]     **MS. RISK:** Okay.
[7]     **MR. VAN DER VEEN:** And that will
[8] take about a half an hour to 45 minutes. Is that
[9] acceptable to you?
[10]     **THE WITNESS:** I'll be here whatever
[11] you need.
[12]     **MR. VAN DER VEEN:** Okay. Counsel
[13] also has, I'm sure, a number of follow-up questions
[14] that could take a couple hours. That's not a problem
[15] to you also?
[16]     She and I have agreed that normally
[17] we're held to an eight-hour rule, in federal court,
[18] per witness. She and I agreed a couple hours ago —
[19] because in all fairness, she should have as much time
[20] with you as she needs. In our seeking out discovery
[21] in this case, it's best if everybody feels that they
[22] had a fair opportunity.
[23]     **THE WITNESS:** Absolutely.
[24]     **MR. VAN DER VEEN:** And so I want to

---

**1—06:04:09   24—06:04:49**                               Page 330

[1] give counsel that fair opportunity also.
[2]     So you don't have a problem with
[3] that?
[4]     **THE WITNESS:** Not at all.
[5]     **MS. RISK:** In other words, you
[6] don't object to coming back and letting us finish up?
[7]     **THE WITNESS:** Not at all. Not at
[8] all.
[9]     **MS. RISK:** Just so you understand,
[10] although I do have an opportunity, with
[11] Mr. van der Veen, I will not take hours. So
[12] regardless of how long Mr. van der Veen takes, and
[13] hopefully it really won't be more than 45 minutes, an
[14] hour, I won't be more than a few hours.
[15]     **THE WITNESS:** Not at all. I'll be
[16] back when you need me as a continuation of what we
[17] didn't get done today, the initial subpoena or
[18] whatever, to have me here.
[19]     **MR. VAN DER VEEN:** Can be
[20] continuing.
[21]     **THE WITNESS:** It's in good faith.
[22] I'll be here however long.
[23]     I gracefully accept being able to
[24] terminate, because I've been working since 5 o'clock

---

**1—06:04:51   24—06:05:49**                               Pag

[1] this morning. But I'll stay however long —
[2] 8 o'clock tonight or whatever you want. I'll come
[3] back — understandably, that my schedule is
[4] convenient to both of yours, if I don't have a trial
[5] conflict or whatever. We'll work that out.
[6]     But are we talking within the week
[7] or a couple weeks or how are long are we talking?
[8]     **MR. VAN DER VEEN:** We need to do it
[9] quickly. I'm probably going to bring a motion to
[10] extend discovery, but we'll talk about that. But as
[11] soon as possible.
[12]     **THE WITNESS:** Okay.
[13]     **MS. RISK:** Okay. As soon as we
[14] can — we'll do our very best to get you a date. And
[15] Mr. van der Veen has noticed your deposition, or
[16] subpoenaed you here. So I'll give him dates, and he
[17] can get a date to you.
[18]     **THE WITNESS:** Not a problem.
[19]     **MS. RISK:** But other than the
[20] scheduling, I would ask and reconfirm what
[21] Mr. van der Veen told you earlier: That when you
[22] leave this room, we're still technically in the midst
[23] of a deposition. So I would —
[24]     **THE WITNESS:** I understand.

---

**1—06:05:50   17—06:06:22**                               Pag

[1]     **MS. RISK:** — request that you not
[2] speak — I won't speak to you, or Mr. van der Veen,
[3] anyone from Mr. van der Veen's office, or from my
[4] office, other than the scheduling of the continuation
[5] of the deposition.
[6]     **MR. VAN DER VEEN:** And actually,
[7] under the local rule, that is only valid for a
[8] five-day period of time. But we're going to agree to
[9] extend that five-day period of time.
[10]     **THE WITNESS:** However long you
[11] need.
[12]     (Discussion off the record.)
[13]     **MR. VAN DER VEEN:** As you know,
[14] this is a deposition —
[15]     **THE WITNESS:** I'll waive the
[16] reading and signing.
[17]     (Deposition concluded at 6:05 p.m.)
[18]
[19]
[20]
[21]
[22]
[23]
[24]

---

Corporal Jeffrey Weaver
June 23, 2005

Vascek v.
UPS

**Page 333**

[1]　　　　　　INDEX
[2] WITNESS:　　　　　　　　PAGE
[3] CORPORAL JEFFREY W. WEAVER
[4]　Mr. van der Veen　　　　3
[5]
[6]
[7]　　　　　EXHIBITS
[8] PLAINTIFFS' DESCRIPTION　　　PAGE
[9] 1　　Subpoena of Corporal Weaver　　5
[10] 2　　Photocopy of binder kept by　103
　　　　Corporal Weaver on accident
[11]　　investigation
[12] 3　　Complete resume and curriculum　103
　　　　vitae of Corporal Weaver
[13]
　　　4　　Diagram prepared at deposition　103
[14]　　by Mr. van der Veen
[15] 5　　Diagram prepared at deposition　106
　　　　by Mr. van der Veen
[16]
　　　6　　Corporal Weaver's portion of the　144
[17]　　complete accident report
[18] 7　　Field sketch made by Sergeant　173
　　　　Cox
[19]
　　　8　　Color photocopies of photographs　177
[20]
　　　9　　Follow-up field sketch by　253
[21]　　Corporal Weaver
[22]
[23]
[24]

**Page**

[1]　　　　　CERTIFICATE
[2] State of Delaware　　　　　　　:
[3] New Castle County　　　　　　:
[4]
[5]　　　　I, Gail Inghram Verbano, the
　　officer before whom the foregoing proceedings were
[6] taken, do hereby certify that the witness whose
　　testimony appears in the foregoing deposition was
[7] duly sworn by me before the commencement of the
　　deposition; that the testimony of said witness was
[8] taken by me, in Wilmington, Delaware, on June 23,
　　2005, to the best of my ability and thereafter
[9] reduced to writing under my direction; and that I am
　　neither counsel for, related to, nor employed by any
[10] of the parties of the above-titled action; and
　　further that I am not a relative or employee of any
[11] attorney or counsel employed by the parties thereto,
　　nor financially or otherwise interested in the
[12] outcome of the action.
[13]
[14]　　　WITNESS my hand and official seal
　　this 20th day of July A.D. 2005.
[15]
[16]
[17]
[18]
[19]
[20]
　　　　　　Gail Inghram Verbano, RPR-RMR
[21]　　　　CSR No. 8635
　　　　　　Certification No.: 220
[22]　　　　(Expires 1-31-2008)
[23]
[24]