# EXHIBIT C

Page 335

[1]          VOLUME II
[2]     IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF DELAWARE
[3]
HEIDI VASCEK, Individually and as       :
[4] administratrix of THE ESTATE OF      :
JOHN VASCEK, JR.,                        :
[5]
    Plaintiffs,                          :
[6]                                      : C.A. No.
    v.                                   : 04-1538 SLR
[7]
UNITED PARCEL SERVICES, INC., a          :
[8] Delaware corporation, and MARK BARD, :
[9]     Defendants.                       :
[10]     Continued deposition of CPL. JEFFREY
[11] L. WEAVER, taken pursuant to notice before Adam D.
[12] Miller, Registered Professional Reporter and
[13] Certified Shorthand Reporter, in the law offices of
[14] Richard R. Wier, Jr., P.A., 1220 Market Street, #600,
[15] Wilmington, Delaware, on Monday, August 22, 2005,
[16] beginning at approximately 9:07 a.m., there being
[17] present:
[18] APPEARANCES:
[19]     KATS, JAMISON, van der VEEN & ASSOCIATES
         25 Bustleton Pike
[20]     Feasterville, Pennsylvania 19053
         BY: MICHAEL T. van der VEEN, ESQUIRE
[21]     Attorney for Plaintiffs
[22]

[23]     CORBETT & ASSOCIATES
         Registered Professional Reporters
         1400 French Street   Wilmington, DE 19801
[24]        (302) 571-0510
         www.corbettreporting.com

Page 33

9—09:08:35  24—09:09:06
[1]     APPEARANCES CONTINUED:
[2]     DLA PIPER RUDNICK GRAY CARY US LLP
        One Liberty Place, 1650 Market Street
[3] Suite 4900
        Philadelphia, Pennsylvania 19103
[4] BY: JAYNE ANDERSON RISK, ESQUIRE
        Attorney for Defendants
[5]
[6]     (Exhibits Weaver 10 through 12 were
[7] premarked for identification.)
[8]
[9]     BY MR. van der VEEN:
[10]    Q: Trooper, good morning. Michael
[11] van der Veen. Nice to see you again. Thanks for
[12] coming in this morning.
[13]    A: Good morning.
[14]    Q: You understand that you're still under
[15] oath to tell the truth?
[16]    A: Yes.
[17]    Q: Before I get started with some questions,
[18] I want to identify three documents and two pieces of
[19] information that you brought with you as a follow-up
[20] to our last deposition.
[21]    The first thing that I think that you
[22] brought us was a color copy — what I marked as
[23] Weaver No. 10, a color copy of your sketch of the
[24] roadway and your sketch of the vehicles in, in this

1—09:09:14  24—09:10:28               Page 337
[1] accident; is that true?
[2]    A: Yes, sir.
[3]    Q: And Weaver No. 11 is just black-and-white
[4] of that?
[5]    A: Yes, sir.
[6]    Q: And Weaver No. 12, a list of nine
[7] motorcycle cases that you have investigated in your
[8] tenure on the FAIR team as an accident
[9] reconstructionist?
[10]    A: Yes, sir.
[11]    Q: Uh-huh. Now, you had also given us two
[12] points of information. I just want to clarify that
[13] while we're on the record.
[14]    I had ask you during your previous
[15] deposition. You'd indicated that you would get
[16] three — you would give me the names of publications,
[17] books, texts, treatise, that you found to be
[18] authoritative on the issue of skid marks?
[19]    A: Yes, sir.
[20]    Q: And you've identified Fundamentals of
[21] Traffic Accident Reconstruction by John Daily,
[22] D-A-I-L-Y; Handbook for Accident Reconstruction by
[23] M.J. Lofgren, L-O-F-G-R-E-N; and Motorcycle Accident
[24] Investigation by Albert T. Baxter; correct?

1—09:10:32  24—09:11:32                          Page 338

[1] A: Yes, sir. There is also one more on the
[2] front.
[3] Q: Oh, great. Okay.
[4] A: Over there in the corner.
[5] Q: The Traffic Accident Investigation Manual
[6] by, of course, Mr. Baker?
[7] A: Yes, sir.
[8] Q: Thanks. And you'd also given, written
[9] down for me — and I'm just going to read it —
[10] information as to when your accident investigation
[11] report in this case, the Vascek case, was — had
[12] interaction with other people?
[13] A: Yes, sir.
[14] Q: And you've indicated that the report was
[15] finished and — TOT?
[16] A: Turned over to.
[17] Q: — turned over to Bill Nottingham for
[18] first review on February 15th of '05?
[19] A: Yes, sir.
[20] Q: It was returned from Bill and corrections
[21] made and turned over to Matt for a second review on
[22] 2/17/05?
[23] A: Yes. That would be Sergeant Matthew Cox,
[24] a supervisor.

1—09:11:33  24—09:12:33                          Page 339

[1] Q: And then corrections were made and sent
[2] out to the office and turned over to Lieutenant
[3] Kresge?
[4] A: Kresge.
[5] Q: And that was March 7th of '05?
[6] A: Yes, sir.
[7] Q: Okay. Let me ask you some questions about
[8] that information.
[9]     When you turned over the report to
[10] Bill Nottingham for a first review, that is something
[11] that you will generally always do, have another
[12] officer review it?
[13] A: Absolutely, always. We — there's four of
[14] us in the unit. Another collision reconstructionist
[15] will review a report prior to being submitted to the
[16] supervisor, just looking for graphic corrections or
[17] something misworded or, as pointed in the first
[18] deposition, some of the mistakes or whatever you
[19] want — like, for instance, it indicated on the face
[20] page and we explained as far as the computer program
[21] having some quirks in it, that it indicated that he
[22] wasn't deceased.
[23]     We pick blocks and sometimes — and
[24] they're working on that. And those are things that

1—09:12:35  24—09:13:38                          Page 340

[1] we looked for. Every collision is reviewed by
[2] another collision reconstructionist. And even before
[3] it goes to the supervisor, it's returned to the
[4] initial officer, investigator. If there's anything
[5] found, minor corrections, whatever, is what it
[6] normally is — or sometimes the spell
[7] check, it'll pick it up if it's spelled correctly.
[8] But it could be a typo and there's a missing letter;
[9] but if it's still a word, it doesn't pick it up.
[10] Whatever corrections, if any, are made.
[11]     And then it's submitted to the
[12] supervisor. He then reviews it. And when he gets
[13] done with it, has the opportunity to review it in its
[14] entirety, he sends it back. If there's any
[15] corrections or things that need to be changed,
[16] they're made at that time. And then it's sent out of
[17] the office, which goes to the traffic lieutenant of
[18] the troop of where the collision occurred, the
[19] jurisdiction. We — our responsibility is the entire
[20] county of New Castle County.
[21]     But the report, once it leaves our
[22] office, will then go to the traffic lieutenant of
[23] whatever troop, whether it's Troop 2, 9, 1, or 6. In
[24] this case it's Troop 1, which is Lieutenant Kresge.

1—09:13:41  24—09:14:52                          Page 341

[1]     At that point we have no other, in our
[2] office, reason to and/or way of tracking it when it
[3] goes out of the lieutenant's office. It then goes to
[4] headquarters. It is then reviewed again by
[5] headquarters, personnel from the traffic control
[6] section. And then it's put in a category as to
[7] whether or not it can be released. Or if it's
[8] prosecution pending or whatever, there's a hold put
[9] on it. But that's — for every report that we do,
[10] that's the process that it does go through.
[11] Q: So in this case, in the Vascek case, when
[12] Bill Nottingham looked your report, he looked at it
[13] not for your opinions or the actual dynamics of your
[14] accident reconstruction, but he looked at it for
[15] overall spelling, that it makes sense, that there's
[16] nothing glaring as an error; is that correct?
[17] A: Combination. I mean, primarily, that's
[18] what he's looking for. But, equally, if something
[19] jumps out at him or something to go — he's not
[20] reinvestigating the incident. He's looking for
[21] anything that might look out of the ordinary.
[22]     And, primarily, when the same eyes —
[23] and I think I touched on this in the first
[24] deposition. When you're working on a report and then

[1] you're interrupted and then you get back to that
[2] report and then you're interrupted, sometimes your,
[3] your continuity is all messed up as far as — you
[4] don't start on a Monday and work on it until you're
[5] done without being interrupted. So — and as I did
[6] testify earlier, there was a, a felony case that the
[7] AG's office bumped this one —
[8]     Q: I remember.
[9]     A: — and said, you know, priority that one.
[10] And that's why then it took even a little bit longer
[11] than normal to get out of the office and get
[12] completed. Not any less important of this collision
[13] and what happened as well the other; it's just
[14] because of the dynamics of the criminal parts of it.
[15]     Q: I understand that. Do you know if Bill
[16] Nottingham had made any corrections to your report?
[17]     A: I wouldn't remember. Primarily, what we
[18] do is if there's a comma out of place or whatever, we
[19] make the corrections, throw that away, and then —
[20] and print it, a new copy of whatever misspelled word
[21] corrected or whatever and then submit it. Same thing
[22] when the supervisor reviews it; we don't keep any of
[23] that.
[24]     Q: If he had — would you remember if he had

[1] made a substantive change, a change or a correction
[2] substantively either to opinions or conclusions or
[3] distances?
[4]     A: Yes.
[5]     Q: And he didn't make any changes of that
[6] extent?
[7]     A: No, I don't recall of any with this.
[8]         And the other thing that I think I
[9] said in the first deposition as well is, what we try
[10] to do, if at all possible, there's four of us in the
[11] unit; two of us are on call all the time, which means
[12] two of us are at a scene — in this case as well.
[13]     Later this afternoon Sergeant Cox is
[14] coming in. He was the co-investigator or assistant
[15] with this investigation until I was assigned scene
[16] lead — scene investigator, lead investigator. And
[17] then his involvement then was very minimal after
[18] that. Obviously, he has recollection of it because
[19] he was there.
[20]     But what we try to do is to give it to
[21] someone else who has not been at that scene, because
[22] a fresh set of eyes from another reconstructionist —
[23] not saying their opinion would be tainted or they'd
[24] start to jump to any conclusions.

[1]     But if you know some of it, you might
[2] be skimming instead of reading substance line for
[3] line, which is what we're trying to do is to give the
[4] best possible professional product when we're done,
[5] that we don't later bite the bullet because we missed
[6] something. And also in this case we see and saw that
[7] there's two time differences from the Fire Board to
[8] Recon. And we didn't, we didn't pick up on it.
[9]     Q: Yeah.
[10]     A: We can explain it but — as to why it
[11] didn't get caught. So that's the sole purpose of the
[12] review process.
[13]     Q: Fair enough. Do you know if Matt Cox made
[14] any changes substantively to your report?
[15]     A: I don't recall any.
[16]     Q: Okay. And I guess the same question for
[17] Lieutenant Kresge: Do you know if there were any
[18] substantive changes made by Lieutenant Kresge?
[19]     A: The lieutenant never returned the report
[20] to our office, and I did not receive any follow-up
[21] emails and/or telephone calls. So basically — and
[22] the process is still the same. If they would have
[23] found something that needed correcting, the policy or
[24] process is that they would return it to me with

[1] stickies on it or mark — they'd mark up the original
[2] report or whatever, say, Make these corrections.
[3]     But I never received it back from him
[4] and — nor did I receive any notification from
[5] headquarters. Again, equally, if they find something
[6] that, through the change, still hasn't been caught,
[7] there were — I was never notified by either
[8] Lieutenant Kresge or headquarters personnel.
[9]     Q: Let me change subjects if we could. And I
[10] want to talk about your investigation of the UPS
[11] vehicle —
[12]     A: Uh-huh.
[13]     Q: — the UPS package van.
[14]     A: Yes, sir.
[15]     Q: On the UPS package van did you make a
[16] determination as to whether it had any kind of
[17] electronic control module on it, ECM?
[18]     A: No, I did not.
[19]     Q: Do you know whether there's an ECM on that
[20] package van or not?
[21]     A: I do not know.
[22]     Q: Do you have your original field notes with
[23] you, which you were kind enough to give us at the
[24] last time —

1—09:19:32   24—09:20:48                        Page 346

[1] A: Yes.

[2] Q: — regarding Mr. Bard's interview.

[3] A: Yes.

[4] Q: Can you, first, for me describe your

[5] procedure for taking a statement from one of the

[6] drivers involved in a fatal accident?

[7] A: Normally what we do is, once we've made a

[8] decision of who is going to be the senior

[9] investigator of whatever particular crash we're on —

[10] it doesn't happen every time — but what we try to do

[11] is, is to determine who's going to handle the

[12] investigation.

[13]     And the purpose and reason for that is

[14] then if there is anyone at the scene that needs to be

[15] interviewed, obviously it would be better for the

[16] senior investigator to do the interviews so that it's

[17] minimizing other involvement of the other FAIR team

[18] member while they're doing other things; you're

[19] interviewing them, obviously, as well, so that you

[20] don't have to refer to the supplement that someone

[21] else writes because they've interviewed someone, if

[22] possible; because, obviously, it's your

[23] investigation. So we try to determine who's going to

[24] be handling it at that time.

1—09:20:50   24—09:21:51                        Page 347

[1] Q: As you did in this case.

[2] A: As we did in this case.

[3]     I then — procedure basically is to

[4] take the individual to our police car, try to exclude

[5] them a little bit from what's going on around us if

[6] it's a real busy, active scene, mostly so that we're

[7] hopefully not interrupted.

[8]     It's difficult in the middle of an

[9] interview — and it still happens — you know, they

[10] tap on your window and say, Hey, the tow truck's

[11] here, or, Did so-and-so leave such and such? or

[12] whatever. And then you lose your line of thought if

[13] you're in the middle.

[14]     So you want to try to be, like anyone

[15] else, professional from the beginning to the end of

[16] having — you know, how A through Z, you ask your

[17] questions or whatever.

[18]     And this case was no different. I

[19] interviewed Mr. Bard in my police vehicle, as I

[20] stated in the first deposition. And a representative

[21] from the company was with me or in the vehicle at

[22] that time, which was —

[23] Q: Mr. Long?

[24] A: Thank you.

1—09:21:52   24—09:22:48                        Page 348

[1] MS. RISK: No. Excuse me.

[2] Mr. Jester, I believe.

[3] BY MR. van der VEEN:

[4] Q: Mr. Jester?

[5] A: That's right — was in the vehicle with

[6] us. And primarily that is not a problem. Each

[7] investigator has his own style of technique of what

[8] they're comfortable with or whatnot. I've not

[9] normally ever had a problem with someone sitting in

[10] with me.

[11]     I normally go tell them that you're an

[12] observer; you can listen to what's being said. I

[13] don't have a problem with you being here as a

[14] representative from the company, but you're not

[15] engaged in questions or whatever else is involved.

[16] Primarily it's just a, you know, ask an interview —

[17] so, I mean, they're not going to get in a position of

[18] saying, well, maybe being intimidated of not saying

[19] something correct because someone's there.

[20] Q: Yeah.

[21] A: We do one of two: We either take

[22] handwritten notes, which I did in this case, or a

[23] tape-recorded interview. In this case I took hand

[24] notes. It's not spelled out. I mean, we're not

1—09:22:49   24—09:23:51                        Page 349

[1] mandated that we have to do one or the other;

[2] sometimes more convenient for the other. But in this

[3] case, I took field notes.

[4]     I ask questions, ask them to explain

[5] to me what happened, then go back and touch on things

[6] while I'm writing notes while they're talking to me,

[7] as well as clarifying.

[8]     And then I go over my notes to make

[9] sure that what I wrote reflects what they told me.

[10] And then to conclude it, I always put a starting time

[11] and an ending time when I'm done. And then when I go

[12] back later to do — not in the detail that this

[13] gentleman does, word for word, line for line, dot for

[14] dot —

[15] Q: The court reporter.

[16] A: — but I take from the notes the bullets

[17] that I wrote and put it into sentence form of a

[18] synopsis of the brief comments that were made

[19] regarding what they said to me.

[20] Q: In this case you had Mr. Bard; you brought

[21] him into your vehicle; correct?

[22] A: Yes, sir.

[23] Q: And you asked him questions?

[24] A: Yes, sir.

1—09:23:52  24—09:24:47                    Page 350

[1]  Q: You asked him, first, to kind of give you
[2] a narrative of what happened and what he remembered?
[3]  A: Yes, sir.
[4]  Q: And then you asked him specific questions
[5] about areas that are important to you?
[6]  A: Yes, sir.
[7]  Q: And you're taking notes at the same time?
[8]  A: Yes, sir.
[9]  Q: After you've completed your notes, you
[10] read through your notes?
[11]  A: Yes, sir.
[12]  Q: And then you ask him about each note that
[13] you've taken to confirm that that's what he said?
[14]  A: Yes, sir.
[15]  Q: And you did that in this case?
[16]  A: Yes, sir. Every case.
[17]  Q: Now, I'm not going to go through the
[18] entire interview line by line with you.
[19]  A: Okay.
[20]  Q: But I would like you to have a copy of
[21] your report. On page 12 of your report, that has the
[22] entire first interview with Mark Bard.
[23]  A: Okay.
[24]  Q: With respect to the distance of the

1—09:24:49  24—09:26:01                    Page 351

[1] motorcycle, the information that Mr. Bard first saw
[2] the motorcycle when it was 50 to 75 feet away from
[3] him, where did you get that information?
[4]  A: From my notes of what he said to me from
[5] the interview in the car.
[6]  Q: So you got that information from Mr. Bard
[7] himself?
[8]  A: Yes, sir.
[9]  MS. RISK: Objection; leading.
[10] BY MR. van der VEEN:
[11]  Q: Did you — at any time from your
[12] recollection or from your notes, did he tell you that
[13] he first saw the motorcycle on the stone bridge?
[14]  A: From my recollection, not; and from the
[15] notes, I don't see anything that reflects that
[16] either, no, sir.
[17]  Q: Okay. Mr. Bard has testified that he told
[18] you in this interview in your squad car that he first
[19] saw the motorcycle on the stone bridge and you told
[20] him that that was 50 to 75 feet away.
[21]  MS. RISK: Objection.
[22] BY MR. van der VEEN:
[23]  Q: Do you recall that happening?
[24]  A: I don't recall me saying that it was 50 to

1—09:26:04  24—09:27:09                    Page 352

[1] 75 feet away.
[2]  Q: Would you ever estimate a distance for the
[3] driver of another vehicle in a fatal accident case
[4] for him?
[5]  A: No, sir. The line of questioning that I
[6] do normally is something — I mean, I've said it so
[7] many times, so many years — I'm not trying to lock
[8] you in. What I'm trying to get an idea of,
[9] approximate, whatever works for you, is what I
[10] basically say, car distances, because some people
[11] will say, Well, six car lengths, whatever, if they're
[12] more comfortable with that. If you're comfortable
[13] with feet, yards — I mean, I'll say yards or meters,
[14] whatever.
[15]  But whatever they say to me, what I'm
[16] trying to do — and it's not a trick question. I'm
[17] not trying to lock them in so that later, you know,
[18] like today we can back-and-forth it. I'm just trying
[19] to get an idea of approximately where they were when
[20] they said they saw whatever they saw, whomever it is.
[21]  Sometimes we get out of the car and
[22] ask them, Could you show me where you were? In this
[23] case, I didn't do that. Through — and, and through
[24] experience, you kind of sort of get a gut feeling. I

1—09:27:12  24—09:28:06                    Page 353

[1] mean, when someone tells you something, if it's a
[2] real, Oh, about a hundred feet, as opposed to, A
[3] hundred feet maybe, that's — it's less convincing.
[4] Sometimes we'll do that and get out of the car and
[5] say, you know, Show me. But I did not do that in
[6] this case, and the notes that I wrote reflect what I
[7] believe.
[8]  Q: When he told you that it was 50 to 75 feet
[9] away, did he seem certain about it?
[10]  A: Appeared — yes, appeared to be, what I
[11] remember.
[12]  Q: Now, when he gave you the approximation of
[13] 50 to 75 feet, he was sitting -- you were sitting in
[14] your front seat of your squad car; correct?
[15]  A: Yes, sir.
[16]  Q: And he was sitting in the front passenger
[17] seat of your squad car?
[18]  A: Yes, sir.
[19]  Q: And he was just north of the intersection
[20] and the accident scene looking into the scene —
[21]  A: Yes, sir.
[22]  Q: — correct?
[23]  A: Yes, sir.
[24]  Q: And you gave him plenty of time to answer

1—09:28:10  24—09:29:06    Page 354

[1] your questions? You didn't rush him in any way?

[2]    MS. RISK: Objection to form.

[3] BY MR. van der VEEN:

[4]    Q: Did you rush him in any way?

[5]    A: No. They take whatever time they need.

[6] And, again, if they're not committed, if they don't,

[7] aren't comfortable — for instance, another common

[8] question we ask at every investigation, just about,

[9] Do you know or remember right before the crash

[10] approximately how fast you were traveling?

[11]    Right away people sometimes say, Oh,

[12] this is a cop question; he's trying to nail me. And

[13] they'll hem, haw around and, No, I have no idea. Or

[14] sometimes they'll tell us.

[15]    I'm just trying to get approximate.

[16] There's no trick agenda here. It's just to try to

[17] get an overall as an investigator. We didn't get to

[18] witness what took place but is responsible for

[19] investigating, just to try to get an accurate

[20] reflection of what they, you know, they can tell you

[21] and share with you.

[22]    Q: Okay. Regarding Mr. Bard's statement

[23] about whether he does or does not wear glasses, he

[24] told you that he did not wear glasses?

---

1—09:29:32  24—09:30:14    Page 355

[1]    A: Correct.

[2]    Q: He didn't tell you, I own glasses but

[3] don't wear them; they're only for reading?

[4]    MS. RISK: Objection; form.

[5]    THE WITNESS: I don't recall him ever

[6] saying that, no.

[7] BY MR. van der VEEN:

[8]    Q: If he told you that he had glasses but

[9] they were only for reading, would you have reflected

[10] that in your notes?

[11]    MS. RISK: Objection.

[12]    THE WITNESS: Yes. And that is common

[13] to have individuals that have since required them but

[14] haven't gone to DMV so it's not reflected. And

[15] that's why it's a question, because it's not

[16] always — not everyone's valid and current and up to

[17] date on their driver's licenses to have it endorsed

[18] of restrictions or what they might or might not need

[19] to know or have.

[20] BY MR. van der VEEN:

[21]    Q: Okay.

[22]    A: And that's why we ask it. I mean, I

[23] wasn't asking specifically in this case for that. I

[24] was just saying, Do you wear glasses? Were you

---

1—09:30:18  24—09:31:57    Page 356

[1] wearing glasses.

[2]    Q: And as far as you remember and as far as

[3] your notes reflect, he said, I do not wear glasses?

[4]    A: Yes, sir.

[5]    Q: He did tell you that he never heard the

[6] motorcycle?

[7]    A: Never heard the motorcycle approaching;

[8] yes, sir.

[9]    Q: Even when it was 60 to 85 feet away from

[10] him?

[11]    MS. RISK: Objection to the form.

[12]    THE WITNESS: All he said was he

[13] never — when I asked him, I asked him if he had

[14] heard the motorcycle. And he said he never heard it

[15] as it was approaching. So to me that would mean not

[16] at all.

[17] BY MR. van der VEEN:

[18]    Q: He did not tell you in this first

[19] interview that the first person on the scene was John

[20] Seiffert?

[21]    MS. RISK: Objection; form.

[22]    THE WITNESS: I wouldn't know any

[23] reason why he would have told me that. I certainly

[24] didn't or wouldn't have asked that.

---

1—09:31:58  24—09:32:58    Page 357

[1] BY MR. van der VEEN:

[2]    Q: Okay. Well, if you look at the bottom of

[3] your statement, the bottom of your summary of his

[4] statement, it says, He does not remember anyone else

[5] being around when the traffic collision occurred

[6] other than the nurse that stopped to help. The nurse

[7] did not say much. But she did state that the

[8] motorcycle passed her right before the collision

[9] happened.

[10]    A: Okay.

[11]    Q: When you were interviewing him on this

[12] date, did he tell you about any contact that he had

[13] with John Seiffert?

[14]    A: I don't recall any, no, sir.

[15]    Q: Did he tell you that after the impact, his

[16] truck rolled forward and rolled on top of Mr. Vascek?

[17]    A: Yes, sir, I remember him telling me that.

[18]    Q: He did tell you that?

[19]    A: Uh-huh.

[20]    Q: And is that in your notes? The last time

[21] I asked you in your deposition, you said he didn't

[22] tell you that and that it wasn't reflected in your

[23] notes.

[24]    MS. RISK: Objection; form,

---

1—09:32:59  24—09:34:13                    Page 358

[1] speculation.

[2]   MR. van der VEEN: It's not

[3] speculation. It's the record.

[4]   MS. RISK: Representation of the

[5] record. The record speaks for itself.

[6] BY MR. van der VEEN:

[7]   Q: I'm going to ask the question for your

[8] second interview as well.

[9]   A: It was the second interview.

[10]   Q: I'm going to ask you about that too.

[11]   A: He didn't tell me that — according to the

[12] notes, he didn't tell me that the first time and

[13] apparently made the comment in the second interview.

[14]   Q: Well, please look at your second interview

[15] before you come to that conclusion.

[16]   MS. RISK: Objection. Is there a

[17] question pending?

[18]   MR. van der VEEN: There will be when

[19] he's done. I'm giving him an opportunity to read.

[20]   THE WITNESS: He moved it — I was

[21] told that he moved it during the second interview and

[22] that he was instructed by one of the nurses, not

[23] Mr. Seiffert/Seiffert, whatever his last name was.

[24] BY MR. van der VEEN:

1—09:34:13  24—09:35:01                    Page 359

[1]   Q: Now, nowhere in your report does it

[2] indicate that he ever told you or at the time that

[3] you wrote your report you had any knowledge of his

[4] truck rolling up on him —

[5]   MS. RISK: Objection; form.

[6] BY MR. van der VEEN:

[7]   Q: — up on his arm?

[8]   MS. RISK: Objection; form.

[9]   THE WITNESS: I'm sorry. Ask the

[10] question again.

[11] BY MR. van der VEEN:

[12]   Q: Sure. If you read your report through

[13] from front to cover, it does not mention that you

[14] were aware that this van ended up rolling up on

[15] Mr. Vascek?

[16]   MS. RISK: Objection; form.

[17]   THE WITNESS: That's correct, not

[18] through him.

[19] BY MR. van der VEEN:

[20]   Q: Okay. It is not mentioned in any of your

[21] witness statements?

[22]   A: It's not?

[23]   Q: (Nodded.)

[24]   MS. RISK: Objection; form.

1—09:35:02  24—09:36:02                    Page 360

[1]   THE WITNESS: Okay.

[2] BY MR. van der VEEN:

[3]   Q: And would that mean that nobody had told

[4] you about it?

[5]   A: No.

[6]   Q: Okay.

[7]   A: I'm recalling, I believe it was during the

[8] interview or the conversations, the telephone

[9] conversations that I had off and on with Mr. Seiffert

[10] when I interviewed him.

[11]   Q: Okay. Mr. Bard testified in his

[12] deposition that he didn't tell you about that.

[13]   MS. RISK: Objection.

[14] BY MR. van der VEEN:

[15]   Q: Do you know why he wouldn't tell you about

[16] that?

[17]   MS. RISK: Objection; speculation.

[18]   THE WITNESS: Why he wouldn't tell me

[19] that he had rolled onto the arm?

[20] BY MR. van der VEEN:

[21]   Q: Yeah.

[22]   A: No idea.

[23]   Q: Now, Mr. Bard — and I'm looking at his

[24] first statement — told you that — it says, Mr. Bard

1—09:36:06  24—09:37:24                    Page 361

[1] stated that the motorcycle was traveling at a high

[2] rate of speed and estimated the speed to be

[3] approximately 80 miles per hour. Do you see where

[4] that is in your report and also then in your notes?

[5]   A: I see it in my notes. And I see it in the

[6] report, yes, sir.

[7]   Q: Okay. Did Mr. Bard tell you that it was

[8] going a hundred miles an hour?

[9]   A: No, sir.

[10]   Q: Did Mr. Bard tell you that it was going a

[11] hundred miles an hour and then you told him, No, no,

[12] it had to be 80?

[13]   MS. RISK: Objection.

[14]   THE WITNESS: No. What I wrote is

[15] what he said. I have no reason to go higher or lower

[16] or — and those are questions that I clarify, because

[17] we're talking about a speed, whether it's an estimate

[18] or his behalf or not or whomever, her behalf.

[19]   80 mile an hour is what's in my notes.

[20] 80 mile an hour is what's in the report. 80 mile an

[21] hour is what I remember from the interview. I would

[22] have had no reason to say, No, it was probably going

[23] faster than that, or, No, it was probably going

[24] slower, or whatever. I have no reason to do that.

1—09:37:32  24—09:38:33                    Page 362

[1] I mean, as an investigator, I'm a, I'm
[2] a mediator to put all the facts together and try to
[3] come to a conclusion with what the facts and
[4] everything, the totality of everything tells me.
[5]     I'm not going to — there's no
[6] win/loss, gain/loss by me suggesting other than what
[7] they're saying. I mean, I didn't know him from Adam
[8] the day before this collision and only had the
[9] contact with him as a result of this investigation as
[10] well as with the others in any of the other
[11] investigations that I conduct.
[12]     Q: Now, you had a second interview with
[13] Mr. Bard. And you indicate — and this was in
[14] February of this year, of '05. And you say, Mr. Bard
[15] confirmed what he had originally stated during his
[16] initial interview.
[17]     Do you see that in your report?
[18]     A: Yes, sir.
[19]     Q: You would have gone over with him, then,
[20] what he told you in the first interview —
[21]     A: Yes, sir.
[22]     Q: — with your notes?
[23]     A: Yes.
[24]     Q: You would have told him that he had

1—09:38:35  24—09:39:22                    Page 363

[1] estimated the speed at 50 to 75 miles an hour?
[2]     MS. RISK: Objection; form.
[3]     THE WITNESS: When I do that, when I
[4] put a statement, like this is confirmation, I don't
[5] go over every single line item and say, you know,
[6] Well, yes, he said he got up at this time in the
[7] morning. I go over the main topics of where I'm
[8] going at as far as — and speed would have been one
[9] of them.
[10]     And if there would have been any
[11] opportunity or any time for him to have corrected me
[12] from the first interview when we went over the notes
[13] before he got out of the police car, he could have
[14] had that opportunity to clarify it then as well
[15] because it was, it was during the conversation that
[16] we discussed.
[17] BY MR. van der VEEN:
[18]     Q: Speed and distance being two of the most
[19] salient points in an accident reconstruction;
[20] correct?
[21]     MS. RISK: Objection; form.
[22]     THE WITNESS: It is the most
[23] important — one of many important factors of any
[24] collision, yes.

1—09:39:23  24—09:40:08                    Page 364

[1] BY MR. van der VEEN:
[2]     Q: Sure. And when you go over the salient
[3] facts with somebody on the second interview, speed
[4] and distance is something that you would cover;
[5] correct?
[6]     A: Yes.
[7]     MS. RISK: Objection; form.
[8] BY MR. van der VEEN:
[9]     Q: And do you remember when you talked with
[10] him the second time that you went over speed and
[11] distance?
[12]     A: I — other than — I mean, I, I don't have
[13] an absolute checkmark saying I went over each of
[14] these line items. But from over the years of my
[15] experience and getting set in a procedure of doing
[16] things, I know that's what I do. And I touch on the
[17] highlights.
[18]     And also during the course — it's not
[19] reflected in there. But during the course of my
[20] interviews, I give them the opportunity — you know,
[21] basically I tell them, If there's anything that, from
[22] the first interview and any other subsequent
[23] interviews — a lot's happened right now. I know
[24] you're emotionally upset. This is an ugly situation.

1—09:40:11  24—09:41:07                    Page 365

[1] Is there anything you think you might — is important
[2] for me to know that you didn't tell me or I didn't
[3] ask?
[4]     And then I leave an open, blanket
[5] invitation that, if at any time — you got my — I
[6] mean, I give them my business card. I give them the
[7] numbers to reach me. If something triggers in your
[8] mind — Oh, nuts, I forgot about that — call me; let
[9] me know. If you think it's important, we'll put it
[10] in the report.
[11]     Every interview I have that is
[12] discussed with them, any and all of them, whether
[13] it's on the phone, whether it's in person, to give
[14] the person the opportunity, if there's something that
[15] they forgot to tell me, I'm giving them that
[16] opportunity. They can always call me. I can always
[17] add a fourth contact or fifth contact, or however
[18] many interviews we have, to do that.
[19]     And the only other contact that I ever
[20] had with, that I recall with Mr. Bard — and I don't
[21] know if it's in the notes or not, if I reflected the
[22] exact date — but later when the Attorney General's
[23] office made the decision of this not being a
[24] prosecution case, I contacted Mr. Bard.

1—09:41:10  24—09:42:09          Page 366

[1]    And I often do that with all the

[2] operators, just, How are you doing? You know, I

[3] don't want to see you fall through the cracks.

[4] Everyone involved in the situation is a victim, I

[5] mean, whether, you know, a participant, a witness.

[6] It rattles everyone that's involved with it. And

[7] everyone deals with things like this differently.

[8] And the perspective of my direction is just to reach

[9] out and be as compassionate as possible. You know,

[10] is there anything we can do? Are you okay?

[11]    And one of the things that I said I

[12] did — man of my word — I told him when the AG's

[13] office made a decision, I would let him know, So

[14] that's really about, if I recall, the last

[15] conversation I've ever had with him. And I don't

[16] even know if I documented the date that I did it.

[17] Sometimes I do; sometimes I don't. We get caught up

[18] in all the things that we're doing.

[19]    But, but to, I guess I'm rattling on

[20] now longer that I have to. But I try to extend every

[21] opportunity to anyone that I ever interview to, you

[22] know, call me, whether it's two days later, five days

[23] later, six months later, and bring it to my

[24] attention.

1—09:42:10  24—09:46:13          Page 367

[1]    Q: And he never did that regarding speed or

[2] distance?

[3]    A: No, sir.

[4]    (Discussion held off the record.)

[5]                    RECESS

[6]    (The court reporter read back the last

[7] question and answer.)

[8] BY MR. van der VEEN:

[9]    Q: Did Mr. Bard ever tell you that he found a

[10] skid mark to the motorcycle?

[11]    A: I don't recall him ever telling me that.

[12] It would have been in the notes. I didn't review

[13] everything verbatim, you know, line for line, again,

[14] coming here in today. But, no, I don't recall that

[15] ever.

[16]    Q: You didn't find — would you like to take

[17] a couple minutes and read through your report so that

[18] you're fresh with it?

[19]    A: I'm fine.

[20]    Q: Okay. You never found a skid mark from

[21] the motorcycle?

[22]    A: Other than the mark that we talked about

[23] at great lengths in the previous deposition, no, the

[24] mark right by the, where the UPS truck and the

1—09:46:16  24—09:48:06          Page 368

[1] motorcycle — but other than that, no.

[2]    Q: Okay. And that mark we were talking about

[3] you did not attribute to being to the motorcycle?

[4]    A: Correct.

[5]    Q: Did he ever tell you that when he first

[6] saw the motorcycle, that the driver's head was down?

[7]    MS. RISK: Objection;

[8] mischaracterization of testimony, speculation.

[9]    THE WITNESS: I don't recall him ever

[10] telling me that.

[11]    MR. van der VEEN: I don't think it

[12] can be both.

[13]    MS. RISK: Yes.

[14]    THE WITNESS: I recall the interview

[15] from Mr. Seiffert indicating the positioning of the

[16] operator and the dynamics of what the motorcycle did

[17] and the body and everything. But I don't recall —

[18] there's nothing in the notes, and I don't recall him

[19] ever telling me that, no.

[20] BY MR. van der VEEN:

[21]    Q: Okay.

[22]    A: Or I would have noted it.

[23]    Q: You spoke with a Colton Swift about three

[24] or four months after this accident; do you recall

1—09:48:08  24—09:49:34          Page 369

[1] that?

[2]    A: Yes, sir.

[3]    Q: And it was a conversation that lasted

[4] about ten minutes, 15 minutes?

[5]    A: Yes, sir.

[6]    Q: And in this conversation you didn't ask

[7] him what his job duties were?

[8]    MS. RISK: Objection to the form.

[9] BY MR. van der VEEN:

[10]    Q: Did you ask him what his job duties were?

[11]    A: Asked what his position was.

[12]    Q: Did you ask him what his riding experience

[13] was?

[14]    A: I asked him if he was — if I recall, I

[15] asked him if he was an experienced motorcycle

[16] operator, his experience. But he just said

[17] experience since 1994. I didn't go into, other than

[18] what's in the report, since '94.

[19]    Q: Did anybody ever tell you that you could

[20] do a stoppie going, coasting down a driveway with the

[21] motorcycle off?

[22]    A: I believe we did discuss that in the first

[23] deposition. And I don't recall exactly what my

[24] answer was. But I didn't remember or know that that

1—09:49:38  24—09:51:08                     Page 370

[1] could be done, other than — by definition of what my
[2] understanding of what gravity is, to get it to have
[3] the rear wheel to come up as high as it would — you
[4] can get the rear to bounce off of the asphalt or
[5] concrete or whatever, to a degree. But on a drift
[6] you're not going to get the motorcycle to come and
[7] stand on its end. You need a higher velocity for
[8] that. And that's the conversation of what this was
[9] about. But — so yes.
[10]    Q: Okay. I'm looking at page 16 of your
[11] report where you begin the reconstruction aspect.
[12] And it's your second paragraph: Visibility tests
[13] were conducted at the collision scene on the day of
[14] the collision as well as during follow-up visits to
[15] the intersection.
[16]    Do you know when your follow-up visits
[17] were or how many there were?
[18]    A: Two. One follow-up and the day of the
[19] collision. Actually, there were — wait a minute.
[20] There were two follow-ups. And one was — in looking
[21] through my notes, it's not documented — that was
[22] within like a week or so after the crash.
[23]    Q: Okay.
[24]    A: The second one was done later, which was

1—09:51:10  24—09:52:18                     Page 371

[1] reflected on the, all the papers that you made. And
[2] when I went back and did some more detailed distances
[3] and collected some overall dynamic — or the layout
[4] of the intersection and where it all occurred. Of
[5] course, that was much later then so the foliage and
[6] things like that were not the same.
[7]    But I was looking at that point, just
[8] taking measurements like how far from the center of
[9] the intersection the edge of the concrete bridge was
[10] and the hedgerow and things like that.
[11]    Q: Mr. Bard testified in his deposition that
[12] approximately three weeks after his accident at this
[13] intersection, that somebody knocked down the stop
[14] sign and that it was replaced.
[15]    Did you have any knowledge of that?
[16]    A: I would have no knowledge of that. That
[17] would probably, I would have to think, be reflected
[18] not only in collisions somehow, some way, whatever
[19] date as well as DelDOT, because they're very
[20] accurate, I mean, about things like that, going out
[21] and putting them back up.
[22]    And whether the sign was knocked down
[23] by a collision or not, obviously if it was knocked
[24] down by a collision, there would be a report that

1—09:52:20  24—09:54:12                     Page 372

[1] would generate from that. Or if someone hit it,
[2] knocked it down, and kept going, certainly, obviously
[3] it has to be put back up. Somebody, a motorist, a
[4] resident in that area, whatever, some way, somehow
[5] notified the authorities to have it put back up. But
[6] I have — I would have no knowledge of that.
[7]    Q: DelDOT would be in charge of replacing
[8] that stop sign if it were ever knocked down?
[9]    A: Correct. That's their roadway. And my
[10] experience is that they are very fast at replacing
[11] signage, something obviously as important as a stop
[12] sign, equally as well. I mean, if it's something not
[13] quite as important, not that they're not all
[14] important, but some certainly have higher priorities
[15] of importance.
[16]    Q: You say on page 17 of your report, the, I
[17] think, third full sentence at the top, It is
[18] necessary for eastbound traveling motorists to move
[19] forward towards Montchanin Road to visibly see north-
[20] and southbound traveling motorists that are
[21] approaching the intersection.
[22]    Do you see that?
[23]    A: Yes, sir.
[24]    Q: And that is because why?

1—09:54:14  24—09:55:49                     Page 373

[1]    A: Because the stop sign is further back from
[2] where the actual roadway intersects with Twaddell
[3] Mill Road. So the requirements of Delaware law, or
[4] any law, I think, in any state, you're obligated to
[5] stop or required, responsible to stop at the stop
[6] sign, which in this case is, you're not going to see
[7] everything because you're further — it's a hidden
[8] intersection. It's in a curve.
[9]    Your responsibility then is to proceed
[10] forward cautiously and, prior to entering, making
[11] sure, you know, you can see both ways. And the
[12] statement for this is just that it's a hidden
[13] intersection. And you have to do that there, it's —
[14] every motorist that approaches it, unless they have a
[15] death wish and just want to go through it. I mean,
[16] it's just the designs of the intersection.
[17]    Q: Under Delaware law — and I'm going to
[18] show you the stop signs and yield signs statute in
[19] Delaware, if I may, and if you'd take a look at it.
[20]    A: What part are you referring to, the entire
[21] thing?
[22]    Q: Sure.
[23]    A: Okay.
[24]    (Discussion held off the record.)

1—09:57:32  24—09:58:17                              Page 374

[1] BY MR. van der VEEN:

[2] Q: The statute for duties at a stop sign

[3] speaks of three different types of markings at the

[4] intersection, does it not?

[5] MS. RISK: Objection; form.

[6] THE WITNESS: Yes, sir.

[7] BY MR. van der VEEN:

[8] Q: It speaks about an intersection that has a

[9] stop sign and then a white painted stop line;

[10] correct?

[11] A: Yes. We refer to it as a stop bar.

[12] Q: Stop bar?

[13] A: Yes, sir.

[14] Q: It speaks of an intersection with a stop

[15] sign, no stop bar, but a painted crosswalk,

[16] pedestrian crosswalk; correct?

[17] A: Yes.

[18] Q: And it speaks of an intersection with a

[19] stop sign but no stop bar and no painted crosswalk;

[20] correct?

[21] A: Yes, sir.

[22] Q: That third type of an intersection is the

[23] type of intersection that is Twaddell Mill Road and

[24] Montchanin Road; correct?

1—09:58:18  24—09:58:52                              Page 375

[1] A: Yes.

[2] MS. RISK: Objection; form.

[3] THE WITNESS: Yes, sir.

[4] BY MR. van der VEEN:

[5] Q: It has no stop bar?

[6] A: I don't know. There might have one day

[7] been, but it wasn't there then, whether the road's

[8] surfaced and not painted again, but no.

[9] Q: On the day of this accident there was no

[10] stop bar?

[11] A: No.

[12] MS. RISK: Objection; form.

[13] BY MR. van der VEEN:

[14] Q: And there was no white painted line?

[15] A: No, sir.

[16] Q: There was no white painted crosswalk?

[17] MS. RISK: Objection.

[18] THE WITNESS: No, sir.

[19] BY MR. van der VEEN:

[20] Q: So under the statute his duty is to not

[21] stop at the stop sign but to stop at the edge of the

[22] roadway between Montchanin Road and Twaddell Mill

[23] Road; correct?

[24] MS. RISK: Objection; form.

1—09:58:53  24—09:59:54                              Page 376

[1] THE WITNESS: Yes, sir; my

[2] understanding of it, yes, sir.

[3] BY MR. van der VEEN:

[4] Q: So that if he has testified that he

[5] stopped with the front of his vehicle even with the

[6] stop sign, which is about 15 feet back from the edge

[7] of the roadway, he would have stopped 15 feet too

[8] early; correct?

[9] MS. RISK: Objection.

[10] THE WITNESS: Under that definition,

[11] yes.

[12] BY MR. van der VEEN:

[13] Q: Under the law?

[14] A: Yes, sir.

[15] MS. RISK: Objection.

[16] BY MR. van der VEEN:

[17] Q: And he was clear with you that he did not

[18] stop at the point where Montchanin Road and Twaddell

[19] Mill Road intersect one another; correct?

[20] MS. RISK: Objection; form.

[21] THE WITNESS: My memory of — no, he

[22] did not. He stopped at the stop sign and then slowly

[23] proceeded toward the intersection.

[24] BY MR. van der VEEN:

1—09:59:54  24—10:01:36                              Page 377

[1] Q: If he had stopped at the edge of the

[2] roadway where he was, his sight line would be

[3] improved for both northbound and southbound lanes;

[4] correct?

[5] A: The sight line would be the same whether

[6] he stopped or not —

[7] Q: No —

[8] A: — I mean, because during the interview,

[9] he indicated he was looking. So if he's looking to

[10] the left and he's slowly entering, he's still going

[11] to see that whether he stops or not. Whatever is

[12] there is there.

[13] Q: Did he tell you that he was also looking

[14] right?

[15] A: He told me...

[16] He said he moved forward, still didn't

[17] see anything coming.

[18] Q: Okay. Did he tell you that from the time

[19] that he stopped to the stop sign to the time that he

[20] got to the intersection of the roadway, he looked to

[21] his right three times?

[22] A: I don't recall him telling me that.

[23] Q: Okay. If he — comparing the sight line

[24] when stopped at the stop sign — strike that

[1] question.

[2]    Would your sight line be better for

[3] the southbound lanes of Route 100 if you stopped at

[4] the stop sign or if you stopped at the edge of the

[5] roadway?

[6]    A: If you stopped at the edge of the roadway,

[7] you can see more of the curve.

[8]    Q: If you had been — if you stopped when you

[9] enter the intersection, would you be traveling faster

[10] if you started from the stop sign or if you started

[11] from the very edge of the roadway?

[12]    MS. RISK: Objection; hypothetical,

[13] form.

[14]    THE WITNESS: If you started from the

[15] edge of the roadway and began to execute a left turn

[16] as opposed to starting it at the stop sign, your

[17] speed's going to be slower because you're just

[18] starting.

[19]    Whereas, you've covered already

[20] 15 feet or whatever you said the stop sign was back.

[21] If it was an intersection that didn't require that,

[22] where visibility was better and you started from the

[23] stop sign out, you've got 15 feet to start picking up

[24] speed.

[1]    Whereas, if you're at the edge of the

[2] roadway, you're not going to accelerate as fast.

[3] Even if you tromp on it, still you're going to get

[4] only what you get in the amount of distance that you

[5] travel before the, in this case, impact.

[6] BY MR. van der VEEN:

[7]    Q: Correct. At the edge of the roadway, is

[8] your sight line — at the edge of the roadway, is

[9] your sight line into the southbound lanes of

[10] Route 100 greater than 50 to 75 feet?

[11]    A: Yes, sir. Mine was when I looked.

[12]    Q: What was yours?

[13]    A: I mean, you can see, as reflected in the

[14] diagram and the distances as far as the hedgerow and

[15] the other things that are down there, you can see

[16] with, even with foliage at that point. And, of

[17] course, later then — when, later into the winter,

[18] whenever, when the foliage was cut back or not as

[19] full, you can definitely see, I mean, at least into

[20] the curve where the hedgerow is, which — 200-some

[21] feet or whatever.

[22]    Q: 279 feet?

[23]    A: Yeah.

[24]    Q: Trooper, you had at one point faxed a

[1] draft of your report to UPS; do you recall that?

[2]    MS. RISK: Objection.

[3]    THE WITNESS: Do I recall that?

[4] BY MR. van der VEEN:

[5]    Q: You have a fax cover sheet that I was able

[6] to review.

[7]    A: I'm sure I did if you said I did. If we

[8] do that, we put the information — I put a copy of it

[9] in the file.

[10]    Q: Uh-huh.

[11]    A: And that's not uncommon for us to do, to

[12] give basic information to any and all parties that

[13] request it.

[14]    This would be it.

[15]    Q: May I take a look at that?

[16]    A: (Complies.)

[17]    Q: This was in November of '04; correct? And

[18] you faxed it to Jim Liggett? Do you know who Jim

[19] Liggett is?

[20]    A: He's a representative of UPS.

[21]    Q: And do you know what his position is at

[22] UPS?

[23]    A: He is — works with the safety management.

[24]    Q: Oh, do you have his card?

[1]    A: He gave me a business card of Michael

[2] Long, and his information was on the back. That was

[3] what I had from the date of the crash.

[4]    Q: So Mr. Liggett was on the scene also on

[5] the day of the crash — I mean, Mr. Long was also

[6] there?

[7]    A: If I recall, yes, sir.

[8]    Q: Who else gave you cards from UPS, do you

[9] know, or related to this accident? I see you have my

[10] card there, Michael van der Veen.

[11]    A: That's when we met, on the day that we

[12] met, yeah, November 22nd.

[13]    Q: Okay.

[14]    A: I have a card from J.C. Kenney —

[15]    Q: Yeah.

[16]    A: — senior field investigator for Liberty

[17] Mutual.

[18]    Q: Uh-huh.

[19]    A: Paul Wallace, this is a card I put in the

[20] file from the AG's office, who reviewed the case. I

[21] have business, several business cards, well, two

[22] actually, from Miss Risk. I met with her on June 9th

[23] of this year. I have a business card from Jim Jester

[24] from UPS.

1—10:07:44  24—10:08:42                          Page 382

[1] Q: Uh-huh. When did you meet with him?

[2] A: I don't remember. He might — he was

[3] probably at the scene because that's the only reason

[4] I would have gotten that. But just a lot of times it

[5] seems people are handing out their business cards.

[6] And, of course, I got a card from the tow company.

[7] Q: Can I make a copy of all of these cards?

[8] A: Sure.

[9] MS. RISK: There is actually, if

[10] counsel will look to the notes that the corporal was

[11] kind enough to provide us with, his entire file last

[12] time, there's a photocopy with all of those cards on

[13] it.

[14] MR. van der VEEN: Front and back? I

[15] didn't see that.

[16] MS. RISK: I believe so. If you just

[17] want to make a copy, that's fine. I wasn't trying

[18] to...

[19] MR. van der VEEN: Okay. I'll make

[20] copies of these.

[21] BY MR. van der VEEN:

[22] Q: I met with you, according to what you

[23] wrote on the back of my card, November 22nd?

[24] A: Yes.

---

1—10:08:43  24—10:09:30                          Page 383

[1] Q: Do you remember when we met, I was trying

[2] to get a copy of the draft of the report?

[3] A: I don't remember.

[4] Q: Do you remember Nina calling you in

[5] October, November, December, and January trying to

[6] get a draft of the report?

[7] A: Yes.

[8] Q: And we were not able to get a draft of the

[9] report?

[10] A: Wasn't finished.

[11] Q: Then how come in November a draft of the

[12] report went to UPS?

[13] A: They requested preliminary. Any

[14] conversation that I had with you and/or Miss Bushman,

[15] my recollection was that they wanted the completed

[16] report. That was not a completed report.

[17] Q: Okay.

[18] A: I would have provided that if you would

[19] have just said, Hey, can you give me —

[20] Q: — what you have so far?

[21] A: Yeah. Yes.

[22] Q: We didn't ask the question right?

[23] A: My — all the conversations I had was, my

[24] understanding was that you were requesting the full

---

1—10:09:33  24—10:10:47                          Page 384

[1] report. And that's —

[2] Q: Okay.

[3] A: And I never even picked up on it. Or I

[4] would have said, Hey, you know, I can give you this.

[5] Q: Okay. Thanks.

[6] I don't believe I have any more

[7] questions for you. Let me double-check if I may, my

[8] list.

[9] Did you ever tell Mr. Bard that

[10] Mr. Vascek lost his right-of-way on Route 100

[11] southbound because he was going too fast?

[12] MS. RISK: Objection; form.

[13] THE WITNESS: I don't recall ever

[14] telling him that. I did explain to him when I called

[15] him and told him what the Attorney General's office

[16] decision was, that there is a — and it's possible he

[17] misunderstood what I was explaining to him at that

[18] point where that came from.

[19] But there is an obligation, first and

[20] foremost, of course, at that intersection he has to

[21] yield; Montchanin Road has the right-of-way. But

[22] equally in the decision and in looking at it, when an

[23] individual, for instance, is DUI or excessive speed

[24] or is also contributing to the causation, the way the

---

1—10:10:52  24—10:11:59                          Page 385

[1] Attorney General's office looked at it and what I was

[2] explaining to him is that one doesn't override the

[3] other; but collectively, together — maybe it doesn't

[4] sound clear — is negating. There's more than just a

[5] clear-cut stop sign violation or whatever, a traffic

[6] light violation or whatever. But I wouldn't have

[7] said it negates it.

[8] BY MR. van der VEEN:

[9] Q: The Attorney General's office chose not to

[10] prosecute him because they didn't think they could

[11] prove beyond a reasonable doubt that he had criminal

[12] conduct; correct?

[13] MS. RISK: Objection; form.

[14] Objection; speculation.

[15] THE WITNESS: The decision Mr. Wallace

[16] gave me was, after explaining the circumstances of

[17] the collision, from the finished collision report,

[18] after reviewing those facts, they felt that the

[19] charges weren't warranted, not — they didn't go o

[20] telling me a jury or anything...

[21] I mean, I know what the law says when

[22] we go into court work. But they, they didn't go into

[23] that. They just said with what existed in this

[24] situation, they didn't feel that it was warranted to

---

---

**Page 386**

1—10:12:01   24—10:12:39

[1] charge Mr. Bard. And we didn't — they didn't direct

[2] me to charge him.

[3] BY MR. van der VEEN:

[4] Q: In your opinion, did Mr. Vascek ever lose

[5] his right-of-way?

[6] MS. RISK: Objection; hypothetical,

[7] form.

[8] THE WITNESS: My opinion as a trooper

[9] or my opinion as me specifically?

[10] BY MR. van der VEEN:

[11] Q: As a trooper, under the law.

[12] A: Basically —

[13] MS. RISK: Objection; form.

[14] THE WITNESS: I don't feel that he

[15] lost his right-of-way.

[16] BY MR. van der VEEN:

[17] Q: Okay.

[18] A: I also felt, as I wrote in this

[19] report, that he contributed to the outcome of this

[20] collision —

[21] Q: I understand.

[22] A: — by his actions.

[23] Q: Do you believe — Mr. Bard testified that

[24] Mr. Vascek should have gone into the lane of oncoming

---

**Page 387**

1—10:12:43   24—10:14:01

[1] traffic to avoid this collision. Do you know of any

[2] law that requires somebody to leave their lane of

[3] travel and go into oncoming traffic when somebody

[4] blocks their right-of-way?

[5] MS. RISK: Objection; form, misstates

[6] the testimony.

[7] THE WITNESS: I'm not aware of any

[8] laws as far as legal laws. But as far as

[9] common-sense situations, if obviously you have an

[10] opportunity to be defensive and to avoid a collision,

[11] going into another lane if nothing else is coming,

[12] there's nothing wrong with doing that.

[13] BY MR. van der VEEN:

[14] Q: With respect to this case, if that UPS

[15] truck pulled out in front of him 50 to 75 feet away,

[16] and Mr. Vascek was in the southbound lanes, would he

[17] have been able to see through the truck into the

[18] northbound lanes?

[19] MS. RISK: Objection; form.

[20] THE WITNESS: I don't know what he

[21] would have been able to see.

[22] BY MR. van der VEEN:

[23] Q: Do you recall either yourself or the FAIR

[24] team ever meeting with — before this accident —

---

**Page 388**

1—10:14:06   24—10:15:07

[1] meeting with UPS safety personnel and having UPS tell

[2] you all what they do?

[3] A: Prior to this collision?

[4] Q: Yeah.

[5] A: I wouldn't have had any reason to.

[6] Q: After this collision?

[7] A: Still wouldn't have any reason to, other

[8] than clarifying what they do — I mean, the gentlemen

[9] that were at the scene were there conducting their

[10] own investigation which is, again, I stated, I'm

[11] sure, in the previous deposition. We try to respect

[12] any other party that's involved, as long as it's not

[13] interfering with what we're doing.

[14] I mean, for instance, we

[15] investigate — if we're inspecting a truck, the

[16] parties can be there while our mechanics, our truck

[17] mechanics, whatever, inspector, whatever, to watch

[18] and ask questions or whatever, but just so it's not

[19] interfering. But there wouldn't be any reason for me

[20] to know in detail what UPS policy is for handling

[21] collisions.

[22] Q: What investigation were they doing that

[23] you saw on the day of the accident?

[24] A: I didn't see any of them doing anything.

---

**Page 389**

1—10:15:09   24—10:16:03

[1] On the day of the accident they had a truck backed up

[2] to the truck that was involved in the collision.

[3] And, and they had requested permission to unload the

[4] parcel packages. But other than that, I didn't

[5] observe them doing anything.

[6] Q: Did you see them taking any photographs?

[7] A: I don't remember. They might have. But I

[8] really — I mean, being in and out of the car, I

[9] don't recall specifically seeing them do that. They

[10] might have. They probably did. I'd be more than

[11] probably 80 to 90 percent sure they probably did.

[12] I mean, that is common. I mean, I've

[13] investigated other commercial motor vehicle

[14] collisions of other companies in which — like DART,

[15] for instance, I mean, they send people out

[16] immediately and start photographing. And that's not

[17] a problem.

[18] Q: Many trucking companies require drivers to

[19] carry cameras right in their trucks; right?

[20] A: Yes, in my experience and knowledge from

[21] what's been shared.

[22] Q: Of course.

[23] MS. RISK: Objection; relevance.

[24] MR. van der VEEN: Counsel, that's an

---

---

1—10:16:04  24—10:16:55                                        Page 390

[1] objection that we've preserved. It's not an
[2] objection that's necessary to be made now.
[3]     THE WITNESS: The only time —
[4]     MS. RISK: Objection still stands.
[5]     THE WITNESS: The only time that we
[6] would need or go into —
[7]     MR. van der VEEN: Even though you
[8] know it's improper, you're still having it stand?
[9]     MS. RISK: Objection. Counsel's
[10] argument about what is proper and what is not proper
[11] in front of the witness, in fact, is improper. And I
[12] would appreciate it if counsel would keep his
[13] comments to a minimum this time.
[14]     MR. van der VEEN: Counsel, you know
[15] we reserved the right to object to relevancy. We
[16] waived that objection for this, the purpose of this
[17] deposition.
[18]     MS. RISK: Counsel, would you ask your
[19] question, please, so that we can get on with this
[20] deposition. Because we've already been nine hours
[21] into a deposition that you've had to ask questions.
[22] And I would appreciate the opportunity to speak to
[23] Corporal Weaver today. And I would also appreciate
[24] your cooperation. Could you go on with your

---

1—10:16:57  24—10:17:49                                        Page 391

[1] questions, please?
[2]     MR. van der VEEN: Well, wait a
[3] minute. This is crucial. Are you telling me that we
[4] did not at the beginning of the stipulation (sic)
[5] stipulate that all objections other than to form are
[6] specifically preserved?
[7]     MS. RISK: We stipulated to
[8] objections.
[9]     MR. van der VEEN: And does that go to
[10] today's deposition as well?
[11]     MS. RISK: Yes, it does.
[12]     MR. van der VEEN: Okay. Okay.
[13]     MS. RISK: Yes, it does.
[14]     MR. van der VEEN: Okay.
[15]     THE WITNESS: What I started to say
[16] was that if there's an incident in which it would
[17] involve the investigation, we would go — and an
[18] example is that I investigated a fatal a number of
[19] years ago in which a DART bus was involved. And at
[20] that time they were instructed not to move the
[21] vehicles from the roadway.
[22]     Whether it was a hazard or not, they
[23] were instructed to leave it there. And as a result
[24] of a first crash that occurred, a subsequent crash

---

1—10:17:53  24—10:19:00                                        Page 392

[1] occurred which was a fatal. And that required
[2] in-depth. But for this case there was no reason for
[3] me — I mean, I had no indication or reason to know
[4] why or what UPS does other than sharing information
[5] with them and as well as getting information from
[6] them regarding the lengths of the vehicles or
[7] something that we might need in regards to the
[8] collision or whatever. Just as example. But —
[9]     BY MR. van der VEEN:
[10]     Q: Do you remember if Mr. Jester was taking
[11] notes in the backseat of your squad car while the —
[12] in the backseat of your car while you were taking the
[13] statement from Mr. Bard?
[14]     A: I don't know if he was or wasn't. I don't
[15] recall that he did. But, again, I'm sitting —
[16] Mr. Bard's to my right, and he's directly behind me.
[17] And I don't recall him doing it, but he might have.
[18] But I can't say he did or didn't.
[19]     Q: Do you recall — how many conversations
[20] during the investigation of this matter did you have
[21] with UPS personnel, from Miss Risk on down?
[22]     A: I can only approximate.
[23]     MS. RISK: Or up.
[24]     THE WITNESS: Approximate —

---

1—10:19:00  24—10:29:18                                        Page 393

[1] BY MR. van der VEEN:
[2]     Q: From Miss Risk on up.
[3]     A: Maybe a dozen, total. And that might
[4] be — I mean, it might be a few more or a few less.
[5] I mean, I don't document every — I mean, if they
[6] call about something and say, Hey, did you get
[7] such-and-such in the fax machine, or whatever, I
[8] mean, I don't keep a log every time I talk to
[9] someone.
[10]     Q: What did Miss Risk speak with you about
[11] when she met with you in June?
[12]     A: Basically, if my memory — she wanted to
[13] know basic information about the collision as far as
[14] documentation and the overall dynamics of what I
[15] found and what's written in the report.
[16]     Q: Okay. I don't believe I have any more
[17] questions for you. I appreciate your time.
[18]     (Discussion held off the record.)
[19]                RECESS
[20]            BY MS. RISK:
[21]     Q: Good morning, Corporal Weaver.
[22]     A: Good morning.
[23]     Q: My name is Jayne Risk. We've met several
[24] times now. I just wanted to confirm for you that the

---

1—10:29:24  24—10:30:19                    Page 394

[1] instructions that Mr. van der Veen gave you at the
[2] very beginning of your first day of deposition hold
[3] true now. And those would be the instructions
[4] regarding allowing me to finish my sentence before
[5] you answer the question because that makes it easier
[6] for the court reporter and makes the transcription
[7] clearer.
[8]     Do you understand that?
[9]     **A:** Yes, ma'am.
[10]    **Q:** Okay. And in my case in particular,
[11] because I have a tendency to pause at the end of a
[12] sentence, so I just wanted to make you aware of that
[13] so that we make his job, the court reporter's job,
[14] easier.
[15]    And also if I ask you a question
[16] that's confusing, please ask me to rephrase the
[17] question; because if you answer the question that
[18] I've asked, those who read the transcript will
[19] understand that you understood my question and
[20] answered that question; is that fair?
[21]    **A:** Yes.
[22]    **Q:** Okay. Because I'm following many hours of
[23] deposition questions, it may seem as though we're
[24] going over ground that's already been covered or

1—10:30:23  24—10:31:29                    Page 395

[1] that, you know, I'm going to have to go back and
[2] forth to different places and fill in gaps.
[3]    So do you understand that —
[4]    **A:** Yes.
[5]    **Q:** — we may be asking a lot of different
[6] questions today?
[7]    **A:** Yes.
[8]    **Q:** I wanted to follow up on a line of
[9] questioning that Mr. van der Veen just had with
[10] regard to your contacts with UPS. And we'll talk a
[11] little bit about your telephone conversations in a
[12] little while. But with specific regard to your
[13] contacts with UPS, were they contacts where you were
[14] requesting information from UPS?
[15]    **A:** Some of them were from requesting
[16] information; some of them, like at the scene, it was
[17] just an exchange of information. They would approach
[18] me and tell me they're so-and-so for — representing
[19] the, you know, the company. I mean, kind of a little
[20] bit of both.
[21]    **Q:** Okay. Through all of your contacts with
[22] UPS, both at the scene, in person, and on the
[23] telephone, did you find any of the representatives of
[24] UPS to be anything less than cooperative?

1—10:31:29  24—10:32:38                    Page 396

[1]    **A:** Absolutely not.
[2]    **Q:** Did you find any of the representatives of
[3] UPS to be anything less than forthcoming and
[4] forthright in their response to you?
[5]    **A:** Yes.
[6]    **Q:** Do you have any reason to believe that any
[7] of the contacts with UPS that you had were such that
[8] UPS employees were trying to influence your decision
[9] and the drafting of that police report?
[10]    **A:** Absolute not.
[11]    **Q:** Okay. I'm going to talk a little bit
[12] about your background, and we talked extensively
[13] about your background the last day of deposition. I
[14] want to take you back to the 18 months that you spent
[15] as a military policeman in Germany.
[16]    **A:** Yes, ma'am.
[17]    **Q:** Okay. Now, it's my understanding from
[18] your testimony that during the course of that time,
[19] you — during the course of that time, you
[20] investigated over a hundred accidents?
[21]    **A:** Approximately, yes.
[22]    **Q:** Okay. And during the course of those
[23] investigations, did those activities always
[24] include — or did those investigations include the

1—10:32:41  24—10:33:19                    Page 397

[1] interview of witnesses?
[2]    **A:** Yes.
[3]    **Q:** Did those investigations include taking
[4] witness statements?
[5]    **A:** Yes.
[6]    **Q:** Did those investigations include taking
[7] measurements at a scene?
[8]    **A:** Yes.
[9]    **Q:** Did those investigations include field
[10] sketches of an accident scene?
[11]    **A:** Yes.
[12]    **Q:** Did those investigations include
[13] collecting physical evidence at a scene?
[14]    **A:** Yes.
[15]    **Q:** And the plotting of physical evidence at a
[16] scene?
[17]    **A:** Yes.
[18]    **Q:** Did those investigations also include the
[19] preservation of evidence at a scene?
[20]    **A:** Yes.
[21]    **Q:** Did those investigations include taking
[22] photographs?
[23]    **A:** Yes.
[24]    **Q:** Did those investigations also include

1—10:33:25   24—10:34:46                              Page 398

[1] your — did you draw conclusions regarding the cause
[2] of an accident as a result of those investigations?
[3]   A: Yes.
[4]   Q: Okay. Did those investigations include at
[5] times issuing citations —
[6]   A: Yes.
[7]   Q: — to individuals?
[8]     During the time that you were at York
[9] College —
[10]   A: Yes.
[11]   Q: — I believe you testified you got an
[12] associate degree in police science —
[13]   A: Yes.
[14]   Q: — from York College?
[15]     Can you describe the courses, the
[16] types of courses that you took in police science?
[17]   A: I could have brought my transcripts.
[18]     Criminology; basic law; the
[19] fundamentals of law nationwide; case rulings and
[20] decisions that relate to law enforcement, such as
[21] Miranda and where it came about; behind the scenes,
[22] things like that.
[23]     Just general police courses of law
[24] enforcement — not in the depth of courses that I

1—10:34:51   24—10:36:08                              Page 399

[1] took later from some schools that specifically were
[2] more like patrol procedures and things like that or
[3] some other courses that were offered by other
[4] universities that I attended; but just the basic
[5] dynamics or background in police work.
[6]   Q: Okay. Did you take any courses in
[7] accident investigation?
[8]   A: I don't recall taking any at York College
[9] or, for that matter, Temple. The courses that I took
[10] relating to investigations were done at the
[11] Harrisburg Area Community College, which was the
[12] Act 120 that we talked about when I got my
[13] certification as a municipal officer in the
[14] Commonwealth of Pennsylvania, which is coordinated
[15] through the Academy of Pennsylvania State Police.
[16] That's when I got the hands-on and the classes
[17] relating to on-scene investigations. At the
[18] university and college level, it was more of a
[19] general, overall view of law enforcement.
[20]   Q: That Act 21 (sic) training that you just
[21] spoke of, was that when you were at East Hempfield?
[22]   A: Yes.
[23]   Q: And you participated in a 15-week accident
[24] program on accident investigation?

1—10:36:14   24—10:37:10                              Page 400

[1]   A: At Harrisburg Area Community College?
[2]   Q: Yes.
[3]   A: I believe it was about a one-week course
[4] devoted to collision investigations. The course was
[5] 90 days.
[6]   Q: Oh, I'm sorry. Your 15-week program was
[7] an academy program?
[8]   A: Yes; that's the entire academy.
[9]   Q: Okay.
[10]   A: That's everything. That's all the duties
[11] that a law enforcement officer does in the
[12] Commonwealth, including first-aid training and all
[13] requirements by law, Pennsylvania law.
[14]   Q: What part of that program was relating to
[15] accident investigations?
[16]   A: About a week of it. Again, it's not —
[17] you don't start Monday through Friday and we're all
[18] doing traffic collision investigations at this point.
[19] It's, you might one Monday do, you know, four hours
[20] and then the following Monday do four hours. I mean,
[21] it's broken up with however they put the — but it, I
[22] believe, my memory, it's about a full 40-hour work
[23] week total.
[24]   Q: And there was a 12-week field training

1—10:37:14   24—10:38:17                              Page 401

[1] program you were involved in?
[2]   A: With the Delaware State Police, yes, not
[3] with Pennsylvania.
[4]   Q: Now, when you were at the Delaware State
[5] Police, the 12-week field training program, how much
[6] of that program was relating to accident
[7] investigation?
[8]   A: Probably about a third of it, one of the
[9] major things that we do, because they're so frequent.
[10]   Q: And that accident investigation, the part
[11] of that program, did that cover all of the areas of
[12] accident investigation, including witness statements,
[13] taking measurements at the scene, and all the things
[14] we just discussed?
[15]   A: Yes; basically applying what you learned
[16] in the academy on the road.
[17]   Q: Okay. Did you have the opportunity during
[18] that field training program to actually investigate
[19] real accident scenes?
[20]   A: Yes.
[21]   Q: During the — from the time you were in
[22] the military in Germany till today, approximately how
[23] many motor vehicle accidents, whethere they be
[24] truck/car, car/motorcycle, motorcycle/truck, how many

1—10:38:24   24—10:39:20                     Page 402

[1] motor vehicle accidents have you investigated?

[2] A: Do you have a copy of my resume?

[3] Q: I do. I do.

[4] A: I don't know off memory. I'm thinking

[5] probably around four thousand-ish, but I don't

[6] remember the exact number that's on there.

[7] Q: Okay. And in all of those investigations

[8] that you conducted, was your methodology basically

[9] the same, the methodology that you've discussed with

[10] Mr. van der Veen the first day of deposition?

[11] A: Basically the same — the same, although

[12] as, obviously as I get older and more experienced and

[13] attend more classes, other ways; but the basics, yes.

[14] I mean, as far as the basics of investigating a

[15] crash, do the same for each and every one of them.

[16] Q: You were chief investigating officer on

[17] the scene of this accident; is that correct?

[18] A: Yes.

[19] Q: And you were also the author of the police

[20] report —

[21] A: Yes, ma'am.

[22] Q: — correct?

[23] And you were assisted by Sergeant Cox?

[24] A: Yes.

1—10:39:21   24—10:40:23                     Page 403

[1] Q: Do you have an independent recollection of

[2] the day of this accident?

[3] A: Yes.

[4] Q: And you have an independent recollection

[5] of your investigation?

[6] A: Yes.

[7] Q: Okay. Could you just briefly review for

[8] me your recollection of your investigation of this

[9] accident?

[10] A: How brief do you want it? I mean, we went

[11] through the previous deposition.

[12] I mean, we're on call. We get

[13] notified of a collision when it occurs. We get the

[14] information of where to respond to. Whether we're

[15] off duty or on duty, we go to the scene.

[16] I went to the scene of this collision

[17] and met with Sergeant Cox. At that point, like

[18] what's spelled out in the report; there's a UPS truck

[19] on Twaddell Mill Road. There's another truck

[20] directly behind it, backed up to it, rear end to rear

[21] end, butt to butt.

[22] There's a motorcycle laying on the

[23] roadway. It was in the intersection at Montchanin

[24] Road. There's a couple roads — I mean, it's a

1—10:40:24   24—10:41:40                     Page 404

[1] couple police officers there. The road's closed,

[2] completely closed to motorists.

[3] Made contact with the initial troopers

[4] at the scene. And they give us, provide me with a

[5] basic knowledge of what they can tell me at that

[6] point. And begin the on-scene investigation of

[7] photographing and preparing a field diagram or

[8] assisting with; Sergeant Cox did it in this.

[9] But conducting interviews. I

[10] conducted an interview with Mr. Bard, the operator of

[11] the UPS truck. Basically doing everything that we

[12] need to do at the scene, clearing the scene. Then

[13] oftentimes either responding to the hospital to do a

[14] follow-up or whatever else is needed for the

[15] investigation.

[16] Once we've compiled that, we go back

[17] to the troop. And we're required to send a Teletype,

[18] which is statewide, State agencies, Delaware State

[19] Police, of the bare basics of the collision. It's a

[20] requirement that we have to send and say, On this

[21] date at this time a fatal motor vehicle collision

[22] occurred, and then a brief synopsis of what we know

[23] at least at that point. And at that time then we're

[24] done for the day.

1—10:41:42   24—10:42:49                     Page 405

[1] The next day, of course, and the days

[2] that subsequently follow, we do whatever we need to

[3] do to inspect, follow-ups, as it's all spelled out in

[4] the report of what we did. That's real brief.

[5] Q: Okay. With respect to your police report,

[6] did you issue any citations —

[7] A: No.

[8] Q: — as a result of this accident?

[9] A: No.

[10] Q: Did you issue a citation to Mark Bard, the

[11] driver of the UPS vehicle?

[12] A: No.

[13] Q: Is there a policy — strike that.

[14] Okay. I'm going to refer you to your

[15] police report, which I believe is Exhibit — is it 2?

[16] A: The collision report or the lengthy

[17] criminal incident report?

[18] Q: I have both together from the last.

[19] A: Okay. There was — there are two separate

[20] reports, but they refer to one another. That's —

[21] one's just a collision report, and the other is — I

[22] don't know. Whatever one you're going to ask me on,

[23] I just want to clarify. I don't know where I'm

[24] looking.

1—10:42:50  24—10:43:41                          Page 406

[1]   MS. RISK: I believe that at the last

[2] deposition the entire report was marked as a single

[3] exhibit; is that correct?

[4]   MR. van der VEEN: That's correct.

[5]   MS. RISK: Okay.

[6]                        BY MS. RISK:

[7]   Q: I'll refer you to page No. 2.

[8]   A: Okay.

[9]   Q: Under citation information — actually,

[10] under vehicle information —

[11]   A: Yes.

[12]   Q: — contributing circumstances, driver —

[13] that driver refers to Mr. Vascek, doesn't it?

[14]   A: Yes.

[15]   Q: Okay. And you have an 04. You filled in

[16] an 04 in that box; is that correct?

[17]   A: Yes.

[18]   Q: And the 04 is exceeded the authorized

[19] speed limit —

[20]   A: Yes.

[21]   Q: — is that correct?

[22]   If Mr. Vascek had lived after this

[23] accident, would he have received a citation for

[24] excessive speed as a result of this accident?

---

1—10:43:47  24—10:44:37                          Page 407

[1]   MR. van der VEEN: Objection.

[2]                        BY MS. RISK:

[3]   Q: Based on the information that's in this

[4] police report.

[5]   A: Probably.

[6]   Q: Okay. On page 3 —

[7]   A: But that determination, again, would be by

[8] the Attorney General's office — well, I wouldn't

[9] have been called to this if it wasn't a fatal. But

[10] through regular Delaware State Police procedure, if

[11] the investigating trooper, if I was just a trooper,

[12] not in the capacity that I currently am in, yes.

[13]   Q: And you were a trooper —

[14]   A: Yes.

[15]   Q: — at one point in your career, weren't

[16] you —

[17]   A: Yes.

[18]   Q: — Corporal Weaver?

[19]   A: Yes.

[20]   Q: Had you been a trooper in this

[21] circumstance, then you would have issued a citation

[22] to Mr. Vascek, had he lived?

[23]   MR. van der VEEN: Objection.

[24]                        BY MS. RISK:

---

1—10:44:42  24—10:45:48                          Page 408

[1]   Q: Based on what this police —

[2]   A: In this, in this case probably not. And

[3] the reason for that is my inability — I can't say

[4] exactly how fast he was traveling, which is something

[5] I would have to prove.

[6]   Is it a contributing circumstance to

[7] the collision? Yes. And that's primarily

[8] contributing — what this is stating. Whether I can

[9] actually issue a summons, I wouldn't have been able

[10] to because I couldn't determine how fast he was

[11] traveling.

[12]   Q: In order to issue a summons as a Delaware

[13] State trooper, is it necessary for you to be able to

[14] determine the precise speed that an individual is

[15] going at the time —

[16]   A: Yes.

[17]   Q: — including in an accident?

[18]   A: Yes.

[19]   Q: On page 3 of your report, I'll refer you

[20] to the top. The top part, the top information refers

[21] to Mr. Bard, the UPS driver; is that correct?

[22]   A: Yes.

[23]   Q: The very top. And under — in the box

[24] "driver distraction," do you see where I am? One,

---

1—10:45:54  24—10:46:34                          Page 409

[1] two, three, four, five lines, about five lines down.

[2]   A: Okay.

[3]   Q: You have "none" —

[4]   A: Yes.

[5]   Q: — is that correct?

[6]   A: Yes.

[7]   Q: And that's because you found that Mr. Bard

[8] was not distracted?

[9]   A: No.

[10]   Q: Okay. And in the box beside that,

[11] "alcohol/drugs suspected," you have 01, neither

[12] alcohol nor drugs suspected?

[13]   A: Correct.

[14]   Q: And that's because you had no reason to

[15] believe that Mr. Bard was under the influence of

[16] alcohol or drugs, were you?

[17]   A: Correct.

[18]   Q: In fact, Mr. Bard voluntarily submitted to

[19] a blood-alcohol — portable blood-alcohol test,

[20] didn't he?

[21]   MR. van der VEEN: Objection.

[22]                        BY MS. RISK:

[23]   Q: Did Mr. Bard voluntarily submit —

[24]   A: Yes.

---

1—10:46:34  24—10:47:23      Page 410

[1] **Q:** — to a portable blood-alcohol test?

[2]    MR. van der VEEN: Objection to the

[3] form.

[4] **THE WITNESS:** Yes.

[5]         BY MS. RISK:

[6]    **Q:** And what were the findings of that test?

[7]    **A:** Zero.

[8]    **Q:** Directing your attention just three lines

[9] further down in the driver injury category —

[10]    **A:** Yes.

[11]    **Q:** — still referring to Mr. Bard, "occupant

[12] protection system use," you have designated 04; and

[13] that his "shoulder belt and lap belt used"?

[14]    **A:** Yes.

[15]    **Q:** Mr. Bard had his shoulder and lap belt in

[16] use at the time of the accident, didn't he?

[17]    **A:** That's what he said, yes.

[18]    **Q:** Did you have any reason to believe that

[19] Mr. Bard didn't have his shoulder and belt on?

[20]    MR. van der VEEN: Objection to the

[21] form.

[22] **THE WITNESS:** No.

[23]         BY MS. RISK:

[24]    **Q:** Under the heading "Vehicle Information,"

1—10:47:27  24—10:48:20      Page 411

[1] this is, again, referring — this is referring now to

[2] the UPS 2001 Freightliner.

[3]    Do you see where I am?

[4]    **A:** Yes, ma'am.

[5]    **Q:** Okay. In the box "contributing

[6] circumstances, driver" that refers to Mr. Bard? Does

[7] that refer to Mr. Bard?

[8]    **A:** Which block? I'm sorry. I'm trying to

[9] identify which one.

[10]    **Q:** Seventh block down under "Vehicle

[11] Information" on the page that's referring to Mr. Bard

[12] and the UPS vehicle.

[13]    **A:** What's the caption?

[14]    **Q:** "Contributing circumstances —

[15]    **A:** Correct, that would refer to Mr. Bard,

[16] yes.

[17]    **Q:** — driver."

[18]    You designated a 01, which is no

[19] improper driving; correct?

[20]    **A:** Correct.

[21]    **Q:** And is that because you didn't find any

[22] evidence of improper driving on the part of Mr. Bard;

[23] is that correct?

[24]    MR. van der VEEN: Objection.

1—10:48:20  24—10:49:26      Page 412

[1] **THE WITNESS:** Correct.

[2]         BY MS. RISK:

[3]    **Q:** Did you find any evidence of improper

[4] driving on the part of Mr. Bard?

[5]    **A:** No.

[6]    **Q:** Okay. Let me refer you to page 4 of the

[7] police report, specifically your description of the

[8] accident area in the second paragraph on page 4.

[9]    **A:** Okay.

[10]    **Q:** That Delaware Route 100 is a rural

[11] roadway. The paragraph that starts that, It's a

[12] rural roadway that consists of many hills and sharp

[13] curves.

[14]    **A:** Yes.

[15]    **Q:** At the intersection — strike that.

[16]    Delaware Route 100 in that area, the

[17] lanes of travel are separated by a double-yellow

[18] line, aren't they?

[19]    **A:** Yes.

[20]    **Q:** And under Delaware law that means that

[21] passing is not permissible, doesn't it?

[22]    **A:** Yes.

[23]    **Q:** Is the posted speed limit on that road 40

[24] miles an hour?

1—10:49:27  24—10:50:37      Page 413

[1]    **A:** Yes.

[2]    **Q:** And on the Twaddell Mill Road, running up

[3] to the intersection of Delaware Route 100, Montchanin

[4] Road, the posted speed limit is 30 miles per hour; is

[5] that correct?

[6]    **A:** Yes.

[7]    **Q:** And the only traffic signal at the

[8] intersection of Montchanin Road and Twaddell Mill is

[9] the stop sign for Twaddell Mill; is that correct?

[10]    **A:** Yes.

[11]    **Q:** In the fourth paragraph on page 4, your

[12] narrative in the police report, your finding was

[13] that — CRT. What does CRT stand for?

[14]    **A:** County route. There's three identifying

[15] numbers there. Delaware Route 100; the name of the

[16] road is Montchanin Road in that area; and there's a

[17] County route number assigned to it, which is 235.

[18]    **Q:** You determined that, according to this,

[19] that Vehicle 1 — which was Mr. Vascek; is that

[20] correct?

[21]    **A:** Yes.

[22]    **Q:** — was traveling at an unknown high rate

[23] of speed —

[24]    **A:** Yes.

1—10:50:37  24—10:51:07                    Page 414

[1]    Q: — is that correct?

[2]    MR. van der VEEN: Objection to the

[3] form of the question.

[4]              BY MS. RISK:

[5]    Q: Was that your finding?

[6]    A: Yes.

[7]    Q: And that's what it states here in your

[8] police report?

[9]    A: Yes.

[10]   MR. van der VEEN: Objection to the

[11] form of the question.

[12]             BY MS. RISK:

[13]   Q: And your second finding in that paragraph

[14] is that Vehicle No. 2 — which is Mr. Bard; is that

[15] correct?

[16]   A: Yes.

[17]   Q: — had stopped for a stop sign at the

[18] intersection with Montchanin Road; is that correct?

[19]   A: Yes.

[20]   MR. van der VEEN: Objection to the

[21] form of the question.

[22]             BY MS. RISK:

[23]   Q: Is there any evidence that Mr. Bard did

[24] not stop at the stop sign on Twaddell Mill Road?

1—10:51:09  24—10:51:47                    Page 415

[1]    A: No.

[2]    Q: In fact, Mr. Bard testified that he came

[3] to a stop at the stop sign on Twaddell Mill Road;

[4] isn't that correct?

[5]    MR. van der VEEN: Objection to the

[6] form of the question.

[7]    THE WITNESS: Yes.

[8]              BY MS. RISK:

[9]    Q: And the independent witness, John

[10] Seiffert, also told you that Mr. Bard came to a

[11] complete stop at that stop sign, didn't he?

[12]   A: Yes.

[13]   Q: So that as far as you were concerned,

[14] there is no argument about whether or not Mr. Bard

[15] stopped at that stop sign?

[16]   MR. van der VEEN: Objection to the

[17] form of the question.

[18]   THE WITNESS: Correct.

[19]             BY MS. RISK:

[20]   Q: And the final paragraph on that page,

[21] Operator No. 2 who, again, is Mr. Bard, you found

[22] that he looked in both directions?

[23]   A: Yes.

[24]   Q: And that's —

1—10:51:49  24—10:52:23                    Page 416

[1]    MR. van der VEEN: Objection to the

[2] form of the question.

[3]              BY MS. RISK:

[4]    Q: — based on what Mr. Bard told you?

[5]    A: Yes.

[6]    Q: Did Mr. Bard tell you he looked in both

[7] directions?

[8]    A: Yes.

[9]    Q: Okay. Mr. Bard told you he didn't see any

[10] vehicles approaching from either direction, did he?

[11]   A: No.

[12]   Q: Okay. And he also told you he moved

[13] slowly forward, didn't he?

[14]   A: Yes.

[15]   Q: Okay. Mr. Seiffert told you that Mr. Bard

[16] came to a complete stop at the intersection, didn't

[17] he?

[18]   A: Yes.

[19]   Q: Mr. Seiffert also told you that Mr. Bard

[20] moved slowly forward into the intersection, didn't

[21] he?

[22]   MR. van der VEEN: Objection to the

[23] form of the question.

[24]   THE WITNESS: Yes.

1—10:52:23  24—10:53:23                    Page 417

[1]              BY MS. RISK:

[2]    Q: Mr. Seiffert never told you that Mr. Bard

[3] accelerated into the intersection, did he?

[4]    A: No.

[5]    Q: And at the end of your narrative on

[6] page 4, you state that Operator No. 1 — who is

[7] Mr. Vascek; correct?

[8]    A: Yes.

[9]    Q: — applied the front brake of Vehicle

[10] No. 1 — which was this motorcycle; correct?

[11]   A: Yes.

[12]   Q: — in a manner in which caused the rear

[13] tire of Vehicle No. 1 to come off the ground —

[14]   A: Yes.

[15]   Q: — is that correct?

[16]   Did that information come from

[17] Mr. Seiffert?

[18]   A: Yes.

[19]   Q: Okay. And Mr. Seiffert is the independent

[20] witness who was located behind Mr. Bard's UPS

[21] vehicle; is that correct?

[22]   A: Yes.

[23]   Q: You go on to state that Vehicle No. 1

[24] continued to travel forward in a southerly direction

1—10:53:27  24—10:54:39                                Page 418

[1] in a stoppie position. Did that information also
[2] come from Mr. Seiffert?
[3]   A: Yes, ma'am.
[4]   Q: When you describe a "stoppie position,"
[5] Corporal Weaver — or excuse me.
[6]      When Mr. Seiffert described the
[7] position of the motorcycle rear wheel to you, what
[8] was his description of when he first saw the rear
[9] wheel of the motorcycle?
[10]   A: The rear wheel of the motorcycle was
[11] coming up off of the ground and continued to come off
[12] the ground, in which the motorcycle front tire is on
[13] the ground and the rear is completely, basically a
[14] 90-degree-from-the-ground perspective.
[15]   Q: And Mr. Seiffert testified that the first
[16] time he saw the motorcycle, the rear wheel was off
[17] the ground 8 to 10 inches. Did he ever tell you that
[18] the motorcycle wheel came back to the ground at any
[19] time?
[20]   A: No.
[21]   Q: Did he ever describe the dynamics of the
[22] rear wheel as he was watching the motorcycle as a
[23] hopping or coming up and down off of the ground?
[24]   A: No.

1—10:54:39  24—10:55:44                                Page 419

[1]   Q: Was his description a continuous
[2] progression of the rear wheel into the air, into a
[3] somewhat up-and-down position?
[4]   A: Yes.
[5]   Q: You go on to say that Operator No. 1, who
[6] is, again, Mr. Vascek, was raised into the air as the
[7] rear tire of Vehicle No. 1 departed from the asphalt
[8] roadway surface. Again, that information came from
[9] Mr. Seiffert, didn't it?
[10]   A: Yes.
[11]   Q: Operator No. 1, Mr. Vascek, held onto the
[12] handlebars of Vehicle No. 1 and continued to travel
[13] southbound with Vehicle No. 1, in a tucked position,
[14] head positioned toward the ground, feet into the air,
[15] and back approaching Vehicle No. 2.
[16]      Is that, again, Mr. Seiffert's
[17] description of the motorcycle as it approached the
[18] UPS vehicle?
[19]   A: Yes.
[20]   Q: Okay. The front tire of Vehicle No. 1 and
[21] the back of Operator No. 1 struck the left front
[22] fender of Vehicle No. 2 — that's the UPS vehicle,
[23] isn't it?
[24]   A: Yes.

1—10:55:44  24—10:56:50                                Page 420

[1]   Q: — simultaneously sandwiching Operator
[2] No. 1 between Vehicle No. 1 and Vehicle No. 2 for the
[3] point of impact.
[4]      Is that consistent — that's what
[5] Mr. Seiffert told you?
[6]   A: Yes.
[7]   Q: And that's your understanding of how this
[8] accident, how the impact occurred?
[9]   A: Yes.
[10]   Q: Okay. The point of impact occurred
[11] approximately 14 feet 2 inches west of the east edge
[12] of the roadway on the roadway within the intersection
[13] and within the southbound lane of Montchanin Road.
[14]      Now, is that information based on what
[15] Mr. Seiffert told you?
[16]   A: That's based on the combination of what he
[17] told me and the mark on the roadway in relationship
[18] to the evidence that we picked up of positioning, of
[19] where we felt, where they said the motorcycle fell,
[20] where Mr. Vascek fell, and the initial area where the
[21] motorcycle was, yes —
[22]   Q: Okay.
[23]   A: — when it impacted the van — truck.
[24]   Q: Let me direct you to the fatal motor

1—10:56:55  24—10:58:11                                Page 421

[1] vehicle collision report, which I have as a part of
[2] the same exhibit but, as you've explained, is not
[3] necessarily a part of the police report; is that
[4] correct?
[5]   A: Correct.
[6]   Q: I want to talk about, first of all, your
[7] description of the scene. Basically your description
[8] of the scene, the second paragraph — I'll refer you
[9] to the second paragraph.
[10]   A: Okay.
[11]   Q: Okay. And the second paragraph primarily
[12] relates to the 2003 Yamaha R1 motorcycle that was
[13] driven by Mr. Vascek; is that correct?
[14]   A: Yes.
[15]   Q: You found that the motorcycle displayed
[16] moderate contact damage; is that correct?
[17]   A: Yes.
[18]   Q: And can you tell me what that's based on,
[19] that finding?
[20]   A: Based on just visual observation and
[21] experience as a trooper, not getting into the dollars
[22] and cents of seeing the things that kind of occurred
[23] or damaged internally, but just looking at it, just
[24] first looking at it, your opinion of, you know,

---

**1—10:58:14  24—10:58:51**                          Page 422

[1] severe, moderate, light. It was moderate.

[2] **Q:** Okay. Now —

[3] **A:** Just a judgment call on my behalf of just

[4] looking at what I'm looking at.

[5] **Q:** Sure. And you looked at it at the scene;

[6] correct?

[7] **A:** Yes.

[8] **Q:** So that was part of your original walking

[9] the scene —

[10] **A:** Yes.

[11] **Q:** — taking a look at the motorcycle?

[12] **A:** Yes.

[13] **Q:** In the beginning of your investigation

[14] when you were at the scene and you took a look at the

[15] motorcycle, did you lift up the motorcycle?

[16] **A:** No, not initially. As was. As it was at

[17] rest.

[18] **Q:** So when you took a look at the motorcycle,

[19] you didn't move the motorcycle at all?

[20] **A:** No.

[21] **Q:** You didn't — did you move the, rotate the

[22] wheels at all?

[23] **A:** No.

[24] **Q:** So you didn't — did you touch the

---

**1—10:58:53  24—10:59:54**                          Page 423

[1] motorcycle at all at the scene that day?

[2] **A:** I don't recall touching it, no.

[3] **Q:** Okay. What about when you went

[4] subsequently — you testified earlier that you went

[5] to inspect the motorcycle at Ellmore's?

[6] **A:** Yes.

[7] **Q:** And I believe you did that the following

[8] day, on the 27th?

[9] **A:** Whatever the day that's reflected in the

[10] report. I can look at it for — but, yes, when I

[11] inspected the vehicle, I looked at it.

[12] **Q:** Can you tell me the course of your

[13] inspection, how you went about inspecting the

[14] motorcycle when you were at Ellmore's?

[15] **A:** Primarily I have — and it's also

[16] introduced as evidence as part the report. We have

[17] an examination sheet that we kind of sketch the

[18] visible damage, what looks or appears to be what's

[19] damaged on it. And that's part of the record.

[20] Basically just looking for any type, what type of

[21] damages and taking some basic measurements of, of the

[22] wheel base, things like that.

[23] **Q:** And you recorded all of that on the

[24] vehicle profile —

---

**1—10:59:55  24—11:00:33**                          Page 424

[1] **A:** Yes.

[2] **Q:** — the damage profile; correct?

[3] **A:** Yes.

[4] **Q:** And you also recorded it by taking

[5] photographs, didn't you?

[6] **A:** Yes.

[7] **Q:** And is that part of the basis for your

[8] determination that there was moderate contact damage

[9] on the motorcycle?

[10] MR. van der VEEN: Objection.

[11] THE WITNESS: Yes.

[12]                 BY MS. RISK:

[13] **Q:** Did you examine the wheels of the

[14] motorcycle?

[15] **A:** Yes.

[16] **Q:** Can you tell me how you did that?

[17] **A:** Just visually looked at them. I didn't

[18] touch them or move the motorcycle. I mean, it was

[19] propped up, and the kickstand was down. It was in an

[20] upright position. And I just walked and, and viewed

[21] it, looked at it.

[22] **Q:** So you didn't flip it upside down and roll

[23] the wheels around and inspect all of the tread or any

[24] of that?

---

**1—11:00:34  24—11:01:25**                          Page 425

[1] **A:** No.

[2] **Q:** So the course of your inspection at

[3] Ellmore's — during the course of your inspection at

[4] Ellmore's Towing, was the motorcycle always in an

[5] upright position with the kickstand?

[6] **A:** Yes.

[7] **Q:** Who was at Ellmore's when you inspected

[8] the motorcycle?

[9] **A:** I mean, there were people that worked

[10] there, were in and out. This motorcycle was placed

[11] inside a garage. I mean, there were people, I have

[12] no idea who they were, other than employees.

[13]   And I was greeted by the manager when

[14] I got there and told him obviously why I'm there. I

[15] don't know — I can't tell you what his name is, just

[16] they know us by face and we're here to look at a

[17] motorcycle. Can I see it?

[18]   Yeah. Here it is. You know, whatever

[19] you need, let me know, or I'll try to help you or

[20] whatever.

[21]   Took photographs, looked at the

[22] Polaroids of the helmet and clothing that was

[23] gathered at the scene — that's in the report — and

[24] basically did a general inspection and departed and

---

---

1—11:01:27  24—11:02:12                          Page 426

[1] told them it was authorized to be released.

[2]     They put a hold — we put a hold on
[3] the vehicle until we're done looking at it. And then
[4] once we give authorization, the family or insurance
[5] company or whomever, however they do whatever they
[6] do, are authorized to do that. But until that point,
[7] no one's supposed to — it's not released.

[8]     Q: Okay. And during the course of or after
[9] you were finished your inspection, you told the
[10] manager that the motorcycle was released for
[11] inspection by other parties?

[12]     A: Yes.

[13]     Q: Okay. When you spoke to the manager, did
[14] the manager tell you that —

[15]     MR. van der VEEN: Objection to the
[16] form of the question.

[17]                 BY MS. RISK:

[18]     Q: — UPS had been to the facility or that
[19] anyone had been to the facility to inspect that
[20] motorcycle prior to your being there?

[21]     A: Had he told me?

[22]     Q: Yes.

[23]     A: I don't recall that, no.

[24]     Q: Is that something that he would have told

---

1—11:02:13  24—11:03:10                          Page 427

[1] you?

[2]     A: I would have liked to have thought. But,
[3] unfortunately, we put holds on vehicles; and some tow
[4] companies are better than others. And I'm not
[5] reflecting this in any of the others. But there has
[6] been incidents in which — they're beyond our
[7] control.

[8]     I mean, we request — excluding if we
[9] take them and put them in an impoundment lot that is
[10] controlled by the State Police, we can't prevent
[11] family members from getting in or adjusters from
[12] getting in.

[13]     I mean, we request that; but whether
[14] they honor it or whether — or the people that know
[15] that's not supposed to take place aren't there and
[16] someone else is just walking through and says, Sure,
[17] go look at it — I mean, I can't tell
[18] you who did or who did not see that vehicle before I
[19] looked at it.

[20]     Q: So you have no information or reason to
[21] believe that UPS investigators or anybody else looked
[22] at that motorcycle before you did?

[23]     A: To my knowledge, no.

[24]     Q: Okay. What time were you at Ellmore's on

---

1—11:03:16  24—11:04:12                          Page 428

[1] October 27th?

[2]     A: About 8:15.

[3]     Q: That's 8:15 a.m.?

[4]     A: A.m., in the morning.

[5]     Q: And how long was your inspection of the
[6] motorcycle? How long did it take?

[7]     A: I don't have — I don't mark when I start
[8] and when I stop. I mean, I mark when I start. I
[9] don't mark when I stop. But from experience, I was
[10] probably there anywhere from a half hour perhaps to
[11] an hour.

[12]     Q: Okay. Do you have a specific recollection
[13] of how long you were there —

[14]     A: No.

[15]     Q: — that day?

[16]     A: Just average. I mean, to me after a while
[17] they're all about the same.

[18]     Q: That's fair. So you were there anywhere
[19] from a half an hour to an hour?

[20]     A: Yes.

[21]     Q: But you have no reason to believe that you
[22] would have been there for any more than an hour?

[23]     A: No. The only time I would be there longer
[24] for these would be when we do, for instance,

---

1—11:04:16  24—11:05:12                          Page 429

[1] measurements of two vehicles. When we're measuring
[2] the damage, it takes a longer time to gather that
[3] data and to do it. So it takes much more detail.

[4]     On an average, about an hour is about
[5] average, especially for a motorcycle; unless a
[6] mechanic has been brought and they inspect it
[7] mechanically or in case or — but in this case, no.

[8]     Q: You didn't have a mechanic inspect the
[9] motorcycle mechanically?

[10]     A: No.

[11]     Q: Was anyone with you the day you inspected
[12] the motorcycle?

[13]     A: From the FAIR team?

[14]     Q: Yes.

[15]     A: No.

[16]     Q: Was anyone with you at all?

[17]     A: No; other than the employees coming in and
[18] out, but that's common — normally, again, being the
[19] senior investigator, unless we request the others to
[20] be with us and assist us, it's our investigation.
[21] And unless we — they'll come if we need them, but
[22] there wouldn't be any reason to have anyone else
[23] there.

[24]     Q: You didn't think there was any reason to

---