1—11:05:13  24—11:05:57                    Page 430

[1] have anybody else there?

[2]   **A:** No.

[3]   **Q:** The profile that you, the damage profile

[4] that you drew of the motorcycle, did you do that at

[5] Ellmore's facility?

[6]   **A:** Yes.

[7]   **Q:** So you actually stood there and shaded in

[8] the areas of damage while you were looking at the

[9] motorcycle?

[10]   **A:** Yes.

[11]   **Q:** Okay. Did you take any notes from that

[12] inspection?

[13]   **A:** Just what's on the inspection sheet.

[14]   **Q:** Okay.

[15]   **A:** Nothing more.

[16]   **Q:** And so, then, it's fair to say that

[17] somewhere around 9:15 or so, you released the

[18] motorcycle?

[19]   **A:** Yes.

[20]     MR. van der VEEN: Objection.

[21]            BY MS. RISK:

[22]   **Q:** Did you release the motorcycle at —

[23]   **A:** At the conclusion.

[24]   **Q:** — approximately 9:15 or at the conclusion

---

1—11:05:59  24—11:07:26                    Page 431

[1] of your inspection?

[2]   **A:** Yes.

[3]   **Q:** Referring back to the police or the fatal

[4] collision report, page 3, with regard to the

[5] motorcycle damage, the areas of damage, what were the

[6] areas of damage that you found?

[7]   **A:** Motorcycle displayed moderate contact

[8] damage. The contact damage was located around the

[9] upper portions of the motorcycle. Damaged areas

[10] included the upper front handlebars, fuel tank, seat,

[11] and upper rear. Slight contact damage was also

[12] located on the left side foot pedals, kickstand, and

[13] wheel bolts.

[14]   **Q:** The damage that you observed when you

[15] inspected the motorcycle, was that damage consistent

[16] with your understanding of the dynamics of this

[17] accident?

[18]   **A:** Yes.

[19]   **Q:** The next paragraph under description of

[20] the scene when you first arrived at the scene, you

[21] observed — it states that you observed two white

[22] chalk marks on the black asphalt surface. What were

[23] those chalk marks? What was the purpose of those

[24] chalk marks?

---

1—11:07:28  24—11:08:10                    Page 432

[1]   **A:** They were marked by one of the troopers

[2] prior to our arrival. And one word was "feet" and

[3] the other was "head" to give us an idea of where the

[4] body was after impact.

[5]   **Q:** And that's because Mr. Vascek's body was

[6] no longer at the scene when you arrived there; is

[7] that correct?

[8]   **A:** Correct.

[9]   **Q:** Who was the trooper who chalked those

[10] words on the pavement?

[11]   **A:** I don't know.

[12]   **Q:** But it's your understanding that it was

[13] one of the initial responding troopers?

[14]   **A:** Yeah. They'll often do that.

[15]   **Q:** And is that commonplace and routine?

[16]   **A:** Yes.

[17]   **Q:** And is that because you're not actually

[18] ever the first responding troopers at a scene?

[19]     MR. van der VEEN: Object to the form

[20] of the question.

[21]     THE WITNESS: That's why, yes.

[22]            BY MS. RISK:

[23]   **Q:** As a member of the FAIR team — or are the

[24] FAIR team members ever the first responding troopers

---

1—11:08:13  24—11:09:04                    Page 433

[1] on the scene?

[2]     MR. van der VEEN: Objection to the

[3] form of the question.

[4]     THE WITNESS: No.

[5]            BY MS. RISK:

[6]   **Q:** Is that because you are called by the

[7] troopers who are on the scene?

[8]   **A:** Correct.

[9]     MR. van der VEEN: Objection to the

[10] form of the question.

[11]            BY MS. RISK:

[12]   **Q:** Is the FAIR team only called when an

[13] accident involves a serious injury, fatality, or a

[14] departmental situation?

[15]   **A:** Under normal policy call-outs, yes. But I

[16] think I said it in the initial deposition, is that we

[17] will come out for anything. It can be just a

[18] nobody-injured, maybe a speed-issue crash. Or we'll

[19] come out and assist at any time.

[20]     But the baselines for us to come out,

[21] normally it's either a fatality or it looks like it's

[22] going to be, it's a serious crash, or it's a

[23] departmental. Those are the three main guidelines

[24] why we come out. But we still — we can come out for

---

1—11:09:07   24—11:10:01                          Page 434

[1] anything — and do. I mean, if a trooper asks us for
[2] help, what do is we share with anyone.
[3]   Q: Are Delaware State Troopers under a
[4] directive to call you if the accident involves a
[5] fatality?
[6]   A: Actually, what they're supposed to do is
[7] notify their road supervisor or assistant road
[8] supervisor. And then they are to call us out.
[9]   Q: So it's the decision of the road
[10] supervisor?
[11]   A: Yes. And that can be conveyed through
[12] phone. I mean, if somebody says, Hey, we obviously
[13] have a fatality here, I mean, if it's injuries that
[14] are inconsistent with life, they immediately shut —
[15] shut it down. That road unit notifies the troop.
[16] And then the troop calls out — and by way of acting
[17] as an agent of the road supervisor.
[18]   But if it's a not-quite-so — you
[19] know, "do we call them/don't we call them" — the
[20] road supervisor is contacted to have us — they make
[21] the call and tell us whether they want us or they
[22] don't.
[23]   Q: Did you speak to the officer who drew the
[24] chalk lines on the pavement?

1—11:10:02   24—11:11:07                          Page 435

[1]   A: I don't know who did it.
[2]   Q: Okay.
[3]   A: I — the troopers that were there. It
[4] could have been a trooper that came to the scene when
[5] the initial commotion's going on and then later left
[6] and took one of the traffic control points to keep us
[7] from being run over and keep us safe.
[8]   I don't know who marked it. It was
[9] somebody that was there. I mean, the communication
[10] dispatch sheet says who all went to that scene. It
[11] was one of them, but I don't know who.
[12]   Q: Okay.
[13]   A: So I might have talked to them, but I
[14] don't know —
[15]   Q: Who it was?
[16]   A: — who it was.
[17]   Q: Page 4 of your report, you state that the
[18] area where — well, this area had been initially
[19] identified by individuals at the scene as the
[20] approximate area of where the impact had occurred.
[21]   Specifically, what was it about that
[22] area that indicated to you or that was indicated to
[23] you by others that that was the area of the accident?
[24] Were there specific signs that you saw that were

1—11:11:11   24—11:12:02                          Page 436

[1] indicated to you by others at the scene to tell you
[2] that that was the area of the accident.
[3]   MR. van der VEEN: Objection to the
[4] form of the question.
[5]   THE WITNESS: Just a collection —
[6] total of all the comments that were made: the
[7] statements by Mr. Bard, the statements by
[8] Mr. Seiffert, the statements by the witness — the
[9] nurses, and what little bit of physical evidence that
[10] we had, collectively, that was — and that's why it
[11] was approximate. I mean, I'm not sure exactly
[12] 100 percent this is exactly where it happened, but
[13] within that area. It was a collection of all that
[14] was told.
[15]   BY MS. RISK:
[16]   Q: Okay. We've talked a little bit or you've
[17] talked, spoken with Mr. van der Veen earlier about a
[18] patch of brown dirt.
[19]   A: Yes.
[20]   Q: Do you have a recollection of seeing that
[21] patch of brown dirt?
[22]   A: Yes.
[23]   Q: And who was it who told you that that
[24] patch of brown dirt was the point of impact —

1—11:12:07   24—11:12:50                          Page 437

[1]   MR. van der VEEN: Objection —
[2]   BY MS. RISK:
[3]   Q: — between the motorcycle and the van, the
[4] UPS van?
[5]   MR. van der VEEN: Objection to the
[6] form of the question.
[7]   THE WITNESS: I'd have to look through
[8] the notes. I'm not sure. I'm thinking that someone
[9] told Sergeant Cox that and that's how I learned it,
[10] through his supplemental. I'm not sure. I don't
[11] remember exactly who. But that was — reference was
[12] made to the dirt on the roadway.
[13]   BY MS. RISK:
[14]   Q: But it's your recollection that there is a
[15] witness who identified the brown patch as the point
[16] of impact between the vehicles?
[17]   A: One of those reflected to it, yes, or
[18] directed us to it.
[19]   Q: All right. And if you look in your
[20] report, it actually was Miss Amy Stratton who was
[21] interviewed by Sergeant Cox.
[22]   A: Okay.
[23]   Q: Do you recall Mr. Bard identifying that as
[24] the point of impact —

UPS & Bard

1—11:12:57  24—11:13:37                    Page 438

[1]    MR. van der VEEN: Objection to the
[2] form of the question.
[3]                    BY MS. RISK:
[4]    Q: — also?
[5]    A: I don't recall him, no.
[6]    Q: You've also discussed a scuff mark, skid
[7] mark, located in the area of where the right tire
[8] would have been on the UPS van?
[9]    A: Yes.
[10]    MR. van der VEEN: Objection to the
[11] form of the question.
[12]    MS. RISK: There is no question yet.
[13]    MR. van der VEEN: No? Yeah, there
[14] is.
[15]                    BY MS. RISK:
[16]    Q: Earlier in your deposition with
[17] Mr. van der Veen, there was much discussion about a
[18] scuff mark —
[19]    A: Yes.
[20]    MR. van der VEEN: Objection to the
[21] form of the question.
[22]                    BY MS. RISK:
[23]    Q: — and whether or not that was a skid
[24] mark.

1—11:13:38  24—11:14:45                    Page 439

[1]    My question is, is the location of
[2] that tire mark with respect to the location of the
[3] brown patch consistent with the witness testimony
[4] about where the point of impact was for the accident?
[5]    MR. van der VEEN: Objection.
[6] Objection to the form of the question.
[7]    THE WITNESS: What you're asking me,
[8] if I'm understanding your question, is in
[9] relationship to the van or the truck location with
[10] that tire scuff mark being the right front vehicle
[11] tire and in relationship to where the dirt was, if
[12] that was one and the same?
[13]                    BY MS. RISK:
[14]    Q: Yes.
[15]    A: No. I believe the dirt is further north.
[16]    Q: No. That's not my — I'm sorry. I'm not
[17] being clear.
[18]    Is the location of the scuff mark, the
[19] tire mark from the UPS package car, the location —
[20] with respect to the location of the brown patch,
[21] consistent with the location of the UPS package car
[22] at the point, at the time impact —
[23]    MR. van der VEEN: Objection to the
[24] form of the question.

1—11:14:46  24—11:16:05                    Page 440

[1]    BY MS. RISK:
[2]    Q: — those two reference points?
[3]    A: Yes.
[4]    Q: Okay. In the second paragraph of your
[5] summary report, you found that the UPS van displayed
[6] severe contact damage in the left front fender area
[7] of the vehicle. And you also drafted — or drew a
[8] vehicle damage profile for the UPS van; isn't that
[9] correct?
[10]    A: Yes.
[11]    Q: Okay. What was the damage that you
[12] observed on the UPS package car?
[13]    A: The left front fender area and I believe,
[14] if I recall, a portion area of part of the hood,
[15] directly — it's the area that is directly in front
[16] of where the driver's door ends, that area.
[17]    Q: How far — do you recall how far is that
[18] damage from the driver's door?
[19]    A: Approximately a foot or so.
[20]    Q: And based on your observations of that
[21] damage, you determined that damage to be severe
[22] damage; correct?
[23]    A: Yes.
[24]    MR. van der VEEN: Objection to the

1—11:16:05  24—11:18:01                    Page 441

[1] form of the question. I believe at your last
[2] deposition you looked at a photograph and described
[3] it as moderate.
[4]                    BY MS. RISK:
[5]    Q: From your observation, was the damage to
[6] the UPS package car severe contact damage?
[7]    MR. van der VEEN: Objection to the
[8] form of the question.
[9]    THE WITNESS: Yes.
[10]                    BY MS. RISK:
[11]    Q: I'll refer you to page 12 — actually, let
[12] me start with page 13. I'm sorry. Bottom of page
[13] 13, I'd like to talk a little bit about your
[14] interview of Mr. Seiffert.
[15]    According to your report, when did you
[16] contact Mr. Seiffert?
[17]    A: On Wednesday afternoon, October 27th, at
[18] about 1355 or 1:00 — almost 2:00 o'clock in the
[19] afternoon.
[20]    Q: And when did that conversation conclude?
[21]    A: About five minutes after 2:00.
[22]    Q: So that —
[23]    A: It was about a ten-minute conversation.
[24]    Q: And that was by telephone —

1—11:18:02  24—11:18:44                    Page 442

[1]  A: Yes.

[2]  Q: — is that correct?

[3]    How did you get Mr. Seiffert's

[4] telephone number?

[5]  A: The information was shared to me by one of

[6] the troopers at the scene that had obtained it.

[7]  Q: Did you talk to Mr. Seiffert at the scene?

[8]  A: No, He wasn't at the scene when I was

[9] there. As far as I know, he wasn't. It was never

[10] brought to my attention if he was.

[11]  Q: When you spoke to Mr. Seiffert, did

[12] Mr. Seiffert tell you that he had called the Delaware

[13] State Police and asked them why no one had called

[14] him, that he had witnessed a fatal accident?

[15]    MR. van der VEEN: Objection to the

[16] form of the question.

[17]    THE WITNESS: Do I recall him saying

[18] that?

[19]             BY MS. RISK:

[20]  Q: Yes.

[21]  A: No.

[22]  Q: Did he say that to you?

[23]  A: I don't recall him saying it to me.

[24]  Q: Did Mr. —

---

1—11:18:44  24—11:20:31                    Page 443

[1]  A: I called and talked to him, but I don't

[2] recall — no.

[3]  Q: Did anyone from the Delaware State Police

[4] call you and direct you to call Mr. Seiffert?

[5]  A: I don't have any, any records of anyone

[6] referring me to call him.

[7]  Q: You just called him as a part of your

[8] normal investigation?

[9]  A: Yes.

[10]  Q: Do you remember who it was who gave you

[11] the contact information for John Seiffert?

[12]  A: No.

[13]  Q: Was it Sergeant Cox; do you remember?

[14]  A: No, I don't — I don't know. One of the

[15] troopers at the scene or it could have been Sergeant

[16] Cox. They could have given it to him. I don't know.

[17]    There's a lot of chaos going on at a

[18] scene. And a lot of times things are just put on our

[19] dashboard. You know, they'll ask us or someone will

[20] say, Hey, we've got printout sheets of the car or

[21] whatever. And they throw them in our car. I don't

[22] know.

[23]  Q: Okay. And in the report on page 13,

[24] continuing onto page 14, that's a, as you described

---

1—11:20:34  24—11:21:15                    Page 444

[1] it, a brief synopsis of the content of your interview

[2] of Mr. Seiffert?

[3]  A: Yes.

[4]  Q: Is that fair?

[5]  A: Yes.

[6]  Q: Did you ask Mr. Seiffert specific

[7] questions?

[8]  A: Yes.

[9]  Q: Did you give Mr. Seiffert the opportunity

[10] to give you any more information that he possibly had

[11] about this accident or the circumstances surrounding

[12] this accident?

[13]  A: Yes.

[14]  Q: Did you rush Mr. Seiffert at all during

[15] this telephone interview?

[16]  A: No.

[17]  Q: Do you feel that Mr. Seiffert had every

[18] opportunity to tell you what went on, what he knew

[19] about the accident?

[20]  A: Yes.

[21]  Q: Did Mr. Seiffert at the time of your

[22] telephone conversation with him seem forthcoming with

[23] information?

[24]  A: Yes.

---

1—11:21:17  24—11:22:04                    Page 445

[1]  Q: Did it seem to you that he would have told

[2] you everything he knew at that point?

[3]    MR. van der VEEN: Objection to the

[4] form of the question.

[5]    THE WITNESS: It's the impression from

[6] the conversation, yes.

[7]             BY MS. RISK:

[8]  Q: Did you give Mr. Seiffert your telephone

[9] number at the barracks so that he could contact you

[10] in the future if he had any more information to give

[11] you?

[12]  A: Yes.

[13]  Q: I'll refer you to page 14. And you took

[14] notes on your interview with Mr. Seiffert; correct?

[15]  A: Yes.

[16]  Q: As you do with all of your witness

[17] interviews; correct?

[18]  A: Yes.

[19]  Q: You say in the report that Mr. Seiffert

[20] told you that he was traveling eastbound on Twaddell

[21] Mill and was located behind the UPS truck when the

[22] collision occurred; is that correct?

[23]  A: Yes.

[24]  Q: He was leaving a job site right there at

---

---

1—11:22:08  24—11:22:49                                Page 446

[1] 517 Twaddell Mill; correct?

[2] **A:** Yes.

[3] **Q:** Mr. Seiffert told you that the UPS truck

[4] passed by his location as he was coming out of the

[5] driveway at 517 Twaddell Mill; is that fair?

[6] **A:** Yes.

[7] **Q:** Mr. Seiffert never told you that the UPS

[8] truck was going at a fast clip, did he?

[9] **A:** No.

[10] **Q:** If he had told you that, is that something

[11] you would have written down in your notes?

[12] **A:** I would have written it down.

[13] **Q:** I see —

[14] **A:** No.

[15] **Q:** — you're referring to your notes. Is it

[16] in your notes?

[17] **A:** No.

[18] **Q:** So is it fair to say that Mr. Seiffert

[19] didn't tell you that the UPS truck was traveling at a

[20] fast clip —

[21]   MR. van der VEEN: Objection to the

[22] form of the question.

[23]   THE WITNESS: Back to what

[24] Mr. van der Veen stated earlier, if he had said it

---

1—11:22:54  24—11:23:43                                Page 447

[1] and he said it fast while I was writing notes and I

[2] didn't pick it up, when I went back through the notes

[3] the second time, it would have been the opportunity

[4] for him to clarify and say it was traveling at a fast

[5] clip.

[6]                    BY MS. RISK:

[7] **Q:** He didn't do that, did he?

[8] **A:** I don't recall that ever — it's not in my

[9] notes, and I have no personal memory of it.

[10] **Q:** Mr. Seiffert stated that he and the UPS

[11] truck came to a complete stop at the stop sign; is

[12] that correct?

[13] **A:** Yes.

[14] **Q:** And that's corroborated by Mr. Bard's

[15] testimony about coming to a complete stop at the stop

[16] sign, isn't it? I'm sorry. Mr. Bard's version of

[17] the facts to you.

[18] **A:** Of what Mr. Bard did?

[19] **Q:** Yes.

[20] **A:** It doesn't confirm that — he doesn't say

[21] in his interview that Mr. Seiffert stopped.

[22] **Q:** Fair. That was a poorly worded question.

[23]   Did that corroborate Mr. Bard's

[24] rendition of stopping completely at the stop sign?

---

1—11:23:46  24—11:24:31                                Page 448

[1] **A:** Yes.

[2] **Q:** Mr. Seiffert told you that the UPS truck

[3] then began to turn left and suddenly stopped —

[4] **A:** Yes.

[5] **Q:** — is that correct?

[6]   And that the truck was approximately

[7] two feet way from the center of the double line —

[8] **A:** Yes.

[9] **Q:** — is that correct?

[10]   When he said the truck was

[11] approximately two feet away from the center of the

[12] double line, did he mean that the truck was entirely

[13] in the southbound lane of Montchanin Road? In other

[14] words, the truck had not crossed over the

[15] double-yellow line?

[16] **A:** Correct.

[17] **Q:** Mr. Seiffert then told you about a

[18] motorcycle approaching from the north traveling

[19] southbound on Montchanin Road; correct?

[20] **A:** Yes.

[21] **Q:** And that would have been Mr. Vascek —

[22] **A:** Yes.

[23] **Q:** — is that correct?

[24]   And Mr. Seiffert then told you that

---

1—11:24:31  24—11:25:24                                Page 449

[1] the rear wheel of the motorcycle came off the ground;

[2] correct?

[3] **A:** Yes.

[4] **Q:** And the motorcycle operator's feet left

[5] the pegs of the motorcycle and the operator held onto

[6] the handlebars?

[7] **A:** Yes.

[8] **Q:** Is that a fair description?

[9] **A:** Yes.

[10] **Q:** And then Mr. Seiffert told you that the

[11] operator and the motorcycle struck the truck?

[12] **Q:** The top back head area of the operator's

[13] head was tucked down, and his back struck the truck;

[14] is what that Mr. Seiffert told you?

[15] **A:** Yes.

[16] **Q:** Mr. Seiffert told you that he then ran to

[17] the motorcycle operator; is that correct?

[18] **A:** Yes.

[19] **Q:** Mr. Seiffert — did Mr. Seiffert — did

[20] you ask Mr. Seiffert how fast the motorcycle was

[21] going?

[22] **A:** Yes.

[23] **Q:** Did Mr. Seiffert tell you how fast the

---

1—11:25:26   24—11:26:18                    Page 450

[1] motorcycle was going at impact?

[2] A: Yes.

[3] Q: And what did Mr. Seiffert tell you was the
[4] speed of the motorcycle at impact?

[5] A: He estimated between 35 to 45 miles per
[6] hour at impact.

[7] Q: Now, Corporal Weaver, what's your
[8] understanding of "at impact"?

[9] A: When — as previous described, the
[10] motorcycle's up; the operator, Mr. Vascek, is in
[11] between the two; and at that point when they hit, he
[12] estimated at 35.

[13] Q: 35 to 45 miles per hour?

[14] A: Based on what he observed and the time
[15] that he observed it, however long that was.

[16] Q: Did you ask Mr. Seiffert how fast the
[17] motorcycle was going when he first saw the
[18] motorcycle?

[19] A: Yes.

[20] Q: And what did he tell you?

[21] A: He said he was not sure how fast the
[22] motorcycle was traveling, initial speed.

[23] Q: Okay.

[24] A: And the parentheses is mine, meaning

1—11:26:20   24—11:27:27                    Page 451

[1] initial speed for the form of the question. And what
[2] he said to me was that — I'm trying to get more out
[3] of him as to, well, you saw it, That's what you're
[4] saying it was at impact. Did you see it or could you
[5] estimate how fast it was traveling further, however
[6] long it was that you observed it?

[7] And he said, No.

[8] Q: He said, No. But did he tell you anything
[9] else about the motorcycle's movement coming toward
[10] the impact or just prior to impact?

[11] A: He said that it had been already
[12] decelerating for approximately one to two seconds
[13] when he observed it.

[14] Q: Did he tell you how he knew or what
[15] indicated to him that the motorcycle had already been
[16] decelerating one to two seconds?

[17] A: I'm sorry. The question again?

[18] Q: Did he tell you what he saw, what he
[19] observed, or what indicated to him that the
[20] motorcycle had been decelerating for one to two
[21] seconds when he observed it?

[22] A: Not other than his description of what the
[23] bike was doing.

[24] Q: Was it your understanding when you were

1—11:27:30   24—11:28:16                    Page 452

[1] speaking to Mr. Seiffert when he was talking about
[2] decelerating that he was talking about the timeframe
[3] from when he first saw the motorcycle to the point of
[4] impact?

[5] A: Yes.

[6] MR. van der VEEN: Objection as to the
[7] form of the question.

[8] BY MS. RISK:

[9] Q: What is your understanding of the
[10] timeframe that Mr. Seiffert was referring to when he
[11] was talking about decelerating for one to two
[12] seconds?

[13] MR. van der VEEN: Objection to the
[14] question.

[15] THE WITNESS: My understanding of what
[16] Mr. Seiffert told me was that he observed the
[17] motorcycle for about one to two seconds before
[18] impact.

[19] BY MS. RISK:

[20] Q: And what was the motorcycle doing while he
[21] was observing it for that one to two seconds?

[22] A: It's coming up in a stoppie position, as I
[23] explained earlier, with the wheel down — front wheel
[24] down, rear wheel coming up, tucked position of

1—11:28:19   24—11:29:09                    Page 453

[1] Mr. Vascek.

[2] Q: And was the motorcycle decelerating during
[3] that time period?

[4] A: Yes.

[5] Q: So is it safe to say that the initial
[6] speed of the motorcycle when Mr. Seiffert first saw
[7] it was greater than 35 to 45 miles an hour, which is
[8] the speed he estimated at impact?

[9] MR. van der VEEN: Objection to the
[10] form of the question.

[11] THE WITNESS: Yes.

[12] BY MS. RISK:

[13] Q: Okay. Mr. Seiffert estimated that the
[14] motorcycle was approximately 45 feet away from the
[15] truck when he first saw it?

[16] A: Yes.

[17] Q: Did you ask Mr. Seiffert that specific
[18] question?

[19] A: Yes.

[20] Q: Okay. Can you tell me the type of
[21] question you asked?

[22] A: How far away from the, from the truck was
[23] the motorcycle when you first observed it?

[24] Q: Okay. And what did Mr. Seiffert respond?

1—11:29:12   24—11:30:17                    Page 454

[1]   A: 35 to 40 feet — 35 to 40 — I'm sorry.

[2] That's the miles per hour.

[3]   Q: Midway in the paragraph.

[4]   A: 45 feet. I'm sorry. I'm looking at the

[5] speed limit that he stated. The approximate speed is

[6] in two separate areas of the report.

[7]   45 feet.

[8]   Q: And that was his estimate of how far away

[9] the motorcycle was from the truck when he first

[10] observed it?

[11]   A: Yes.

[12]   Q: Was Mr. Seiffert vacillating back and

[13] forth about the distance? Or was Mr. — I'm sorry.

[14]   Was Mr. Seiffert vacillating back and

[15] forth about the distance? Did he give you any

[16] indication that he was unsure?

[17]   A: I don't remember of him giving me that

[18] indication.

[19]   Q: Did he seem pretty sure about that

[20] 45 feet?

[21]   A: Yes. I felt, obviously, during —

[22]   MR. van der VEEN: Objection to the

[23] form of the question.

[24]   THE WITNESS: — the interview

---

1—11:30:18   24—11:31:21                    Page 455

[1] listening to him on the phone, I felt — and that's

[2] what I wrote, what I put in the notes and what I put

[3] in the report.

[4]             BY MS. RISK:

[5]   Q: So if after having met with

[6] Mr. van der Veen twice and spent considerable amount

[7] of time with him at the scene of the accident

[8] Mr. Seiffert testified that he wasn't really sure

[9] about that 45 feet, would you still today say that

[10] the day after the accident when you spoke to

[11] Mr. Seiffert, he told you it was 45 feet?

[12]   MR. van der VEEN: Objection to the

[13] form of the question.

[14]   THE WITNESS: Yes.

[15]             BY MS. RISK:

[16]   Q: The same question with regard to the speed

[17] at impact of the motorcycle. If, after having spent

[18] two times with Mr. van der Veen and a considerable

[19] amount of time at the accident scene, Mr. Seiffert

[20] were to say that he wasn't sure about the speed of

[21] the motorcycle at impact, is it your testimony here

[22] today —

[23]   MR. van der VEEN: Objection to the

[24] form of the question.

---

1—11:31:22   24—11:32:00                    Page 456

[1]             BY MS. RISK:

[2]   Q: — that when you asked him, he said 35 to

[3] 45 miles per hour was the speed?

[4]   A: Yes.

[5]   MR. van der VEEN: Objection to the

[6] form of the question.

[7]             BY MS. RISK:

[8]   Q: And you had no indication when you asked

[9] him that on the telephone — strike that.

[10]   You didn't prompt Mr. Seiffert for a

[11] speed, did you?

[12]   A: Other than asking him the question if he

[13] could estimate —

[14]   MR. van der VEEN: Other than the way

[15] he did with Mr. Bard?

[16]   MS. RISK: Excuse me. Move to strike

[17] counsel's comments.

[18]             BY MS. RISK:

[19]   Q: Go ahead.

[20]   A: Excluding answering — asking the

[21] question, Could you give me an estimate of the speed

[22] at, you know, at impact, other than that, no. Again,

[23] I'm not going to say, Well, was he going 45 mile an

[24] hour? 35? 65? 70? What can you tell me? What did

---

1—11:32:03   24—11:32:56                    Page 457

[1] you see, in your experience as a driver? And if

[2] you're not comfortable with committing to something,

[3] then don't. That's my line with everyone that I talk

[4] to.

[5]   Q: So you gave Mr. Seiffert the opportunity

[6] to say, No, I'm not comfortable with giving you a

[7] speed?

[8]   A: Exactly.

[9]   Q: And Mr. Seiffert did not say, No, I'm not

[10] comfortable with giving a speed, did he?

[11]   A: He sounded competent and comfortable with

[12] what he said when — my recollection, there was no

[13] stumbling or "uh-uh." Like we talked earlier, I

[14] asked him the question and he answered it and I wrote

[15] it down.

[16]   Q: And this, again, is a conversation you had

[17] with Mr. Seiffert the day after the accident,

[18] correct, October 27th?

[19]   A: Yes.

[20]   Q: At 1355; correct?

[21]   A: Yes.

[22]   Q: Actually less than 24 hours after the

[23] accident; is that fair?

[24]   A: Yes.

---

1—11:33:07   24—11:34:04                          Page 458

[1] Q: Mr. Seiffert also told you that when the
[2] UPS truck came to a stop, it was approximately 2 feet
[3] from the center of the double-yellow line; is that
[4] correct?
[5] A: Yes.
[6] Q: Is that consistent with the physical
[7] evidence that you observed at the scene, specifically
[8] the scuff mark and the brown, the patch of dirt?
[9] MR. van der VEEN: Objection to the
[10] form of the question.
[11] THE WITNESS: Yes.
[12] MR. van der VEEN: It's not a scuff
[13] mark.
[14] BY MS. RISK:
[15] Q: Did Mr. Seiffert tell you that he heard
[16] the motorcycle prior to the accident?
[17] A: No, he did not hear it.
[18] Q: Is your understanding that Mr. Seiffert
[19] meant he did not hear the motorcycle before the
[20] collision occurred?
[21] A: Correct.
[22] Q: So the first time he heard the motorcycle
[23] was the collision itself; is that what — would that
[24] be fair?

---

1—11:34:05   24—11:35:13                          Page 459

[1] A: That is my understanding, yes.
[2] Q: And that not hearing the motorcycle,
[3] that's consistent with Mr. Bard's statement about not
[4] hearing the motorcycle also?
[5] A: Yes.
[6] MR. van der VEEN: Objection to the
[7] form of the question.
[8] BY MS. RISK:
[9] Q: And when you have consistent testimony or
[10] consistent statements like that, that helps in
[11] your — that's a factor in your reconstructing an
[12] accident, isn't it?
[13] MR. van der VEEN: Objection to the
[14] form of the question.
[15] THE WITNESS: Yes.
[16] BY MS. RISK:
[17] Q: And if Mr. — after spending two visits
[18] with Mr. van der Veen and being out at the scene with
[19] Mr. van der Veen and his engineers, if Mr. Seiffert
[20] was to back away from his statement that the
[21] motorcycle was decelerating, you would still stand by
[22] his statement that he told you less than 24 hours
[23] after the accident that he knew that the motorcycle
[24] or he could tell that the motorcycle was decelerating

---

1—11:35:17   24—11:36:24                          Page 460

[1] for a period of one to two seconds when he hit it?
[2] MR. van der VEEN: Objection to the
[3] form of the question.
[4] BY MS. RISK:
[5] Q: Is that fair?
[6] A: That's fair, yes.
[7] Q: Okay. You spoke to other witnesses at the
[8] scene; correct?
[9] A: No.
[10] Q: Oh, I'm sorry. You spoke to —
[11] A: Sergeant Cox did.
[12] Q: Okay. And part of the conclusions and
[13] findings in your police report are based on the
[14] conversation that Sergeant Cox had with Amy Stratton?
[15] A: Correct.
[16] Q: Is it your understanding that Miss
[17] Stratton stated that she was traveling southbound on
[18] Montchanin Road?
[19] A: Yes.
[20] Q: And that there was a point in time when
[21] Mr. Vascek came up quickly behind her on his
[22] motorcycle; is that correct?
[23] A: Yes.
[24] MR. van der VEEN: Objection to the

---

1—11:36:24   24—11:37:11                          Page 461

[1] form of the question.
[2] BY MS. RISK:
[3] Q: This is your understanding of Miss
[4] Stratton's statement to Sergeant Cox?
[5] A: Yes.
[6] Q: And that she was traveling behind a
[7] bicyclist at the time; is that correct?
[8] A: Yes.
[9] Q: And that at a point in time prior to the
[10] accident scene, she passed the bicyclist?
[11] A: Correct.
[12] Q: Is that your understanding?
[13] A: Yes.
[14] Q: And that Mr. Vascek, the motorcycle
[15] operator, followed her when she passed the bicyclist?
[16] A: Yes.
[17] Q: Is that your understanding?
[18] A: Yes.
[19] Q: Then there came a point in time when she
[20] passed the bicyclist and traveled in front of the
[21] bicyclist going back into her travel lane southbound
[22] or Montchanin Road; is that your understanding?
[23] A: Yes.
[24] Q: And that Mr. Vascek did not go back into

---

---

Page 462

[1] the southbound lane behind her but proceeded past her
[2] at a fast rate of speed?
[3]      MR. van der VEEN: Objection to the
[4] form of the question.
[5]           BY MS. RISK:
[6]    Q: Is that your understanding?
[7]    A: Yes.
[8]    Q: And that Miss Stratton did not see the
[9] motorcycle again until she came around the corner at
[10] the accident scene; is that correct?
[11]    A: That's my understanding of the statement,
[12] yes.
[13]    Q: And that Miss Stratton at the time was
[14] traveling 50 miles per hour; is that correct?
[15]    A: That's my understanding of the statement,
[16] yes.
[17]    Q: So the assumption if Miss Stratton is
[18] traveling 50 miles an hour and does not see
[19] Mr. Vascek again on his motorcycle, isn't it fair to
[20] assume that just prior to the curve in the road
[21] before — on Montchanin before the stone bridge, that
[22] Mr. Vascek was doing at least 50 miles an hour?
[23]      MR. van der VEEN: Objection to the
[24] form of the question.

Page 463

[1]      THE WITNESS: Based on her estimate,
[2] yes —
[3]           BY MS. RISK:
[4]    Q: Okay.
[5]    A: — of her traveled speed, yes.
[6]      MR. van der VEEN: Objection.
[7]           BY MS. RISK:
[8]    Q: And her estimate would be based on her
[9] sitting in her car; is that fair?
[10]    A: That's my understanding, yes.
[11]    Q: Let's talk a little bit about your
[12] interview of Mr. Bard. And it's on page 12.
[13]      Before we get into what you have here
[14] in the report, can you tell me, do you have an
[15] independent recollection of talking to Mark Bard on
[16] the day of the accident?
[17]    A: Yes.
[18]    Q: Okay. Can you tell me what his demeanor
[19] was?
[20]    A: He was very emotionally upset —
[21]    Q: Okay.
[22]    A: — and understandably, which is very
[23] common, with the reasons why we come to work and why
[24] we're at where we're at.

Page 464

[1]    Q: And what about him made you think he was
[2] very emotionally upset?
[3]    A: Just observations and experience from
[4] doing this for a number of years or even not just
[5] doing this but just common exposure and contact with
[6] other human beings that death and sadness and
[7] different — it was obvious — I mean, he was just
[8] shaken.
[9]      Not — I don't want to say nervous,
[10] not in regards to — well, when we interview someone
[11] that's involved in something, say, where we just
[12] grabbed them for a robbery or whatever, sometimes,
[13] you know, they're shaking and nervous in relationship
[14] to why we're bringing them in, because they know
[15] they're under arrest and caught with their hand in
[16] the cookie jar, whatever.
[17]      This was a form of emotional — it's
[18] evident that he was upset. I mean, I don't know how
[19] to — if I'm being clear enough. I mean,
[20] emotionally, I mean, at times I recall him perhaps
[21] tearing up a little bit or voice cracking. It's
[22] evident that this shook him. He knew at that scene
[23] the, the severity of this crash. So he was upset.
[24]    Q: Okay.

Page 465

[1]    A: Emotionally, mentally, physically. I
[2] mean, because one of the things that we do is request
[3] and have a victim service representative respond to
[4] the scenes to talk with them, to provide them with a
[5] brochure, and to convey and explain some of the
[6] resources that the State has to offer participants in
[7] these.
[8]      Like I said earlier, everyone's a
[9] victim, whether they contributed to the crash or just
[10] at the wrong place at the wrong time, witnessed it or
[11] whatever, this is something that traumatizes their
[12] lives. You see it on the news, and you know it's
[13] somewhere else. Or you see it in a movie, and you
[14] know it's fake. When it's real, it hits closer to
[15] home.
[16]      The victim service representatives
[17] also do follow-ups to check to make sure you're okay,
[18] you know, so that you're able to productively
[19] hopefully heal from this incident and continue with
[20] your life, as opposed to going into depression or all
[21] the other things that can happen as a result of this.
[22]      So we have a catch mechanism. It's
[23] not pure, you know, a hundred percent sure proof, but
[24] we try to reach out. And I'm sure — I don't know.

[1] I'd have to look to see who actually was the victim
[2] service representative. But I know people talk to
[3] them.
[4] And I also, through doing this the
[5] years that I've done it, I'm a very compassionate
[6] person. I mean, I'm, I have a job to do. But I
[7] also, there are times in interviews in which if
[8] you're that emotionally upset, I'm not going to take
[9] an interview then. It's not going to be — it's not
[10] going to enhance my investigation because the quality
[11] of the interview might not be so good; and equally,
[12] you know, if you're just totally devastated by this
[13] that's happened.
[14] I mean, he was — he agreed to be
[15] interviewed. He was cooperative, voluntarily got in
[16] the car, was, I mean, was together enough, I mean, I
[17] felt, to conduct an interview. I mean, he wasn't
[18] breaking down and just sobbing uncontrollably. But,
[19] I mean, it was evident that he was upset by what had
[20] happened.
[21] Q: In your estimation, the fact that he was
[22] struck by a motorcycle that he describes as flying
[23] toward him about a foot from his open driver's door,
[24] in your estimation, is it understandable that a

[1] person, an individual, a human being in that
[2] situation, who also saw his own life on the line, was
[3] emotionally upset?
[4] MR. van der VEEN: Objection to the
[5] ridiculous question.
[6] THE WITNESS: Yes, to your question.
[7] BY MS. RISK:
[8] Q: Was Mr. Bard cooperative?
[9] A: Absolutely.
[10] Q: Did you find him to be a credible
[11] individual?
[12] A: I had no reason to doubt the content of
[13] what he was saying as well as any of the others that
[14] I spoke with.
[15] Q: Okay. You talked a little bit about, on
[16] your first day of deposition, how your forte is
[17] people and that witness interviews are your favorite
[18] part of the job. Or I don't know whether you called
[19] it your favorite part of the job, but your forte?
[20] A: Yes.
[21] Q: Is that because you have a good handle or
[22] you see yourself as having a good handle on what
[23] you're dealing with in a particular situation with an
[24] interview?

[1] MR. van der VEEN: Objection to the
[2] form of the question.
[3] THE WITNESS: I would like to think
[4] over the years that I have gained good people
[5] communicative skills. I do a lot of presentations.
[6] I do — I'm an instructor at the academy. And
[7] obviously in trials when you're trying to explain
[8] what you do to the jury, you want to be as credible
[9] as possible, not talking over them, under them, but
[10] so they can understand you.
[11] To answer your question, yes, I mean,
[12] I believe that I'm a people person. And I — not to
[13] allow, go over the line to allow it to — it's not
[14] going to influence what I write. What they tell me
[15] is what they tell me.
[16] And the questions that I ask and the
[17] direction of what I have to do as an investigator, I
[18] mean, as far as, as far as being compassionate, if
[19] he's going to break down, we can conclude this and
[20] talk at another time.
[21] But that interview was conducted; I
[22] didn't see, reflecting back, anything that was out of
[23] the ordinary. There was no interference or —
[24] whether — whatever conversations took place with

[1] Mr. Bard and the other representatives of UPS prior
[2] to my arrival and/or after my arrival, when we got in
[3] that car when he was, you know, requested, the first
[4] and foremost, UPS didn't say, No, you can't interview
[5] him. And he didn't say, No, I don't want to talk to
[6] you.
[7] He got in the car. We sat down.
[8] Standard procedure, interview, documented with notes.
[9] And, you know, get out of the car. Some light
[10] conversation occurs at a scene afterwards; not
[11] anything to reflect or say, Oh, yeah, I remember him
[12] telling me that he collects bottle caps or something.
[13] I mean, none of that. But, I mean, I felt that what
[14] he told me was as accurate that he could tell me at
[15] that point in time shortly thereafter of the crash.
[16] BY MS. RISK:
[17] Q: Okay. I'll refer you to page 12 in your
[18] interview of Mr. Bard. That was at the scene you
[19] interviewed him?
[20] A: Yes.
[21] Q: And you have the time at 1755; is that
[22] correct?
[23] A: Yes, beginning.
[24] Q: And you concluded that interview at?

1—11:45:54  24—11:46:43                    Page 470

[1]  A: Seven minutes after 6:00 p.m.

[2]  Q: So that interview was approximately twelve

[3]  minutes?

[4]  A: Yes.

[5]  Q: Okay. And it occurred in the police

[6]  patrol car?

[7]  A: Yes.

[8]  Q: We talked about that.

[9]  A: Can I elaborate?

[10]  Q: Yes.

[11]  A: The content of the interview occurred at

[12]  that time. Now, he was in the car a little bit

[13]  longer than that because what I do is then go into

[14]  outside the investigative questions. At that point

[15]  I'm reaffirming to him victim services.

[16]      You know, call me. You've got my

[17]  name, my number, things — you don't just keep — I'm

[18]  not going to put all that repetitively over and over.

[19]  I gave him my business card, talked to him, told him

[20]  to call me, call me, call me, call me. But that,

[21]  that timeframe, the twelve minutes, is for the

[22]  interview purpose.

[23]  Q: Okay. So you actually spent more time —

[24]  A: Correct.

1—11:46:43  24—11:47:23                    Page 471

[1]  Q: — talking to him —

[2]  A: Yes.

[3]  Q: — than is reflected?

[4]  A: Prior to and after. Outside the car,

[5]  just, Hey, are you all right? You know, can I get

[6]  you anything or whatever, as well as doing the other

[7]  things that I'm doing. But I had more than just

[8]  contact for twelve minutes, yes.

[9]  Q: Is that true, generally speaking, with all

[10]  of your interviews —

[11]  A: Yes.

[12]  Q: — that when — you just have to wait for

[13]  me to finish.

[14]      — that the time that you give for the

[15]  beginning of the interview and the time that you give

[16]  for the conclusion of the interview are just for

[17]  substance of the interview itself and don't include

[18]  any additional information or pleasantries or

[19]  whatever that you go back and forth with the person?

[20]  A: Yes.

[21]      MR. van der VEEN: Objection to the

[22]  form of the question.

[23]      THE WITNESS: I'm looking — the

[24]  timelines that are in my notes, when I refer to when

1—11:47:25  24—11:48:25                    Page 472

[1]  I start an interview and when I conclude an

[2]  interview, it is directed solely at my asking

[3]  questions or trying to observe and find — not

[4]  observe — to try to find out what statement they

[5]  want to tell me about, what they can say.

[6]                    BY MS. RISK:

[7]  Q: Okay.

[8]  A: Prodded by questions, of course, by my

[9]  own — but focusing on the crash, the reason why I'm

[10]  there.

[11]  Q: Mr. Jester was in the car — we've gone

[12]  over this, correct? — the UPS representative?

[13]  A: Yes.

[14]  Q: Did Mr. Jester say anything during the

[15]  interview of Mr. Bard?

[16]  A: I don't recall him saying anything other

[17]  than common politenesses or thanking me for allowing

[18]  him to be in the vehicle with me when we concluded;

[19]  but, no — not at any time during the conversation of

[20]  this.

[21]      Now, some of the same information that

[22]  I'm sharing with Mr. Bard I also shared with him as

[23]  far as, you know, members of the victim services will

[24]  be doing follow-ups or whatever, but equally, you

1—11:48:28  24—11:49:30                    Page 473

[1]  know, telling him, Here's my — you know, giving him

[2]  a business card name and — Here's my name, number,

[3]  equally. You know, if you need something or have

[4]  questions or whatever, you know, feel free to call.

[5]      And I tell everyone the same thing.

[6]  If I can tell you, I will. If I can't, I won't or

[7]  will tell you I can tell you at a later time if it's

[8]  still under investigation, if it's — you know, for

[9]  instance, if I get the name of a person to interview

[10]  and I haven't had the luxury or opportunity to

[11]  interview them yet, I'm not going to share that

[12]  information with anyone, other than, Yeah, I have a

[13]  witness, period. And that's it.

[14]      I mean, but I don't recall any

[15]  conversations whatsoever with him other than him

[16]  thanking me for being there and being supportive of

[17]  your, of the driver, their driver, Mr. Bard.

[18]  Q: When you were speaking during the course

[19]  of your interview with Mr. Bard, when you were asking

[20]  him questions and he was giving you answers, did you

[21]  get any indication whatsoever that he was looking at

[22]  Mr. Jester for approval or looking to Mr. Jester to

[23]  see how to answer a question? Did you get any

[24]  indication from Mr. Bard at all that he was

1—11:49:33  24—11:50:22                    Page 474

[1] intimidated or looking to Mr. Jester for responses?

[2] **A:** No.

[3] **Q:** Okay.

[4] **A:** And, actually, if he would have felt

[5] uncomfortable, I would have had Mr. Jester step out

[6] of the car.

[7] **Q:** Okay. Do you give a witness that

[8] opportunity?

[9] **A:** Normally, yes. I can't recall I

[10] specifically said that. But that's the normal thing

[11] that I go through, as far as if you're uncomfortable

[12] with this, you know, let me know and he won't be

[13] involved.

[14]     But I don't have a problem with him

[15] being in the — as long as I set the ground — you

[16] know, this is my field. I call the rules. As long

[17] as you abide by the rules, we're good to go. He can

[18] sit there and listen, but you're not going to

[19] participate or — unless I ask you. I mean,

[20] that's — but I don't recall if I specifically said

[21] that. But that's, I mean, that's what I normally do.

[22] **Q:** Did Mr. Bard at any time tell you that he

[23] was intimidated with Mr. Jester there or ask that

[24] Mr. Jester not be there?

1—11:50:23  24—11:51:03                    Page 475

[1] **A:** No.

[2] **Q:** Okay.

[3] **A:** As a follow-up to that, there was never

[4] any time during the interview that he indicated to me

[5] that he was uncomfortable with him being there.

[6] **Q:** Okay.

[7] **A:** And I would have immediately had him exit

[8] the car. It's not — wouldn't have been an issue.

[9] **Q:** Because it's more important for you to

[10] have the statements —

[11] **A:** I want him —

[12] **Q:** — of the operator?

[13] **A:** — to be able to tell me — if he's afraid

[14] he's going to get in trouble with UPS, I don't want

[15] him talking — I want him to tell me what he knows

[16] and what he feels — or whomever the situation is. I

[17] want the truth, bottom line. Let the cards fall as

[18] they do.

[19] **Q:** Okay. Mr. Bard, in the second paragraph

[20] of your summary or your synopsis, as you call it, of

[21] the content of the interview with Mr. Bard — you

[22] took notes; is that correct?

[23] **A:** Yes.

[24] **Q:** All right. And we have your notes?

1—11:51:05  24—11:51:54                    Page 476

[1] **A:** Yes.

[2] **Q:** And this interview or this summary is

[3] based on your notes; is that correct?

[4] **A:** Yes.

[5] **Q:** So it's not verbatim from what Mr. Bard

[6] said?

[7] **A:** No.

[8] **Q:** It's just based on your notes?

[9] **A:** Yes.

[10] **Q:** According to your summary, it says that

[11] Mr. Bard stopped at the stop sign at the intersection

[12] of Montchanin Road; is that correct?

[13] **A:** Yes.

[14] **Q:** And that's consistent with Mr. Seiffert's

[15] recollection of what Mr. Bard did, isn't it?

[16] **A:** Yes.

[17] **Q:** It goes on to say, Mr. Bard stated that he

[18] could not see, moved forward, and still did not see

[19] anything coming. Mr. Bard stated that he was slowly

[20] coming out into the intersection when he suddenly saw

[21] a motorcycle approaching from his left side.

[22]     Is Mr. Bard's statement consistent

[23] with Mr. Seiffert, the independent witness?

[24] **A:** Yes.

1—11:51:57  24—11:52:48                    Page 477

[1] **Q:** Mr. Bard stated that — I'm sorry.

[2]     The motorcycle was approximately 50 to

[3] 75 feet away from him when he first saw it?

[4] **A:** Yes.

[5] **Q:** Do you remember Mark Bard — do you

[6] remember Mark Bard specifically saying that the

[7] motorcycle was 50 to 75 feet away?

[8] **A:** Yes.

[9] **Q:** Okay. Did Mr. Bard ever give

[10] you — strike that.

[11]     Mr. Bard testified that he thought

[12] that he told you — although he also testified that

[13] he was emotionally upset —

[14]     MR. van der VEEN: Objection. Come

[15] on.

[16]                 **BY MS. RISK:**

[17] **Q:** — thought that he told you that he saw —

[18] that he saw the, first of all, the motorcycle on the

[19] stone bridge.

[20]     You have no recollection of Mr. Bard

[21] telling you that?

[22] **A:** No.

[23] **Q:** Okay. It's your recollection, or from

[24] your notes, that Mr. Bard told you 50 to 75 feet from

---

1—11:52:52  24—11:53:37                                    Page 478

[1] the —

[2]   A: Yes.

[3]   Q: — from the truck?

[4]   A: Yes.

[5]   Q: Okay. Are you aware that Mr. Bard had no

[6] idea up until the spring of this year how far the

[7] stone bridge actually was from his truck?

[8]   MR. van der VEEN: Objection.

[9]   THE WITNESS: Would that surprise me?

[10]                BY MS. RISK:

[11]   Q: Would that surprise you?

[12]   A: No —

[13]   Q: No?

[14]   A: — because he was estimating. And I don't

[15] know him from Adam. I don't know how good he is at

[16] estimating distance. So to tell me that, no, it

[17] wouldn't surprise me.

[18]   Q: And certainly it wouldn't surprise you;

[19] you wouldn't think that someone was intentionally

[20] lying if they came forward and said, I have no idea

[21] that it was that far away until I paced it out

[22] walking with my wife?

[23]   A: No.

[24]   Q: He did tell you, though, or according to

---

1—11:53:39  24—11:54:29                                    Page 479

[1] the report, he used the words "the motorcycle was

[2] flying"?

[3]   A: Yes.

[4]   Q: And he also told you the headlights of the

[5] motorcycle were on; is that correct?

[6]   A: Yes.

[7]   Q: And that the motorcycle operator was

[8] wearing a helmet; is that correct?

[9]   A: Yes.

[10]   Q: The next sentence on page 12 after "the

[11] operator was wearing a helmet," a female witness

[12] arrived at the scene and identified herself as a

[13] nurse, identified as Witness No. 1, Mrs. Amy

[14] Stratton.

[15]   As we sit here today, it's your

[16] understanding that Miss Stratton was not the nurse

[17] who arrived on the scene first; isn't that correct?

[18]   A: Correct.

[19]   Q: Miss Stratton was actually the operator of

[20] the vehicle who was driving southbound behind

[21] Mr. Vascek; correct?

[22]   A: Correct.

[23]   Q: And is it your understanding that the

[24] witness who arrived and identified herself as a nurse

---

1—11:54:33  24—11:55:25                                    Page 480

[1] was, in fact, Karen Garroway?

[2]   A: Yes.

[3]   Q: And you had the opportunity to interview

[4] Karen Garroway on the telephone, didn't you?

[5]   A: Yes. Follow-up phone calls, yes.

[6]   Q: And did someone at the scene — how did

[7] you get Karen Garroway's contact information?

[8]   A: Sergeant Cox's supplemental report and

[9] notes.

[10]   Q: So someone at the scene informed Sergeant

[11] Cox that there had been a nurse on the scene?

[12]   A: Yes.

[13]   Q: Was Karen Garroway at the scene when you

[14] arrived?

[15]   A: No.

[16]   Q: Was Kristin DiPaolo at the scene when you

[17] arrived?

[18]   A: No.

[19]   Q: Was Amy Stratton at the scene when you

[20] arrived?

[21]   A: No.

[22]   Q: So she left. Sergeant Cox interviewed

[23] Miss Stratton on the telephone?

[24]   A: I'm not sure where he interviewed her.

---

1—11:55:28  24—11:57:48                                    Page 481

[1] Let me look at his — I have his field notes. Let me

[2] find his supplement. I'm not sure where the

[3] interview was conducted.

[4]   (Discussion held off the record.)

[5]   THE WITNESS: She was at the scene.

[6]                BY MS. RISK:

[7]   Q: Okay. So she was at the scene when

[8] Sergeant Cox arrived?

[9]   A: Correct.

[10]   Q: But she wasn't at the scene when you were

[11] there?

[12]   A: Well, she probably was. But I don't

[13] recall where she was located, and I didn't conduct

[14] the interview. I wasn't — I was focusing on

[15] Mr. Bard. And it's evident, obviously, in his

[16] supplement he interviewed her at the scene. But I

[17] never had any contact with her at the scene.

[18]   Q: Okay. All right. Back to your interview

[19] with Mr. Bard.

[20]   Mr. Bard told you that someone

[21] instructed him to move the truck back to provide

[22] space for the fallen motorcycle operator; is that

[23] correct?

[24]   A: Yes.

---

1—11:57:50   24—11:59:05                  Page 482

[1]   **Q:** All right. And he told you that he did
[2] move the — he backed up the truck and moved it from
[3] its original resting position; correct?
[4]   **A:** Yes.
[5]   **Q:** He also told you that the motorcycle was
[6] moved, didn't he? Up at the — the statement is
[7] after — here's the statement: The truck was backed
[8] up and moved from its original position. The nurse
[9] removed the operator's helmet and began attending to
[10] his medical needs. Others assisted at the scene by
[11] moving the motorcycle away as well?
[12]   **A:** Yes. Sorry. I couldn't find it.
[13]   **Q:** He told you that the motorcycle operator
[14] was initially face down on the pavement, didn't he?
[15]   **A:** Yes.
[16]   **Q:** And you asked him if he wore glasses;
[17] correct?
[18]   **A:** Correct.
[19]   **Q:** And he told you he didn't wear glasses?
[20]   **A:** Correct.
[21]   **Q:** When Mr. van der Veen asked you earlier if
[22] you were aware that he had prescription reading
[23] glasses —
[24]   MR. van der VEEN: Objection to the

1—11:59:05   24—11:59:38                  Page 483

[1] form of the question.
[2]   MS. RISK: I haven't asked a question
[3] yet.
[4]   MR. van der VEEN: I never said
[5] "prescription." I already know your question is
[6] wrong without finishing it.
[7]   MS. RISK: Well, I would disagree.
[8] But I will not make the court reporter go back and
[9] look.
[10]                  BY MS. RISK:
[11]   **Q:** Mr. Bard, would you —
[12]   MR. van der VEEN: He can do a word
[13] search.
[14]                  BY MS. RISK:
[15]   **Q:** Would you ask — you can see that I'm
[16] sitting here with reading glasses today. If you were
[17] to ask me on the road, relating to my driving, if I
[18] wore glasses, I would tell you "no," would that —
[19] would you assume that I was lying if I did that?
[20]   **A:** No.
[21]   **Q:** Okay. Are reading glasses —
[22]   MR. van der VEEN: Objection to the
[23] form of the question.
[24]                  BY MS. RISK:

1—11:59:38   24—12:00:21                  Page 484

[1]   **Q:** Are reading glasses necessary, in your
[2] understanding, in the operation of a vehicle?
[3]   **A:** No.
[4]   MR. van der VEEN: Objection to the
[5] form of the question.
[6]                  BY MS. RISK:
[7]   **Q:** So when Mr. Bard told you that he didn't
[8] wear glasses, you understood that to mean he didn't
[9] wear glasses?
[10]   **A:** To operator a vehicle.
[11]   **Q:** To operate a vehicle. Thank you.
[12]   Mr. Bard told you that he'd been
[13] assigned to this route for over two years?
[14]   **A:** Yes.
[15]   **Q:** And that he was with UPS for approximately
[16] 25 years; correct?
[17]   **A:** Yes.
[18]   **Q:** And that he had been driving for 20 years;
[19] is that correct?
[20]   **A:** Of those, yes.
[21]   **Q:** Of the 25 years.
[22]   He told you that the motorcycle was
[23] traveling at a high rate of speed?
[24]   **A:** Yes.

1—12:00:22   24—12:01:03                  Page 485

[1]   MR. van der VEEN: Objection to the
[2] form of the question.
[3]                  BY MS. RISK:
[4]   **Q:** Did you — did Mr. Bard tell you that the
[5] motorcycle was traveling at a high rate of speed?
[6]   MR. van der VEEN: Objection to the
[7] form of the question.
[8]   THE WITNESS: Yes.
[9]                  BY MS. RISK:
[10]   **Q:** Did you ask Mr. Bard how fast the
[11] motorcycle was going?
[12]   **A:** Yes.
[13]   **Q:** And what did he say to you?
[14]   **A:** He estimated approximately 80 miles per
[15] hour.
[16]   **Q:** Did he tell you — did he use the words
[17] "high rate of speed"?
[18]   **A:** Yes.
[19]   **Q:** Did he also use the words "80 miles per
[20] hour"?
[21]   **A:** Yes.
[22]   **Q:** Mr. Bard testified the other day that he
[23] thought that he told you the motorcycle was going a
[24] hundred miles an hour.

[1]    That's not your recollection, is it?

[2]    A: I would have — no. I would have written

[3] it.

[4]    Q: You would have written "a hundred miles an

[5] hour"?

[6]    A: Because a hundred is obviously much more

[7] substantial than 80.

[8]    Q: Than 80. Okay.

[9]    Mr. Bard also told you that he was a

[10] motorcycle operator himself, didn't he?

[11]    A: Yes.

[12]    Q: And did you take that into consideration

[13] when you assessed his rendition of how the accident

[14] happened?

[15]    MR. van der VEEN: Objection to the

[16] form of the question.

[17]    THE WITNESS: Absolutely.

[18]                BY MS. RISK:

[19]    Q: And his observations of the motorcycle?

[20]    A: Absolutely.

[21]    Q: Okay. Because — is that because someone

[22] who operates a motorcycle or who has operated a

[23] motorcycle is more familiar with the operation and

[24] the dynamics of a motorcycle?

[1]    A: Exactly. Everyone says motorcycles fly.

[2] But when someone who has experience, to whatever

[3] degree, that has more bearing by just their own

[4] observations of what they're saying.

[5]    Q: And is there also —

[6]    A: I'm not putting it on a scale and saying,

[7] All right. It's a ten as opposed to a 5. But if you

[8] tell me you operate a motorcycle and you have

[9] experience and how long you've been operating a

[10] motorcycle, if you tell me how fast the vehicle's

[11] traveling, that, to me as an investigator, has a

[12] little more bearing than somebody standing on a

[13] street corner who's never ridden a motorcycle in

[14] their life and says "80 miles an hour."

[15]    I mean, I'm not — what they say, they

[16] say. But looking at the overall weight by him being

[17] an experienced — stating that he's an experienced

[18] motorcycle operator has a little more bearing than if

[19] he said he hadn't.

[20]    Q: Mr. Seiffert testified that he has also

[21] been a motorcycle operator. Mr. Seiffert never told

[22] you that in the course of your interview with him,

[23] did he?

[24]    A: I don't believe he did.

[1]    Q: That's not a question you would normally

[2] ask a witness at an accident scene?

[3]    A: No.

[4]    Q: Okay. If — knowing that Mr. — with the

[5] understanding that Mr. Seiffert testified that he has

[6] operated motorcycles and has motorcycle experience,

[7] does that also affect your, the weight that you would

[8] give what Mr. Seiffert told you at the scene the next

[9] day?

[10]    MR. van der VEEN: Objection to the

[11] form of the question.

[12]    THE WITNESS: Yes.

[13]                BY MS. RISK:

[14]    Q: About the scene the next day; I'm sorry.

[15]    So Mr. Seiffert's description of how

[16] the motorcycle was elevating up, the dynamics of the

[17] position of the motorcycle as well as the speed, you

[18] would give that more weight because you would

[19] understand that Mr. Seiffert has experience with

[20] motorcycles; is that correct?

[21]    MR. van der VEEN: Objection to the

[22] form of the question.

[23]    THE WITNESS: I would give it more

[24] weight for two reasons: one, for that reason, of his

[1] experience; and secondly, that he's an independent

[2] witness as opposed to being an operator of — someone

[3] that's involved in the collision. He has nothing to

[4] lose or gain. So he's going to have a little more

[5] weight of his comments —

[6]    MR. van der VEEN: Uh-huh.

[7]    THE WITNESS: — because of he's

[8] telling, through now you, explaining that he does

[9] have motorcycle experience. But he also is an

[10] independent witness.

[11]    MR. van der VEEN: Uh-huh.

[12]    THE WITNESS: And whatever he sees and

[13] whatever he says he saw, even, you know, it has more

[14] bearing because he's an independent — he doesn't

[15] know Mr. Bard or Mr. Vascek, other than from this now

[16] incident that's altered all their lives. But he has

[17] a little more bearing of what he's telling me as far

[18] as weight, yeah.

[19]                BY MS. RISK:

[20]    Q: The weight of what he told you when you

[21] interviewed him the day after the accident?

[22]    A: Yes.

[23]    Q: The next sentence in your summary of

[24] Mr. Bard's interview: He never heard the motorcycle

---

[1] approaching prior to the crash.

[2]     That's Mr. Bard never heard the

[3] motorcycle; is that correct?

[4]     **A:** Correct.

[5]     **Q:** Did you ask Mr. Bard if he heard the

[6] motorcycle?

[7]     **A:** Yes.

[8]     **Q:** And that's — he answered "no"?

[9]     **A:** Correct.

[10]     **Q:** That's not something he offered to you?

[11]     **A:** No.

[12]     **Q:** And that's consistent with, again,

[13] Mr. Seiffert's testimony that he didn't hear the

[14] motorcycle prior to the collision either?

[15]     **A:** Correct.

[16]     **Q:** The door of the UPS truck was open, and he

[17] was wearing his seat belt; is that correct?

[18]     **A:** Yes, what he said.

[19]     **Q:** He stated that he had no injuries. And in

[20] parens you have "physical"?

[21]     **A:** Yes.

[22]     **Q:** Did he say, "I have no physical injuries,"

[23] or did you add the word "physical"?

[24]     **A:** He said he was upset.

---

[1]     **Q:** So you added the word "physical" as

[2] opposed to "mental"?

[3]     **A:** Meaning no — correct; emotional.

[4]     **Q:** Mr. Bard told you that he was emotionally

[5] upset —

[6]     **A:** Yes.

[7]     **Q:** — as well as appearing —

[8]     **A:** Yes.

[9]     **Q:** — to be —

[10]     (Discussion held off the record.)

[11]                 BY MS. RISK:

[12]     **Q:** The UPS truck was not equipped with a

[13] safety air bag system; that's your statement in here.

[14] That's based on Mr. Bard's statement to you?

[15]     **A:** Yes.

[16]     **Q:** Okay. Mr. Bard told you that he had not

[17] consumed any alcohol or medications; is that true?

[18]     **A:** Yes.

[19]     **Q:** And that's consistent with the results of

[20] the voluntary portable blood-alcohol test that you

[21] gave him or that was administered to him at the

[22] scene?

[23]     MR. van der VEEN: Objection to the

[24] form of the question.

---

[1]     THE WITNESS: Yes.

[2]                 BY MS. RISK:

[3]     **Q:** Mr. Bard told you that he went to bed

[4] approximately 2200 hours military time; that would be

[5] 10:00 o'clock; is that fair?

[6]     **A:** Yes.

[7]     **Q:** And that he got up at 6:10 in the morning?

[8]     **A:** The following morning, yes.

[9]     **Q:** And he told you that he got a good night's

[10] sleep and that he was well rested —

[11]     **A:** Yes.

[12]     **Q:** — is that correct?

[13]     How did he describe his health?

[14]     **A:** He said he was in good health. These are

[15] questions that I asked. I prod. I'm — basically

[16] the questions I ask, I said, Well, how would you

[17] consider the evening? Were you interrupted, or was

[18] it complete through the night? Do you feel you — do

[19] you consider yourself well rested? I threw out an

[20] array of questions or of words. And his response was

[21] he was well rested.

[22]     I said, Are you tired?

[23] He said that he wasn't tired. And he

[24] indicated that he had gotten a good night's sleep,

---

[1] exactly what it says in the report.

[2]     And the other reason, the question

[3] that I always, normally always try to remember to ask

[4] is health, if you're on medication, if you're under

[5] the weather, if you've just seen a physician for

[6] something or whatever, it could play a factor in the

[7] crash. And that's why I ask, giving them the

[8] opportunity. That's not something he would just or

[9] anyone would normally say, Well, I'm in good health

[10] today. I asked. But he said he was in good health.

[11]     **Q:** Okay.

[12]     **A:** As well as the next question I ask is, Can

[13] you estimate — I mean, I know what time the fire

[14] board got the call, and I know what time Recom got

[15] the call. But to your memory of everything that's

[16] happened, what time do you think, approximately, the

[17] collision occurred?

[18]     And his response was 4:00.

[19]     **Q:** 4:00 o'clock?

[20]     **A:** 4:00 p.m.

[21]     **Q:** How much of this interview as it is

[22] summarized in your report is a result of your direct

[23] questions to Mr. Bard?

[24]     MR. van der VEEN: Objection to the

---

1—12:08:32  24—12:09:35                                    Page 494

[1] form of the question.

[2]     THE WITNESS: About one-quarter.

[3]                  BY MS. RISK:

[4]     Q: Okay.

[5]     A: And their questions are — I mean, I ask

[6] questions, and then whatever they say is what I

[7] write. If I need to clarify, I mean, like I said,

[8] these questions here, these are solicited by me. I

[9] mean, I'm asking a standard: Have you had anything

[10] to drink? Have you consumed any alcohol? How much

[11] sleep? Et cetera, et cetera.

[12]     About three-quarters of the

[13] conversation or the interview is I'm, I'm prodding

[14] with an initial question and then I let them talk.

[15] And while they're talking, I'm jotting things down.

[16]     And then when I go back, Sir, well, so

[17] let me — let me go over this again. You're telling

[18] me that you are located here and you did this, this,

[19] and this. And that's during the exchange of when,

[20] when you look at the notes, you'll see things bounced

[21] around.

[22]     When we make a clarification of

[23] something that he said back here, I'm writing it back

[24] here when he said it. Then further in as the

---

1—12:09:37  24—12:10:49                                    Page 495

[1] interview continues, like the deposition, as we go —

[2] and I'll say, Well, you're saying 80 mile an hour.

[3] Or you're saying you completely stopped, or whatever.

[4] It's just clarification. But the majority of, of

[5] everything there, about three-quarters of it is, by

[6] their admission, just voluntarily talking.

[7]     Q: You had occasion — let me go back.

[8]     The summary that you have here in

[9] police report, is that a fair and accurate summary of

[10] your conversation, the sum and substance of your

[11] conversation with Mr. Bard at the scene that day?

[12]     A: Yes.

[13]     Q: Then you had occasion to follow up with

[14] Mr. Bard?

[15]     A: Yes.

[16]     Q: And when did you do that?

[17]     A: Would have been Wednesday morning,

[18] February 9th, 2005, at approximately five minutes

[19] after 8:00 a.m.

[20]     Q: And according to your conclusion time,

[21] that conversation for the interview lasted about 15

[22] minutes; is that fair?

[23]     A: Yes.

[24]     Q: All right. What did Mr. Bard — what did

---

1—12:10:52  24—12:12:05                                    Page 496

[1] you discuss with Mr. Bard during that follow-up

[2] interview?

[3]     A: We went over the initial interview and,

[4] again, stating from first questioning, the

[5] highlights, not going over every tiny little, you

[6] know, was the air bag deployed or no meds and things.

[7] But going — when I say, Confirm the original

[8] statement, it's dealing with the substance relating

[9] to the crash itself, not all the other things that

[10] externally contribute.

[11]     Q: Uh-huh.

[12]     A: But, like, you know, you're traveling, the

[13] estimate of the speed of the vehicle and what

[14] happened.

[15]     And then there were a couple other

[16] questions that were asked because what happens is

[17] during the course of it, the investigation, other

[18] questions are asked by other witness or statements

[19] are provided that sometimes solicit other questions,

[20] follow-up questions, like, Well — and in this case

[21] there was a question as to whether or not he had or

[22] had not — question was — assisted with CPR.

[23]     And I wouldn't have had a reason to

[24] ask that initially or wouldn't have had any knowledge

---

1—12:12:07  24—12:12:52                                    Page 497

[1] to even know why to ask that initially. But if —

[2] sometimes family members contact us and ask

[3] questions. So for — we do follow-up phone calls and

[4] say, you know, Well, do you remember if you did or

[5] you didn't? Whatever the questions are.

[6]     Q: And in this case the question that you

[7] asked Mr. Bard about whether or not he helped or

[8] assisted with providing CPR was, in fact, prompted by

[9] the family members requesting that information,

[10] wasn't it?

[11]     A: Yes.

[12]     MR. van der VEEN: Objection to the

[13] form of the question.

[14]                  BY MS. RISK:

[15]     Q: Specifically Mrs. Vascek?

[16]     A: Yes.

[17]     Q: Okay. Mr. Bard told you in his follow-up

[18] interview that the motorcycle had been moved from its

[19] original final resting position after the collision

[20] occurred; correct?

[21]     A: Yes.

[22]     Q: And that was consistent with the

[23] information that you had from him prior to this

[24] interview; correct?

1—12:12:53   24—12:14:05                    Page 498

[1]  A: Yes.

[2]  Q: And then he also — and he told you that
[3] he was instructed to move the UPS truck by one of the
[4] nurses that arrived at the collision and was
[5] attending to the injured motorcycle operator; is that
[6] correct?

[7]  A: Yes.

[8]  Q: And it was your understanding that one of
[9] the nurses had asked him to move it because — to
[10] facilitate their —

[11]  A: Medical assistance.

[12]  Q: — helping Mr. Vascek?

[13]  A: Yes.

[14]  Q: Medical assistance; fair.
[15]   And he told you that he moved the
[16] truck?

[17]  A: Yes.

[18]  Q: Did he tell you how far he moved the
[19] truck?

[20]  A: He didn't say specifically how far he
[21] moved it. It's my understanding through the comments
[22] of the nurses that it was moved back a couple of
[23] feet. But he never specifically stated, and I don't
[24] have anything — that's just in the back of my head

1—12:14:08   24—12:14:52                    Page 499

[1] for some reason that it was, that it was just moved
[2] back. But he didn't give me a "feet,"

[3]  Q: And if I were to represent to you that
[4] both Mr. Bard and Mr. Seiffert testified that the UPS
[5] truck was moved back approximately two and a half to
[6] three feet, that would be consistent with your
[7] recollection of what the nurses or your recollection
[8] of how far the truck was moved?

[9]  MR. van der VEEN: Objection to the
[10] form of the question. That assumes two movings in
[11] one question. There's the time he moved it when
[12] Seiffert told him, and there's the time he moved it
[13] when the nurses told him. And the nurses weren't
[14] there at that time.

[15]  MS. RISK: Why, Mr. van der Veen, I do
[16] believe you are indulging in a speaking objection —

[17]  MR. van der VEEN: No. I'm helping
[18] you.

[19]  MS. RISK: — as I will remind you, we
[20] are here under the Federal Rules.

[21]  MR. van der VEEN: No. I'm helping
[22] you.

[23]  MS. RISK: The question was, with
[24] specific regard —

1—12:14:54   24—12:15:38                    Page 500

[1]  MR. van der VEEN: You're just asking
[2] the same questions over and over again. I'm trying
[3] to help you clarify them.

[4]  MS. RISK: Mr. van der Veen, please.
[5] I do not need your help. Someone who has sat here
[6] for over eight hours asking questions, I think that I
[7] have — I should have your cooperation and your
[8] patience. Excuse me.

[9]  MR. van der VEEN: You were getting my
[10] cooperation.

[11]           BY MS. RISK:

[12]  Q: Corporal Weaver, we were talking about the
[13] instance when the truck was moved rearward because
[14] the nurses — or a nurse had requested it be moved to
[15] help with the medical treatment they were giving —

[16]  A: Yes.

[17]  Q: — to Mr. Vascek, that specific moving of
[18] the UPS vehicle. And you told me that it was your
[19] understanding from the back of your mind from the
[20] nurse or someone it had just been moved a couple of
[21] feet?

[22]  A: Correct.

[23]  Q: My question to you is, if I were to
[24] represent to you that both Mr. Bard and Mr. Seiffert

1—12:15:42   24—12:16:29                    Page 501

[1] have testified that the UPS truck was moved on that
[2] occasion two and a half to three feet, is that
[3] consistent with your recollection or your
[4] understanding of how far the truck was moved as a
[5] result of being requested to move by the nurses?

[6]  MR. van der VEEN: Objection;
[7] mischaracterization of Mr. Seiffert's testimony.

[8]   You can answer.

[9]  THE WITNESS: Yes.

[10]           BY MS. RISK:

[11]  Q: Thank you.

[12]  MS. RISK: It's not a
[13] mischaracterization.

[14]           BY MS. RISK:

[15]  Q: Okay. Mr. Bard also told you that he
[16] assisted another person with moving the motorcycle
[17] away from the accident scene?

[18]  A: Yes.

[19]  Q: Is it your understanding he did that also
[20] for purposes of the nurses rendering medical help?

[21]  A: Yes.

[22]  Q: Okay. Did Mr. Bard tell you how far he
[23] moved the motorcycle?

[24]  A: Not in feet, no.

---

**1—12:16:33  24—12:17:35**  Page 502

[1]  **Q:** Did you see physical evidence at the scene
[2]  that was consistent — that would be consistent with
[3]  movement, moving the motorcycle across the roadway?
[4]  **A:** Yes.
[5]  **Q:** And what physical evidence did you find at
[6]  the scene?
[7]  **A:** Light scratch marks from the pegs of the
[8]  vehicle in the down position.
[9]  **Q:** Okay. Did you photograph that, those
[10]  scratches?
[11]  **A:** They're in the photographs of this
[12]  investigation, yes.
[13]  **Q:** And is that consistent also with physical
[14]  damage to the left side peg of the motorcycle —
[15]  **A:** Yes.
[16]  **Q:** — that you have noted in the report?
[17]  **A:** Yes.
[18]  **Q:** Okay. Mr. Bard — also during this
[19]  follow-up interview with Mr. Bard — told you that he
[20]  gripped — when he saw the motorcycle, he gripped the
[21]  steering wheel; is that correct?
[22]  **A:** Yes.
[23]  **Q:** He slammed on the brakes and held on for
[24]  impact?

---

**1—12:17:35  24—12:19:04**  Page 503

[1]  **A:** Yes.
[2]  **Q:** Did Mr. Bard offer that information to
[3]  you, or was that information a result of a specific
[4]  question that you asked Mr. Bard?
[5]  **A:** I don't recall. That probably was — by
[6]  looking at the notes that I took — was follow-up
[7]  questions that I had asked in regards to
[8]  clarification of what happened at the scene at that
[9]  point.
[10]  **Q:** Okay. Mr. Bard told you that the
[11]  motorcycle struck the truck instantly after he saw
[12]  it?
[13]  **A:** Yes.
[14]  **Q:** Okay. Is that the result of a question
[15]  that you asked him?
[16]  **A:** I'd have to say probably. I can't — I'm
[17]  not a hundred percent sure. It would probably have
[18]  been in the form of a question as to how much time
[19]  from the time, you know, you first saw the impact and
[20]  you applied your brakes, I mean, a series of
[21]  questions.
[22]  But I can't say whether or not it
[23]  was — every one of these is a specific question or a
[24]  combination that was prodded by my follow-up

---

**1—12:19:06  24—12:20:02**  Page 504

[1]  conversations with him from other things that I had
[2]  learned through the course of the investigation and
[3]  questions that had been asked by family members
[4]  through the victim service representative to me.
[5]  **Q:** When Mr. Bard used the word "instantly,"
[6]  is that his word?
[7]  **A:** Yes.
[8]  **Q:** Okay. He also told you that the impact
[9]  knocked the truck sideways and almost knocked him out
[10]  of his seat; is that correct?
[11]  **A:** Yes.
[12]  **Q:** Was the information that he offered to
[13]  you, or was that as a result of a specific question
[14]  that you asked?
[15]  **A:** The first part would have been — said
[16]  held on and knocked — the vehicle was knocked
[17]  sideways, that could have been asked by me. The
[18]  combination of things that followed after that would
[19]  have been comments that I — best of my memory is
[20]  that he just, he said that he was almost knocked out
[21]  of his seat and had he not had his seat belt on, he
[22]  wouldn't have stayed where he stayed.
[23]  **Q:** Is Mr. Bard's statement that the impact
[24]  knocked the truck sideways and almost knocked him out

---

**1—12:20:06  24—12:21:06**  Page 505

[1]  of his seat consistent with physical evidence that
[2]  you found at the scene?
[3]  MR. van der VEEN: Objection to the
[4]  form of the question.
[5]  THE WITNESS: Yes.
[6]  **BY MS. RISK:**
[7]  **Q:** And what physical evidence that you found
[8]  at the scene is that statement consistent with?
[9]  **A:** It would be consistent with the damage to
[10]  the truck, considering the dynamics of a vehicle
[11]  striking a vehicle from the direction in which it did
[12]  and in the manner in which it did. But the vehicle
[13]  being up and face down with the body —
[14]  **Q:** I don't want to interrupt you, but when
[15]  you say, Vehicle up, down with the body —
[16]  **A:** Meaning the rear wheel in the air, front
[17]  wheel in the ground and Mr. Vascek being pinned, the
[18]  word I used — and that was my descriptive word — of
[19]  a sandwich, trying to describe in words what
[20]  happened. To cause that amount of damage, it had to
[21]  have been, from his description, an impact enough to
[22]  cause that — I mean, the jolt to rock the, the UPS
[23]  van.
[24]  **Q:** Was there any other physical evidence at

---

1—12:21:08   24—12:22:10                                   Page 506

[1] the scene that you had to corroborate the vehicle,

[2] UPS vehicle moving sideways —

[3]   A: The mark on the road.

[4]   Q: — being knocked sideways?

[5]   A: The mark on the roadway is evident that

[6] the vehicle had to have been pushed to — enough to

[7] have left a mark.

[8]   Q: And you're referring to the tire mark from

[9] the right tire of the UPS vehicle?

[10]   A: Yes.

[11]   Q: Is it your understanding that when Amy

[12] Stratton came upon the scene, she observed that the

[13] UPS truck was rocking?

[14]   A: Was still rocking, that was my

[15] understanding of that interview, yes.

[16]   Q: That's what she told Sergeant Cox; that's

[17] your understanding?

[18]   A: And through Sergeant Cox conveying that to

[19] me.

[20]   Q: And that statement is consistent both with

[21] Mr. Bard saying that he was knocked sideways, with

[22] the damage to UPS vehicle's left fender, as well as

[23] the physical evidence of the tire mark from the right

[24] tire; correct?

1—12:22:11   24—12:22:57                                   Page 507

[1]   A: Yes.

[2]   Q: Mr. Bard told you that his seat belt kept

[3] him in the driver's seat?

[4]   A: Yes.

[5]   Q: And that he estimated that the truck was

[6] moved sideways approximately one foot; is that

[7] correct?

[8]   A: Yes.

[9]   Q: Okay. Was that based on a question that

[10] you asked him or was that —

[11]   A: That would have been directed. That's

[12] something that when we get into specifics of feet,

[13] that's normally something that I — I mean, I can't

[14] be 100 percent, but I'm about 99 percent sure that

[15] that was a question that I asked: Can you estimate

[16] how far the vehicle was moved by the impact?

[17]   Q: And Mr. Bard told you that he thought his

[18] estimation was correct because of the tire mark at

[19] the collision scene from the right tire; is that

[20] correct?

[21]   A: Correct.

[22]   Q: Now, he offered that information on the

[23] telephone, or was that the result of a question you

[24] asked him?

1—12:23:02   24—12:41:35                                   Page 508

[1]   A: If it's confirmed, it means I asked him —

[2]   Q: Okay.

[3]   A: — thinking out loud now.

[4]   (Discussion held off the record.)

[5]              RECESS

[6]           BY MS. RISK:

[7]   Q: Corporal Weaver, I wanted to talk to you a

[8] little bit about your interview of Colton Swift.

[9]   A: Okay.

[10]   Q: Mr. Swift was — well, first of all,

[11] what's the date of your interview of Mr. Swift?

[12]   A: That interview occurred on Thursday

[13] afternoon, February 3rd, 2005, at approximately 1255

[14] hours, or 5 minutes before 1:00 p.m. in the

[15] afternoon.

[16]   Q: And based on the conclusion time of 1310

[17] hours, that would have been about 15 minutes —

[18]   A: Yes.

[19]   Q: — is that correct?

[20]   A: Yes.

[21]   Q: And this is a synopsis of the content of

[22] your interview of Mr. Swift?

[23]   A: Yes.

[24]   Q: What's the purpose of your going to see

1—12:41:38   24—12:42:33                                   Page 509

[1] Mr. Swift.

[2]   A: My contact for him was to do a follow-up

[3] from information that had been provided in the course

[4] of the investigation regarding the motorcycle.

[5]   Q: I'm sorry. This was a telephone

[6] interview, wasn't it?

[7]   A: Yes.

[8]   Q: So you didn't go to see Mr. Swift?

[9]   A: No.

[10]   Q: And the purpose was for you to find out

[11] more about the bicycle — about the motorcycle?

[12]   A: Find some information about the

[13] motorcycle, which I didn't realize it's in here. But

[14] I didn't know at the time that the motorcycle had

[15] been totaled. He voluntarily gave me that

[16] information.

[17]   But the purpose of the conversation

[18] was to ask him some specific questions regarding the

[19] particular motorcycle involved in this collision,

[20] capabilities, what it can do, or in relationship to

[21] what it was described to have done, for my own

[22] purpose, to get some information as to what type of

[23] speeds would require it to do what it did.

[24]   Q: When you were talking about what was

1—12:42:34  24—12:43:38                           Page 510

[1] described that it was done, you're talking about
[2] Mr. Seiffert's description of the position of the
[3] rear wheel and the motorcycle from the time he saw it
[4] until the time of impact; correct?
[5]    **A:** Yes.
[6]    MR. van der VEEN: Objection to the
[7] form of the question.
[8]              BY MS. RISK:
[9]    **Q:** What did you ask Mr. Swift?
[10]   **A:** I mean, basic information: who he is,
[11] what his job title is, what he does for Honda East.
[12] I've contacted Honda East and other dealerships in
[13] many variations of — in investigations over the
[14] course of the year. Other — I mean, call
[15] dealerships, that's not uncommon for us to do to get
[16] specifications or information from the manufacturer
[17] of a particular vehicle.
[18]    Asked him who he was and got that
[19] basic information; asked him how long he'd been
[20] working for them, of which he said since 1994. I'm
[21] sorry. He has motorcycle experience since 1994; that
[22] he'd been working for Honda East since 2000.
[23]    He gave me an estimate as to what the
[24] damage was to the vehicle, between 2500 to $4,000,

1—12:43:41  24—12:45:03                           Page 511

[1] and also indicated that it was totaled.
[2]    He said that the framework was not
[3] bent and that the brake system was very good on the
[4] bike as far as capabilities and what that bike would
[5] do. And then he gave a description, when I was
[6] trying to get an idea of a range of speeds or
[7] describing what was described to me to him, by what
[8] was described to me by Mr. Seiffert's observations,
[9] this was the information that I — the reason for the
[10] call, to find out exactly what type of speeds would
[11] be necessary to have a bike do what it did as it was
[12] described in this crash.
[13]   **Q:** Okay. And what did Mr. Swift tell you
[14] about the movement of the rear wheel with respect to
[15] the bike and speed?
[16]   **A:** He said that the bike has the ability to
[17] perform stoppies, and I put in parentheses what he
[18] meant was that the front wheel stops. At lower
[19] speeds, he estimated between 20 to 25 miles per hour,
[20] provide the ability to get the rear tire to pop off
[21] of the ground at a low height or hop.
[22]   **Q:** Is that when he was — when Mr. Swift was
[23] telling you about lower speeds, between 20 to 25
[24] miles an hour, allowing the rear tire to pop off of

1—12:45:08  24—12:46:02                           Page 512

[1] the ground, is that the type of movement or dynamics
[2] that we're talking about in this accident?
[3]    **A:** No.
[4]    **Q:** Okay. Did you describe the dynamics of
[5] this accident to Mr. Swift?
[6]    **A:** Yes.
[7]    **Q:** And did you describe, in essence,
[8] Mr. Seiffert's observations of the motorcycle
[9] dynamics?
[10]   **A:** Yes.
[11]   **Q:** And did Mr. Swift have any observations
[12] about the speed component with regard to this
[13] specific motorcycle, based on your description to him
[14] of the dynamics of this?
[15]   **A:** Yes.
[16]   **Q:** And what was it?
[17]   **A:** He indicated that by my description of
[18] what I gave him, based on what Mr. Seiffert provided
[19] as well as what the rest of the investigation I knew
[20] at that point, he said higher speeds, more
[21] significant — for higher, more significant speeds
[22] are needed to bring the rear tire up off the ground
[23] into a stoppie position, is what he called it, a
[24] stoppie position.

1—12:46:02  24—12:46:48                           Page 513

[1]    Based on the description of the
[2] dynamics of this investigation, Mr. Swift estimated
[3] that the speed of the motorcycle would have to have
[4] been approximately 50 to 60 miles per hour or higher
[5] to get the bike to do what it did in this collision
[6] as I described it to him.
[7]    **Q:** And that would be bringing the rear wheel
[8] up off of the pavement and the rear wheel in a
[9] progressive manner going up into the air to end up
[10] perpendicular the road — the bicycle to end up
[11] perpendicular to the road?
[12]    MR. van der VEEN: Objection.
[13]              BY MS. RISK:
[14]   **Q:** Is that a fair representation of
[15] Mr. Seiffert's observations?
[16]   **A:** Yes.
[17]    MR. van der VEEN: Objection to the
[18] form of the question.
[19]              BY MS. RISK:
[20]   **Q:** And Mr. Swift told you that it would take
[21] a speed of 50 to 60 miles per hour or higher to be
[22] able to do that?
[23]   **A:** Yes.
[24]    MR. van der VEEN: Objection.

---

1—12:46:49   24—12:47:35                     Page 514

[1]       BY MS. RISK:

[2]    Q: Is that speed approximation by Mr. Swift

[3] with regard to this specific motorcycle and its

[4] capabilities, is that consistent with the other facts

[5] that you collected in this case, both the physical

[6] evidence as well as the testimony of all of the

[7] witnesses?

[8]       MR. van der VEEN: Objection to the

[9] form of the question.

[10]   THE WITNESS: Yes.

[11]       BY MS. RISK:

[12]    Q: And that would be that Mr. Vascek's speed

[13] was in excess of 50 to 60 miles an hour —

[14]       MR. van der VEEN: Objection to the

[15] form of the question. That's —

[16]       BY MS. RISK:

[17]    Q: — when Mr. Seiffert first saw him?

[18]       MR. van der VEEN: Objection to the

[19] form of the question. It assumes testimony that this

[20] officer clearly said he can't give.

[21]    MS. RISK: It's a poorly worded

[22] question. I'll ask it again.

[23]       BY MS. RISK:

[24]    Q: Is Mr. Swift's estimate of the speed

---

1—12:47:39   24—12:48:46                     Page 515

[1] consistent, not the exact speed, but speeds in excess

[2] of the 40-mile-per-hour speed limit, consistent with

[3] all of the other evidence and testimony that was

[4] collected in this case?

[5]       MR. van der VEEN: Objection to the

[6] form of the question.

[7]    THE WITNESS: The range that he gave

[8] is consistent with the overall statements that were

[9] provided by all parties and the physical evidence —

[10]       BY MS. RISK:

[11]    Q: When you —

[12]    A: — without assigning a specific speed to

[13] the bike.

[14]    Q: When you were deposed the first day of

[15] your deposition, you testified about being able to

[16] weigh statements between witnesses that may be

[17] inconsistent. Do you recall that?

[18]    A: Yes.

[19]    Q: And in this case was it necessary for you

[20] to weigh statements as between witnesses? Did you

[21] have any inconsistent information in this

[22] investigation at all?

[23]    A: Not that I'm aware of.

[24]    Q: Okay. In fact, all of the information

---

1—12:48:50   24—12:49:46                     Page 516

[1] that you have in this case, the testimony of the

[2] witnesses, is consistent with regard to Mr. Bard

[3] coming to a complete stop, isn't it?

[4]    A: Yes.

[5]    Q: And all of the information that you have

[6] with regard to witness statements is that Mr. Bard,

[7] after coming to a complete stop, slowly proceeded

[8] into the intersection, isn't it?

[9]    A: Yes.

[10]    Q: And all of the information that you have

[11] regarding the position of the UPS vehicle coming to a

[12] stop just prior to the double-yellow line in the

[13] intersection is consistent in this case, isn't it?

[14]       MR. van der VEEN: Objection to the

[15] form of the question.

[16]    THE WITNESS: Yes.

[17]       BY MS. RISK:

[18]    Q: And that would include both with regard to

[19] the position of the UPS vehicle where it stopped,

[20] that would be all of the physical evidence and the

[21] witness statements would all be consistent with

[22] respect to the location of the UPS vehicle and where

[23] it stopped in the road —

[24]       MR. van der VEEN: Objection to the

---

1—12:49:46   24—12:50:48                     Page 517

[1] form of the question.

[2]    THE WITNESS: Yes.

[3]       BY MS. RISK:

[4]    Q: — is that correct?

[5]       And all of the witness testimony and

[6] physical evidence with regard to the motorcycle

[7] impacting the UPS package car is consistent, isn't

[8] it?

[9]    A: Yes.

[10]       MR. van der VEEN: Objection to the

[11] form of the question.

[12]       BY MS. RISK:

[13]    Q: You interviewed Miss Kristin DiPaolo,

[14] didn't you, Corporal Weaver?

[15]    A: Yes.

[16]    Q: You conducted a telephone interview of

[17] Miss DiPaolo.

[18]    A: Yes.

[19]    Q: And she was one of the nurses who came

[20] upon the scene?

[21]    A: Yes.

[22]    Q: I'll refer you to page 14 of your summary

[23] report. When did you conduct the interview of Miss

[24] DiPaolo?

---

UPS & Bard                                                                    Vol. 2, August 22, 2005

---

1—12:50:50  24—12:52:07                          Page 518

[1] A: Wednesday afternoon, February 2nd, 2005,
[2] at approximately 1545 hours, or 3:45 p.m.
[3] Q: And based on the conclusion time of your
[4] interview, 1556, that's approximately eleven minutes
[5] you spoke to Ms. DiPaolo?
[6] A: Yes.
[7] Q: And in your report there's a brief
[8] synopsis of the content of that interview; correct?
[9] A: Yes.
[10] Q: What did Miss DiPaolo tell you?
[11] A: She stated that she was coming from
[12] Delaware and was traveling northbound on Montchanin
[13] Road headed, heading toward Pennsylvania. The car in
[14] front of her at the intersection and the female
[15] operator jumped out and stated, Somebody must be
[16] hurt. And I'm a nurse.
[17] Miss DiPaolo told the female that she
[18] was also a nurse and then responded to the location
[19] of the motorcycle operator. She initially checked
[20] and felt a weak pulse. She was worried about the
[21] operator's neck. The operator then stopped
[22] breathing, and both nurses began CPR. The operator
[23] never regained a pulse. Miss DiPaolo asked someone
[24] to call 911. The operator was basically dead at the

---

1—12:52:12  24—12:53:13                          Page 519

[1] scene, and she's referring to the motorcycle
[2] operator, Mr. Vascek.
[3] The collision had just happened when
[4] she arrived. It was a fresh collision scene. The
[5] UPS truck was stopped and partially in the
[6] intersection, almost midway.
[7] Miss DiPaolo stated that she is
[8] familiar with the area. It is difficult to see from
[9] both directions.
[10] She was referring to Montchanin
[11] Road/Twaddell Mill, the intersection. She described
[12] the intersection as a very bad intersection. There
[13] are many trees in the area of the intersection which
[14] helps add to the visibility problem.
[15] The truck operator had to come out
[16] into the intersection to see. The other nurse, who's
[17] identified in the report as Witness 1, Miss Amy R.
[18] Stratton told her that the motorcycle operator was on
[19] her tail and passed her on the double-yellow line
[20] just before the collision happened.
[21] Q: Now, we've — let me interrupt you for a
[22] minute.
[23] A: We've clarified —
[24] Q: Go ahead. I'm sorry.

---

1—12:53:13  24—12:54:22                          Page 520

[1] A: — that that is not Miss Stratton. That
[2] would be — Miss Stratton was the young lady that
[3] Sergeant Cox interviewed. The other nurse would be
[4] Miss —
[5] Q: — Garroway?
[6] A: Thank you.
[7] Q: But Miss Stratton was the individual whom
[8] Mr. Vascek was following. So the information with
[9] regard to Miss Stratton in that statement is correct,
[10] isn't it?
[11] A: Yes.
[12] Q: It's just the fact that she's not a nurse?
[13] A: It's the wrong — correct.
[14] Q: Okay. Go ahead.
[15] A: Said that the motorcycle was traveling
[16] fast when it passed her and before it went out of
[17] sight. It appeared that the motorcycle and operator
[18] hit the truck and dropped to the ground.
[19] And she remembers the truck driver
[20] moving the truck to help provide them with some
[21] working space, and the UPS driver was very upset.
[22] And she described the collision day as a nice fall
[23] day and it was clear, referring to visibility as far
[24] as overall weather conditions.

---

1—12:54:24  24—12:55:20                          Page 521

[1] Q: And that was all what Miss DiPaolo told
[2] you except for the part about what Miss Stratton told
[3] her about Mr. Vascek following behind her; correct?
[4] MR. van der VEEN: Objection to the
[5] form of the question.
[6] THE WITNESS: Yes.
[7] MR. van der VEEN: Except for her
[8] being a nurse, you mean?
[9] MS. RISK: Yeah.
[10] BY MS. RISK:
[11] Q: I think when you started, it's not clear.
[12] Did Miss Stratton tell Miss DiPaolo that the
[13] motorcycle was traveling fast when it passed her and
[14] before it went out of sight?
[15] A: Yes.
[16] Q: You also had the opportunity to interview
[17] the other nurse at the scene, Miss Karen Garroway;
[18] correct? On page 16, it's a summary of your
[19] interview of Miss Garroway.
[20] A: That was by telephone.
[21] Q: Okay. When did you conduct that
[22] interview?
[23] A: Wednesday afternoon, February 9th, 2005,
[24] at approximately 1340 hours, or 20 minutes before

---

[1] 2:00 p.m. in afternoon.

[2]  **Q:** Based on the conclusion time of that

[3] interview of 1348 you were — your interview of,

[4] telephone interview of Miss Garroway was

[5] approximately eight minutes; is that correct?

[6]  **A:** Correct. Yes.

[7]  **Q:** And that interview was conducted by

[8] telephone?

[9]  **A:** Yes.

[10]  **Q:** And you recorded it with handwritten

[11] notes; correct?

[12]  **A:** Yes.

[13]  **Q:** Okay. Can you tell me what Miss Garroway

[14] told you?

[15]  **A:** She stated that she was traveling

[16] northbound on Montchanin Road and had arrived at the

[17] scene of the collision briefly after it happened.

[18]  **MR. van der VEEN:** Let the record

[19] reflect the witness is reading the document.

[20]  **THE WITNESS:** She did not witness the

[21] crash. She initially wondered why the UPS truck was

[22] located where it was. She saw the driver of the UPS

[23] truck get out of the truck as she approached from the

[24] distance and was not sure what was going on. She

[1] felt that something was not right. From what she had

[2] observed up to that point, she said she knew

[3] something was not right.

[4]

[5]                    **BY MS. RISK:**

[5]  **Q:** You mean while she was traveling in the

[6] car when she first observed —

[7]  **MR. van der VEEN:** Objection.

[8]  **THE WITNESS:** When she got out, when

[9] she's walking toward, in the course of what she just

[10] shared with me, she's saying that she knows

[11] something's not right for this truck to be where it

[12] is, not knowing why it's where it is, but something

[13] is not, is not the way it should be.

[14]  She was the first northbound car to

[15] arrive at the collision scene. Another person in

[16] another car, which later was reflected to be

[17] Miss Christine DiPaolo in this investigation, she was

[18] located directly behind her vehicle.

[19]  And Miss Garroway stated that she was

[20] on her way home at the time when she rolled up on

[21] this crash. She got out of her car to see what had

[22] happened. The motorcycle operator was on the ground

[23] face down and was basically lifeless.

[24]  She and the other nurse, which is Miss

[1] DiPaolo, immediately began to attend to the medical

[2] needs of the operator. They rolled him over onto his

[3] back and took off his motorcycle helmet. They

[4] instructed the UPS driver to back the truck up to

[5] provide them with some additional working space. The

[6] truck was in her back as she attempted to assist with

[7] the injured operator. She stated that she was not

[8] sure about the motorcycle being moved.

[9]  I asked her — that was prodded by a

[10] question.

[11]  And the operator's one leg may have

[12] been near the motorcycle, and it was moved. She was

[13] not sure.

[14]                    **BY MS. RISK:**

[15]  **Q:** Did you later find out that the motorcycle

[16] was moved?

[17]  **A:** Yes.

[18]  **Q:** Do you have an independent recollection of

[19] this conversation with Miss Garroway?

[20]  **A:** Not other than my notes.

[21]  **Q:** Okay. And you've been looking at your

[22] report throughout what you've just told me about your

[23] conversation with Miss Garroway; correct?

[24]  **A:** Yes.

[1]  **Q:** It's your understanding that Miss Garroway

[2] instructed — was the individual who instructed

[3] Mr. Bard to move the UPS vehicle —

[4]  **A:** Yes.

[5]  **Q:** — so that she could attend to Mr. Vascek;

[6] correct?

[7]  **MR. van der VEEN:** Objection to the

[8] form of the question.

[9]  **THE WITNESS:** Yes.

[10]                    **BY MS. RISK:**

[11]  **Q:** Corporal Weaver, how long did you spend at

[12] the scene on the day of the accident?

[13]  **A:** By looking at the dispatch from the

[14] communication center, it looks like approximately two

[15] hours from the time I arrived until the time that I

[16] cleared the scene.

[17]  **Q:** Okay. So you spent two hours at the

[18] accident scene that day?

[19]  **A:** Approximately.

[20]  **Q:** And you went back two additional days to

[21] follow up; correct?

[22]  **A:** Yes.

[23]  **Q:** How long did you spend on the first

[24] follow-up date at the accident scene?

UPS & Bard                                    Vol. 2, August 22, 2005

---

1—01:01:02  24—01:02:13                Page 526

[1]    A: Approximately 15 to 20 minutes.

[2]    Q: And what did you do that follow-up date at
[3] the accident scene?

[4]    A: Basically at that point I was just looking
[5] at the overall layout of the intersection, just all
[6] perspectives driving toward it from the north, from
[7] the south, and also from Twaddell Mill, just
[8] basically coming around in all directions from the
[9] intersection just to get an overall perspective from
[10] looking at it because obviously I have to take from
[11] the field notes that Sergeant Cox — field sketch,
[12] excuse me, do a diagram and just to get a better
[13] personal understanding of the intersection.

[14]    And then I went back on a later
[15] date — that's on the notes — of where I got out and
[16] did an actual more-detailed, by using a roller wheel
[17] and marking known distances, like to the edge of the
[18] bridge and where the tree lines are and things like
[19] that.

[20]    Q: And you did that on the second
[21] follow-up —

[22]    A: Yes.

[23]    Q: — inspection?

[24]    How long did you spend in the second

---

1—01:02:16  24—01:05:02                Page 527

[1] follow-up at the scene?

[2]    A: I'm looking for my note. It's always the
[3] one I can't find; because it's not where I'm looking.

[4]    Looking at the notes that I've taken
[5] and the time of reference of when I started and
[6] looking at the notes that I took and judging my past
[7] experience to do this, I was probably there about —
[8] now, I'm estimating — about an hour and a half,
[9] maybe two hours, tops.

[10]    Q: Do you feel you did a careful and thorough
[11] investigation of this accident, Corporal Weaver?

[12]    A: Yes.

[13]    Q: In the reconstruction portion of your
[14] report, you state that due to the lack of specific
[15] physical evidence at the collision scene, there was
[16] no reconstruction speed calculations made during this
[17] investigation; is that correct?

[18]    A: Yes.

[19]    Q: In the last day of your deposition, there
[20] was a lengthy discussion between yourself and
[21] Mr. van der Veen about perfect-world reconstructions.
[22] Do you recall that?

[23]    A: Yes.

[24]    Q: And in a perfect-world reconstruction, you

---

1—01:05:05  24—01:06:08                Page 528

[1] would have everything there to be able to reconstruct
[2] the accident beyond a shadow of a doubt, wouldn't
[3] you?

[4]    A: To a degree of scientific ability —

[5]    MR. van der VEEN: Objection.

[6]    THE WITNESS: — yes.

[7]                  BY MS. RISK:

[8]    Q: Okay. You've testified earlier that
[9] you've investigated over 4,000, approximately — and
[10] I won't hold you to that — accidents during the
[11] course of your police work.

[12]    What percentage of that 4,000
[13] investigations have you had a perfect-world scenario
[14] where you had all of the physical evidence and all of
[15] the witness statements that you would want? I'm just
[16] asking for an estimate.

[17]    A: None. There is no perfect — where you'd
[18] have absolutely everything you'd need.

[19]    Q: Okay. So there are what percentage of
[20] times, then — so it's a hundred percent of the time
[21] you don't have everything that you need; is that
[22] fair?

[23]    A: That's fair.

[24]    Q: But of those 4,000 or approximately 4,000

---

1—01:06:12  24—01:07:09                Page 529

[1] investigations that you did, how many did you not
[2] come to a conclusion as to the primary cause of the
[3] accident?

[4]    A: Less than one percent.

[5]    Q: So is it fair to say, then, that even
[6] though you may not have all of the physical evidence
[7] or the witness statements that you would want, that
[8] it is necessary at times to draw conclusions based on
[9] the information that's available to you; is that
[10] fair?

[11]    A: Yes.

[12]    MR. van der VEEN: Objection.

[13]                  BY MS. RISK:

[14]    Q: Corporal Weaver, are you comfortable with
[15] the conclusions that you've drawn with respect to the
[16] police report that's in front of you here today?

[17]    MR. van der VEEN: Objection.

[18]    THE WITNESS: Yes.

[19]                  BY MS. RISK:

[20]    Q: And the conclusions and findings that are
[21] in that very lengthy police report, are they based on
[22] the two hours at the accident scene of investigation,
[23] two follow-ups at the accident scene, multiple
[24] witness interviews, interview of a Honda East service

---