Vol. 2, August 26, 2002

1—01:07:13  24—01:08:32                Page 530

[1] person, and other work and hours of investigation in
[2] this case?
[3]    A: Yes.
[4]    Q: Okay. So the lack of specific physical
[5] evidence in this case that you refer to in the
[6] reconstruction part of your report, that's with
[7] respect to coming to a specific finding for the
[8] specific speed calculation, isn't it?
[9]    A: Yes.
[10]    Q: In the reconstruction part of your report,
[11] you also make note halfway down the second paragraph
[12] that there is an "intersection ahead" sign posted
[13] approximately 50 feet prior to the intersection —
[14] I'm sorry. That's page 16.
[15]    A: Thank you. Yes.
[16]    Q: — prior to the intersection which advises
[17] southbound traveling tourists, motorists of the
[18] intersection. Did I state that correctly?
[19]    A: Yes.
[20]    Q: Now, the southbound traveling motorist in
[21] this case would be Mr. Vascek, wouldn't it?
[22]    A: Yes.
[23]    Q: So 50 feet prior to the
[24] Montchanin/Twaddell Mill intersection, there is an

1—01:08:35  24—01:09:22                Page 531

[1] advisory sign on Montchanin Road advising motorists
[2] like Mr. Vascek that there is an intersection ahead,
[3] isn't there?
[4]    A: Yes.
[5]    Q: And that's because it's a lined
[6] intersection and motorists coming southbound are
[7] coming around a curve, aren't they?
[8]    MR. van der VEEN: Objection to the
[9] form of the question.
[10]    THE WITNESS: My experience with
[11] dealing with DelDOT would be that would be the reason
[12] why that sign is there, yes.
[13]    BY MS. RISK:
[14]    Q: As a — in your 20 years as a trooper and
[15] in your experience as a policeman, is that sign there
[16] to warn motorists that there is an intersection up
[17] ahead?
[18]    A: Yes.
[19]    Q: At the time of this accident was there
[20] anything obstructing that sign?
[21]    A: No.
[22]    MR. van der VEEN: Objection to the
[23] form of the question.
[24]    BY MS. RISK:

1—01:09:22  24—01:10:22                Page 532

[1]    Q: Were there any shrubs obstructing the
[2] sign?
[3]    A: No.
[4]    MR. van der VEEN: Objection to the
[5] form of the question?
[6]    BY MS. RISK:
[7]    Q: Trees obstructing the sign?
[8]    A: No.
[9]    MR. van der VEEN: Objection to the
[10] form of the question.
[11]    BY MS. RISK:
[12]    Q: Was the sign visible — on the date of
[13] this accident, was the sign present and visible for
[14] Mr. Vascek approaching that intersection?
[15]    A: Yes.
[16]    MR. van der VEEN: Objection to the
[17] form of the question.
[18]    BY MS. RISK:
[19]    Q: On page 17 in your reconstruction of the
[20] accident, you state, It is necessary for eastbound
[21] traveling motorists to move forward toward Montchanin
[22] Road to visibly see north- and southbound traveling
[23] motorists that are approaching the intersection; is
[24] that a fair recitation of that statement?

1—01:10:24  24—01:11:24                Page 533

[1]    A: Yes.
[2]    Q: Now, when you're referring to eastbound
[3] traveling motorists, you're referring in this case to
[4] Mr. Bard; correct?
[5]    A: Yes.
[6]    Q: Okay. So it's your opinion that eastbound
[7] traveling motorists like Mr. Bard need to move
[8] forward or in order — they need to move forward to
[9] visibly see north- and southbound traveling motorists
[10] at that intersection; correct?
[11]    A: Yes.
[12]    Q: And is it your understanding that
[13] Mr. Bard, in fact, did that?
[14]    A: Yes.
[15]    Q: And is it your understanding that Mr. Bard
[16] had to worry about both southbound motorists like
[17] Mr. Vascek, which would be to his left, as well as
[18] northbound motorists to his right?
[19]    A: Yes.
[20]    Q: And, in fact, if you were seated in
[21] Mr. Bard's seat at that intersection, to his right up
[22] the hill is another curve in the road, isn't it?
[23]    A: Yes.
[24]    Q: So there are blind curves both to the left

UPS & Bard

---

**1—01:11:27  24—01:12:16**  Page 534

[1] and the right of the Montchanin/Twaddell Mill
[2] intersection, aren't there?
[3]     MR. van der VEEN: Objection to the
[4] form of the question.
[5]     THE WITNESS: Yes.
[6]                 BY MS. RISK:
[7]     Q: So care should be taken — caution should
[8] be taken by any driver approaching that intersection
[9] to both look left as well as right; is that fair?
[10]    A: Yes.
[11]    Q: Okay. In fact, if Mr. Bard had just been
[12] looking left at the time of this accident and a car
[13] had been approaching northbound, he may have been hit
[14] by that vehicle —
[15]    MR. van der VEEN: Objection to the
[16] form of the question.
[17]                BY MS. RISK:
[18]    Q: — maybe?
[19]    A: Yes.
[20]    MR. van der VEEN: Objection to the
[21] form of the question. If there was a vehicle assumes
[22] facts not in evidence.
[23]                BY MS. RISK:
[24]    Q: Paragraph 3 of your reconstruction states

---

**1—01:12:23  24—01:13:24**  Page 535

[1] that based on witness statements, Operator No. 2
[2] statements — that's Mr. Bard; correct?
[3]    A: Yes.
[4]    Q: — and physical evidence at the collision
[5] scene, the UPS truck had stopped approximately 2 feet
[6] away from the center of the roadway at impact; is
[7] that correct?
[8]    A: Yes.
[9]    Q: You make the observation that this
[10] provided the entire northbound lane of travel to
[11] remain open for an evasive maneuver approximately
[12] 10 feet 6 inches, if time and travel speed had
[13] permitted.
[14]    Could you explain to me what you mean
[15] by that statement?
[16]    A: If a vehicle was traveling — the
[17] positioning of the UPS truck is all but in the center
[18] of the roadway, all but 2 feet, through —
[19] Mr. Seiffert is the main witness of the statement as
[20] to the placement and then confirmed through the one
[21] nurse, I believe, that made the comment.
[22]    If a vehicle is traveling in a
[23] southbound lane, as the operator of the motorcycle
[24] was, Mr. Vascek, and if he was traveling at a speed.

---

**1—01:13:28  24—01:14:21**  Page 536

[1] that would have enabled him to do a maneuver to
[2] swerve to the left and provided, as we stated
[3] earlier, that there was nothing in that lane and it
[4] was safe to do so, to avoid the truck, it could have
[5] been done,
[6]    But it's based on how fast — which I
[7] can't say how fast he was traveling, whether it would
[8] have been, the speed he was traveling would have been
[9] able to do it or not.
[10]    But the point that I'm making as
[11] observation is the southbound lane was blocked all
[12] but 2 feet, but the northbound lane was still clear.
[13] And it's to divert the other questions as far as
[14] legally, does he have — I'm just looking at common
[15] sense-wise.
[16]    When your rear is in — your life is
[17] going towards something, if you can go off the road
[18] and do it safely and, you know, defensively, you're
[19] going to — with the time that you have to react and
[20] the speed that you're traveling, you're going to try
[21] to do something.
[22]    Q: And that something would be —
[23]    A: It's just natural for anyone, any driver
[24] to do.

---

**1—01:14:22  24—01:15:23**  Page 537

[1]    Q: And in this case would that something be
[2] to take an evasive maneuver and go into the
[3] northbound lane?
[4]    A: That's the point of what I'm trying to
[5] explain, that that lane was open. If that was an
[6] option, if speed was within the realm that that could
[7] have been done, that was a possible option that
[8] Mr. Vascek might have done. But it didn't happen.
[9] I'm just explaining that that lane is open.
[10]    Q: Based on Mr. Seiffert, the independent
[11] witness's statements to you, from the time he first
[12] saw the motorcycle, position of the rear wheel, as
[13] well as the position of the operator with respect to
[14] the motorcycle, from the time he first saw the
[15] motorcycle to the time of impact, his description of
[16] Mr. Vascek's body with respect to the motorcycle, did
[17] Mr. Vascek have control over his motorcycle to be
[18] able to make an evasive maneuver at that point —
[19]    MR. van der VEEN: Objection to the
[20] form of the question.
[21]                BY MS. RISK:
[22]    Q: — at any point along the way?
[23]    A: Within that one to two seconds that he
[24] described and the position in which it was in, no.

---

[1] **Q:** Do you have any information available to
[2] you, either testimony or physical evidence, that
[3] Mr. Vascek took an evasive maneuver of any kind?

[4] **A:** I have no knowledge of that.

[5] **Q:** Okay. When you fill out an initial crime
[6] report — or isn't it — is it mandatory to fill out
[7] a crime report when there's a fatality involved in an
[8] accident?

[9] **A:** Yes.

[10] **Q:** So that's mandatory; you have no choice?

[11] **A:** Correct.

[12] **Q:** And in the case of a fatal accident, is
[13] there a process, a mandatory process that the police
[14] report goes through with respect to the Attorney
[15] General reviewing it?

[16] **A:** Yes.

[17] **Q:** Can you explain that process? Or with
[18] respect to this accident.

[19] **A:** Basically, what is done is the
[20] investigation is conducted. The Attorney General's
[21] office is normally notified earlier in the
[22] investigation, if need be.

[23]    If it's unknown at that point, I mean,
[24] we're still collecting a lot of material, whatever —

[1] I mean, they're still — they're initially notified.
[2] One of the things that we do, as I said earlier, we
[3] go back and send a Teletype before — however long
[4] we've been working on an investigation, if we're
[5] working twelve hours on it or whatever, before we
[6] leave, the last thing that we do, the divisional
[7] requirement's that we send a Teletype — was a
[8] Teletype; it's an email message — to reflect that a
[9] fatal has occurred.

[10]    And on that mailing roster of the
[11] people who we elect, there's a series from the
[12] colonel on down with people, key people that need to
[13] be notified in the Attorney General's office. And
[14] the Attorney Generals — the Deputy Attorney Generals
[15] that work with our fatal collisions all are on that.

[16]    So that — their initial notice of it,
[17] if I don't make a phone call from the scene and don't
[18] warrant it at that time or within a couple days later
[19] don't make an immediate phone call to the Attorney
[20] General's office, they are still made aware of it by
[21] way of they are sent the Teletypes to know that, hey,
[22] the State Police fatal team went out on this
[23] location, this date, this time, the bare, basic facts
[24] of the collision. So they're initially notified

[1] through that.

[2]    Later, through subsequent follow-ups
[3] through the course of the investigation, we'll call
[4] and ask for guidance.

[5]    Sir, this is what I got. What do you
[6] want me to do? Have I done this — I've done this,
[7] this, and this. Do I need to do anything else?
[8] Whatever you want us to do and made aware of the
[9] case.

[10]    When the report is completed, when
[11] we've collected all the data and the finished product
[12] is absolutely finished, it's iron sealed, everybody's
[13] reviewed it from our office and it's on its way to
[14] headquarters, we make an appointment with the DAG,
[15] physically go into their office, sit down with them,
[16] provide them with a copy of the report to view —
[17] they can keep it if they wish or diagrams — and they
[18] pick our brains, so to speak. And we explain what
[19] the overall investigation revealed.

[20]    And then we're subject to whatever
[21] questions they want to ask us at that point. Did we
[22] do this? Did we do that? What about this? What
[23] about that?

[24]    And then they make a determination.

[1] Sometimes it's done right then and there.
[2] Oftentimes, more the pallor of the situation is that
[3] there's a time lapse; because sometimes they'll
[4] bounce it off other Deputy Attorney Generals.

[5]    They have sessions that meet weekly.

[6] And, oftentimes, they'll get what we call a round
[7] robin. They'll all be in a conference room. And
[8] they'll talk about cases that are going on during
[9] that week. And as a result of it, they'll bounce it
[10] off each other and say, Well, what do you think? or
[11] whatever. And — but, I mean, that's the overall
[12] perspective.

[13]    But then they will direct us. If
[14] we've done everything or they feel that we have
[15] nothing else to pursue, without any guidance, you
[16] know, go do this, do this, or whatever, they get back
[17] with us and give us a ruling on their perspective of
[18] the Attorney General's side of the house, what they
[19] want us to do or what they think or feel we should
[20] do. They direct us at prosecution, nonprosecution,
[21] traffic, criminal. They tell us what to do.

[22] **Q:** Did there come a time when you met with
[23] the AG's office with respect to this accident?

[24] **A:** Yes.

---

UPS & Bard                                                              Vol. 2, August 22, 200

---

1—01:20:07   24—01:21:35                    Page 542

[1] **Q:** And who did you meet with at the AG's
[2] office?
[3] **A:** Deputy Attorney General Paul Wallace.
[4] **Q:** Can you tell me what happened during the
[5] course of your discussions with the Deputy Attorney
[6] General?
[7] **A:** Explained the investigation, showed him
[8] the photographs, showed him the diagram. Engaged in
[9] conversation about what happened, what the
[10] investigation revealed. And he made a determination
[11] that there would be no prosecution in this case.
[12] **Q:** And when was that meeting?
[13] **A:** Wednesday morning, February 9th, 2005, at
[14] approximately 10:00 a.m. in the morning I met with
[15] Deputy Attorney General Paul Wallace.
[16] **Q:** Corporal Weaver, you determined the
[17] primary cause of this accident to be the operator of
[18] the motor — the motorcycle operator was operating
[19] the motorcycle in a manner too fast for conditions —
[20]     MR. van der VEEN: Objection to the
[21] form of the question.
[22]             **BY MS. RISK:**
[23] **Q:** — he experienced as he entered a sharp
[24] curve in the roadway and approached the location of a

---

1—01:21:37   24—01:22:08                    Page 543

[1] hidden intersection; isn't that correct?
[2] **A:** Yes.
[3]     MR. van der VEEN: Objection to the
[4] form of the question.
[5]             **BY MS. RISK:**
[6] **Q:** Corporal Weaver, what did you determine to
[7] be the primary cause of this accident?
[8]     MR. van der VEEN: Objection to the
[9] form of the question. He's already determined that
[10] he could not make a determination within a reasonable
[11] degree of scientific certainty.
[12]     MS. RISK: That was not my question.
[13] Speaking objection. I asked Corporal Weaver, What
[14] did you determine to be the primary cause of this
[15] accident?
[16]     MR. van der VEEN: Objection to the
[17] form of the question.
[18]             **BY MS. RISK:**
[19] **Q:** Did you — let me back up for a minute,
[20] Corporal Weaver.
[21] Did you determine a primary cause to
[22] this accident?
[23] **A:** Yes.
[24]     MR. van der VEEN: Objection to the

---

1—01:22:08   24—01:22:57                    Page 54

[1] form of the question.
[2]             **BY MS. RISK:**
[3] **Q:** And what was the primary cause that you
[4] determined in this accident?
[5]     MR. van der VEEN: Objection to the
[6] form of the question.
[7]     THE WITNESS: That Mr. Vascek, who was
[8] operating the motorcycle, had operated his motorcycle
[9] in a manner which was too fast for the conditions
[10] that he experienced as he entered a sharp curve in
[11] the roadway and approached the location of a hidden
[12] intersection.
[13]             **BY MS. RISK:**
[14] **Q:** Okay. In your first day of depositions,
[15] Corporal Weaver, Mr. van der Veen asked you some
[16] questions about your opinions to a reasonable degree
[17] of accident reconstruction certainty; do you recall
[18] that?
[19] **A:** Yes.
[20] **Q:** The opinions that are in this police
[21] report with regard to the primary cause of this
[22] accident, do you hold those to a reasonable degree of
[23] accident investigation certainty?
[24] **A:** Yes.

---

1—01:22:59   24—01:24:06                    Page 545

[1]     MR. van der VEEN: Objection to the
[2] form of the question.
[3]             **BY MS. RISK:**
[4] **Q:** So is it fair to say that the speed
[5] calculations are the only part of this accident that
[6] you can't determine to a reasonable degree of
[7] accident reconstruction certainty?
[8] **A:** Yes.
[9]     MR. van der VEEN: Objection to the
[10] form of the question.
[11]             **BY MS. RISK:**
[12] **Q:** Is it fair to say — strike that.
[13]     Corporal Weaver, after the accident —
[14] I'm going to refer you to your file — actually, to
[15] your — which you have right in front of you — your
[16] telephone message memos. After the time of this
[17] accident you received a phone call, phone message
[18] from Richard Wier; do you recall that?
[19] **A:** Yes.
[20] **Q:** And Richard Wier is plaintiff's counsel in
[21] this case along with Mr. van der Veen, isn't he?
[22] **A:** Yes.
[23] **Q:** I don't have a page number to refer you
[24] to, but it's the upper left-hand corner of mine —

---

1—01:24:10  24—01:25:00                    Page 546

[1] you have the independent telephone memos there.

[2]    A: Okay.

[3]    Q: Do you have that in front of you?

[4]    A: If it's — are you referring to the one

[5] from January 13th?

[6]    Q: Yes, sir. January 13th, 2005. And is

[7] this — it's your understanding — your understanding

[8] that this January 13th, '05, was after a lawsuit was

[9] filed, is that correct, in this case? Or you don't

[10] know?

[11]    A: I don't know.

[12]    Q: Okay. Did you know at the time of this

[13] phone message who Mr. Richard Wier was?

[14]    A: Yes.

[15]    Q: Did you know that he was Mrs. Vascek's

[16] attorney?

[17]    A: No — oh, yes.

[18]    Q: Okay.

[19]    A: I thought — when you asked if I knew,

[20] I've known Mr. Wier via other investigations, through

[21] the office, yeah.

[22]    Q: But you understood this telephone message

[23] to be left by Mr. Wier with respect to the Vascek

[24] accident?

---

1—01:25:01  24—01:26:53                    Page 547

[1]    A: Yes.

[2]    Q: And you also understood that he

[3] represented, along with Mr. van der Veen — whether

[4] or not you knew Mr. van der Veen at that point —

[5] Mrs. Vascek?

[6]    A: Yes.

[7]    Q: And I'm sorry. I believe you did know

[8] Mr. van der Veen represented Mrs. Vascek at that

[9] point because you had already spoken to

[10] Mr. van der Veen in early November of 2004; is that

[11] correct?

[12]    A: Yes.

[13]    Q: You didn't speak to Mr. Wier that day, did

[14] you?

[15]    A: The day that I spoke with —

[16]    Q: No. The day of this phone message on

[17] January 13th, '05.

[18]    A: This was a tape message and — do we have

[19] a calendar? Can you tell me what the day of the week

[20] the 13th of January was?

[21]    MS. RISK: We can go off the record.

[22]    (Discussion held off the record.)

[23]    THE WITNESS: The following Tuesday I

[24] left a message on the answering machine. I'm looking

---

1—01:26:57  24—01:28:47                    Page 548

[1] at this. I didn't speak to him. But I didn't put

[2] the date on here. I put 9:50 twice, which is — but

[3] at 9:50 in the morning on Tuesday, if the 13th was a

[4] Thursday, that would have been the 18th I returned

[5] the phone call and left a message. Basically it was

[6] requesting information about the, the report and that

[7] the reports would be filed, forwarded once they were

[8] completed.

[9]          BY MS. RISK:

[10]    Q: Okay.

[11]    A: It was inquiring about the completion of

[12] the reports.

[13]    Q: Okay.

[14]    MR. van der VEEN: Let me see.

[15]    THE WITNESS: (Complies.)

[16]          BY MS. RISK:

[17]    Q: On the tape, the tape message that

[18] Mr. Wier left for you, what was the substance of what

[19] Mr. Wier said?

[20]    A: My memory — I don't have it written down

[21] here. But my memory is the conversation was — or

[22] the message that was on the answering machine was

[23] that there was a, an independent witness, an

[24] additional witness that could — and my memory of the

---

1—01:28:51  24—01:29:51                    Page 549

[1] exact words — because I shared these with the guys

[2] in the office — was that they could prove that the

[3] UPS driver was at fault. And those were words on it.

[4] And I didn't save it. We don't. We write it down

[5] and delete it and move on.

[6]    And I later found out that who they

[7] were referring to was Mr. Seiffert, who I'd already

[8] interviewed. And then I had — a couple days later

[9] had a conversation with Mr. Baxter, who contacted me,

[10] who is the instructor from IPTM that taught me, who

[11] was the instructor of the course that we took for the

[12] motorcycle collision course through IPTM that was

[13] offered at our fire school. That's where I took the

[14] course, and he was the instructor.

[15]    And he had asked me some information

[16] about the marks, the conversation I had with him

[17] on — that would have been that Thursday.

[18]    Q: All right. Let me back up just for a

[19] minute. We can talk about Mr. Baxter in just a

[20] minute.

[21]    But the voice-mail message that was

[22] left by Mr. Wier was that there was new information

[23] from an independent witness or a new independent

[24] witness that would show that the UPS driver was at

---

1—01:29:54  24—01:30:59                          Page 550

[1] fault for the accident; that's your recollection?

[2]     MR. van der VEEN: Objection to the

[3] form of the question.

[4]     THE WITNESS: Yes.

[5]                    BY MS. RISK:

[6]     Q: And when you called — when you later

[7] found out that that witness was Mr. Seiffert, did you

[8] have a conversation with Mr. Wier or Mr. van der Veen

[9] or anyone from that office about the fact that you

[10] had already interviewed Mr. Seiffert?

[11]     A: No.

[12]     Q: With regard to information that you —

[13]     (Interruption at the door.)

[14]                    BY MS. RISK:

[15]     Q: — that witness gives during an interview,

[16] is it your experience that the information the

[17] witness gives you just after the accident is more

[18] accurate than any information that they would give

[19] you after having met —

[20]     A: Yes.

[21]     Q: — with lawyers? Okay.

[22]     You referenced a telephone call that

[23] you had from an Al Baxter; is that correct?

[24]     A: Yes.

1—01:31:01  24—01:32:09                          Page 551

[1]     Q: And that's — is that telephone call also

[2] on January 13th, '05, or did you return the call on

[3] January 13th, '05? On the telephone memo it's not

[4] clear.

[5]     A: I — there was a tape message about — on

[6] the 13th, Thursday, and it was basically asking,

[7] requesting information about skid marks or about

[8] marks — no reference — just marks in the

[9] investigation.

[10]     Q: Okay. Did you have an opportunity to call

[11] Mr. Baxter back?

[12]     A: Yes.

[13]     Q: And can you tell me the substance of that

[14] conversation?

[15]     A: It was a very brief conversation. Just

[16] primarily my memory was that he was just asking me

[17] about the marks of what I saw and if I was able to

[18] determine the exact, what I said here today — or

[19] previous deposition.

[20]     And my conversation was that if a

[21] additional — additional information was obtained and

[22] he was doing reports, my understanding, as he was hired

[23] by whomever, if they would forward the reports to me,

[24] I would consider it and look it over as part of this

1—01:32:12  24—01:33:03                          Page 552

[1] investigation. But nothing was ever sent.

[2]     Q: Okay. Mr. Baxter, you're aware, is

[3] Mrs. Vascek's or is the expert on behalf of

[4] Mr. van der Veen?

[5]     A: Yes.

[6]     Q: And were you aware of that on the date

[7] that you talked to him?

[8]     A: Yes.

[9]     Q: Did he identify himself as such?

[10]     A: Yes.

[11]     Q: When he asked you about the marks, what

[12] marks was he specifically referring to?

[13]     A: He was referring to the mark that was on

[14] the roadway that we have identified it being at the

[15] location of the right front tire of the UPS truck.

[16]     Q: Did he offer any information or knowledge

[17] or opinions with respect to that mark —

[18]     A: No.

[19]     Q: — during your conversation?

[20]     A: No.

[21]     Q: Did he offer any other information during

[22] your conversation with him?

[23]     A: I don't recall him saying anything other

[24] than just basic inquiry and indicated that a report

1—01:33:07  24—01:33:56                          Page 553

[1] would be done. Then I suggested — I said, you know,

[2] Tell Mr. Wier or whomever, who's the driving force of

[3] what you're doing, if you would forward a copy of the

[4] report, we'll consider it. And I'll review it with

[5] the AG's office as well. But that was — it was a

[6] general conversation.

[7]     I mean, he's, Hey, you remember me? I

[8] taught you.

[9]     Yeah, yeah. You know, basic

[10] pleasantries or whatever.

[11]     But as far as the facts, we didn't go

[12] really — I didn't go into a specific dynamic — or

[13] any tiny, minute detail of anything. I gave him

[14] general information, said that I found a mark at the

[15] scene and that's all that we found. Didn't see

[16] anything else prior, pre-collision marking. And that

[17] was it.

[18]     Q: Okay. He didn't offer any — did he offer

[19] any information about the difference between a skid

[20] mark and a scuff mark?

[21]     A: We didn't explore that, no.

[22]     Q: Okay.

[23]     A: He didn't offer, and I didn't ask.

[24]     Q: You never received a report or any

1—01:33:57  24—C1:34:51                    Page 554

[1] material from Mr. Baxter after that conversation, did
[2] you?
[3]    A: No.
[4]    Q: Did you ever have another conversation
[5] with Mr. Baxter?
[6]    A: No.
[7]    Q: Is that the only conversation you had with
[8] Mr. Baxter?
[9]    A: Regarding this case, yes.
[10]    Q: Okay. Do you have other cases that
[11] involve Mr. Baxter?
[12]    A: No. He was my instructor. I meant as
[13] a — I had conversations with him when I was a
[14] student in the school but not any other
[15] conversations.
[16]    Q: When you spoke to Mr. van der Veen in
[17] early November of 2005, how long did you spend with
[18] Mr. van der Veen?
[19]    A: Maybe a half hour.
[20]    Q: What did you talk about?
[21]    A: The overall findings of, of the case and
[22] where we were with it at this point, what I could
[23] share with him.
[24]    Q: And is there anything that you shared with

1—01:34:55  24—01:36:10                    Page 555

[1] Mr. van der Veen that is either not in the police
[2] report or that we haven't discussed here in our last
[3] however many hours of deposition?
[4]    A: No.
[5]    Q: Have you ever spoken to Mrs. Vascek?
[6]    A: No.
[7]    Q: Have you ever received any type of
[8] communication from Mrs. Vascek?
[9]    A: Through other means, yes.
[10]    Q: Can you explain that to me?
[11]    A: Victim services, she had been in contact.
[12] The family had been in contact with victim services.
[13] And the victim service representative sent me some
[14] questions which prodded some follow-up phone calls to
[15] try to — what we talked about earlier, about whether
[16] Mr. Bard did or did not assist with CPR, was one of
[17] those questions.
[18]    Q: Was one of the other questions that
[19] Mrs. Vascek took issue with your finding that
[20] Mr. Bard had no proper — improper driving actions?
[21]    A: Yes.
[22]    Q: Did there come a time when you received a
[23] photograph of Mr. Vascek from Mrs. Vascek?
[24]    A: Yes.

1—01:36:10  24—01:37:28                    Page 556

[1]    Q: And in what context did you receive that
[2] photograph?
[3]    A: It was provided to me by a victim service
[4] representative. And basically she said that she
[5] wanted, the family wanted me to see how beautiful a
[6] person that he was.
[7]    Q: Had you ever had a victim's spouse send
[8] you a photograph before for the purpose of showing
[9] you what a beautiful person this person was?
[10]    A: No.
[11]    Q: At your first day of deposition,
[12] Mr. van der Veen asked you that if he sent Nina from
[13] his office to your office, if he could review the
[14] accident reconstruction material texts in your
[15] office. Did Nina ever come to your — did Nina or
[16] anyone from Mr. van der Veen's office ever come to
[17] your office to inspect any of the accident
[18] reconstruction materials in your office?
[19]    MR. van der VEEN: Objection to the
[20] form of the question.
[21]    THE WITNESS: No.
[22]         BY MS. RISK:
[23]    Q: Did you ever, other than what you've
[24] presented here today, have you ever sent anything to

1—01:37:34  24—01:39:50                    Page 557

[1] Mr. van der Veen as a result of the first deposition
[2] with regard to accident reconstruction materials?
[3]    A: No.
[4]    Q: Mr. van der Veen asked you earlier about
[5] Mr. Bard looking left-right-left. Has Mr. Bard ever
[6] told you that he looked multiple times, I believe is
[7] how it was worded, left-right-left?
[8]    A: Yes.
[9]    Q: Do you remember that?
[10]    A: Yes.
[11]    Q: Did you ask Mr. Bard how many times he
[12] looked left-right-left?
[13]    A: No.
[14]    Q: Corporal Weaver, you testified in your
[15] first day of deposition that you did not find a skid
[16] mark from the motorcycle at the scene; do you recall
[17] that?
[18]    A: Yes.
[19]    Q: Is it possible that, given the twilight
[20] hour of the day, if there was a faint mark, that you
[21] may have missed it?
[22]    A: Absolutely.
[23]    MR. van der VEEN: Objection to the
[24] form of the question.

1—01:39:51  24—01:41:03                              Page 558

[1]  MS. RISK: That's all the questions
[2]  that I have.
[3]  BY MR. van der VEEN:
[4]  Q: Are you saying that you missed the
[5]  motorcycle — a skid mark on the motorcycle because
[6]  it was getting dark?
[7]  A: What I'm saying is if there was a faint
[8]  skid mark at that scene, with the limits of light and
[9]  what was there, it's possible that it wasn't
[10]  detected.
[11]  Q: Well, what time did you get there?
[12]  A: Little after 5:00.
[13]  Q: Do you note anywhere in any of your
[14]  reports or any of your notes or anywhere that you had
[15]  a problem with the lighting?
[16]  MS. RISK: Objection; argumentative.
[17]  BY MR. van der VEEN:
[18]  Q: Did you note anywhere that you had a
[19]  problem with the lighting? I'm not arguing with you.
[20]  Did you note it?
[21]  A: No.
[22]  MS. RISK: Objection. Noting the
[23]  plaintiff's attorney shouting, for the record.
[24]  BY MR. van der VEEN:

1—01:41:04  24—01:41:45                              Page 559

[1]  Q: As you sit here today, do you have any
[2]  recollection of having a problem with the lighting?
[3]  A: No.
[4]  Q: As you sit here today, do you believe that
[5]  there was a skid mark there that you missed?
[6]  A: I'm saying that I didn't see any skid
[7]  marks.
[8]  Her question was, is it possible there
[9]  was a faint mark that I didn't detect?
[10]  And I'm saying it's possible.
[11]  Q: Anything's possible?
[12]  A: Absolutely.
[13]  Q: Do you think that there's — do you think
[14]  that you missed anything?
[15]  A: I don't think I did.
[16]  Q: Do you think that the lighting caused you
[17]  any difficulty in being able to detect a faint skid
[18]  mark?
[19]  A: It's very possible. We have two
[20]  investigators at the scene.
[21]  Q: Right.
[22]  A: Sergeant Cox didn't detect anything, nor
[23]  did I. There's heavy foliage. It's on a rural area
[24]  that's dark, as in under good conditions. Is it

1—01:41:47  24—01:42:15                              Page 560

[1]  possible there's a mark there that I didn't pick up?
[2]  Absolutely. I don't know what more you're asking.
[3]  As far as I'm — I'm answering as honestly as I can
[4]  answer.
[5]  Q: Did Mr. Bard ever tell you that he found a
[6]  faint mark?
[7]  MS. RISK: Objection.
[8]  THE WITNESS: No.
[9]  MS. RISK: Objection; asked and
[10]  answered.
[11]  BY MR. van der VEEN:
[12]  Q: Did you ask him about — did he tell
[13]  you — he did tell you he saw a skid mark regarding
[14]  the van?  .
[15]  A: Did I ask him?
[16]  Q: Did he tell you?
[17]  A: I don't recall him telling me.
[18]  MS. RISK: Objection.
[19]  THE WITNESS: No. It's not marked
[20]  anywhere in the evidence. I would have — it would
[21]  have been written in my notes if he told me.
[22]  BY MR. van der VEEN:
[23]  Q: He says he told you.
[24]  MS. RISK: Objection;

1—01:42:15  24—01:43:06                              Page 561

[1]  misrepresentation of the testimony and speculation.
[2]  BY MR. van der VEEN:
[3]  Q: Did he tell you that?
[4]  A: What I testified to at the previous
[5]  deposition and today is what I was told the day that
[6]  I interviewed the individuals that I have said that I
[7]  have interviewed them. The notes that I have written
[8]  and referred to — and it is confirmed or conveyed
[9]  into the report — are what was told to me at that
[10]  time.
[11]  He did not tell me. I have no
[12]  recollection of any comments about any skid mark,
[13]  because it's not in the notes. I don't have any
[14]  personal recollection of it.
[15]  Q: Let me back up here.
[16]  A: If he changed his story or has made
[17]  comments subsequently since, I'm only testifying to
[18]  what this — was done during the course of the
[19]  investigation during the times, of the dates I say I
[20]  interviewed whom, what they said.
[21]  Q: Trooper, let me get this point down so
[22]  it's rock-solid clear. Okay?
[23]  You got on the scene. It was
[24]  daylight; right?

1—01:43:08  24—01:43:44                    Page 562

[1] A: Yes.

[2] Q: Plenty of light for you; right?

[3] A: Yes.

[4] Q: You didn't ask for a flashlight?

[5] A: No.

[6] Q: Could have; right? Correct? You could

[7] have had illumination if you needed it?

[8] MS. RISK: Objection; argumentative,

[9] harassing tone of voice.

[10] BY MR. van der VEEN:

[11] Q: You could have had artificial illumination

[12] if you needed it; correct?

[13] A: That's correct.

[14] Q: And you didn't feel you needed it; right?

[15] A: That's correct.

[16] Q: And you looked for a skid mark from the

[17] bike; correct?

[18] A: That's correct.

[19] Q: And you looked carefully, didn't you?

[20] A: That's correct.

[21] Q: And you didn't find one?

[22] A: And that is correct.

[23] MR. van der VEEN: Okay. Now, I have

[24] a series of questions for you. Actually, I've got

1—01:43:46  24—01:50:12                    Page 563

[1] a — based on the questions by counsel, I have a lot

[2] of questions for you. So the question is, what do we

[3] want to do with the witness out there, just make him

[4] sit and wait or reschedule him?

[5] MS. RISK: Let's go off the record.

[6] (Discussion held off the record.)

[7] BY MR. van der VEEN:

[8] Q: I asked you at our last — after a series

[9] of long questions where we really went through the

[10] photographs and we went through the skid marks and we

[11] went through your report and we went through witness

[12] statements, I asked you a series of questions

[13] regarding your opinions within a reasonable degree of

[14] accident reconstruction scientific certainty; do you

[15] recall those questions?

[16] A: Basically, yes.

[17] Q: And when I asked you, Are any of the

[18] opinions here in your report based on — are given

[19] within a reasonable degree of accident reconstruction

[20] scientific certainty, you said that, no, they were

[21] not. And we were talking in terms of expert

[22] qualifications. Do you remember that?

[23] A: No.

[24] Q: Okay. Then I'm going to need to have your

1—01:50:15  24—01:54:41                    Page 564

[1] deposition printed out so that you can read it; okay?

[2] A: Okay.

[3] (Discussion held off the record.)

[4] BY MR. van der VEEN:

[5] Q: With respect to your report, looking on

[6] page 17, the line that both I and Miss Risk have

[7] asked you about now, the line that reads, It is

[8] necessary, up at the top, for eastbound traveling

[9] motorists to move forward towards Montchanin Road to

[10] visibly see north- and southbound traveling motorists

[11] that are approaching the intersection; do you see

[12] that?

[13] A: Yes, sir.

[14] Q: To move forward of what?

[15] A: To move forward of the stop sign.

[16] Q: And then they're supposed to do what under

[17] the law?

[18] A: Stop.

[19] Q: Did this driver — did Mr. Bard do that?

[20] A: Not in my understanding that he did, no.

[21] Q: He didn't tell you he did; right?

[22] A: Correct.

[23] Q: And the witness told you that — the

[24] independent witness told you that he did not?

1—01:54:44  24—01:55:31                    Page 565

[1] A: Correct.

[2] Q: Okay. So he has violated the statute, has

[3] he not?

[4] MS. RISK: Objection to form.

[5] Objection; calls for opinion.

[6] THE WITNESS: Yes.

[7] BY MR. van der VEEN:

[8] Q: Okay. Now knowing what he did and now

[9] knowing what the statute says, would you issue him a

[10] citation?

[11] A: No.

[12] Q: Why not?

[13] A: Because I fall under the Attorney

[14] General's office.

[15] Q: Would the Attorney General then file a

[16] citation?

[17] A: I don't know. You'd have to ask them.

[18] MS. RISK: For the record, counsel's

[19] holding up a document that he's previously shown the

[20] witness that purports to be a copy of Delaware Rules

[21] of the Road.

[22] BY MR. van der VEEN:

[23] Q: The statute that we've gone over, you

[24] understand that to be the statute of duties at a stop

1—01:55:33  24—01:56:09                    Page 566

[1] sign?

[2]    A: Yes, sir.

[3]    Q: Did Mr. Bard follow his duties at the stop

[4] sign?

[5]    MS. RISK: Objection.

[6]    THE WITNESS: Under those, no.

[7] BY MR. van der VEEN:

[8]    Q: Under Delaware law?

[9]    MR. van der VEEN: Objection.

[10]    THE WITNESS: No.

[11] BY MR. van der VEEN:

[12]    Q: Had you witnessed the manner in which he

[13] stopped or rather the manner in which he didn't stop

[14] where he was supposed to at this intersection, would

[15] you have ticketed him?

[16]    MS. RISK: Objection to form.

[17]    THE WITNESS: Under the circumstances

[18] of this crash, motorcycle coming from the north to

[19] the south at a high rate of speed —

[20] BY MR. van der VEEN:

[21]    Q: No, no, no, no.

[22]    A: — or just him coming out?

[23]    Q: Yeah.

[24]    A: Would I?

1—01:56:10  24—01:56:55                    Page 567

[1]    Q: Yeah.

[2]    A: No.

[3]    Q: And the reason why?

[4]    A: If it didn't constitute a hazard to

[5] anyone, if there was no one else there and he moved

[6] slowly, as he did, entered the intersection. Had he

[7] just gone through the stop sign, yeah, that would

[8] have been not an issue.

[9]    Q: Okay.

[10]    A: But he stopped. You're asking me if he

[11] would have continued to go through and didn't stop,

[12] would I give him a ticket? Knowing — if I was

[13] directly behind him, if I was Mr. Seiffert and he

[14] stopped and then moved slowly forward and moved out

[15] and there was no crash, no, I wouldn't write him —

[16] written him a ticket.

[17]    Q: Okay. So when you violate a statute, a

[18] traffic statute, you don't give a ticket for it?

[19]    MS. RISK: Objection to form.

[20]    THE WITNESS: Supposed to.

[21] BY MR. van der VEEN:

[22]    Q: But you just wouldn't?

[23]    A: It's the discretion of the officer.

[24]    Q: What's the discretion of the officer?

1—01:56:57  24—01:57:42                    Page 568

[1]    A: As I previously stated, if he blew through

[2] that stop sign, yes, he would have been stopped and

[3] cited if I was the trooper that was behind him.

[4]    But he did stop. If I was behind him

[5] and he did stop and he moved slowly, as he described

[6] and the independent witness described, and nothing's

[7] coming and he slowly enters that intersection and no

[8] crash occurs, no, I'm not going to stop him and give

[9] a ticket.

[10]    Q: How do you know nothing's coming if you

[11] aren't looking to the left?

[12]    MS. RISK: Objection to form.

[13] BY MR. van der VEEN:

[14]    Q: How do you know nothing's coming if you

[15] aren't in a position in the roadway where you can see

[16] from the left?

[17]    MS. RISK: Objection to counsel's —

[18]    THE WITNESS: We're concluding this.

[19]    MS. RISK: Excuse me. Objection to

[20] counsel's not allowing the witness to answer —

[21]    THE WITNESS: Because I am not going

[22] to sit and continue to be directed at the questions

[23] in which you are attacking me personally as an

[24] investigator — no, don't wave your hands or — I've

1—01:57:45  24—01:58:41                    Page 569

[1] been more than professional through this whole

[2] deposition.

[3]    I'm an investigator that did an

[4] investigation. You've got months and years or

[5] whatever to minutely pick things that we do and do

[6] whatever you need to do and ask me the questions.

[7] I'm asking (sic) the questions from the beginning of

[8] this to the ending of this and the integrity in which

[9] I did and conducted this.

[10]    You asked me earlier whether or not we

[11] did or did not miss a skid mark. It's possible, and

[12] I answered that. Yes, it's possible we missed it.

[13]    But your attacks at me are putting me

[14] on the defensive, and I'm tired of it. I have had a

[15] long weekend, as I explained to you off the record,

[16] that we've had multiple departmentals; we've had

[17] fatals that we've been out on. And I have not had a

[18] lot of sleep in the last week.

[19]    And for me to come in here early,

[20] voluntarily, to be subjected to your demeanor and

[21] your attacks of me, I would much rather conclude this

[22] and come back another day and start fresh; because I

[23] don't feel it's fair to me as an investigator, of all

[24] that I've done in this past week, to be continually

---

1—01:58:44  24—01:59:34                    Page 570

[1] acted as if I'm the bad guy here. And that's how I
[2] feel.
[3]     Now, this counselor has not attacked
[4] me or come at me in the direction at which you have
[5] in the previous as well as this one. And I just
[6] honestly don't see this going anywhere in a positive
[7] direction.
[8]     I have told you before, I had a
[9] doctor's appointment for my son during the first
[10] deposition, which I canceled and I departed from
[11] here, which he didn't make. And I now — I have
[12] informed you before, this is going on and on and on.
[13] I'm not saying I won't cooperate with
[14] you. I'm not saying I won't answer your questions.
[15] But considering what I've been through this past week
[16] and my son now has an appointment, I don't know what
[17] else — I have a life beyond the division.
[18]     And I've cooperated beyond what I
[19] think I can give you with your questioning. But I
[20] don't feel it's fair professionally for you to come
[21] at me as you're attacking me.
[22] BY MR. van der VEEN:
[23]     Q: Are you done?
[24]     MS. RISK: For the record —

---

1—01:59:35  24—01:59:53                    Page 571

[1]     THE WITNESS: Yes.
[2] BY MR. van der VEEN:
[3]     Q: Are you done? First of all —
[4]     MS. RISK: — counsel — for the
[5] record.
[6]     MR. van der VEEN: No. First of
[7] all —
[8]     MS. RISK: Excuse me. Please don't
[9] interrupt me, counsel. For the record —
[10]     MR. van der VEEN: No. We're in
[11] the — no. You'll have your chance to —
[12]     MS. RISK: For the record I would
[13] like —
[14]     MR. van der VEEN: No. I'm not making
[15] any records.
[16]     MS. RISK: Counsel for UPS would like
[17] to — and Mr. Bard — would like to support and agree
[18] with everything, all the observations that —
[19]     MR. van der VEEN: Mr. Bard isn't
[20] here.
[21]     MS. RISK: — Corporal Weaver has
[22] made. Thank you.
[23] BY MR. van der VEEN:
[24]     Q: Corporal Weaver, first of all, I wasn't

---

1—01:59:55  24—02:00:29                    Page 572

[1] the one who asked you, Is it possible you missed the
[2] skid mark? Counsel for UPS, who you just endorsed as
[3] being a wonderful person, did.
[4]     MS. RISK: Oh, objection; harassing,
[5] argumentative. And you know what? We're going to
[6] call the Judge.
[7] BY MR. van der VEEN:
[8]     Q: Do you remember that?
[9]     MS. RISK: Please stop.
[10] BY MR. van der VEEN:
[11]     Q: Do you remember that?
[12]     No. Don't stop.
[13]     MS. RISK: Stop asking the witness
[14] questions. Stop.
[15]     MR. van der VEEN: No. I'm going to
[16] ask the witness questions.
[17]     MS. RISK: Stop asking the witness
[18] questions.
[19]     (Ms. Risk left the room.)
[20]     THE WITNESS: The witness is leaving.
[21]     MR. van der VEEN: Wait. Hang on.
[22] Don't leave. You told me that we had until you had
[23] to leave for your son.
[24]     THE WITNESS: I'm not answering

---

1—02:00:29  24—02:01:13                    Page 573

[1] questions while the other counselor's not here.
[2]     MR. van der VEEN: Okay. Well, then
[3] let me ask you about what your schedule is to come
[4] back and answer questions.
[5]     THE WITNESS: I will have to get back
[6] to you with my schedule. I don't even have my
[7] planner with me. I don't know what I have and what I
[8] don't have.
[9]     MR. van der VEEN: Okay. Can you
[10] please sit for — I don't want to end on this note.
[11] Would you please sit and relax.
[12]     THE WITNESS: I'm relaxed.
[13]     MR. van der VEEN: Okay. I do not
[14] have nor have I in any way ever in this deposition
[15] tried to attack you personally at all. What I've
[16] really been trying to do is hone in on the things
[17] that you're sure about and the things that you aren't
[18] sure about. I've tried to hone in on the things that
[19] I've seen that are incorrect in the report and things
[20] that I think are correct in the report.
[21]     (Ms. Risk entered the room.)
[22]     MS. RISK: Excuse me. May I ask that
[23] no more go on while I'm out of the room.
[24]     MR. van der VEEN: No.

---

1—02:01:13  24—02:01:59                                Page 574

[1]    MS. RISK: I have Judge Robinson that
[2] I'm going to get on the phone.
[3]    MR. van der VEEN: So what? So what?
[4] You don't —
[5]    MS. RISK: Stop.
[6]    MR. van der VEEN: — leave in the
[7] middle of my deposition.
[8]    MS. RISK: I didn't walk out. I asked
[9] you politely to please stop because I would like to
[10] call the judge. I do not believe that under the
[11] Rules, under Delaware civility and the statement of
[12] lawyers' conduct, that — harassing a witness is
[13] definitely a reason to call the judge. In fact, it's
[14] a reason to get your pro hac revoked.
[15]    MR. van der VEEN: Go ahead.
[16] No, Trooper, I have not been meaning
[17] to harass you in any way.
[18]    MS. RISK: I am going to ask again. I
[19] have to leave the room to talk on the phone with the
[20] Judge.
[21]    MR. van der VEEN: Use the phone here.
[22]    MS. RISK: I have the other line going
[23] out in the office. I would ask that you please stop
[24] asking questions. Please, Mr. van der Veen, I'm

1—02:02:03  24—02:02:41                                Page 575

[1] asking you as a reasonable human being —
[2]    MR. van der VEEN: No.
[3]    MS. RISK: — to act civilly and stop
[4] asking question.
[5]    MR. van der VEEN: Don't leave the
[6] room. I'm not asking questions. I'm talking to the
[7] trooper.
[8]    MS. RISK: Can I ask you that —
[9]    MR. van der VEEN: Don't leave the
[10] room. My — staff can get the phone on in here.
[11]    (Ms. Risk left the room.)
[12]    MS. RISK: Can I have a line on this
[13] phone in here? Thank you.
[14]    MR. van der VEEN: I'm not in any way
[15] trying to harass you. I'm trying to get to the
[16] bottom of this. I'm trying to ask you questions.
[17] That's all I'm trying to do.
[18]    (Ms. Risk entered the room.)
[19]    MS. RISK: Let the record reflect that
[20] counsel has just walked back into the room and is
[21] trying to call the Judge but counsel — plaintiff's
[22] counsel will not cooperate and stop speaking.
[23]    MR. van der VEEN: Trooper, is it your
[24] opinion that I've been rude to you?

1—02:02:44  24—02:03:35                                Page 576

[1]    THE WITNESS: Your aggressiveness
[2] there's times where I personally feel that you were
[3] attacking me personally of something that I did or
[4] didn't do or "could've/should've" done. I'm here to
[5] discuss what happened, what I know. And the manner
[6] in which you're asking those questions can be done
[7] without you raising your voice or feeling on a
[8] personal defense that you're coming at me
[9] individually.
[10]    And that — and the escalation of the
[11] voice and the tone of your voice — and, like I said,
[12] with everything I've been through this past week, out
[13] of fairness to me, I don't want to sit here and give
[14] an incorrect answer because I'm tired or I'm now
[15] starting to get emotionally upset because I'm feeling
[16] personally attacked of what I did as a Delaware State
[17] trooper, as an investigator.
[18]    MR. van der VEEN: To me, that's fair.
[19] To me, that's fair. Okay? And we can do that —
[20]    MS. RISK: Counsel, this telephone
[21] does not work. I'm trying to get your attention.
[22] The telephone in the conference room does not work.
[23] Do not wave me off. I am following —
[24]    MR. van der VEEN: Stop interrupting

1—02:03:36  24—02:04:06                                Page 577

[1] me.
[2]    MS. RISK: I didn't.
[3]    MR. van der VEEN: Stop interrupting
[4] me.
[5]    MS. RISK: I'm trying to speak to you.
[6] I'm going to call the Judge.
[7]    MR. van der VEEN: I'm speaking to the
[8] trooper right now. Fine. Call the Judge.
[9]    MS. RISK: Please stop.
[10]    MR. van der VEEN: Trooper, do you
[11] understand that I'm not trying to — do you accept my
[12] representation to you that I'm not trying to attack
[13] you personally.
[14]    MS. RISK: For the record, counselor
[15] is leaving the room, and Mr. van der Veen will not
[16] stop speaking while I go to try and get the Judge on
[17] the phone. He will not cooperate.
[18]    MR. van der VEEN: Use your cell
[19] phone.
[20]    MS. RISK: And he will not cooperate.
[21]    (Ms. Risk left the room.)
[22] MR. van der VEEN: Trooper, do you
[23] understand that I'm really not attacking you
[24] personally in any way? The job that you do, the

1—02:04:11   24—02:05:07                      Page 578

[1] credentials that you have, those are all respected by
[2] me very much, that the point of this is just for me
[3] to ask questions. I didn't think in the hours that
[4] I've been asking you I've raised my voice at you. If
[5] I have raised my voice at you, accept my apology;
[6] okay?
[7]    THE WITNESS: Understood.
[8]    (Ms. Risk entered the room.)
[9] MR. van der VEEN: And I understand
[10] that you're tired, and I understand that you're
[11] emotional so that we will reconvene this. And I
[12] really have a very short period of time with you. I
[13] have about another 15, 20, 25 minutes of questions
[14] for you. Okay? And we will reconvene it at a time
[15] that's convenient for you; is that fair?
[16]    THE WITNESS: Yes, sir.
[17]    MR. van der VEEN: Okay. Thank you.
[18]    MS. RISK: In all due respect for the
[19] officer, I would request at our reconvention of time,
[20] that counsel be limited in the time of his questions
[21] to the time that he's represented to Corporal Weaver
[22] that he has, which is approximately 15 to 25 minutes.
[23] Would you agree to that, counsel?
[24]    MR. van der VEEN: No, I'm not. I

1—02:05:07   24—02:08:10                      Page 579

[1] don't know what his answers are going to be, quite
[2] frankly. But I will keep it as short and as brief as
[3] I can; okay? I don't see it going over half an hour.
[4] Maybe it will. Maybe it will. Maybe it will go 33
[5] minutes. I just don't know. But I'm going — I'm
[6] not going to waste your time. I'll be as efficient
[7] as I can with my questions; is that fair?
[8]    THE WITNESS: I understand.
[9]    MR. van der VEEN: Okay. Thank you.
[10]    THE WITNESS: Can I get you to make
[11] copies of those so I can take those with me, please,
[12] and put those back in the file — copies.
[13]    MR. van der VEEN: Yeah.
[14]    (Discussion held off the record.)
[15]    MS. RISK: Corporal Weaver, just
[16] before you leave, I just want to remind you that
[17] because you are still under deposition and an oath,
[18] that it's your duty not to speak to anybody,
[19] including Mr. van der Veen or anyone from his office
[20] or myself or anyone from my office.
[21]    THE WITNESS: Understood.
[22]    MS. RISK: Do you understand that?
[23]    THE WITNESS: Not a problem.
[24]    MS. RISK: Except with regard to

1—02:08:11   5—02:08:57                        Page 580

[1] rescheduling your deposition.
[2]    THE WITNESS: Not a problem.
[3] Understood.
[4]    (Discussion held off the record.)
[5]    (Deposition concluded at 2:08 p.m.)
[6]              INDEX
[7] BY MR. van der VEEN:   336
    BY MS. RISK:   393
[8] BY MR. van der VEEN:   558
[9]           EXHIBITS
[10] NAME    DESCRIPTION        PAGE
[11] Weaver 10  Color Accident Scene Sketch    336
[12] Weaver 11  Black-and-White Copy of Exhibit  336
       Weaver 10
[13]
    Weaver 12  Handwritten Notes         336
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

                                              Page 581

[1]       CERTIFICATION
[2]
[3]
[4]       I, ADAM D. MILLER, Registered
[5] Professional Reporter, certify that the foregoing is
[6] a true and accurate transcript of the foregoing
[7] deposition, that the witness was first sworn by me at
[8] the time, place and on the date herein before set
[9] forth.
[10]       I further certify that I am neither
[11] attorney nor counsel for, not related to nor employed
[12] by any of the parties to the action in which this
[13] deposition was taken; further, that I am not a
[14] relative or employee of any attorney or counsel
[15] employed in this case, nor am I financially
[16] interested in this action.
[17]
[18]
[19]
[20] Adam D. Miller
    Registered Professional Reporter, Notary Public,
[21] and Certified Shorthand Reporter of the State of
    Delaware #109-RPR (Exp. 01-31-2008)
[22]
[23]
[24]

Page 335

[1]            VOLUME II
[2]    IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF DELAWARE
[3]
  HEIDI VASCEK, Individually and as          :
[4]  administratrix of THE ESTATE OF          :
  JOHN VASCEK, JR.,                          :
[5]
        Plaintiffs,                          :
[6]                                          : C.A. No.
        v.                                   : 04-1538 SLR
[7]
  UNITED PARCEL SERVICES, INC., a
[8]  Delaware corporation, and MARK BARD, :
[9]      Defendants.                          :
[10]      Continued deposition of CPL. JEFFREY
[11]  L. WEAVER, taken pursuant to notice before Adam D.
[12]  Miller, Registered Professional Reporter and
[13]  Certified Shorthand Reporter, in the law offices of
[14]  Richard R. Wier, Jr., P.A., 1220 Market Street, #600,
[15]  Wilmington, Delaware, on Monday, August 22, 2005,
[16]  beginning at approximately 9:07 a.m., there being
[17]  present:
[18]  APPEARANCES:
[19]      KATS, JAMISON, van der VEEN & ASSOCIATES
          25 Bustleton Pike
[20]      Feasterville, Pennsylvania 19053
          BY: MICHAEL T. van der VEEN, ESQUIRE
[21]      Attorney for Plaintiffs
[22]

          CORBETT & ASSOCIATES
[23]      Registered Professional Reporters
        1400 French Street    Wilmington, DE 19801
[24]          (302) 571-0510
          www.corbettreporting.com

9—09:08:35  24—09:09:06                    Page 33

[1]      APPEARANCES CONTINUED:
[2]      DLA PIPER RUDNICK GRAY CARY US LLP
        One Liberty Place, 1650 Market Street
[3]  Suite 4900
        Philadelphia, Pennsylvania 19103
[4]  BY: JAYNE ANDERSON RISK, ESQUIRE
        Attorney for Defendants
[5]
[6]      (Exhibits Weaver 10 through 12 were
[7]  premarked for identification.)
[8]
[9]      BY MR. van der VEEN:
[10]      Q: Trooper, good morning. Michael
[11]  van der Veen. Nice to see you again. Thanks for
[12]  coming in this morning.
[13]      A: Good morning.
[14]      Q: You understand that you're still under
[15]  oath to tell the truth?
[16]      A: Yes.
[17]      Q: Before I get started with some questions,
[18]  I want to identify three documents and two pieces of
[19]  information that you brought with you as a follow-up
[20]  to our last deposition.
[21]      The first thing that I think that you
[22]  brought us was a color copy — what I marked as
[23]  Weaver No. 10, a color copy of your sketch of the
[24]  roadway and your sketch of the vehicles in, in this

1—09:09:14  24—09:10:28                    Page 337

[1]  accident; is that true?
[2]      A: Yes, sir.
[3]      Q: And Weaver No. 11 is just black-and-white
[4]  of that?
[5]      A: Yes, sir.
[6]      Q: And Weaver No. 12, a list of nine
[7]  motorcycle cases that you have investigated in your
[8]  tenure on the FAIR team as an accident
[9]  reconstructionist?
[10]      A: Yes, sir.
[11]      Q: Uh-huh. Now, you had also given us two
[12]  points of information. I just want to clarify that
[13]  while we're on the record.
[14]      I had ask you during your previous
[15]  deposition. You'd indicated that you would get
[16]  three — you would give me the names of publications,
[17]  books, texts, treatise, that you found to be
[18]  authoritative on the issue of skid marks?
[19]      A: Yes, sir.
[20]      Q: And you've identified Fundamentals of
[21]  Traffic Accident Reconstruction by John Daily,
[22]  D-A-I-L-Y; Handbook for Accident Reconstruction by
[23]  M.J. Lofgren, L-O-F-G-R-E-N; and Motorcycle Accident
[24]  Investigation by Albert T. Baxter; correct?

---

1—09:10:32  24—09:11:32                    Page 338

[1] A: Yes, sir. There is also one more on the
[2] front.
[3] Q: Oh, great. Okay.
[4] A: Over there in the corner.
[5] Q: The Traffic Accident Investigation Manual
[6] by, of course, Mr. Baker?
[7] A: Yes, sir.
[8] Q: Thanks. And you'd also given, written
[9] down for me — and I'm just going to read it —
[10] information as to when your accident investigation
[11] report in this case, the Vascek case, was — had
[12] interaction with other people?
[13] A: Yes, sir.
[14] Q: And you've indicated that the report was
[15] finished and — TOT?
[16] A: Turned over to.
[17] Q: — turned over to Bill Nottingham for
[18] first review on February 15th of '05?
[19] A: Yes, sir.
[20] Q: It was returned from Bill and corrections
[21] made and turned over to Matt for a second review on
[22] 2/17/05?
[23] A: Yes. That would be Sergeant Matthew Cox,
[24] a supervisor.

---

1—09:11:33  24—09:12:33                    Page 339

[1] Q: And then corrections were made and sent
[2] out to the office and turned over to Lieutenant
[3] Kresge?
[4] A: Kresge.
[5] Q: And that was March 7th of '05?
[6] A: Yes, sir.
[7] Q: Okay. Let me ask you some questions about
[8] that information.
[9] When you turned over the report to
[10] Bill Nottingham for a first review, that is something
[11] that you will generally always do, have another
[12] officer review it?
[13] A: Absolutely, always. We — there's four of
[14] us in the unit. Another collision reconstructionist
[15] will review a report prior to being submitted to the
[16] supervisor, just looking for graphic corrections or
[17] something misworded or, as pointed in the first
[18] deposition, some of the mistakes or whatever you
[19] want — like, for instance, it indicated on the face
[20] page and we explained as far as the computer program
[21] having some quirks in it, that it indicated he
[22] wasn't deceased.
[23] We pick blocks and sometimes — and
[24] they're working on that. And those are things that

---

1—09:12:35  24—09:13:38                    Page 340

[1] we looked for. Every collision is reviewed by
[2] another collision reconstructionist. And even before
[3] it goes to the supervisor, it's returned to the
[4] initial officer, investigator. If there's anything
[5] found, minor corrections, whatever, is what it
[6] normally is or something is — or sometimes the spell
[7] check, it'll pick it up if it's spelled correctly.
[8] But it could be a typo and there's a missing letter;
[9] but if it's still a word, it doesn't pick it up.
[10] Whatever corrections, if any, are made.
[11] And then it's submitted to the
[12] supervisor. He then reviews it. And when he gets
[13] done with it, has the opportunity to review it in its
[14] entirety, he sends it back. If there's any
[15] corrections or things that need to be changed,
[16] they're made at that time. And then it's sent out of
[17] the office, which goes to the traffic lieutenant of
[18] the troop of where the collision occurred, the
[19] jurisdiction. We — our responsibility is the entire
[20] county of New Castle County.
[21] But the report, once it leaves our
[22] office, will then go to the traffic lieutenant of
[23] whatever troop, whether it's Troop 2, 9, 1, or 6. In
[24] this case it's Troop 1, which is Lieutenant Kresge.

---

1—09:13:41  24—09:14:52                    Page 341

[1] At that point we have no other, in our
[2] office, reason to and/or way of tracking it when it
[3] goes out of the lieutenant's office. It then goes to
[4] headquarters. It is then reviewed again by
[5] headquarters, personnel from the traffic control
[6] section. And then it's put in a category as to
[7] whether or not it can be released. Or if it's
[8] prosecution pending or whatever, there's a hold put
[9] on it. But that's — for every report that we do,
[10] that's the process that it does go through.
[11] Q: So in this case, in the Vascek case, when
[12] Bill Nottingham looked your report, he looked at it
[13] not for your opinions or the actual dynamics of your
[14] accident reconstruction, but he looked at it for
[15] overall spelling, that it makes sense, that there's
[16] nothing glaring as an error; is that correct?
[17] A: Combination. I mean, primarily, that's
[18] what he's looking for. But, equally, if something
[19] jumps out at him or something to go — he's not
[20] reinvestigating the incident. He's looking for
[21] anything that might look out of the ordinary.
[22] And, primarily, when the same eyes —
[23] and I think I touched on this in the first
[24] deposition. When you're working on a report and then

---

1—09:14:54  24—09:15:57                 Page 342

[1] you're interrupted and then you get back to that
[2] report and then you're interrupted, sometimes your,
[3] your continuity is all messed up as far as — you
[4] don't start on a Monday and work on it until you're
[5] done without being interrupted. So — and as I did
[6] testify earlier, there was a, a felony case that the
[7] AG's office bumped this one —
[8]    Q: I remember.
[9]    A: — and said, you know, priority that one.
[10] And that's why then it took even a little bit longer
[11] than normal to get out of the office and get
[12] completed. Not any less important of this collision
[13] and what happened as well the other; it's just
[14] because of the dynamics of the criminal parts of it.
[15]    Q: I understand that. Do you know if Bill
[16] Nottingham had made any corrections to your report?
[17]    A: I wouldn't remember. Primarily, what we
[18] do is if there's a comma out of place or whatever, we
[19] make the corrections, throw that away, and then —
[20] and print it, a new copy of whatever misspelled word
[21] corrected or whatever and then submit it. Same thing
[22] when the supervisor reviews it; we don't keep any of
[23] that.
[24]    Q: If he had — would you remember if he had

1—09:16:00  24—09:16:52                 Page 343

[1] made a substantive change, a change or a correction
[2] substantively either to opinions or conclusions or
[3] distances?
[4]    A: Yes.
[5]    Q: And he didn't make any changes of that
[6] extent?
[7]    A: No, I don't recall of any with this.
[8]    And the other thing that I think I
[9] said in the first deposition as well is, what we try
[10] to do, if at all possible, there's four of us in the
[11] unit; two of us are on call all the time, which means
[12] two of us are at a scene — in this case as well.
[13]    Later this afternoon Sergeant Cox is
[14] coming in. He was the co-investigator or assistant
[15] with this investigation until I was assigned scene
[16] lead — scene investigator, lead investigator. And
[17] then his involvement then was very minimal after
[18] that. Obviously, he has recollection of it because
[19] he was there.
[20]    But what we try to do is to give it to
[21] someone else who has not been at that scene, because
[22] a fresh set of eyes from another reconstructionist —
[23] not saying their opinion would be tainted or they'd
[24] start to jump to any conclusions.

1—09:16:53  24—09:17:53                 Page 3·

[1]    But if you know some of it, you might
[2] be skimming instead of reading substance line for
[3] line, which is what we're trying to do is to give the
[4] best possible professional product when we're done,
[5] that we don't later bite the bullet because we missed
[6] something. And also in this case we see and saw that
[7] there's two time differences from the Fire Board to
[8] Recon. And we didn't, we didn't pick up on it.
[9]    Q: Yeah.
[10]    A: We can explain it but — as to why it
[11] didn't get caught. So that's the sole purpose of the
[12] review process.
[13]    Q: Fair enough. Do you know if Matt Cox made
[14] any changes substantively to your report?
[15]    A: I don't recall any.
[16]    Q: Okay. And I guess the same question for
[17] Lieutenant Kresge: Do you know if there were any
[18] substantive changes made by Lieutenant Kresge?
[19]    A: The lieutenant never returned the report
[20] to our office, and I did not receive any follow-up
[21] emails and/or telephone calls. So basically — and
[22] the process is still the same. If they would have
[23] found something that needed correcting, the policy or
[24] process is that they would return it to me with

1—09:17:55  24—09:19:32                 Page 34!

[1] stickies on it or mark — they'd mark up the original
[2] report or whatever, say, Make these corrections.
[3]    But I never received it back from him
[4] and — nor did I receive any notification from
[5] headquarters. Again, equally, if they find something
[6] that, through the change, still hasn't been caught,
[7] there were — I was never notified by either
[8] Lieutenant Kresge or headquarters personnel.
[9]    Q: Let me change subjects if we could. And I
[10] want to talk about your investigation of the UPS
[11] vehicle —
[12]    A: Uh-huh.
[13]    Q: — the UPS package van.
[14]    A: Yes, sir.
[15]    Q: On the UPS package van did you make a
[16] determination as to whether it had any kind of
[17] electronic control module on it, ECM?
[18]    A: No, I did not.
[19]    Q: Do you know whether there's an ECM on that
[20] package van or not?
[21]    A: I do not know.
[22]    Q: Do you have your original field notes with
[23] you, which you were kind enough to give us at the
[24] last time —

1—09:19:32  24—09:20:48                    Page 346

[1]  **A:** Yes.

[2]  **Q:** — regarding Mr. Bard's interview.

[3]  **A:** Yes.

[4]  **Q:** Can you, first, for me describe your

[5] procedure for taking a statement from one of the

[6] drivers involved in a fatal accident?

[7]  **A:** Normally what we do is, once we've made a

[8] decision of who is going to be the senior

[9] investigator of whatever particular crash we're on —

[10] it doesn't happen every time — but what we try to do

[11] is, is to determine who's going to handle the

[12] investigation.

[13]    And the purpose and reason for that is

[14] then if there is anyone at the scene that needs to be

[15] interviewed, obviously it would be better for the

[16] senior investigator to do the interviews so that it's

[17] minimizing other involvement of the other FAIR team

[18] member while they're doing other things; you're

[19] interviewing them, obviously, as well, so that you

[20] don't have to refer to the supplement that someone

[21] else writes because they've interviewed someone, if

[22] possible; because, obviously, it's your

[23] investigation. So we try to determine who's going to

[24] be handling it at that time.

1—09:20:50  24—09:21:51                    Page 347

[1]  **Q:** As you did in this case?

[2]  **A:** As we did in this case.

[3]    I then — procedure basically is to

[4] take the individual to our police car, try to exclude

[5] them a little bit from what's going on around us if

[6] it's a real busy, active scene, mostly so that we're

[7] hopefully not interrupted.

[8]    It's difficult in the middle of an

[9] interview — and it still happens — you know, they

[10] tap on your window and say, Hey, the tow truck's

[11] here, or, Did so-and-so leave such and such? or

[12] whatever. And then you lose your line of thought if

[13] you're in the middle.

[14]    So you want to try to be, like anyone

[15] else, professional from the beginning to the end of

[16] having — you know, how A through Z, you ask your

[17] questions or whatever.

[18]    And this case was no different, I

[19] interviewed Mr. Bard in my police vehicle, as I

[20] stated in the first deposition. And a representative

[21] from the company was with me or in the vehicle at

[22] that time, which was —

[23]  **Q:** Mr. Long?

[24]  **A:** Thank you.

1—09:21:52  24—09:22:48                    Page 348

[1]  **MS. RISK:** No. Excuse me.

[2] Mr. Jester, I believe.

[3] BY MR. van der VEEN:

[4]  **Q:** Mr. Jester?

[5]  **A:** That's right — was in the vehicle with

[6] us. And primarily that is not a problem. Each

[7] investigator has his own style of technique of what

[8] they're comfortable with or whatnot. I've not

[9] normally ever had a problem with someone sitting in

[10] with me.

[11]    I normally go tell them that you're an

[12] observer; you can listen to what's being said. I

[13] don't have a problem with you being here as a

[14] representative from the company, but you're not

[15] engaged in questions or whatever else is involved.

[16] Primarily it's just a, you know, ask an interview —

[17] so, I mean, they're not going to get in a position of

[18] saying, well, maybe being intimidated of not saying

[19] something correct because someone's there.

[20]  **Q:** Yeah.

[21]  **A:** We do one of two: We either take

[22] handwritten notes, which I did in this case, or a

[23] tape-recorded interview. In this case I took hand

[24] notes. It's not spelled out. I mean, we're not

1—09:22:49  24—09:23:51                    Page 349

[1] mandated that we have to do one or the other;

[2] sometimes more convenient for the other. But in this

[3] case, I took field notes.

[4]    I ask questions, ask them to explain

[5] to me what happened, then go back and touch on things

[6] while I'm writing notes while they're talking to me,

[7] as well as clarifying.

[8]    And then I go over my notes to make

[9] sure that what I wrote reflects what they told me.

[10] And then to conclude it, I always put a starting time

[11] and an ending time when I'm done. And then when I go

[12] back later to do — not in the detail that this

[13] gentleman does, word for word, line for line, dot for

[14] dot —

[15]  **Q:** The court reporter.

[16]  **A:** — but I take from the notes the bullets

[17] that I wrote and put it into sentence form of a

[18] synopsis of the brief comments that were made

[19] regarding what they said to me.

[20]  **Q:** In this case you had Mr. Bard; you brought

[21] him into your vehicle; correct?

[22]  **A:** Yes, sir.

[23]  **Q:** And you asked him questions?

[24]  **A:** Yes, sir.

1—09:23:52  24—09:24:47          Page 350

[1]    Q: You asked him, first, to kind of give you

[2] a narrative of what happened and what he remembered?

[3]    A: Yes, sir.

[4]    Q: And then you asked him specific questions

[5] about areas that are important to you?

[6]    A: Yes, sir.

[7]    Q: And you're taking notes at the same time?

[8]    A: Yes, sir.

[9]    Q: After you've completed your notes, you

[10] read through your notes?

[11]    A: Yes, sir.

[12]    Q: And then you ask him about each note that

[13] you've taken to confirm that that's what he said?

[14]    A: Yes, sir.

[15]    Q: And you did that in this case?

[16]    A: Yes, sir. Every case.

[17]    Q: Now, I'm not going to go through the

[18] entire interview line by line with you.

[19]    A: Okay.

[20]    Q: But I would like you to have a copy of

[21] your report. On page 12 of your report, that has the

[22] entire first interview with Mark Bard.

[23]    A: Okay.

[24]    Q: With respect to the distance of the

1—09:24:49  24—09:26:01          Page 351

[1] motorcycle, the information that Mr. Bard first saw

[2] the motorcycle when it was 50 to 75 feet away from

[3] him, where did you get that information?

[4]    A: From my notes of what he said to me from

[5] the interview in the car.

[6]    Q: So you got that information from Mr. Bard

[7] himself?

[8]    A: Yes, sir.

[9]    MS. RISK: Objection; leading.

[10] BY MR. van der VEEN:

[11]    Q: Did you — at any time from your

[12] recollection or from your notes, did he tell you that

[13] he first saw the motorcycle on the stone bridge?

[14]    A: From my recollection, not; and from the

[15] notes, I don't see anything that reflects that

[16] either, no, sir.

[17]    Q: Okay. Mr. Bard has testified that he told

[18] you in this interview in your squad car that he first

[19] saw the motorcycle on the stone bridge and you told

[20] him that that was 50 to 75 feet away.

[21]    MS. RISK: Objection.

[22] BY MR. van der VEEN:

[23]    Q: Do you recall that happening?

[24]    A: I don't recall me saying that it was 50 to

1—09:26:04  24—09:27:09          Page 352

[1] 75 feet away.

[2]    Q: Would you ever estimate a distance for the

[3] driver of another vehicle in a fatal accident case

[4] for him?

[5]    A: No, sir. The line of questioning that I

[6] do normally is something — I mean, I've said it so

[7] many times, so many years — I'm not trying to lock

[8] you in. What I'm trying to get an idea of,

[9] approximate, whatever works for you, is what I

[10] basically say, car distances, because some people

[11] will say, Well, six car lengths, whatever, if they're

[12] more comfortable with that. If you're comfortable

[13] with feet, yards — I mean, I'll say yards or meters,

[14] whatever.

[15]    But whatever they say to me, what I'm

[16] trying to do — and it's not a trick question. I'm

[17] not trying to lock them in so that later, you know,

[18] like today we can back-and-forth it. I'm just trying

[19] to get an idea of approximately where they were when

[20] they said they saw whatever they saw, whomever it is.

[21]    Sometimes we get out of the car and

[22] ask them, Could you show me where you were? In this

[23] case, I didn't do that. Through — and, and through

[24] experience, you kind of sort of get a gut feeling. I

1—09:27:12  24—09:28:06          Page 353

[1] mean, when someone tells you something, if it's a

[2] real, Oh, about a hundred feet, as opposed to, A

[3] hundred feet maybe, that's — it's less convincing.

[4] Sometimes we'll do that and get out of the car and

[5] say, you know, Show me. But I did not do that in

[6] this case, and the notes that I wrote reflect what I

[7] believe.

[8]    Q: When he told you that it was 50 to 75 feet

[9] away, did he seem certain about it?

[10]    A: Appeared — yes, appeared to be, what I

[11] remember.

[12]    Q: Now, when he gave you the approximation of

[13] 50 to 75 feet, he was sitting — you were sitting in

[14] your front seat of your squad car; correct?

[15]    A: Yes, sir.

[16]    Q: And he was sitting in the front passenger

[17] seat of your squad car?

[18]    A: Yes, sir.

[19]    Q: And he was just north of the intersection

[20] and the accident scene looking into the scene —

[21]    A: Yes, sir.

[22]    Q: — correct?

[23]    A: Yes, sir.

[24]    Q: And you gave him plenty of time to answer

1—09:28:10  24—09:29:06                    Page 354

[1] your questions? You didn't rush him in any way?

[2]　　MS. RISK: Objection to form.

[3] BY MR. van der VEEN:

[4]　　Q: Did you rush him in any way?

[5]　　A: No. They take whatever time they need.

[6] And, again, if they're not committed, if they don't,

[7] aren't comfortable — for instance, another common

[8] question we ask at every investigation, just about,

[9] Do you know or remember right before the crash

[10] approximately how fast you were traveling?

[11]　　Right away people sometimes say, Oh,

[12] this is a cop question; he's trying to nail me. And

[13] they'll hem, haw around and, No, I have no idea. Or

[14] sometimes they'll tell us.

[15]　　I'm just trying to get approximate.

[16] There's no trick agenda here. It's just to try to

[17] get an overall as an investigator. We didn't get to

[18] witness what took place but is responsible for

[19] investigating, just to try to get an accurate

[20] reflection of what they, you know, they can tell you

[21] and share with you.

[22]　　Q: Okay. Regarding Mr. Bard's statement

[23] about whether he does or does not wear glasses, he

[24] told you that he did not wear glasses?

1—09:29:32  24—09:30:14                    Page 355

[1]　　A: Correct.

[2]　　Q: He didn't tell you, I own glasses but

[3] don't wear them; they're only for reading?

[4]　　MS. RISK: Objection; form.

[5]　　THE WITNESS: I don't recall him ever

[6] saying that, no.

[7] BY MR. van der VEEN:

[8]　　Q: If he told you that he had glasses but

[9] they were only for reading, would you have reflected

[10] that in your notes?

[11]　　MS. RISK: Objection.

[12]　　THE WITNESS: Yes. And that is common

[13] to have individuals that have since required them but

[14] haven't gone to DMV so it's not reflected. And

[15] that's why it's a question, because it's not

[16] always — not everyone's valid and current and up to

[17] date on their driver's licenses to have it endorsed

[18] of restrictions or what they might or might not need

[19] to know or have.

[20] BY MR. van der VEEN:

[21]　　Q: Okay.

[22]　　A: And that's why we ask it. I mean, I

[23] wasn't asking specifically in this case for that. I

[24] was just saying, Do you wear glasses? Were you

1—09:30:18  24—09:31:57                    Page 356

[1] wearing glasses.

[2]　　Q: And as far as you remember and as far as

[3] your notes reflect, he said, I do not wear glasses?

[4]　　A: Yes, sir.

[5]　　Q: He did tell you that he never heard the

[6] motorcycle?

[7]　　A: Never heard the motorcycle approaching;

[8] yes, sir.

[9]　　Q: Even when it was 60 to 85 feet away from

[10] him?

[11]　　MS. RISK: Objection to the form.

[12]　　THE WITNESS: All he said was he

[13] never — when I asked him, I asked him if he had

[14] heard the motorcycle. And he said he never heard it

[15] as it was approaching. So to me that would mean not

[16] at all.

[17] BY MR. van der VEEN:

[18]　　Q: He did not tell you in this first

[19] interview that the first person on the scene was John

[20] Seiffert?

[21]　　MS. RISK: Objection; form.

[22]　　THE WITNESS: I wouldn't know any

[23] reason why he would have told me that. I certainly

[24] didn't or wouldn't have asked that.

1—09:31:58  24—09:32:58                    Page 357

[1] BY MR. van der VEEN:

[2]　　Q: Okay. Well, if you look at the bottom of

[3] your statement, the bottom of your summary of his

[4] statement, it says, He does not remember anyone else

[5] being around when the traffic collision occurred

[6] other than the nurse that stopped to help. The nurse

[7] did not say much. But she did state that the

[8] motorcycle passed her right before the collision

[9] happened.

[10]　　A: Okay.

[11]　　Q: When you were interviewing him on this

[12] date, did he tell you about any contact that he had

[13] with John Seiffert?

[14]　　A: I don't recall any, no, sir.

[15]　　Q: Did he tell you that after the impact, his

[16] truck rolled forward and rolled on top of Mr. Vascek?

[17]　　A: Yes, sir, I remember him telling me that.

[18]　　Q: He did tell you that?

[19]　　A: Uh-huh.

[20]　　Q: And is that in your notes? The last time

[21] I asked you in your deposition, you said he didn't

[22] tell you that and that it wasn't reflected in your

[23] notes.

[24]　　MS. RISK: Objection; form,

---

1—09:32:59  24—09:34:13                              Page 358

[1] speculation.

[2]     MR. van der VEEN: It's not

[3] speculation. It's the record.

[4]     MS. RISK: Representation of the

[5] record. The record speaks for itself.

[6] BY MR. van der VEEN:

[7]     Q: I'm going to ask the question for your

[8] second interview as well.

[9]     A: It was the second interview.

[10]     Q: I'm going to ask you about that too.

[11]     A: He didn't tell me that — according to the

[12] notes, he didn't tell me that the first time and

[13] apparently made the comment in the second interview.

[14]     Q: Well, please look at your second interview

[15] before you come to that conclusion.

[16]     MS. RISK: Objection. Is there a

[17] question pending?

[18]     MR. van der VEEN: There will be when

[19] he's done. I'm giving him an opportunity to read.

[20]     THE WITNESS: He moved it — I was

[21] told that he moved it during the second interview and

[22] that he was instructed by one of the nurses, not

[23] Mr. Seiffert/Seiffert, whatever his last name was.

[24] BY MR. van der VEEN:

---

1—09:34:13  24—09:35:01                              Page 359

[1]     Q: Now, nowhere in your report does it

[2] indicate that he ever told you or at the time that

[3] you wrote your report you had any knowledge of his

[4] truck rolling up on him —

[5]     MS. RISK: Objection; form.

[6] BY MR. van der VEEN:

[7]     Q: — up on his arm?

[8]     MS. RISK: Objection; form.

[9]     THE WITNESS: I'm sorry. Ask the

[10] question again.

[11] BY MR. van der VEEN:

[12]     Q: Sure. If you read your report through

[13] from front to cover, it does not mention that you

[14] were aware that this van ended up rolling up on

[15] Mr. Vascek?

[16]     MS. RISK: Objection; form.

[17]     THE WITNESS: That's correct, not

[18] through him.

[19] BY MR. van der VEEN:

[20]     Q: Okay. It is not mentioned in any of your

[21] witness statements?

[22]     A: It's not?

[23]     Q: (Nodded.)

[24]     MS. RISK: Objection; form.

---

1—09:35:02  24—09:36:02                              Page 360

[1]     THE WITNESS: Okay.

[2] BY MR. van der VEEN:

[3]     Q: And would that mean that nobody had told

[4] you about it?

[5]     A: No.

[6]     Q: Okay.

[7]     A: I'm recalling, I believe it was during the

[8] interview or the conversations, the telephone

[9] conversations that I had off and on with Mr. Seiffert

[10] when I interviewed him.

[11]     Q: Okay. Mr. Bard testified in his

[12] deposition that he didn't tell you about that.

[13]     MS. RISK: Objection.

[14] BY MR. van der VEEN:

[15]     Q: Do you know why he wouldn't tell you about

[16] that?

[17]     MS. RISK: Objection; speculation.

[18]     THE WITNESS: Why he wouldn't tell me

[19] that he had rolled onto the arm?

[20] BY MR. van der VEEN:

[21]     Q: Yeah.

[22]     A: No idea.

[23]     Q: Now, Mr. Bard — and I'm looking at his

[24] first statement — told you that — it says, Mr. Bard

---

1—09:36:06  24—09:37:24                              Page 361

[1] stated that the motorcycle was traveling at a high

[2] rate of speed and estimated the speed to be

[3] approximately 80 miles per hour. Do you see where

[4] that is in your report and also then in your notes?

[5]     A: I see it in my notes. And I see it in the

[6] report, yes, sir.

[7]     Q: Okay. Did Mr. Bard tell you that it was

[8] going a hundred miles an hour?

[9]     A: No, sir.

[10]     Q: Did Mr. Bard tell you that it was going a

[11] hundred miles an hour and then you told him, No, no,

[12] it had to be 80?

[13]     MS. RISK: Objection.

[14]     THE WITNESS: No. What I wrote is

[15] what he said. I have no reason to go higher or lower

[16] or — and those are questions that I clarify, because

[17] we're talking about a speed, whether it's an estimate

[18] or his behalf or not or whomever, her behalf.

[19]     80 mile an hour is what's in my notes.

[20] 80 mile an hour is what's in the report. 80 mile an

[21] hour is what I remember from the interview. I would

[22] have had no reason to say, No, it was probably going

[23] faster than that, or, No, it was probably going

[24] slower, or whatever. I have no reason to do that.

---

1—09:37:32  24—09:38:33                                   Page 362

[1]     I mean, as an investigator, I'm a, I'm

[2] a mediator to put all the facts together and try to

[3] come to a conclusion with what the facts and

[4] everything, the totality of everything tells me.

[5]     I'm not going to — there's no

[6] win/lose, gain/loss by me suggesting other than what

[7] they're saying. I mean, I didn't know him from Adam

[8] the day before this collision and only had the

[9] contact with him as a result of this investigation as

[10] well as with the others in any of the other

[11] investigations that I conduct.

[12]     Q: Now, you had a second interview with

[13] Mr. Bard. And you indicate — and this was in

[14] February of this year, of '05. And you say, Mr. Bard

[15] confirmed what he had originally stated during his

[16] initial interview.

[17]     Do you see that in your report?

[18]     A: Yes, sir.

[19]     Q: You would have gone over with him, then,

[20] what he told you in the first interview —

[21]     A: Yes, sir.

[22]     Q: — with your notes?

[23]     A: Yes.

[24]     Q: You would have told him that he had

1—09:38:35  24—09:39:22                                   Page 363

[1] estimated the speed at 50 to 75 miles an hour?

[2]     MS. RISK: Objection; form.

[3]     THE WITNESS: When I do that, when I

[4] put a statement, like this is confirmation, I don't

[5] go over every single line item and say, you know,

[6] Well, yes, he said he got up at this time in the

[7] morning. I go over the main topics of where I'm

[8] going at as far as — and speed would have been one

[9] of them.

[10]     And if there would have been any

[11] opportunity or any time for him to have corrected me

[12] from the first interview when we went over the notes

[13] then he got out of the police car, he could have

[14] had that opportunity to clarify it then as well

[15] because it was, it was during the conversation that

[16] we discussed.

[17] BY MR. van der VEEN:

[18]     Q: Speed and distance being two of the most

[19] salient points in an accident reconstruction;

[20] correct?

[21]     MS. RISK: Objection; form.

[22]     THE WITNESS: It is the most

[23] important — one of many important factors of any

[24] collision, yes.

1—09:39:23  24—09:40:08                                   Page 364

[1] BY MR. van der VEEN:

[2]     Q: Sure. And when you go over the salient

[3] facts with somebody on the second interview, speed

[4] and distance is something that you would cover;

[5] correct?

[6]     A: Yes.

[7]     MS. RISK: Objection; form.

[8] BY MR. van der VEEN:

[9]     Q: And do you remember when you talked with

[10] him the second time that you went over speed and

[11] distance?

[12]     A: I — other than — I mean, I, I don't have

[13] an absolute checkmark saying I went over each of

[14] these line items. But from over the years of my

[15] experience and getting set in a procedure of doing

[16] things, I know that's what I do. And I touch on the

[17] highlights.

[18]     And also during the course — it's not

[19] reflected in there. But during the course of my

[20] interviews, I give them the opportunity — you know,

[21] basically I tell them, If there's anything that, from

[22] the first interview and any other subsequent

[23] interviews — a lot's happened right now. I know

[24] you're emotionally upset. This is an ugly situation.

1—09:40:11  24—09:41:07                                   Page 365

[1] Is there anything you think you might — is important

[2] for me to know that you didn't tell me or I didn't

[3] ask?

[4]     And then I leave an open, blanket

[5] invitation that, if at any time — you got my — I

[6] mean, I give them my business card, I give them the

[7] numbers to reach me. If something triggers in your

[8] mind — Oh, nuts, I forgot about that — call me; let

[9] me know. If you think it's important, we'll put it

[10] in the report.

[11]     Every interview I have that is

[12] discussed with them, any and all of them, whether

[13] it's on the phone, whether it's in person, to give

[14] the person the opportunity, if there's something that

[15] they forgot to tell me, I'm giving them that

[16] opportunity. They can always call me. I can always

[17] add a fourth contact or fifth contact, or however

[18] many interviews we have, to do that.

[19]     And the only other contact that I ever

[20] had with, that I recall with Mr. Bard — and I don't

[21] know if it's in the notes or not, if I reflected the

[22] exact date — but later when the Attorney General's

[23] office made the decision of this not being a

[24] prosecution case, I contacted Mr. Bard.

1—09:41:10  24—09:42:09                                   Page 366

[1]    And I often do that with all the
[2] operators, just, How are you doing? You know, I
[3] don't want to see you fall through the cracks.
[4] Everyone involved in the situation is a victim, I
[5] mean, whether, you know, a participant, a witness.
[6] It rattles everyone that's involved with it. And
[7] everyone deals with things like this differently.
[8] And the perspective of my direction is just to reach
[9] out and be as compassionate as possible. You know,
[10] is there anything we can do? Are you okay?
[11]    And one of the things that I said I
[12] did — man of my word — I told him when the AG's
[13] office made a decision, I would let him know. So
[14] that's really about, if I recall, the last
[15] conversation I've ever had with him. And I don't
[16] even know if I documented the date that I did it.
[17] Sometimes I do; sometimes I don't. We get caught up
[18] in all the things that we're doing.
[19]    But, but to, I guess I'm rattling on
[20] now longer that I have to. But I try to extend every
[21] opportunity to anyone that I ever interview to, you
[22] know, call me, whether it's two days later, five days
[23] later, six months later, and bring it to my
[24] attention.

1—09:42:10  24—09:46:13                                   Page 367

[1]    Q: And he never did that regarding speed or
[2] distance?
[3]    A: No, sir.
[4]    (Discussion held off the record.)
[5]                    RECESS
[6]    (The court reporter read back the last
[7] question and answer.)
[8] BY MR. van der VEEN:
[9]    Q: Did Mr. Bard ever tell you that he found a
[10] skid mark to the motorcycle?
[11]    A: I don't recall him ever telling me that.
[12] It would have been in the notes. I didn't review
[13] everything verbatim, you know, line for line, again,
[14] coming here in today. But, no, I don't recall that
[15] ever.
[16]    Q: You didn't find — would you like to take
[17] a couple minutes and read through your report so that
[18] you're fresh with it?
[19]    A: I'm fine.
[20]    Q: Okay. You never found a skid mark from
[21] the motorcycle?
[22]    A: Other than the mark that we talked about
[23] at great lengths in the previous deposition, no, the
[24] mark right by the, where the UPS truck and the

1—09:46:16  24—09:48:06                                   Page 368

[1] motorcycle — but other than that, no.
[2]    Q: Okay. And that mark we were talking about
[3] you did not attribute to being to the motorcycle?
[4]    A: Correct.
[5]    Q: Did he ever tell you that when he first
[6] saw the motorcycle, that the driver's head was down?
[7]    MS. RISK: Objection;
[8] mischaracterization of testimony, speculation.
[9]    THE WITNESS: I don't recall him ever
[10] telling me that.
[11]    MR. van der VEEN: I don't think it
[12] can be both.
[13]    MS. RISK: Yes.
[14]    THE WITNESS: I recall the interview
[15] from Mr. Seiffert indicating the positioning of the
[16] operator and the dynamics of what the motorcycle did
[17] and the body and everything. But I don't recall —
[18] there's nothing in the notes, and I don't recall him
[19] ever telling me that, no.
[20] BY MR. van der VEEN:
[21]    Q: Okay.
[22]    A: Or I would have noted it.
[23]    Q: You spoke with a Colton Swift about three
[24] or four months after this accident; do you recall

1—09:48:08  24—09:49:34                                   Page 369

[1] that?
[2]    A: Yes, sir.
[3]    Q: And it was a conversation that lasted
[4] about ten minutes, 15 minutes?
[5]    A: Yes, sir.
[6]    Q: And in this conversation you didn't ask
[7] him what his job duties were?
[8]    MS. RISK: Objection to the form.
[9] BY MR. van der VEEN:
[10]    Q: Did you ask him what his job duties were?
[11]    A: Asked what his position was.
[12]    Q: Did you ask him what his riding experience
[13] was?
[14]    A: I asked him if he was — if I recall, I
[15] asked him if he was an experienced motorcycle
[16] operator, his experience. But he just said
[17] experience since 1994. I didn't go into, other than
[18] what's in the report, since '94.
[19]    Q: Did anybody ever tell you that you could
[20] do a stoppie going, coasting down a driveway with the
[21] motorcycle off?
[22]    A: I believe we did discuss that in the first
[23] deposition. And I don't recall exactly what my
[24] answer was. But I didn't remember or know that that

1—09:49:38   24—09:51:08      Page 370

[1] could be done, other than — by definition of what my
[2] understanding of what a stoppie is, to get it to have
[3] the rear wheel to come up as high as it would — you
[4] can get the rear to bounce off of the asphalt or
[5] concrete or whatever, to a degree. But on a drift
[6] you're not going to get the motorcycle to come and
[7] stand on its end. You need a higher velocity for
[8] that. And that's the conversation of what this was
[9] about. But — so yes.
[10]     Q: Okay. I'm looking at page 16 of your
[11] report where you begin the reconstruction aspect.
[12] And it's your second paragraph: Visibility tests
[13] were conducted at the collision scene on the day of
[14] the collision as well as during follow-up visits to
[15] the intersection.
[16]     Do you know when your follow-up visits
[17] were or how many there were?
[18]     A: Two. One follow-up and the day of the
[19] collision. Actually, there were — wait a minute.
[20] There were two follow-ups. And one was — in looking
[21] through my notes, it's not documented — that was
[22] within like a week or so after the crash.
[23]     Q: Okay.
[24]     A: The second one was done later, which was

1—09:51:10   24—09:52:18      Page 371

[1] reflected on the, all the papers that you made. And
[2] when I went back and did some more detailed distances
[3] and collected some overall dynamic — or the layout
[4] of the intersection and where it all occurred. Of
[5] course, that was much later then so the foliage and
[6] things like that were not the same.
[7]     But I was looking at that point, just
[8] taking measurements like how far from the center of
[9] the intersection the edge of the concrete bridge was
[10] and the hedgerow and things like that.
[11]     Q: Mr. Bard testified in his deposition that
[12] approximately three weeks after his accident at this
[13] intersection, that somebody knocked down the stop
[14] sign and that it was replaced.
[15]     Did you have any knowledge of that?
[16]     A: I would have no knowledge of that. That
[17] would probably, I would like to think, be reflected
[18] not only in collisions somehow, some way, whatever
[19] date as well as DelDOT, because they're very
[20] accurate, I mean, about things like that, going out
[21] and putting them back up.
[22]     And whether the sign was knocked down
[23] by a collision or not, obviously if it was knocked
[24] down by a collision, there would be a report that

1—09:52:20   24—09:54:12      Page 372

[1] would generate from that. Or if someone hit it,
[2] knocked it down, and kept going, certainly, obviously
[3] it has to be put back up. Somebody, a motorist, a
[4] resident in that area, whatever, some way, somehow
[5] notified the authorities to have it put back up. But
[6] I have — I would have no knowledge of that.
[7]     Q: DelDOT would be in charge of replacing
[8] that stop sign if it were ever knocked down?
[9]     A: Correct. That's their roadway. And my
[10] experience is that they are very fast at replacing
[11] signage, something obviously as important as a stop
[12] sign, equally as well. I mean, if it's something not
[13] quite as important, not that they're not all
[14] important, but some certainly have higher priorities
[15] of importance.
[16]     Q: You say on page 17 of your report, the, I
[17] think, third full sentence at the top, It is
[18] necessary for eastbound traveling motorists to move
[19] forward towards Montchanin Road to visibly see north-
[20] and southbound traveling motorists that are
[21] approaching the intersection.
[22]     Do you see that?
[23]     A: Yes, sir.
[24]     Q: And that is because why?

1—09:54:14   24—09:55:49      Page 373

[1]     A: Because the stop sign is further back from
[2] where the actual roadway intersects with Twaddell
[3] Mill Road. So the requirements of Delaware law, or
[4] any law, I think, in any state, you're obligated to
[5] stop or required, responsible to stop at the stop
[6] sign, which in this case is, you're not going to see
[7] everything because you're further — it's a hidden
[8] intersection. It's in a curve.
[9]     Your responsibility then is to proceed
[10] forward cautiously and, prior to entering, making
[11] sure, you know, you can see both ways. And the
[12] statement for this is just that it's a hidden
[13] intersection. And you have to do that there, it's —
[14] every motorist that approaches it, unless they have a
[15] death wish and just want to go through it. I mean,
[16] it's just the designs of the intersection.
[17]     Q: Under Delaware law — and I'm going to
[18] show you the stop signs and yield signs statute in
[19] Delaware, if I may, and if you'd take a look at it.
[20]     A: What part are you referring to, the entire
[21] thing?
[22]     Q: Sure.
[23]     A: Okay.
[24]     (Discussion held off the record.)

1—09:57:32   24—09:58:17                          Page 374

[1] BY MR. van der VEEN:

[2] **Q:** The statute for duties at a stop sign

[3] speaks of three different types of markings at the

[4] intersection, does it not?

[5] **MS. RISK:** Objection; form.

[6] **THE WITNESS:** Yes, sir.

[7] BY MR. van der VEEN:

[8] **Q:** It speaks about an intersection that has a

[9] stop sign and then a white painted stop line;

[10] correct?

[11] **A:** Yes. We refer to it as a stop bar.

[12] **Q:** Stop bar?

[13] **A:** Yes, sir.

[14] **Q:** It speaks of an intersection with a stop

[15] sign, no stop bar, but a painted crosswalk,

[16] pedestrian crosswalk; correct?

[17] **A:** Yes.

[18] **Q:** And it speaks of an intersection with a

[19] stop sign but no stop bar and no painted crosswalk;

[20] correct?

[21] **A:** Yes, sir.

[22] **Q:** That third type of an intersection is the

[23] type of intersection that is Twaddell Mill Road and

[24] Montchanin Road; correct?

1—09:58:18   24—09:58:52                          Page 375

[1] **A:** Yes.

[2] **MS. RISK:** Objection; form.

[3] **THE WITNESS:** Yes, sir.

[4] BY MR. van der VEEN:

[5] **Q:** It has no stop bar?

[6] **A:** I don't know. There might have one day

[7] been, but it wasn't there then, whether the road's

[8] surfaced and not painted again, but no.

[9] **Q:** On the day of this accident there was no

[10] stop bar?

[11] **A:** No.

[12] **MS. RISK:** Objection; form.

[13] BY MR. van der VEEN:

[14] **Q:** And there was no white painted line?

[15] **A:** No, sir.

[16] **Q:** There was no white painted crosswalk?

[17] **MS. RISK:** Objection.

[18] **THE WITNESS:** No, sir.

[19] BY MR. van der VEEN:

[20] **Q:** So under the statute his duty is to not

[21] stop at the stop sign but to stop at the edge of the

[22] roadway between Montchanin Road and Twaddell Mill

[23] Road; correct?

[24] **MS. RISK:** Objection; form.

1—09:58:53   24—09:59:54                          Page 376

[1] **THE WITNESS:** Yes, sir; my

[2] understanding of it, yes, sir.

[3] BY MR. van der VEEN:

[4] **Q:** So that if he has testified that he

[5] stopped with the front of his vehicle even with the

[6] stop sign, which is about 15 feet back from the edge

[7] of the roadway, he would have stopped 15 feet too

[8] early; correct?

[9] **MS. RISK:** Objection.

[10] **THE WITNESS:** Under that definition,

[11] yes.

[12] BY MR. van der VEEN:

[13] **Q:** Under the law?

[14] **A:** Yes, sir.

[15] **MS. RISK:** Objection.

[16] BY MR. van der VEEN:

[17] **Q:** And he was clear with you that he did not

[18] stop at the point where Montchanin Road and Twaddell

[19] Mill Road intersect one another; correct?

[20] **MS. RISK:** Objection; form.

[21] **THE WITNESS:** My memory of — no, he

[22] did not. He stopped at the stop sign and then slowly

[23] proceeded toward the intersection.

[24] BY MR. van der VEEN:

1—09:59:54   24—10:01:36                          Page 377

[1] **Q:** If he had stopped at the edge of the

[2] roadway where he was, his sight line would be

[3] improved for both northbound and southbound lanes;

[4] correct?

[5] **A:** The sight line would be the same whether

[6] he stopped or not —

[7] **Q:** No —

[8] **A:** — I mean, because during the interview,

[9] he indicated he was looking. So if he's looking to

[10] the left and he's slowly entering, he's still going

[11] to see that whether he stops or not. Whatever is

[12] there is there.

[13] **Q:** Did he tell you that he was also looking

[14] right?

[15] **A:** He told me...

[16] He said he moved forward, still didn't

[17] see anything coming.

[18] **Q:** Okay. Did he tell you that from the time

[19] that he stopped to the stop sign to the time that he

[20] got to the intersection of the roadway, he looked to

[21] his right three times?

[22] **A:** I don't recall him telling me that.

[23] **Q:** Okay. If he — comparing the sight line

[24] when stopped at the stop sign — strike that

1—10:01:44  24—10:02:58                    Page 378

[1] question.

[2]    Would your sight line be better for

[3] the southbound lanes of Route 100 if you stopped at

[4] the stop sign or if you stopped at the edge of the

[5] roadway?

[6]    A: If you stopped at the edge of the roadway,

[7] you can see more of the curve.

[8]    Q: If you had been — if you stopped when you

[9] enter the intersection, would you be traveling faster

[10] if you started from the stop sign or if you started

[11] from the very edge of the roadway?

[12]    MS. RISK: Objection; hypothetical,

[13] form.

[14]    THE WITNESS: If you started from the

[15] edge of the roadway and began to execute a left turn

[16] as opposed to starting it at the stop sign, your

[17] speed's going to be slower because you're just

[18] starting.

[19]    Whereas, you've covered already

[20] 15 feet or whatever you said the stop sign was back.

[21] If it was an intersection that didn't require that,

[22] where visibility was better and you started from the

[23] stop sign out, you've got 15 feet to start picking up

[24] speed.

1—10:02:59  24—10:04:47                    Page 379

[1]    Whereas, if you're at the edge of the

[2] roadway, you're not going to accelerate as fast.

[3] Even if you tromp on it, still you're going to get

[4] only what you get in the amount of distance that you

[5] travel before the, in this case, impact.

[6] BY MR. van der VEEN:

[7]    Q: Correct. At the edge of the roadway, is

[8] your sight line — at the edge of the roadway, is

[9] your sight line into the southbound lanes of

[10] Route 100 greater than 50 to 75 feet?

[11]    A: Yes, sir. Mine was when I looked.

[12]    Q: What was yours?

[13]    A: I mean, you can see, as reflected in the

[14] diagram and the distances as far as the hedgerow and

[15] the other things that are down there, you can see

[16] with, even with foliage at that point. And, of

[17] course, later then — when, later into the winter,

[18] whenever, when the foliage was cut back or not as

[19] full, you can definitely see, I mean, at least into

[20] the curve where the hedgerow is, which — 200-some

[21] feet or whatever.

[22]    Q: 279 feet?

[23]    A: Yeah.

[24]    Q: Trooper, you had at one point faxed a

1—10:04:50  24—10:06:38                    Page 380

[1] draft of your report to UPS; do you recall that?

[2]    MS. RISK: Objection.

[3]    THE WITNESS: Do I recall that?

[4] BY MR. van der VEEN:

[5]    Q: You have a fax cover sheet that I was able

[6] to review.

[7]    A: I'm sure I did if you said I did. If we

[8] do that, we put the information — I put a copy of it

[9] in the file.

[10]    Q: Uh-huh.

[11]    A: And that's not uncommon for us to do, to

[12] give basic information to any and all parties that

[13] request it.

[14]    This would be it.

[15]    Q: May I take a look at that?

[16]    A: (Complies.)

[17]    Q: This was in November of '04; correct? And

[18] you faxed it to Jim Liggett? Do you know who Jim

[19] Liggett is?

[20]    A: He's a representative of UPS.

[21]    Q: And do you know what his position is at

[22] UPS?

[23]    A: He is — works with the safety management.

[24]    Q: Oh, do you have his card?

1—10:06:40  24—10:07:43                    Page 381

[1]    A: He gave me a business card of Michael

[2] Long, and his information was on the back. That was

[3] what I had from the date of the crash.

[4]    Q: So Mr. Liggett was on the scene also on

[5] the day of the crash — I mean, Mr. Long was also

[6] there?

[7]    A: If I recall, yes, sir.

[8]    Q: Who else gave you cards from UPS, do you

[9] know, or related to this accident? I see you have my

[10] card there, Michael van der Veen.

[11]    A: That's when we met, on the day that we

[12] met, yeah, November 22nd.

[13]    Q: Okay.

[14]    A: I have a card from J.C. Kenney —

[15]    Q: Yeah.

[16]    A: — senior field investigator for Liberty

[17] Mutual.

[18]    Q: Uh-huh.

[19]    A: Paul Wallace, this is a card I put in the

[20] file from the AG's office, who reviewed the case. I

[21] have business, several business cards, well, two

[22] actually, from Miss Risk. I met with her on June 9th

[23] of this year. I have a business card from Jim Jester

[24] from UPS.

**Min-U-Script®**                    Corbett & Associates  (302) 571-0510