1—10:07:44  24—10:08:42.                                   Page 382

[1] Q: Uh-huh. When did you meet with him?

[2] A: I don't remember. He might — he was

[3] probably at the scene because that's the only reason

[4] I would have gotten that. But just a lot of times it

[5] seems people are handing out their business cards.

[6] And, of course, I got a card from the tow company.

[7] Q: Can I make a copy of all of these cards?

[8] A: Sure.

[9] MS. RISK: There is actually, if

[10] counsel will look to the notes that the corporal was

[11] kind enough to provide us with, his entire file last

[12] time, there's a photocopy with all of those cards on

[13] it.

[14] MR. van der VEEN: Front and back? I

[15] didn't see that.

[16] MS. RISK: I believe so. If you just

[17] want to make a copy, that's fine. I wasn't trying

[18] to...

[19] MR. van der VEEN: Okay. I'll make

[20] copies of these.

[21] BY MR. van der VEEN:

[22] Q: I met with you, according to what you

[23] wrote on the back of my card, November 22nd?

[24] A: Yes.

1—10:08:43  24—10:09:30                                    Page 383

[1] Q: Do you remember when we met, I was trying

[2] to get a copy of the draft of the report?

[3] A: I don't remember.

[4] Q: Do you remember Nina calling you in

[5] October, November, December, and January trying to

[6] get a draft of the report?

[7] A: Yes.

[8] Q: And we were not able to get a draft of the

[9] report?

[10] A: Wasn't finished.

[11] Q: Then how come in November a draft of the

[12] report went to UPS?

[13] A: They requested preliminary. Any

[14] conversation that I had with you and/or Miss Bushman,

[15] my recollection was that they wanted the completed

[16] report. That was not a completed report.

[17] Q: Okay.

[18] A: I would have provided that if you would

[19] have just said, Hey, can you give me —

[20] Q: — what you have so far?

[21] A: Yeah. Yes.

[22] Q: We didn't ask the question right?

[23] A: My — all the conversations I had was, my

[24] understanding was that you were requesting the full

1—10:09:33  24—10:10:47                                    Page 384

[1] report. And that's —

[2] Q: Okay.

[3] A: And I never even picked up on it. Or I

[4] would have said, Hey, you know, I can give you this.

[5] Q: Okay. Thanks.

[6] I don't believe I have any more

[7] questions for you. Let me double-check if I may, my

[8] list.

[9] Did you ever tell Mr. Bard that

[10] Mr. Vascek lost his right-of-way on Route 100

[11] southbound because he was going too fast?

[12] MS. RISK: Objection; form.

[13] THE WITNESS: I don't recall ever

[14] telling him that. I did explain to him when I called

[15] him and told him what the Attorney General's office

[16] decision was, that there is a — and it's possible he

[17] misunderstood what I was explaining to him at that

[18] point where that came from.

[19] But there is an obligation, first and

[20] foremost, of course, at that intersection he has to

[21] yield; Montchanin Road has the right-of-way. But

[22] equally in the decision and in looking at it, when an

[23] individual, for instance, is DUI or excessive speed

[24] or is also contributing to the causation, the way the

1—10:10:52  24—10:11:59                                    Page 385

[1] Attorney General's office looked at it and what I was

[2] explaining to him is that one doesn't override the

[3] other; but collectively, together — maybe it doesn't

[4] sound clear — is negating. There's more than just a

[5] clear-cut stop sign violation or whatever, a traffic

[6] light violation or whatever. But I wouldn't have

[7] said it negates it.

[8] BY MR. van der VEEN:

[9] Q: The Attorney General's office chose not to

[10] prosecute him because they didn't think they could

[11] prove beyond a reasonable doubt that he had criminal

[12] conduct; correct?

[13] MS. RISK: Objection; form.

[14] Objection; speculation.

[15] THE WITNESS: The decision Mr. Wallace

[16] gave me was, after explaining the circumstances of

[17] the collision from the finished collision report,

[18] after reviewing those facts, they felt that the

[19] charges weren't warranted, not — they didn't go o

[20] telling me a jury or anything...

[21] I mean, I know what the law says when

[22] we go into court work. But they, they didn't go into

[23] that. They just said with what existed in this

[24] situation, they didn't feel that it was warranted to

[1] charge Mr. Bard. And we didn't — they didn't direct
[2] me to charge him.
[3] BY MR. van der VEEN:
[4]     Q: In your opinion, did Mr. Vascek ever lose
[5] his right-of-way?
[6]     MS. RISK: Objection; hypothetical,
[7] form.
[8]     THE WITNESS: My opinion as a trooper
[9] or my opinion as me specifically?
[10] BY MR. van der VEEN:
[11]     Q: As a trooper, under the law.
[12]     A: Basically —
[13]     MS. RISK: Objection; form.
[14]     THE WITNESS: I don't feel that he
[15] lost his right-of-way.
[16] BY MR. van der VEEN:
[17]     Q: Okay.
[18]     A: But I also felt, as I wrote in this
[19] report, that he contributed to the outcome of this
[20] collision —
[21]     Q: I understand.
[22]     A: — by his actions.
[23]     Q: Do you believe — Mr. Bard testified that
[24] Mr. Vascek should have gone into the lane of oncoming

[1] traffic to avoid this accident. Do you know of any
[2] law that requires somebody to leave their lane of
[3] travel and go into oncoming traffic when somebody
[4] blocks their right-of-way?
[5]     MS. RISK: Objection; form, misstates
[6] the testimony.
[7]     THE WITNESS: I'm not aware of any
[8] laws as far as legal laws. But as far as
[9] common-sense situations, if obviously you have an
[10] opportunity to be defensive and to avoid a collision,
[11] going into another lane if nothing else is coming,
[12] there's nothing wrong with doing that.
[13] BY MR. van der VEEN:
[14]     Q: With respect to this case, if that UPS
[15] truck pulled out in front of him 50 to 75 feet away,
[16] and Mr. Vascek was in the southbound lanes, would he
[17] have been able to see through the truck into the
[18] northbound lanes?
[19]     MS. RISK: Objection; form.
[20]     THE WITNESS: I don't know what he
[21] would have been able to see.
[22] BY MR. van der VEEN:
[23]     Q: Do you recall either yourself or the FAIR
[24] team ever meeting with — before this accident —

[1] meeting with UPS safety personnel and having UPS tell
[2] you all what they do?
[3]     A: Prior to this collision?
[4]     Q: Yeah.
[5]     A: I wouldn't have had any reason to.
[6]     Q: After this collision?
[7]     A: Still wouldn't have any reason to, other
[8] than clarifying what they do — I mean, the gentlemen
[9] that were at the scene were there conducting their
[10] own investigation which is, again, I stated, I'm
[11] sure, in the previous deposition. We try to respect
[12] any other party that's involved, as long as it's not
[13] interfering with what we're doing.
[14]     I mean, for instance, we
[15] investigate — if we're inspecting a truck, the
[16] parties can be there while our mechanics, our truck
[17] mechanics, whatever, inspector, whatever, to watch
[18] and ask questions or whatever, but just so it's not
[19] interfering. But there wouldn't be any reason for me
[20] to know in detail what UPS policy is for handling
[21] collisions.
[22]     Q: What investigation were they doing that
[23] you saw on the day of the accident?
[24]     A: I didn't see any of them doing anything.

[1] On the day of the accident they had a truck backed up
[2] to the truck that was involved in the collision.
[3] And, and they had requested permission to unload the
[4] parcel packages. But other than that, I didn't
[5] observe them doing anything.
[6]     Q: Did you see them taking any photographs?
[7]     A: I don't remember. They might have. But I
[8] really — I mean, being in and out of the car, I
[9] don't recall specifically seeing them do that. They
[10] might have. They probably did. I'd be more than
[11] probably 80 to 90 percent sure they probably did.
[12]     I mean, that is common. I mean, I've
[13] investigated other commercial motor vehicle
[14] collisions of other companies in which — like DART,
[15] for instance, I mean, they send people out
[16] immediately and start photographing. And that's not
[17] a problem.
[18]     Q: Many trucking companies require drivers to
[19] carry cameras right in their trucks; right?
[20]     A: Yes, in my experience and knowledge from
[21] what's been shared.
[22]     Q: Of course.
[23]     MS. RISK: Objection; relevance.
[24]     MR. van der VEEN: Counsel, that's an

1—10:16:04  24—10:16:55                    Page 390

[1] objection that we've preserved. It's not an
[2] objection that's necessary to be made now.
[3]     THE WITNESS: The only time —
[4]     MS. RISK: Objection still stands.
[5]     THE WITNESS: The only time that we
[6] would need or go into —
[7]     MR. van der VEEN: Even though you
[8] know it's improper, you're still having it stand?
[9]     MS. RISK: Objection. Counsel's
[10] argument about what is proper and what is not proper
[11] in front of the witness, in fact, is improper. And I
[12] would appreciate it if counsel would keep his
[13] comments to a minimum this time.
[14]     MR. van der VEEN: Counsel, you know
[15] we reserved the right to object to relevancy. We
[16] waived that objection for this, the purpose of this
[17] deposition.
[18]     MS. RISK: Counsel, would you ask your
[19] question, please, so that we can get on with this
[20] deposition. Because we've already been nine hours
[21] into a deposition that you've had to ask questions.
[22] And I would appreciate the opportunity to speak to
[23] Corporal Weaver today. And I would also appreciate
[24] your cooperation. Could you go on with your

1—10:16:57  24—10:17:49                    Page 391

[1] questions, please?
[2]     MR. van der VEEN: Well, wait a
[3] minute. This is crucial. Are you telling me that we
[4] did not at the beginning of the stipulation (sic)
[5] stipulate that all objections other than to form are
[6] specifically preserved?
[7]     MS. RISK: We stipulated to
[8] objections.
[9]     MR. van der VEEN: And does that go to
[10] today's deposition as well?
[11]     MS. RISK: Yes, it does.
[12]     MR. van der VEEN: Okay. Okay.
[13]     MS. RISK: Yes, it does.
[14]     MR. van der VEEN: Okay.
[15]     THE WITNESS: What I started to say
[16] was that if there's an incident in which it would
[17] involve the investigation, we would go — and an
[18] example is that I investigated a fatal a number of
[19] years ago in which a DART bus was involved. And at
[20] that time they were instructed not to move the
[21] vehicles from the roadway.
[22]     Whether it was a hazard or not, they
[23] were instructed to leave it there. And as a result
[24] of a first crash that occurred, a subsequent crash

1—10:17:53  24—10:19:00                    Page 392

[1] occurred which was a fatal. And that required
[2] in-depth. But for this case there was no reason for
[3] me — I mean, I had no indication or reason to know
[4] why or what UPS does other than sharing information
[5] with them and as well as getting information from
[6] them regarding the lengths of the vehicles or
[7] something that we might need in regards to the
[8] collision or whatever. Just as example. But —
[9] BY MR. van der VEEN:
[10]     Q: Do you remember if Mr. Jester was taking
[11] notes in the backseat of your squad car while the —
[12] in the backseat of your car while you were taking the
[13] statement from Mr. Bard?
[14]     A: I don't know if he was or wasn't. I don't
[15] recall that he did. But, again, I'm sitting —
[16] Mr. Bard's to my right, and he's directly behind me.
[17] And I don't recall him doing it, but he might have.
[18] But I can't say he did or didn't.
[19]     Q: Do you recall — how many conversations
[20] during the investigation of this matter did you have
[21] with UPS personnel, from Miss Risk on down?
[22]     A: I can only approximate.
[23]     MS. RISK: Or up.
[24]     THE WITNESS: Approximate —

1—10:19:00  24—10:29:18                    Page 393

[1] BY MR. van der VEEN:
[2]     Q: From Miss Risk on up.
[3]     A: Maybe a dozen, total. And that might
[4] be — I mean, it might be a few more or a few less.
[5] I mean, I don't document every — I mean, if they
[6] call about something and say, Hey, did you get
[7] such-and-such in the fax machine, or whatever, I
[8] mean, I don't keep a log every time I talk to
[9] someone.
[10]     Q: What did Miss Risk speak with you about
[11] when she met with you in June?
[12]     A: Basically, if my memory — she wanted to
[13] know basic information about the collision as far as
[14] documentation and the overall dynamics of what I
[15] found and what's written in the report.
[16]     Q: Okay. I don't believe I have any more
[17] questions for you. I appreciate your time.
[18]     (Discussion held off the record.)
[19]             RECESS
[20]         BY MS. RISK:
[21]     Q: Good morning, Corporal Weaver.
[22]     A: Good morning.
[23]     Q: My name is Jayne Risk. We've met several
[24] times now. I just wanted to confirm for you that the

1—10:29:24   24—10:30:19                          Page 394

[1] instructions that Mr. van der Veen gave you at the
[2] very beginning of your first day of deposition hold
[3] true now. And those would be the instructions
[4] regarding allowing me to finish my sentence before
[5] you answer the question because that makes it easier
[6] for the court reporter and makes the transcription
[7] clearer.

[8]     Do you understand that?
[9]     A: Yes, ma'am.
[10]    Q: Okay. And in my case in particular,
[11] because I have a tendency to pause at the end of a
[12] sentence, so I just wanted to make you aware of that
[13] so that we make his job, the court reporter's job,
[14] easier.

[15]     And also if I ask you a question
[16] that's confusing, please ask me to rephrase the
[17] question; because if you answer the question that
[18] I've asked, those who read the transcript will
[19] understand that you understood my question and
[20] answered that question; is that fair?
[21]    A: Yes.
[22]    Q: Okay. Because I'm following many hours of
[23] deposition questions, it may seem as though we're
[24] going over ground that's already been covered or

1—10:30:23   24—10:31:29                          Page 395

[1] that, you know, I'm going to have to go back and
[2] forth to different places and fill in gaps.

[3]     So do you understand that —
[4]     A: Yes.
[5]     Q: — we may be asking a lot of different
[6] questions today?
[7]     A: Yes.
[8]     Q: I wanted to follow up on a line of
[9] questioning that Mr. van der Veen just had with
[10] regard to your contacts with UPS. And we'll talk a
[11] little bit about your telephone conversations in a
[12] little while. But with specific regard to your
[13] contacts with UPS, were they contacts where you were
[14] requesting information from UPS?
[15]    A: Some of them were from requesting
[16] information; some of them, like at the scene, it was
[17] just an exchange of information. They would approach
[18] me and tell me they're so-and-so for — representing
[19] the, you know, the company. I mean, kind of a little
[20] bit of both.
[21]    Q: Okay. Through all of your contacts with
[22] UPS, both at the scene, in person, and on the
[23] telephone, did you find any of the representatives of
[24] UPS to be anything less than cooperative?

1—10:31:29   24—10:32:38                          Page 396

[1]     A: Absolutely not.
[2]     Q: Did you find any of the representatives of
[3] UPS to be anything less than forthcoming and
[4] forthright in their response to you?
[5]     A: Yes.
[6]     Q: Do you have any reason to believe that any
[7] of the contacts with UPS that you had were such that
[8] UPS employees were trying to influence your decision
[9] and the drafting of that police report?
[10]    A: Absolute not.
[11]    Q: Okay. I'm going to talk a little bit
[12] about your background, and we talked extensively
[13] about your background the last day of deposition. I
[14] want to take you back to the 18 months that you spent
[15] as a military policeman in Germany.
[16]    A: Yes, ma'am.
[17]    Q: Okay. Now, it's my understanding from
[18] your testimony that during the course of that time,
[19] you — during the course of that time, you
[20] investigated over a hundred accidents?
[21]    A: Approximately, yes.
[22]    Q: Okay. And during the course of those
[23] investigations, did those activities always
[24] include — or did those investigations include the

1—10:32:41   24—10:33:19                          Page 397

[1] interview of witnesses?
[2]     A: Yes.
[3]     Q: Did those investigations include taking
[4] witness statements?
[5]     A: Yes.
[6]     Q: Did those investigations include taking
[7] measurements at a scene?
[8]     A: Yes.
[9]     Q: Did those investigations include field
[10] sketches of an accident scene?
[11]    A: Yes.
[12]    Q: Did those investigations include
[13] collecting physical evidence at a scene?
[14]    A: Yes.
[15]    Q: And the plotting of physical evidence at a
[16] scene?
[17]    A: Yes.
[18]    Q: Did those investigations also include the
[19] preservation of evidence at a scene?
[20]    A: Yes.
[21]    Q: Did those investigations include taking
[22] photographs?
[23]    A: Yes.
[24]    Q: Did those investigations also include

---

1—10:33:25  24—10:34:46                          Page 398

[1] your — did you draw conclusions regarding the cause
[2] of an accident as a result of those investigations?
[3]    A: Yes.
[4]    Q: Okay. Did those investigations include at
[5] times issuing citations —
[6]    A: Yes.
[7]    Q: — to individuals?
[8]    During the time that you were at York
[9] College —
[10]    A: Yes.
[11]    Q: — I believe you testified you got an
[12] associate degree in police science —
[13]    A: Yes.
[14]    Q: — from York College?
[15]    Can you describe the courses, the
[16] types of courses that you took in police science?
[17]    A: I could have brought my transcripts.
[18]    Criminology; basic law; the
[19] fundamentals of law nationwide; case rulings and
[20] decisions that relate to law enforcement, such as
[21] Miranda and where it came about; behind the scenes,
[22] things like that.
[23]    Just general police courses of law
[24] enforcement — not in the depth of courses that I

---

1—10:34:51  24—10:36:08                          Page 399

[1] took later from some schools that specifically were
[2] more like patrol procedures and things like that or
[3] some other courses that were offered by other
[4] universities that I attended; but just the basic
[5] dynamics or background in police work.
[6]    Q: Okay. Did you take any courses in
[7] accident investigation?
[8]    A: I don't recall taking any at York College
[9] or, for that matter, Temple. The courses that I took
[10] relating to investigations were done at the
[11] Harrisburg Area Community College, which was the
[12] Act 120 that we talked about when I got my
[13] certification as a municipal officer in the
[14] Commonwealth of Pennsylvania, which is coordinated
[15] through the Academy of Pennsylvania State Police.
[16] That's when I got the hands-on and the classes
[17] relating to on-scene investigations. At the
[18] university and college level, it was more of a
[19] general, overall view of law enforcement.
[20]    Q: That Act 21 (sic) training that you just
[21] spoke of, was that when you were at East Hempfield?
[22]    A: Yes.
[23]    Q: And you participated in a 15-week accident
[24] program on accident investigation?

---

1—10:36:14  24—10:37:10                          Page 400

[1]    A: At Harrisburg Area Community College?
[2]    Q: Yes.
[3]    A: I believe it was about a one-week course
[4] devoted to collision investigations. The course was
[5] 90 days.
[6]    Q: Oh, I'm sorry. Your 15-week program was
[7] an academy program?
[8]    A: Yes; that's the entire academy.
[9]    Q: Okay.
[10]    A: That's everything. That's all the duties
[11] that a law enforcement officer does in the
[12] Commonwealth, including first-aid training and all
[13] requirements by law, Pennsylvania law.
[14]    Q: What part of that program was relating to
[15] accident investigations?
[16]    A: About a week of it. Again, it's not —
[17] you don't start Monday through Friday and we're all
[18] doing traffic collision investigations at this point.
[19] It's, you might one Monday do, you know, four hours
[20] and then the following Monday do four hours. I mean,
[21] it's broken up with however they put the — but it, I
[22] believe, my memory, it's about a full 40-hour work
[23] week total.
[24]    Q: And there was a 12-week field training

---

1—10:37:14  24—10:38:17                          Page 401

[1] program you were involved in?
[2]    A: With the Delaware State Police, yes, not
[3] with Pennsylvania.
[4]    Q: Now, when you were at the Delaware State
[5] Police, the 12-week field training program, how much
[6] of that program was relating to accident
[7] investigation?
[8]    A: Probably about a third of it, one of the
[9] major things that we do, because they're so frequent.
[10]    Q: And that accident investigation, the part
[11] of that program, did that cover all of the areas of
[12] accident investigation, including witness statements,
[13] taking measurements at the scene, and all the things
[14] we just discussed?
[15]    A: Yes; basically applying what you learned
[16] in the academy on the road.
[17]    Q: Okay. Did you have the opportunity during
[18] that field training program to actually investigate
[19] real accident scenes?
[20]    A: Yes.
[21]    Q: During the — from the time you were in
[22] the military in Germany till today, approximately how
[23] many motor vehicle accidents, whether they be
[24] truck/car, car/motorcycle, motorcycle/truck, how many

---

1—10:38:24  24—10:39:20                    Page 402

[1] motor vehicle accidents have you investigated?

[2]    A: Do you have a copy of my resume?

[3]    Q: I do. I do.

[4]    A: I don't know off memory. I'm thinking
[5] probably around four thousand-ish, but I don't
[6] remember the exact number that's on there.

[7]    Q: Okay. And in all of those investigations
[8] that you conducted, was your methodology basically
[9] the same, the methodology that you've discussed with
[10] Mr. van der Veen the first day of deposition?

[11]    A: Basically the same — the same, although
[12] as, obviously as I get older and more experienced and
[13] attend more classes, other ways; but the basics, yes.
[14] I mean, as far as the basics of investigating a
[15] crash, do the same for each and every one of them.

[16]    Q: You were chief investigating officer on
[17] the scene of this accident; is that correct?

[18]    A: Yes.

[19]    Q: And you were also the author of the police
[20] report —

[21]    A: Yes, ma'am.

[22]    Q: — correct?

[23]    And you were assisted by Sergeant Cox?

[24]    A: Yes.

1—10:39:21  24—10:40:23                    Page 403

[1]    Q: Do you have an independent recollection of
[2] the day of this accident?

[3]    A: Yes.

[4]    Q: And you have an independent recollection
[5] of your investigation?

[6]    A: Yes.

[7]    Q: Okay. Could you just briefly review for
[8] me your recollection of your investigation of this
[9] accident?

[10]    A: How brief do you want it? I mean, we went
[11] through the previous deposition.

[12]    I mean, we're on call. We get
[13] notified of a collision when it occurs. We get the
[14] information of where to respond to. Whether we're
[15] off duty or on duty, we go to the scene.

[16]    I went to the scene of this collision
[17] and met with Sergeant Cox. At that point, like
[18] what's spelled out in the report, there's a UPS truck
[19] on Twaddell Mill Road. There's another truck
[20] directly behind it, backed up to it, rear end to rear
[21] end, butt to butt.

[22]    There's a motorcycle laying on the
[23] roadway. It was in the intersection at Montchanin
[24] Road. There's a couple roads — I mean, it's a

1—10:40:29  24—10:41:40                    Page 404

[1] couple police officers there. The road's closed,
[2] completely closed to motorists.

[3]    Made contact with the initial troopers
[4] at the scene. And they give us, provide me with a
[5] basic knowledge of what they can tell me at that
[6] point. And begin the on-scene investigation of
[7] photographing and preparing a field diagram or
[8] assisting with; Sergeant Cox did it in this.

[9]    But conducting interviews. I
[10] conducted an interview with Mr. Bard, the operator of
[11] the UPS truck. Basically doing everything that we
[12] need to do at the scene, clearing the scene. Then
[13] oftentimes either responding to the hospital to do a
[14] follow-up or whatever else is needed for the
[15] investigation.

[16]    Once we've compiled that, we go back
[17] to the troop. And we're required to send a Teletype,
[18] which is statewide, State agencies, Delaware State
[19] Police, of the bare basics of the collision. It's a
[20] requirement that we have to send and say, On this
[21] date at this time a fatal motor vehicle collision
[22] occurred, and then a brief synopsis of what we know
[23] at least at that point. And at that time then we're
[24] done for the day.

1—10:41:42  24—10:42:49                    Page 405

[1]    The next day, of course, and the days
[2] that subsequently follow, we do whatever we need to
[3] do to inspect, follow-ups, as it's all spelled out in
[4] the report of what we did. That's real brief.

[5]    Q: Okay. With respect to your police report,
[6] did you issue any citations —

[7]    A: No.

[8]    Q: — as a result of this accident?

[9]    A: No.

[10]    Q: Did you issue a citation to Mark Bard, the
[11] driver of the UPS vehicle?

[12]    A: No.

[13]    Q: Is there a policy — strike that.

[14]    Okay. I'm going to refer you to your
[15] police report, which I believe is Exhibit — is it 2?

[16]    A: The collision report or the lengthy
[17] criminal incident report?

[18]    Q: I have both together from the last.

[19]    A: Okay. There was — there are two separate
[20] reports, but they refer to one another. That's —
[21] one's just a collision report, and the other is — I
[22] don't know. Whatever one you're going to ask me on,
[23] I just want to clarify. I don't know where I'm
[24] looking.

1—10:42:50  24—10:43:41                    Page 406

[1]  MS. RISK: I believe that at the last
[2]  deposition the entire report was marked as a single
[3]  exhibit; is that correct?
[4]     MR. van der VEEN: That's correct.
[5]  MS. RISK: Okay.
[6]                    BY MS. RISK:
[7]  Q: I'll refer you to page No. 2.
[8]  A: Okay.
[9]  Q: Under citation information — actually,
[10] under vehicle information —
[11] A: Yes.
[12] Q: — contributing circumstances, driver —
[13] that driver refers to Mr. Vascek, doesn't it?
[14] A: Yes.
[15] Q: Okay. And you have an 04. You filled in
[16] an 04 in that box; is that correct?
[17] A: Yes.
[18] Q: And the 04 is exceeded the authorized
[19] speed limit —
[20] A: Yes.
[21] Q: — is that correct?
[22]    If Mr. Vascek had lived after this
[23] accident, would he have received a citation for
[24] excessive speed as a result of this accident?

1—10:43:47  24—10:44:37                    Page 407

[1]  MR. van der VEEN: Objection.
[2]                    BY MS. RISK:
[3]  Q: Based on the information that's in this
[4]  police report.
[5]  A: Probably.
[6]  Q: Okay. On page 3 —
[7]  A: But that determination, again, would be by
[8]  the Attorney General's office — well, I wouldn't
[9]  have been called to this if it wasn't a fatal. But
[10] through regular Delaware State Police procedure, if
[11] the investigating trooper, if I was just a trooper,
[12] not in the capacity that I currently am in, yes.
[13] Q: And you were a trooper —
[14] A: Yes.
[15] Q: — at one point in your career, weren't
[16] you —
[17] A: Yes.
[18] Q: — Corporal Weaver?
[19] A: Yes.
[20] Q: Had you been a trooper in this
[21] circumstance, then you would have issued a citation
[22] to Mr. Vascek, had he lived?
[23] MR. van der VEEN: Objection.
[24]                    BY MS. RISK:

1—10:44:42  24—10:45:48                    Page 408

[1]  Q: Based on what this police —
[2]  A: In this, in this case probably not. And
[3]  the reason for that is my inability — I can't say
[4]  exactly how fast he was traveling, which is something
[5]  I would have to prove.
[6]     Is it a contributing circumstance to
[7]  the collision? Yes. And that's primarily
[8]  contributing — what this is stating. Whether I can
[9]  actually issue a summons, I wouldn't have been able
[10] to because I couldn't determine how fast he was
[11] traveling.
[12] Q: In order to issue a summons as a Delaware
[13] State trooper, is it necessary for you to be able to
[14] determine the precise speed that an individual is
[15] going at the time —
[16] A: Yes.
[17] Q: — including in an accident?
[18] A: Yes.
[19] Q: On page 3 of your report, I'll refer you
[20] to the top. The top part, the top information refers
[21] to Mr. Bard, the UPS driver; is that correct?
[22] A: Yes.
[23] Q: The very top. And under — in the box
[24] "driver distraction," do you see where I am? One,

1—10:45:54  24—10:46:34                    Page 409

[1]  two, three, four, five lines, about five lines down.
[2]  A: Okay.
[3]  Q: You have "none" —
[4]  A: Yes.
[5]  Q: — is that correct?
[6]  A: Yes.
[7]  Q: And that's because you found that Mr. Bard
[8]  was not distracted?
[9]  A: No.
[10] Q: Okay. And in the box beside that,
[11] "alcohol/drugs suspected," you have 01, neither
[12] alcohol nor drugs suspected?
[13] A: Correct.
[14] Q: And that's because you had no reason to
[15] believe that Mr. Bard was under the influence of
[16] alcohol or drugs, were you?
[17] A: Correct.
[18] Q: In fact, Mr. Bard voluntarily submitted to
[19] a blood-alcohol — portable blood-alcohol test,
[20] didn't he?
[21] MR. van der VEEN: Objection.
[22]                    BY MS. RISK:
[23] Q: Did Mr. Bard voluntarily submit —
[24] A: Yes.

1—10:46:34   24—10:47:23        Page 410

[1] **Q:** — to a portable blood-alcohol test?

[2] MR. van der VEEN: Objection to the

[3] form.

[4] **THE WITNESS:** Yes.

[5]                 **BY MS. RISK:**

[6] **Q:** And what were the findings of that test?

[7] **A:** Zero.

[8] **Q:** Directing your attention just three lines

[9] further down in the driver injury category —

[10] **A:** Yes.

[11] **Q:** — still referring to Mr. Bard, "occupant

[12] protection system use," you have designated 04; and

[13] that his "shoulder belt and lap belt used"?

[14] **A:** Yes.

[15] **Q:** Mr. Bard had his shoulder and lap belt in

[16] use at the time of the accident, didn't he?

[17] **A:** That's what he said, yes.

[18] **Q:** Did you have any reason to believe that

[19] Mr. Bard didn't have his shoulder and belt on?

[20] MR. van der VEEN: Objection to the

[21] form.

[22] **THE WITNESS:** No.

[23]                 **BY MS. RISK:**

[24] **Q:** Under the heading "Vehicle Information,"

1—10:47:27   24—10:48:20        Page 411

[1] this is, again, referring — this is referring now to

[2] the UPS 2001 Freightliner.

[3]      Do you see where I am?

[4] **A:** Yes, ma'am.

[5] **Q:** Okay. In the box "contributing

[6] circumstances, driver" that refers to Mr. Bard? Does

[7] that refer to Mr. Bard?

[8] **A:** Which block? I'm sorry. I'm trying to

[9] identify which one.

[10] **Q:** Seventh block down under "Vehicle

[11] Information" on the page that's referring to Mr. Bard

[12] and the UPS vehicle.

[13] **A:** What's the caption?

[14] **Q:** "Contributing circumstances —

[15] **A:** Correct, that would refer to Mr. Bard,

[16] yes.

[17] **Q:** — driver."

[18]      You designated a 01, which is no

[19] improper driving; correct?

[20] **A:** Correct.

[21] **Q:** And is that because you didn't find any

[22] evidence of improper driving on the part of Mr. Bard;

[23] is that correct?

[24] MR. van der VEEN: Objection.

1—10:48:20   24—10:49:26        Page 412

[1] **THE WITNESS:** Correct.

[2]                 **BY MS. RISK:**

[3] **Q:** Did you find any evidence of improper

[4] driving on the part of Mr. Bard?

[5] **A:** No.

[6] **Q:** Okay. Let me refer you to page 4 of the

[7] police report, specifically your description of the

[8] accident area in the second paragraph on page 4.

[9] **A:** Okay.

[10] **Q:** That Delaware Route 100 is a rural

[11] roadway. The paragraph that starts that, It's a

[12] rural roadway that consists of many hills and sharp

[13] curves.

[14] **A:** Yes.

[15] **Q:** At the intersection — strike that.

[16]      Delaware Route 100 in that area, the

[17] lanes of travel are separated by a double-yellow

[18] line, aren't they?

[19] **A:** Yes.

[20] **Q:** And under Delaware law that means that

[21] passing is not permissible, doesn't it?

[22] **A:** Yes.

[23] **Q:** Is the posted speed limit on that road 40

[24] miles an hour?

1—10:49:27   24—10:50:37        Page 413

[1] **A:** Yes.

[2] **Q:** And on the Twaddell Mill Road, running up

[3] to the intersection of Delaware Route 100, Montchanin

[4] Road, the posted speed limit is 30 miles per hour; is

[5] that correct?

[6] **A:** Yes.

[7] **Q:** And the only traffic signal at the

[8] intersection of Montchanin Road and Twaddell Mill is

[9] the stop sign for Twaddell Mill; is that correct?

[10] **A:** Yes.

[11] **Q:** In the fourth paragraph on page 4, your

[12] narrative in the police report, your finding was

[13] that — CRT. What does CRT stand for?

[14] **A:** County route. There's three identifying

[15] numbers there. Delaware Route 100; the name of the

[16] road is Montchanin Road in that area; and there's a

[17] County route number assigned to it, which is 235.

[18] **Q:** You determined that, according to this,

[19] that Vehicle 1 — which was Mr. Vascek; is that

[20] correct?

[21] **A:** Yes.

[22] **Q:** — was traveling at an unknown high rate

[23] of speed —

[24] **A:** Yes.

UPS & Bard

---

1—10:50:37  24—10:51:07                Page 414

[1]  Q: — is that correct?

[2]  MR. van der VEEN: Objection to the

[3]  form of the question.

[4]  BY MS. RISK:

[5]  Q: Was that your finding?

[6]  A: Yes.

[7]  Q: And that's what it states here in your

[8]  police report?

[9]  A: Yes.

[10]  MR. van der VEEN: Objection to the

[11]  form of the question.

[12]  BY MS. RISK:

[13]  Q: And your second finding in that paragraph

[14]  is that Vehicle No. 2 — which is Mr. Bard; is that

[15]  correct?

[16]  A: Yes.

[17]  Q: — had stopped for a stop sign at the

[18]  intersection with Montchanin Road; is that correct?

[19]  A: Yes.

[20]  MR. van der VEEN: Objection to the

[21]  form of the question.

[22]  BY MS. RISK:

[23]  Q: Is there any evidence that Mr. Bard did

[24]  not stop at the stop sign on Twaddell Mill Road?

---

1—10:51:09  24—10:51:47                Page 415

[1]  A: No.

[2]  Q: In fact, Mr. Bard testified that he came

[3]  to a stop at the stop sign on Twaddell Mill Road;

[4]  isn't that correct?

[5]  MR. van der VEEN: Objection to the

[6]  form of the question.

[7]  THE WITNESS: Yes.

[8]  BY MS. RISK:

[9]  Q: And the independent witness, John

[10]  Seiffert, also told you that Mr. Bard came to a

[11]  complete stop at that stop sign, didn't he?

[12]  A: Yes.

[13]  Q: So that as far as you were concerned,

[14]  there is no argument about whether or not Mr. Bard

[15]  stopped at that stop sign?

[16]  MR. van der VEEN: Objection to the

[17]  form of the question.

[18]  THE WITNESS: Correct.

[19]  BY MS. RISK:

[20]  Q: And the final paragraph on that page,

[21]  Operator No. 2 who, again, is Mr. Bard, you found

[22]  that he looked in both directions?

[23]  A: Yes.

[24]  Q: And that's —

---

1—10:51:49  24—10:52:23                Page 41(

[1]  MR. van der VEEN: Objection to the

[2]  form of the question.

[3]  BY MS. RISK:

[4]  Q: — based on what Mr. Bard told you?

[5]  A: Yes.

[6]  Q: Did Mr. Bard tell you he looked in both

[7]  directions?

[8]  A: Yes.

[9]  Q: Okay. Mr. Bard told you he didn't see any

[10]  vehicles approaching from either direction, did he?

[11]  A: No.

[12]  Q: Okay. And he also told you he moved

[13]  slowly forward, didn't he?

[14]  A: Yes.

[15]  Q: Okay. Mr. Seiffert told you that Mr. Bard

[16]  came to a complete stop at the intersection, didn't

[17]  he?

[18]  A: Yes.

[19]  Q: Mr. Seiffert also told you that Mr. Bard

[20]  moved slowly forward into the intersection, didn't

[21]  he?

[22]  MR. van der VEEN: Objection to the

[23]  form of the question.

[24]  THE WITNESS: Yes.

---

1—10:52:23  24—10:53:23                Page 417

[1]  BY MS. RISK:

[2]  Q: Mr. Seiffert never told you that Mr. Bard

[3]  accelerated into the intersection, did he?

[4]  A: No.

[5]  Q: And at the end of your narrative on

[6]  page 4, you state that Operator No. 1 — who is

[7]  Mr. Vascek; correct?

[8]  A: Yes.

[9]  Q: — applied the front brake of Vehicle

[10]  No. 1 — which was this motorcycle; correct?

[11]  A: Yes.

[12]  Q: — in a manner in which caused the rear

[13]  tire of Vehicle No. 1 to come off the ground —

[14]  A: Yes.

[15]  Q: — is that correct?

[16]  Did that information come from

[17]  Mr. Seiffert?

[18]  A: Yes.

[19]  Q: Okay. And Mr. Seiffert is the independent

[20]  witness who was located behind Mr. Bard's UPS

[21]  vehicle; is that correct?

[22]  A: Yes.

[23]  Q: You go on to state that Vehicle No. 1

[24]  continued to travel forward in a southerly direction

---

---

1—10:53:27  24—10:54:39      Page 418

[1] in a stoppie position. Did that information also
[2] come from Mr. Seiffert?

[3]    A: Yes, ma'am.

[4]    Q: When you describe a "stoppie position,"
[5] Corporal Weaver — or excuse me.

[6]    When Mr. Seiffert described the
[7] position of the motorcycle rear wheel to you, what
[8] was his description of when he first saw the rear
[9] wheel of the motorcycle?

[10]    A: The rear wheel of the motorcycle was
[11] coming up off of the ground and continued to come off
[12] the ground, in which the motorcycle front tire is on
[13] the ground and the rear is completely, basically a
[14] 90-degree-from-the-ground perspective.

[15]    Q: And Mr. Seiffert testified that the first
[16] time he saw the motorcycle, the rear wheel was off
[17] the ground 8 to 10 inches. Did he ever tell you that
[18] the motorcycle wheel came back to the ground at any
[19] time?

[20]    A: No.

[21]    Q: Did he ever describe the dynamics of the
[22] rear wheel as he was watching the motorcycle as a
[23] hopping or coming up and down off of the ground?

[24]    A: No.

---

1—10:54:39  24—10:55:44      Page 419

[1]    Q: Was his description a continuous
[2] progression of the rear wheel into the air, into a
[3] somewhat up-and-down position?

[4]    A: Yes.

[5]    Q: You go on to say that Operator No. 1, who
[6] is, again, Mr. Vascek, was raised into the air as the
[7] rear tire of Vehicle No. 1 departed from the asphalt
[8] roadway surface. Again, that information came from
[9] Mr. Seiffert, didn't it?

[10]    A: Yes.

[11]    Q: Operator No. 1, Mr. Vascek, held onto the
[12] handlebars of Vehicle No. 1 and continued to travel
[13] southbound with Vehicle No. 1, in a tucked position,
[14] head positioned toward the ground, feet into the air,
[15] and back approaching Vehicle No. 2.

[16]    Is that, again, Mr. Seiffert's
[17] description of the motorcycle as it approached the
[18] UPS vehicle?

[19]    A: Yes.

[20]    Q: Okay. The front tire of Vehicle No. 1 and
[21] the back of Operator No. 1 struck the left front
[22] fender of Vehicle No. 2 — that's the UPS vehicle,
[23] isn't it?

[24]    A: Yes.

---

1—10:55:44  24—10:56:50      Page 420

[1]    Q: — simultaneously sandwiching Operator
[2] No. 1 between Vehicle No. 1 and Vehicle No. 2 for the
[3] point of impact.

[4]    Is that consistent — that's what
[5] Mr. Seiffert told you?

[6]    A: Yes.

[7]    Q: And that's your understanding of how this
[8] accident, how the impact occurred?

[9]    A: Yes.

[10]    Q: Okay. The point of impact occurred
[11] approximately 14 feet 2 inches west of the east edge
[12] of the roadway on the roadway within the intersection
[13] and within the southbound lane of Montchanin Road.

[14]    Now, is that information based on what
[15] Mr. Seiffert told you?

[16]    A: That's based on the combination of what he
[17] told me and the mark on the roadway in relationship
[18] to the evidence that we picked up of positioning, of
[19] where we felt, where they said the motorcycle fell,
[20] where Mr. Vascek fell, and the initial area where the
[21] motorcycle was, yes —

[22]    Q: Okay.

[23]    A: — when it impacted the van — truck.

[24]    Q: Let me direct you to the fatal motor

---

1—10:56:55  24—10:58:11      Page 421

[1] vehicle collision report, which I have as a part of
[2] the same exhibit but, as you've explained, is not
[3] necessarily a part of the police report; is that
[4] correct?

[5]    A: Correct.

[6]    Q: I want to talk about, first of all, your
[7] description of the scene. Basically your description
[8] of the scene, the second paragraph — I'll refer you
[9] to the second paragraph.

[10]    A: Okay.

[11]    Q: Okay. And the second paragraph primarily
[12] relates to the 2003 Yamaha R1 motorcycle that was
[13] driven by Mr. Vascek; is that correct?

[14]    A: Yes.

[15]    Q: You found that the motorcycle displayed
[16] moderate contact damage; is that correct?

[17]    A: Yes.

[18]    Q: And can you tell me what that's based on,
[19] that finding?

[20]    A: Based on just visual observation and
[21] experience as a trooper, not getting into the dollars
[22] and cents of seeing the things that kind of occurred
[23] or damaged internally, but just looking at it, just
[24] first looking at it, your opinion of, you know,

---

Page 422

1—10:58:14  24—10:58:51

[1] severe, moderate, light. It was moderate.

[2] **Q:** Okay. Now —

[3] **A:** Just a judgment call on my behalf of just

[4] looking at what I'm looking at.

[5] **Q:** Sure. And you looked at it at the scene;

[6] correct?

[7] **A:** Yes.

[8] **Q:** So that was part of your original walking

[9] the scene —

[10] **A:** Yes.

[11] **Q:** — taking a look at the motorcycle?

[12] **A:** Yes.

[13] **Q:** In the beginning of your investigation

[14] when you were at the scene and you took a look at the

[15] motorcycle, did you lift up the motorcycle?

[16] **A:** No, not initially. As was. As it was at

[17] rest.

[18] **Q:** So when you took a look at the motorcycle,

[19] you didn't move the motorcycle at all?

[20] **A:** No.

[21] **Q:** You didn't — did you move the, rotate the

[22] wheels at all?

[23] **A:** No.

[24] **Q:** So you didn't — did you touch the

Page 423

1—10:58:53  24—10:59:54

[1] motorcycle at all at the scene that day?

[2] **A:** I don't recall touching it, no.

[3] **Q:** Okay. What about when you went

[4] subsequently — you testified earlier that you went

[5] to inspect the motorcycle at Ellmore's?

[6] **A:** Yes.

[7] **Q:** And I believe you did that the following

[8] day, on the 27th?

[9] **A:** Whatever the day that's reflected in the

[10] report. I can look at it for — but, yes, when I

[11] inspected the vehicle, I looked at it.

[12] **Q:** Can you tell me the course of your

[13] inspection, how you went about inspecting the

[14] motorcycle when you were at Ellmore's?

[15] **A:** Primarily I have — and it's also

[16] introduced as evidence as part the report. We have

[17] an examination sheet that we kind of sketch the

[18] visible damage, what looks or appears to be what's

[19] damaged on it. And that's part of the record.

[20] Basically just looking for any type, what type of

[21] damages and taking some basic measurements of, of the

[22] wheel base, things like that.

[23] **Q:** And you recorded all of that on the

[24] vehicle profile —

Page 424

1—10:59:55  24—11:00:33

[1] **A:** Yes.

[2] **Q:** — the damage profile; correct?

[3] **A:** Yes.

[4] **Q:** And you also recorded it by taking

[5] photographs, didn't you?

[6] **A:** Yes.

[7] **Q:** And is that part of the basis for your

[8] determination that there was moderate contact damage

[9] on the motorcycle?

[10] **MR. van der VEEN:** Objection.

[11] **THE WITNESS:** Yes.

[12]                    **BY MS. RISK:**

[13] **Q:** Did you examine the wheels of the

[14] motorcycle?

[15] **A:** Yes.

[16] **Q:** Can you tell me how you did that?

[17] **A:** Just visually looked at them. I didn't

[18] touch them or move the motorcycle. I mean, it was

[19] propped up, and the kickstand was down. It was in an

[20] upright position. And I just walked and, and viewed

[21] it, looked at it.

[22] **Q:** So you didn't flip it upside down and roll

[23] the wheels around and inspect all of the tread or any

[24] of that?

Page 425

1—11:00:34  24—11:01:25

[1] **A:** No.

[2] **Q:** So the course of your inspection at

[3] Ellmore's — during the course of your inspection at

[4] Ellmore's Towing, was the motorcycle always in an

[5] upright position with the kickstand?

[6] **A:** Yes.

[7] **Q:** Who was at Ellmore's when you inspected

[8] the motorcycle?

[9] **A:** I mean, there were people that worked

[10] there, were in and out. This motorcycle was placed

[11] inside a garage. I mean, there were people, I have

[12] no idea who they were, other than employees.

[13] And I was greeted by the manager when

[14] I got there and told him obviously why I'm there. I

[15] don't know — I can't tell you what his name is, just

[16] they know us by face and we're here to look at a

[17] motorcycle. Can I see it?

[18] Yeah. Here it is. You know, whatever

[19] you need, let me know, or I'll try to help you or

[20] whatever.

[21] Took photographs, looked at the

[22] Polaroids of the helmet and clothing that was

[23] gathered at the scene — that's in the report — and

[24] basically did a general inspection and departed and

[1] told them it was authorized to be released.

[2]    They put a hold — we put a hold on

[3] the vehicle until we're done looking at it. And then

[4] once we give authorization, the family or insurance

[5] company or whomever, however they do whatever they

[6] do, are authorized to do that. But until that point,

[7] no one's supposed to — it's not released.

[8]    Q: Okay. And during the course of or after

[9] you were finished your inspection, you told the

[10] manager that the motorcycle was released for

[11] inspection by other parties?

[12]    A: Yes.

[13]    Q: Okay. When you spoke to the manager, did

[14] the manager tell you that —

[15]    MR. van der VEEN: Objection to the

[16] form of the question.

[17]           BY MS. RISK:

[18]    Q: — UPS had been to the facility or that

[19] anyone had been to the facility to inspect that

[20] motorcycle prior to your being there?

[21]    A: Had he told me?

[22]    Q: Yes.

[23]    A: I don't recall that, no.

[24]    Q: Is that something that he would have told

[1] you?

[2]    A: I would have liked to have thought. But

[3] unfortunately, we put holds on vehicles; and some tow

[4] companies are better than others. And I'm not

[5] reflecting this in any of the others. But there has

[6] been incidents in which — they're beyond our

[7] control.

[8]    I mean, we request — excluding if we

[9] take them and put them in an impoundment lot that is

[10] controlled by the State Police, we can't prevent

[11] family members from getting in or adjusters from

[12] getting in.

[13]    I mean, we request that; but whether

[14] they honor it or whether — or the people that know

[15] that's not supposed to take place aren't there and

[16] someone else is just walking through and says, Sure,

[17] go look at it — I mean, we request it. I can't tell

[18] you who did or who did not see that vehicle before I

[19] looked at it.

[20]    Q: So you have no information or reason to

[21] believe that UPS investigators or anybody else looked

[22] at that motorcycle before you did?

[23]    A: To my knowledge, no.

[24]    Q: Okay. What time were you at Ellmore's on

[1] October 27th?

[2]    A: About 8:15.

[3]    Q: That's 8:15 a.m.?

[4]    A: A.m., in the morning.

[5]    Q: And how long was your inspection of the

[6] motorcycle? How long did it take?

[7]    A: I don't have — I don't mark when I start

[8] and when I stop. I mean, I mark when I start. I

[9] don't mark when I stop. But from experience, I was

[10] probably there anywhere from a half hour perhaps to

[11] an hour.

[12]    Q: Okay. Do you have a specific recollection

[13] of how long you were there —

[14]    A: No.

[15]    Q: — that day?

[16]    A: Just average. I mean, to me after a while

[17] they're all about the same.

[18]    Q: That's fair. So you were there anywhere

[19] from a half an hour to an hour?

[20]    A: Yes.

[21]    Q: But you have no reason to believe that you

[22] would have been there for any more than an hour?

[23]    A: No. The only time I would be there longer

[24] for these would be when we do, for instance,

[1] measurements of two vehicles. When we're measuring

[2] the damage, it takes a longer time to gather that

[3] data and to do it. So it takes much more detail.

[4]    On an average, about an hour is about

[5] average, especially for a motorcycle; unless a

[6] mechanic has been around and they inspect it

[7] mechanically or in case or — but in this case, no.

[8]    Q: You didn't have a mechanic inspect the

[9] motorcycle mechanically?

[10]    A: No.

[11]    Q: Was anyone with you the day you inspected

[12] the motorcycle?

[13]    A: From the FAIR team?

[14]    Q: Yes.

[15]    A: No.

[16]    Q: Was anyone with you at all?

[17]    A: No; other than the employees coming in and

[18] out, but that's common — normally, again, being the

[19] senior investigator, unless we request the others to

[20] be with us and assist us, it's our investigation.

[21] And unless we — they'll come if we need them, but

[22] there wouldn't be any reason to have anyone else

[23] there.

[24]    Q: You didn't think there was any reason to

1—11:05:13  24—11:05:57                                    Page 430

[1] have anybody else there?

[2]     **A:** No.

[3]     **Q:** The profile that you, the damage profile

[4] that you drew of the motorcycle, did you do that at

[5] Ellmore's facility?

[6]     **A:** Yes.

[7]     **Q:** So you actually stood there and shaded in

[8] the areas of damage while you were looking at the

[9] motorcycle?

[10]     **A:** Yes.

[11]     **Q:** Okay. Did you take any notes from that

[12] inspection?

[13]     **A:** Just what's on the inspection sheet.

[14]     **Q:** Okay.

[15]     **A:** Nothing more.

[16]     **Q:** And so, then, it's fair to say that

[17] somewhere around 9:15 or so, you released the

[18] motorcycle?

[19]     **A:** Yes.

[20]     MR. van der VEEN: Objection.

[21]           **BY MS. RISK:**

[22]     **Q:** Did you release the motorcycle at —

[23]     **A:** At the conclusion.

[24]     **Q:** — approximately 9:15 or at the conclusion

---

1—11:05:59  24—11:07:26                                    Page 431

[1] of your inspection?

[2]     **A:** Yes.

[3]     **Q:** Referring back to the police or the fatal

[4] collision report, page 3, with regard to the

[5] motorcycle damage, the areas of damage, what were the

[6] areas of damage that you found?

[7]     **A:** Motorcycle displayed moderate contact

[8] damage. The contact damage was located around the

[9] upper portions of the motorcycle. Damaged areas

[10] included the upper front handlebars, fuel tank, seat,

[11] and upper rear. Slight contact damage was also

[12] located on the left side foot pedals, kickstand, and

[13] wheel bolts.

[14]     **Q:** The damage that you observed when you

[15] inspected the motorcycle, was that damage consistent

[16] with your understanding of the dynamics of this

[17] accident?

[18]     **A:** Yes.

[19]     **Q:** The next paragraph under description of

[20] the scene when you first arrived at the scene, you

[21] observed — it states that you observed two white

[22] chalk marks on the black asphalt surface. What were

[23] those chalk marks? What was the purpose of those

[24] chalk marks?

---

1—11:07:28  24—11:08:10                                    Page 432

[1]     **A:** They were marked by one of the troopers

[2] prior to our arrival. And one word was "feet" and

[3] the other was "head" to give us an idea of where the

[4] body was after impact.

[5]     **Q:** And that's because Mr. Vascek's body was

[6] no longer at the scene when you arrived there; is

[7] that correct?

[8]     **A:** Correct.

[9]     **Q:** Who was the trooper who chalked those

[10] words on the pavement?

[11]     **A:** I don't know.

[12]     **Q:** But it's your understanding that it was

[13] one of the initial responding troopers?

[14]     **A:** Yeah. They'll often do that.

[15]     **Q:** And is that commonplace and routine?

[16]     **A:** Yes.

[17]     **Q:** And is that because you're not actually

[18] ever the first responding troopers at a scene?

[19]     MR. van der VEEN: Object to the form

[20] of the question.

[21]     THE WITNESS: That's why, yes.

[22]           **BY MS. RISK:**

[23]     **Q:** As a member of the FAIR team — or are the

[24] FAIR team members ever the first responding troopers

---

1—11:08:13  24—11:09:04                                    Page 433

[1] on the scene?

[2]     MR. van der VEEN: Objection to the

[3] form of the question.

[4]     THE WITNESS: No.

[5]           **BY MS. RISK:**

[6]     **Q:** Is that because you are called when an

[7] troopers who are on the scene?

[8]     **A:** Correct.

[9]     MR. van der VEEN: Objection to the

[10] form of the question.

[11]           **BY MS. RISK:**

[12]     **Q:** Is the FAIR team only called when an

[13] accident involves a serious injury, fatality, or a

[14] departmental situation?

[15]     **A:** Under normal policy call-outs, yes. But I

[16] think I said it in the initial deposition, is that we

[17] will come out for anything. It can be just a

[18] nobody-injured, maybe a speed-issue crash. Or we'll

[19] come out and assist at any time.

[20]     But the baselines for us to come out,

[21] normally it's either a fatality or it looks like it's

[22] going to be, it's a serious crash, or it's a

[23] departmental. Those are the three main guidelines

[24] why we come out. But we still — we can come out for

1—11:09:07  24—11:10:01                    Page 434

[1] anything — and do. I mean, if a trooper asks us for
[2] help, what do is we share with anyone.
[3]   **Q:** Are Delaware State Troopers under a
[4] directive to call you if the accident involves a
[5] fatality?
[6]   **A:** Actually, what they're supposed to do is
[7] notify their road supervisor or assistant road
[8] supervisor. And then they are to call us out.
[9]   **Q:** So it's the decision of the road
[10] supervisor?
[11]   **A:** Yes. And that can be conveyed through
[12] phone. I mean, if somebody says, Hey, we obviously
[13] have a fatality here, I mean, if it's injuries that
[14] are inconsistent with life, they immediately shut —
[15] shut it down. That road unit notifies the troop.
[16] And then the troop calls out — and by way of acting
[17] as an agent of the road supervisor.
[18]   But if it's a not-quite-so — you
[19] know, "do we call them/don't we call them" — the
[20] road supervisor is contacted to have us — they make
[21] the call and tell us whether they want us or they
[22] don't.
[23]   **Q:** Did you speak to the officer who drew the
[24] chalk lines on the pavement?

1—11:10:02  24—11:11:07                    Page 435

[1]   **A:** I don't know who did it.
[2]   **Q:** Okay.
[3]   **A:** I — the troopers that were there. It
[4] could have been a trooper that came to the scene when
[5] the initial commotion's going on and then later left
[6] and took one of the traffic control points to keep us
[7] from being run over and keep us safe.
[8]   I don't know who marked it. It was
[9] somebody that was there. I mean, the communication
[10] dispatch sheet says who all went to that scene. It
[11] was one of them, but I don't know who.
[12]   **Q:** Okay.
[13]   **A:** So I might have talked to them, but I
[14] don't know —
[15]   **Q:** Who it was?
[16]   **A:** — who it was.
[17]   **Q:** Page 4 of your report, you state that the
[18] area where — well, this area had been initially
[19] identified by individuals at the scene as the
[20] approximate area of where the impact had occurred.
[21] Specifically, what was it about that
[22] area that indicated to you or that was indicated to
[23] you by others that that was the area of the accident?
[24] Were there specific signs that you saw that were

1—11:11:11  24—11:12:02                    Page 436

[1] indicated to you by others at the scene to tell you
[2] that that was the area of the accident.
[3]   **MR. van der VEEN:** Objection to the
[4] form of the question.
[5]   **THE WITNESS:** Just a collection —
[6] total of all the comments that were made: the
[7] statements by Mr. Bard, the statements by
[8] Mr. Seiffert, the statements by the witness — the
[9] nurses, and what little bit of physical evidence that
[10] we had, collectively, that was — and that's why it
[11] was approximate. I mean, I'm not sure exactly
[12] 100 percent this is exactly where it happened, but
[13] within that area. It was a collection of all that
[14] was told.
[15]   **BY MS. RISK:**
[16]   **Q:** Okay. We've talked a little bit or you've
[17] talked, spoken with Mr. van der Veen earlier about a
[18] patch of brown dirt.
[19]   **A:** Yes.
[20]   **Q:** Do you have a recollection of seeing that
[21] patch of brown dirt?
[22]   **A:** Yes.
[23]   **Q:** And who was it who told you that that
[24] patch of brown dirt was the point of impact —

1—11:12:07  24—11:12:50                    Page 437

[1]   **MR. van der VEEN:** Objection —
[2]   **BY MS. RISK:**
[3]   **Q:** — between the motorcycle and the van, the
[4] UPS van?
[5]   **MR. van der VEEN:** Objection to the
[6] form of the question.
[7]   **THE WITNESS:** I'd have to look through
[8] the notes. I'm not sure. I'm thinking that someone
[9] told Sergeant Cox that and that's how I learned it,
[10] through his supplemental. I'm not sure. I don't
[11] remember exactly who. But that was — reference was
[12] made to the dirt on the roadway.
[13]   **BY MS. RISK:**
[14]   **Q:** But it's your recollection that there is a
[15] witness who identified the brown patch as the point
[16] of impact between the vehicles?
[17]   **A:** One of those reflected to it, yes, or
[18] directed us to it.
[19]   **Q:** All right. And if you look in your
[20] report, it actually was Miss Amy Stratton who was
[21] interviewed by Sergeant Cox.
[22]   **Q:** Okay.
[23]   **Q:** Do you recall Mr. Bard identifying that as
[24] the point of impact —

1—11:12:57  24—11:13:37                        Page 438

[1]     MR. van der VEEN: Objection to the
[2] form of the question.
[3]                    BY MS. RISK:
[4]     Q: — also?
[5]     A: I don't recall him, no.
[6]     Q: You've also discussed a scuff mark, skid
[7] mark, located in the area of where the right tire
[8] would have been on the UPS van?
[9]     A: Yes.
[10]    MR. van der VEEN: Objection to the
[11] form of the question.
[12]    MS. RISK: There is no question yet.
[13]    MR. van der VEEN: No? Yeah, there
[14] is.
[15]                    BY MS. RISK:
[16]    Q: Earlier in your deposition with
[17] Mr. van der Veen, there was much discussion about a
[18] scuff mark —
[19]    A: Yes.
[20]    MR. van der VEEN: Objection to the
[21] form of the question.
[22]                    BY MS. RISK:
[23]    Q: — and whether or not that was a skid
[24] mark.

1—11:13:38  24—11:14:45                        Page 439

[1]     My question is, is the location of
[2] that tire mark with respect to the location of the
[3] brown patch consistent with the witness testimony
[4] about where the point of impact was for the accident?
[5]     MR. van der VEEN: Objection.
[6] Objection to the form of the question.
[7]     THE WITNESS: What you're asking me,
[8] if I'm understanding your question, is in
[9] relationship to the van or the truck location with
[10] that tire scuff mark being the right front vehicle
[11] tire and in relationship to where the dirt was, if
[12] that was one and the same?
[13]                    BY MS. RISK:
[14]    Q: Yes.
[15]    A: No. I believe the dirt is further north.
[16]    Q: No. That's not my — I'm sorry. I'm not
[17] being clear.
[18]    Is the location of the scuff mark, the
[19] tire mark from the UPS package car, the location —
[20] with respect to the location of the brown patch,
[21] consistent with the location of the UPS package car
[22] at the point, at the time impact —
[23]    MR. van der VEEN: Objection to the
[24] form of the question.

1—11:14:46  24—11:16:05                        Page 440

[1]     Q: — those two reference points?
[2]     A: Yes.
[3]     Q: Okay. In the second paragraph of your
[4] summary report, you found that the UPS van displayed
[5] severe contact damage in the left front fender area
[6] of the vehicle. And you also drafted — or drew a
[7] vehicle damage profile for the UPS van; isn't that
[8] correct?
[9]     A: Yes.
[10]    Q: Okay. What was the damage that you
[11] observed on the UPS package car?
[12]    A: The left front fender area and I believe,
[13] if I recall, a portion area of part of the hood,
[14] directly — it's the area that is directly in front
[15] of where the driver's door ends, that area.
[16]    Q: How far — do you recall how far is that
[17] damage from the driver's door?
[18]    A: Approximately a foot or so.
[19]    Q: And based on your observations of that
[20] damage, you determined that damage to be severe
[21] damage; correct?
[22]    A: Yes.
[23]    MR. van der VEEN: Objection to the

1—11:16:05  24—11:18:01                        Page 441

[1] form of the question. I believe at your last
[2] deposition you looked at a photograph and described
[3] it as moderate.
[4]                    BY MS. RISK:
[5]    Q: From your observation, was the damage to
[6] the UPS package car severe contact damage?
[7]    MR. van der VEEN: Objection to the
[8] form of the question.
[9]    THE WITNESS: Yes.
[10]                    BY MS. RISK:
[11]    Q: I'll refer you to page 12 — actually, let
[12] me start with page 13. I'm sorry. Bottom of page
[13] 13, I'd like to talk a little bit about your
[14] interview of Mr. Seiffert.
[15]    According to your report, when did you
[16] contact Mr. Seiffert?
[17]    A: On Wednesday afternoon, October 27th, at
[18] about 1355 or 1:00 — almost 2:00 o'clock in the
[19] afternoon.
[20]    Q: And when did that conversation conclude?
[21]    A: About five minutes after 2:00.
[22]    Q: So that —
[23]    A: It was about a ten-minute conversation.
[24]    Q: And that was by telephone —

1—11:18:02  24—11:18:44                                    Page 442

[1] A: Yes.

[2] Q: — is that correct?

[3]     How did you get Mr. Seiffert's

[4] telephone number?

[5] A: The information was shared to me by one of

[6] the troopers at the scene that had obtained it.

[7] Q: Did you talk to Mr. Seiffert at the scene?

[8] A: No, He wasn't at the scene when I was

[9] there. As far as I know, he wasn't. It was never

[10] brought to my attention if he was.

[11] Q: When you spoke to Mr. Seiffert, did

[12] Mr. Seiffert tell you that he had called the Delaware

[13] State Police and asked them why no one had called

[14] him, that he had witnessed a fatal accident?

[15]     MR. van der VEEN: Objection to the

[16] form of the question.

[17]     THE WITNESS: Do I recall him saying

[18] that?

[19]                 BY MS. RISK:

[20] Q: Yes.

[21] A: No.

[22] Q: Did he say that to you?

[23] A: I don't recall him saying it to me.

[24] Q: Did Mr. —

1—11:18:44  24—11:20:31                                    Page 443

[1] A: I called and talked to him, but I don't

[2] recall — no.

[3] Q: Did anyone from the Delaware State Police

[4] call you and direct you to call Mr. Seiffert?

[5] A: I don't have any, any records of anyone

[6] referring me to call him.

[7] Q: You just called him as a part of your

[8] normal investigation?

[9] A: Yes.

[10] Q: Do you remember who it was who gave you

[11] the contact information for John Seiffert?

[12] A: No,

[13] Q: Was it Sergeant Cox; do you remember?

[14] A: No, I don't — I don't know. One of the

[15] troopers at the scene or it could have been Sergeant

[16] Cox. They could have given it to him. I don't know.

[17]     There's a lot of chaos going on at a

[18] scene. And a lot of times things are just put on our

[19] dashboard. You know, they'll ask us or someone will

[20] say, Hey, we've got printout sheets of the car or

[21] whatever. And they throw them in our car. I don't

[22] know.

[23] Q: Okay. And in the report on page 13,

[24] continuing onto page 14, that's a, as you described

1—11:20:34  24—11:21:15                                    Page 444

[1] it, a brief synopsis of the content of your interview

[2] of Mr. Seiffert?

[3] A: Yes.

[4] Q: Is that fair?

[5] A: Yes.

[6] Q: Did you ask Mr. Seiffert specific

[7] questions?

[8] A: Yes.

[9] Q: Did you give Mr. Seiffert the opportunity

[10] to give you any more information that he possibly had

[11] about this accident or the circumstances surrounding

[12] this accident?

[13] A: Yes.

[14] Q: Did you rush Mr. Seiffert at all during

[15] this telephone interview?

[16] A: No.

[17] Q: Do you feel that Mr. Seiffert had every

[18] opportunity to tell you what went on, what he knew

[19] about the accident?

[20] A: Yes.

[21] Q: Did Mr. Seiffert at the time of your

[22] telephone conversation with him seem forthcoming with

[23] information?

[24] A: Yes.

1—11:21:17  24—11:22:04                                    Page 445

[1] Q: Did it seem to you that he would have told

[2] you everything he knew at that point?

[3]     MR. van der VEEN: Objection to the

[4] form of the question.

[5]     THE WITNESS: It's the impression from

[6] the conversation, yes.

[7]                 BY MS. RISK:

[8] Q: Did you give Mr. Seiffert your telephone

[9] number at the barracks so that he could contact you

[10] in the future if he had any more information to give

[11] you?

[12] A: Yes.

[13] Q: I'll refer you to page 14. And you took

[14] notes on your interview with Mr. Seiffert; correct?

[15] A: Yes.

[16] Q: As you do with all of your witness

[17] interviews; correct?

[18] A: Yes.

[19] Q: You say in the report that Mr. Seiffert

[20] told you that he was traveling eastbound on Twaddell

[21] Mill and was located behind the UPS truck when the

[22] collision occurred; is that correct?

[23] A: Yes.

[24] Q: He was leaving a job site right there at

1—11:22:08  24—11:22:49                      Page 446

[1] 517 Twaddell Mill; correct?

[2] **A:** Yes.

[3] **Q:** Mr. Seiffert told you that the UPS truck

[4] passed by his location as he was coming out of the

[5] driveway at 517 Twaddell Mill; is that fair?

[6] **A:** Yes.

[7] **Q:** Mr. Seiffert never told you that the UPS

[8] truck was going at a fast clip, did he?

[9] **A:** No.

[10] **Q:** If he had told you that, is that something

[11] you would have written down in your notes?

[12] **A:** I would have written it down.

[13] **Q:** I see —

[14] **A:** No.

[15] **Q:** — you're referring to your notes. Is it

[16] in your notes?

[17] **A:** No.

[18] **Q:** So is it fair to say that Mr. Seiffert

[19] didn't tell you that the UPS truck was traveling at a

[20] fast clip —

[21]    MR. van der VEEN: Objection to the

[22] form of the question.

[23]    **THE WITNESS:** Back to what

[24] Mr. van der Veen stated earlier, if he had said it

1—11:22:54  24—11:23:43                      Page 447

[1] and he said it fast while I was writing notes and I

[2] didn't pick it up, when I went back through the notes

[3] the second time, it would have been the opportunity

[4] for him to clarify and say it was traveling at a fast

[5] clip.

[6]          BY MS. RISK:

[7] **Q:** He didn't do that, did he?

[8] **A:** I don't recall that ever — it's not in my

[9] notes, and I have no personal memory of it.

[10] **Q:** Mr. Seiffert stated that he and the UPS

[11] truck came to a complete stop at the stop sign; is

[12] that correct?

[13] **A:** Yes.

[14] **Q:** And that's corroborated by Mr. Bard's

[15] testimony about coming to a complete stop at the stop

[16] sign, isn't it? I'm sorry. Mr. Bard's version of

[17] the facts to you.

[18] **A:** Of what Mr. Bard did?

[19] **Q:** Yes.

[20] **A:** It doesn't confirm that — he doesn't say

[21] in his interview that Mr. Seiffert stopped.

[22] **Q:** Fair. That was a poorly worded question.

[23]    Did that corroborate Mr. Bard's

[24] rendition of stopping completely at the stop sign?

1—11:23:46  24—11:24:31                      Page 448

[1] **A:** Yes.

[2] **Q:** Mr. Seiffert told you that the UPS truck

[3] then began to turn left and suddenly stopped —

[4] **A:** Yes.

[5] **Q:** — is that correct?

[6]    And that the truck was approximately

[7] two feet way from the center of the double line —

[8] **A:** Yes.

[9] **Q:** — is that correct?

[10]    When he said the truck was

[11] approximately two feet away from the center of the

[12] double line, did he mean that the truck was entirely

[13] in the southbound lane of Montchanin Road? In other

[14] words, the truck had not crossed over the

[15] double-yellow line?

[16] **A:** Correct.

[17] **Q:** Mr. Seiffert then told you about a

[18] motorcycle approaching from the north traveling

[19] southbound on Montchanin Road; correct?

[20] **A:** Yes.

[21] **Q:** And that would have been Mr. Vascek —

[22] **A:** Yes.

[23] **Q:** — is that correct?

[24]    And Mr. Seiffert then told you that

1—11:24:31  24—11:25:24                      Page 449

[1] the rear wheel of the motorcycle came off the ground;

[2] correct?

[3] **A:** Yes.

[4] **Q:** And the motorcycle operator's feet left

[5] the pegs of the motorcycle and the operator held onto

[6] the handlebars?

[7] **A:** Yes.

[8] **Q:** Is that a fair description?

[9] **A:** Yes.

[10] **Q:** And then Mr. Seiffert told you that the

[11] operator and the motorcycle struck the truck?

[12] **A:** Yes.

[13] **Q:** The top back head area of the operator's

[14] head was tucked down, and his back struck the truck;

[15] is what that Mr. Seiffert told you?

[16] **A:** Yes.

[17] **Q:** Mr. Seiffert told you that he then ran to

[18] the motorcycle operator; is that correct?

[19] **A:** Yes.

[20] **Q:** Mr. Seiffert — did Mr. Seiffert — did

[21] you ask Mr. Seiffert how fast the motorcycle was

[22] going?

[23] **A:** Yes.

[24] **Q:** Did Mr. Seiffert tell you how fast the

---

1—11:25:26  24—11:26:18                    Page 450

[1] motorcycle was going at impact?

[2]   A: Yes.

[3]   Q: And what did Mr. Seiffert tell you was the

[4] speed of the motorcycle at impact?

[5]   A: He estimated between 35 to 45 miles per

[6] hour at impact.

[7]   Q: Now, Corporal Weaver, what's your

[8] understanding of "at impact"?

[9]   A: When — as previous described, the

[10] motorcycle's up; the operator, Mr. Vascek, is in

[11] between the two; and at that point when they hit, he

[12] estimated at 35.

[13]   Q: 35 to 45 miles per hour?

[14]   A: Based on what he observed and the time

[15] that he observed it, however long that was.

[16]   Q: Did you ask Mr. Seiffert how fast the

[17] motorcycle was going when he first saw the

[18] motorcycle?

[19]   A: Yes.

[20]   Q: And what did he tell you?

[21]   A: He said he was not sure how fast the

[22] motorcycle was traveling, initial speed.

[23]   Q: Okay.

[24]   A: And the parentheses is mine, meaning

---

1—11:26:20  24—11:27:27                    Page 451

[1] initial speed for the form of the question. And what

[2] he said to me was that — I'm trying to get more out

[3] of him as to, well, you saw it. That's what you're

[4] saying it was at impact. Did you see it or could you

[5] estimate how fast it was traveling further, however

[6] long it was that you observed it?

[7]   And he said, No.

[8]   Q: He said, No. But did he tell you anything

[9] else about the motorcycle's movement coming toward

[10] the impact or just prior to impact?

[11]   A: He said that it had been already

[12] decelerating for approximately one to two seconds

[13] when he observed it.

[14]   Q: Did he tell you how he knew or what

[15] indicated to him that the motorcycle had already been

[16] decelerating one to two seconds?

[17]   A: I'm sorry. The question again?

[18]   Q: Did he tell you what he saw, what he

[19] observed, or what indicated to him that the

[20] motorcycle had been decelerating for one to two

[21] seconds when he observed it?

[22]   A: Not other than his description of what the

[23] bike was doing.

[24]   Q: Was it your understanding when you were

---

1—11:27:30  24—11:28:16                    Page 452

[1] speaking to Mr. Seiffert when he was talking about

[2] decelerating that he was talking about the timeframe

[3] from when he first saw the motorcycle to the point of

[4] impact?

[5]   A: Yes.

[6]   MR. van der VEEN: Objection as to the

[7] form of the question.

[8]            BY MS. RISK:

[9]   Q: What is your understanding of the

[10] timeframe that Mr. Seiffert was referring to when he

[11] was talking about decelerating for one to two

[12] seconds?

[13]   MR. van der VEEN: Objection to the

[14] question.

[15]   THE WITNESS: My understanding of what

[16] Mr. Seiffert told me was that he observed the

[17] motorcycle for about one to two seconds before

[18] impact.

[19]            BY MS. RISK:

[20]   Q: And what was the motorcycle doing while he

[21] was observing it for that one to two seconds?

[22]   A: It's coming up in a stoppie position, as I

[23] explained earlier, with the wheel down — front wheel

[24] down, rear wheel coming up, tucked position of

---

1—11:28:19  24—11:29:09                    Page 453

[1] Mr. Vascek.

[2]   Q: And was the motorcycle decelerating during

[3] that time period?

[4]   A: Yes.

[5]   Q: So is it safe to say that the initial

[6] speed of the motorcycle when Mr. Seiffert first saw

[7] it was greater than 35 to 45 miles an hour, which is

[8] the speed he estimated at impact?

[9]   MR. van der VEEN: Objection to the

[10] form of the question.

[11]   THE WITNESS: Yes.

[12]            BY MS. RISK:

[13]   Q: Okay. Mr. Seiffert estimated that the

[14] motorcycle was approximately 45 feet away from the

[15] truck when he first saw it?

[16]   A: Yes.

[17]   Q: Did you ask Mr. Seiffert that specific

[18] question?

[19]   A: Yes.

[20]   Q: Okay. Can you tell me the type of

[21] question you asked?

[22]   A: How far away from the, from the truck was

[23] the motorcycle when you first observed it?

[24]   Q: Okay. And what did Mr. Seiffert respond?

---

UPS & Bard

---

1—11:29:12   24—11:30:17                              Page 454

[1]  A: 35 to 40 feet — 35 to 40 — I'm sorry.

[2]  That's the miles per hour.

[3]  Q: Midway in the paragraph.

[4]  A: 45 feet. I'm sorry. I'm looking at the

[5]  speed limit that he stated. The approximate speed is

[6]  in two separate areas of the report.

[7]  45 feet.

[8]  Q: And that was his estimate of how far away

[9]  the motorcycle was from the truck when he first

[10]  observed it?

[11]  A: Yes.

[12]  Q: Was Mr. Seiffert vacillating back and

[13]  forth about the distance? Or was Mr. — I'm sorry.

[14]  Was Mr. Seiffert vacillating back and

[15]  forth about the distance? Did he give you any

[16]  indication that he was unsure?

[17]  A: I don't remember of him giving me that

[18]  indication.

[19]  Q: Did he seem pretty sure about that

[20]  45 feet?

[21]  A: Yes. I felt, obviously, during —

[22]  MR. van der VEEN: Objection to the

[23]  form of the question.

[24]  THE WITNESS: — the interview

---

1—11:30:18   24—11:31:21                              Page 455

[1]  listening to him on the phone, I felt — and that's

[2]  what I wrote, what I put in the notes and what I put

[3]  in the report.

[4]  BY MS. RISK:

[5]  Q: So if after having met with

[6]  Mr. van der Veen twice and spent considerable amount

[7]  of time with him at the scene of the accident

[8]  Mr. Seiffert testified that he wasn't really sure

[9]  about that 45 feet, would you still today say that

[10]  the day after the accident when you spoke to

[11]  Mr. Seiffert, he told you it was 45 feet?

[12]  MR. van der VEEN: Objection to the

[13]  form of the question.

[14]  THE WITNESS: Yes.

[15]  BY MS. RISK:

[16]  Q: The same question with regard to the speed

[17]  at impact of the motorcycle. If, after having spent

[18]  two times with Mr. van der Veen and a considerable

[19]  amount of time at the accident scene, Mr. Seiffert

[20]  were to say that he wasn't sure about the speed of

[21]  the motorcycle at impact, is it your testimony here

[22]  today —

[23]  MR. van der VEEN: Objection to the

[24]  form of the question.

---

1—11:31:22   24—11:32:00                              Page 456

[1]  BY MS. RISK:

[2]  Q: — that when you asked him, he said 35 to

[3]  45 miles per hour was the speed?

[4]  A: Yes.

[5]  MR. van der VEEN: Objection to the

[6]  form of the question.

[7]  BY MS. RISK:

[8]  Q: And you had no indication when you asked

[9]  him that on the telephone — strike that.

[10]  You didn't prompt Mr. Seiffert for a

[11]  speed, did you?

[12]  A: Other than asking him the question if he

[13]  could estimate —

[14]  MR. van der VEEN: Other than the way

[15]  he did with Mr. Bard?

[16]  MS. RISK: Excuse me. Move to strike

[17]  counsel's comments.

[18]  BY MS. RISK:

[19]  Q: Go ahead.

[20]  A: Excluding answering — asking the

[21]  question, Could you give me an estimate of the speed

[22]  at, you know, at impact, other than that, no. Again,

[23]  I'm not going to say, Well, was he going 45 mile an

[24]  hour? 35? 65? 70? What can you tell me? What did

---

1—11:32:03   24—11:32:56                              Page 457

[1]  you see, in your experience as a driver? And if

[2]  you're not comfortable with committing to something,

[3]  then don't. That's my line with everyone that I talk

[4]  to.

[5]  Q: So you gave Mr. Seiffert the opportunity

[6]  to say, No, I'm not comfortable with giving you a

[7]  speed?

[8]  A: Exactly.

[9]  Q: And Mr. Seiffert did not say, No, I'm not

[10]  comfortable with giving a speed, did he?

[11]  A: He sounded competent and comfortable with

[12]  what he said when — my recollection, there was no

[13]  stumbling or "uh-uh." Like we talked earlier, I

[14]  asked him the question and he answered it and I wrote

[15]  it down.

[16]  Q: And this, again, is a conversation you had

[17]  with Mr. Seiffert the day after the accident,

[18]  correct, October 27th?

[19]  A: Yes.

[20]  Q: At 1355; correct?

[21]  A: Yes.

[22]  Q: Actually less than 24 hours after the

[23]  accident; is that fair?

[24]  A: Yes.

---

Case 1:04-cv-01538-SLR    Document 97-11    Filed 10/06/2005    Page 20 of 25    UPS v. Bard

**1—11:33:07  24—11:34:04**                    Page 458

[1]  Q: Mr. Seiffert also told you that when the
[2]  UPS truck came to a stop, it was approximately 2 feet
[3]  from the center of the double-yellow line; is that
[4]  correct?

[5]  A: Yes.

[6]  Q: Is that consistent with the physical
[7]  evidence that you observed at the scene, specifically
[8]  the scuff mark and the brown, the patch of dirt?

[9]       MR. van der VEEN: Objection to the
[10]  form of the question.

[11]       THE WITNESS: Yes.

[12]       MR. van der VEEN: It's not a scuff
[13]  mark.

**BY MS. RISK:**

[15]  Q: Did Mr. Seiffert tell you that he heard
[16]  the motorcycle prior to the accident?

[17]  A: No, he did not hear it.

[18]  Q: Is your understanding that Mr. Seiffert
[19]  meant he did not hear the motorcycle before the
[20]  collision occurred?

[21]  A: Correct.

[22]  Q: So the first time he heard the motorcycle
[23]  was the collision itself; is that what — would that
[24]  be fair?

**1—11:34:05  24—11:35:13**                    Page 459

[1]  A: That is my understanding, yes.

[2]  Q: And that not hearing the motorcycle,
[3]  that's consistent with Mr. Bard's statement about not
[4]  hearing the motorcycle also?

[5]  A: Yes.

[6]       MR. van der VEEN: Objection to the
[7]  form of the question.

**BY MS. RISK:**

[9]  Q: And when you have consistent testimony or
[10]  consistent statements like that, that helps in
[11]  your — that's a factor in your reconstructing an
[12]  accident, isn't it?

[13]       MR. van der VEEN: Objection to the
[14]  form of the question.

[15]       THE WITNESS: Yes.

**BY MS. RISK:**

[17]  Q: And if Mr. — after spending two visits
[18]  with Mr. van der Veen and being out at the scene with
[19]  Mr. van der Veen and his engineers, if Mr. Seiffert
[20]  was to back away from his statement that the
[21]  motorcycle was decelerating, you would still stand by
[22]  his statement that he told you less than 24 hours
[23]  after the accident that he knew that the motorcycle
[24]  or he could tell that the motorcycle was decelerating

**1—11:35:17  24—11:36:24**                    Page 460

[1]  for a period of one to two seconds when he hit it?

[2]       MR. van der VEEN: Objection to the
[3]  form of the question.

**BY MS. RISK:**

[5]  Q: Is that fair?

[6]  A: That's fair, yes.

[7]  Q: Okay. You spoke to other witnesses at the
[8]  scene; correct?

[9]  A: No.

[10]  Q: Oh, I'm sorry. You spoke to —

[11]  A: Sergeant Cox did.

[12]  Q: Okay. And part of the conclusions and
[13]  findings in your police report are based on the
[14]  conversation that Sergeant Cox had with Amy Stratton?

[15]  A: Correct.

[16]  Q: Is it your understanding that Miss
[17]  Stratton stated that she was traveling southbound on
[18]  Montchanin Road?

[19]  A: Yes.

[20]  Q: And that there was a point in time when
[21]  Mr. Vascek came up quickly behind her on his
[22]  motorcycle; is that correct?

[23]  A: Yes.

[24]       MR. van der VEEN: Objection to the

**1—11:36:24  24—11:37:11**                    Page 461

[1]  form of the question.

**BY MS. RISK:**

[3]  Q: This is your understanding of Miss
[4]  Stratton's statement to Sergeant Cox?

[5]  A: Yes.

[6]  Q: And that she was traveling behind a
[7]  bicyclist at the time; is that correct?

[8]  A: Yes.

[9]  Q: And that at a point in time prior to the
[10]  accident scene, she passed the bicyclist?

[11]  A: Correct.

[12]  Q: Is that your understanding?

[13]  A: Yes.

[14]  Q: And that Mr. Vascek, the motorcycle
[15]  operator, followed her when she passed the bicyclist?

[16]  A: Yes.

[17]  Q: Is that your understanding?

[18]  A: Yes.

[19]  Q: Then there came a point in time when she
[20]  passed the bicyclist and traveled in front of the
[21]  bicyclist going back into her travel lane southbound
[22]  or Montchanin Road; is that your understanding?

[23]  A: Yes.

[24]  Q: And that Mr. Vascek did not go back into

1—11:37:14  24—11:38:10    Page 462

[1] the southbound lane behind her but proceeded past her
[2] at a fast rate of speed?
[3]     MR. van der VEEN: Objection to the
[4] form of the question.
[5]         BY MS. RISK:
[6]     Q: Is that your understanding?
[7]     A: Yes.
[8]     Q: And that Miss Stratton did not see the
[9] motorcycle again until she came around the corner at
[10] the accident scene; is that correct?
[11]     A: That's my understanding of the statement,
[12] yes.
[13]     Q: And that Miss Stratton at the time was
[14] traveling 50 miles per hour; is that correct?
[15]     A: That's my understanding of the statement,
[16] yes.
[17]     Q: So the assumption if Miss Stratton is
[18] traveling 50 miles an hour and does not see
[19] Mr. Vascek again on his motorcycle, isn't it fair to
[20] assume that just prior to the curve in the road
[21] before — on Montchanin before the stone bridge, that
[22] Mr. Vascek was doing at least 50 miles an hour?
[23]     MR. van der VEEN: Objection to the
[24] form of the question.

1—11:38:11  24—11:39:05    Page 463

[1] THE WITNESS: Based on her estimate,
[2] yes —
[3]         BY MS. RISK:
[4]     Q: Okay.
[5]     A: — of her traveled speed, yes.
[6]     MR. van der VEEN: Objection.
[7]         BY MS. RISK:
[8]     Q: And her estimate would be based on her
[9] sitting in her car; is that fair?
[10]     A: That's my understanding, yes.
[11]     Q: Let's talk a little bit about your
[12] interview of Mr. Bard. And it's on page 12.
[13]     Before we get into what you have here
[14] in the report, can you tell me, do you have an
[15] independent recollection of talking to Mark Bard on
[16] the day of the accident?
[17]     A: Yes.
[18]     Q: Okay. Can you tell me what his demeanor
[19] was?
[20]     A: He was very emotionally upset —
[21]     Q: Okay.
[22]     A: — and understandably, which is very
[23] common, with the reasons why we come to work and why
[24] we're at where we're at.

1—11:39:07  24—11:40:24    Page 464

[1]     Q: And what about him made you think he was
[2] very emotionally upset?
[3]     A: Just observations and experience from
[4] doing this for a number of years or even not just
[5] doing this but just common exposure and contact with
[6] other human beings that death and sadness and
[7] different — it was obvious — I mean, he was just
[8] shaken.
[9]     Not — I don't want to say nervous,
[10] not in regards to — well, when we interview someone
[11] that's involved in something, say, where we just
[12] grabbed them for a robbery or whatever, sometimes,
[13] you know, they're shaking and nervous in relationship
[14] to why we're bringing them in, because they know
[15] they're under arrest and caught with their hand in
[16] the cookie jar, whatever.
[17]     This was a form of emotional — it's
[18] evident that he was upset. I mean, I don't know how
[19] to — if I'm being clear enough. I mean,
[20] emotionally, I mean, at times I recall him perhaps
[21] tearing up a little bit or voice cracking. It's
[22] evident that this shook him. He knew at that scene
[23] the, the severity of this crash. So he was upset.
[24]     Q: Okay.

1—11:40:25  24—11:41:35    Page 465

[1]     A: Emotionally, mentally, physically, I
[2] mean, because one of the things that we do is request
[3] and have a victim service representative respond to
[4] the scenes to talk with them, to provide them with a
[5] brochure, and to convey and explain some of the
[6] resources that the State has to offer participants in
[7] these.
[8]     Like I said earlier, everyone's a
[9] victim, whether they contributed to the crash or just
[10] at the wrong place at the wrong time, witnessed it or
[11] whatever, this is something that traumatizes their
[12] lives. You see it on the news, and you know it's
[13] somewhere else. Or you see it in a movie, and you
[14] know it's fake. When it's real, it hits closer to
[15] home.
[16]     The victim service representatives
[17] also do follow-ups to check to make sure you're okay,
[18] you know, so that you're able to productively
[19] hopefully heal from this incident and continue with
[20] your life, as opposed to going into depression or all
[21] the other things that can happen as a result of this.
[22]     So we have a catch mechanism. It's
[23] not pure, you know, a hundred percent sure proof, but
[24] we try to reach out. And I'm sure — I don't know.

(1) I'd have to look to see who actually was the victim
(2) service representative. But I know people talk to
(3) them.
(4)     And I also, through doing this the
(5) years that I've done it, I'm a very compassionate
(6) person. I mean, I'm, I have a job to do. But I
(7) also, there are times in interviews in which if
(8) you're that emotionally upset, I'm not going to take
(9) an interview then. It's not going to be — it's not
(10) going to enhance my investigation because the quality
(11) of the interview might not be so good; and equally,
(12) you know, if you're just totally devastated by this
(13) that's happened.
(14)     I mean, he was — he agreed to be
(15) interviewed. He was cooperative, voluntarily got in
(16) the car, was, I mean, was together enough, I mean, I
(17) felt, to conduct an interview. I mean, he wasn't
(18) breaking down and just sobbing uncontrollably. But,
(19) I mean, it was evident that he was upset by what had
(20) happened.
(21)     Q: In your estimation, the fact that he was
(22) struck by a motorcycle that he describes as flying
(23) toward him about a foot from his open driver's door,
(24) in your estimation, is it understandable that a

(1) person, an individual, a human being in that
(2) situation, who also saw his own life on the line, was
(3) emotionally upset?
(4)     MR. van der VEEN: Objection to the
(5) ridiculous question.
(6)     THE WITNESS: Yes, to your question.
(7)         BY MS. RISK:
(8)     Q: Was Mr. Bard cooperative?
(9)     A: Absolutely.
(10)     Q: Did you find him to be a credible
(11) individual?
(12)     A: I had no reason to doubt the content of
(13) what he was saying as well as any of the others that
(14) I spoke with.
(15)     Q: Okay. You talked a little bit about, on
(16) your first day of deposition, how your forte is
(17) people and that witness interviews are your favorite
(18) part of the job. Or I don't know whether you called
(19) it your favorite part of the job, but your forte?
(20)     A: Yes.
(21)     Q: Is that because you have a good handle or
(22) you see yourself as having a good handle on what
(23) you're dealing with in a particular situation with an
(24) interview?

(1)     MR. van der VEEN: Objection to the
(2) form of the question.
(3)     THE WITNESS: I would like to think
(4) over the years that I have gained good people
(5) communicative skills. I do a lot of presentations.
(6) I do — I'm an instructor at the academy. And
(7) obviously in trials when you're trying to explain
(8) what you do to the jury, you want to be as credible
(9) as possible, not talking over them, under them, but
(10) so they can understand you.
(11)     To answer your question, yes, I mean,
(12) I believe that I'm a people person. And I — not to
(13) allow, go over the line to allow it to — it's not
(14) going to influence what I write. What they tell me
(15) is what they tell me.
(16)     And the questions that I ask and the
(17) direction of what I have to do as an investigator, I
(18) mean, as far as, as far as being compassionate, if
(19) he's going to break down, we can conclude this and
(20) talk at another time.
(21)     But that interview was conducted; I
(22) didn't see, reflecting back, anything that was out of
(23) the ordinary. There was no interference or —
(24) whether — whatever conversations took place with

(1) Mr. Bard and the other representatives of UPS prior
(2) to my arrival and/or after my arrival, when we got in
(3) that car when he was, you know, requested, the first
(4) and foremost, UPS didn't say, No, you can't interview
(5) him. And he didn't say, No, I don't want to talk to
(6) you.
(7)     He got in the car. We sat down.
(8) Standard procedure, interview, documented with notes.
(9) And, you know, get out of the car. Some light
(10) conversation occurs at a scene afterwards; not
(11) anything to reflect or say, Oh, yeah, I remember him
(12) telling me that he collects bottle caps or something.
(13) I mean, none of that. But, I mean, I felt that what
(14) he told me was as accurate that he could tell me at
(15) that point in time shortly thereafter of the crash.
(16)         BY MS. RISK:
(17)     Q: Okay. I'll refer you to page 12 in your
(18) interview of Mr. Bard. That was at the scene you
(19) interviewed him?
(20)     A: Yes.
(21)     Q: And you have the time at 1755; is that
(22) correct?
(23)     A: Yes, beginning.
(24)     Q: And you concluded that interview at?

1—11:45:54  24—11:46:43                          Page 470

[1] A: Seven minutes after 6:00 p.m.

[2] Q: So that interview was approximately twelve

[3] minutes?

[4] A: Yes.

[5] Q: Okay. And it occurred in the police

[6] patrol car?

[7] A: Yes.

[8] Q: We talked about that.

[9] A: Can I elaborate?

[10] Q: Yes.

[11] A: The content of the interview occurred at

[12] that time. Now, he was in the car a little bit

[13] longer than that because what I do is then go into

[14] outside the investigative questions. At that point

[15] I'm reaffirming to him victim services.

[16]    You know, call me. You've got my

[17] name, my number, things — you don't just keep — I'm

[18] not going to put all that repetitively over and over.

[19] I gave him my business card, talked to him, told him

[20] to call me, call me, call me, call me. But that,

[21] that timeframe, the twelve minutes, is for the

[22] interview purpose.

[23] Q: Okay. So you actually spent more time —

[24] A: Correct.

1—11:46:43  24—11:47:23                          Page 471

[1] Q: — talking to him —

[2] A: Yes.

[3] Q: — than is reflected?

[4] A: Prior to and after. Outside the car,

[5] just, Hey, are you all right? You know, can I get

[6] you anything or whatever, as well as doing the other

[7] things that I'm doing. But I had more than just

[8] contact for twelve minutes, yes.

[9] Q: Is that true, generally speaking, with all

[10] of your interviews —

[11] A: Yes.

[12] Q: — that when — you just have to wait for

[13] me to finish.

[14]    — that the time that you give for the

[15] beginning of the interview and the time that you give

[16] for the conclusion of the interview are just for

[17] substance of the interview itself and don't include

[18] any additional information or pleasantries or

[19] whatever that you go back and forth with the person?

[20] A: Yes.

[21]    MR. van der VEEN: Objection to the

[22] form of the question.

[23]    THE WITNESS: I'm looking — the

[24] timelines that are in my notes, when I refer to when

1—11:47:25  24—11:48:25                          Page 472

[1] I start an interview and when I conclude an

[2] interview, it is directed solely at my asking

[3] questions or trying to observe and find — not

[4] observe — to try to find out what statement they

[5] want to tell me about, what they can say.

[6]                    BY MS. RISK:

[7] Q: Okay.

[8] A: Prodded by questions, of course, by my

[9] own — but focusing on the crash, the reason why I'm

[10] there.

[11] Q: Mr. Jester was in the car — we've gone

[12] over this, correct? — the UPS representative.

[13] A: Yes.

[14] Q: Did Mr. Jester say anything during the

[15] interview of Mr. Bard?

[16] A: I don't recall him saying anything other

[17] than common politenesses or thanking me for allowing

[18] him to be in the vehicle with me when we concluded;

[19] but, no — not at any time during the conversation of

[20] this.

[21]    Now, some of the same information that

[22] I'm sharing with Mr. Bard I also shared with him as

[23] far as, you know, members of the victim services will

[24] be doing follow-ups or whatever, but equally, you

1—11:48:28  24—11:49:30                          Page 473

[1] know, telling him, Here's my — you know, giving him

[2] a business card name and — Here's my name, number,

[3] equally. You know, if you need something or have

[4] questions or whatever, you know, feel free to call.

[5]    And I tell everyone the same thing.

[6] If I can tell you, I will. If I can't, I won't or

[7] will tell you I can tell you at a later time if it's

[8] still under investigation, if it's — you know, for

[9] instance, if I get the name of a person to interview

[10] and I haven't had the luxury or opportunity to

[11] interview them yet, I'm not going to share that

[12] information with anyone, other than, Yeah, I have a

[13] witness, period. And that's it.

[14]    I mean, but I don't recall any

[15] conversations whatsoever with him other than him

[16] thanking me for being there and being supportive of

[17] your, of the driver, their driver, Mr. Bard.

[18] Q: When you were speaking during the course

[19] of your interview with Mr. Bard, when you were asking

[20] him questions and he was giving you answers, did you

[21] get any indication whatsoever that he was looking at

[22] Mr. Jester for approval or looking to Mr. Jester to

[23] see how to answer a question? Did you get any

[24] indication from Mr. Bard at all that he was

[1] intimidated or looking to Mr. Jester for responses?

[2]    A: No.

[3]    Q: Okay.

[4]    A: And, actually, if he would have felt

[5] uncomfortable, I would have had Mr. Jester step out

[6] of the car.

[7]    Q: Okay. Do you give a witness that

[8] opportunity?

[9]    A: Normally, yes. I can't recall I

[10] specifically said that. But that's the normal thing

[11] that I go through, as far as if you're uncomfortable

[12] with this, you know, let me know and he won't be

[13] involved.

[14]    But I don't have a problem with him

[15] being in the — as long as I set the ground — you

[16] know, this is my field. I call the rules. As long

[17] as you abide by the rules, we're good to go. He can

[18] sit there and listen, but you're not going to

[19] participate or — unless I ask you. I mean,

[20] that's — but I don't recall if I specifically said

[21] that. But that's, I mean, that's what I normally do.

[22]    Q: Did Mr. Bard at any time tell you that he

[23] was intimidated with Mr. Jester there or ask that

[24] Mr. Jester not be there?

[1]    A: No.

[2]    Q: Okay.

[3]    A: As a follow-up to that, there was never

[4] any time during the interview that he indicated to me

[5] that he was uncomfortable with him being there.

[6]    Q: Okay.

[7]    A: And I would have immediately had him exit

[8] the car. It's not — wouldn't have been an issue.

[9]    Q: Because it's more important for you to

[10] have the statements —

[11]    A: I want him —

[12]    Q: — of the operator?

[13]    A: — to be able to tell me — if he's afraid

[14] he's going to get in trouble with UPS, I don't want

[15] him talking — I want him to tell me what he knows

[16] and what he feels — or whomever the situation is. I

[17] want the truth, bottom line. Let the cards fall as

[18] they do.

[19]    Q: Okay. Mr. Bard, in the second paragraph

[20] of your summary or your synopsis, as you call it, of

[21] the content of the interview with Mr. Bard — you

[22] took notes; is that correct?

[23]    A: Yes.

[24]    Q: All right. And we have your notes?

[1]    A: Yes.

[2]    Q: And this interview or this summary is

[3] based on your notes; is that correct?

[4]    A: Yes.

[5]    Q: So it's not verbatim from what Mr. Bard

[6] said?

[7]    A: No.

[8]    Q: It's just based on your notes?

[9]    A: Yes.

[10]    Q: According to your summary, it says that

[11] Mr. Bard stopped at the stop sign at the intersection

[12] of Montchanin Road; is that correct?

[13]    A: Yes.

[14]    Q: And that's consistent with Mr. Seiffert's

[15] recollection of what Mr. Bard did, isn't it?

[16]    A: Yes.

[17]    Q: It goes on to say, Mr. Bard stated that he

[18] could not see, moved forward, and still did not see

[19] anything coming. Mr. Bard stated that he was slowly

[20] coming out into the intersection when he suddenly saw

[21] a motorcycle approaching from his left side.

[22]    Is Mr. Bard's statement consistent

[23] with Mr. Seiffert, the independent witness?

[24]    A: Yes.

[1]    Q: Mr. Bard stated that — I'm sorry.

[2]    The motorcycle was approximately 50 to

[3] 75 feet away from him when he first saw it?

[4]    A: Yes.

[5]    Q: Do you remember Mark Bard — do you

[6] remember Mark Bard specifically saying that the

[7] motorcycle was 50 to 75 feet away?

[8]    A: Yes.

[9]    Q: Okay. Did Mr. Bard ever give

[10] you — strike that.

[11]    Mr. Bard testified that he thought

[12] that he told you — although he also testified that

[13] he was emotionally upset —

[14]    MR. van der VEEN: Objection. Come

[15] on.

[16]    BY MS. RISK:

[17]    Q: — thought that he told you that he saw —

[18] that he saw, first of all, the motorcycle on the

[19] stone bridge.

[20]    You have no recollection of Mr. Bard

[21] telling you that?

[22]    A: No.

[23]    Q: Okay. It's your recollection, or from

[24] your notes, that Mr. Bard told you 50 to 75 feet from

**1—11:52:52  24—11:53:37          Page 478**

[1] the —

[2] **A:** Yes.

[3] **Q:** — from the truck?

[4] **A:** Yes.

[5] **Q:** Okay. Are you aware that Mr. Bard had no

[6] idea up until the spring of this year how far the

[7] stone bridge actually was from his truck?

[8]   MR. van der VEEN: Objection.

[9] THE WITNESS: Would that surprise me?

[10]           BY MS. RISK:

[11] **Q:** Would that surprise you?

[12] **A:** No —

[13] **Q:** No?

[14] **A:** — because he was estimating. And I don't

[15] know him from Adam. I don't know how good he is at

[16] estimating distance. So to tell me that, no, it

[17] wouldn't surprise me.

[18]   **Q:** And certainly it wouldn't surprise you;

[19] you wouldn't think that someone was intentionally

[20] lying if they came forward and said, I have no idea

[21] that it was that far away until I paced it out

[22] walking with my wife?

[23] **A:** No.

[24] **Q:** He did tell you, though, or according to

**1—11:53:39  24—11:54:29          Page 479**

[1] the report, he used the words "the motorcycle was

[2] flying"?

[3] **A:** Yes.

[4] **Q:** And he also told you the headlights of the

[5] motorcycle were on; is that correct?

[6] **A:** Yes.

[7] **Q:** And that the motorcycle operator was

[8] wearing a helmet; is that correct?

[9] **A:** Yes.

[10] **Q:** The next sentence on page 12 after "the

[11] operator was wearing a helmet," a female witness

[12] arrived at the scene and identified herself as a

[13] nurse, identified as Witness No. 1, Mrs. Amy

[14] Stratton.

[15]   As we sit here today, it's your

[16] understanding that Miss Stratton was not the nurse

[17] who arrived on the scene first; isn't that correct?

[18] **A:** Correct.

[19] **Q:** Miss Stratton was actually the operator of

[20] the vehicle who was driving southbound behind

[21] Mr. Vascek; correct?

[22] **A:** Correct.

[23] **Q:** And is it your understanding that the

[24] witness who arrived and identified herself as a nurse

**1—11:54:33  24—11:55:25          Page 480**

[1] was, in fact, Karen Garroway?

[2] **A:** Yes.

[3] **Q:** And you had the opportunity to interview

[4] Karen Garroway on the telephone, didn't you?

[5] **A:** Yes. Follow-up phone calls, yes.

[6] **Q:** And did someone at the scene — how did

[7] you get Karen Garroway's contact information?

[8] **A:** Sergeant Cox's supplemental report and

[9] notes.

[10] **Q:** So someone at the scene informed Sergeant

[11] Cox that there had been a nurse on the scene?

[12] **A:** Yes.

[13] **Q:** Was Karen Garroway at the scene when you

[14] arrived?

[15] **A:** No.

[16] **Q:** Was Kristin DiPaolo at the scene when you

[17] arrived?

[18] **A:** No.

[19] **Q:** Was Amy Stratton at the scene when you

[20] arrived?

[21] **A:** No.

[22] **Q:** So she left. Sergeant Cox interviewed

[23] Miss Stratton on the telephone?

[24] **A:** I'm not sure where he interviewed her.

**1—11:55:28  24—11:57:48          Page 481**

[1] Let me look at his — I have his field notes. Let me

[2] find his supplement. I'm not sure where the

[3] interview was conducted.

[4]   (Discussion held off the record.)

[5] THE WITNESS: She was at the scene.

[6]           BY MS. RISK:

[7] **Q:** Okay. So she was at the scene when

[8] Sergeant Cox arrived?

[9] **A:** Correct.

[10] **Q:** But she wasn't at the scene when you were

[11] there?

[12] **A:** Well, she probably was. But I don't

[13] recall where she was located, and I didn't conduct

[14] the interview. I wasn't — I was focusing on

[15] Mr. Bard. And it's evident, obviously, in his

[16] supplement he interviewed her at the scene. But I

[17] never had any contact with her at the scene.

[18] **Q:** Okay. All right. Back to your interview

[19] with Mr. Bard.

[20]   Mr. Bard told you that someone

[21] instructed him to move the truck back to provide

[22] space for the fallen motorcycle operator; is that

[23] correct?

[24] **A:** Yes.