**1—11:57:50  24—11:59:05**     Page 482

[1]    **Q:** All right. And he told you that he did
[2] move the — he backed up the truck and moved it from
[3] its original resting position; correct?
[4]    **A:** Yes.
[5]    **Q:** He also told you that the motorcycle was
[6] moved, didn't he? Up at the — the statement is
[7] after — here's the statement: The truck was backed
[8] up and moved from its original position. The nurse
[9] removed the operator's helmet and began attending to
[10] his medical needs. Others assisted at the scene by
[11] moving the motorcycle away as well?
[12]    **A:** Yes. Sorry. I couldn't find it.
[13]    **Q:** He told you that the motorcycle operator
[14] was initially face down on the pavement, didn't he?
[15]    **A:** Yes.
[16]    **Q:** And you asked him if he wore glasses;
[17] correct?
[18]    **A:** Correct.
[19]    **Q:** And he told you he didn't wear glasses?
[20]    **A:** Correct.
[21]    **Q:** When Mr. van der Veen asked you earlier if
[22] you were aware that he had prescription reading
[23] glasses —
[24]    MR. van der VEEN: Objection to the

**1—11:59:05  24—11:59:38**     Page 483

[1] form of the question.
[2]    MS. RISK: I haven't asked a question
[3] yet.
[4]    MR. van der VEEN: I never said
[5] "prescription." I already know your question is
[6] wrong without finishing it.
[7]    MS. RISK: Well, I would disagree.
[8] But I will not make the court reporter go back and
[9] look.
[10]    **BY MS. RISK:**
[11]    **Q:** Mr. Bard, would you —
[12]    MR. van der VEEN: He can do a word
[13] search.
[14]    **BY MS. RISK:**
[15]    **Q:** Would you ask — you can see that I'm
[16] sitting here with reading glasses today. If you were
[17] to ask me on the road, relating to my driving, if I
[18] wore glasses, and I tell you "no," would that —
[19] would you assume that I was lying if I did that?
[20]    **A:** No.
[21]    **Q:** Okay. Are reading glasses —
[22]    MR. van der VEEN: Objection to the
[23] form of the question.
[24]    **BY MS. RISK:**

**1—11:59:38  24—12:00:21**     Page 484

[1]    **Q:** Are reading glasses necessary, in your
[2] understanding, in the operation of a vehicle?
[3]    **A:** No.
[4]    MR. van der VEEN: Objection to the
[5] form of the question.
[6]    **BY MS. RISK:**
[7]    **Q:** So when Mr. Bard told you that he didn't
[8] wear glasses, you understood that to mean he didn't
[9] wear glasses?
[10]    **A:** To operator a vehicle.
[11]    **Q:** To operate a vehicle. Thank you.
[12]    Mr. Bard told you that he'd been
[13] assigned to this route for over two years?
[14]    **A:** Yes.
[15]    **Q:** And that he was with UPS for approximately
[16] 25 years; correct?
[17]    **A:** Yes.
[18]    **Q:** And that he had been driving for 20 years;
[19] is that correct?
[20]    **A:** Of those, yes.
[21]    **Q:** Of the 25 years.
[22]    He told you that the motorcycle was
[23] traveling at a high rate of speed?
[24]    **A:** Yes.

**1—12:00:22  24—12:01:03**     Page 485

[1]    MR. van der VEEN: Objection to the
[2] form of the question.
[3]    **BY MS. RISK:**
[4]    **Q:** Did you — did Mr. Bard tell you that the
[5] motorcycle was traveling at a high rate of speed?
[6]    MR. van der VEEN: Objection to the
[7] form of the question.
[8]    THE WITNESS: Yes.
[9]    **BY MS. RISK:**
[10]    **Q:** Did you ask Mr. Bard how fast the
[11] motorcycle was going?
[12]    **A:** Yes.
[13]    **Q:** And what did he say to you?
[14]    **A:** He estimated approximately 80 miles per
[15] hour.
[16]    **Q:** Did he tell you — did he use the words
[17] "high rate of speed"?
[18]    **A:** Yes.
[19]    **Q:** Did he also use the words "80 miles per
[20] hour"?
[21]    **A:** Yes.
[22]    **Q:** Mr. Bard testified the other day that he
[23] thought he told you the motorcycle was going a
[24] hundred miles an hour.

---

1—12:01:04  24—12:01:49                                    Page 486

[1]    That's not your recollection, is it?

[2]    A: I would have — no. I would have written

[3]  it.

[4]    Q: You would have written "a hundred miles an

[5]  hour"?

[6]    A: Because a hundred is obviously much more

[7]  substantial than 80.

[8]    Q: Than 80. Okay.

[9]    Mr. Bard also told you that he was a

[10]  motorcycle operator himself, didn't he?

[11]    A: Yes.

[12]    Q: And did you take that into consideration

[13]  when you assessed his rendition of how the accident

[14]  happened?

[15]    MR. van der VEEN: Objection to the

[16]  form of the question.

[17]    THE WITNESS: Absolutely.

[18]              BY MS. RISK:

[19]    Q: And his observations of the motorcycle?

[20]    A: Absolutely.

[21]    Q: Okay. Because — is that because someone

[22]  who operates a motorcycle or who has operated a

[23]  motorcycle is more familiar with the operation and

[24]  the dynamics of a motorcycle?

---

1—12:01:51  24—12:03:08                                    Page 487

[1]    A: Exactly. Everyone says motorcycles fly.

[2]  But when someone who has experience, to whatever

[3]  degree, that has more bearing by just their own

[4]  observations of what they're saying.

[5]    Q: And is there also —

[6]    A: I'm not putting it on a scale and saying,

[7]  All right. It's a ten as opposed to a 5. But if you

[8]  tell me you operate a motorcycle and you have

[9]  experience and how long you've been operating a

[10]  motorcycle, if you tell me how fast the vehicle's

[11]  traveling, that, to me as an investigator, has a

[12]  little more bearing than somebody standing on a

[13]  street corner who's never ridden a motorcycle in

[14]  their life and says "80 miles an hour."

[15]    I mean, I'm not — what they say, they

[16]  say. But looking at the overall weight by him being

[17]  an experienced — stating that he's an experienced

[18]  motorcycle operator has a little more bearing than if

[19]  he said he hadn't.

[20]    Q: Mr. Seiffert testified that he has also

[21]  been a motorcycle operator. Mr. Seiffert never told

[22]  you that in the course of your interview with him,

[23]  did he?

[24]    A: I don't believe he did.

---

1—12:03:10  24—12:04:01                                    Page 488

[1]    Q: That's not a question you would normally

[2]  ask a witness at an accident scene?

[3]    A: No.

[4]    Q: Okay. If — knowing that Mr. — with the

[5]  understanding that Mr. Seiffert testified that he has

[6]  operated motorcycles and has motorcycle experience,

[7]  does that also affect your, the weight that you would

[8]  give what Mr. Seiffert told you at the scene the next

[9]  day?

[10]    MR. van der VEEN: Objection to the

[11]  form of the question.

[12]    THE WITNESS: Yes.

[13]              BY MS. RISK:

[14]    Q: About the scene the next day; I'm sorry.

[15]    So Mr. Seiffert's description of how

[16]  the motorcycle was elevating up, the dynamics of the

[17]  position of the motorcycle as well as the speed, you

[18]  would give that more weight because you would

[19]  understand that Mr. Seiffert has experience with

[20]  motorcycles; is that correct?

[21]    MR. van der VEEN: Objection to the

[22]  form of the question.

[23]    THE WITNESS: I would give it more

[24]  weight for two reasons: one, for that reason, of his

---

1—12:04:05  24—12:05:08                                    Page 489

[1]  experience; and secondly, that he's an independent

[2]  witness as opposed to being an operator of — someone

[3]  that's involved in the collision. He has nothing to

[4]  lose or gain. So he's going to have a little more

[5]  weight of his comments —

[6]    MR. van der VEEN: Uh-huh.

[7]    THE WITNESS: — because of he's

[8]  telling, through now you, explaining that he does

[9]  have motorcycle experience. But he also is an

[10]  independent witness.

[11]    MR. van der VEEN: Uh-huh.

[12]    THE WITNESS: And whatever he sees and

[13]  whatever he says he saw, even, you know, it has more

[14]  bearing because he's an independent — he doesn't

[15]  know Mr. Bard or Mr. Vascek, other than from this now

[16]  incident that's altered all their lives. But he has

[17]  a little more bearing of what he's telling me as far

[18]  as weight, yeah.

[19]              BY MS. RISK:

[20]    Q: The weight of what he told you when you

[21]  interviewed him the day after the accident?

[22]    A: Yes.

[23]    Q: The next sentence in your summary of

[24]  Mr. Bard's interview: He never heard the motorcycle

---

---

**1—12:05:12  24—12:05:53**                                    Page 490

[1] approaching prior to the crash.

[2]     That's Mr. Bard never heard the

[3] motorcycle; is that correct?

[4]     **A:** Correct.

[5]     **Q:** Did you ask Mr. Bard if he heard the

[6] motorcycle?

[7]     **A:** Yes.

[8]     **Q:** And that's — he answered "no"?

[9]     **A:** Correct.

[10]     **Q:** That's not something he offered to you?

[11]     **A:** No.

[12]     **Q:** And that's consistent with, again,

[13] Mr. Seiffert's testimony that he didn't hear the

[14] motorcycle prior to the collision either?

[15]     **A:** Correct.

[16]     **Q:** The door of the UPS truck was open, and he

[17] was wearing his seat belt; is that correct?

[18]     **A:** Yes, what he said.

[19]     **Q:** He stated that he had no injuries. And in

[20] parens you have "physical"?

[21]     **A:** Yes.

[22]     **Q:** Did he say, "I have no physical injuries,"

[23] or did you add the word "physical"?

[24]     **A:** He said he was upset.

---

**1—12:05:54  24—12:06:50**                                    Page 491

[1]     **Q:** So you added the word "physical" as

[2] opposed to "mental"?

[3]     **A:** Meaning no — correct; emotional.

[4]     **Q:** Mr. Bard told you that he was emotionally

[5] upset —

[6]     **A:** Yes.

[7]     **Q:** — as well as appearing —

[8]     **A:** Yes.

[9]     **Q:** — to be —

[10]     (Discussion held off the record.)

[11]          BY MS. RISK:

[12]     **Q:** The UPS truck was not equipped with a

[13] safety air bag system; that's your statement in here.

[14] That's based on Mr. Bard's statement to you?

[15]     **A:** Yes.

[16]     **Q:** Okay. Mr. Bard told you that he had not

[17] consumed any alcohol or medications; is that true?

[18]     **A:** Yes.

[19]     **Q:** And that's consistent with the results of

[20] the voluntary portable blood-alcohol test that you

[21] gave him or that was administered to him at the

[22] scene?

[23]     **MR. van der VEEN:** Objection to the

[24] form of the question.

---

**1—12:06:50  24—12:07:36**                                    Page 492

[1]     THE WITNESS: Yes.

[2]          BY MS. RISK:

[3]     **Q:** Mr. Bard told you that he went to bed

[4] approximately 2200 hours military time; that would be

[5] 10:00 o'clock; is that fair?

[6]     **A:** Yes.

[7]     **Q:** And that he got up at 6:10 in the morning?

[8]     **A:** The following morning, yes.

[9]     **Q:** And he told you that he got a good night's

[10] sleep and that he was well rested —

[11]     **A:** Yes.

[12]     **Q:** — is that correct?

[13]     How did he describe his health?

[14]     **A:** He said he was in good health. These are

[15] questions that I asked. I prod. I'm — basically

[16] the questions I ask, I said, Well, how would you

[17] consider the evening? Were you interrupted, or was

[18] it complete through the night? Do you feel you — do

[19] you consider yourself well rested? I threw out an

[20] array of questions or of words. And his response was

[21] he was well rested.

[22]     I said, Are you tired?

[23] He said that he wasn't tired. And he

[24] indicated that he had gotten a good night's sleep,

---

**1—12:07:39  24—12:08:32**                                    Page 493

[1] exactly what it says in the report.

[2]     And the other reason, the question

[3] that I always, normally always try to remember to ask

[4] is health, if you're on medication, if you're under

[5] the weather, if you've just seen a physician for

[6] something or whatever, it could play a factor in the

[7] crash. And that's why I ask, giving them the

[8] opportunity. That's not something he would just or

[9] anyone would normally say, Well, I'm in good health

[10] today. I asked. But he said he was in good health.

[11]     **Q:** Okay.

[12]     **A:** As well as the next question I ask is, Can

[13] you estimate — I mean, I know what time the fire

[14] board got the call, and I know what time Recom got

[15] the call. But to your memory of everything that's

[16] happened, what time do you think, approximately, the

[17] collision occurred?

[18]     And his response was 4:00.

[19]     **Q:** 4:00 o'clock?

[20]     **A:** 4:00 p.m.

[21]     **Q:** How much of this interview as it is

[22] summarized in your report is a result of your direct

[23] questions to Mr. Bard?

[24]     **MR. van der VEEN:** Objection to the

---

1—12:08:32  24—12:09:35                    Page 494

[1] form of the question.

[2]     THE WITNESS: About one-quarter.

[3]         BY MS. RISK:

[4]     Q: Okay.

[5]     A: And their questions are — I mean, I ask

[6] questions, and then whatever they say is what I

[7] write. If I need to clarify, I mean, like I said,

[8] these questions here, these are solicited by me. I

[9] mean, I'm asking a standard: Have you had anything

[10] to drink? Have you consumed any alcohol? How much

[11] sleep? Et cetera, et cetera.

[12]     About three-quarters of the

[13] conversation or the interview is I'm, I'm prodding

[14] with an initial question and then I let them talk.

[15] And while they're talking, I'm jotting things down.

[16]     And then when I go back, Sir, well, so

[17] let me — let me go over this again. You're telling

[18] me that you are located here and you did this, this,

[19] and this. And that's during the exchange of when,

[20] when you look at the notes, you'll see things bounced

[21] around.

[22]     When we make a clarification of

[23] something that he said back here, I'm writing it back

[24] here when he said it. Then further in as the

1—12:09:37  24—12:10:49                    Page 495

[1] interview continues, like the deposition, as we go —

[2] and I'll say, Well, you're saying 80 mile an hour,

[3] Or you're saying you completely stopped, or whatever.

[4] It's just clarification. But the majority of, of

[5] everything there, about three-quarters of it is, by

[6] their admission, just voluntarily talking.

[7]     Q: You had occasion — let me go back.

[8]     The summary that you have here in

[9] police report, is that a fair and accurate summary of

[10] your conversation, the sum and substance of your

[11] conversation with Mr. Bard at the scene that day?

[12]     A: Yes.

[13]     Q: Then you had occasion to follow up with

[14] Mr. Bard?

[15]     A: Yes.

[16]     Q: And when did you do that?

[17]     A: Would have been Wednesday morning,

[18] February 9th, 2005, at approximately five minutes

[19] after 8:00 a.m.

[20]     Q: And according to your conclusion time,

[21] that conversation for the interview lasted about 15

[22] minutes; is that fair?

[23]     A: Yes.

[24]     Q: All right. What did Mr. Bard — what did

1—12:10:52  24—12:12:05                    Page 496

[1] you discuss with Mr. Bard during that follow-up

[2] interview?

[3]     A: We went over the initial interview and,

[4] again, stating from first questioning, the

[5] highlights, not going over every tiny little, you

[6] know, was the air bag deployed or no meds and things.

[7] But going — when I say, Confirm the original

[8] statement, it's dealing with the substance relating

[9] to the crash itself, not all the other things that

[10] externally contribute.

[11]     Q: Uh-huh.

[12]     A: But, like, you know, you're traveling, the

[13] estimate of the speed of the vehicle and what

[14] happened.

[15]     And then there were a couple other

[16] questions that were asked because what happens is

[17] during the course of it, the investigation, other

[18] questions are asked by other witness or statements

[19] are provided that sometimes solicit other questions,

[20] follow-up questions, like, Well — and in this case

[21] there was a question as to whether or not he had or

[22] had not — question was — assisted with CPR.

[23]     And I wouldn't have had a reason to

[24] ask that initially or wouldn't have had any knowledge

1—12:12:07  24—12:12:52                    Page 497

[1] to even know why to ask that initially. But if —

[2] sometimes family members contact us and ask

[3] questions. So for — we do follow-up phone calls and

[4] say, you know, Well, do you remember if you did or

[5] you didn't? Whatever the questions are.

[6]     Q: And in this case the question that you

[7] asked Mr. Bard about whether or not he helped or

[8] assisted with providing CPR was, in fact, prompted by

[9] the family members requesting that information,

[10] wasn't it?

[11]     A: Yes.

[12]     MR. van der VEEN: Objection to the

[13] form of the question.

[14]         BY MS. RISK:

[15]     Q: Specifically Mrs. Vascek?

[16]     A: Yes.

[17]     Q: Okay. Mr. Bard told you in his follow-up

[18] interview that the motorcycle had been moved from its

[19] original final resting position after the collision

[20] occurred; correct?

[21]     A: Yes.

[22]     Q: And that was consistent with the

[23] information that you had from him prior to this

[24] interview; correct?

1—12:12:53  24—12:14:05                          Page 498

[1]  A: Yes.

[2]  Q: And then he also — and he told you that
[3] he was instructed to move the UPS truck by one of the
[4] nurses that arrived at the collision and was
[5] attending to the injured motorcycle operator; is that
[6] correct?

[7]  A: Yes.

[8]  Q: And it was your understanding that one of
[9] the nurses had asked him to move it because — to
[10] facilitate their —

[11]  A: Medical assistance.

[12]  Q: — helping Mr. Vascek?

[13]  A: Yes.

[14]  Q: Medical assistance; fair.

[15]   And he told you that he moved the
[16] truck?

[17]  A: Yes.

[18]  Q: Did he tell you how far he moved the
[19] truck?

[20]  A: He didn't say specifically how far he
[21] moved it. It's my understanding through the comments
[22] of the nurses that it was moved back a couple of
[23] feet. But he never specifically stated, and I don't
[24] have anything — that's just in the back of my head

---

1—12:14:08  24—12:14:52                          Page 499

[1] for some reason that it was, that it was just moved
[2] back. But he didn't give me a "feet."

[3]  Q: And if I were to represent to you that
[4] both Mr. Bard and Mr. Seiffert testified that the UPS
[5] truck was moved back approximately two and a half to
[6] three feet, that would be consistent with your
[7] recollection of what the nurses or your recollection
[8] of how far the truck was moved?

[9]  MR. van der VEEN: Objection to the
[10] form of the question. That assumes two movings in
[11] one question. There's the time he moved it when
[12] Seiffert told him, and there's the time he moved it
[13] when the nurses told him. And the nurses weren't
[14] there at that time.

[15]  MS. RISK: Why, Mr. van der Veen, I do
[16] believe you are indulging in a speaking objection —

[17]  MR. van der VEEN: No. I'm helping
[18] you.

[19]  MS. RISK: — as I will remind you, we
[20] are here under the Federal Rules.

[21]  MR. van der VEEN: No. I'm helping
[22] you.

[23]  MS. RISK: The question was, with
[24] specific regard —

---

1—12:14:54  24—12:15:38                          Page 500

[1]  MR. van der VEEN: You're just asking
[2] the same questions over and over again. I'm trying
[3] to help you clarify them.

[4]  MS. RISK: Mr. van der Veen, please.
[5] I do not need your help. Someone who has sat here
[6] for over eight hours asking questions, I think that I
[7] have — I should have your cooperation and your
[8] patience. Excuse me.

[9]  MR. van der VEEN: You were getting my
[10] cooperation.

[11]       BY MS. RISK:

[12]  Q: Corporal Weaver, we were talking about the
[13] instance when the truck was moved rearward because
[14] the nurses — or a nurse had requested it be moved to
[15] help with the medical treatment they were giving —

[16]  A: Yes.

[17]  Q: — to Mr. Vascek, that specific moving of
[18] the UPS vehicle. And you told me that it was your
[19] understanding from the back of your mind from the
[20] nurse or someone it had just been moved a couple of
[21] feet?

[22]  A: Correct.

[23]  Q: My question to you is, if I were to
[24] represent to you that both Mr. Bard and Mr. Seiffert

---

1—12:15:42  24—12:16:29                          Page 501

[1] have testified that the UPS truck was moved on that
[2] occasion two and a half to three feet, is that
[3] consistent with your recollection or your
[4] understanding of how far the truck was moved as a
[5] result of being requested to move by the nurses?

[6]  MR. van der VEEN: Objection;
[7] mischaracterization of Mr. Seiffert's testimony.

[8]   You can answer.

[9]  THE WITNESS: Yes.

[10]       BY MS. RISK:

[11]  Q: Thank you.

[12]  MS. RISK: It's not a
[13] mischaracterization.

[14]       BY MS. RISK:

[15]  Q: Okay. Mr. Bard also told you that he
[16] assisted another person with moving the motorcycle
[17] away from the accident scene?

[18]  A: Yes.

[19]  Q: Is it your understanding he did that also
[20] for purposes of the nurses rendering medical help?

[21]  A: Yes.

[22]  Q: Okay. Did Mr. Bard tell you how far he
[23] moved the motorcycle?

[24]  A: Not in feet, no.

---

UPS & Bard                                                Vol. 2, August 22, 200

---

1—12:16:33  24—12:17:35                      Page 502

[1]  Q: Did you see physical evidence at the scene
[2] that was consistent — that would be consistent with
[3] movement, moving the motorcycle across the roadway?
[4]  A: Yes.
[5]  Q: And what physical evidence did you find at
[6] the scene?
[7]  A: Light scratch marks from the pegs of the
[8] vehicle in the down position.
[9]  Q: Okay. Did you photograph that, those
[10] scratches?
[11]  A: They're in the photographs of this
[12] investigation, yes.
[13]  Q: And is that consistent also with physical
[14] damage to the left side peg of the motorcycle —
[15]  A: Yes.
[16]  Q: — that you have noted in the report?
[17]  A: Yes.
[18]  Q: Okay. Mr. Bard — also during this
[19] follow-up interview with Mr. Bard — told you that he
[20] gripped — when he saw the motorcycle, he gripped the
[21] steering wheel; is that correct?
[22]  A: Yes.
[23]  Q: He slammed on the brakes and held on for
[24] impact?

---

1—12:17:35  24—12:19:04                      Page 503

[1]  A: Yes.
[2]  Q: Did Mr. Bard offer that information to
[3] you, or was that information a result of a specific
[4] question that you asked Mr. Bard?
[5]  A: I don't recall. That probably was — by
[6] looking at the notes that I took — was follow-up
[7] questions that I had asked in regards to
[8] clarification of what happened at the scene at that
[9] point.
[10]  Q: Okay. Mr. Bard told you that the
[11] motorcycle struck the truck instantly after he saw
[12] it?
[13]  A: Yes.
[14]  Q: Okay. Is that the result of a question
[15] that you asked him?
[16]  A: I'd have to say probably. I can't — I'm
[17] not a hundred percent sure. It would probably have
[18] been in the form of a question as to how much time
[19] from the time, you know, you first saw the impact and
[20] you applied your brakes, I mean, a series of
[21] questions.
[22]  But I can't say whether or not it
[23] was — every one of these is a specific question or a
[24] combination that was prodded by my follow-up

---

1—12:19:06  24—12:20:02                      Page 504

[1] conversations with him from other things that I had
[2] learned through the course of the investigation and
[3] questions that had been asked by family members
[4] through the victim service representative to me.
[5]  Q: When Mr. Bard used the word "instantly,"
[6] is that his word?
[7]  A: Yes.
[8]  Q: Okay. He also told you that the impact
[9] knocked the truck sideways and almost knocked him out
[10] of his seat; is that correct?
[11]  A: Yes.
[12]  Q: Was the information that he offered to
[13] you, or was that as a result of a specific question
[14] that you asked?
[15]  A: The first part would have been — said
[16] held on and knocked — the vehicle was knocked
[17] sideways, that could have been asked by me. The
[18] combination of things that followed after that would
[19] have been comments that I — best of my memory is
[20] that he just, he said that he was almost knocked out
[21] of his seat and had he not had his seat belt on, he
[22] wouldn't have stayed where he stayed.
[23]  Q: Is Mr. Bard's statement that the impact
[24] knocked the truck sideways and almost knocked him out

---

1—12:20:06  24—12:21:06                      Page 505

[1] of his seat consistent with physical evidence that
[2] you found at the scene?
[3]  MR. van der VEEN: Objection to the
[4] form of the question.
[5]  THE WITNESS: Yes.
[6]
[7]  BY MS. RISK:
[7]  Q: And what physical evidence that you found
[8] at the scene is that statement consistent with?
[9]  A: It would be consistent with the damage to
[10] the truck, considering the dynamics of a vehicle
[11] striking a vehicle from the direction in which it did
[12] and in the manner in which it did. But the vehicle
[13] being up and face down with the body —
[14]  Q: I don't want to interrupt you, but when
[15] you say, Vehicle up, down with the body —
[16]  A: Meaning the rear wheel in the air, front
[17] wheel in the ground and Mr. Vascek being pinned, the
[18] word I used — and that was my descriptive word — of
[19] a sandwich, trying to describe in words what
[20] happened. To cause that amount of damage, it had to
[21] have been, from his description, an impact enough to
[22] cause that — I mean, the jolt to rock the, the UPS
[23] van.
[24]  Q: Was there any other physical evidence at

---

1—12:21:08  24—12:22:10                    Page 506

[1] the scene that you had to corroborate the vehicle,
[2] UPS vehicle moving sideways —
[3]    A: The mark on the road.
[4]    Q: — being knocked sideways?
[5]    A: The mark on the roadway is evident that
[6] the vehicle had to have been pushed to — enough to
[7] have left a mark.
[8]    Q: And you're referring to the tire mark from
[9] the right tire of the UPS vehicle?
[10]   A: Yes.
[11]   Q: Is it your understanding that when Amy
[12] Stratton came upon the scene, she observed that the
[13] UPS truck was rocking?
[14]   A: Was still rocking, that was my
[15] understanding of that interview, yes.
[16]   Q: That's what she told Sergeant Cox; that's
[17] your understanding?
[18]   A: And through Sergeant Cox conveying that to
[19] me.
[20]   Q: And that statement is consistent both with
[21] Mr. Bard saying that he was knocked sideways, with
[22] the damage to UPS vehicle's left fender, as well as
[23] the physical evidence of the tire mark from the right
[24] tire; correct?

1—12:22:11  24—12:22:57                    Page 507

[1]    A: Yes.
[2]    Q: Mr. Bard told you that his seat belt kept
[3] him in the driver's seat?
[4]    A: Yes.
[5]    Q: And that he estimated that the truck was
[6] moved sideways approximately one foot; is that
[7] correct?
[8]    A: Yes.
[9]    Q: Okay. Was that based on a question that
[10] you asked him or was that —
[11]   A: That would have been directed. That's
[12] something that when we get into specifics of feet,
[13] that's normally something that I — I mean, I can't
[14] be 100 percent, but I'm about 99 percent sure that
[15] that was a question that I asked: Can you estimate
[16] how far the vehicle was moved by the impact?
[17]   Q: And Mr. Bard told you that he thought his
[18] estimation was correct because of the tire mark at
[19] the collision scene from the right tire; is that
[20] correct?
[21]   A: Correct.
[22]   Q: Now, he offered that information on the
[23] telephone, or was that the result of a question you
[24] asked him?

1—12:23:02  24—12:41:35                    Page 508

[1]    A: If it's confirmed, it means I asked him —
[2]    Q: Okay.
[3]    A: — thinking out loud now.
[4]    (Discussion held off the record.)
[5]            RECESS
[6]        BY MS. RISK:
[7]    Q: Corporal Weaver, I wanted to talk to you a
[8] little bit about your interview of Colton Swift.
[9]    A: Okay.
[10]   Q: Mr. Swift was — well, first of all,
[11] what's the date of your interview of Mr. Swift?
[12]   A: That interview occurred on Thursday
[13] afternoon, February 3rd, 2005, at approximately 1255
[14] hours, or 5 minutes before 1:00 p.m. in the
[15] afternoon.
[16]   Q: And based on the conclusion time of 1310
[17] hours, that would have been about 15 minutes —
[18]   A: Yes.
[19]   Q: — is that correct?
[20]   A: Yes.
[21]   Q: And this is a synopsis of the content of
[22] your interview of Mr. Swift?
[23]   A: Yes.
[24]   Q: What's the purpose of your going to see

1—12:41:38  24—12:42:33                    Page 509

[1] Mr. Swift?
[2]    A: My contact for him was to do a follow-up
[3] from information that had been provided in the course
[4] of the investigation regarding the motorcycle.
[5]    Q: I'm sorry. This was a telephone
[6] interview, wasn't it?
[7]    A: Yes.
[8]    Q: So you didn't go to see Mr. Swift?
[9]    A: No.
[10]   Q: And the purpose was for you to find out
[11] more about the bicycle — about the motorcycle?
[12]   A: Find some information about the
[13] motorcycle, which I didn't realize it's in here. But
[14] I didn't know at the time that the motorcycle had
[15] been totaled. He voluntarily gave me that
[16] information.
[17]   But the purpose of the conversation
[18] was to ask him some specific questions regarding the
[19] particular motorcycle involved in this collision,
[20] capabilities, what it can do, or in relationship to
[21] what it was described to have done, for my own
[22] purpose, to get some information as to what type of
[23] speeds would require it to do what it did.
[24]   Q: When you were talking about what was

1—12:42:34  24—12:43:38                              Page 510

[1] described that it was done, you're talking about
[2] Mr. Seiffert's description of the position of the
[3] rear wheel and the motorcycle from the time he saw it
[4] until the time of impact; correct?
[5]    A: Yes.
[6]    MR. van der VEEN: Objection to the
[7] form of the question.
[8]                BY MS. RISK:
[9]    Q: What did you ask Mr. Swift?
[10]    A: I mean, basic information: who he is,
[11] what his job title is, what he does for Honda East.
[12] I've contacted Honda East and other dealerships in
[13] many variations of — in investigations over the
[14] course of the year. Other — I mean, call
[15] dealerships, that's not uncommon for us to do to get
[16] specifications or information from the manufacturer
[17] of a particular vehicle.
[18]    Asked him who he was and got that
[19] basic information; asked him how long he'd been
[20] working for them, of which he said since 1994. I'm
[21] sorry. He has motorcycle experience since 1994; that
[22] he'd been working for Honda East since 2000.
[23]    He gave me an estimate as to what the
[24] damage was to the vehicle, between 2500 to $4,000,

1—12:43:41  24—12:45:03                              Page 511

[1] and also indicated that it was totaled.
[2]    He said that the framework was not
[3] bent and that the brake system was very good on the
[4] bike as far as capabilities and what that bike would
[5] do. And then he gave a description, when I was
[6] trying to get an idea of a range of speeds or
[7] describing what was described to me to him, by what
[8] was described to me by Mr. Seiffert's observations,
[9] this was the information that I — the reason for the
[10] call, to find out exactly what type of speeds would
[11] be necessary to have a bike do what it did as it was
[12] described in this crash.
[13]    Q: Okay. And what did Mr. Swift tell you
[14] about the movement of the rear wheel with respect to
[15] the bike and speed?
[16]    A: He said that the bike has the ability to
[17] perform stoppies, and I put in parentheses what he
[18] meant was that the front wheel stops. At lower
[19] speeds, he estimated between 20 to 25 miles per hour,
[20] provide the ability to get the rear tire to pop off
[21] of the ground at a low height or hop.
[22]    Q: Is that when he was — when Mr. Swift was
[23] telling you about lower speeds, between 20 to 25
[24] miles an hour, allowing the rear tire to pop off of

1—12:45:08  24—12:46:02                              Page 512

[1] the ground, is that the type of movement or dynamics
[2] that we're talking about in this accident?
[3]    A: No.
[4]    Q: Okay. Did you describe the dynamics of
[5] this accident to Mr. Swift?
[6]    A: Yes.
[7]    Q: And did you describe, in essence,
[8] Mr. Seiffert's observations of the motorcycle
[9] dynamics?
[10]    A: Yes.
[11]    Q: And did Mr. Swift have any observations
[12] about the speed component with regard to this
[13] specific motorcycle, based on your description to him
[14] of the dynamics of this?
[15]    A: Yes.
[16]    Q: And what was it?
[17]    A: He indicated that by my description of
[18] what I gave him, based on what Mr. Seiffert provided
[19] as well as what the rest of the investigation I knew
[20] at that point, he said higher speeds, more
[21] significant — for higher, more significant speeds
[22] are needed to bring the rear tire up off the ground
[23] into a stopple position, is what he called it, a
[24] stoppie position.

1—12:46:02  24—12:46:48                              Page 513

[1]    Based on the description of the
[2] dynamics of this investigation, Mr. Swift estimated
[3] that the speed of the motorcycle would have to have
[4] been approximately 50 to 60 miles per hour or higher
[5] to get the bike to do what it did in this collision
[6] as I described it to him.
[7]    Q: And that would be bringing the rear wheel
[8] up off of the pavement and the rear wheel in a
[9] progressive manner going up into the air to end up
[10] perpendicular to the road — the bicycle to end up
[11] perpendicular to the road?
[12]    MR. van der VEEN: Objection.
[13]                BY MS. RISK:
[14]    Q: Is that a fair representation of
[15] Mr. Seiffert's observations?
[16]    A: Yes.
[17]    MR. van der VEEN: Objection to the
[18] form of the question.
[19]                BY MS. RISK:
[20]    Q: And Mr. Swift told you that it would take
[21] a speed of 50 to 60 miles per hour or higher to be
[22] able to do that?
[23]    A: Yes.
[24]    MR. van der VEEN: Objection.

**1—12:46:49  24—12:47:35**                      Page 514

**BY MS. RISK:**

[2]   Q: Is that speed approximation by Mr. Swift
[3] with regard to this specific motorcycle and its
[4] capabilities, is that consistent with the other facts
[5] that you collected in this case, both the physical
[6] evidence as well as the testimony of all of the
[7] witnesses?
[8]   MR. van der VEEN: Objection to the
[9] form of the question.
[10]   THE WITNESS: Yes.
[11]   **BY MS. RISK:**
[12]   Q: And that would be that Mr. Vascek's speed
[13] was in excess of 50 to 60 miles an hour —
[14]   MR. van der VEEN: Objection to the
[15] form of the question. That's —
[16]   **BY MS. RISK:**
[17]   Q: — when Mr. Seiffert first saw him?
[18]   MR. van der VEEN: Objection to the
[19] form of the question. It assumes testimony that this
[20] officer clearly said he can't give.
[21]   MS. RISK: It's a poorly worded
[22] question. I'll ask it again.
[23]   **BY MS. RISK:**
[24]   Q: Is Mr. Swift's estimate of the speed

**1—12:47:39  24—12:48:46**                      Page 515

[1] consistent, not the exact speed, but speeds in excess
[2] of the 40-mile-per-hour speed limit, consistent with
[3] all of the other evidence and testimony that was
[4] collected in this case?
[5]   MR. van der VEEN: Objection to the
[6] form of the question.
[7]   THE WITNESS: The range that he gave
[8] is consistent with the overall statements that were
[9] provided by all parties and the physical evidence —
[10]   **BY MS. RISK:**
[11]   Q: When you —
[12]   A: — without assigning a specific speed to
[13] the bike.
[14]   Q: When you were deposed the first day of
[15] your deposition, you testified about being able to
[16] weigh statements between witnesses that may be
[17] inconsistent. Do you recall that?
[18]   A: Yes.
[19]   Q: And in this case was it necessary for you
[20] to weigh statements as between witnesses? Did you
[21] have any inconsistent information in this
[22] investigation at all?
[23]   A: Not that I'm aware of.
[24]   Q: Okay. In fact, all of the information

**1—12:48:50  24—12:49:46**                      Page 516

[1] that you have in this case, the testimony of the
[2] witnesses, is consistent with regard to Mr. Bard
[3] coming to a complete stop, isn't it?
[4]   A: Yes.
[5]   Q: And all of the information that you have
[6] with regard to witness statements is that Mr. Bard,
[7] after coming to a complete stop, slowly proceeded
[8] into the intersection, isn't it?
[9]   A: Yes.
[10]   Q: And all of the information that you have
[11] regarding the position of the UPS vehicle coming to a
[12] stop just prior to the double-yellow line in the
[13] intersection is consistent in this case, isn't it?
[14]   MR. van der VEEN: Objection to the
[15] form of the question.
[16]   THE WITNESS: Yes.
[17]   **BY MS. RISK:**
[18]   Q: And that would include both with regard to
[19] the position of the UPS vehicle where it stopped,
[20] that would be all of the physical evidence and the
[21] witness statements would all be consistent with
[22] respect to the location of the UPS vehicle and where
[23] it stopped in the road —
[24]   MR. van der VEEN: Objection to the

**1—12:49:46  24—12:50:48**                      Page 517

[1] form of the question.
[2]   THE WITNESS: Yes.
[3]   **BY MS. RISK:**
[4]   Q: — is that correct?
[5]   And all of the witness testimony and
[6] physical evidence with regard to the motorcycle
[7] impacting the UPS package car is consistent, isn't
[8] it?
[9]   A: Yes.
[10]   MR. van der VEEN: Objection to the
[11] form of the question.
[12]   **BY MS. RISK:**
[13]   Q: You interviewed Miss Kristin DiPaolo,
[14] didn't you, Corporal Weaver?
[15]   A: Yes.
[16]   Q: You conducted a telephone interview of
[17] Miss DiPaolo.
[18]   A: Yes.
[19]   Q: And she was one of the nurses who came
[20] upon the scene?
[21]   A: Yes.
[22]   Q: I'll refer you to page 14 of your summary
[23] report. When did you conduct the interview of Miss
[24] DiPaolo?

UPS & Bard

1—12:50:50  24—12:52:07                        Page 518

[1]   A: Wednesday afternoon, February 2nd, 2005,
[2] at approximately 1545 hours, or 3:45 p.m.
[3]   Q: And based on the conclusion time of your
[4] interview, 1556, that's approximately eleven minutes
[5] you spoke to Ms. DiPaolo?
[6]   A: Yes.
[7]   Q: And in your report there's a brief
[8] synopsis of the content of that interview; correct?
[9]   A: Yes.
[10]   Q: What did Miss DiPaolo tell you?
[11]   A: She stated that she was coming from
[12] Delaware and was traveling northbound on Montchanin
[13] Road headed, heading toward Pennsylvania. The car in
[14] front of her at the intersection and the female
[15] operator jumped out and stated, Somebody must be
[16] hurt. And I'm a nurse.
[17]   Miss DiPaolo told the female that she
[18] was also a nurse and then responded to the location
[19] of the motorcycle operator. She initially checked
[20] and felt a weak pulse. She was worried about the
[21] operator's neck. The operator then stopped
[22] breathing, and both nurses began CPR. The operator
[23] never regained a pulse. Miss DiPaolo asked someone
[24] to call 911. The operator was basically dead at the

1—12:52:12  24—12:53:13                        Page 519

[1] scene, and she's referring to the motorcycle
[2] operator, Mr. Vascek.
[3]   The collision had just happened when
[4] she arrived. It was a fresh collision scene. The
[5] UPS truck was stopped and partially in the
[6] intersection, almost midway.
[7]   Miss DiPaolo stated that she is
[8] familiar with the area. It is difficult to see from
[9] both directions.
[10]   She was referring to Montchanin
[11] Road/Twaddell Mill, the intersection. She described
[12] the intersection as a very bad intersection. There
[13] are many trees in the area of the intersection which
[14] helps add to the visibility problem.
[15]   The truck operator had to come out
[16] into the intersection to see. The other nurse, who's
[17] identified in the report as Witness 1, Miss Amy R.
[18] Stratton told her that the motorcycle operator was on
[19] her tail and passed her on the double-yellow line
[20] just before the collision happened.
[21]   Q: Now, we've — let me interrupt you for a
[22] minute.
[23]   A: We've clarified —
[24]   Q: Go ahead. I'm sorry.

1—12:53:13  24—12:54:22                        Page 520

[1]   A: — that it is not Miss Stratton. That
[2] would be — Miss Stratton was the young lady that
[3] Sergeant Cox interviewed. The other nurse would be
[4] Miss —
[5]   Q: — Garroway?
[6]   A: Thank you.
[7]   Q: But Miss Stratton was the individual whom
[8] Mr. Vascek was following. So the information with
[9] regard to Miss Stratton in that statement is correct,
[10] isn't it?
[11]   A: Yes.
[12]   Q: It's just the fact that she's not a nurse?
[13]   A: It's the wrong — correct.
[14]   Q: Okay. Go ahead.
[15]   A: Said that the motorcycle was traveling
[16] fast when it passed her and before it went out of
[17] sight. It appeared that the motorcycle and operator
[18] hit the truck and dropped to the ground.
[19]   And she remembers the truck driver
[20] moving the truck to help provide them with some
[21] working space, and the UPS driver was very upset.
[22] And she described the collision day as a nice fall
[23] day and it was clear, referring to visibility as far
[24] as overall weather conditions.

1—12:54:24  24—12:55:20                        Page 521

[1]   Q: And that was all what Miss DiPaolo told
[2] you except for the part about what Miss Stratton told
[3] her about Mr. Vascek following behind her; correct?
[4]   MR. van der VEEN: Objection to the
[5] form of the question.
[6]   THE WITNESS: Yes.
[7] MR. van der VEEN: Except for her
[8] being a nurse, you mean?
[9]   MS. RISK: Yeah.
[10]                BY MS. RISK:
[11]   Q: I think when you started, it's not clear.
[12] Did Miss Stratton tell Miss DiPaolo that the
[13] motorcycle was traveling fast when it passed her and
[14] before it went out of sight?
[15]   A: Yes.
[16]   Q: You also had the opportunity to interview
[17] the other nurse at the scene, Miss Karen Garroway;
[18] correct? On page 16, it's a summary of your
[19] interview of Miss Garroway.
[20]   A: That was by telephone.
[21]   Q: Okay. When did you conduct that
[22] interview?
[23]   A: Wednesday afternoon, February 9th, 2005,
[24] at approximately 1340 hours, or 20 minutes before

---

1—12:55:25   24—12:56:13                     Page 522

[1] 2:00 p.m. in afternoon.

[2]    Q: Based on the conclusion time of that

[3] interview of 1348 you were — your interview of,

[4] telephone interview of Miss Garroway was

[5] approximately eight minutes; is that correct?

[6]    A: Correct. Yes.

[7]    Q: And that interview was conducted by

[8] telephone?

[9]    A: Yes.

[10]    Q: And you recorded it with handwritten

[11] notes; correct?

[12]    A: Yes.

[13]    Q: Okay. Can you tell me what Miss Garroway

[14] told you?

[15]    A: She stated that she was traveling

[16] northbound on Montchanin Road and had arrived at the

[17] scene of the collision briefly after it happened.

[18]    MR. van der VEEN: Let the record

[19] reflect the witness is reading the document.

[20]    THE WITNESS: She did not witness the

[21] crash. She initially wondered why the UPS truck was

[22] located where it was. She saw the driver of the UPS

[23] truck get out of the truck as she approached from the

[24] distance and was not sure what was going on. She

---

1—12:56:20   24—12:57:14                     Page 523

[1] felt that something was not right. From what she had

[2] observed up to that point, she said she knew

[3] something was not right.

[4]    BY MS. RISK:

[5]    Q: You mean while she was traveling in the

[6] car when she first observed —

[7]    MR. van der VEEN: Objection.

[8]    THE WITNESS: When she got out, when

[9] she's walking toward, in the course of what she just

[10] shared with me, she's saying that she knows

[11] something's not right for this truck to be where it

[12] is, not knowing why it's where it is, but something

[13] is not, is not the way it should be.

[14]    She was the first northbound car to

[15] arrive at the collision scene. Another person in

[16] another car, which later was reflected to be

[17] Miss Christine DiPaolo in this investigation, she was

[18] located directly behind her vehicle.

[19]    And Miss Garroway stated that she was

[20] on her way home at the time when she rolled up on

[21] this crash. She got out of her car to see what had

[22] happened. The motorcycle operator was on the ground

[23] face down and was basically lifeless.

[24]    She and the other nurse, which is Miss

---

1—12:57:16   24—12:58:16                     Page 524

[1] DiPaolo, immediately began to attend to the medical

[2] needs of the operator. They rolled him over onto his

[3] back and took off his motorcycle helmet. They

[4] instructed the UPS driver to back the truck up to

[5] provide them with some additional working space. The

[6] truck was in her back as she attempted to assist her

[7] the injured operator. She stated that she was not

[8] sure about the motorcycle being moved.

[9]    I asked her — that was prodded by a

[10] question.

[11]    And the operator's one leg may have

[12] been near the motorcycle, and it was moved. She was

[13] not sure.

[14]    BY MS. RISK:

[15]    Q: Did you later find out that the motorcycle

[16] was moved?

[17]    A: Yes.

[18]    Q: Do you have an independent recollection of

[19] this conversation with Miss Garroway?

[20]    A: Not other than my notes.

[21]    Q: Okay. And you've been looking at your

[22] report throughout what you've just told me about your

[23] conversation with Miss Garroway; correct?

[24]    A: Yes.

---

1—12:58:20   24—01:00:58                     Page 525

[1]    Q: It's your understanding that Miss Garroway

[2] instructed — was the individual who instructed

[3] Mr. Bard to move the UPS vehicle —

[4]    A: Yes.

[5]    Q: — so that she could attend to Mr. Vascek;

[6] correct?

[7]    MR. van der VEEN: Objection to the

[8] form of the question.

[9]    THE WITNESS: Yes.

[10]    BY MS. RISK:

[11]    Q: Corporal Weaver, how long did you spend at

[12] the scene on the day of the accident?

[13]    A: By looking at the dispatch from the

[14] communication center, it looks like approximately two

[15] hours from the time I arrived until the time that I

[16] cleared the scene.

[17]    Q: Okay. So you spent two hours at the

[18] accident scene that day?

[19]    A: Approximately.

[20]    Q: And you went back two additional days to

[21] follow up; correct?

[22]    A: Yes.

[23]    Q: How long did you spend on the first

[24] follow-up date at the accident scene?

---

---

Page 526

[1] A: Approximately 15 to 20 minutes.

[2] Q: And what did you do that follow-up date at

[3] the accident scene?

[4] A: Basically at that point I was just looking

[5] at the overall layout of the intersection, just all

[6] perspectives driving toward it from the north, from

[7] the south, and also from Twaddell Mill, just

[8] basically coming around in all directions from the

[9] intersection just to get an overall perspective from

[10] looking at it because obviously I have to take from

[11] the field notes that Sergeant Cox — field sketch,

[12] excuse me, do a diagram and just to get a better

[13] personal understanding of the intersection.

[14] And then I went back on a later

[15] date — that's on the notes — of where I got out and

[16] did an actual more-detailed, by using a roller wheel

[17] and marking known distances, like to the edge of the

[18] bridge and where the tree lines are and things like

[19] that.

[20] Q: And you did that on the second

[21] follow-up —

[22] A: Yes.

[23] Q: — inspection?

[24] How long did you spend in the second

---

Page 527

[1] follow-up at the scene?

[2] A: I'm looking for my note. It's always the

[3] one I can't find; because it's not where I'm looking.

[4] Looking at the notes that I've taken

[5] and the time of reference of when I started and

[6] looking at the notes that I took and judging my past

[7] experience to do this, I was probably there about —

[8] now, I'm estimating — about an hour and a half,

[9] maybe two hours, tops.

[10] Q: Do you feel you did a careful and thorough

[11] investigation of this accident, Corporal Weaver?

[12] A: Yes.

[13] Q: In the reconstruction portion of your

[14] report, you state that due to the lack of specific

[15] physical evidence at the collision scene, there was

[16] no reconstruction speed calculations made during this

[17] investigation; is that correct?

[18] A: Yes.

[19] Q: In the last day of your deposition, there

[20] was a lengthy discussion between yourself and

[21] Mr. van der Veen about perfect-world reconstructions.

[22] Do you recall that?

[23] A: Yes.

[24] Q: And in a perfect-world reconstruction, you

---

Page 528

[1] would have everything there to be able to reconstruct

[2] the accident beyond a shadow of a doubt, wouldn't

[3] you?

[4] A: To a degree of scientific ability —

[5] MR. van der VEEN: Objection.

[6] THE WITNESS: — yes.

[7] BY MS. RISK:

[8] Q: Okay. You've testified earlier that

[9] you've investigated over 4,000, approximately — and

[10] I won't hold you to that — accidents during the

[11] course of your police work.

[12] What percentage of that 4,000

[13] investigations have you had a perfect-world scenario

[14] where you had all of the physical evidence and all of

[15] the witness statements that you would want? I'm just

[16] asking for an estimate.

[17] A: None. There is no perfect — where you'd

[18] have absolutely everything you'd need.

[19] Q: Okay. So there are what percentage of

[20] times, then — so it's a hundred percent of the time

[21] you don't have everything that you need; is that

[22] fair?

[23] A: That's fair.

[24] Q: But of those 4,000 or approximately 4,000

---

Page 529

[1] investigations that you did, how many did you not

[2] come to a conclusion as to the primary cause of the

[3] accident?

[4] A: Less than one percent.

[5] Q: So is it fair to say, then, that even

[6] though you may not have all of the physical evidence

[7] or the witness statements that you would want, that

[8] it is necessary at times to draw conclusions based on

[9] the information that's available to you; is that

[10] fair?

[11] A: Yes.

[12] MR. van der VEEN: Objection.

[13] BY MS. RISK:

[14] Q: Corporal Weaver, are you comfortable with

[15] the conclusions that you've drawn with respect to the

[16] police report that's in front of you here today?

[17] MR. van der VEEN: Objection.

[18] THE WITNESS: Yes.

[19] BY MS. RISK:

[20] Q: And the conclusions and findings that are

[21] in that very lengthy police report, are they based on

[22] the two hours at the accident scene of investigation,

[23] two follow-ups at the accident scene, multiple

[24] witness interviews, interview of a Honda East service

---

---

[1] person, and other work and hours of investigation in

[2] this case?

[3]   A: Yes.

[4]   Q: Okay. So the lack of specific physical

[5] evidence in this case that you refer to in the

[6] reconstruction part of your report, that's with

[7] respect to coming to a specific finding for the

[8] specific speed calculation, isn't it?

[9]   A: Yes.

[10]   Q: In the reconstruction part of your report,

[11] you also make note halfway down the second paragraph

[12] that there is an "intersection ahead" sign posted

[13] approximately 50 feet prior to the intersection —

[14] I'm sorry. That's page 16.

[15]   A: Thank you. Yes.

[16]   Q: — prior to the intersection which advises

[17] southbound traveling tourists, motorists of the

[18] intersection. Did I state that correctly?

[19]   A: Yes.

[20]   Q: Now, the southbound traveling motorist in

[21] this case would be Mr. Vascek, wouldn't it?

[22]   A: Yes.

[23]   Q: So 50 feet prior to the

[24] Montchanin/Twaddell Mill intersection, there is an

---

[1] advisory sign on Montchanin Road advising motorists

[2] like Mr. Vascek that there is an intersection ahead,

[3] isn't there?

[4]   A: Yes.

[5]   Q: And that's because it's a lined

[6] intersection and motorists coming southbound are

[7] coming around a curve, aren't they?

[8]   MR. van der VEEN: Objection to the

[9] form of the question.

[10]   THE WITNESS: My experience with

[11] dealing with DelDOT would be that would be the reason

[12] why that sign is there, yes.

[13]   BY MS. RISK:

[14]   Q: As a — in your 20 years as a trooper and

[15] in your experience as a policeman, is that sign there

[16] to warn motorists that there is an intersection up

[17] ahead?

[18]   A: Yes.

[19]   Q: At the time of this accident was there

[20] anything obstructing that sign?

[21]   A: No.

[22]   MR. van der VEEN: Objection to the

[23] form of the question.

[24]   BY MS. RISK:

---

[1]   Q: Were there any shrubs obstructing the

[2] sign?

[3]   A: No.

[4]   MR. van der VEEN: Objection to the

[5] form of the question?

[6]   BY MS. RISK:

[7]   Q: Trees obstructing the sign?

[8]   A: No.

[9]   MR. van der VEEN: Objection to the

[10] form of the question.

[11]   BY MS. RISK:

[12]   Q: Was the sign visible — on the date of

[13] this accident, was the sign present and visible for

[14] Mr. Vascek approaching that intersection?

[15]   A: Yes.

[16]   MR. van der VEEN: Objection to the

[17] form of the question.

[18]   BY MS. RISK:

[19]   Q: On page 17 in your reconstruction of the

[20] accident, you state, It is necessary for eastbound

[21] traveling motorists to move forward toward Montchanin

[22] Road to visibly see north- and southbound traveling

[23] motorists that are approaching the intersection; is

[24] that a fair recitation of that statement?

---

[1]   A: Yes.

[2]   Q: Now, when you're referring to eastbound

[3] traveling motorists, you're referring in this case to

[4] Mr. Bard; correct?

[5]   A: Yes.

[6]   Q: Okay. So it's your opinion that eastbound

[7] traveling motorists like Mr. Bard need to move

[8] forward or in order — they need to move forward to

[9] visibly see north- and southbound traveling motorists

[10] at that intersection; correct?

[11]   A: Yes.

[12]   Q: And is it your understanding that

[13] Mr. Bard, in fact, did that?

[14]   A: Yes.

[15]   Q: And is it your understanding that Mr. Bard

[16] had to worry about both southbound motorists like

[17] Mr. Vascek, which would be to his left, as well as

[18] northbound motorists to his right?

[19]   A: Yes.

[20]   Q: And, in fact, if you were seated in

[21] Mr. Bard's seat at that intersection, to his right up

[22] the hill is another curve in the road, isn't it?

[23]   A: Yes.

[24]   Q: So there are blind curves both to the left

---

---

[1] and the right of the Montchanin/Twaddell Mill
[2] intersection, aren't there?
[3]    MR. van der VEEN: Objection to the
[4] form of the question.
[5]    THE WITNESS: Yes.
[6]         BY MS. RISK:
[7]    Q: So care should be taken — caution should
[8] be taken by any driver approaching that intersection
[9] to both look left as well as right; is that fair?
[10]    A: Yes.
[11]    Q: Okay. In fact, if Mr. Bard had just been
[12] looking left at the time of this accident and a car
[13] had been approaching northbound, he may have been hit
[14] by that vehicle —
[15]    MR. van der VEEN: Objection to the
[16] form of the question.
[17]         BY MS. RISK:
[18]    Q: — maybe?
[19]    A: Yes.
[20]    MR. van der VEEN: Objection to the
[21] form of the question. If there was a vehicle assumes
[22] facts not in evidence.
[23]         BY MS. RISK:
[24]    Q: Paragraph 3 of your reconstruction states

[1] that based on witness statements, Operator No. 2
[2] statements — that's Mr. Bard; correct?
[3]    A: Yes.
[4]    Q: — and physical evidence at the collision
[5] scene, the UPS truck had stopped approximately 2 feet
[6] away from the center of the roadway at impact; is
[7] that correct?
[8]    A: Yes.
[9]    Q: You make the observation that this
[10] provided the entire northbound lane of travel to
[11] remain open for an evasive maneuver approximately
[12] 10 feet 6 inches, if time and travel speed had
[13] permitted.
[14]    Could you explain to me what you mean
[15] by that statement?
[16]    A: If a vehicle was traveling — the
[17] positioning of the UPS truck is all but in the center
[18] of the roadway, all but 2 feet, through —
[19] Mr. Seiffert is the main witness of the statement as
[20] to the placement and then confirmed through the one
[21] nurse, I believe, that made the comment.
[22]    If a vehicle is traveling in a
[23] southbound lane, as the operator of the motorcycle
[24] was, Mr. Vascek, and if he was traveling at a speed

[1] that would have enabled him to do a maneuver to
[2] swerve to the left and provided, as we stated
[3] earlier, that there was nothing in that lane and it
[4] was safe to do so, to avoid the truck, it could have
[5] been done.
[6]    But it's based on how fast — which I
[7] can't say how fast he was traveling, whether it would
[8] have been, the speed he was traveling would have been
[9] able to do it or not.
[10]    But the point that I'm making as
[11] observation is the southbound lane was blocked all
[12] but 2 feet, but the northbound lane was still clear.
[13] And it's to divert the other questions as far as
[14] legally, does he have — I'm just looking at common
[15] sense-wise.
[16]    When your rear is in — your life is
[17] going towards something, if you can go off the road
[18] and do it safely and, you know, defensively, you're
[19] going to — with the time that you have to react and
[20] the speed that you're traveling, you're going to try
[21] to do something.
[22]    Q: And that something would be —
[23]    A: It's just natural for anyone, any driver
[24] to do.

[1]    Q: And in this case would that something be
[2] to take an evasive maneuver and go into the
[3] northbound lane?
[4]    A: That's the point of what I'm trying to
[5] explain, that that lane was open. If that was an
[6] option, if speed was within the realm that that could
[7] have been done, that was a possible option that
[8] Mr. Vascek might have done. But it didn't happen.
[9] I'm just explaining that that lane is open.
[10]    Q: Based on Mr. Seiffert, the independent
[11] witness's statements to you, from the time he first
[12] saw the motorcycle, position of the rear wheel, as
[13] well as the position of the operator with respect to
[14] the motorcycle, from the time he first saw the
[15] motorcycle to the time of impact, his description of
[16] Mr. Vascek's body with respect to the motorcycle, did
[17] Mr. Vascek have control over his motorcycle to be
[18] able to make an evasive maneuver at that point —
[19]    MR. van der VEEN: Objection to the
[20] form of the question.
[21]         BY MS. RISK:
[22]    Q: — at any point along the way?
[23]    A: Within that one to two seconds that he
[24] described and the position in which it was in, no.

---

1—01:15:26  24—01:17:06                    Page 538

[1]    **Q:** Do you have any information available to
[2] you, either testimony or physical evidence, that
[3] Mr. Vascek took an evasive maneuver of any kind?
[4]    **A:** I have no knowledge of that.
[5]    **Q:** Okay. When you fill out an initial crime
[6] report — or isn't it — is it mandatory to fill out
[7] a crime report when there's a fatality involved in an
[8] accident?
[9]    **A:** Yes.
[10]   **Q:** So that's mandatory; you have no choice?
[11]   **A:** Correct.
[12]   **Q:** And in the case of a fatal accident, is
[13] there a process, a mandatory process that the police
[14] report goes through with respect to the Attorney
[15] General reviewing it?
[16]   **A:** Yes.
[17]   **Q:** Can you explain that process? Or with
[18] respect to this accident.
[19]   **A:** Basically, what is done is the
[20] investigation is conducted. The Attorney General's
[21] office is normally notified earlier in the
[22] investigation, if need be.
[23]      If it's unknown at that point, I mean,
[24] we're still collecting a lot of material, whatever —

1—01:17:09  24—01:18:02                    Page 539

[1] I mean, they're still — they're initially notified.
[2] One of the things that we do, as I said earlier, we
[3] go back and send a Teletype before — however long
[4] we've been working on an investigation, if we're
[5] working twelve hours on it or whatever, before we
[6] leave, the last thing that we do, the divisional
[7] requirement's that we send a Teletype — was a
[8] Teletype; it's an email message — to reflect that a
[9] fatal has occurred.
[10]     And on that mailing roster of the
[11] people who we elect, there's a series from the
[12] colonel on down with people, key people that need to
[13] be notified in the Attorney General's office. And
[14] the Attorney Generals — the Deputy Attorney Generals
[15] that work with our fatal collisions all are on that.
[16]     So that — their initial notice of it,
[17] if I don't make a phone call from the scene and don't
[18] warrant it at that time or within a couple days later
[19] don't make an immediate phone call to the Attorney
[20] General's office, they are still made aware of it by
[21] way of they are sent the Teletypes to know that, hey,
[22] the State Police fatal team went out on this
[23] location, this date, this time, the bare, basic facts
[24] of the collision. So they're initially notified

1—01:18:07  24—01:19:01                    Page 540

[1] through that.
[2]     Later, through subsequent follow-ups
[3] through the course of the investigation, we'll call
[4] and ask for guidance.
[5]     Sir, this is what I got. What do you
[6] want me to do? Have I done this — I've done this,
[7] this, and this. Do I need to do anything else?
[8] Whatever you want us to do and made aware of the
[9] case.
[10]     When the report is completed, when
[11] we've collected all the data and the finished product
[12] is absolutely finished, it's iron sealed, everybody's
[13] reviewed it from our office and it's on its way to
[14] headquarters, we make an appointment with the DAG,
[15] physically go into their office, sit down with them,
[16] provide them with a copy of the report to view —
[17] they can keep it if they wish or diagrams — and they
[18] pick our brains, so to speak. And we explain what
[19] the overall investigation revealed.
[20]     And then we're subject to whatever
[21] questions they want to ask us at that point. Did we
[22] do this? Did we do that? What about this? What
[23] about that?
[24]     And then they make a determination.

1—01:19:02  24—01:20:07                    Page 541

[1] Sometimes it's done right then and there.
[2] Oftentimes, more the pallor of the situation is that
[3] there's a time lapse; because sometimes they'll
[4] bounce it off other Deputy Attorney Generals.
[5]     They have sessions that meet weekly.
[6] And, oftentimes, they'll get what we call a round
[7] robin. They'll all be in a conference room. And
[8] they'll talk about cases that are going on during
[9] that week. And as a result of it, they'll bounce it
[10] off each other and say, Well, what do you think? or
[11] whatever. And — but, I mean, that's the overall
[12] perspective.
[13]     But then they will direct us. If
[14] we've done everything or they feel that we have
[15] nothing else to pursue, without any guidance, you
[16] know, go do this, do this, or whatever, they get back
[17] with us and give us a ruling on their perspective of
[18] the Attorney General's side of the house, what they
[19] want us to do or what they think or feel we should
[20] do. They direct us at prosecution, nonprosecution,
[21] traffic, criminal. They tell us what to do.
[22]   **Q:** Did there come a time when you met with
[23] the AG's office with respect to this accident?
[24]   **A:** Yes.

1—01:20:07  24—01:21:35                          Page 542

[1] **Q:** And who did you meet with at the AG's
[2] office?

[3] **A:** Deputy Attorney General Paul Wallace.

[4] **Q:** Can you tell me what happened during the
[5] course of your discussions with the Deputy Attorney
[6] General?

[7] **A:** Explained the investigation, showed him
[8] the photographs, showed him the diagram. Engaged in
[9] conversation about what happened, what the
[10] investigation revealed. And he made a determination
[11] that there would be no prosecution in this case.

[12] **Q:** And when was that meeting?

[13] **A:** Wednesday morning, February 9th, 2005, at
[14] approximately 10:00 a.m. in the morning I met with
[15] Deputy Attorney General Paul Wallace.

[16] **Q:** Corporal Weaver, you determined the
[17] primary cause of this accident to be the operator of
[18] the motor — the motorcycle operator was operating
[19] the motorcycle in a manner too fast for conditions —

[20] MR. van der VEEN: Objection to the
[21] form of the question.

[22] BY MS. RISK:

[23] **Q:** — he experienced as he entered a sharp
[24] curve in the roadway and approached the location of a

1—01:21:37  24—01:22:08                          Page 543

[1] hidden intersection; isn't that correct?

[2] **A:** Yes.

[3] MR. van der VEEN: Objection to the
[4] form of the question.

[5] BY MS. RISK:

[6] **Q:** Corporal Weaver, what did you determine to
[7] be the primary cause of this accident?

[8] MR. van der VEEN: Objection to the
[9] form of the question. He's already determined that
[10] he could not make a determination within a reasonable
[11] degree of scientific certainty.

[12] MS. RISK: That was not my question.
[13] Speaking objection. I asked Corporal Weaver, What
[14] did you determine to be the primary cause of this
[15] accident?

[16] MR. van der VEEN: Objection to the
[17] form of the question.

[18] BY MS. RISK:

[19] **Q:** Did you — let me back up for a minute,
[20] Corporal Weaver.

[21] Did you determine a primary cause to
[22] this accident?

[23] **A:** Yes.

[24] MR. van der VEEN: Objection to the

1—01:22:08  24—01:22:57                          Page 54

[1] form of the question.

[2] BY MS. RISK:

[3] **Q:** And what was the primary cause that you
[4] determined in this accident?

[5] MR. van der VEEN: Objection to the
[6] form of the question.

[7] THE WITNESS: That Mr. Vascek, who was
[8] operating the motorcycle, had operated his motorcycle
[9] in a manner which was too fast for the conditions
[10] that he experienced as he entered a sharp curve in
[11] the roadway and approached the location of a hidden
[12] intersection.

[13] BY MS. RISK:

[14] **Q:** Okay. In your first day of depositions,
[15] Corporal Weaver, Mr. van der Veen asked you some
[16] questions about your opinions to a reasonable degree
[17] of accident reconstruction certainty; do you recall
[18] that?

[19] **A:** Yes.

[20] **Q:** The opinions that are in this police
[21] report with regard to the primary cause of this
[22] accident, do you hold those to a reasonable degree of
[23] accident investigation certainty?

[24] **A:** Yes.

1—01:22:59  24—01:24:06                          Page 545

[1] MR. van der VEEN: Objection to the
[2] form of the question.

[3] BY MS. RISK:

[4] **Q:** So is it fair to say that the speed
[5] calculations are the only part of this accident that
[6] you can't determine to a reasonable degree of
[7] accident reconstruction certainty?

[8] **A:** Yes.

[9] MR. van der VEEN: Objection to the
[10] form of the question.

[11] BY MS. RISK:

[12] **Q:** Is it fair to say — strike that.

[13] Corporal Weaver, after the accident —
[14] I'm going to refer you to your file — actually, to
[15] your — which you have right in front of you — your
[16] telephone message memos. After the time of this
[17] accident you received a phone call, phone message
[18] from Richard Wier; do you recall that?

[19] **A:** Yes.

[20] **Q:** And Richard Wier is plaintiff's counsel in
[21] this case along with Mr. van der Veen, isn't he?

[22] **A:** Yes.

[23] **Q:** I don't have a page number to refer you
[24] to, but it's the upper left-hand corner of mine —

1—01:24:10  24—01:25:00                    Page 546

[1] you have the independent telephone memos there.

[2]     A: Okay.

[3]     Q: Do you have that in front of you?

[4]     A: If it's — are you referring to the one

[5] from January 13th?

[6]     Q: Yes, sir. January 13th, 2005. And is

[7] this — it's your understanding — your understanding

[8] that this January 13th, '05, was after a lawsuit was

[9] filed, is that correct, in this case? Or you don't

[10] know?

[11]     A: I don't know.

[12]     Q: Okay. Did you know at the time of this

[13] phone message who Mr. Richard Wier was?

[14]     A: Yes.

[15]     Q: Did you know that he was Mrs. Vascek's

[16] attorney?

[17]     A: No — oh, yes.

[18]     Q: Okay.

[19]     A: I thought — when you asked if I knew,

[20] I've known Mr. Wier via other investigations, through

[21] the office, yeah.

[22]     Q: But you understood this telephone message

[23] to be left by Mr. Wier with respect to the Vascek

[24] accident?

---

1—01:25:01  24—01:26:53                    Page 547

[1]     A: Yes.

[2]     Q: And you also understood that he

[3] represented, along with Mr. van der Veen — whether

[4] or not you knew Mr. van der Veen at that point —

[5] Mrs. Vascek?

[6]     A: Yes.

[7]     Q: And I'm sorry. I believe you did know

[8] Mr. van der Veen represented Mrs. Vascek at that

[9] point because you had already spoken to

[10] Mr. van der Veen in early November of 2004; is that

[11] correct?

[12]     A: Yes.

[13]     Q: You didn't speak to Mr. Wier that day, did

[14] you?

[15]     A: The day that I spoke with —

[16]     Q: No. The day of this phone message on

[17] January 13th, '05.

[18]     A: This was a tape message and — do we have

[19] a calendar? Can you tell me what the day of the week

[20] the 13th of January was?

[21]     MS. RISK: We can go off the record.

[22]     (Discussion held off the record.)

[23]     THE WITNESS: The following Tuesday I

[24] left a message on the answering machine. I'm looking

---

1—01:26:57  24—01:28:47                    Page 548

[1] at this. I didn't speak to him. But I didn't put

[2] the date on here. I put 9:50 twice, which is — but

[3] at 9:50 in the morning on Tuesday, if the 13th was a

[4] Thursday, that would have been the 18th I returned

[5] the phone call and left a message. Basically it was

[6] requesting information about the, the report and that

[7] the reports would be filed, forwarded once they were

[8] completed.

[9]             BY MS. RISK:

[10]     Q: Okay.

[11]     A: It was inquiring about the completion of

[12] the reports.

[13]     Q: Okay.

[14]     MR. van der VEEN: Let me see.

[15]     THE WITNESS: (Complies.)

[16]             BY MS. RISK:

[17]     Q: On the tape, the tape message that

[18] Mr. Wier left for you, what was the substance of what

[19] Mr. Wier said?

[20]     A: My memory — I don't have it written down

[21] here. But my memory is the conversation was — or

[22] the message that was on the answering machine was

[23] that there was a, an independent witness, an

[24] additional witness that could — and my memory of the

---

1—01:28:51  24—01:29:51                    Page 549

[1] exact words — because I shared these with the guys

[2] in the office — was that they could prove that the

[3] UPS driver was at fault. And those were words on it.

[4] And I didn't save it. We don't. We write it down

[5] and delete it and move on.

[6]     And I later found out that who they

[7] were referring to was Mr. Seiffert, who I'd already

[8] interviewed. And then I had — a couple days later

[9] had a conversation with Mr. Baxter, who contacted me,

[10] who is the instructor from IPTM that taught me, who

[11] was the instructor of the course that we took for the

[12] motorcycle collision course through IPTM that was

[13] offered at our fire school. That's where I took the

[14] course, and he was the instructor.

[15]     And he had asked me some information

[16] about the marks, the conversation I had with him

[17] on — that would have been that Thursday.

[18]     Q: All right. Let me back up just for a

[19] minute. We can talk about Mr. Baxter in just a

[20] minute.

[21]     But the voice-mail message that was

[22] left by Mr. Wier was that there was new information

[23] from an independent witness or a new independent

[24] witness that would show that the UPS driver was at

---

---

1—01:29:54  24—01:30:59                    Page 550

[1] fault for the accident; that's your recollection?

[2]     MR. van der VEEN: Objection to the

[3] form of the question.

[4] THE WITNESS: Yes.

[5]                 BY MS. RISK:

[6]     Q: And when you called — when you later

[7] found out that that witness was Mr. Seiffert, did you

[8] have a conversation with Mr. Wier or Mr. van der Veen

[9] or anyone from that office about the fact that you

[10] had already interviewed Mr. Seiffert?

[11]     A: No.

[12]     Q: With regard to information that you —

[13]     (Interruption at the door.)

[14]                 BY MS. RISK:

[15]     Q: — that witness gives during an interview,

[16] is it your experience that the information the

[17] witness gives you just after the accident is more

[18] accurate than any information that they would give

[19] you after having met —

[20]     A: Yes.

[21]     Q: — with lawyers? Okay.

[22]     You referenced a telephone call that

[23] you had from an Al Baxter; is that correct?

[24]     A: Yes.

---

1—01:31:01  24—01:32:09                    Page 551

[1]     Q: And that's — is that telephone call also

[2] on January 13th, '05, or did you return the call on

[3] January 13th, '05? On the telephone memo it's not

[4] clear.

[5]     A: I — there was a tape message about — on

[6] the 13th, Thursday, and it was basically asking,

[7] requesting information about skid marks or about

[8] marks — no reference — just marks in the

[9] investigation.

[10]     Q: Okay. Did you have an opportunity to call

[11] Mr. Baxter back?

[12]     A: Yes.

[13]     Q: And can you tell me the substance of that

[14] conversation?

[15]     A: It was a very brief conversation. Just

[16] primarily my memory was that he was just asking me

[17] about the marks of what I saw and if I was able to

[18] determine the exact, what I said here today — or

[19] previous deposition.

[20]     And my conversation was that if a

[21] additional — additional information was obtained and

[22] he was doing reports, my understanding, he was hired

[23] by whomever, if they would forward the reports to me,

[24] I would consider it and look it over as part of this

---

1—01:32:12  24—01:33:03                    Page 552

[1] investigation. But nothing was ever sent.

[2]     Q: Okay. Mr. Baxter, you're aware, is

[3] Mrs. Vascek's or is the expert on behalf of

[4] Mr. van der Veen?

[5]     A: Yes.

[6]     Q: And were you aware of that on the date

[7] that you talked to him?

[8]     A: Yes.

[9]     Q: Did he identify himself as such?

[10]     A: Yes.

[11]     Q: When he asked you about the marks, what

[12] marks was he specifically referring to?

[13]     A: He was referring to the mark that was on

[14] the roadway that we have identified it being at the

[15] location of the right front tire of the UPS truck.

[16]     Q: Did he offer any information or knowledge

[17] or opinions with respect to that mark —

[18]     A: No.

[19]     Q: — during your conversation?

[20]     A: No.

[21]     Q: Did he offer any other information during

[22] your conversation with him?

[23]     A: I don't recall him saying anything other

[24] than just basic inquiry and indicated that a report

---

1—01:33:07  24—01:33:56                    Page 553

[1] would be done. Then I suggested — I said, you know,

[2] Tell Mr. Wier or whomever, who's the driving force of

[3] what you're doing, if you would forward a copy of the

[4] report, we'll consider it. And I'll review it with

[5] the AG's office as well. But that was — it was a

[6] general conversation.

[7]     I mean, he's, Hey, you remember me? I

[8] taught you.

[9]     Yeah, yeah. You know, basic

[10] pleasantries or whatever.

[11]     But as far as the facts, we didn't go

[12] really — I didn't go into a specific dynamic — or

[13] any tiny, minute detail of anything. I gave him

[14] general information, said that I found a mark at the

[15] scene and that's all that we found. Didn't see

[16] anything else prior, pre-collision marking. And that

[17] was it.

[18]     Q: Okay. He didn't offer any — did he offer

[19] any information about the difference between a skid

[20] mark and a scuff mark?

[21]     A: We didn't explore that, no.

[22]     Q: Okay.

[23]     A: He didn't offer, and I didn't ask.

[24]     Q: You never received a report or any

---

---

**1—01:33:57  24—C1:34:51**                                      Page 554

[1] material from Mr. Baxter after that conversation, did
[2] you?
[3]   A: No.
[4]   Q: Did you ever have another conversation
[5] with Mr. Baxter?
[6]   A: No.
[7]   Q: Is that the only conversation you had with
[8] Mr. Baxter?
[9]   A: Regarding this case, yes.
[10]   Q: Okay. Do you have other cases that
[11] involve Mr. Baxter?
[12]   A: No. He was my instructor. I meant as
[13] a — I had conversations with him when I was a
[14] student in the school but not any other
[15] conversations.
[16]   Q: When you spoke to Mr. van der Veen in
[17] early November of 2005, how long did you spend with
[18] Mr. van der Veen?
[19]   A: Maybe a half hour.
[20]   Q: What did you talk about?
[21]   A: The overall findings of, of the case and
[22] where we were with it at this point, what I could
[23] share with him.
[24]   Q: And is there anything that you shared with

---

**1—01:34:55  24—01:36:10**                                      Page 555

[1] Mr. van der Veen that is either not in the police
[2] report or that we haven't discussed here in our last
[3] however many hours of deposition?
[4]   A: No.
[5]   Q: Have you ever spoken to Mrs. Vascek?
[6]   A: No.
[7]   Q: Have you ever received any type of
[8] communication from Mrs. Vascek?
[9]   A: Through other means, yes.
[10]   Q: Can you explain that to me?
[11]   A: Victim services, she had been in contact.
[12] The family had been in contact with victim services.
[13] And the victim service representative sent me some
[14] questions which prodded some follow-up phone calls to
[15] try to — what we talked about earlier, about whether
[16] Mr. Bard did or did not assist with CPR, was one of
[17] those questions.
[18]   Q: Was one of the other questions that
[19] Mrs. Vascek took issue with your finding that
[20] Mr. Bard had no proper — improper driving actions?
[21]   A: Yes.
[22]   Q: Did there come a time when you received a
[23] photograph of Mr. Vascek from Mrs. Vascek?
[24]   A: Yes.

---

**1—01:36:10  24—01:37:28**                                      Page 556

[1]   Q: And in what context did you receive that
[2] photograph?
[3]   A: It was provided to me by a victim service
[4] representative. And basically she said that she
[5] wanted, the family wanted me to see how beautiful a
[6] person that he was.
[7]   Q: Had you ever had a victim's spouse send
[8] you a photograph before for the purpose of showing
[9] you what a beautiful person this person was?
[10]   A: No.
[11]   Q: At your first day of deposition,
[12] Mr. van der Veen asked you that if he sent Nina from
[13] his office to your office, if he could review the
[14] accident reconstruction material texts in your
[15] office. Did Nina ever come to your — did Nina or
[16] anyone from Mr. van der Veen's office ever come to
[17] your office to inspect any of the accident
[18] reconstruction materials in your office?
[19]     MR. van der VEEN: Objection to the
[20] form of the question.
[21]     THE WITNESS: No.
[22]             BY MS. RISK:
[23]   Q: Did you ever, other than what you've
[24] presented here today, have you ever sent anything to

---

**1—01:37:34  24—01:39:50**                                      Page 557

[1] Mr. van der Veen as a result of the first deposition
[2] with regard to accident reconstruction materials?
[3]   A: No.
[4]   Q: Mr. van der Veen asked you earlier about
[5] Mr. Bard looking left-right-left. Has Mr. Bard ever
[6] told you that he looked multiple times, I believe is
[7] how it was worded, left-right-left?
[8]   A: Yes.
[9]   Q: Do you remember that?
[10]   A: Yes.
[11]   Q: Did you ask Mr. Bard how many times he
[12] looked left-right-left?
[13]   A: No.
[14]   Q: Corporal Weaver, you testified in your
[15] first day of deposition that you did not find a skid
[16] mark from the motorcycle at the scene; do you recall
[17] that?
[18]   A: Yes.
[19]   Q: Is it possible that, given the twilight
[20] hour of the day, if there was a faint mark, that you
[21] may have missed it?
[22]   A: Absolutely.
[23]     MR. van der VEEN: Objection to the
[24] form of the question.

---

---

1—01:39:51  24—01:41:03                          Page 558

[1] MS. RISK: That's all the questions
[2] that I have.
[3] BY MR. van der VEEN:
[4] Q: Are you saying that you missed the
[5] motorcycle — a skid mark on the motorcycle because
[6] it was getting dark?
[7] A: What I'm saying is if there was a faint
[8] skid mark at that scene, with the limits of light and
[9] what was there, it's possible that it wasn't
[10] detected.
[11] Q: Well, what time did you get there?
[12] A: Little after 5:00.
[13] Q: Do you note anywhere in any of your
[14] reports or any of your notes or anywhere that you had
[15] a problem with the lighting?
[16] MS. RISK: Objection; argumentative.
[17] BY MR. van der VEEN:
[18] Q: Did you note anywhere that you had a
[19] problem with the lighting? I'm not arguing with you.
[20] Did you note it?
[21] A: No.
[22] MS. RISK: Objection. Noting the
[23] plaintiff's attorney shouting, for the record.
[24] BY MR. van der VEEN:

---

1—01:41:04  24—01:41:45                          Page 559

[1] Q: As you sit here today, do you have any
[2] recollection of having a problem with the lighting?
[3] A: No.
[4] Q: As you sit here today, do you believe that
[5] there was a skid mark there that you missed?
[6] A: I'm saying that I didn't see any skid
[7] marks.
[8] Her question was, is it possible there
[9] was a faint mark that I didn't detect?
[10] And I'm saying it's possible.
[11] Q: Anything's possible?
[12] A: Absolutely.
[13] Q: Do you think that there's — do you think
[14] that you missed anything?
[15] A: I don't think I did.
[16] Q: Do you think that the lighting caused you
[17] any difficulty in being able to detect a faint skid
[18] mark?
[19] A: It's very possible. We have two
[20] investigators at the scene.
[21] Q: Right.
[22] A: Sergeant Cox didn't detect anything, nor
[23] did I. There's heavy foliage. It's on a rural area
[24] that's dark, as in under good conditions. Is it

---

1—01:41:47  24—01:42:15                          Page 560

[1] possible there's a mark there that I didn't pick up?
[2] Absolutely. I don't know what more you're asking.
[3] As far as I'm — I'm answering as honestly as I can
[4] answer.
[5] Q: Did Mr. Bard ever tell you that he found a
[6] faint mark?
[7] MS. RISK: Objection.
[8] THE WITNESS: No.
[9] MS. RISK: Objection; asked and
[10] answered.
[11] BY MR. van der VEEN:
[12] Q: Did you ask him about — did he tell
[13] you — he did tell you he saw a skid mark regarding
[14] the van?
[15] A: Did I ask him?
[16] Q: Did he tell you?
[17] A: I don't recall him telling me.
[18] MS. RISK: Objection.
[19] THE WITNESS: No. It's not marked
[20] anywhere in the evidence. I would have — it would
[21] have been written in my notes if he told me.
[22] BY MR. van der VEEN:
[23] Q: He says he told you.
[24] MS. RISK: Objection;

---

1—01:42:15  24—01:43:06                          Page 561

[1] misrepresentation of the testimony and speculation.
[2] BY MR. van der VEEN:
[3] Q: Did he tell you that?
[4] A: What I testified to at the previous
[5] deposition and today is what I was told the day that
[6] I interviewed the individuals that I have said that I
[7] have interviewed them. The notes that I have written
[8] and referred to — and it is confirmed or conveyed
[9] into the report — are what was told to me at that
[10] time.
[11] He did not tell me. I have no
[12] recollection of any comments about any skid mark,
[13] because it's not in the notes. I don't have any
[14] personal recollection of it.
[15] Q: Let me back up here.
[16] A: If he changed his story or has made
[17] comments subsequently since, I'm only testifying to
[18] what this — was done during the course of the
[19] investigation during the times, of the dates I say I
[20] interviewed whom, what they said.
[21] Q: Trooper, let me get this point down so
[22] it's rock-solid clear. Okay?
[23] You got on the scene. It was
[24] daylight; right?

---

1—01:43:08    24—01:43:44    Page 562

[1] A: Yes.

[2] Q: Plenty of light for you; right?

[3] A: Yes.

[4] Q: You didn't ask for a flashlight?

[5] A: No.

[6] Q: Could have; right? Correct? You could

[7] have had illumination if you needed it?

[8] MS. RISK: Objection; argumentative,

[9] harassing tone of voice.

[10] BY MR. van der VEEN:

[11] Q: You could have had artificial illumination

[12] if you needed it; correct?

[13] A: That's correct.

[14] Q: And you didn't feel you needed it; right?

[15] A: That's correct.

[16] Q: And you looked for a skid mark from the

[17] bike; correct?

[18] A: That's correct.

[19] Q: And you looked carefully, didn't you?

[20] A: That's correct.

[21] Q: And you didn't find one?

[22] A: And that is correct.

[23] MR. van der VEEN: Okay. Now, I have

[24] a series of questions for you. Actually, I've got

1—01:43:46    24—01:50:12    Page 563

[1] a — based on the questions from counsel, I have a lot

[2] of questions for you. So the question is, what do we

[3] want to do with the witness out there, just make him

[4] sit and wait or reschedule him?

[5] MS. RISK: Let's go off the record.

[6] (Discussion held off the record.)

[7] BY MR. van der VEEN:

[8] Q: I asked you at our last — after a series

[9] of long questions where we really went through the

[10] photographs and we went through the skid marks and we

[11] went through your report and we went through witness

[12] statements, I asked you a series of questions

[13] regarding your opinions within a reasonable degree of

[14] accident reconstruction scientific certainty; do you

[15] recall those questions?

[16] A: Basically, yes.

[17] Q: And when I asked you, Are any of the

[18] opinions here in your report based on — are given

[19] within a reasonable degree of accident reconstruction

[20] scientific certainty, you said that, no, they were

[21] not. And we were talking in terms of expert

[22] qualifications. Do you remember that?

[23] A: No.

[24] Q: Okay. Then I'm going to need to have your

1—01:50:15    24—01:54:41    Page 564

[1] deposition printed out so that you can read it; okay?

[2] A: Okay.

[3] (Discussion held off the record.)

[4] BY MR. van der VEEN:

[5] Q: With respect to your report, looking on

[6] page 17, the line that both I and Miss Risk have

[7] asked you about now, the line that reads, It is

[8] necessary, up at the top, for eastbound traveling

[9] motorists to move forward towards Montchanin Road to

[10] visibly see north- and southbound traveling motorists

[11] that are approaching the intersection; do you see

[12] that?

[13] A: Yes, sir.

[14] Q: To move forward of what?

[15] A: To move forward of the stop sign.

[16] Q: And then they're supposed to do what under

[17] the law?

[18] A: Stop.

[19] Q: Did this driver — did Mr. Bard do that?

[20] A: Not in my understanding that he did, no.

[21] Q: He didn't tell you he did; right?

[22] A: Correct.

[23] Q: And the witness told you that — the

[24] independent witness told you that he did not?

1—01:54:44    24—01:55:31    Page 565

[1] A: Correct.

[2] Q: Okay. So he has violated the statute, has

[3] he not?

[4] MS. RISK: Objection to form.

[5] Objection; calls for opinion.

[6] THE WITNESS: Yes.

[7] BY MR. van der VEEN:

[8] Q: Okay. Now knowing what he did and now

[9] knowing what the statute says, would you issue him a

[10] citation?

[11] A: No.

[12] Q: Why not?

[13] A: Because I fall under the Attorney

[14] General's office.

[15] Q: Would the Attorney General then file a

[16] citation?

[17] A: I don't know. You'd have to ask him.

[18] MS. RISK: For the record, counsel's

[19] holding up a document that he's previously shown the

[20] witness that purports to be a copy of Delaware Rules

[21] of the Road.

[22] BY MR. van der VEEN:

[23] Q: The statute that we've gone over, you

[24] understand that to be the statute of duties at a stop

1—01:55:33  24—01:56:09                 Page 566

[1] sign?

[2] A: Yes, sir.

[3] Q: Did Mr. Bard follow his duties at the stop

[4] sign?

[5] MS. RISK: Objection.

[6] THE WITNESS: Under those, no.

[7] BY MR. van der VEEN:

[8] Q: Under Delaware law?

[9] MR. van der VEEN: Objection.

[10] THE WITNESS: No.

[11] BY MR. van der VEEN:

[12] Q: Had you witnessed the manner in which he

[13] stopped or rather the manner in which he didn't stop

[14] where he was supposed to at this intersection, would

[15] you have ticketed him?

[16] MS. RISK: Objection to form.

[17] THE WITNESS: Under the circumstances

[18] of this crash, motorcycle coming from the north to

[19] the south at a high rate of speed —

[20] BY MR. van der VEEN:

[21] Q: No, no, no, no.

[22] A: — or just him coming out?

[23] Q: Yeah.

[24] A: Would I?

1—01:56:10  24—01:56:55                 Page 567

[1] Q: Yeah.

[2] A: No.

[3] Q: And the reason why?

[4] A: If it didn't constitute a hazard to

[5] anyone, if there was no one else there and he moved

[6] slowly, as he did, entered the intersection. Had he

[7] just gone through the stop sign, yeah, that would

[8] have been not an issue.

[9] Q: Okay.

[10] A: But he stopped. You're asking me if he

[11] would have continued to go through and didn't stop,

[12] would I give him a ticket? Knowing — if I was

[13] directly behind him, if I was Mr. Seiffert and he

[14] stopped and then moved slowly forward and moved out

[15] and there was no crash, no, I wouldn't write him —

[16] written him a ticket.

[17] Q: Okay. So when you violate a statute, a

[18] traffic statute, you don't give a ticket for it?

[19] MS. RISK: Objection to form.

[20] THE WITNESS: Supposed to.

[21] BY MR. van der VEEN:

[22] Q: But you just wouldn't?

[23] A: It's the discretion of the officer.

[24] Q: What's the discretion of the officer?

1—01:56:57  24—01:57:42                 Page 568

[1] A: As I previously stated, if he blew through

[2] that stop sign, yes, he would have been stopped and

[3] cited if I was the trooper that was behind him.

[4] But he did stop. If I was behind him

[5] and he did stop and he moved slowly, as he described

[6] and the independent witness described, and nothing's

[7] coming and he slowly enters that intersection and no

[8] crash occurs, no, I'm not going to stop him and give

[9] a ticket.

[10] Q: How do you know nothing's coming if you

[11] aren't looking to the left?

[12] MS. RISK: Objection to form.

[13] BY MR. van der VEEN:

[14] Q: How do you know nothing's coming if you

[15] aren't in a position in the roadway where you can see

[16] from the left?

[17] MS. RISK: Objection to counsel's —

[18] THE WITNESS: We're concluding this.

[19] MS. RISK: Excuse me. Objection to

[20] counsel's not allowing the witness to answer —

[21] THE WITNESS: Because I am not going

[22] to sit and continue to be directed at the questions

[23] in which you are attacking me personally as an

[24] investigator — no, don't wave your hands or — I've

1—01:57:45  24—01:58:41                 Page 569

[1] been more than professional through this whole

[2] deposition.

[3] I'm an investigator that did an

[4] investigation. You've got months and years or

[5] whatever to minutely pick things that we do and do

[6] whatever you need to do and ask me the questions.

[7] I'm asking (sic) the questions from the beginning of

[8] this to the ending of this and the integrity in which

[9] I did and conducted this.

[10] You asked me earlier whether or not we

[11] did or did not miss a skid mark. It's possible, and

[12] I answered that. Yes, it's possible we missed it.

[13] But your attacks at me are putting me

[14] on the defensive, and I'm tired of it. I have had a

[15] long weekend, as I explained to you off the record,

[16] that we've had multiple departmentals; we've had

[17] fatals that we've been out on. And I have not had a

[18] lot of sleep in the last week.

[19] And for me to come in here early,

[20] voluntarily, to be subjected to your demeanor and

[21] your attacks of me, I would much rather conclude this

[22] and come back another day and start fresh; because I

[23] don't feel it's fair to me as an investigator, of all

[24] that I've done in this past week, to be continually

[1] acted as if I'm the bad guy here. And that's how I
[2] feel.
[3]    Now, this counselor has not attacked
[4] me or come at me in the direction at which you have
[5] in the previous as well as this one. And I just
[6] honestly don't see this going anywhere in a positive
[7] direction.
[8]    I have told you before, I had a
[9] doctor's appointment for my son during the first
[10] deposition, which I canceled and I departed from
[11] here, which he didn't make. And I now — I have
[12] informed you before, this is going on and on and on.
[13]    I'm not saying I won't cooperate with
[14] you. I'm not saying I won't answer your questions.
[15] But considering what I've been through this past week
[16] and my son now has an appointment, I don't know what
[17] else — I have a life beyond the division.
[18]    And I've cooperated beyond what I
[19] think I can give you with your questioning. But I
[20] don't feel it's fair professionally for you to come
[21] at me as you're attacking me.
[22] BY MR. van der VEEN:
[23]    Q: Are you done?
[24]    MS. RISK: For the record —

[1]    THE WITNESS: Yes.
[2] BY MR. van der VEEN:
[3]    Q: Are you done? First of all —
[4]    MS. RISK: — counsel — for the
[5] record.
[6]    MR. van der VEEN: No. First of
[7] all —
[8]    MS. RISK: Excuse me. Please don't
[9] interrupt me, counsel. For the record —
[10]    MR. van der VEEN: No. We're in
[11] the — no. You'll have your chance to —
[12]    MS. RISK: For the record I would
[13] like —
[14]    MR. van der VEEN: No. I'm not making
[15] any records.
[16]    MS. RISK: Counsel for UPS would like
[17] to — and Mr. Bard — would like to support and agree
[18] with everything, all the observations that —
[19]    MR. van der VEEN: Mr. Bard isn't
[20] here.
[21]    MS. RISK: — Corporal Weaver has
[22] made. Thank you.
[23] BY MR. van der VEEN:
[24]    Q: Corporal Weaver, first of all, I wasn't

[1] the one who asked you, Is it possible you missed the
[2] skid mark? Counsel for UPS, who you just endorsed as
[3] being a wonderful person, did.
[4]    MS. RISK: Oh, objection; harassing,
[5] argumentative. And you know what? We're going to
[6] call the Judge.
[7] BY MR. van der VEEN:
[8]    Q: Do you remember that?
[8]    MS. RISK: Please stop.
[10] BY MR. van der VEEN:
[11]    Q: Do you remember that?
[12]    No. Don't stop.
[13]    MS. RISK: Stop asking the witness
[14] questions. Stop.
[15]    MR. van der VEEN: No. I'm going to
[16] ask the witness questions.
[17]    MS. RISK: Stop asking the witness
[18] questions.
[19]    (Ms. Risk left the room.)
[20]    THE WITNESS: The witness is leaving.
[21]    MR. van der VEEN: Wait. Hang on.
[22] Don't leave. You told me that we had until you had
[23] to leave for your son.
[24]    THE WITNESS: I'm not answering

[1] questions while the other counselor's not here.
[2]    MR. van der VEEN: Okay. Well, then
[3] let me ask you about what your schedule is to come
[4] back and answer questions.
[5]    THE WITNESS: I will have to get back
[6] to you with my schedule. I don't even have my
[7] planner with me. I don't know what I have and what I
[8] don't have.
[9]    MR. van der VEEN: Okay. Can you
[10] please sit for — I don't want to end on this note.
[11] Would you please sit and relax.
[12]    THE WITNESS: I'm relaxed.
[13]    MR. van der VEEN: Okay. I do not
[14] have nor have I in any way ever in this deposition
[15] tried to attack you personally at all. What I've
[16] really been trying to do is hone in on the things
[17] that you're sure about and the things that you aren't
[18] sure about. I've tried to hone in on the things that
[19] I've seen that are incorrect in the report and things
[20] that I think are correct in the report.
[21]    (Ms. Risk entered the room.)
[22]    MS. RISK: Excuse me. May I ask that
[23] no more go on while I'm out of the room.
[24]    MR. van der VEEN: No.

1—02:01:13  24—02:01:59                    Page 574

[1]     MS. RISK: I have Judge Robinson that
[2] I'm going to get on the phone.
[3]     MR. van der VEEN: So what? So what?
[4] You don't —
[5]     MS. RISK: Stop.
[6]     MR. van der VEEN: — leave in the
[7] middle of my deposition.
[8]     MS. RISK: I didn't walk out. I asked
[9] you politely to please stop because I would like to
[10] call the judge. I do not believe that under the
[11] Rules, under Delaware civility and the statement of
[12] lawyers' conduct, that — harassing a witness is
[13] definitely a reason to call the judge. In fact, it's
[14] a reason to get your pro hac revoked.
[15]     MR. van der VEEN: Go ahead.
[16] No, Trooper, I have not been meaning
[17] to harass you in any way.
[18]     MS. RISK: I am going to ask again. I
[19] have to leave the room to talk on the phone with the
[20] Judge.
[21]     MR. van der VEEN: Use the phone here.
[22]     MS. RISK: I have the other line going
[23] out in the office. I would ask that you please stop
[24] asking questions. Please, Mr. van der Veen, I'm

1—02:02:03  24—02:02:41                    Page 575

[1] asking you as a reasonable human being —
[2]     MR. van der VEEN: No.
[3]     MS. RISK: — to act civilly and stop
[4] asking question.
[5]     MR. van der VEEN: Don't leave the
[6] room. I'm not asking questions. I'm talking to the
[7] trooper.
[8]     MS. RISK: Can I ask you that —
[9]     MR. van der VEEN: Don't leave the
[10] room. My — staff can get the phone on in here.
[11]     (Ms. Risk left the room.)
[12]     MS. RISK: Can I have a line on this
[13] phone in here? Thank you.
[14]     MR. van der VEEN: I'm not in any way
[15] trying to harass you. I'm trying to get to the
[16] bottom of this. I'm trying to ask you questions.
[17] That's all I'm trying to do.
[18]     (Ms. Risk entered the room.)
[19]     MS. RISK: Let the record reflect that
[20] counsel has just walked back into the room and is
[21] trying to call the Judge but counsel — plaintiff's
[22] counsel will not cooperate and stop speaking.
[23]     MR. van der VEEN: Trooper, is it your
[24] opinion that I've been rude to you?

1—02:02:44  24—02:03:35                    Page 576

[1]     THE WITNESS: Your aggressiveness —
[2] there's times where I personally feel that you were
[3] attacking me personally of something that I did or
[4] didn't do or "could've/should've" done. I'm here to
[5] discuss what happened, what I know. And the manner
[6] in which you're asking those questions can be done
[7] without you raising your voice or feeling on a
[8] personal defense that you're coming at me
[9] individually.
[10]     And that — and the escalation of the
[11] voice and the tone of your voice — and, like I said,
[12] with everything I've been through this past week, out
[13] of fairness to me, I don't want to sit here and give
[14] an incorrect answer because I'm tired or I'm now
[15] starting to get emotionally upset because I'm feeling
[16] personally attacked of what I did as a Delaware State
[17] trooper, as an investigator.
[18]     MR. van der VEEN: To me, that's fair.
[19] To me, that's fair. Okay? And we can do that —
[20]     MS. RISK: Counsel, this telephone
[21] does not work. I'm trying to get your attention.
[22] The telephone in the conference room does not work.
[23] Do not wave me off. I am following —
[24]     MR. van der VEEN: Stop interrupting

1—02:03:36  24—02:04:06                    Page 577

[1] me.
[2]     MS. RISK: I didn't.
[3]     MR. van der VEEN: Stop interrupting
[4] me.
[5]     MS. RISK: I'm trying to speak to you.
[6] I'm going to call the Judge.
[7]     MR. van der VEEN: I'm speaking to the
[8] trooper right now. Fine. Call the Judge.
[9]     MS. RISK: Please stop.
[10]     MR. van der VEEN: Trooper, do you
[11] understand that I'm not trying to — do you accept my
[12] representation to you that I'm not trying to attack
[13] you personally.
[14]     MS. RISK: For the record, counselor
[15] is leaving the room, and Mr. van der Veen will not
[16] stop speaking while I go to try and get the Judge on
[17] the phone. He will not cooperate.
[18]     MR. van der VEEN: Use your cell
[19] phone.
[20]     MS. RISK: And he will not cooperate.
[21]     (Ms. Risk left the room.)
[22]     MR. van der VEEN: Trooper, do you
[23] understand that I'm really not attacking you
[24] personally in any way? The job that you do, the

[1] credentials that you have, those are all respected by
[2] me very much, that the point of this is just for me
[3] to ask questions. I didn't think in the hours that
[4] I've been asking you I've raised my voice at you. If
[5] I have raised my voice at you, accept my apology;
[6] okay?
[7]    THE WITNESS: Understood.
[8]    (Ms. Risk entered the room.)
[9] MR. van der VEEN: And I understand
[10] that you're tired, and I understand that you're
[11] emotional so that we will reconvene this. And I
[12] really have a very short period of time with you. I
[13] have about another 15, 20, 25 minutes of questions
[14] for you. Okay? And we will reconvene it at a time
[15] that's convenient for you; is that fair?
[16]    THE WITNESS: Yes, sir.
[17]    MR. van der VEEN: Okay. Thank you.
[18]    MS. RISK: In all due respect for the
[19] officer, I would request at our reconvention of time,
[20] that counsel be limited in the time of his questions
[21] to the time that he's represented to Corporal Weaver
[22] that he has, which is approximately 15 to 25 minutes.
[23] Would you agree to that, counsel?
[24]    MR. van der VEEN: No, I'm not. I

[1] don't know what his answers are going to be, quite
[2] frankly. But I will keep it as short and as brief as
[3] I can; okay? I don't see it going over half an hour.
[4] Maybe it will. Maybe it will. Maybe it will go 33
[5] minutes. I just don't know. But I'm going — I'm
[6] not going to waste your time. I'll be as efficient
[7] as I can with my questions; is that fair?
[8]    THE WITNESS: I understand.
[9]    MR. van der VEEN: Okay. Thank you.
[10]    THE WITNESS: Can I get you to make
[11] copies of those so I can take those with me, please,
[12] and put those back in the file — copies.
[13]    MR. van der VEEN: Yeah.
[14]    (Discussion held off the record.)
[15]    MS. RISK: Corporal Weaver, just
[16] before you leave, I just want to remind you that
[17] because you are still under deposition and an oath,
[18] that it's your duty not to speak to anybody,
[19] including Mr. van der Veen or anyone from his office
[20] or myself or anyone from my office.
[21]    THE WITNESS: Understood.
[22]    MS. RISK: Do you understand that?
[23]    THE WITNESS: Not a problem.
[24]    MS. RISK: Except with regard to

[1] rescheduling your deposition.
[2]    THE WITNESS: Not a problem.
[3] Understood.
[4]    (Discussion held off the record.)
[5]    (Deposition concluded at 2:08 p.m.)
[6]          INDEX
[7] BY MR. van der VEEN:   336
[8]    BY MS. RISK:   393
[9] BY MR. van der VEEN:   558
[9]
[9]        EXHIBITS
[10] NAME      DESCRIPTION      PAGE
[11] Weaver 10  Color Accident Scene Sketch   336
[12] Weaver 11  Black-and-White Copy of Exhibit  336
[12]      Weaver 10
[13]
[13]    Weaver 12  Handwritten Notes      336
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

[1]       CERTIFICATION
[2]
[3]
[4]    I, ADAM D. MILLER, Registered
[5] Professional Reporter, certify that the foregoing is
[6] a true and accurate transcript of the foregoing
[7] deposition, that the witness was first sworn by me at
[8] the time, place and on the date herein before set
[9] forth.
[10]    I further certify that I am neither
[11] attorney nor counsel for, not related to nor employed
[12] by any of the parties to the action in which this
[13] deposition was taken; further, that I am not a
[14] relative or employee of any attorney or counsel
[15] employed in this case, nor am I financially
[16] interested in this action.
[17]
[18]
[19]
[20] Adam D. Miller
[20]    Registered Professional Reporter, Notary Public,
[21] and Certified Shorthand Reporter of the State of
[21]    Delaware #109-RPR (Exp. 01-31-2008)
[22]
[23]
[24]